UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  2:18-CR-00759-CJC-4 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| AARON EASON, | ) | Friday, November 2, 2018 |
| | ) | (10:06 a.m. to 10:54 a.m.) |
| Defendant. | ) | |


DETENTION HEARING


BEFORE THE HONORABLE ROZELLA A. OLIVER,
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For The Government:          PATRICK FITZGERALD, ESQ.
                             Assistant United States Attorney
                             312 North Spring Street
                             Los Angeles, CA 90012


For The Defendant:           JOHN N. McNICHOLAS, ESQ.
                             McNicholas Law Office, LLC
                             464 Palos Verdes Blvd.
                             Redondo Beach, CA 90277


Court Reporter:              Recorded; CourtSmart

Courtroom Deputy:            Donnamarie Luengo

Transcribed by:              Exceptional Reporting Services, Inc.
                             P.O. Box 18668
                             Corpus Christi, TX 78480-8668
                             361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1   **Los Angeles, California; Friday, November 2, 2018; 10:06 a.m.**

2   **(Call to Order)**

3   **THE COURT:**  Calling Case MJ-18-2791, *United States of*

4   *America versus Aaron Eason.*

5   Counsel, your appearances, please?

6   **MR. FITZGERALD:**  Good morning, Your Honor.  Patrick

7   Fitzgerald on behalf of the United States.

8   **THE COURT:**  Good morning, Mr. Fitzgerald.

9   **MR. McNICHOLAS:**  Good morning, Your Honor.  John

10  McNicholas appearing on behalf of Aaron Eason, who's present in

11  custody.

12  Also, Your Honor, with me at counsel table is Florida

13  attorney Augustus Invictus, who is planning on being involved

14  in this case.  And we're asking if he can remain at counsel.

15  He is Mr. Eason's private attorney.

16  **THE COURT:**  Okay.  Let me ask -- thank you very much

17  -- is it Mr. Invictus?

18  **MR. INVICTUS:**  Yes, ma'am.

19  **THE COURT:**  All right.  Have you -- are admitted into

20  the central district?

21  **MR. INVICTUS:**  No, ma'am, I've not --

22  **THE COURT:**  Okay, all right.

23  **MR. INVICTUS:**  -- (indisc.) yet.

24  **THE COURT:**  Okay.  I think then for purposes of

25  today, I don't think you can participate.  I didn't hear

1  Mr. McNicholas saying that he would be participating, but

2  instead --

3          **MR. McNICHOLAS:**  He's -- he will be -- I just want

4  him to stay at counsel table.  He's a witness.

5          And we -- actually, we have a proffer regarding

6  something that happened with Mr. Invictus and the Defendant.

7  And the Government's aware of it.  And so he may actually

8  testify.

9          **THE COURT:**  Okay.  Well, why don't we take it one

10 step at a time.  And please be seated.

11         And then Mr. Eason, I see that you're here; good

12 morning, sir.

13         **DEFENDANT EASON:**  Good morning.

14         **THE COURT:**  Okay.  We are here, as you know, on a

15 continued detention hearing.  I have had an opportunity to

16 review the updated Pretrial Services report.

17         And I've also received the Defendant's memorandum in

18 support of his release pending trial.  Mr. Fitzgerald, have you

19 had an opportunity to review the memorandum?

20         **MR. FITZGERALD:**  I have, Your Honor, yes.

21         **THE COURT:**  Okay, all right; thank you.

22         So why don't we just begin.  First, I'll take the

23 Government's proffer again.  And then I'll hear from

24 Mr. McNicholas.

25         **MR. FITZGERALD:**  Your Honor, the Government proffers

1    the complaint in this matter, the contents of the Pretrial

2    Services report.

3           And it also proffers that yesterday afternoon, a two-

4    count indictment against the Defendant and other members of the

5    RAM organization was returned by the grand jury, one count at

6    18 USC; Section 371, conspiracy, and then 18 USC; 2101, riot --

7    an aiding and abetting, rioting.

8           **THE COURT:**  Okay.  All right.  Thank you very much.

9           Mr. McNicholas, so I will hear you first.  Why don't

10   you go ahead and state what you're prepared to offer in support

11   of bond in this case?  And then I'll hear argument as well.

12          **MR. McNICHOLAS:**  Your Honor, for general information

13   -- and we offer the complaint and the Pretrial Services report,

14   and that Mr. Eason had never been arrested in his life prior to

15   October 28, 2018.  He's 38 years old.

16          Number two, Mr. Eason has lived in the central

17   district of California for about 98 percent of his life.  He

18   also lived in Portland.  I believe he lived in Arizona for just

19   a few months at one point in like 2000.

20          Mr. Eason has never been to Europe.  There were some

21   comments about the organization having ties to Europe and

22   actually going there for some kind of training.

23          Mr. Eason has never been to Europe.  Mr. Eason has

24   been outside of the United States two times his entire life,

25   once at age 10.  And another time a few years later, they were

1    both (phonetic) to Mexico with his family.

