UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  2:18-CR-00759-CJC-4 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| AARON EASON, | ) | Tuesday, November 27, 2018 |
| | ) | (1:08 p.m. to 2:25 p.m.) |
| Defendant. | ) | |


DETENTION HEARING


BEFORE THE HONORABLE ROZELLA A. OLIVER,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:

For The Government:        DAVID T. RYAN, ESQ.
                          GEORGE E PENCE, IV, ESQ.
                          Assistant United States Attorney
                          312 North Spring Street
                          Los Angeles, CA 90012


For The Defendant:        JOHN N. McNICHOLAS, ESQ.
                          McNicholas Law Office, LLC
                          464 Palos Verdes Blvd.
                          Redondo Beach, CA 90277


Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Donnamarie Luengo

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

1                                    INDEX

2   DEFENSE WITNESS          DIRECT      CROSS      REDIRECT   RECROSS

3   BRITTNEY WELCH              9          23

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      **Los Angeles, California; Tuesday, November 27, 2018; 1:08 p.m.**

2                              **(Call to order)**

3              **THE CLERK:**  Calling Case CR-18-759, *United States of*

4      *America versus Aaron Eason*.  Counsel, appearances, please?

5              **MR. RYAN:**  Good afternoon, Your Honor, David Ryan and

6      George Pence on behalf of the United States.  Also at counsel

7      table is FBI Special Agent Hank Waldheim.

8              **THE COURT:**  Good afternoon.

9              **MR. McNICHOLAS:**  Good afternoon, Your Honor, John

10     McNicholas appearing on behalf of Aaron Easton who's present in

11     custody.

12             **THE COURT:**  Good afternoon.  Good afternoon, please

13     be seated.  All right, we're here today on, Mr. McNicholas,

14     your motion for a bail review.  And procedurally I thought it

15     would go to the district judge but it looks like it's been sent

16     back to me to resolve.

17             **MR. McNICHOLAS:**  Yes, Your Honor.  We submitted the

18     declaration of Brittney Welsh (sic) who is present in court,

19     and I would actually like her to testify if your -- if the

20     Court would permit.  And I'm also reading the addendum to the

21     Pretrial Services Report which does state that Walter Eason

22     would actually be willing to act as a secured surety.  So that

23     could be new information as well.

24             **THE COURT:**  Okay, all right.  So I'll take that in --

25     for purposes of the new information that's been presented.  All

1    right, and --

2           **MR. McNICHOLAS:**  Additionally, Your Honor, with the -

3    - with Ms. Welsh's (sic) declaration, I submitted Exhibits 9

4    and 10.  After I filed the declaration, the Government did

5    provide me with video recordings and I was able to do

6    screenshots of parts of those that I have provided to the Court

7    as well.  So my exhibit numbers actually trail from the last

8    hearing that we were at and that's why I started --

9           **THE COURT:**  Right.

10          **MR. McNICHOLAS:**  -- with Exhibit 9.

11          **THE COURT:**  Right.  And then so what was handed up to

12   me are color copies at least I pulled down your -- the

13   declaration of Ms. Welsh (sic) at Docket 65 and so I have two

14   exhibits, nine and ten, and then it looks like after that are

15   the additional ones that you just referenced --

16          **MR. McNICHOLAS:**  Right.

17          **THE COURT:**  -- that you made screenshots.

18          **MR. McNICHOLAS:**  And I could describe them to the

19   Court.  Exhibit 11 is intended to show the actual speaker's

20   area from the perspective of the group that Mr. Eason was

21   associated with.  It was a free speech rally.  So Exhibit 11

22   actually shows the area in the background where the speakers

23   were engaged.  So I thought that was significant and that

24   should be shown to the Court.

25          Exhibit 12 is merely a shot of the resistance

1   movement, the Antifa crowd, that was there, possessing banners

2   "Trump must go by any means necessary."  I thought that was

3   significant enough to show to the Court as well.

4           Exhibit 13 is four different still screenshots.  The

5   Government has presented exhibits of Mr. Eason using physical

6   force against an individual who appears to be on the ground

7   who's wearing dark clothing.  Exhibit 13 gives the Court

8   perspective on what actually occurred.  Mr. Eason was attacked

9   by that individual.  It's shown by the stills that I have

10  starting with 13-A, I call it, the first page, where the

11  individual is actually taking a swing at Mr. Eason.  Mr. Eason

12  does not punch the man.  He puts his arm up in the air, his

13  hand is in the air to block the punch.  After that, the second

14  shot, the second still, shows the individual trying to tackle

15  Mr. Eason.  He puts his hands around Mr. Eason's waist and the

16  two of them go to the ground.  As you can see by the third

17  photograph, they're going to the ground.  And by the fourth

18  still, Mr. Eason has the man, the man is face down, but he's

19  still holding on to Mr. Eason's legs.  And Mr. Eason then uses

20  his elbow and he uses his fist to get the guy loose.  When the

21  man is loose, Mr. Eason stands up, he returns to where he was

22  before.  That's extremely important because from the evidence

23  I've seen, that is the most significant act of violence that

24  the Government claims Mr. Eason engaged in ever.  So that was

25  important.

1        Exhibit 14 is also important because it kind of lays

2   out the positions of the different individuals, the different

3   groups.  As you can see on the first page of Exhibit 14 there's

4   Aaron Eason standing behind what is an orange mesh that was

5   placed by the Berkeley Police Department.  On the other side of

6   the orange mesh, you see in the distance there is Berkeley

7   police officers.  Well that was sort of a no-walk zone.  That

8   was the area that the police were to patrol during the rally.

9   On the other side is -- of the mesh, there's actually another

10  mesh, and you'll see that 14-B, the second page, that is what

11  is on the other side of the mesh.  So you see there's a

12  significant number of individuals dressed in black with their

13  faces covered, and that is what Aaron Eason's looking at,

14  because these pictures were taken simultaneously, Your Honor.

15  The camera was panning one group and then panning the other

16  group.  I was noting what was actually being verbalized, which

17  I will proffer.  I'm not going to play the recordings today but

18  there's an individual singing "The Star Spangled Banner" next

19  to Aaron Eason, and meanwhile the -- you can hear where the

20  Antifa crowd is, their chant is, "Racist, sexist, antigay, Nazi

21  scumbags, go away."  And that was going on pretty much

22  throughout the entire day from that side until actual violence

23  did ring out.  It's also important to note, I just wanted the

24  Court to take notice of who's on the side where -- who's Aaron

25  Eason standing with.  Well, one of the individuals is Brittney

1   Welsh (sic), who I want to testify.  She's right next to him.

2   And then there's other people, various different colors,

3   various different racial backgrounds that are standing in Aaron

4   Eason's group.  And I thought was significant as well.  That's

5   why I attached that.

6           **THE COURT:**  That's Exhibit 14, the --

7           **MR. McNICHOLAS:** Yeah, Exhibit 14, Your Honor.

8           **THE COURT:**  Okay, 14-A.

9           **MR. McNICHOLAS:**  Yes.

10           **THE COURT:**  All right, let me just ask either

11   Mr. Ryan or Mr. Pence, with respect to the exhibits, it sounds

12   like Mr. McNicholas, there's -- obtained them from the

13   discovery that you produced being the Government so I assume

14   there's no objection as to foundation.

15           **MR. RYAN:**  No objection.

16           **THE COURT:**  Okay, all right.  And then we have -- let

17   me -- I'll just ask you to sit down for just a minute,

18   Mr. McNicholas, so we can ascertain how we're going to proceed.

19           And then I have from the Government an exhibit binder

20   which I assume, Mr. Ryan, has already been provided to

21   Mr. McNicholas.

22           **MR. McNICHOLAS:**  I --

23           **THE COURT:**  Or the exhibits, the content.

24           **MR. McNICHOLAS:**  I did receive them by email

25   yesterday.  I don't -- did you give me the book?  I didn't get

1    the book.

2              THE COURT:  And it looks like they're the same

3    exhibits as contained in the courtesy copy; is that right, --

4              MR. RYAN:  Yes, it should --

5              THE COURT:  -- Mr. Ryan?

6              MR. RYAN:  -- be file-stamped.

7              THE COURT:  Okay.

8              MR. RYAN:  On the top.

9              THE COURT:  Great.  And does the Government intend to

10   put on a witness?

11             MR. RYAN:  No, Your Honor.

12             THE COURT:  Okay, all right.  So then,

13   Mr. McNicholas, you did indicate that you would like to call a

14   witness; is that Ms. Welsh (sic)?

