NICOLA T. HANNA
United States Attorney
PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division
DAVID T. RYAN (Cal. Bar No. 295785)
GEORGE E. PENCE (Cal. Bar No. 257595)
Assistant United States Attorneys
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4491/2253
     Facsimile: (213) 894-2979
     E-mail:    david.ryan@usdoj.gov
                george.pence@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-759-CJC |
|---|---|
| Plaintiff, | GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT AARON EASON'S APPLICATION FOR BAIL REVIEW; EXHIBITS |
| v. | |
| ROBERT RUNDO, ROBERT BOMAN, AARON EASON, and TYLER LAUBE, | |
| Defendants. | |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys David T. Ryan and
George E. Pence, hereby files its opposition to defendant AARON
EASON's application for bail review.

//

//

1    This opposition is based upon the attached memorandum of points

2  and authorities and exhibits, the files and records in this case, and

3  such further evidence and argument as the Court may permit.

4  Dated: December 20, 2018          Respectfully submitted,

5                                    NICOLA T. HANNA
                                     United States Attorney
6
                                     PATRICK R. FITZGERALD
7                                    Assistant United States Attorney
                                     Chief, National Security Division
8

9                                    _____/s/_____
                                     DAVID T. RYAN
10                                   GEORGE E. PENCE
                                     Assistant United States Attorneys
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Table of Contents

Table of Authorities.............................................1

MEMORANDUM OF POINTS AND AUTHORITIES.............................1

I.    INTRODUCTION..............................................1

II.   STATEMENT OF FACTS........................................3

      A.    March 4, 2017: San Diego, California................3

      B.    March 25, 2017: Huntington Beach, California.......3

      C.    April 15, 2017: Berkeley, California................6

      D.    Defendant and Co-Conspirators Celebrated Berkeley and
            Planned for More Events............................9

      E.    San Bernardino, California: June 10, 2017.........11

III.  ARGUMENT.................................................13

      A.    Nature and Circumstances of the Offense Charged..........13

      B.    Weight of the Evidence.............................17

      C.    Personal History and Characteristics...............18

      D.    Nature and Seriousness of the Danger...............19

      E.    Defendant's Proposed Conditions of Release are
            Makeweight.........................................20

IV.   CONCLUSION...............................................21

**Table of Authorities**

**Cases**

Callanan v. United States,

  364 U.S. 587, 81 S.Ct. 321, 5 L. Ed. 2d 312 (1961) ............... 20

Salinas v. United States,

  522 U.S. 52, 118 S.Ct. 469, 139 L. Ed. 2d 352 (1997) ............ 19

United States v. Jimenez-Recio,

  537 U.S. 270 (2003) ........................................... 20

United States v. Rabinowich,

  238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915) ................. 20

**Statutes**

18 U.S.C. § 3142(g) ............................................. 13

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Throughout 2017, defendant and his co-conspirators engaged in a campaign of violence, traveling far and wide to assault people who did not share their white supremacist ideology at political rallies, recruiting and training members to join their racist cause, and bragging about their "victories" online.  Defendant and his co-conspirators used the cover of free expression to disguise their true goal:  to batter, beat, and suppress the speech of those with whom they disagreed.  Defendant has not renounced this goal; to the contrary, in September 2017 he wrote to a co-conspirator about his plan to "go hard" with their brand of violent activism, and upon his arrest in October 2018, agents seized notebooks showing defendant's plans to continue recruiting and building the "White Nationalist" movement.  Courts in California and Virginia have uniformly held that there is no set of conditions that might be fashioned that sufficiently mitigate the clear danger to the community and risk of flight that defendant's co-conspirators present.  And there are no such conditions that might be fashioned with respect to defendant, who should remain detained.

The evidence of defendant's violent propensities is overwhelming.  Hours of video footage show defendant and his co-conspirators trampling over police barricades, chasing their victims through city streets, and punching people who posed no physical threat to them, all while chanting pro-fascist messages such as "Pinochet! Pinochet!" and expressly violent exhortations such as "knock that little bitch out!"  In light of this overwhelming evidence, two of the eight defendants charged for these riots have

1   already pleaded guilty and admitted that they and other members of

2   what they described as the "DIY Division" and "Rise Against Movement"

3   ("RAM") assaulted protestors at both Huntington Beach and Berkeley.

4   This evidence, and defendant's co-conspirators' guilty pleas, flatly

5   refute defendant's attempt to characterize his conduct and that of

6   his co-conspirators as peaceful or confined to self-defense.

