HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
JULIA DEIXLER (Bar No. 301954)
(E-Mail:  julia_deixler@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
ROBERT RUNDO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>        v.<br><br>ROBERT RUNDO,<br>ROBERT BOMAN,<br>AARON EASON, and<br>TYLER LAUBE,<br><br>               Defendant. | Case No. CR 18-759-CJC<br><br>**DEFENDANTS ROBERT RUNDO, ROBERT BOMAN, AND AARON EASON'S JOINT MOTION TO DISMISS THE INDICTMENT** |

TO: UNITED STATES ATTORNEY NICOLA T. HANNA AND ASSISTANT UNITED STATES ATTORNEYS DAVID RYAN AND GEORGE PENCE:

PLEASE TAKE NOTICE that on May 20, 2019, at 9:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Cormac J. Carney, United States District Court Judge, Defendants Robert Rundo, Robert Boman, and Aaron Eason will jointly bring for hearing the following motion:

1

## **MOTION**

2          Defendant Robert Rundo, by and through his counsel of record, Deputy Federal

3   Public Defender Julia Deixler, Defendant Robert Boman, by and through his counsel of

4   record, Peter Swarth, and Defendant Aaron Eason, by and through his counsel of

5   record, John Neil McNicholas, hereby move for an order dismissing Counts One and

6   Two of the Indictment.  This motion is made pursuant to Rule 12(b) of the Federal

7   Rules of Criminal Procedure and the First and Fifth Amendments of the United States

8   Constitution, and is based on the attached memorandum of points and authorities, all

9   files and records in this case, and any further information and argument that may be

10   presented to the Court.

11

12                                              Respectfully submitted,

13                                              HILARY POTASHNER
                                               Federal Public Defender
14

15   DATED:  April 22, 2019              By   */s/ Julia Deixler*
                                               ─────────────────────────
16                                             JULIA DEIXLER
                                               Deputy Federal Public Defender
17                                             Attorneys for ROBERT RUNDO

18

19                                       By   */s/ per email authorization*
                                               ─────────────────────────
20                                             PETER SWARTH
                                               Law Offices of Peter Swarth
21                                             Attorney for ROBERT BOMAN

22

23                                       By   */s/ per email authorization*
                                               ─────────────────────────
24                                             JOHN NEIL MCNICHOLAS
                                               McNicholas Law Office
25                                             Attorney for AARON EASON

26

27

28

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ...................................................................................... 1

II. OFFENSES CHARGED ........................................................................ 2

III. FACTUAL BACKGROUND................................................................. 4

IV. ARGUMENT......................................................................................... 5

    A.    Count Two Must be Dismissed Because the Anti-Riot Act is Unconstitutionally Overbroad............................................................... 6

        1.    *The Statute is Facially Overbroad Because it Regulates a Substantial Amount of Protected Speech and Assembly*.................... 6

        2.    *The Statute Violates the Heckler's Veto Doctrine*. .......................... 11

    B.    Count Two Must Be Dismissed Because the Anti-Riot Act is Unconstitutionally Vague.................................................................... 13

        1.    *The Statute is Void for Vagueness*. .................................................. 13

        2.    *The Statute is Unconstitutionally Vague as Applied to Defendants*. ..................................................................................... 16

    C.    The Allegations in Count Two Are Insufficient to Establish that Defendants Violated the Anti-Riot Act....................................... 18

        1.    *The Indictment Fails to Allege an Interstate Commerce Nexus*. ..... 18

        2.    *The Indictment Does Not Allege a Riotous Intent*. .......................... 21

    D.    Count One Must Be Dismissed Because it Violates Wharton's Rule. ....... 21

    E.    Count One Must be Dismissed For the Same Reasons as Count Two. ...... 23

V. CONCLUSION...................................................................................... 23

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Federal Cases**

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002).............................................................................. 6

*Bible Believers v. Wayne Cty.*,
  805 F.3d 228 (6th Cir. 2015) .......................................................... 8, 11

*Virginia v. Black*,
  538 U.S. 343 (2003).............................................................................. 6

*Bond v. United States*,
  564 U.S. 211 (2011)............................................................................ 19

*Bond v. United States*,
  572 U.S. 844 (2014)............................................................................ 19

*Boos v. Barry*,
  485 U.S. 312 (1988).............................................................................. 2

*United States v. Boren*,
  278 F.3d 911 (9th Cir. 2002) .............................................................. 4

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)...................................................................... 6, 7, 8

*United States v. Buddenberg*,
  2010 WL 2735547 (N.D. Cal. Jul. 12, 2010) ............................... 18

*City of Chicago v. Morales*,
  527 U.S. 41 (1999)............................................................................. 13

*United States v. Dellinger*,
  472 F.2d 340 (7th Cir. 1972) ....................................................*passim*

*United States v. Doremus*,
  888 F.2d 630 (9th Cir. 1989) ...................................................... 13, 16

*New York v. Ferber*,
  458 U.S. 747 (1982)............................................................................. 7

*Forsyth Cty., Georgia v. Nationalist Movement*,
  505 U.S. 123 (1992)..................................................................... 11, 12

# TABLE OF AUTHORITIES

Page(s)

*Gebardi v. United States*,
   287 U.S. 112 (1932)..................................................................................21

*Giaccio v. Pennsylvania*,
   382 U.S. 399 (1966)..................................................................................14

*Gitlow v. New York*,
   268 U.S. 652 (1925)..................................................................................10

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)..................................................................................13

*Gregory v. City of Chicago*,
   394 U.S. 111 (1969)..................................................................................12

*Hamling v. United States*,
   418 U.S. 87 (1974)....................................................................................18

*United States v. Harris*,
   705 F.3d 929 (9th Cir. 2013) ...................................................................16

*Hess v. Indiana*,
   414 U.S. 105 (1973)....................................................................................8

*Virginia v. Hicks*,
   539 U.S. 113 (2003)....................................................................................6

*Iannelli v. United States*,
   420 U.S. 770 (1975)....................................................................21, 22, 23

*Johnson v. United States*,
   576 U.S. __, 135 S. Ct. 2551 (2015) .......................................................15