2            His entire family, except for one brother who lives

3    in Arizona, is here.  His father, his mother, his sister, and

4    his brother, and his daughter are all in the back row.  And I

5    would proffer the testimony from his father, Walter Eason,

6    regarding some of the issues that have been alleged in the

7    amended Pretrial Services report.

8            So we have a situation where the individual's never

9    been arrested before, and suddenly, he's charged with a crime

10   of inciting or remaining in a riot, which carries a maximum of

11   five years' imprisonment, how -- when I read the statute.

12           I believe, just based on the statute itself, that the

13   time and imprisonment is not enough for a reasonable person to

14   want to commit flight, because you can also get probation off

15   of this offense if you are convicted, assuming that you are in

16   fact guilty.

17           Regarding the flight issue, apparently, the news on

18   the mainstream media came out midweek last week that there was

19   a warrant for Mr. Eason's arrest.  Mr. Eason found out from his

20   father that there was a warrant for his arrest, that the FBI

21   was looking for him.

22           Mr. Eason didn't know what to do.  He's never --

23   remember, he's never had issues with the law in his life.  So

24   the logical thing to do is of course try to find a lawyer.

25           So Mr. Eason calls around trying to find a lawyer in

1    the area where they live up in Anza.  It's far away from a lot;

2    I mean there's not a lot out there where he lives.

3           East of him, no -- it's not like they're right next

4    to San Bernardino or even Riverside.  It's a long ways to go

5    from there.

6           Eventually, a friend referred Augustus Invictus, who

7    is an attorney from the state of Florida, licensed in four

8    states.  And this is up his alley, these issues; he's dealt

9    with these issues before.

10           So Mr. Eason contacted Augustus Invictus.  I'm

11    proffering the testimony of Mr. Invictus.  He's prepared to

12    testify.

13           I don't know if the Government wants to accept the

14    testimony or not.  But the bottom line is this; the information

15    I had is that Mr. Invictus spoke to Mr. Eason on either Friday

16    or Saturday, the 26th or 27th of October.

17           He -- they agreed that Mr. Invictus would be his

18    counsel on this matter, and that Mr. Eason wanted to know what

19    should he do.  The advice of counsel, based upon his fear of

20    Government retaliation or danger regarding the FBI was, wait

21    for me, we'll turn you in together, we will drive to the FBI

22    together, I will drop you off at the office.

23           Mr. Invictus was flying from Florida.  He did not

24    arrive until Sunday the 28th.  As soon as Mr. Invictus arrived,

25    he escorted Mr. Eason to the FBI office on Wilshire Boulevard.

1          They met with the FBI agents.  He turned himself in;

2   and he remained in custody ever since.  So that's the extent of

3   what you could call some sort of flight issue.

4          I believe he did what most ordinary human beings do

5   when they're charged with a criminal complaint, is they find a

6   lawyer, they try to do it the best they can, so they're not

7   arrested and they're not subject to the byproducts of an

8   arrest, especially where they live out in that property.

9          Now, in the amended Pretrial Services report, there

10  is additional information regarding Walter Eason.  Walter Eason

11  has no criminal record either.  He's lived in the central

12  district his entire life.

13         And when the FBI came to his property, Walter Eason

14  was just simply putting the FBI on alert; he said, you know,

15  400 feet from our property, there is a Marijuana growing farm;

16  and I just want -- just be careful out there, because these

17  guys, you don't know if they're going to shoot you, if you

18  happen to stumble upon their property.

19         Well, in the amended report, the commentary that I'm

20  reading, are like, oh, Mr. Eason's actually the bad guy, and he

21  might shoot somebody or some of his family member might shoot

22  somebody.

23         That's not the case.  We're dealing with a very

24  reasonable ordinary group of people that are all together.

25  They all work.  They all have jobs.  Everybody's gainfully

1    employed.

2           So that wasn't the point.  Yes, there are a few

3    firearms on the property.  But if the Court were to release

4    Mr. Eason, the firearms would be removed from the property.

5           And that would obviously be a condition that he

6    couldn't go to the property unless the firearms are removed.

7    There are a few firearms on the property.

8           Now, this Rise Above movement, Aaron Eason is not a

9    member, period.  He never was a member.  The three codefendants

10   in this case, maybe they're members and maybe they're not

11   members.

12          But the bottom line is, Aaron Eason's had very little

13   contact with any of those people.  He doesn't know them on a

14   personal level.  They are not his friends.

15          They associated for the purpose of going to this

16   Berkley rally, because Mr. Eason ended up putting a van on

17   somebody else's credit card and signed the contract for the van

18   for the basic premise that he was the only individual in the

19   van that was actually old enough to rent the van.

20          So he was designated to do it.  He used somebody

21   else's credit card.  So he rented the van, so then went up to

22   this rally.

23          Now, I believe, Your Honor, based on the facts that

24   I'm reading, and going to the facts, which are the least

25   important part of the release issue, but still significant, is

1    that conservative rallies, Donald Trump rallies, right-wing

2    rallies, rallies based on the First Amendment speech,

3    regardless of the content, are still protected, still

4    protected.