15             MR. McNICHOLAS:  Yes, Your Honor.

16             THE COURT:  Okay, all right, you may go ahead and do

17   that.  Is she present, Ms. Welsh (sic)?

18             MR. McNICHOLAS:  Yes, she is.

19             THE COURT:  All right.  Good afternoon, Ms. Welsh

20   (sic).  If you could come forward?

21             MS. SPEAKER:  I'm so sorry.

22             THE COURT:  It's all right.  We misdirected you.

23   We're in a --

24             MS. SPEAKER:  We're in a different courtroom.

25             THE COURT:  -- different courtroom from our normal

1  one.  Sorry about that.

2          THE CLERK:  Can you stand right there and raise your

3  right hand?

4          **BRITTNEY WELCH, DEFENDANT'S WITNESS, SWORN**

5          THE CLERK:  Thank you.  You can go ahead and have a

6  seat.  Go ahead and state and spell your name for the record.

7          THE WITNESS:  Brittney Welch, that's B-R-I-T-T-N-E-Y,

8  Welch, W-E-L-C-H.

9          THE COURT:  All right, you may proceed,

10  Mr. McNicholas.

11          MR. McNICHOLAS:  Hello, Ms. Welsh (sic).

12                  **DIRECT EXAMINATION**

13  BY MR. McNICHOLAS:

14  Q    What is it that you do for a living?

15  A    Right now I'm a caretaker for my father.  He has late-

16  stage cancer.  I am also a fulltime student getting my

17  certification as a respiratory therapist practitioner.

18  Q    And do you live in San Diego County?

19  A    I'm in North County, Oceanside.

20  Q    Do you know Aaron Eason?

21  A    Yes.

22  Q    And how do you know Aaron Eason?

23  A    He attended the rally that I had organized in San Diego

24  called "March For Trump."

25  Q    Okay.  Now, you said you organized a rally in San Diego

1   called "March For Trump."  What was that about?

2   A    It was the nationwide march that occurred on March 4th,

3   2017.  I had volunteered to organize the location of San Diego.

4   Q    And what was it about Aaron Eason that called for the two

5   of you to meet?

6   A    He showed up.  I had introduced -- I had met a lot of the

7   attendees that had showed up as well.  He volunteered to assist

8   me if I had any troubles, and we exchanged information and we

9   kept in contact and stuff.

10  Q    Do you recall whether the "March For Trump" in San Diego

11  was an organized event?

12  A    Yes.  It was extremely organized.

13  Q    And were there permits requested for that?

14  A    We had permits.  We also had the Embarcadero area.  We had

15  the FBI and the police of the area patrol and, you know, scout

16  the area to make sure that nothing was out of place and made

17  sure that people were safe as well.

18  Q    And were there speakers at that event?

19  A    Not at that -- not in my organized march.  There was a

20  second part to it called "The Spirit Rally," I believe, and

21  there were speakers.

22  Q    Okay.  Now, you say you organized this "March For Trump."

23  Is it because of any political leanings or affiliations that

24  you have?

25  A    I don't have any political leanings.  I never really

1   identified with one.  But I wanted to express my right to show

2   my support for our president.

3   Q    Have you ever heard of a group called the "Rise Above

4   Movement?"

5   A    Not until recently.

6   Q    Like how recently?

7   A    Until this case.

8   Q    So after this case you -- was filed, you heard about it.

9   A    Correct.

10  Q    Do you know who told you about it?

11  A    It was you.  You did.

12  Q    Okay.  And that was obviously after I was appointed to be

13  Mr. Eason's attorney.

14  A    Correct.

15  Q    So at the San Diego march, was there anything unusual that

16  happened between different groups of people that was noticeable

17  to you?

18  A    Our march -- the march was pretty peaceful.  There was no

19  altercations whatsoever.  Now, at the spirit rally afterwards

20  there were some extreme groups there.  There was like a handful

21  of Antifas.

22  Q    Okay, now you mentioned a spirit rally, where was the

23  spirit rally?

24  A    That was held by the Bay, right behind the convention

25  center.

1  Q    And were you there for that?

2  A    I attended after the march ended.

3  Q    Was Aaron Eason there?

4  A    I believe so.

5  Q    Now, you said some Antifa were present at the spirit

6  rally.  How do you know what Antifa is?

7  A    Just from what they look like online, their presence in

8  the media of -- I've known what Antifa was from what the media

9  have, you know, shown on TV, their violence presence of

10 attacking people at different events.

11 Q    So did any attacks occur at San Diego?

12 A    No attacks occurred at San Diego.  I made sure that there

13 was police and the authorities involved to make sure people

14 were safe.

15 Q    All right.  After you organized the San Diego event, did

16 you go on to assist with any other events?

17 A    I provided my support for the Berkeley free speech rally.

18 Q    And that was on April 15, 2017, correct?

19 A    Yes, sir.

20 Q    Now, before that, I believe it was in March, not too long

21 after your San Diego "March For Trump," there was an event in

22 Huntington Beach; did you know about that?

23 A    Yes, I did.

24 Q    And were you part of that group?

25 A    No, I was not.

1  Q    Were you -- did you have any communications with anybody

2  that was actually in Huntington Beach?

3  A    Yes, I did.

4  Q    And who was that?

5  A    With Aaron.

6  Q    And what was -- what were your communications involving?

7  A    He just asked if I was going to be there.

8  Q    Okay.  The -- your involvement in the San Diego event was

9  related to what you said was a national movement, correct?

10 A    Correct, a totally grassroot national movement.

11 Q    And in fact wasn't there a group based out of Berkeley

12 that was also organizing an event on that same day?

13 A    Correct.  It was the Berkeley's location of the "March For

14 Trump."

15 Q    And do you know who organized that event?

16 A    Rich Black.

17 Q    So Rich Black was the organizer of the "March For Trump."

18 Did Rich Black then organize the April 15th event?

19 A    Yes, he did.

20 Q    Did -- and did Rich Black ask you to assist him at the

21 April 15th event?

22 A    He did.

23 Q    And what did he ask you to do?

24 A    He asked if I could try to invite people, see if there was

25 anyone that -- any supporters from my event would be willing to

1    go show up because, you know, more power in numbers.

2    Q    Did you contact Aaron Eason based upon that?

3    A    I did let Aaron know that I was thinking about going to

4    Berkeley because it was being promoted on Facebook.  I asked if

5    he would like to volunteer and come along and he -- yes.

6    Q    And what was the purpose of asking Aaron to come along?

7    A    To help with the event, to help protect some of the

8    attendees from getting attacked.

9    Q    And why was there an actual threat of attendees being

10   injured or hurt?

11   A    Because that is precisely what Antifa did at the "March

12   For Trump" rally on March 4th, 2017.  They also threatened Rich

13   Black directly and the other attendees that were there.

14   Q    Did you actually witness Antifa attacking attendees of the

15   San Diego event?

16   A    The San Diego event I did not witness it.  I did receive

17   threats online that they were going to try to attack the

18   attendees.

19   Q    And you were also familiar with what happened with Milo

20   Yiannopoulus --

21   A    Yes.

22   Q    -- at Berkeley?

23   A    Yes.

24   Q    And you are also familiar with Ben Shapiro's event being

25   canceled.

1   A    Correct.

2   Q    So what -- did Rich Black actually voice his concerns to

3   you that he thought that people were in danger if there was not

4   some sort of a presence at the Berkeley event in order to

5   protect the speakers?

6   A    Yes.

7   Q    So did he ask you to recruit these people?

8   A    No.  He just asked if I could just invite more people

9   because he felt that if there weren't as many people, then

10  there won't be -- then they would be outnumbered by Antifa.

11  Q    So you told Aaron Eason about the event, correct?

12  A    I told him about the event and I asked if he could see if

13  he can reach out to any friends, any people that he met at the

14  rally.  I reached out to a bunch of people at the rally if they

15  would like to go to the Berkeley event.

16  Q    Now, Rich Black also said that he would reimburse for

17  travel expenses and hotels, correct?

18  A    Correct.  He said he would reimburse if I were to bring a

19  group of people, however many, just as long as we had people to

20  provide as a deterrent or protection.

21  Q    So did in fact everybody get reimbursed for their expenses

22  to come?

23  A    No.

24  Q    Okay.  Including who?

25  A    Me.

1    Q    So you were out-of-pocket --

2    A    Yes.

3    Q    -- for what?  What expenses did you have to pay for?

4    A    Probably altogether for the hotel it was like 1,500.

5    Q    Did you pay for Aaron's hotel room?

6    A    Yes.

7    Q    When the event at Berkeley took place on April 15th, do

8    you recall approximately what time of the morning you arrived

9    at that location?