7        Defendant's acts of violence were not random.  Rather, they were

8   the result of defendant and his co-conspirators coming together

9   around their shared ideology to engage in violent confrontations

10  against those with opposing political views.  Defendant's adherence

11  to violent extremist ideology is central to understanding the acts of

12  violence charged in this case and the ongoing danger he poses to the

13  community.  Defendant's writings are replete with Nazi swastikas,

14  anti-Semitic images, lists of "potential recruits," a strategy for

15  building a "White Nationalism" movement, and a "Courage Plan" to

16  "fight and trounce someone in anger," and "practice an attitude of

17  alpha dominance everywhere you go."  Defendant's co-conspirators —

18  with whom defendant participated in three riots, and whom defendant

19  recruited, trained, and drove to the Berkeley riot — openly shared

20  their allegiance to Adolf Hitler, Nazism, and Fascism through online

21  posts, text messages, and "Heil Hitler" tattoos and graffiti.

22       That is why the Magistrate Judge has twice ordered this

23  defendant detained pending trial, and why with the exception of Tyler

24  Laube (whom this Court ordered released on bond only after he pleaded

25  guilty, accepted responsibility for his conduct, and came forward

26  with seven sureties), all six remaining defendants arrested in

27  connection with these riots (two of whom attempted to flee) have been

28  detained by all five Judges who have reviewed the cases against them.

## II.   STATEMENT OF FACTS

### A.   March 4, 2017: San Diego, California

On March 4, 2017, defendant attended a political rally in San Diego, California, along with co-defendants Robert Rundo ("Rundo"), Robert Boman ("Boman"), and Tyler Laube ("Laube"), and other members of what was then known as the "DIY Division" and later re-branded to the Rise Above Movement ("RAM"), including Michael Miselis ("Miselis") and RAM co-founder Benjamin Daley ("Daley").  According to witness statements, a group of counter-protestors standing at the back of the event traded insults with the defendants and their associates as they arrived.  Video of the event recorded by Boman shows Boman walking across the front of the stage holding a sign with the words "Da Goyim Know," while others in the group cheered.[1]  (Ex. 1A).  Moments later, Laube said, "we got here at the wrong time, dude, I really wanted to fuck those motherfuckers up."  Another associate responded, "I know, right.  But it wouldn't have happened, there were so many cops."  Laube responded, "yea well they came in and they were talking shit but all the cops were around them.  It's pretty easy to talk shit when you're surrounded by cops."  (Ex. 1B).  The San Diego event concluded without an outbreak of violence.

### B.   March 25, 2017: Huntington Beach, California

On March 15, 2017, defendant attended a combat training session with Rundo, Daley, Laube, and other DIY Division/RAM members.  The DIY Division documented the training event on its Instagram account, posting a photograph of defendant and the other attendees at the

---

[1] As stated in the Complaint, the phrase "da goyim know" is used by white supremacy extremists to refer to their purported knowledge of a Jewish conspiracy to control world affairs.  (See Dkt. 1, ¶ 21).

event.[2]  (Ex. 2 at 1).  On March 25, 2017, defendant attended another political rally in Huntington Beach, California, along with Rundo, Daley, Laube, Boman, Miselis, and other DIY Division/RAM members. Several hundred people attended the "Make America Great Again" rally that day, the vast majority of whom engaged in peaceful activities throughout the day.  (Complaint, Dkt. 1, ¶ 20).

Videos show hundreds of rally attendees marching south along the beach.  (See Ex. 3A).  At the same time, to the north of the marchers, defendant, his co-conspirators, and other associates carrying signs that read "DEFEND AMERICA" and "Da Goyim Know," did not march south, but went to the area where a small group of counter-protestors had gathered.  (Complaint, Dkt. 1, ¶ 21).

Defendant, Boman, Daley, and Laube, at the forefront of a group of at least 30 others, confronted a photographer and a reporter covering the event for a local publication called The OC Weekly. (Ex. 3B at 0:00-0:30).[3]  A man then shoved the OC Weekly photographer from behind, and punched the reporter four times, while an event organizer, Jennifer Sterling, tried to pull the man away.  (Id. at 0:30-0:39).  As the reporter stumbled backward, Laube grabbed the reporter's shoulder with his left hand, and punched the reporter three times in the face.  (Id. at 0:39-0:42).  Ms. Sterling attempted to pull defendant Laube away.  A counter-protestor released pepper

---

[2] Defendant has repeatedly asserted that he was not included in RAM promotional materials.  (Dkt. 106 at 53, Dkt. 104 at 9).  In fact, however, as set forth herein, defendant appears in several photographs posted on social media by RAM and its predecessor organization the DIY Division.