*United States v. Kilbride*,
   584 F.3d 1240 (9th Cir. 2009) .................................................................16

*Kolender v. Lawson*,
   461 U.S. 352 (1983)............................................................................13, 14

*United States v. Lopez*,
   514 U.S. 549 (1995)..................................................................................19

*United States v. Markiewicz*,
   978 F.2d 786 (2d Cir. 1992) .........................................................19, 20, 21

# TABLE OF AUTHORITIES

Page(s)

*United States v. Montgomery,*
   384 F.3d 1050 (9th Cir. 2004) ........................................................ 3

*N.A.A.C.P v. Claiborne Hardware Co.,*
   458 U.S. 886 (1982) .................................................................. 7, 9

*Sessions v. Dimaya,*
   584 U.S. ___, 138 S. Ct. 1204 (2018) ....................................... 15

*In re Shead,*
   302 F. Supp. 560 (N.D. Cal. 1969) ............................... 10, 16, 17

*Watts v. United States,*
   394 U.S. 705 (1969) ...................................................................... 7

*United States v. Williams,*
   553 U.S. 285 (2008) ...................................................................... 6

**Federal Statutes**

18 U.S.C. § 371 ................................................................... 2, 3, 21

18 U.S.C. § 2101 ................................................................... *passim*

18 U.S.C. § 2102 ................................................................... *passim*

**Constitutions**

U.S. Const., amend. I ........................................................... *passim*

U.S. Const., Art. I, Sec. 8 ............................................................ 19

**Rules**

Fed. R. Crim. P. 7(c)(1) ............................................................. 18

Fed. R. Crim. Proc. 12(b)(3) ........................................................ 1

**Other Authorities**

113 CONG. REC. 19373 (1967) .................................................. 10

Zalman, Marvin, *The Federal Anti-Riot Act and Political Crime: The Need
   for Criminal Law Theory*, 20 Villanova L. Rev. 897 (1975) .................................. 10

# I.    INTRODUCTION

Under Federal Rule of Criminal Procedure 12(b)(3) and the First, Fifth, and Sixth Amendments to the United States Constitution, Defendants Robert Rundo, Robert Boman, and Aaron Eason (together, "Defendants") respectfully move to dismiss Counts One and Two of the Indictment for failure to state an offense.  The government has charged Defendants under 18 U.S.C. § 2101, the Federal Anti-Riot Act, a statute that is rarely prosecuted and is thus largely untested.  The Act was passed in 1968 as part of the Civil Rights Act to give the federal government a tool to respond to protests against the Vietnam War and other civil unrest.  Since that time, neither the Supreme Court nor the Ninth Circuit Court of Appeals has reviewed the constitutionality of the statute.  But the close nexus between the Anti-Riot Act and the First Amendment cannot be ignored.  As the Seventh Circuit identified over forty years ago in one of the only significant prosecutions under this statute, the Act "operates in an area where there is substantial potential for abridgment of expression."  *United States v. Dellinger*, 472 F.2d 340, 355-56 (7th Cir. 1972), *cert. denied*, 410 U.S. 970 (1973); *see also id.* at 362 ("We do not pretend to minimize the first amendment problems presented on the face of this statute.")  This is because the statute criminalizes not only violence but also speech and expressive conduct that may only be loosely linked to acts likely to create a "public disturbance."  The contours of the Act are poorly defined.  It sweeps in a wide array of speech and assembly protected under the First Amendment, and fails to adequately notify the public and law enforcement about what conduct is prohibited and whose conduct can be prosecuted.

The dangers this poorly drafted statute pose are brought into sharp focus when applied to this case.  Here, the government seeks to federally prosecute Defendants for conduct that amounts to—at worst—a state law assault offense.  The government seeks to distinguish Defendants' conduct from an ordinary simple assault case and confer federal jurisdiction by alleging that Defendants were members of an organization that

1

espouses unsavory political views.  This should give the Court significant pause.

Foundational to First Amendment jurisprudence is the notion that "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate breathing space to the freedoms protected by the First Amendment.'"  *Boos v. Barry*, 485 U.S. 312, 322 (1988) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)).  Courts must protect the right of unpopular speakers to espouse their views, even when they may arouse hostile or even violent reactions in others.

The government charges Defendants with one count of conspiracy to violate the Anti-Riot Act and one count of violation of the Anti-Riot Act, both of which should be dismissed.  Count Two (Travel or Use of Interstate Commerce with Intent to Riot, 18 U.S.C. § 2101) is unconstitutional because it is substantially overbroad and irremediably vague, both on its face and as applied to Defendants.  Moreover, Count Two of the Indictment otherwise does not allege facts sufficient to establish that the Defendants traveled or used a facility of interstate commerce with the requisite intent, nor that they thereafter committed an overt act with the intent to riot.

Count One (Conspiracy, 18 U.S.C. § 371) is unconstitutional for the same reasons as Count Two.  It is also barred by Wharton's Rule, which precludes charging a conspiracy where the object offense proscribes concerted action by multiple individuals, as the Anti-Riot Act does.  The Court should dismiss the Indictment in its entirety as to all defendants.

## II.    OFFENSES CHARGED

Count Two of the Indictment charges Defendants with violating the Federal Anti-Riot Act, 18 U.S.C. § 2101, which prohibits traveling in interstate or foreign commerce or use of "any facility of interstate or foreign commerce" with the intent to riot, and aiding and abetting the commission of that offense.  Count One of the Indictment charges that Defendants conspired to commit an offense against the United States, namely, the Federal Anti-Riot Act, in violation of 18 U.S.C. § 371.  Dkt. No. 47.

2

To establish a conspiracy under 18 U.S.C. § 371, the government must prove "(1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004).  In this case, the government must prove that each Defendant entered into an illegal agreement to use facilities of interstate commerce with the intent to riot, in violation of 18 U.S.C. § 2101.