5           Yet this group of people, anarchists, Antifa,

6    communists, whatever you want to call them, have been

7    inflicting violence upon Donald Trump supporters, upon

8    conservatives, upon right-wingers, upon white supremacists,

9    whatever, they've been doing it, and they've been showing up at

10   events where these people have been peacefully speaking and

11   peacefully marching, throwing anything from eggs in the face,

12   to locks over the head, to mace in the eyes, over, and over,

13   and over again.

14          So these people see this stuff on the news, and

15   they're going, why doesn't the police protect speech?  They're

16   not protecting speech.

17          Why can't we do something?  Can something be done?

18   Well, why can't we just go there, at least to stand by?  Why

19   can't we go there to stand by?

20          And as -- when they stand by, the confrontation

21   begins.  The -- I mean there's thousands of videos on the

22   internet, Your Honor, regarding what's going on.

23          Berkley, almost the entire Berkley April 15th, 2017

24   rally is captured on video.  And virtually all that I've seen

25   is Antifa going to the conservative, or right-winger, Trump

1    supporters, whatever they are, and right in their face,

2    aggressively instigating confrontation.

3              I attached several exhibits, Your Honor, because I

4    think those exhibits are important.  In addition to the two

5    letters that I have, Your Honor -- and I'll just mention those

6    briefly, because those go more towards the integrity of

7    Mr. Eason -- the first letter is from a veterinarian in the

8    area, Mrs. Anderson, who actually employed Mr. Eason to do

9    landscaping work on -- for the community of Anza, where they

10   actually went, and put up decorative signs throughout the

11   community.

12             And he has actually assisted her before.  And when

13   there was a fire in -- on her property, he was the first one to

14   go there and protect the property.  So she wanted to make that

15   clear.

16             And any thought that Mr. Eason is a white supremacist

17   is completely beyond her belief, because she actually sees him

18   on a daily basis.  And that is not her opinion of Mr. Eason at

19   all; okay?  So this is somebody that actually knows her.

20             Also, I included a letter from Mr. Eason's brother-

21   in-law.  And he has also stated that Mr. Eason did work for

22   him, and -- when they were doing landscaping.

23             Also, Your Honor, I'm proffering that Mr. Eason also

24   had a job as a bartender at a winery.  And he worked at a feed

25   store in the area as well.  So he's kept himself busy.

1          His dad, Walter Eason, they have a deal; take care of

2     this property, cook our meals for us, keep the place clean, and

3     you can stay here, you and your daughter can stay here.   And

4     Mr. Eason's 13-year-old daughter is also here in the courtroom.

5          The two of them live together.   The mother is not the

6     caregiver for that child; Mr. Eason is.   The -- Mr. Eason is

7     the provider and the caregiver.   And Mr. Eason, his father

8     Walter, and his brother Tim, and his daughter, they all live in

9     that house together.

10          There's another residence on the property; it's

11     actually a converted barn.   That's where Mr. Eason's mother

12     lives, because the parents are divorced.   And his sister and

13     his sister's family live in that converted barn.

14          So those people are all on this property.   It is not

15     an active ranch; it's just a property; it's a -- it's land, and

16     it's where they live.   It's been in the Eason family for a few

17     generations.   Mr. Eason owns the property outright.

18          So anyway, those are Exhibit 1 and 2.   Exhibit 3,

19     going down the list, has to do -- I put that out there, because

20     I think it's really important that that shows significantly

21     that the three codefendants, they're all in-action photos;

22     okay?

23          They're actually -- those photos were taken at events

24     at rallies, days where there was actually confrontation.   Aaron

25     Eason, they don't have anything; there's no pictures of him

1    punching people or getting in fights with anybody.  They took a

2    DMV photo.

3          So here, we have Rondelle (phonetic) Bowman and Laub

4    (phonetic); and they're action photos.  And you got a picture

5    of Aaron Eason smiling for the camera when he's getting his

6    driver's license.

7          I think that's important, Your Honor, because Aaron

8    Eason was never in the picture in this case until he

9    communicated with the individuals about going to Berkley, and

10   they're taking a van, they're going to do some training.

11         And then they go to Berkley.  And you never hear

12   about Mr. Eason again.  Despite the history of this RAM

13   movement, despite the allegations of white supremacy, Aaron

14   Eason is in this picture for a short period of time.

15         Exhibit 4 through 7 illustrates who the true

16   aggressors are.  And it is the Antifa, communist, anarchist

17   movement that is stifling speech in places like Berkley, in

18   places like Portland, in places like Washington DC.

19         It is a very difficult position for some reason.  I

20   don't know why law enforcement stands down.  But the Berkley

21   Police definitely stood down on April 15th.

22         They waited for all these events to happen.  They

23   actually -- in Exhibit 4, this is actually a photograph of an

24   individual hitting a -- basically a helpless victim over the

25   head with a bike lock.

1          The individual who hit him over the head with a bike

2    lock was prosecuted by local authorities.  He ended up with a

3    misdemeanor.  But he did some pretty serious damage.

4          It's all on video for the world to see.  But it was a

5    pretty violent act.  The guy was sitting here engaged with the

6    women standing in front wearing a mask; those are Antifa

7    members.