10   A    I'm going to say it was around 8:00 a.m., 7:00 a.m., 8:00

11   a.m.

12   Q    And what was going on when you arrived?

13   A    A lot of the people were just standing around.  There was

14   hardly any attendees there at first.  There was no PD, there

15   was no orange mesh.

16   Q    So it was a small crowd.

17   A    Small crowd.

18   Q    What time did the speaker start speaking?

19   A    It's hard to say.  I want to say maybe around 10:00 a.m.

20   Q    And then I've submitted an exhibit which you've already

21   seen earlier today and it was marked as Exhibit 11, but it

22   shows the area where the speakers were; you recall seeking that

23   exhibit?

24   A    Yes.

25   Q    And what was the sound system like that the speakers had?

```
                    Welch - Direct / By Mr. McNicholas                17
```

 1   A    They had a couple speakers, stereos, and a microphone.

 2   Q    Do you recall a time where Antifa started flooding the

 3   park?

 4   A    Yes.

 5   Q    And was that -- do you recall approximately what time that

 6   was?

 7   A    It had to have been around 9:00 a.m., --

 8   Q    When the --

 9   A    -- 8:30, 9:00 a.m.

10   Q    -- Antifa people came, did they bring their own sound

11   systems?

12   A    They did.  A lot of them had stereos.  Yes, they did.

13   Q    When Antifa people arrived, could you even hear the

14   speakers that were with your group?

15   A    No, not really.  They had blowhorns.

16   Q    And of course they were chanting as well.

17   A    They were chanting.  They had rap music cranked up really

18   loud.

19   Q    Was there a time where you observed Antifa people with

20   weapons?

21   A    Yes.

22   Q    And what did you observe from the Antifa side?

23   A    I saw sticks, not sticks but like wooden poles, some metal

24   poles, bats, bottles, big rocks, bricks.

25   Q    Were they being thrown?

1   A    They weren't being thrown but you can just -- they had

2   them in the grass area with them.

3   Q    Were there any explosive devices that you witnessed?

4   A    Yes.

5   Q    And when -- did you actually see explosive devices

6   ignited?

7   A    Yes.

8   Q    And were any of them from your side of the mesh?

9   A    They were being thrown in from the Antifa side onto my

10  side of the mesh.

11  Q    Do you recall a point in the day where the event really

12  got out of control and it looked like there were fights

13  breaking out?

14  A    Yes.

15  Q    What was -- from your perspective, what did you observe?

16  A    I observed Antifa, the Antifa side, they were reaching

17  over, you know, threatening to hit people.  And then it got to

18  the point where they started initially throwing things, M80's,

19  they were throwing them.  They started exploding by my feet and

20  by my head.  They started throwing more.  And then they tried

21  to go around the barrier and through the sides of the park to

22  where the speakers were.

23  Q    Did any of the Antifa people make it to the other side

24  where the speakers were?

25  A    Some of them tried and what ended up happening was a lot

1  of the speakers -- or not the actual speakers but the

2  attendees, some of the attendees were pushing them out onto the

3  street.

4  Q    Did you see a point where basically most of the people

5  ended up in the streets and out of the park?

6  A    Yes.

7  Q    Were you part of that group that left the park?

8  A    I tried to stay as near to the stage as possible.

9  Q    And why was that?

10 A    To help the attendees that were getting hurt.

11 Q    So there were attendees being hurt.

12 A    Yes.

13 Q    People that were there to attend the free speech rally.

14 A    Yes.

15 Q    Were any of those Antifa members or were there -- were the

16 victims associated with your group?

17 A    All of the victims were the attendees that were there for

18 the event.

19 Q    And when you say that, --

20 A    For the rally.

21 Q    -- because the Government has a different perspective on

22 what attendees are, when you say "attendees," are you talking

23 about Antifa protestors or are you talking about people that

24 were there to support the free speech movement.

25 A    People that were there to support the free speech movement

1    were the ones that were getting hurt.

2    Q     And what kind of injuries did you witness?

3    A     People had gashes on their faces.  A lot of pepper sprays,

4    a lot of people, like older people, younger people, they

5    couldn't walk, couldn't see.  We had to drag them behind the

6    stage because that was the only safe area.  Some of the people,

7    some of the attendees, if they tried to push Antifa away, were

8    getting dragged out into the street into the crowd of Antifa to

9    get beat up and thrown back.  So it was pretty scary, it was

10   pretty hectic.

11   Q     How much contact did you have with Aaron Eason that day?

12   A     I tried to keep in contact with him as much as possible.

13   Like I kept -- you know, if I saw someone that knew him or if I

14   saw him, I just made sure he was okay.  So as much as possible

15   to make sure he was okay.

16   Q     Did you have any belief that Mr. Eason was actually part

17   of some kind of White supremacist group when he came to assist

18   you that day?

19   A     Not at all.

20   Q     Now, the Government is -- has screenshots of Mr. Eason

21   engaging in a fight; you're aware of that, right?

22   A     Correct.

23   Q     You never witnessed Mr. Eason in actual physical

24   altercations, though, right?

25   A     Never.

1  Q    As far as the color of the shirts, was there an agreement

2  as to what color Mr. Eason would wear or what color you would

3  wear while you were there?

4  A    We were all to wear light gray.

5  Q    And the reason was what?

6  A    To be able to distinguish ourselves in case we got lost in

7  the chaos.

8  Q    Right.  And of course Antifa was mostly in black.

9  A    They were all in black so we wanted to make sure that we

10 were able to distinguish ourselves from them.

11 Q    Now, some of these individuals on your side were also

12 wearing masks; you recall that?

13 A    Yes.

14 Q    And did you know those people?

15 A    No.  Not personally.

16 Q    Not personally.  Did you know whether they were affiliated

17 with Mr. Eason in any kind of organizations?

18 A    No.

19 Q    Now, you got to know Aaron Eason pretty well, correct?

20 A    Correct.

21 Q    And you saw him outside of these rallies, didn't you?

22 A    Correct.

23 Q    How many times do you think you saw Mr. Eason outside of

24 these political events?

25 A    Maybe ten times.

Welch - Direct / By Mr. McNicholas                          22

1   Q    And in the ten times that you saw Mr. Eason outside of

2   these political events, were you able to gauge in your mind

3   whether Mr. Eason was a responsible individual will actually

4   show up for court if he were asked to do so?

5   A    Absolutely.

6   Q    Was Mr. Eason working or was he engaged in any other

7   activities that you knew of at the time?

8   A    Every time I would ask Aaron what he was doing, he was

9   either working, looking for work, or he was spending time with

10  his daughter.

11  Q    Did you ever see anything regarding Mr. Eason that would

12  make you believe that he was dangerous?

13  A    Not at all.

14  Q    So you wouldn't think that he's a threat to the community

15  if he were to be released.

16  A    Oh, no, not at all.  He's too responsible.

17  Q    Did anyone on your side of the mesh at any of the events

18  you were involved with or -- I mean on your side of the mesh or

19  involved with your groups at either San Diego or in Berkeley,

20  did any of them ever possess weapons that you saw?

21  A    Never.

22  Q    There were allegations that Mr. Eason actually wore a

23  mask; did you ever see Mr. Eason with a mask?

24  A    Never.  Everyone knew not to wear masks because, you know,

25  we had nothing to hide.

Welch - Cross / By Mr. Ryan                     23

1  Q    And did you ever see Mr. Eason put tape on his hands?

2  A    Never.

3  Q    And did you ever see Mr. Eason hold sticks or talk about

4  sticks or anything like that?

5  A    Never.

6  Q    In fact, the whole idea of Mr. Eason's presence was just

7  to protect the people that were speaking, correct?

8  A    Absolutely.

9           **MR. McNICHOLAS:**  Thank you, I have nothing further.

10          **THE COURT:**  All right, thank you very much.  Cross

11 examination?

12          **MR. RYAN:**  Thank you.

13      **(Mr. Ryan/Mr. Speaker confer)**

14          **MR. RYAN:**  Your Honor, may I approach with the

15 exhibit binder?

16          **THE COURT:**  Yes, yes.

17      **(Pause)**

18          **MR. RYAN:**  Good afternoon, Ms. Welsh (sic).

19          **THE WITNESS:**  Hello.