[3] Defendant is shown confronting the journalists while wearing a green jacket and a red hat, while Daley, Boman, Laube, and other stand directly behind him.

spray, leading the crowd to momentarily disperse.  (Id. at 0:42-0:50).

Seconds later, defendant, Rundo, Boman, Daley, Miselis, and at least 20 other people began pursuing three counter-protestors north along the beach, with several people chanting, "You can't run, you can't hide, you get helicopter ride!"[4]  (Ex. 4 at 0:00-0:14).[5]  Boman kicked one counter-protestor in the back, and shoved a second counter-protestor in the back.  (Id. at 0:04, 0:20; Ex. 3B at 1:27, 1:43).  Another man punched the third counter-protestor in the face, knocking her down, as a third yelled, "knock that little bitch out!" (Ex. 4 at 0:28-30).  Seconds later, Rundo approached two of the counter-protestors from behind, punched one in the back of the head, turned to the other, punched him in the back of the head, grabbed the back of his neck, and threw him to the ground, landing on top of him. Rundo held the counter-protestor down with his left hand and threw several punches at his head while defendant and other RAM members looked on.  (Ex. 3B at 1:54-2:15; Ex. 4 at 0:29-0:50).  After several seconds, the counter-protestor released pepper spray, leading Rundo to back away.  The counter-protestor then ran northeast from the beach into a parking lot, while a large group pursued him, pushing him and hitting him with flag poles.  (Ex. 3B at 2:15-2:49).

---

[4] White supremacy extremists and neo-Nazis often refer to "helicopter rides" when discussing how to treat communists and other anti-fascists.  The phrase is a reference to extrajudicial killings known as "death flights" committed by General Augusto Pinochet's forces in Chile in the late 1970s, in which the dictator's forces threw opponents out of helicopters.

[5] Defendant appears in Exhibit 4 again in his green jacket and red hat, standing next to Boman, who is holding the "Da Goyim Know" sign, and Daley, who is wearing a black shirt and sunglasses.

The next day, March 26, 2017, defendant celebrated this violence online.  Boman posted on Facebook a link to an article from The Daily Stormer, a news website and online community forum that is well known among neo-Nazis and white supremacy extremists, titled "Trumpenkriegers Physically Remove Antifa Homos in Huntington Beach," along with the comment, "We did it fam."  (Ex. 5).  Later that day, EASON commented on the post, "TRUMPENKRIEGERS!!!!!!"  (Id.)

Defendant's co-conspirators continued bragging about their violence for months.  Later in 2017, the RAM Instagram account posted a photograph of Rundo punching a counter-protestor at the Huntington Beach event, with the words "Physical Removal" superimposed across the top and the comment, "The day we got our start.  Not many altrighters can say they Not only stood and fought antifa but actually chased them out of rallies and keep fellow patriots safe." (Ex. 6).  The RAM Twitter account also posted a picture showing several DIY Division/RAM members at the Huntington Beach rally, standing behind their "Defend America" sign, with the accompanying text, "Shortly after this pic antifa was btfo in Huntington Beach."[6] (Complaint, Dkt. 1, ¶ 31).

**C.   April 15, 2017: Berkeley, California**

In the weeks before the political rally in Berkeley, California on April 15, 2017, numerous groups and individuals commonly referred to as "far-right" and "far-left" promoted their intention to engage in a massive violent confrontation, or "battle," at the event.  A previous event in Berkeley on March 4, 2017, had descended into violence between these opposing groups.  According to one former DIY

---

[6] "BTFO" stands for "Blown the Fuck Out."

1  Division/RAM associate, Daley and others in the group frequently

2  discussed how the event on April 15 was going to be a "war."

3      Defendant started preparing for the "war" almost immediately.

4  On March 27, 2017, defendant sent a text message to Miselis stating

5  that he was "expecting about 15 solid guys in our caravan coming up

6  from So Cal and we can accommodate [sic] as many as you can give. . .

7  .  Anyone who doesn't come will wish they had." (Complaint, Dkt. 1,

8  ¶ 32).  Defendant told Miselis, "we have hand to hand and formation

9  fighting training in San Clemente this Saturday.  It's not required,

10  but we'd like to get everyone we can there."  (Id.)  Two days later,

11  defendant confirmed with Miselis, "Training is a go. . . . We'll

12  probably have equipment for shield and stick training and our

13  formation tactics ready."