To convict Defendants under Count Two, the government must prove that Defendants:  (1) traveled in interstate commerce or used a facility of interstate commerce "with the intent to incite, organize, promote and encourage a riot," and (2) thereafter performed or attempted to perform any other overt act for such purposes.  18 U.S.C. § 2101; *see also Dellinger*, 472 F.2d at 349 (7th Cir. 1972).  The terms "riot" and "to incite a riot" are defined in 18 U.S.C. § 2102 as follows:

> (a) As used in this chapter, the term "riot" means a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.

> (b) As used in this chapter, the term "to incite a riot", or "to organize, promote, encourage, participate in, or carry on a riot", includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.

18 U.S.C. § 2102.

### III. FACTUAL BACKGROUND

For purposes of this Motion to Dismiss, the Court must accept, as alleged, the facts stated in the Indictment. *United States v. Boren*, 278 F.3d 911, 913 (9th Cir. 2002).  The Indictment alleges that beginning in or around February 2017, Defendants and others participated in a "white supremacist organization" called the "Rise Above Movement," or "RAM."  Dkt. 47, ¶ 1.  The Indictment alleges generally that RAM and its members used the internet to post videos and pictures of members of the group "assaulting people at political events, accompanied by messages in support of RAM's white supremacist ideology."  *Id*. ¶ 3.

The Indictment discusses four such political rallies.  The first took place on March 25, 2017, in Huntington Beach, California.  Mr. Rundo, Mr. Boman, Mr. Eason, and other RAM members attended the rally.  *Id.* at 4-5.  Mr. Rundo and Mr. Boman are alleged to have assaulted persons during the rally.  *Id.* at 5.   The following day, Mr. Boman posted a news article and photographs describing the rally.  *Id.*

On April 15, 2017, Mr. Rundo, Mr. Boman, Mr. Eason, and other purported RAM members drove from Southern California to attend a political rally in Berkeley, California, travelling in a passenger van allegedly rented by Mr. Eason with a Visa credit card.  *Id*. at 6.   The Indictment alleges that Mr. Rundo, Mr. Boman, and Mr. Eason each assaulted persons at the Berkeley political rally.  Two to three weeks prior to the rally, Mr. Eason sent three text messages to an unidentified co-conspirator inviting him to attend the rally, to attend a "combat training session," and to recruit additional people to attend the rally in order to provide "security" at the event.  *Id*. at 5-6.  In the days following the Berkeley rally, Mr. Boman and other unidentified RAM members posted photographs of the rally on social media websites.  *Id*. at 7.

On June 10, 2017, Mr. Rundo and other purported RAM members attended a political rally in San Bernardino, California.  *Id*. at 8.  Mr. Rundo did not commit any acts of violence or property damage there, nor did he encourage others to do so.  *Id*.

4

Finally, the Indictment alleges that unidentified co-conspirators travelled to Charlottesville, Virginia to attend the "Unite the Right" rally on August 11-12, 2017. None of the defendants in this case attended the Charlottesville rally.

The Indictment further alleges that between August 2017 and May 2018, Defendants and other alleged RAM members posted photographs, videos, and messages discussing past political rallies and promoting their political ideology. *Id*. at 10-11. They also exchanged text messages organizing training sessions for "boxing" and "mixed martial arts," all of which occurred in California. *Id*. at 11. The Indictment does not allege that Mr. Rundo, Mr. Boman, or Mr. Eason attended any political rallies or other events outside of the State of California.

## IV. ARGUMENT

A court must dismiss a charge if it "fail[s] to state an offense." Fed. R. Crim. Pr. 12(b)(3)(B). A charge fails to state an offense when the conduct alleged in the indictment is not a crime, and when the Constitution precludes the prosecution. Where a constitutional challenge to a charge is made on the grounds that the charge conflicts with the First Amendment's guarantees of free thought, belief, and expression, the trial court should subject the legal sufficiency of the Indictment to exacting scrutiny. The sections that follow demonstrate that each of the two counts of the Indictment fail for multiple reasons and the Indictment therefore must be dismissed in its entirety. Each argument is an independent and sufficient basis for dismissal as to all defendants.

In Count Two of the Indictment, the government alleges that between March 27, 2017 and April 15, 2017, Defendants violated 18 U.S.C. § 2101, the Federal Anti-Riot Act. Count Two suffers from fatal constitutional flaws. First, the Act is overbroad because it prohibits a substantial amount of constitutionally protected activity. The Act fails to comply with the long-held principle that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force . . . except where such advocacy is directed to inciting or producing *imminent*

1    *lawless action* and is *likely to incite or produce such action*."  *Brandenburg v. Ohio*,

2    395 U.S. 444, 447 (1969) (emphasis added).

3            Second, the Act violates Due Process because it is impermissibly vague.  The

4    Act is void for vagueness because it fails to give adequate notice of what conduct is

5    prohibited and because it deters constitutionally protected conduct.  The Act is also

6    vague as applied to Defendants because it does not provide them with adequate notice

7    of which of their communications crossed the boundary from lawful self-expression to

8    unlawful incitement of violence.  Consequently, Count Two must be dismissed.

9            Third, Count Two must be dismissed because the Indictment fails to allege two

10   key elements of the offense, namely, that Defendants: (1) possessed a riotous intent;

11   and (2) used a facility of interstate commerce with such intent.

12   **A.     Count Two Must be Dismissed Because the Anti-Riot Act is**

13   **        Unconstitutionally Overbroad.**

14           *1.     The Statute is Facially Overbroad Because it Regulates a Substantial*

15           *Amount of Protected Speech and Assembly*.

16           The Federal Anti-Riot Act must be struck down as facially overbroad.  When the

17   First Amendment is implicated, "a statute is overbroad because it is unclear whether it

18   regulates a substantial amount of protected speech."  *United States v. Williams*, 553

19   U.S. 285, 304 (2008) (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,

20   455 U.S. 489, 494-95 (1982)).  The Constitution "gives significant protection from

21   overbroad laws that chill speech within the First Amendment's vast and privileged

22   sphere."  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).  This is

23   especially true "when the overbroad statute imposes criminal sanctions."  *Virginia v.*

24   *Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).  The First Amendment affords

25   protection not only to speech but also to symbolic or expressive conduct.  *Virginia v.*

26   *Black*, 538 U.S. 343, 358 (2003).  "All expression of ideas is affected by, or is, itself,

27   conduct, and all conduct necessarily expresses some idea, emotion, or thought."