8          And suddenly, somebody behind the man with the hoodie

9    pops out with a lock in his hand and hits him over the head

10   gushing blood.  He had to be -- he had to go to the hospital

11   and get -- and be treated.

12         Okay, so that was significant.  That is when police

13   actually stepped in at that Berkley rally.

14         The next picture just illustrates the type of person

15   who is there, the antagonizers, the communists, the anarchists,

16   who actually go to these rallies.  This is a woman who makes

17   very clear what her positions are, that she was headed to

18   Berkley to disrupt the neo-white supremacist jerk circle today,

19   nervous but determined to bring back 100 Nazi scalps.

20         And then she gets there.  She's got a wine bottle in

21   her hand during the video, during when there was actually

22   rioting going on.  That's what she's got for her weapon as

23   she's jumping into the crowd, to do damage.

24         I know this woman is fairly notorious for her

25   actions.  And she's on Twitter, and on Facebook, and everywhere

1    else, just advertising what she does.

2              We also wanted to show Exhibit 6, because Exhibit 6

3    is the Berkley April 15th.  And there were actually -- many of

4    these people were wearing Trump, support Trump, Donald Trump t-

5    shirts.

6              And they're in the street in downtown Berkley.  And

7    cars are trying to drive through.  Well, the Antifa guys, all

8    the guys here with the hoodies, and the masks, and everything,

9    standing on the right, are blocking traffic; they're not

10   letting people go through.

11             So the ones on the left were there basically trying

12   to get the cars escorted through, so that they could get

13   peacefully to their destination.  Confrontation obviously

14   resulted.

15             But there is a video, Your Honor, that I watched,

16   that shows these -- Trump's -- people with Trump t-shirts on,

17   people that are part of Mr. Eason's group that were actually

18   trying to help these cars move through.

19             Then also, Your Honor, I attached another photograph

20   with the individual being struck by a skateboard.  He's wearing

21   a Trump t-shirt.

22             The individual hitting him is an Antifa member

23   wearing a mask.  And then the final Exhibit 7 was just an

24   illustration of what these people were up against.

25             You see a guy just basically sitting down, being

1    confronted by a mob of Antifa members, most of them masked, but

2    the woman in front who is yelling, get the fuck out of here,

3    you racist piece of shit, she's not wearing a mask; she's

4    wearing sunglasses and a hat, and she looks like she might be a

5    leader of the group.

6            Within seconds, there's an individual standing behind

7    the woman.  He's wearing a motorcycle helmet and a mask.  His

8    face is covered.

9            Within seconds, that individual goes to a helpless

10   World War II veteran sitting in a wheelchair, takes the

11   veteran's water bottle from his hands and sprays it all over

12   his body.  And that's depicted in Exhibit 7.  I showed the

13   screen shot of that.

14           That's the reality of what happened in Berkley.  It

15   has nothing to do with viewpoint.  It has nothing to do with

16   white supremacy.  It has nothing to do with going after certain

17   groups because they have things to say about other groups.

18           Mr. Eason is not a flight risk.  Conditions are

19   definitely -- conditions can be fashioned to make sure that he

20   appears at every court appearance.

21           And conditions can be fashioned to ensure that if in

22   fact anybody considers him a danger to the community, that he

23   will not be a danger to the community.  Number one, he doesn't

24   know those codefendants; he wants to be severed from them.

25           A condition that he have no contact with

1    codefendants, or any members of RAM, or any members of any

2    white supremacy group, or any other hate group, or whatever

3    people think, is an appropriate condition, because Mr. Eason's

4    moved on, he's not part of that.  So that's an appropriate

5    condition.

6         Curfew is an appropriate condition.  I mean house

7    arrest would be an appropriate condition as well, but I don't

8    believe, Your Honor, that he's done anything to require house

9    arrest; but it would -- I mean you could do that as well.  I've

10   asked for curfew.

11        Staying in the central district of California, he's

12   never had a passport in his life, so that's not an issue.  And

13   removing weapons from the property, of course is something that

14   can be done as well.

15        I do believe, Your Honor, that this group has been

16   targeted.  It is definitely viewpoint discrimination against

17   certain people.

18        I don't know why the FBI has decided to go after

19   Mr. Eason and a few others.  I know that they were on the

20   property just a couple days ago with a search warrant, looking

21   for additional, whatever they could find to link him to hate

22   groups or whatever.

23        So they're still after him; they're still looking for

24   information.  But that's not what he's being charged with; he's

25   being charged with being involved with a riot, inciting and

1   carrying on a riot.

2          Well, what did he do to that?  There's no evidence he

3   did that.

4          **THE COURT:**  All right, thank you very much,

5   Mr. McNicholas.

6          All right, any response from the Government?

7          **MR. FITZGERALD:**  Yes, Your Honor.  First, again,

8   because the indictment has been returned, and there are two

9   counts, the Defendant is looking at a 10-year possible

10  sentence.  And the difference between 10 years and five years

11  is relevant to the risk of flight.