20                     **CROSS EXAMINATION**

21 **BY MR. RYAN:**

22 Q    In your declaration and I believe just now, you wrote that

23 you were not familiar with RAM, or the "Rise Above Movement" in

24 2017, correct?

25 A    Correct.

Welch - Cross / By Mr. Ryan                                    24

1   Q    You're not a part of the "Rise Above Movement" or RAM?

2   A    No.

3   Q    You never attended any RAM boxing training sessions or

4   mixed martial arts training sessions.

5   A    No.

6   Q    Did you -- you didn't communicate with RAM leaders Ben

7   Daily or Robert Rundo about who was involved in RAM.

8   A    Not at all.

9   Q    Or about what RAM's goals were or ideology.

10  A    No.

11  Q    If you can, take a look in the binder in front of you in

12  Exhibit 4, it's one of the last tabs there.  It has three

13  pages.  If you can look at Exhibit 1, do you recognize anyone

14  in that photograph?

15  A    Okay, yes.

16  Q    Who do you recognize?

17  A    That is Aaron.

18  Q    Is that the Defendant, Mr. Eason, inside of the red circle

19  there?

20  A    Yes.

21  Q    Do you recognize anyone else in that photograph?

22  A    No.  I can't really tell.

23  Q    Okay, if you can turn to page two, please; do you

24  recognize anyone in that photograph?

25  A    I'm assuming that's another picture of Aaron.

1   Q    Do you recognize anyone else in the photograph?

2   A    No.

3   Q    And then if you can turn to page three, do you recognize

4   anyone in that photograph?

5   A    Aaron and Ben Daily.

6   Q    Is that Ben Daily with the sunglasses in the front middle

7   standing up?

8   A    Yes.

9   Q    How do you know Ben Daily?

10  A    He attended my "March For Trump" rally.

11  Q    In San Diego?

12  A    Correct.

13  Q    Did you ever see Mr. Daily after that event?

14  A    Yes.

15  Q    Where did you see him?

16  A    At the Berkeley --

17  Q    Event?

18  A    Yes.

19  Q    Did you ever see Mr. Daily on any other occasions?

20  A    Yes.

21  Q    What occasions are those?

22  A    He -- a few months ago he paid me some cash because he

23  felt bad about me not getting reimbursed for the Berkeley

24  event.

25  Q    Did you ever talk with Mr. Daily about the "Rise Above

1   Movement?"

2   A    Not -- I wasn't aware about the "Rise Above Movement."  I

3   knew that he had a group of friends that, you know, he hung out

4   with.  But I wasn't aware that he had a movement.

5   Q    Okay.

6   A    I just, you know, I knew he had a group of friends that,

7   you know, he went to AA meetings with.

8   Q    Okay.  And you testified that you asked Mr. Eason to go to

9   Berkeley, and in your declaration you wrote you asked him to go

10  there and to "invite friends to assist in protecting speakers

11  and innocent bystanders from violent attacks."  Do you recall

12  that?

13  A    Correct.

14  Q    Did you know that Mr. Eason was inviting people associated

15  with the "Rise Above Movement" to the event?

16  A    No.

17  Q    You said that at the event, everyone knew -- I believe

18  your testimony was everyone knew not to wear masks.

19  A    Correct.

20  Q    Did you see the people standing around Mr. Eason at the

21  event wearing masks with skeleton or skull designs on their

22  faces?

23  A    I did see a few people.  I did see a couple people wearing

24  masks.

25  Q    Yes.  One of them was Mr. Daily.  Or if you know.

1    A    When I saw him at the event, I didn't see him wearing a

2    mask.

3    Q    Okay.  You didn't follow RAM social media accounts or

4    Twitter or Instagram.

5    A    No.

6    Q    You didn't see RAM describe itself on Twitter as:  "The

7    only alt-right crew that actually beats Antifa senseless and

8    wins rallies."

9    A    No.  I've never seen that.

10   Q    If you can look at page four, there's a tab called

11   "complaint."  It's towards the front of the binder.  If you

12   can, look at page four.  Just let me know when you're there.

13   A    Okay.  Okay, I'm there.

14   Q    You don't recall ever seeing these posts on any social

15   media accounts.

16   A    On page four?

17   Q    Page four of the complaint which should be the first tab,

18   the two pictures at the bottom, one of which says:  "White

19   unity" and the other says:  "R-A-M" with people with the skull

20   masks.

21   A    No, I've never seen this and I've never seen these

22   pictures before.

23   Q    And so you didn't know that Ben Daily's group was a group

24   that promoted White unity.

25   A    Correct.

1  Q    You never saw Ben Daily or Mr. Eason or the friends that

2  he went to Berkeley or San Diego with, you never saw them with

3  tattoos or sculptures or social media posts promoting Adolph

4  Hitler or Nazi ideology.

5  A    I've never seen that.

6  Q    And you were not at the Huntington Beach event on March

7  25th, 2017, correct?

8  A    Correct.

9  Q    You were not at this -- in an event in San Bernardino on

10  June 10, 2017.

11  A    Correct.

12  Q    At Huntington Beach, you didn't see Mr. Eason and several

13  others pursue or assault protestors.

14  A    Not at all.

15  Q    And at San Bernardino, you didn't see Mr. Eason and

16  several others chase protestors and smash their car windows.

17  A    No.

18  Q    And regarding Berkeley, before Berkeley, did you know that

19  Mr. Eason -- whether he was organizing hand-to-hand and

20  formation fighting training with RAM members?

21  A    No.

22  Q    And at the Berkeley event, when you were there, you didn't

23  see Mr. Eason assault anyone.

24  A    Not at all.

25  Q    You didn't see the friends that Mr. Eason came with

Welch - Cross / By Mr. Ryan                                    29

1    assault anyone.

2    A    No.

3    Q    If you can, please look at Exhibit 1, pages five and six.

4    Is it correct that you didn't see this incident when it

5    happened?

6    A    I just saw this picture today.

7    Q    Okay.

8    A    During this event, like when this was actually happening,

9    I wasn't in the area.

10   Q    Okay.  If you can, look at Exhibit 2, pages one and two,

11   and focusing on the portion inside the red circle there, did

12   you see that incident when it happened?

13             **MR. McNICHOLAS:**  Objection, asked and answered.

14             **THE COURT:**  Overruled.

15   A    I don't remember.  I don't think so.

16   Q    Okay.

17             **THE COURT:**  Which -- are you on Exhibit 2, Mr. Ryan?

18             **MR. RYAN:**  Exhibit 2, pages one and two.

19   A    No.

20   Q    Okay.  And if you can return to Exhibit 1, page one, is it

21   correct that this depicts the orange barrier that you were

22   testifying about earlier?

23   A    Yes.

24   Q    And your group would be on the left side of this picture.

25   A    Yes.

Welch - Cross / By Mr. Ryan                                    30

1  Q    And if you can, turn to page two; do you recognize the

2  individual there inside the red circle?

3  A    Yes.

4  Q    Who is that?

5  A    That's Aaron Eason.

6       **(Pause)**

7          **MR. RYAN:**  One moment.

8  Q    If you can, turn to the indictment tab, page 11.  It's the

9  second tab.  You'll see at the bottom, overt act number 47.  It

10 continues on to page 12.

11 A    Okay.

12 Q    Where it says:  "Maybe if there is enough time, could

13 mention Berkeley, how we were the first guys to jump over the

14 barrier and engage and how that had a huge impact."  Did you

15 see that the men with the skull masks and Mr. Eason were the

16 "first guys to jump over the barrier and engage and how that

17 had a huge impact?"

18 A    I'm not sure who was the first to run over the barrier.

19 All I know is that there was an altercation, there was a fight.

20 I saw people on the ground.  And that's when people all started

21 rushing in over the barrier to fight.

22 Q    And that fight that you saw, was that on your side of the

23 orange barrier or on the other side of the orange barrier?

24 A    It started on our side and then it moved over to the

25 Antifa side.

1   Q    Okay.  At the event in San Diego or Berkeley, did you see

2   Mr. Eason and the people he was with gathered around a sign

3   that said:  "Da Goyim Know?"

4   A    At the San Diego --

5            **MR. McNICHOLAS:**  Your Honor, I'm going to object.

6   The crime charged here is inciting a riot.  This is totally

7   irrelevant.

8            **THE COURT:**  Overruled.  You may proceed.

9            **MR. RYAN:**  Would you like me to repeat the question?

10  A    In San Diego?

11  Q    In San Diego or in Berkeley.

12  A    No.

13  Q    In neither event.

14  A    I think I saw -- no, I don't remember seeing any of those

15  signs at those events.