14      Defendant then posted several Twitter messages to promote the

15  attendance of his co-conspirators at the Berkeley event, building on

16  the notoriety they gained from their assaults at Huntington Beach.

17  On April 3, 2017, defendant posted on the Twitter accounts of several

18  prominent political activists that the "boys who chased antifa off

19  the beach in Huntington are coming up" to Berkeley, and asking for

20  the activists to give them a "shout out" and "put some heart in

21  them." (Ex. 7).

22      Defendant not only promoted the coming conflict and recruited

23  soldiers for it; he also handled the logistics.  Defendant reserved

24  an 11-passenger van for the group to travel to Berkeley, arranged

25  payment for their hotel rooms, and traveled with the group from Los

26  Angeles to the rally.  (Ex. 8).

27      At the event, defendant's co-conspirators, whom he had

28  recruited, trained, promoted, and driven to the rally, showed up

ready to do battle, carrying their "Da Goyim Know" and "Defend America" signs, with their hands taped, goggles on, mouth guards in, and faces covered in skull masks. (Ex. 9). Numerous videos show the chaos that unfolded. The two sides were initially separated by orange fencing while they faced off and exchanged insults, with Daley and others at one point chanting, "Pinochet! Pinochet!" (Ex. 10A). After several minutes, defendant, Rundo, Daley, Miselis, and others who had been standing with them at the front of the orange barrier charged across the barrier and began fighting with counter-protestors. (Ex. 10B).[7] After pepper spray was released and defendant and his group returned to their side of the barrier, the two groups again faced off, now separated by police officers, trading insults, threatening each other, and challenging each other to continue fighting. (Exs. 10C, 10D).

Moments later, defendant and his group crossed the orange barrier again and engaged in fights with the counter-protestors. This time, defendant punched a counter-protestor in the back of the head. (Ex. 11 at 0:01-0:09). Defendant and his co-conspirators then lined up in formation, as did a group of counter-protestors, to prepare for another confrontation. A minute later, Daley, Boman, and others ripped a banner away from a group of counter-protestors, while Rundo punched multiple individuals before being subdued and arrested by a Berkeley Police Officer, whom Rundo punched two times in the face. (Id. at 1:00-01:27).

---

[7] As set forth in the Indictment, RAM later bragged about initiating this violence, sending a Twitter message to another Twitter user who had proposed interviewing RAM leaders on a podcast, "Maybe if there [is] enough time could mention [Berkeley] how we were the first guys to jump over the barrier and engage and how that had a huge impact." (Indictment, Dkt. 47, at 11).

Over the next several minutes, the counter-protestors began to leave the park where the rally was held and walk through the streets. Defendant and his co-conspirators pursued them, as both sides continued to hurl insults and engage in numerous confrontations and skirmishes.  The groups then formed against each other in the streets, far removed from the original rally location, with Boman at the front engaging in a verbal back-and-forth with a counter-protestor, before a smoke bomb erupted, a large group yelled "Charge!," and defendant, Rundo, Daley, Miselis, Boman, and others began chasing the counter-protestors through the streets. (Ex. 12 at 0:00-1:15).  During that pursuit, numerous fistfights broke out, with defendant, Daley, Boman, Miselis, and others from their group at the forefront.  (Id. at 1:15-3:05).

### D.   Defendant and Co-Conspirators Celebrated Berkeley and Planned for More Events

After the Berkeley event, defendant and his co-conspirators shared celebratory messages online and through text messages. Immediately after the event, defendant and his co-conspirators posed for a celebratory picture with the banner they had ripped away from counter-protestors.  (Ex. 13).  The next day, the DIY Division Instagram account posted a photograph showing defendant with Daley, Rundo, and others wearing their skull masks in the van defendant had rented to take them to the event.  (Ex. 14 at 1).  An associate commented on the post, "How'd you guys do?"  The DIY Division Instagram account responded, "to[o] good to even talk about on here." Another associate replied, "I expect at least 20 shill scalps," and a third replied, "Total right wing victory."  (Id. at 2).

Also on April 16, 2017, Miselis sent a text message to an associate describing how "our guys were just wrecking them, like not even any room to get a hit in," and how he had "found a video on that site where you can see me breaking [my hand] on a guys head lol." (Complaint, Dkt. 1, ¶ 43).  The associate responded, "I've been looking at videos.  There's a grey-shirted storm trooper at the fucking front every, single, time.  You guys were lions."  Miselis replied, "Total Aryan victory."  (Id.).