28

*Dellinger*, 472 F.2d at 358.  A statute that regulates both speech and conduct is invalid on overbreadth grounds if it "reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771 (1982).  The Anti-Riot Act fails on that ground because the language of the statute extends far beyond unlawful conduct and into speech and assembly that, although potentially disruptive, is protected under the First Amendment.

The Anti-Riot Act chills a substantial amount of speech, assembly, and expressive conduct that warrants First Amendment Protection.  First, the Act impermissibly infringes on the freedom of assembly.  It equates organized assemblies with organized violence.  The right to assemble for the "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *N.A.A.C.P v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citation omitted).  The line between peaceful assembly and violent behavior is not clearly drawn in the statute, and there remains a significant number of disruptive assemblies that, although protected under the First Amendment, come within the purview of the Anti-Riot Act.

Second, the Act impermissibly infringes on the freedom of speech and expressive conduct because it does not satisfy the stringent First Amendment requirements for criminalizing incitement.  Constitutional guarantees of free speech prohibit the criminalization of "advocacy of the use of force . . . except where such advocacy is directed to inciting or producing *imminent lawless action* and *is likely to incite or produce such action*." *Brandenburg*, 395 U.S. at 447.  The Anti-Riot Act fails to meet this high standard because it "sweeps within its condemnation speech which our Constitution has immunized from governmental control." *Id*. at 448.  The statutory scheme creates questions of whether the conduct prohibited under the Act can be "distinguished from what is constitutionally protected speech." *Watts v. United State*s, 394 U.S. 705, 707 (1969).

7

To satisfy the standard for incitement, the expressive conduct (i) must be directed at specific individuals, *Hess v. Indiana*, 414 U.S. 105, 109 (1973), (ii) must "specifically advocate for listeners to take . . . action," *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 244-46 (6th Cir. 2015) (citing *Hess*, 414 U.S. at 109); (iii) must be uttered with the specific intent "to produce . . . imminent disorder," *Hess*, 414 U.S. at 109; and (iv) the action must be likely to occur, *Brandenburg*, 395 U.S. at 448. *Brandenburg* reaffirmed that "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action . . . A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. *Id.* at 448 (citations omitted). A criminal act may not be defined "in terms of mere advocacy not distinguished from incitement to imminent lawless action." *Id.* at 449.

The Anti-Riot Act fails to make the required distinction set out in *Brandenburg* between lawful advocacy and unlawful incitement. Incitement, promotion, or encouragement to riot are not defined under the statute, but they are limited to exclude "the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any act or such acts." 18 U.S.C. § 2102(b). But this carve out for certain lawful expression does not redeem the statute, which still criminalizes speech and conduct far beyond the constitutional limits of the incitement doctrine. This is because the definition of "riot" under the Act is not excluded to violence or illegal conduct but also includes the mere *threat* of an act of violence, when the threat can be carried out or performed. *See* 18 U.S.C. § 2102(a). Consequently, rather than punishing the advocacy of violence that creates a likelihood of imminent actual harm, the Anti-Riot Act punishes a speaker for creating a likelihood of a *threat of conduct* that in turn creates a risk or danger of harm. This scheme creates an attenuation problem that

8

1    punishes speech and expressive conduct when the harm threatened is not imminent and

2    is remote from the speech itself.

3           The Supreme Court has taken notice of such attenuation as a problem in the

4    context of the First Amendment.  In *N.A.A.C.P. v. Claiborne Hardware Co.*, the Court

5    held that a speech using "strong language" promoting boycotts during the Civil Rights

6    era was constitutionally protected because the violence stemming from that speech

7    occurred "weeks or months later."  *N.A.A.C.P.*, 458 U.S. at 928-29.  The temporal

8    attenuation addressed in *N.A.A.C.P.* is of equal concern under the Anti-Riot Act, which

9    punishes a person who travels or uses a facility of interstate commerce with intent to

10   incite a riot, and who also "*thereafter* performs or attempts to perform any other overt

11   act" for the purpose of inciting a riot.  18 U.S.C. § 2101(a) (emphasis added).  In his

12   dissenting opinion in *Dellinger*, Justice Pell summarized the dangers posed by this

13   fundamental flaw in the statute:

14              There is no required causal relationship between the travel with intent and
                the riot actually incited.  No necessary connection whatsoever need be
15              shown between them nor is there any time limitation as to when the overt
                act shall take place with relationship to the travel.  I cannot conceive the
16              constitutional validity of a statute which in this open-ended manner
                punishes a person at the federal level for what would otherwise be a local
17              crime only because at some time in his past he had crossed a state line or
                had used a facility of interstate commerce with a nefarious intent . . . No
18              convicted criminal on probation is placed under such severe nonterminal
19              strictures.

20   *Dellinger*, 472 F.2d at 414 (Pell, J. dissenting).  The Act violates Due Process because

21   it lacks the traditional requirement of the concurrence of *mens rea* and *actus reus*.  This

22   shortcoming was also pointed out by Representative Emanuel Celler, Chairman of the

23   House Judiciary Committee at the time of the statute's enactment:

24              The bill violates the due process clause in providing that intent and act do
25              not coincide.  The bill makes it a crime for an individual to cross a State
                line or to go from a foreign country to a State or to mail a letter with a
26              certain intent to incite or encourage a riot.  Afterward, even though he no
27              longer has that same intent, if he commits some overt act that could be

28                                                    9

> construed as encouraging or promoting a riot or other public disturbance, he will have violated the law, although his crossing of the State line may have occurred months or even years before. This violates a basic requirement of criminal law that the intent and the criminal act must be contemporaneous. It is clear the bill does not require any specific intent at the time of the overt act - only at the time of the crossing of the State line. How a jury could possibly establish this intent unrelated to a contemporaneous act is impossible to fathom.

113 CONG. REC. 19373 (1967) (remarks of Representative Emanuel Celler); *see also* Zalman, Marvin, *The Federal Anti-Riot Act and Political Crime: The Need for Criminal Law Theory*, 20 Villanova L. Rev. 897, 920 (1975).