12         Going in reverse order to the points that were made

13  by Defense counsel; first, in regard to Mr. Eason's conduct,

14  the complaint and the indictment do charge Mr. Eason with being

15  a member of the RAM group.

16         And as set forth in the complaint and the contents of

17  the Pretrial Services report, there is ample evidence to

18  support that charge.

19         In particular, I would note on paragraph 55 of the

20  complaint, the Defendant sent a text message on September 25th,

21  2017, which was after the events in Charlottesville (phonetic),

22  saying, back in position to go hard with activism, but said he

23  had been sidetracked after Berkley.

24         So the idea that he had just an intermittent contact

25  with members of the group for this one event and then had

1    severed ties of last interest is not particularly accurate.

2              Furthermore, along with organizing and setting up the

3    transport to the Berkley event, he also was setting up and

4    inviting people to training, as set forth, for example, in

5    paragraph 33 of the complaint.  And again, they had talked

6    about providing, quote/unquote, security for events.

7              And also, as set forth in the complaint, what the

8    Government is charging and what the evidence supports is that

9    these were not persons who were at a rally or assembly

10   exercising their First Amendment rights.

11             There were, of course, many people there who were

12   doing that.  But also, they went there with the intent and the

13   understanding to engage in violent activities, or in fact to

14   riot.

15             And in fact, even as Defense counsel described it,

16   the event at Berkley was a riot.  And what happened there, as

17   set forth in some of the materials, again listed in the

18   complaint, was in fact the members of RAM, including to a

19   degree, the Defendant did actively engage with persons that

20   they perceived to be ideological enemies, and assaulted them,

21   and otherwise engaged in the violent activities that are

22   covered by the statute.

23             So this is not a situation where people were

24   exercising their First Amendment rights, obviously which should

25   be protected, and then engaged in self-defense when confronted

 1   with others, were people, A, who were proactively looking for

 2   trouble, and B, were in often cases, the aggressors.

 3         And while certainly, to the extent that members of

 4   the assembly were attacked by other persons, that is

 5   regrettable, and it may be at some point, those other persons

 6   should also be charged or will be charged, that does not excuse

 7   the activities of the group or of the Defendant.

 8         Finally, in regard to the discussion of the

 9   ideological interests, and statements, and general position of

10   white supremacy, that was expressed by the members of RAM, that

11   is not charging people for having a particular ideology per

12   say; but it is relevant to showing the nature of the group, the

13   aims of the group, and what the group wanted to accomplish,

14   namely in this case, for this charge, rioting, preparing for

15   riot, inciting a riot.

16         And I think the white supremacist views that are

17   suppressed and established throughout the complaint adequately

18   show the relevance of that to the charges that we are bringing.

19         And then, in regard to the flight risk, even under

20   the circumstances that are described by the Defense, we have a

21   Defendant who was aware that there was a arrest warrant out for

22   him.

23         I can certainly proffer that the FBI was very clear

24   in talking to the Defendant's father, that the Defendant needed

25   to turn himself in immediately.  And they were certainly

1    willing to discuss how he could do that in the safest manner

2    possible.

3            Furthermore, even under the circumstances that we've

4    received from the Defense proffer, there are inconsistencies

5    with the father talking to the Defendant, talking about getting

6    an attorney, while what the FBI was being told was that the

7    Defendant was unavailable and was out somewhere in the desert.

8            So that goes both to the credibility of the father,

9    the credibility of the proffer, and then the credibility of the

10   father as a potential surety in the case.

11           In regard to the proffer regarding the advice of

12   counsel, I've discussed with counsel, and they've agreed,

13   because the advice of counsel has been proffered to this Court,

14   that there's been a limited waiver of the attorney/client

15   privilege.

16           I would prefer not to put a fellow attorney on the

17   stand if that's not necessary.  But I would ask through the

18   Court if we could have a supplemental proffer, where the timing

19   and the circumstances of the discussions between counsel and

20   Defendant occurred; did they occur over the phone, did counsel

21   know where the Defendant was when those discussions took place.

22           **THE COURT:**  Okay.  All right, thank you, very much.

23           All right, Mr. McNicholas, why don't I first pick up

24   where Mr. Fitzgerald left off there with the request for the

25   supplemental proffer.  I do agree that there has to be a

1  limited waiver of the attorney/client privilege if --

2          **MR. McNICHOLAS:**  Yes.  And --

3          **THE COURT:**  -- Mr. Invictus is offering that.

4          **MR. McNICHOLAS:**  -- Mr. Eason is waiving that

5  privilege.

6          **THE COURT:**  Okay.

7          **MR. McNICHOLAS:**  Yes.

8          **THE COURT:**  All right.  Have you had an opportunity

9  to talk to Mr. Eason about that?

10         **MR. McNICHOLAS:**  Yes, I have, Your Honor.

11         **THE COURT:**  Okay.

12         **MR. McNICHOLAS:**  The communication, as I stated

13 during my opening statement, was that the communication was on

14 Friday, the, I believe it's October 26th, between Mr. Eason and

15 Mr. Invictus.

16         And the discussion was, you wait for me, we will turn

17 you in together.  And appointment was made.  Mr. Invictus

18 contacted the FBI.