16  Q    Did you ever hear Mr. Eason or the people he was with use

17  the phrase, "Da Goyim Know?"

18  A    No.

19            **MR. McNICHOLAS:**  Objection, Your Honor, irrelevant.

20  I don't think there was any allegation regarding anti-Jewish

21  bias at these rallies.

22            **THE COURT:**  All right, you can answer with respect to

23  Mr. Eason, and I think the answer was "no."

24  //

25  //

1   **BY MR. RYAN:**

2   Q    Did you ever hear Mr. Eason or his -- or the friends that

3   he invited to Berkeley refer to the event as a "total Aryan

4   victory?"

5   A    No.

6   Q    Did you ever hear them refer to RAM and their -- the goals

7   of RAM as White nationals?

8          **MR. McNICHOLAS:**  Your Honor, I'm going to object

9   again --

10  A    No.

11         **MR. McNICHOLAS:**  -- because he keeps referring to

12  "them."  And I believe this is Aaron Eason's hearing and not

13  Mr. Rundo's hearing or anybody else's hearing.  It's

14  Mr. Eason's hearing.

15         **THE COURT:**  All right, if you could, rephrase.  I'm

16  going to sustain the objection.

17  **BY MR. RYAN:**

18  Q    So, did you ever hear Mr. Eason refer to white

19  nationalism, refer to RAM, as white nationalist?

20  A    No.

21  Q    If you can look at Exhibit 5, page 1 --

22         **MR. McNICHOLAS:**  Your Honor, again, I'm going to

23  object to this line of questioning.  It's irrelevant.  Whether

24  Mr. Eason is anti-Semitic has nothing to do with whether he's a

25  danger to the community or is a flight risk.  And we're going

1    way off with this line of questioning.

2              **THE COURT:**  I guess my first comment is, my binder

3    doesn't have Exhibit 5.

4              **MR. RYAN:**  All right.  It should have a tab that says

5    Exhibit 5, and that --

6              **THE COURT:**  Oh, it does --

7              **MR. RYAN:**  -- okay.

8              **THE COURT:**  -- but there's nothing behind it.

9              **MR. RYAN:**  Is the cover sheet?

10             **THE COURT:**  So --

11             **MR. RYAN:**  Well, why don't you take my binder?

12             **THE COURT:** -- I wonder if that's --

13             **MR. RYAN:**  Take my binder, there.

14             **MR. PENCE:**  Your Honor, may we approach with a new

15   binder for?

16             **THE COURT:**  Thank you.  Maybe, okay, all right.

17             **MR. RYAN:**  I'm happy to address the objection if Your

18   Honor would like.

19             **THE COURT:**  I do, I'm inclined to sustain it because

20   I don't see how this goes to the issue of danger or what's been

21   charged.

22             **MR. RYAN:**  Certainly, Your Honor.  So, as the court

23   previously ordered defendant detained, primarily due to danger

24   to the community.  As the court noted, the allegations set

25   forth, the defendant's association with an extremist, white

1    supremacist organization that violently attacked people.  And

2    then used footage of those attacks along with repeatedly

3    racist, anti-Semitic, and Neo-Nazi messages to recruit more

4    members.  I think, at that detention hearing as well as for the

5    other defendants in the case, and in the complaint and the

6    indictment, the ideology of the organization is relevant both

7    to the underlying charges, but also with respect to danger.

8    Because the allegations are not that these were random acts of

9    violence people happened to get into a fight, but that this was

10   an organization, a conspiracy, it's charged a conspiracy, that

11   this was an organization that existed to further its white

12   supremacy, extremist ideology.

13           And so, that makes its activities and its members

14   more dangerous than those who might have on one occasion or

15   another happen to get into a fight.  The white supremacist

16   nature of the organization is set forth in numerous of the

17   overt acts, numerous paragraphs of the complaint.  It was the

18   organizing principle for the organization.

19           **THE COURT:**  I guess --

20           **MR. McNICHOLAS:**  And Your Honor, it's a 411 argument

21   as well.  If in fact, the government insists on attacking

22   individuals for their viewpoint, perhaps they should go after a

23   white supremacist organization in a RICO prosecution, but not

24   in this case.  Because they're using prejudice to keep these

25   individuals tied up in court on a very minor charge compared to

1   what we normally see in federal court, where they're looking at

2   maybe a year in jail if they're convicted.  Yet, we have this

3   huge attempt to inflame the court by throwing things in here

4   that are completely irrelevant to what they're charged with.

5         THE COURT:  Mr. Ryan, I guess my concern with this

6   line of questioning though, is that Ms. Welsh, Welch excuse me,

7   has already said that she doesn't testify that she was not

8   familiar with Mr. Eason's association with RAM or any other

9   organization.  So, unless you think, have reason to think that

10  she's going to say, yes, she has seen or discussed, somehow has

11  personal knowledge with respect to Exhibit 5 --

12        MR. RYAN:  My anticipation would be that she had not

13  based on her prior testimony, and that's what I wanted to

14  confirm.  But, happy to move on, Your Honor, if you'd prefer.

15        THE COURT:  Okay.  Thank you.

16        MR. RYAN:  Okay.

17        THE COURT:  So, I'll go ahead and sustain the

18  objection.

19        **(Pause)**

20        MR. RYAN:  No further questions, Your Honor.  Thank

21  you very much.

22        THE COURT:  Okay.  Any re-direct, Mr. McNicholas.

23        MR. McNICHOLAS:  No, Your Honor.

24        THE COURT:  All right.  I just have a couple of

25  questions, Ms. Welch.  How long have you known Mr. Eason?

1          THE WITNESS:  Since the 2017 march.  March 4th.

2          THE COURT:  That's the San Diego?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  And how would you describe your

7    relationship with Mr. Eason?

8          THE WITNESS:  We're friendly.  He was very smart,

9    intelligent, and he helped me with coming up with ideas and

10   gathering people to support the Berkeley event.

11         THE COURT:  Okay.  And, you mentioned that, for as

12   part of the San Diego event, is it you were one of the

13   organizers or an, the organizer?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.

16         THE WITNESS:  The, the March for Trump started, I

17   think, the first march was going to be in D.C. or something.

18   And, what ended up happening, a lot of other states wanted to

19   hold their own march, a lot of other towns.  And so, people

20   elected to hold their own.  I inquired about the San Diego, if

21   there was going to be one in California.

22         THE COURT:  Uh-huh.

23         THE WITNESS:  I heard there was one happening in

24   Berkeley, and I decided that was too far.  And, someone reached

25   out to me and said that there's no one organizing one for San

1   Diego, that if I wanted to, I could organize that one.

2           **THE COURT:**  Okay.

3           **THE WITNESS:**  For the location.

4           **THE COURT:**  And you were asked questions by

5   Mr. McNicholas about, or said something to the effect of, it

6   was a peaceful march.  And you mentioned that you had

7   coordinated with law enforcement, and perhaps the FBI --

8           **THE WITNESS:**  Correct.

9           **THE COURT:**  -- to ensure that, is that?  With respect

10  -- and then you were later asked to help in some capacity with

11  Berkeley?

12          **THE WITNESS:**  Uh-huh.

13          **THE COURT:**  Did you undertake, was there similar

14  efforts with respect to outreach to law enforcement?

15          **THE WITNESS:**  For Berkeley --

16          **THE COURT:**  Yes.

17          **THE WITNESS:**  -- no.  The main organizer, Rich Black,

18  who organized with David Fatta (Phonetic), they said they had

19  it under control and they already had permits and Berkeley

20  Police.  They quoted, Berkeley Police is all over it.  That

21  they're going to be there to protect, and it's not going to be

22  anything like the first event that happened at Berkeley.  And

23  so, I was like, okay.  But they did ask if I could bring more

24  supporters in.  Just to help with protecting the attendees.

25          **THE COURT:**  Okay.  So, supporters, okay.

1          **THE WITNESS:**  Uh-huh.

2          **THE COURT:**  And then, last question I think, so you

3    were shown pictures where it appears that Mr. Eason is, has

4    some physical contact with other individuals.  I just wanted to

5    clarify, is it your testimony that you weren't there at that

6    moment?  That you weren't around Mr. Eason when that, when

7    those events unfolded.

8          **THE WITNESS:**  Yeah.  I was near the area, by you

9    know, of being shorter than a lot of the people I was kind of

10   far enough to where I wouldn't get hurt.  Because there were

11   firecrackers and M-80s going off at the same time.