On April 20, 2017, the DIY Division Instagram account posted another photograph showing defendant, Miselis, and a third DIY Division/RAM member standing amidst smoke at the Berkeley event, with the accompanying hashtag, "#DIYDIV."  (Ex. 15).

On April 21, 2017, defendant again sought to recruit soldiers to travel to Berkeley.  He sent a text message to Miselis asking if his broken hand was strong enough to attend another event at Berkeley the next week, stating, "I'm driving up to deny antifa a face-saving victory."  (Id. ¶ 44.)  Defendant also sent Facebook messages to Boman, Daley, and Brittney Welch[8] to recruit them to the upcoming Berkeley event, stating, "Berkeley again.  Returning victors. They're going to feel like th[e] SoCal boys OWN their town."  (Ex. 16 at 3).  After others expressed hesitancy to go, defendant wrote, "we can't let antifa make a comeback.  Another shaming will break them, a victory will make it like Berkeley ne[v]er happened."  (Id. at 2).

On May 7, 2017, Boman posted on Facebook about another upcoming event, with a picture stating "Every Race Has a Place," and the comment, "Shit is going to get buck out there."  (Ex. 17).  An

---

[8] Brittney Welch has also gone by Brittney Dillinger, which is the name shown on her Facebook profile.

10

associate replied, "You should be there . . . you would ROCK some

[Black Lives Matter] bitches!"  Another associate commented, "You

know what I want.  Let them start this civil war.  We will end it."

Boman replied, "Shit bro.  The Jew army would shut it down pretty

quick I feel."  Brittney Welch responded, "Totally wish we could be

there."  Boman replied, "It's going to get outrageous.  Cops aren't

going to do jackshit."  (Id.)

**E.   San Bernardino, California: June 10, 2017**

Defendant and his co-conspirators soon mobilized for violence

again.  On May 15, 2017, the DIY Division Instagram posted a

photograph of Rundo wearing a black skull mask with the comment,

"#rightwingdeathsquad." (Ex. 18).  On June 1, 2017, Daley sent a

Facebook message to an associate stating that he and 30 others were

planning to "take over" an upcoming march, and sharing photographs of

signs that they planned to carry at the march.  (Indictment, Dkt. 47,

at 8).  On June 10, 2017, defendant, Daley, Rundo, Miselis, and other

DIY Division/RAM members attended a political rally in San

Bernardino, California, carrying the signs shown in Daley's Facebook

message, including flags showing individuals being thrown out of

helicopters, in reference to the "helicopter rides" or "death

flights" discussed above.  (Ex. 19).

According to police officers providing security at the rally,

while hundreds of attendees marched peacefully, a group of

demonstrators began facing off with a group of counter-protestors

standing on an opposite street corner.  The rally organizer contacted

the police officer and said that a group of young men who were not

part of her group, and whom she believed were white supremacists,

were "acting aggressively toward the counter protestors." (Ex. 20 at

1). The officer saw that some of the people in that group were wearing black masks with white skulls on them. The officer heard members of the group identify themselves as "Rise Above," and saw them "on several occasions, walking aggressively toward the counter protestors in an apparent attempt to provoke and intimidate them." (Id.). The counter-protestors sought police protection as they tried to leave the area, and the officers saw "several individuals from the aggressive group running" across the street, "chasing counter protestors to their vehicles," and "hitting their vehicles with flag poles." (Id. at 1-2). Officers arrested three individuals, all of whom were wearing the distinctive DIY Division/RAM skull masks.

Three days later, Daley sent a text message to an associate, stating, "we smashed some antifa as they were leaving." (Indictment, Dkt. 47, at 9). The associate responded, "If it wasn't for the White Nationalists nothing would ever get done." Daley replied, "This is true would've been no victory in Huntington or Berkeley." (Id.).

Over the next several months, Daley, Miselis, and other DIY Division/RAM members attended and assaulted protestors at the Unite the Right Rally in Charlottesville, Virginia on August 11-12, 2017, and frequently bragged on social media about the assaults they had committed in Huntington Beach, Berkeley, and San Bernardino, describing themselves as "the only alt right crew that actually beats antifa senseless and wins rallies," and posting numerous photographs and videos of themselves assaulting protestors at political rallies. (Id. at 10). A month after the Charlottesville event, defendant sent a text message to Miselis, stating that he was "back in a position to go hard with activism" after having been "sidetracked after Berkeley." (Id.)

**III. ARGUMENT**

To determine whether pretrial detention is warranted, the Court considers: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  See 18 U.S.C. § 3142(g).  All four factors here weigh in favor of detention.