In one of the few cases examining the Anti-Riot Act, one district court attempted to redeem the statute's attenuation problem by reasoning that "[i]f the disturbances promoted or threatened constitute a clear and present danger, the overt acts themselves which are committed for that purpose, necessarily must also constitute a clear and present danger." *In re Shead*, 302 F. Supp. 560, 565 (N.D. Cal. 1969). However, this construction still fails constitutional muster. Banning the incitement of acts of violence that in turn create the clear and present *threat* of damage is not equivalent to banning the incitement of imminent and likely violence. The Anti-Riot Act does not limit violations to those situations in which the proscribed conduct presents a clear and present danger of actual injury. To suggest that all acts committed for the purpose of incitement actually constitute such a danger is to render meaningless the traditional distinction between advocacy of ideas and true incitement. When "every idea is an incitement," the process by which courts distinguish between intent to cause likely imminent danger becomes untenable. *Gitlow v. New York*, 268 U.S. 652, 673 (1925).

The Anti-Riot Act pushes the bounds of First Amendment jurisprudence even further because, unlike incitement, "promotion," "encouragement," or "organization" of a riot are acts that do not intrinsically suggest an imminent causal relationship to their

10

potential consequences.  The failure to connect a clear and present danger requirement to these activities creates even further attenuation from actual violent conduct.

But the attenuation does not end there.  The Anti-Riot Act proscribes activities an *additional* step away from violent conduct, by punishing travel or the use of interstate facilities *with intent* to incite, promote, or encourage a riot.  The attenuated nexus between intent and harm means there is no fair warning and no clearly discernable standard for application and adjudication, creating due process concerns.  It would mean that the speaker in *Brandenburg* could not be punished for advocating for violence, but he could be punished for traveling across state lines with the intent to advocate the same.  Under the Anti-Riot Act, a speaker must avoid inflammatory words no matter how far removed from a potential "riot," or speak at his peril.  The danger of such a regime is clear:  the statute creates a significant chilling effect based on fear of a potential listener's reaction, and increases the opportunities for selective enforcement and selective prosecution based on hostility toward unpopular views.

Because the Anti-Riot Act punishes speech that incites the mere *threat* of action, rather than speech that specifically invokes listeners to engage in imminent violent action, the Act is unconstitutional under *Brandenburg*.  The "mere tendency of speech to encourage unlawful acts" is not sufficient reason for banning it.  *Bible Believers*, 805 F.3d at 245 (quoting *Ashcroft v. Free Speech Coal*, 535 U.S. 234, 253 (2002)).  Count Two must be dismissed.

### 2.      *The Statute Violates the Heckler's Veto Doctrine*.

The Anti-Riot Act runs afoul of the First Amendment for the additional reason that it permits law enforcement to effectuate a "heckler's veto."  The heckler's veto doctrine protects against the case in which a speaker, protestor, or demonstrator is prosecuted because their speech or expressive conduct causes disapproving bystanders or counter-protestors to react with violence or disorder.  "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty., Georgia v. Nationalist*

11

*Movement*, 505 U.S. 123, 134 (1992).  A heckler's veto is an impermissible content-based speech restriction where the speaker is silenced due to a disorderly or violent reaction of the audience.  *See id.*  The proscription of the heckler's veto is an especially critical First Amendment protection for unpopular speakers.

The doctrine commands that laws regulating conduct "connected with speech, press, assembly, and petition" be narrowly drawn to "bar only the [forbidden] conduct." *Gregory v. City of Chicago*, 394 U.S. 111, 118 (1969) (Black, J., concurring).  Justice Black summarized the danger of overly broad or vague statutes in the context of the heckler's veto:

> [W]hen groups with diametrically opposed, deep-seated views are permitted to air their emotional grievances, side by side, on city streets, tranquility and order cannot be maintained even by the joint efforts of the finest and best officers and of those who desire to be the most law-abiding protestors of their grievances.
>
> It is because of this truth, and a desire both no [sic] promote order and to safeguard First Amendment freedoms, that this Court has repeatedly warned States and governmental units that they cannot regulate conduct connected with these freedoms through use of sweeping, dragnet statutes that may, because of vagueness, jeopardize these freedoms.

*Id.* at 117-118.

The Anti-Riot Act violates the First Amendment because it is not narrowly drawn to protect against the heckler's veto.  The Act fails to provide adequate guidance to law enforcement to distinguish between a riot caused by the malicious intent the speaker or protestor, on the one hand, and a riot caused by the hostile audience of that speech, on the other.  The result is that the Anti-Riot Act effectively denies any group of persons with unpopular beliefs the right to lawfully assemble whenever there is determined opposition.  In its current drafting, for example, an individual could be prosecuted under the Act for engaging in self-defense or some small act in response to a riot instigated by a hostile audience.  This is because the statute does not require that the defendant actually *initiate* the riot; it is sufficient that he or she "participate[s] in" or

12

"commit[s] any act in furtherance of" an ongoing riot.  18 U.S.C. §2101.  Indeed, as the government interprets the Act in this case, all that is needed on the part of the defendants is the use of a telephone or credit card and a real or imputed intent to provoke a "threat . . . of the commission of an act . . . of violence by one person[]" with the ability to execute such a threat.  18 U.S.C. § 2102.  Under this framing, defendants could be held responsible for inciting or encouraging a riot based on the violent actions of a counter-protester who, for example, picks up a rock next to a store window and has the immediate ability to shatter the glass.

The danger the Act poses in suppressing unpopular speech could not be more apparent than in the present case.  The core of this case relates to Defendants' participation at a lawful political rally where, as the Court has previously recognized, many counter-protestors appeared "just to cause trouble and suppress [Defendants'] speech by any means necessary."  Dkt. 113 at 5.  Because the Anti-Riot Act requires persons to censor their speech based on potential listener reactions, it violates the heckler's veto doctrine and is a dangerous tool to be levied against unpopular groups.

**B.      Count Two Must Be Dismissed Because the Anti-Riot Act is Unconstitutionally Vague.**

     *1.      The Statute is Void for Vagueness*.