19         He set up an appointment to meet them on Sunday

20 afternoon, October 28th.  And it was done; and it happened.

21 They met at the federal building.

22         The building's closed on Sundays, but they met there.

23 And Mr. Eason voluntarily surrendered to the FBI.  And by the

24 way, Your Honor, 30 years I've been doing this, criminal

25 defense work.  And occasionally, I -- an individual contacts me

1  who has a warrant for his arrest, wanting to know what to do.

2         I do exactly what Mr. Invictus does; let's figure out

3  a way to turn yourself in, so they don't come marching to your

4  house busting your door down, scaring your family and your

5  children, and we'll do this peacefully, the right way, we'll

6  surrender directly to them.

7         It is the appropriate, and peaceful, and reasonable

8  method of surrender.  Especially, in this case, you've got

9  press all over the place.  Everybody's just dying to take blood

10  of these so-called white supremacists.

11         It wasn't a good situation at all.  If anything,

12  there was legitimate concern for Mr. Eason's safety.  So 100

13  percent reasonable what went on there.

14         I don't think the Court should hold that in any way

15  against Mr. Eason, because it lasted a couple of extra days,

16  because he's waiting for his attorney to come from Florida.

17         Another thing, I do not accept the proffer of the

18  Government, that Mr. Eason is a member of RAM.  They need to

19  prove it; there's no proof of that, okay, there's none

20  anywhere.  So they need to prove that.

21         Number two, Mr. Eason has never been to

22  Charlottesville.  If they're going to bring up the word

23  Charlottesville, prove that as well.  I don't accept any

24  proffer that has anything to do with Charlottesville.  That's

25  irrelevant; it has nothing to do with this case.

1          **THE COURT:**  All right, Mr. McNicholas, why don't I

2    share with you some of my concerns and ask you to respond to

3    them?  So I'm looking at the affidavit.  And so what I have

4    here is -- I look at the timeline.

5          **MR. McNICHOLAS:**  Right.

6          **THE COURT:**  And again, this is based -- focusing on

7    what Mr. Eason was alleged to have said, either through social

8    media, text messages.

9          So we have him identifying himself, and then

10   referencing the Huntington Beach rally, and then after that,

11   undertaking the, what I think can be fairly characterized as

12   organizational steps with respect to the upcoming Berkley

13   rally.

14          And so -- and this is in paragraph 32 -- I mean

15   paragraph 34, the reference to training and preparation for

16   Berkley.  And then the description, paragraph 37, of what

17   transpired at Berkley, including these images of Mr. Eason --

18          **MR. McNICHOLAS:**  Mr. --

19          **THE COURT:**  I think that's, again, paragraph 37.  And

20   then I have after that, I have, I believe the description of

21   the pursuit in paragraph 40, which identifies Mr. Eason as one

22   of those.

23          And then the reference to -- excuse me -- the

24   statements attributed to Mr. Eason about after Berkley, ready

25   to go hard with activism.

1           **MR. McNICHOLAS:**  Right.

2           **THE COURT:**  And so I don't construe what was --

3    what's in the affidavit as saying that Mr. Eason was at

4    Charlottesville, but rather just simply after what transpired

5    in Charlottesville, that there was a, perhaps a quiet period.

6           **MR. McNICHOLAS:**  You know, as far --

7           **THE COURT:**  But -- so I guess -- so -- but let me

8    just be clear on what my concern is.  So we have the Huntington

9    Beach rally, right, with -- I think without their -- at least

10   publicly described about the activities of this group.

11          And then we have what happens at Berkley, and then

12   these images of individuals assaulting other protestors.  And

13   then what I have in front of me -- and there's a finding of

14   probable cause by a magistrate judge with respect to that --

15   and now, I have the proffer of the indictment --

16          **MR. McNICHOLAS:**  Okay.

17          **THE COURT:**  -- of violence occurring.  And then I

18   have description of Mr. Eason standing there.  And again, I

19   think that was -- well, somebody else alleged to be in this

20   movement is assaulting someone, another protestor.

21          **MR. McNICHOLAS:**  Right, right, Your Honor.

22          **THE COURT:**  And then -- but then here's my concern

23   about the danger, Mr. McNicholas, is after all that.  But

24   there's no, at least not from what I'm seeing, kind of like a

25   disavow of this.  I'm not -- this isn't what I signed up for,

1    this is -- this has gone beyond the First Amendment viewpoint.

2              And instead, I then have the post-Berkley, I'm ready

3    to go hard with activism; and that's --

4              **MR. McNICHOLAS:**  Your Honor --

5              **THE COURT:**  -- paragraph 55.

6              **MR. McNICHOLAS:**  -- and I would like to comment on

7    that.

8              **THE COURT:**  Please.

9              **MR. McNICHOLAS:**  Mr. Eason was literally going to be

10   involved in planting trees.  That is what that text is speaking

11   to.  It has nothing to do with the rallies; it has nothing to

12   do with violence; it has to do with legitimate concern for his

13   community and planting trees.