12         **THE COURT:**  Okay.  So, you didn't, I guess what I'm

13   trying to get at is, were you there as Mr. Eason had this

14   contact that we see depicted in the pictures?  You weren't?

15   Okay.  All right.

16         I don't have anything else.  Mr. McNicholas, do you

17   want to ask anything in follow up to what I asked?

18         **MR. McNICHOLAS:**  No, Your Honor.

19         **THE COURT:**  Oh, okay.  All right, Mr. Ryan?

20         **MR. RYAN:**  No, Your Honor.  Thank you.

21         **THE COURT:**  Okay.  Thank you so much, Ms. Welch, for

22   coming down.

23         **THE WITNESS:**  Okay, thank you.  Thank you, Your

24   Honor.

25         **THE COURT:**  Thank you.

1     **(Witness steps down)**

2          **THE COURT:**  Okay.  Anything else Mr. McNicholas,

3     before we turn to argument?

4          **MR. McNICHOLAS:**  No, Your Honor.  I'm ready to argue.

5          **THE COURT:**  Okay.  All right.  And I, the government,

6     nothing from the government?

7          **MR. RYAN:**  No, Your Honor.

8          **THE COURT:**  Okay.  Then Mr. McNicholas, why don't you

9     begin please.

10          **MR. McNICHOLAS:**  Your Honor, and I'm trying to stress

11    the least significant aspect of this hearing, is the facts of

12    the case.  However, even the government's exhibits where they

13    show Aaron Eason squaring off in kind of a fight stance,

14    there's about fifty black clad individuals running towards him

15    in that photograph.  One against fifty.  He's wearing a light

16    colored shirt, so he can be noticed because he thinks he's on

17    the good side.  He's actually there to defend, not to attack.

18          It's also important, the government showed the stills

19    of Aaron Eason with his arms swinging in a punch, but the

20    government did not show the full picture.  The government is

21    hiding the truth, which is shown in our Exhibit 13, starting

22    with 13A, the first page.  That kid comes right at him,

23    swinging at Aaron.  Aaron Eason is not punching him.  He's

24    holding his arm up to block the guy's punch.  Then, on the

25    second page, the individual's actually tackling Aaron Eason.

1    Okay?  So he's got, he's being tackled.  They go all the way to

2    the ground, and it's not until the ground, the guy's still

3    holding onto Aaron Eason's legs.  And Aaron Eason's surrounded

4    by a hundred people in black garb with masks on, and this guy's

5    got him by the legs.  He's doing whatever he can to free

6    himself.  That's what he is doing in that video.  He's not

7    doing anything else.  Once he's free, he stands up, he stand

8    guard, and he goes back to his station.  The government wants

9    you to believe something totally different than what actually

10   occurred.

11          So, with that in mind, Your Honor, that's what Aaron

12   Eason did.  Aaron Eason went to a couple training sessions, he

13   did have some dealings with some of these people that were

14   there.  He was never, and the government can't prove this, he

15   was never associated with the Rise Above Movement.  They have

16   no evidence, except for him showing up and going to a boxing,

17   training, in the park, in a public location which almost

18   everybody in this courtroom probably has done at one point in

19   their lives, at least recently.  Because it's very popular

20   nowadays to do kickboxing, sparring, martial arts, and all that

21   sort of thing, especially with the millennial crowd.

22          So, there's no doubt he was there, there's no doubt

23   that he trained, but this whole thing about going to that extra

24   step, the government has the evidence.  The evidence that I've

25   seen in this case has video, and Aaron Eason's not part of any

1    of the Rise Above Movement video in any way, shape, or form,

2    because he's not part of that group.

3          For the court's just education, I do intend to

4    request severance, because Mr. Eason's not affiliated with that

5    group.  I also intend to file a motion to dismiss, because I

6    believe that the government has misrepresented the facts to the

7    grand jury in getting this indictment.  Because, virtually

8    every word of the first ten paragraphs of the indictment is

9    false.  So, we will be attacking that.

10         But, just going to the, assuming, assuming he was

11   there to fight people that one day, he has a lifetime of no

12   crime.  A lifetime of no violence.  There's a woman who stood

13   up here and said, that's not her experience with Aaron Eason,

14   is he's not a danger.  Her experience with Aaron Eason, he's

15   not a flight risk.  We have his father and his sister here in

16   the courtroom, and his brother, people that know him the best

17   are willing to put their lives on the line in order to sign for

18   Mr. Eason and put up a bond in order, because they believe he's

19   not a flight risk.  They believe he's going to come to court

20   and they believe he's not going to threaten anybody.  Mr. Eason

21   has zero ties with any white nationalist groups.

22         And once again, I want to go back to Mr. Laube.

23   Mr. Laube plead guilty.  He's guideline a level, which if

24   Mr. Eason had the same plea agreement, it would be nine to

25   thirteen months imprisonment for that charge.  Nine to thirteen

42

1   months.

2          I also worked on the ICDA Panel in L.A. Superior

3   Court, and I don't know if the court is aware, but just

4   recently there's been a massive bail reform to make the state

5   system more like the federal system, in that people are

6   basically being held to a bail schedule that was impossible and

7   did not fit the crimes.  And defendants in L.A. Superior Court

8   were being forced to enter guilty pleas simply because by the

9   time their cases got to trial, they were long past time served,

10  and the only reason why the plead guilty, was so they would get

11  out of jail.  And this is looking like this would be one of

12  those situations, Your Honor.  And it shouldn't be that way.

13  There is not enough at stake, regarding the current charges

14  that Mr. Eason would have any interest at all not to come to

15  court and if convicted, to serve his sentence accordingly.  So,

16  I wanted to make that point as well.

17          Again, the facts speak for themselves.  The

18  aggregating factors, he was filmed in a physical altercation,

19  he had bright colors, he went to a few training sessions.  The

20  points in mitigation, no weapons, no tape, no masks, no

21  membership in RAM.  The facts actually show, that I presented

22  to the court, clearly show self-defense and not an attack.  No

23  record, a lifetime in the Central District of California, and

24  also, racial diversity of the group.  Just to contradict

25  everything that the government claims about Mr. Eason's

1    involvement, his group had the racially diverse side.  The

2    other side, you couldn't tell because they all looked like they

3    were all wearing black.

4          The condition, or combination of conditions, could

5    easily be fashioned, Your Honor.  I do believe if there's any

6    concern, it could be met with a GPS ankle monitoring device.

7    Mr. Eason could be required to work, he could be required to

8    attend anger management, he could be required to stay away from

9    anybody associated with this case.  It could be done extremely

10   easy, Your Honor.  He lives far enough from everybody else, I

11   mean, as you know well most of the people involved are in jail.

12   But, from my recollection, most of these people that were

13   allegedly associated with this group lived either in South Bay,

14   Redondo Beach area, some lived down in southern Orange County.

15   Mr. Eason lives in east, in the east part of the valley near

16   Palm Springs.  So, that's how far away he is.  So, they live on

17   a ranch up in the hills there, and they have no, they have no

18   interaction with most of society.

19         **THE COURT:**  So, Mr. McNicholas, before I turned to

20   the government, I'm thinking back to the first detention

21   hearing.  I did spend a lot of time looking at the text

22   messages, I think they're all text messages, maybe they're

23   emails.  And so I came, I come back to those again, both in the

24   complaint, and then ones that are in the indictment.  And I

25   appreciate the point you're making.  It sounds like among

1   others, that there's no video or other documentary evidence to

2   affirmatively show Mr. Eason's membership in this organization,

3   RAM.

4           But, I look at the text messages, which show, it

5   appears communication among some of the charged individuals.

6   But, then there are these other individuals not identified, the

7   co-conspirators numbers 1 and 2.  And then I look at just the

8   language, the content of the messages.  Which seem to

9   contradict, or I think in parts do contradict, the averment of

10  no knowledge about what was afoot.  So, I, I'm not sure there

11  is any additional response.  But I just, I do always like to

12  let the attorneys know where I'm focused.

13          **MR. McNICHOLAS:**  And, Your Honor, I believe I gave a

14  response, and I mentioned trees.  That actually was a

15  legitimate response, when you talked Mr. Eason being more

16  politically engaged or politically active.  And I think that's

17  the text you're referring to.