**A.    Nature and Circumstances of the Offense Charged**

The Indictment and criminal complaint set forth that defendant recruited, trained, and traveled with large groups of co-conspirators to engage in violent confrontations against political opponents at political rallies.  At these rallies, not only did defendant engage in violent acts himself, but those he recruited, trained, promoted, and traveled with were among the leaders in inciting and committing acts of violence.

Defendant contends that he was at the events only to "protect speakers," and not to engage in violence.  (Dkt. 104 at 5).  Yet his and his co-conspirators' own words and actions, captured on videos, text messages, and social media posts, show otherwise.  The video shows him and his co-conspirators repeatedly confronting, pursuing, and assaulting counter-protestors.  After these events, defendant did not recoil or regret that matters had gotten out of hand.  He did not seek to separate himself.  On the contrary, he and his co-conspirators went on social media to celebrate and brag about those assaults, and plan for more.  After Huntington Beach, when the assaults committed by Rundo, Boman, and others were celebrated on the neo-Nazi website The Daily Stormer, defendant celebrated along with

them on Facebook and Twitter and recruited them to Berkeley, inviting
them to "hand to hand and formation fighting training" and assuring
them the Berkeley event was not to be missed: "Anyone who doesn't
come will wish they had."  (Complaint ¶ 32).

After Berkeley, which devolved into a massive riot, defendant
again did not seek to separate himself.  Instead, he was immediately
ready to go again, recruiting Boman and others days later to go back
to Berkeley as "Returning victors" to "deny antifa a face-saving
victory," deliver "another shaming," and make them "feel like th[e]
SoCal boys OWN their town."

Defendant's own words show his satisfaction with the "victory"
he and the group he brought to Berkeley had achieved, and their
intent to deliver another victory at the next event.  That is why the
Magistrate Judge rejected defendant's attempt to minimize his own
involvement, explaining to defendant:

> I spent a lot of time looking at the timeline
> that's set out in the affidavit, what's described
> about this organization RAM.  I took a look at
> the statements that are attributed to you and
> what's described about your participation and/or
> involvement at Berkeley.  And what I take away
> from that is that you appear to understand what
> the movement . . . was doing or did in appearing
> . . . at these events . . . that you took steps
> to arrange, not only for transportation, but some
> type of training.  And then I have a statement
> after that, when it appears to me that you should
> know or should've known what the movement was
> attempting to do, based on the violence that
> occurred at Berkeley . . . showing that you are
> not . . . withdrawing from the movement or the
> conspiracy that's been charged, but instead, you
> are still participating.

(Ex. 21 at 30).

As the Magistrate Judge found, defendant continued participating
through at least the San Bernardino event in June 2017, and sought to

14

1  reengage after the deadly events in Charlottesville in August 2017,

2  when he wrote to Miselis that he was "back in a position to go hard

3  with activism."[9]

4        In response to this evidence, defendant relies on a declaration

5  from Brittney Welch stating that he did not harbor racist views and

6  did not intend to engage in violence.  Ms. Welch, however, admitted

7  that she was not at any training events with defendant and his co-

8  conspirators, she was not at the events in Huntington Beach or San

9  Bernardino, and she did not see the assaults captured on video at

10 Berkeley committed by defendant and those he invited at her request.

11 (Ex. 22 at 24, 26-29, 38).  Her absence from the key events at issue,

12 the Magistrate Judge found, "limits [Ms. Welch's] knowledge as to

13 whether or not Mr. Eason is a danger to the community."  (Id. at 56).

14       Furthermore, Ms. Welch's testimony is contradicted not only by

15 hours of footage and the defendant's own social media and journal

16 entries, but also by her own subsequent communications.  A week after

17 the Berkeley event, when defendant stated on Facebook his intent to

18 go back to Berkeley as "Returning victors" to "break" antifa and make

19 them "feel like th[e] SoCal boys OWN their town," Ms. Welch replied,

20 "I will be there in spirit."  (Ex. 16 at 2-3).  A week after that,

21 contrary to Ms. Welch's testimony that she believed Daley and others

22 were not part of a group and were just friends who "hung out," (Ex.

23 22 at 26), Ms. Welch invited Daley and Boman on Facebook to another

24 political event, stating, "It's an opportunity for you guys to

25

26       [9] Before the Magistrate Judge, defendant asserted that his
   message to Miselis actually referred to his plan to begin "planting
27 trees."  (Ex. 21 at 25; Ex. 22 at 44).  Unsurprisingly, the
   Magistrate Judge found that assertion "difficult to credit."  (Ex. 22
28 at 45).