The Anti-Riot Act is unconstitutionally vague.  A statute is void for vagueness "if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "For statutes . . . involving criminal sanctions the requirement for clarity is enhanced."  *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989) (quotation omitted).  "[E]ven if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests."  *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)); *see also Doremus*, 888

13

F.2d at 634.  Where a law is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits, it fails to meet the requirements of Due Process. *See Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966).  "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender*, 461 U.S. at 257.

The Anti-Riot Act is void for vagueness because the term "riot," as well as the terms to "incite," "organize," "promote," "encourage," "participate in," or "carry on" a riot are not sufficiently defined to give notice of what is prohibited.  These two sources of indeterminacy in the statute are only further compounded by the statute's infrequent application.

The first source of indeterminacy in the statute is the definition of the term "riot." The Act defines riot as "an assemblage of three or more persons" that creates a "public disturbance" involving "an act or acts of violence" or "a threat or threats of the commission of an act or acts of violence by one or more persons . . . having . . . the ability of immediate execution of such threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury" to a person or property.  18 U.S.C. § 2102(a).

There is some conduct that may squarely fall within the provision's grasp, such as assemblies that create violent and unlawful public disturbances.  However, where the conduct merely constitutes a "threat of the commission of an act or acts of violence," conduct that constitutes a threat of violence that can be immediately executed is not adequately defined.  Nor does the limited case law interpreting the statute provide a principled and objective standard to resolve its indeterminacy.  Rather, the determination of whether an act constitutes a threat of violence requires inquiry beyond the elements of the crime.  That is, it requires an abstract assessment of whether the person threatening the commission of an act of violence can actually carry out the

14

threat.  The Supreme Court has recently found several statutes requiring similar risk assessments to be unconstitutionally vague.  *See Johnson v. United States*, 576 U.S. __, 135 S. Ct. 2551 (2015) (holding that the residual clause of the Armed Career Criminal Act, defining "violent felony" as any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another," as unconstitutionally vague); *Sessions v. Dimaya*, 584 U.S. __, 138 S. Ct. 1204 (2018) (part of 18 U.S.C. § 16(b) that defined violent felony was unconstitutionally vague).  Like assessing "potential risk of physical injury to another," assessing the ability to execute a threat requires abstraction and "both denies fair notice to defendants and invites arbitrary enforcement by judges."  *Johnson*, 584 U.S. __, 138 S. Ct. at 2557.

The second source of indeterminacy in the statute involves the term "to incite a riot," or "to organize, promote, encourage, participate in, or carry on a riot."  18 U.S.C. § 2102(b).  The Anti-Riot Act punishes language and expressive conduct which intentionally provokes a "riot."  Each of the terms "incite," "organize," "promote," "encourage," necessarily include speech and expressive conduct.  But these terms lack any clear definition, either within the statute itself or in the limited case law applying it.

Even if the Court finds that the statute is not overbroad and only applies to unlawful incitement, the Act fails to give sufficient guidance about the sort of conduct and speech that constitutes illegal incitement, promotion, or encouragement.  The Act carves out an exception for "mere oral or written (1) advocacy of ideas or (2) expressions of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts."  18 U.S.C. § 2102(b).  But this standard fails to give speakers clear guidance about the forcefulness with which they can advocate for their views before their expression falls within the purview of the statute.  Consider a specific charge against Defendants under 18 U.S.C. § 2101(a)(2):  intent to "encourage" a riot.  In practical terms, it is impossible to determine what "encouragement" is proscribed.  Does "encouraging a riot" include

15

telling someone that they are oppressed, or openly expressing anti-Semitic, racist, or xenophobic views?  If the Act protects the right to advocate for anger at social conditions and government policies, it apparently does so only when the speaker can ensure that the audience will not interpret such anger as a direct call to action.  That is, the distinction between legal and illegal conduct depends on the state of mind of the audience—a distinction impossible to draw.  Because the Act requires that citizens, law enforcement, judges, and juries guess what conduct is and is not prohibited, the statute is unconstitutionally vague.

> 2.   *The Statute is Unconstitutionally Vague as Applied to Defendants*.

Even if the Court does not find that the Anti-Riot Act is void for vagueness, Count Two must be dismissed because the statute is unconstitutionally vague as applied to the circumstances in this case.  In an as-applied vagueness challenge, the Court's inquiry turns on whether the legal framework "provided adequate notice to [a particular defendant] that his particular conduct was proscribed."  *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013); *see also Doremus*, 888 F.2d at 634.  In criminal cases, "the requirement for clarity is enhanced."  *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009) (citation omitted).

Given the First Amendment concerns with the Anti-Riot Act, the few courts interpreting the statute have consistently commented on the importance of distinguishing between mere advocacy, on the one hand, and speech that is both identified with action and "sufficiently likely to propel the violent action," on the other. *Dellinger*, 472 F.2d at 360-61.  The Northern District of California in *In re Shead* upheld the statute against a vagueness challenge at the pre-indictment stage but declined to answer "the more difficult problem of applying the Act to a specific case." 302 F. Supp. at 567.  The court cautioned that the prosecution could be found invalid if indictments "fail[ed] to refine the distinction between mere advocacy and incitement to

16

1    imminent lawless action."  302 F. Supp. at 567 (citing *Brandenburg*, 395 U.S. at 447).

2    The government fails to make such refinements in this case.

3            The Anti-Riot Act prohibits using facilities of interstate commerce with the

4    intent to "incite," "organize, promote, encourage, participate in, or carry on," or

5    "commit any act of violence in furtherance of" a riot.  18 U.S.C. § 2101(a).  Here,

6    Count Two of the Indictment simply parrots the language of the statute, broadly

7    alleging that each defendant violated each of these statutory prongs between March 27,

8    2017 and April 15, 2017.  The government does not specify what particular conduct by

9    Defendants constitutes inciting a riot, organizing a riot, promoting a riot, or

10   encouraging a riot.  And given the ordinary meaning of these terms, Defendants did not

11   have fair notice that their alleged conduct was unlawful on those grounds.