14             And Your Honor, I got a letter right there that you

15   have, Exhibit 1.  Mr. Eason is around the community.  He's

16   beautifying the community.

17             He's putting signs up.  He's a landscaper.  He

18   literally was talking about planting trees.  And without more,

19   there is nothing else.

20             **THE COURT:**  So --

21             **MR. McNICHOLAS:**  I mean to infer that that means

22   anything that is a -- that is criminal, is beyond belief.

23             **THE COURT:**  So in paragraph 55, where it says, I'm

24   back in the position to go hard with activism?

25             **MR. McNICHOLAS:**  Yeah, hard with activism.

1          **THE COURT:**  I got sidetracked after Berkley?

2          **MR. McNICHOLAS:**  Yeah.  And by the way, Your Honor,

3   when you say there was no disavow, he did get sidetracked after

4   Berkley.  He was disheartened after Berkley, after seeing what

5   went on in Berkley, he did step back; he didn't want to be

6   involved in a violent atmosphere.

7          He did make an effort to lead -- and do you know

8   what, Your Honor; he did leave.  He hasn't been there; he has

9   not been there.

10          April 15th, 2017, a year-and-a-half ago, one day,

11   where no photographs are of him, Your Honor -- by the way,

12   Mr. Eason disputes that he's in any photographs.

13          There's a claim that he's in a photograph with a

14   banner.  I don't believe he is; okay?  There's no photographs

15   of Mr. Eason engaged in any kind of confrontational conduct.

16          Again, it's about protecting speakers, about

17   protecting viewpoint.  But the theme is assault; and it's just

18   not the case.  And I mean that will be litigated later on.

19          But even assuming that's the case, a man who's had a

20   life of no crime, a life of no violence -- and I do disagree

21   that it's a consecutive term, because I believe they merge; I

22   believe the conspiracy merges with the 2101 allegation.

23          I do believe it's a five-year maximum.  I mean maybe

24   the Government will continue to argue with me on that; but I do

25   believe they merge, and it is a five-year maximum; okay?

1          This is an individual that deserves a chance.  His

2   family is here; they are willing sureties.  Whatever the

3   Government -- whatever the Court asks from them, I'm sure they

4   will agree to do.

5          I am 100 percent sure that Mr. Eason will be a

6   remarkable individual on pretrial release.  There will be no

7   concerns.  There will be no issues about him going to rallies

8   or events if there were.

9          The internet's pretty big, he's now an infamous

10  individual, and people will know.

11         **THE COURT:**  All right, thank -- anything else,

12  Mr. McNicholas?

13         **MR. McNICHOLAS:**  No, Your Honor.

14         **THE COURT:**  Okay.

15         Mr. Fitzgerald, with respect to the flight danger, I

16  -- as I already expressed to Mr. McNicholas, my concerns about

17  danger, when I look at the flight component or analysis, I see

18  an individual who did self-surrender, eventually not long after

19  being notified.

20         And then I see an individual with no criminal history

21  and who now has willing sureties.  So while I have my concerns

22  about danger, I guess I -- from my position, I do see a

23  condition or combination of conditions with respect to flight.

24         And so I just want to give the Government an

25  opportunity if it wants to be heard on flight.

1          **MR. FITZGERALD:**  Yes, Your Honor.  First, I would

2     state that a person who -- aware of a search warrant and --

3     excuse me -- an arrest warrant and an order of the Court, and

4     is aware that the FBI is actively looking for him and is trying

5     to arrange to have him surrender as soon as possible, feels

6     that it is appropriate to delay, to discuss, determine what's

7     in his best interest, is someone who when he makes that

8     calculus in the future could well decide once again not to

9     appear in court.

10          Second, I'll just reiterate the sureties and the

11     circumstances, whereby he would let out are involved with his

12     family, the property.  And I believe he have shown why there

13     are issues there, where at least one of the surety members, the

14     father, was not being candid with law enforcement regarding the

15     location of his son.

16          And I'll note, despite by request, we have not heard

17     from the Defendant's private counsel where the Defendant was

18     when these telephone calls took place.  And it's certainly

19     possible he was actually at the house with his parents in a

20     safe place, where they simply could have called up the FBI and

21     said, please come and in a low-key nonconfrontational way,

22     please, I'll surrender, you can arrest me.

23          And certainly, I think nothing in the case or

24     anything in the record suggests that the FBI was looking to go

25     in, in a SWAT-sort of mode and was trying to make this as

1    dramatic and violent as possible; quite the opposite.

2            Furthermore, in regard to the number of sureties,

3    there was a suggestion in the Defense memorandum that there

4    would be $100,000; but that would appear to be unsecured.  And

5    I would suggest that any sort of surety that would guarantee

6    the Defendant being here would have to be a larger amount and

7    would have to be secured by real property.

8            **THE COURT:**  Okay.  All right, thank you very much.

9            Anything else, Mr. McNicholas?

10           **MR. McNICHOLAS:**  No, Your Honor.

11           **THE COURT:**  Okay.