18          **THE COURT:**  Right.  He wanted to go hard, he'd taken

19  some --

20          **MR. McNICHOLAS:**  Right.  Hard and in community

21  involvement, and political involvement, it's not all about

22  beating people up, Your Honor.  It's about doing good for the

23  community.  Mr. Eason was telling them about different

24  community service projects that he wanted to work on, like

25  beautification of his neighborhood.  And that actually came up

1    in one of the letters as well, Your Honor.  That he was

2    involved in that.

3             **THE COURT:**  -- right.  No, I remember that.

4             **MR. McNICHOLAS:**  There are other ways, there are

5    other ways to be involved.  However, even assuming, assuming

6    that these guys, the evidence speaks for itself.  The video

7    speaks for itself.  There were not going to be fights without

8    innocent people being attacked.  And the innocent people were

9    on Mr. Eason's side of the mesh.  But, you know, worst case

10   scenario, even if Mr. Eason had this day of violence, even if

11   he was violent for that one day, does that warrant keeping him

12   imprisoned pending his trial?

13            We have cases here in front of the court where

14   individuals, drug dealers, people with weapons, are released

15   based on signature bonds.  Mr. Eason has a lifetime of no

16   criminal activity, yet here he sits here in custody because of

17   this very short period in his life.  And it's completely

18   unreasonable, Your Honor.

19            **THE COURT:**  Well, I think the, I do find -- you know

20   I appreciate that you're relaying the information as you, as

21   it's been described.  But, the explanation about the trees, at

22   the time I was, I found difficult to credit.  I, and now

23   looking at the indictment, which I think was returned after was

24   returned.

25            **MR. McNICHOLAS:**  The indictment was actually issued

```
 1   prior, just like the day before the detention hearing.  We

 2   didn't have an opportunity --

 3            THE COURT:  Oh, okay.

 4            MR. McNICHOLAS:  -- to review it fully.

 5            THE COURT:  Okay.

 6            MR. McNICHOLAS:  I have reviewed it since --

 7            THE COURT:  Okay.

 8            MR. McNICHOLAS:  -- and I still, I challenge

 9   virtually every word.

10            THE COURT:  Well --

11            MR. McNICHOLAS:  Prior to the overt acts.

12            THE COURT:  -- well, I guess so that was then, I did

13   not similarly digest it.  I had not focused on another text

14   message sent to an unidentified individual by Mr. Easton that

15   talks about -- I guess I'm not sure about the timing of it.  It

16   appears to be after Berkeley.

17            MR. McNICHOLAS:  Is it an overt act, Your Honor?

18            THE COURT:  It is.  It's overt act number 23.

19   Because, my understanding, my notes said that the Berkeley

20   event was in mid-April.  And so this is in a text message sent

21   after that.

22            MR. McNICHOLAS:  It was sent the following, five days

23   later.

24            THE COURT:  Five days later.  And so, I don't know

25   what it's in reference to.
```

1          **MR. McNICHOLAS:**  Oh.

2          **THE COURT:**  Again, it talks about Berkeley.

3          **MR. McNICHOLAS:**  Yes, Your Honor.  And I will tell

4   you exactly what happened.  Ann Coulter, I don't know if the

5   court's heard of Ann Coulter, but she's fairly famous

6   conservative journalist.  And she's an editorialist, and she's

7   featured on Fox News, and she writes columns in various

8   different publications.

9          She was scheduled to speak in Berkeley right after

10  the event occurred, where the riot occurred.  And, there was

11  pressure on her from Berkeley, they actually canceled, or they

12  withdrew her permit so she could not speak.  But, the rally

13  organizers were going to go forward with the event anyway

14  without Ann Coulter.  Well, Aaron Eason volunteered to go up to

15  that rally and actually film it, videotape it.  And, you know,

16  hopefully nothing would occur that day.  Apparently, ANTIFA

17  didn't get the memo that the event was still on, and none of

18  them showed up.  But Aaron Eason was there.  Aaron Eason

19  actually filmed the event.  Ann Coulter wasn't there.  It was a

20  minor event, but there were speakers, they were there.  So

21  that's what that was.

22          **THE COURT:**  So, that he was going up there to film

23  it?

24          **MR. McNICHOLAS:**  Yeah, and he did.  And he, Mr. Eason

25  actually filmed the event and shared the film with a website.

1          **THE COURT:**  Okay.  All right.  Thank you,

2     Mr. McNicholas.  I'll hear from the government.

3          **MR. RYAN:**  Thank you, Your Honor.  So, the court

4     previously ordered the defendant detained, as I said, primarily

5     due to danger to the community.  Maybe I'll step over to the --

6          **THE COURT:**  I think it was exclusively the danger --

7          **MR. RYAN:**  -- okay.

8          **THE COURT:**  -- I think it, or it certainly wasn't

9     with respect to flight.  I think Mr. McNicholas and I had a

10    robust conversation about that at the time.

11         **MR. RYAN:**  Now, we're back again, and what we have

12    new in terms of the facts presented, we have the indictment in

13    addition to the complaint.  We have a declaration and testimony

14    which, I think, generally reviewed the declaration from a

15    person who apparently was not at, two of the three events

16    described in the charges.  And apparently did not see the

17    relevant assaults discussed in the charges at the Berkeley

18    event.  Apparently didn't know anything about the Rise Above

19    Movement, didn't know about the defendant's participation at

20    events arranged by the Rise Above Movement trainings, et cetera

21         That testimony, declaration is essentially though a

22    restatement of the argument that I understand defendant

23    presented before, which is essentially that he didn't do it,

24    that he's not guilty.  Of course, a detention hearing is not

25    the forum for a mini trial on the merits, and we do take the

1  allegations, but I'll just make three points about those

2  allegations.

3       Before I do, just to touch on two quick things.  The

4  guideline sentence of nine to thirteen months that defense

5  counsel raised, I suspect that's coming from the base offense

6  level that was identified in the plea agreement without any of

7  the enhancements which apply of which, is that not right?

8       **MR. McNICHOLAS:**  If I could clarify, it would be the

9  base offense level with acceptance of responsibility, criminal

10 history category one.

11      **MR. RYAN:**  Right.  So without any of the specific

12 offense characteristics that the government anticipates would

13 apply.  So, of course its unsurprising that the argument from

14 the defendant is that he's not guilty.

15      First, the idea that the defendant was not affiliated

16 with RAM.  And we've just provided a few excerpts to the court.

17 I hesitate to make this, as I say, a mini trial on the evidence

18 that the government would produce, or would produce at trial.

19 The allegations which are supported by the text messages in the

20 indictment, in the complaint, the excerpts of the photographs

21 that we've provided are that he trained with RAM, helped

22 organize the RAM trainings, traveled to events with RAM locally

23 and in northern California, remained alongside the RAM members

24 at the events, fought alongside RAM at the events.

25 Communicated frequently with RAM leaders in person, on social

1   media, through phone.  This is for several months.  Several

2   months when RAM was at its peak establishing its reputation, at

3   least four different events for what its Twitter account called

4   quote, the only alt-right crew that actually beats ANTIFA

5   senseless and wins rallies.  Or what it's co-founder Ben Daley

6   called quote, the only reason shit was popping off at So-Cal

7   right wing events.

8          This is how RAM presented itself, very openly

9   throughout 2017.  And defendant's involvement with that

10  organization is pretty continuous and significant throughout

11  that period of time.  That's what's set forth in the

12  allegations, we provided a few snippets of what the evidence

13  would be on that point.

14         Second, the idea, I think at the last hearing, the

15  argument from the defendant was that he was quote, standing

16  nearby as other engaged in violence.  That there weren't

17  pictures of him engaging in violence, we've provided those

18  exhibits here.  I would note that the statement that the

19  defendant was surrounded when he was engaged in violence at

20  Berkeley by a lot of people in black shirts, is because the

21  defendant and the RAM members that he was with had, as they

22  later said, crossed the barrier to engage and that had a huge

23  impact.  Those are not my words, that's Ben Daley's words about

24  what happened.  The video does show that, that's why they're

25  surrounded by the other side.  They were on the other side.

51

1    They'd crossed the barrier, and that's when the fights broke

2    out.

3         After that one fight, that's Exhibit 1, I think

4    Counsel made the argument that the defendant went back to the

5    other side.  But, of course, there's Exhibit 2, which is

6    another fight on the ANTIFA side of the barrier.  That fight

7    lead to the police intervening and arresting Mr. Rundo, one of

8    the RAM members the defendant was fighting alongside throughout

9    the day.

10        Exhibit 3 is after the fights on the grass, when the

11   majority of the protesters, counter-protesters, whatever the

12   terminology, had left the grass and were going down the street.