1  recruit."  (Ex. 23).[10]  And a week after that, after Boman advertised

2  on Facebook another event and described how "shit is going to get

3  buck out there," after another person replied that Boman would "ROCK

4  some [Black Lives Matter] bitches!", and after Boman replied that

5  "[t]he Jew army would shut it down pretty quick," Ms. Welch replied,

6  "Totally wish we could be there."  (Ex. 17 at 1).

7       In light of defendant's own words and actions, and those of his

8  co-conspirators, captured on video, social media, and text messages,

9  there is simply no basis for defendant's assertion that he did not

10 commit acts of violence at political rallies, did not recruit and

11 train others to do so, and was not associated with the DIY

12 Division/RAM.  Nor is there a basis for defendant's assertion that

13 the violence at these rallies was provoked and perpetrated solely by

14 those on the opposing side.  (Dkt. 104 at 9-13).  At Huntington

15 Beach, the video shows defendant and his large group pursuing a small

16 group of counter-protestors, and punching and kicking them in the

17 back.  At Berkeley, the video shows people from both sides arrived

18 ready to do battle, which is exactly what they did.  Defendant shares

19 several examples of violence perpetrated by those on the opposing

20 side throughout the day.  But, the fact that people on the other side

21 shared the intent to engage in battle does not change the defendant's

22 deep culpability for his own actions, including planning, preparing,

23 and mobilizing others for violence.

24      For those actions, defendant now faces a significant period of

25 incarceration.  Contrary to defendant's assertion, his likely

26

27      [10] In the months before and after Ms. Welch's Facebook
   communications with Daley and Boman, both of their Facebook profiles
28 were replete with explicit messages in support of Adolf Hitler and
   neo-Nazi ideology.

1  Guidelines range, after the application of specific offense

2  characteristics, is 46-57 months without acceptance of

3  responsibility, and 33-41 months with acceptance.  Defendant

4  calculated a far lower Guidelines range by "assuming," without any

5  basis to do so, that no enhancements would be applicable.  (Dkt. 104

6  at 2).  Based on his false assumption, defendant also asserted that

7  his sentencing exposure would "not justify any reasonable person to

8  flee." (Dkt. 104 at 14).  This argument must carry little weight when

9  two of his co-defendants in this case already fled – defendant Rundo

10 fled to Cuba and El Salvador, where he was arrested, and defendant

11 Boman led police on a lengthy chase on bicycle and on foot before

12 agents tackled and apprehended him.  Given the serious, violent

13 nature of the charges, this factor strongly weighs in favor of

14 detention.

15 **B.  Weight of the Evidence**

16 This factor strongly weighs in favor of detention.  As set forth

17 above, the defendant and his co-conspirators' assaults were captured

18 on video, and their efforts to recruit, train, plan for, and

19 celebrate those assaults throughout 2017 were captured on social

20 media and text messages.  Thus, the evidence against defendant and

21 his co-conspirators is largely in the form of their own words and

22 their own actions, which establish their intent to engage in acts of

23 rioting, and their execution of that intent at political rallies.

24 For these reasons, two of the eight defendants charged in

25 connection with these riots have already pleaded guilty.  Co-

26 defendant Tyler Laube pleaded guilty in this case and admitted that

27 the DIY Division/RAM "regularly held hand-to-hand and other combat

28 training for RAM members and associates to prepare to engage in

17

violent confrontations with protestors and other individuals at political rallies," including one such training session, which defendant attended, on March 15, 2017.  (Dkt. 59 at 5).  Laube further admitted that he "and several RAM members assaulted protestors and other persons" at the Huntington Beach event on March 25, 2017.  (Id.)

Similarly, Cole White pled guilty in the related case in the Western District of Virginia, admitting that he not only engaged in acts of rioting in Charlottesville, but also in Berkeley on April 15, 2017.  White admitted that he met Daley at the Berkeley event, who was "with a group of individuals who identified themselves as the 'Rise Above Movement' or 'RAM.'"  (Ex. 24 at 1).  White further admitted that "there were several violent clashes between some rally attendees and some individuals protesting the rally," and "[i]n one of the first such instances, RAM members crossed the barrier separating the attendees and protestors, and assaulted protestors."  (Id.)  White further admitted that, "[a]s the rally broke up, rally attendees and protestors dispersed onto the streets of downtown Berkeley," where he, "alongside other RAM members, followed a group of protestors who were leaving the area . . . chased after one of the protestors and attacked him, punching him several times in the head," and then "stood over top of another individual who was on the ground and punched him in the head approximately four to five times."  (Id.)  Finally, White admitted, "None of these acts of violence were in self-defense."  (Id.)