12           Based on the allegations set forth in the Indictment, it appears that the foundation

13   of the government's case is that Defendants attended various political rallies and

14   purportedly engaged in fights with counter-protestors or other attendees at those rallies.

15   The Indictment alleges that Defendants or other "RAM members" attended lawful

16   political rallies in Huntington Beach, Berkeley, San Bernardino, and Charlottesville,

17   Virginia, *see* Dkt. 47 (Overt Act Nos. 3, 13, 26, 36), and committed assaults at those

18   rallies, *see id.* (Overt Act Nos. 4-7, 15-17, 27-28, 37).  But even if Defendants had fair

19   notice that engaging in fistfights is illegal (at least under state law), what of discussing

20   a purported assault *after* it has occurred?  The government appears to assert that such

21   conduct constitutes overt acts in furtherance of a conspiracy to riot.  In fact, nearly one-

22   third of the Indictment's allegations consist of claims that Defendants posted content to

23   social media websites or sent text messages discussing these political rallies *after* they

24   occurred.  *See* Dkt. 47 (Overt Act Nos. 7, 8, 18-20, 29, 31, 34, 38, 40- 44, 47).

25   Viewing the Indictment's allegations, it is impossible to draw a distinction between

26   lawful self-expression, promotion, or plain boasting, on the one hand, and unlawful

27   encouragement, promotion, or incitement on the other.  Nor are any of these after-the-

28                                              17

1  fact expressions "sufficiently closely related as a propelling cause of a riot," as they

2  must be to support a prosecution under the Act.  *See Dellinger*, 472 F.2d at 361.

3  Indeed, the Indictment itself evidences the uncertainty with which the government

4  views the scope of the statute, as many of the allegations are related to matters several

5  months before and after the time period of the alleged "riot" in this case.  If the

6  Indictment itself cannot specify what particular conduct constitutes unlawful and

7  intentional incitement of violence, Defendants cannot be expected to have fair notice of

8  these nuances, either.  Count Two must be dismissed.

9  **C.     The Allegations in Count Two Are Insufficient to Establish that**

10 **         Defendants Violated the Anti-Riot Act.**

11       An indictment fails to state an offense if the defendant's alleged conduct is not

12 proscribed by the statute in the indictment.  The words used in the indictment must

13 "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the

14 elements necessary to constitute the offence."  *Hamling v. United States*, 418 U.S. 87,

15 117 (1974).  To provide this clarity to the defendant, merely parroting the language of

16 the criminal statute is insufficient to inform of "what the defendants each said or did

17 that constituted" the criminal course of conduct.  *United States v. Buddenberg*, 2010

18 WL 2735547, *8 (N.D. Cal. Jul. 12, 2010).  The statutory language "must be

19 accompanied with such a statement of the facts and circumstances as will inform the

20 accused of the specific offense . . . with which he is charged."  *Hamling*, 418 U.S. at

21 117-18 (citation omitted); *see also* Fed. R. Crim. P. 7(c)(1) (indictment must contain a

22 "statement of the essential facts constituting the offense charged").

23       *1.     The Indictment Fails to Allege an Interstate Commerce Nexus.*

24       Separate from the statute's constitutionality, Count Two must be dismissed for

25 the independent reason that the Indictment fails to allege an interstate nexus conveying

26 federal jurisdiction in this case.  "[A] criminal act committed wholly within a State

27 cannot be made an offence against the United States unless it have some relation to the

28

                                                18

execution of a power of congress." *Bond v. United States*, 572 U.S. 844, 854 (2014).
The Constitution purposefully withholds a general police power from Congress to
prevent a "plenary police power that would authorize enactment of every type of
legislation." *United States v. Lopez*, 514 U.S. 549, 566 (1995).  Instead, general police
powers are delegated to the states so that they may "function as political entities in their
own right" and be insulated from the will of the federal government. *Bond v. United
States*, 564 U.S. 211, 221 (2011).  Despite the fact that the conduct proscribed by the
Anti-Riot Act is within the typical purview of local law enforcement, Congress sought
to convey federal jurisdiction through the Commerce Clause.  *See* U.S. Const., Art. I,
Sec. 8. [1]  To convict a person under the Anti-Riot Act, the government must prove that
he "travel[led] in interstate or foreign commerce or use[d] any facility of interstate or
foreign commerce" with a riotous intent.  18 U.S.C. § 2101.  "The use of a facility of
interstate commerce is an essential element of an anti-riot act offense."  *United States v.
Markiewicz*, 978 F.2d 786, 813 (2d Cir. 1992).

Here, the Indictment does not allege that Defendants travelled in interstate
commerce.  Nor does it claim that Defendants encouraged others to cross state lines for
riotous purposes.  The government's case thus solely relies on the theory that
Defendants (1) used any facility of interstate or foreign commerce with the intent to
riot; and (2) during the use of that facility or thereafter, performed or attempted to
perform another overt act in furtherance of a riot.  *See* 18 U.S.C. § 2101.  Count Two
alleges that Defendants violated the Anti-Riot Act between March 27, 2017 and April
15, 2017.  Dkt. 47 at ¶ 8.  But the allegations of any interstate activity during that time
period are remarkably slim.  The ***only*** allegations that ***any*** defendant (or, for that
matter, any unindicted co-conspirator) used a "facility of interstate commerce" during

---

[1] The Anti-Riot Act exceeds Congress's authority under the Commerce Clause
because it regulates conduct that in fact "has nothing to do with 'commerce' or any sort
of economic enterprise, however broadly one might define those terms." *Lopez*, 514
U.S. at 562.

19

that time period are that: (1) Mr. Eason sent two text messages to "Co-Conspirator #2" inviting him to participate in the Berkeley political rally; and (2) Mr. Eason used a credit card to rent a van, which Defendants drove entirely within the state of California. *See* Dkt. 47 at 5-6 (Overt Act Nos. 9-11).  The government does not allege that Mr. Rundo or Mr. Boman used a facility of interstate commerce during the relevant time period.[2]  Although the Indictment contains a handful of other allegations that Defendants sent text messages and posted messages on social media relating to the Huntington Beach and Berkeley rallies, all of these occurred *after* any purported "riot."