12           All right, so Mr. Eason, we -- I've heard from the

13   attorneys.  I've evaluated the information in the complaint and

14   the affidavit, as well as the information in the Pretrial

15   Services report.

16           And I've tried to let your attorney know where my

17   concerns are.  And I still have the same concerns that I

18   mentioned to Mr. McNicholas.

19           And it concerns the danger here, the safety of the

20   community, and whether or not a condition or conditions can be

21   fashioned that will ensure the safety of the community.

22           So I know that your attorney disagrees with what I'm

23   about to say.  I'll let you make a record, Mr. McNicholas,

24   after this.  But I have in front of me the information

25   contained in the affidavit.

1          And I spent a lot of time looking at the timeline

2    that's set out in that affidavit, what's described about this

3    organization RAM.  I took a look at the statements that are

4    attributed to you and what's described about your participation

5    and/or involvement at Berkley.

6          And what I take away from that is that you appear to

7    understand what the movement, this movement was doing or did in

8    appearing at (indisc.) appearing at these events, these

9    rallies, that you took steps to arrange, not only for

10   transportation, but some type of training.

11         I don't have any more information about that.  Your

12   attorney will be able to make arguments about what that really

13   means, based on your understanding or your view.

14         But I have just this limited information; and then I

15   have the description about you and what you were doing while

16   you were at the Berkley rally.

17         And then I have a statement after that, when it

18   appears to me that you should know or should've known what the

19   movement was attempting to do, based on the violence that

20   occurred at Berkley, and then knowing all of that.

21         Again, as I had come back to a couple of times, I

22   have this paragraph showing that you are not -- it's not

23   withdrawing from the movement or the conspiracy that's been

24   charged, but instead, you are still participating.  I'm

25   referring again to the paragraph 55.

1          I appreciate what Mr. McNicholas is saying and trying

2     to explain that.  I don't -- I guess I -- within the four

3     corners of the affidavit, I just -- I don't see that as a

4     reasonable description that can somehow make that not of

5     concern to the Court.

6          So for that reason and for those reasons, Mr. Eason,

7     I'm going to order that you be detained and remanded to the

8     custody of the marshals while this case is pending.

9          All right, Mr. McNicholas, do you want to state

10    anything on the record?

11         **MR. McNICHOLAS:**  I will say that the Court has the

12    premise wrong.  It is clearly inaccurate that the group of

13    individuals that did go to Berkley went there to defend

14    speakers, to defend people who were exercising their First

15    Amendment rights.  And when they were being attacked

16    physically, they defended them.

17         However, with that in mind, Mr. Eason never committed

18    a crime.  And even -- the evidence that we've seen so far, so

19    minimum, so transparent, it does not go to the essence of

20    criminal activity.

21         Again, the Rise Above movement is a figment of the

22    Government's imagination, at least regarding Mr. Eason.  I

23    could go on, and on, and on about this.

24         But when you say Mr. Eason never withdrew from the

25    conspiracy, he didn't do anything.  After Berkley, I mean

1    besides one text, where he says, I'm going to get active again,

2    there's nothing.

3              So it really -- there is no justification for holding

4    him in custody pending trial.  It's really too bad.

5              **THE COURT:**  All right.  Does the Government want to

6    put anything else on the record before we --

7              **MR. FITZGERALD:**  Yes, Your Honor.  I want to

8    emphasize, it's not as significant as the post-Charlottesville

9    text is; that is not the only evidence.

10             And in fact, in the complaint itself, shortly after

11   the Berkley melee, the Defendant sent a text message to

12   Mr. Masellis (phonetic) asking if Mr. Masellis' broken hand was

13   strong enough to attend another event at Berkley on April 27th,

14   2017, stating, I'm driving up to deny Antifa, a face-saving

15   (phonetic) victory.

16             And I respectfully submit that they were not talking

17   about planting trees in that exchange.

18             **THE COURT:**  Okay.  All right, thank you.

19             All right, so Mr. McNicholas, I think then what --

20   having now concluded the detention hearing portion, I think we

21   just need to set the date for post indictment arraignment, now

22   that the indictment has been returned.

23             **MR. McNICHOLAS:**  That's fine, Your Honor.

24             **THE COURT:**  And I propose November 9, which is a week

25   from today, at 11:00 a.m.

1          **MR. McNICHOLAS:**  That's fine, Your Honor.

2          **THE COURT:**  All right.

3          All right, Mr. Eason, you're going to be back here in

4   this courtroom a week from today Friday, November 9 at 11:00

5   a.m. for post indictment arraignment, which is when your

6   district judge will be assigned and the Court, whoever is

7   sitting here, will take the not guilty plea and then set dates.

8          All right, anything further, Mr. McNicholas?

9          **MR. McNICHOLAS:**  No, Your Honor.

10          **THE COURT:**  All right.

11          From the Government?

12          **MR. FITZGERALD:**  No, Your Honor.

13          **THE COURT:**  All right.  Thank you.  We're adjourned.

14      **(Proceeding adjourned at 10:54 a.m.)**

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

December 13, 2018_

TONI HUDSON, TRANSCRIBER