13   And the defendant, Mr. Daley, and RAM members, and people they

14   had traveled with were pursuing them along the street and

15   engaging in assorted scuffles as that occurred.

16        So, the idea that the defendant was just standing

17   nearby quote unquote, which was their argument before, I think

18   that's just not supported either by the allegations, or again,

19   the little excerpts or snippets that have been presented.

20        And then third and finally, the idea that the

21   defendant didn't associate with RAM's ideology, which is

22   relevant to the finding of danger because part of the danger

23   here is that these were not random events.  This was a

24   coordinated effort by a group of people.  The effort was as Ben

25   Daley, the founder, put it to quote live the fourteen words.

1   Live the fourteen words was the stated mission, a stated

2   mission, of the organization that the defendant is charged with

3   affiliating with and conspiring with to commit these crimes.

4        So, that's part of the danger.  If they were random

5   events, he'd arguably be less dangerous.  The social media

6   posts and communications between RAM members, a very few of

7   which are provided in Exhibit 5, highlight that ideology.  If

8   the court would like, we can provide many more.

9        These are the gist of the reasons why all eight of

10  the RAM members charged in this case, and the related case in

11  Virginia remain detained pending trial.  I believe the

12  defendant should as well, Your Honor.  If the court has any

13  further questions, I'm happy to answer them.

14       **THE COURT:**  Okay.  Thank you.  Mr. McNicholas, any

15  response?

16       **MR. McNICHOLAS:**  Clearly, the government has a huge

17  burden when this case actually goes to trial.  And, it's going

18  to hands full.  Because, we just had a witness who totally

19  contradicts every word that the government states as to who

20  instigated the fighting.  And, I do think it's quite ridiculous

21  that an individual would be in custody for fist fighting

22  pending trial.  Because, that's really what it comes down to.

23  When no weapons, no weapons -- and this group, this RAM group

24  that they condemn, no drugs, no alcohol, pure lifestyles, there

25  you know there's a lot worse.  Maybe they don't agree mentally,

1   they don't have the same point of view that's correct for

2   today's society, but these individuals that really thought they

3   were doing the right thing.  Aaron Eason wasn't part of RAM.

4   The RAM videos that the government has provided in discovery do

5   not show Aaron Eason.  He was never part of the group.

6          When they all showed up with their masks, at

7   Berkeley, Aaron Eason wasn't given a mask.  Aaron Eason wasn't

8   given a cape.  Aaron Eason wasn't part of their promotions.

9   Aaron Eason's fifteen years older than most of those guys.

10  There's just not a connection.

11         So, we will submit on that.

12         **THE COURT:**  Thank you, Mr. McNicholas.

13         **MR. RYAN:**  Very briefly, Your Honor --

14         **THE COURT:**  Can I, let me just ask a question.

15     **(Pause)**

16         Mr. Ryan, on Exhibit 2, the very last photograph,

17  that would be one, two, three --

18         **MR. RYAN:**  -- Your Honor, may I go grab it off the

19  witness stand?

20         **THE COURT:**  -- five --

21         **MR. RYAN:**  I think we gave the court our binder.

22         **THE COURT:**  -- no, let me.  I'll hand that.  I

23  apologize, let me hand, okay.  Do you have an extra copy?  It

24  wasn't touched upon, I don't, I just don't understand what that

25  is.

1          **MR. RYAN:**  I'm sorry, which page?

2          **THE COURT:**  So, it's the very last page of Exhibit 2.

3          **MR. RYAN:**  Oh, so in the altercation that's shown on

4    the previous two pages, the RAM guys in the masks, that's Ben

5    Daley there in the blond, and Michael Miselis there, or Robert

6    Boman there next to him, ripped this banner away from a group

7    of other protesters.  And this is a photograph of them

8    celebrating that, and it's Mr. Eason there next to them.

9          Mr. Eason drove this group in a van, that's set forth

10   in the indictment that he rented and then traveled to the event

11   with them.  And then, it's just one example along with the

12   others of him being with the group throughout the, going to the

13   event, fighting at the event, leaving the event, training for

14   the event, organizing the next event, et cetera.

15         **THE COURT:**  Okay.  All right, thank you.  And I

16   interrupted you Mr. Ryan.  You wanted to make one point.

17         **MR. RYAN:**  No, that was the point I was going to

18   make.  So, that's enough.

19         **THE COURT:**  All right.  Mr. McNicholas, what I'm

20   going to do as I go through this, I think procedurally I need

21   to anchor whatever I say to your bail review filing.  And one

22   of the points that you raise in seeking reconsideration from

23   the District Judge is that I failed to consider the delay and

24   the self-surrender.  And I apologize if I made an imperfect or

25   inaccurate record, but I don't, that did not factor in to my

1    consideration.

2         And I similarly thought that I had been clear that

3    the detention order was with respect to danger and not with

4    respect to flight.  Because, at the original hearing you had

5    proffered significant sureties.  There was the lack of criminal

6    history as well as the fact of the self-surrender.  So, I'll

7    just state clearly, in my mind the time between the notice that

8    Mr. Eason purportedly received the warrant for his arrest, and

9    the ultimate self-surrender did not make an impact on my

10   decision.

11        With respect to, at the time of the detention hearing

12   you had not had an opportunity to obtain more information from

13   organizers of perhaps another event.  I don't know if you meant

14   the Berkeley event, I assume based on what you presented today

15   that you mean, for example, Ms. Welsh, and being able to obtain

16   her testimony.  And that this information, her testimony

17   combined with videos of the event supports your argument that

18   Mr. Eason is not a danger.

19        So, I'll begin first with Ms. Welsh, who I thought

20   was a credible witness who testified to what she knows and

21   appeared to be truthful about that.  One thing though that

22   stood out, and I asked a follow up question about the extent of

23   her relationship in terms of how much she knows Mr. Easton,

24   because I think that goes, or informs my evaluation of how well

25   she knows Mr. Eason as a person and as an individual.  And it

1    sounds like it's their friendly, I think is the word that she

2    used.  And it was clear to me that when shown exhibits,

3    photographs of Mr. Eason in other situations, even at the

4    Berkeley event, that she testified that she had no familiarity

5    and indeed with respect to what happened at Berkeley, that she

6    was not within the immediate vicinity, and therefore was not a

7    percipient witness.  I think that's a fair characterization of

8    what happened at Berkeley.  And similarly was unaware of

9    Mr. Eason's participation at these training events.

10          And I think, without getting into how you would

11   characterize that, if that was a RAM organized event, or an

12   event for RAM members, she simply just doesn't know anything

13   about it.  And so, I think that limits her knowledge as to

14   whether or not Mr. Eason is a danger to the community.

15          When we were together at the first detention hearing,

16   my recollection is that the allegations in the complaint were

17   limited with respect to whether or not Mr. Eason had engaged in

18   any physical contact or assaults.  I think there was a

19   generalized reference, but I thought it was, there wasn't that

20   much there.  Since then, what I have confirmed in front of me

21   is that Mr. Eason did engage physically with other individuals

22   who were present at the Berkeley event.  I appreciate your

23   characterization, or your description Mr. McNicholas, that this

24   was perhaps self-defense or defense of others.  But, at least

25   in looking at the stills of the video, he did engage in

1    physical contact with at least one, potentially two,

2    individuals at the Berkeley event.  So, again, I think that

3    that goes to what you stated in your bail review as bases, some

4    of the bases for why the court should consider, or reconsider,

5    its previous detention order.

6            So, I just wanted to address what I see as the new

7    information that's presented to the court.  Is there anything

8    else that you think is newly presented to the court that I

9    should address for purposes of the record, Mr. McNicholas?

10           **MR. McNICHOLAS:**  No, Your Honor.

11           **THE COURT:**  Okay.  All right.  Then based on all of

12   that, I'm going to deny the, Mr. Eason's request for

13   reconsideration of bail.  Mr. Eason, so I'm essentially denying

14   your attorney's request.  It's up to you and your attorney

15   whether or not you now want to take this before the District

16   Judge, who is the Judge who is presiding and will handle your

17   case. The substance of the case going forward.

18           Anything else for today, Mr. McNicholas?

19           **MR. McNICHOLAS:**  No, Your Honor.

20           **THE COURT:**  All right.  From the government?

21           **MR. RYAN:**  No, Your Honor.

22           **THE COURT:**  Okay.  Thank you.

23       **(Proceeding adjourned at 2:25 p.m.)**

24

25

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



_____                    December 13, 2018_


                    TONI HUDSON, TRANSCRIBER