## C.   Personal History and Characteristics

Defendant's history and characteristics further weigh in favor of detention, because they include his adherence to an extremist

18

white supremacy ideology in furtherance of which he has already engaged in violence, as set forth above.  Defendant's own Facebook page and journal are not only replete with Nazi swastikas and virulent anti-Semitic images and content, but also lists of "potential recruits," plans to conduct vigilante "patrols" with the organization "Soldiers of Odin," plans to recruit using the neo-Nazi website "Storm Front," a strategy for building a new "White Nationalism 3.0" movement, and a "Courage Plan" to "fight and trounce someone in anger," and "practice an attitude of alpha dominance everywhere you go."  (Exs. 25, 26).

Defendant and his co-conspirators executed defendant's "Courage Plan" throughout 2017, moving to chants of "Pinochet! Pinochet!" and carrying anti-Semitic signs as they pursued and assaulted journalists, anti-fascist protestors, and others.  In light of defendant's adherence to this extremist and hateful ideology, and his history of recruiting others with the ideology to assault political opponents, this factor weighs in favor of detention.

### D.   Nature and Seriousness of the Danger

The nature and seriousness of the danger that would be posed by defendant's release is demonstrated by the danger he has already posed through his own conduct, and that of those he has recruited into his movement, as set forth above.

The Supreme Court emphasized the danger posed by those who not only commit crimes themselves, but conspire with others to do so, explaining that conspiracy

> is "a distinct evil," which "may exist and be punished whether or not the substantive crime ensues." Salinas v. United States, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L. Ed. 2d 352 (1997).  The conspiracy poses a "threat to the public" over and above the threat of the commission of the

relevant substantive crime - both because the "[c]ombination in crime makes more likely the commission of [other] crimes" and because it "decreases the probability that the individuals involved will depart from their path of criminality." Callanan v. United States, 364 U.S. 587, 593-594, 81 S.Ct. 321, 5 L. Ed. 2d 312 (1961); see also United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915) (conspiracy "sometimes quite outweigh[s], in injury to the public, the mere commission of the contemplated crime").

United States v. Jimenez-Recio, 537 U.S. 270, 274-75 (2003)

Defendant's own words and actions show that he has not withdrawn from the movement he has helped to build through his participation in this conspiracy. Instead, he has continued to build it. This factor weighs strongly in favor of detention.

**E.  Defendant's Proposed Conditions of Release are Makeweight**

In addition to the standard terms of pre-trial release, defendant also proposes that he be prohibited from attending political events and rallies and from associating with any white nationalist organization. These proposed conditions fail to mitigate sufficiently the danger to the community that defendant presents.

First, the proposed conditions are largely unenforceable. To ensure compliance, the probation office would have to monitor defendant's activities—including his activities online, where white nationalism flourishes—24 hours per day, seven days per week. The probation office is not well-positioned to devote the resources that would be necessary for such a project. Moreover, unlike restrictions on contacting a victim or witness, defendant's non-compliance would likely go unreported by a third party.

Second, even if this monitoring problem could be solved, there is the additional problem of defining the prohibited conduct. Defendant's own journals make clear that the modus operandi of "WN

20

3.0" is to avoid the "embarrassing" symbols, style, and behavior of earlier white nationalists, such as former Ku Klux Klan Grand Wizard "David Duke" and the "Skinhead movement," and to adopt a "more sensible" approach to "create good public op[]inion." (Ex. 25).  As defendant himself recognizes, this new form of white nationalism is, by design, difficult to distinguish from the mainstream.  The heavy burden of making this distinction would fall first on the probation officer and then on the Court, and would raise difficult questions of political affiliation that courts, for good reason, often seek to avoid answering.  For example, defendant's writings indicate his affiliation with the Soldiers of Odin, (Ex. 19 at 4), which does not self-identify as a white nationalist group, but which has been identified by the Anti-Defamation League as a "hate group."

Moreover, defendant's proposed restriction prohibits contacts only with "organizations," which is another term that defies ready definition, especially in this context, where white nationalist groups form and re-form under different names, or no name at all. For example, even before the co-conspirators adopted the names "DIY Division" and "RAM," they were already a dangerous group of white nationalists.  Whether defendant's affiliation with a similar group in the future would be covered by the proposed condition of release is simply not clear.

## IV.  CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court order defendant to remain detained pending trial.