The Indictment's allegations are insufficient to prosecute Defendants for a federal offense.  The limits of the Commerce Clause would be rendered meaningless if a text message between two California residents and the single swipe of a credit card were sufficient to confer federal jurisdiction for a criminal prosecution.  But even if these minor acts are held to be sufficient, the government cannot impute to Defendants the interstate activities of one another.  Some courts have held that the government is not required to prove that each aider and abettor to a riotous scheme used a facility of interstate commerce, "so long as the scheme had substantial interstate connections." *Markiewicz*, 978 F.2d at 814.  Here, the government alleges **no facts** whatsoever that Mr. Rundo or Mr. Boman assisted in the use of interstate facilities in advance of their attendance at the Berkeley rally, and next to nothing as to Mr. Eason.  Defendants never travelled outside of California to attend the political rallies described in the Indictment, nor called on others to do so.  Not only are the "interstate connections" in this case insubstantial, they are virtually non-existent.  The government seeks to extend the reach of the federal government far beyond the limits envisioned under the Commerce Clause to prosecute what is, at worst, a state assault offense.  The Court should not permit such

---

[2] Because there is no allegation that Mr. Rundo or Mr. Boman used a facility of interstate commerce with unlawful intent to riot, it follows that the Indictment also does not allege that either defendant performed any other overt act in furtherance of a riot during or after the use of a facility of interstate commerce.  Count Two therefore must be dismissed as to both defendants.

20

overreach.  Because the Indictment fails to allege the essential element of an interstate nexus, Count Two must be dismissed as to all defendants.

>    2.    *The Indictment Does Not Allege a Riotous Intent*.

The government also fails to state an offense under Count Two because it does not adequately allege that Defendants possessed the requisite intent to violate the Anti-Riot Act.  The Act "requires the government to prove a defendant's intent at two points in time-when the defendant uses a facility of interstate commerce with the intent to incite a riot, and when the defendant commits an overt act to further any of the purposes articulated in subparagraphs (A) through (D)."  *Markiewicz*, 978 at 813.  The Indictment fails to allege any facts demonstrating that each defendant had the requisite intent at either point in time.

## D.    Count One Must Be Dismissed Because it Violates Wharton's Rule.

Wharton's Rule prohibits a separate conspiracy charge where the underlying crime requires concerted action.  Here, Defendants have been charged with conspiracy to "commit a crime against the United States," which, by statute, already requires "two or more persons."  18 U.S.C. § 371.  Accordingly, the separate conspiracy charge under Count One fails as a matter of law.

Wharton's Rule is an exception to the general rule that a conspiracy to commit a substantive offense and the substantive offense itself are discrete crimes for which separate sanctions may be imposed.  *Iannelli v. United States*, 420 U.S. 770, 781–82 (1975).  Under Wharton's Rule, an agreement between multiple people to commit a crime cannot be prosecuted as a conspiracy when multiple people are necessary to commit the substantive offense.  *Gebardi v. United States*, 287 U.S. 112, 121–22 (1932).

21

In determining whether Wharton's Rule applies, courts examine three criteria:

[(1)] The parties to the agreement are the only persons who participate in commission of the substantive offense, [(2)] the immediate consequences of the crime rest on the parties themselves rather than on society at large… [and (3)] the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society the law of conspiracy seeks to avert.

*Iannelli*, 420 U.S. at 783–84 (citations and footnotes omitted).

Rather than rigidly applying these criteria, courts take a functional view and apply Wharton's Rule whenever "[t]he substantive offense … presents some of the same threats that the law of conspiracy normally is thought to guard against, and it cannot automatically be assumed that the Legislature intended the conspiracy and the substantive offense to remain as discrete crimes upon consummation of the latter." *Id*. at 785.  In *Iannelli*, the Supreme Court held that Wharton's Rule did not apply to a federal gambling statute.  420 U.S. at 789.  The Supreme Court examined the legislative history of the statute, including the fact that the statute "pointedly avoids reference to conspiracy or agreement," while a separate section provided "new penalties for conspiracies to obstruct state law enforcement efforts for the purpose of facilitating conduct of these activities." *Id*. at 787-88.  The Court  continued:  "Viewed in this context, and in light of the numerous references to conspiracies throughout the extensive consideration of the Organized Crime Control Act, we think that the limited congressional definition of 'gambling activities' in [the statute] is significant.  [Congress] chose … to define the substantive offense punished by [the statute] in a manner that fails specifically to invoke the concerns which underlie the law of conspiracy." *Id*.

The statute in this case is markedly different than that at issue in *Iannelli*.  The Anti-Riot Act is animated by the same purpose as the law of conspiracy.  The statute was enacted with the intent to discourage concerted action by multiple individuals to

22

create a public disturbance.  Further, the statute by its very terms contemplates the "concerted criminal activity" of multiple actors.  *Iannelli*, 420 U.S. at 785.  Section 2102 defines a riot as a "public disturbance involving … an assemblage of *three or more persons*" which damage person or property, create a clear and present danger to that effect, or threaten to do such.  18 U.S.C. § 2102(a) (emphasis added).  As such, the substantive offense of travelling with intent to riot concerns the same group conduct that the law of conspiracy seeks to avert.  Wharton's Rule bars Count One.

**E.    Count One Must be Dismissed For the Same Reasons as Count Two.**

Count One must be dismissed for the same reasons as Count Two, as Defendants cannot be prosecuted for a conspiracy to commit a violation of a statute that is unconstitutionally vague and overbroad.  *See supra* Sec. IV.A-B.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Indictment in its entirety.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  April 22, 2019          By  */s/ Julia Deixler*
                                   JULIA DEIXLER
                                   Deputy Federal Public Defender
                                   Attorneys for ROBERT RUNDO

                                By  */s/ per email authorization*
                                   PETER SWARTH
                                   Law Offices of Peter Swarth
                                   Attorney for ROBERT BOMAN

                                By  */s/ per email authorization*
                                   JOHN NEIL MCNICHOLAS
                                   McNicholas Law Office
                                   Attorney for AARON EASON

23