Name: AUSA David T. Ryan
Address: 312 N. Spring Street
City, State, Zip: Los Angeles, CA 90012
Phone: (213) 894-4491
Fax: (213) 894-0141
E-Mail: david.ryan@usdoj.gov

☐ FPD ☐ Appointed ☐ CJA ☐ Pro Per ☐ Retained

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>PLAINTIFF(S),<br>v.<br>ROBERT RUNDO, ROBERT BOMAN, AARON EASON, AND TYLER LAUBE<br>DEFENDANT(S). | CASE NUMBER:<br>CR 18-759-CJC<br><br>NOTICE OF APPEAL |

NOTICE IS HEREBY GIVEN that ___United States of America___ hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
Order Granting Defendants Joint Motion to Dismiss the Indictment; CR No. 145 -- Filed on 6/3/2019
☐ Judgment (specify):

☒ Other (specify):
Order Granting Defendant's Motion to Withdraw Guilty Plea and Dismiss Indictment, CR No. 151 -- Filed on 6/11/19

Imposed or Filed on ___June 3, 2019___. Entered on the docket in this action on ___June 3, 2019___.

A copy of said judgment or order is attached hereto.

June 12, 2019                           s/ David T. Ryan
Date                                    Signature
                                        ☐ Appellant/ProSe  ☒ Counsel for Appellant  ☐ Deputy Clerk

Note:   The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT RUNDO,<br>ROBERT BOMAN,<br>AARON EASON, and<br>TYLER LAUBE,<br><br>Defendants. | Case No.: CR 18-00759-CJC<br><br>ORDER GRANTING DEFENDANTS ROBERT RUNDO, ROBERT BOMAN, AND AARON EASON'S JOINT MOTION TO DISMISS THE INDICTMENT [Dkt. 134] |

## I. INTRODUCTION

The First Amendment safeguards personal liberty, providing that Congress shall make no law abridging the freedom of speech or the right of the people to assemble peaceably. Without it, individuals could not criticize the government, assemble together

for common causes, or petition the government for redress of grievances. The vitality of our democratic and public institutions depends on free and vigorous discussion.

It is easy to champion free speech when it advocates a viewpoint with which we agree. It is much harder when the speech promotes ideas that we find abhorrent. But an essential function of free speech is to invite dispute. Speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Frequently, the public arena is the stage for these disputes. In the Civil Rights Era, for instance, protestors took to the streets to contest segregation and Jim Crow. Today, people continue to take their message to the streets, advocating on hotly contested issues, whether it be abortion, Black Lives Matter, climate change, or healthcare. One person's protest might be another person's riot.

The motion before the Court implicates a statute that threatens these important freedoms: the Anti-Riot Act, 18 U.S.C. § 2101. Congress passed the Anti-Riot Act in 1968, at the height of public advocacy over civil rights and the Vietnam War. Since then, prosecutions under the Anti-Riot Act have been rare. Only a handful of courts have ever evaluated the constitutionality of the statute.

On November 1, 2018, the Grand Jury returned a two-count Indictment charging Defendants with conspiracy to commit rioting, in violation of 18 U.S.C. § 371, and travel or use of interstate commerce with intent to riot, in violation of 18 U.S.C. § 2101. (Dkt. 7 [Indictment].) Defendants Robert Rundo, Robert Boman, and Aaron Eason now move to dismiss the Indictment. Because the Anti-Riot Act regulates a substantial amount of protected speech and assembly, the Court finds the Anti-Riot Act is unconstitutionally overbroad. Accordingly, the Court **GRANTS** Defendants' motion to dismiss.

## II. BACKGROUND

Defendants are allegedly members of a white supremacist organization known as the "Rise Above Movement," or "RAM." (Dkt. 47 [Indictment] ¶ 2.) RAM is a "combat-ready, militant group of a new nationalist white supremacy and identity movement." (*Id.* ¶ 2.) Defendants and other RAM members allegedly used the internet to post videos and pictures of themselves conducting training in hand-to-hand combat, accompanied by messages in support of their white supremacist ideology. (*Id.* ¶ 3.) Between December 2016 and October 2018, Defendants allegedly attended three political rallies in California. (*Id.* ¶¶ 5–6.)

Count One of the Indictment alleges that Defendants conspired and agreed with each other to riot in violation of 18 U.S.C. § 2101. Under the conspiracy, Defendants allegedly recruited members to join RAM and conducted hand-to-hand combat training sessions for RAM members. (*Id.* ¶ 6.) RAM's goal was apparently to provide "security" at right-wing political rallies, where there were often left-wing counterprotestors, known as the "Antifa." (*See id.* ¶¶ 7(1), 7(9).) Defendants and other RAM members traveled to political rallies in Huntington Beach, Berkeley, and San Bernardino. (*Id.* ¶¶ 7(1)–7(29).) In Huntington Beach and Berkeley, Defendants allegedly assaulted persons at the rallies. (*Id.* ¶¶ 7(4)–7(6), 7(15)–7(17).) In San Bernardino, however, none of the Defendants apparently acted violently or committed property damage. After the rallies, Defendants and other RAM members boasted about their actions at these rallies in text messages and on social media. (*Id.* ¶¶ 7(18)–(21), 7(29), 7(38)–7(47).)

Count Two of the Indictment alleges that Defendants used a facility of interstate commerce with the intent to riot. (*Id.* ¶¶ 9–10.) Count Two incorporates the overt acts alleged in Count One. (*Id.* ¶ 9.) Eason allegedly used a credit card to rent a passenger van to travel from Southern California to the rally in Berkeley. (*Id.* ¶¶ 7(12), 9.)

Defendants then committed one or more overt acts with the purpose to incite, organize, promote, encourage, participate in, and carry on a riot. (*Id.* ¶¶ 9–10.)

## III. ANALYSIS

Defendants challenge the Anti-Riot Act on its face. Because of the "sensitive nature of protected expression," *New York v. Ferber*, 458 U.S. 747, 768 (1982), "[t]he Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). To implement this protection, the general rules governing facial attacks on statutes are relaxed. Typically, to succeed in a facial attack, a party must establish "that no set of circumstances exists under which [the statute] would be valid, or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (internal quotation marks and citations omitted). In the First Amendment context, however, a law may be invalidated as overbroad if "it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). This exception is "based on the idea that speakers may be chilled from expressing themselves if overbroad criminal laws are on the books." *United States v. Sineneng-Smith*, 910 F.3d 461, 470 (2018). "To combat that chilling effect, even a person whose activity is clearly not protected may challenge a law as overbroad under the First Amendment." *Id.*

In determining whether a statute is overbroad, the Court must first construe the statute. *See Williams*, 553 U.S. at 293. The Anti-Riot Act provides that:

> Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent –
>
> (1) to incite a riot; or
> (2) to organize, promote, encourage, participate in, or carry on a riot; or

> (3) to commit any act of violence in furtherance of a riot; or
> (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;
>
> and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph [(1)–(4)] . . . [s]hall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 2101(a). To summarize, the Anti-Riot Act has two elements: (1) travel or use of interstate commerce with a certain intent and (2) an overt act for a certain purpose. Notably, the Anti-Riot Act covers far more than acts of violence. It also criminalizes activities that precede any violence, so long as the individual acts with the required purpose or intent. And, importantly, as the government concedes, the Anti-Riot Act reaches speech and expressive conduct. *See United States v. Dellinger*, 472 F.2d 340, 359 (7th Cir. 1972) (finding the Anti-Riot Act implicates the First Amendment).

The next question is what qualifies as a "riot." The Anti-Riot Act defines the term "riot" as:

> a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.

18 U.S.C. § 2102(a). To simplify, the Anti-Riot Act defines "riot" in two ways. A riot is a public disturbance involving acts of violence, committed by at least one person in a

group, which results in property damage or personal injury. This first definition coincides with the common understanding of a riot—for instance, a crowd taking to the streets and smashing windows of a business. A riot also includes a public disturbance involving the threat of violence, by persons in a group, so long as at least one person could immediately act upon the threat. This second definition, for example, would apply to a group threatening to break the windows of a business, while the group is outside the business and holding rocks in their hands.

The Anti-Riot Act, however, does not just criminalize the behavior of those in the heat of a riot. It also criminalizes acts taken long before any crowd gathers, or acts that have only an attenuated connection to any riot, so long as the individual acts with the required purpose. *See* 18 U.S.C. § 2101(a). No violence even need to occur. A defendant could be convicted for renting a car with a credit card, posting about a political rally on Facebook, or texting friends about when to meet up. The Anti-Riot Act offers some clarification as to how far it extends:

> [T]he term "to incite a riot", or "to organize, promote, encourage, participate in, or carry on a riot", includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.

18 U.S.C. § 2102(b). Pursuant to this clause, a defendant cannot be convicted under the statute if he merely advocates ideas or expresses a belief. The double negative, however, places a significant limit on this exception. Although it is *not* a crime merely to advocate ideas, it may *still* be a crime to advocate acts of violence or assert the rightness of, or the right to commit, any such acts.[1]

---

[1] The three decisions construing the Anti-Riot Act have struggled with how to interpret the double negative in section 2102(b). To distinguish the statute from the one found unconstitutional in

After construing the statute, the Court must then ask whether the statute reaches protected speech. *Sineneng-Smith*, 910 F.3d at 479. Not all speech is protected under the First Amendment. Here, the government asserts that speech criminalized by the Anti-Riot Act falls under the incitement exception to the First Amendment. Under this narrow exception, the government may prohibit advocacy of the use of force or of violating the law only "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

Returning back to the statute, however, there is a problem. The Anti-Riot Act has no imminence requirement. The Anti-Riot does not require that advocacy be directed toward inciting or producing imminent lawless action. It criminalizes advocacy even where violence or lawless action is not imminent. And in doing so, the Anti-Riot Act eviscerates *Brandenburg*'s protections of speech.

Consider the overt acts alleged just in the Indictment: A RAM member held a conference call three months before any political rally. (Indictment ¶ 7(1).) Boman posted a news article on Facebook the day after the rally in Huntington Beach. (*Id.* ¶ 7(7).) Several weeks before the Berkeley rally, Eason texted RAM members about attending and providing "security." (*Id.* ¶¶ 7(9)–(10).) After the Berkeley rally, Defendants posted photos on Facebook and Twitter and sent text messages about the Berkeley rally. (*Id.* ¶¶ 7(18)–7(22).) Eason sent text messages about attending another

---

*Brandenburg v. Ohio*, 395 U.S. 444 (1969), these courts have concluded that section 2102(b) does not punish the *mere* advocacy of violence. Rather, section 2102(b) apparently clarifies that *certain* advocacy of violence may be a crime. See *Dellinger*, 472 F.2d at 363; *In re Shead*, 302 F. Supp. 560, 566 (N.D. Cal. 1969); see also *United States v. Daley*, --- F. Supp. 3d ----, 2019 WL 1951586, at *11 (W.D. Va. May 2, 2019). The Court notes, however, that Congress passed the Anti-Riot Act in 1968, before the Supreme Court held implicitly in *Brandenburg*, 395 U.S. at 447–48, and explicitly in *Hess v. Indiana*, 414 U.S. 105, 108–09 (1973), that the mere advocacy of violence is protected speech. The dissent in *Dellinger* also offers compelling reasons to suggest that Congress intended to punish the mere advocacy of violence through the Anti-Riot Act. See *Dellinger*, 472 F.2d at 412 (Pell, J., dissenting).

-7-

rally in Berkeley, which he apparently never attended. (*Id.* ¶ 7(23).)  Nine days before the San Bernardino rally, a RAM member sent a Facebook message sharing photographs of the signs that RAM members planned to carry. (*Id.* ¶ 7(25).)  Three days after the San Bernardino rally, RAM members sent text messages about events at the rally, boasting about beating Antifa. (*Id.* ¶ 7(29).)  Months after the Huntington Beach and Berkeley rallies, Rundo shared a video showing RAM members at those rallies. (*Id.* ¶ 7(31), 7(40).)  He also posted a photo on Twitter of RAM members with the message, "When the squads not out smashing commies . . . #nationalist #lifestyle." (*Id.* ¶ 7(43).)  And almost a year after any rally, Rundo sent a Twitter message in response to a proposal to interview RAM leaders on a podcast. (*Id.* ¶ 7(47).)  This is all protected speech.  So long as Defendants acted with a purpose to incite, organize, promote, encourage, participate, or carry on a riot, however, these acts amount to a crime under the Anti-Riot Act.[2]

The government attempts to save the statute by relying on the definition of "riot." Because the statute defines riot as a "public disturbance involving" either acts or threatened acts of violence that create a "clear and present danger," the government asserts that the overt acts must also pose a clear and present danger.  Other courts have strained to reach similar interpretations. *See Dellinger*, 472 F.2d at 361–62; *United States v. Daley*, --- F. Supp. 3d ----, 2019 WL 1951586, at *11 (W.D. Va. May 2, 2019); *In re Shead*, 302 F. Supp. 560, 566 (N.D. Cal. 1969).  But this ignores the statute's structure and confuses what the Anti-Riot Act actually criminalizes.  The "riot" is some event in the future.  What is a crime is the "overt act" made with the purpose of urging or instigating that future event.  For instance, imagine someone posts on social media, urging others to attend a rally, and he posts with the purpose of promoting or organizing a riot.  Assume, however, that the rally is six months away, so there is no imminent lawless

---

[2] These overt acts appear in Count One of the Indictment, which alleges the conspiracy charge.  Count Two does not specify which overt acts form the basis of the rioting charge, and some of the alleged overt acts do not involve speech.  Even if the statute is constitutional as applied to Defendants, however, these examples indicate how broadly the Anti-Riot Act on its face criminalizes speech.

action. Even if the riot itself would eventually pose a clear and present danger, the overt act does not. Just consider the way in which the government applies the Anti-Riot Act in its own Indictment. Defendants are charged with renting a van with a credit card and sending text messages to one another *weeks* before the Berkeley political rally. These acts cannot reasonably be thought to pose an *imminent* threat of violence or lawless conduct.

The government also asserts that the terms "incite," "organize," "promote," and "encourage" create an imminence requirement, in that these terms imply a relationship between expression and action. The Anti-Riot Act defines these terms to include "urging or instigating other persons to riot." 18 U.S.C. § 2012(b). In one of the few decisions construing the Anti-Riot Act, the Seventh Circuit concluded that the "threshold definition of all [of these] categories as 'urging or instigating' puts a sufficient gloss of propulsion [to action] on the expression described." *Dellinger*, 472 F.3d at 362. Assuming this is true, it still does not solve the Anti-Riot Act's imminence problem. Even if terms like "organize" or "promote" imply *some* degree of action—like urging people to attend an event—there is no requirement that the organizing or promoting be directed towards *imminent* violence or lawless action—that event, for instance, could be months away. And recently in *Sineneng-Smith*, the Ninth Circuit did not find words like "encourage" or "induce" created an imminence requirement. 910 F.3d at 480 (finding statute that made it a crime to "encourage" or "induce" an alien to reside in the country did not require that an alien imminently violate immigration law). Ultimately, the government asks this Court to engage in grammatical gymnastics—and some degree of hand waving—to read an imminence requirement into the Anti-Riot Act. The Court will not do so.

Since the Anti-Riot Act criminalizes protected speech, the Court must next ask whether the statute criminalizes a substantial amount of protected expressive activity in relation to the statute's legitimate sweep. *Williams*, 553 U.S. at 292; *Sineneng-Smith*, 910

F.3d at 479. Congress passed the Anti-Riot Act over concerns in the late 1960s about public disturbances associated with the Civil Rights Movement and anti-Vietnam War protests. Criminalizing acts and imminent threats of violence is a legitimate aim. But the Anti-Riot Act does not focus on the regulation of violence. Rather, it focuses on *pre*-riot communications and actions. And in doing so, it sweeps in a wide swath of protected expressive activity as part of its efforts to punish rioting.

Although the Supreme Court is skeptical of "fanciful hypotheticals" in overbreadth cases, *see Williams*, 553 U.S. at 301, one need look no farther than the overt acts alleged in the Indictment. Although some alleged overt acts create no First Amendment problem, the Indictment also contains a substantial amount of protected expressive activity. It charges the Defendants with making social media posts months before—and months after—any political rallies. Some posts express repugnant, hateful ideas. Other posts advocate the use of violence. Most, if not all, are protected speech.

Applying the Anti-Riot Act to some of the seminal cases on incitement underscores the problem. Consider *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). There, a civil rights activist faced civil liability for an impassioned speech, which was later followed by acts of violence. *See id*. at 928. The Supreme Court found the activist's speech did not transcend *Brandenburg*'s boundaries of protected speech, partly because the actual acts of violence occurred weeks or months after the speech. *Id*. Here, the Anti-Riot Act criminalizes speech even if violence occurs weeks or months after the speech—or even if violence never occurs. The Anti-Riot Act creates a similar tension with *Hess v. Indiana*, 414 U.S. 105 (1973). In that case, the defendant faced a disorderly conduct charge for telling a crowd, "We'll take the fucking street later (or again)," in the middle of an antiwar demonstration, as police attempted to clear the street. *Id*. at 106–07. The Supreme Court held the statement was protected speech because there was no

evidence that his words were likely to produce imminent disorder. *Id.* at 108–09. That same statement could possibly be a crime under the Anti-Riot Act.

The Anti-Riot Act's chilling effect is heightened by its context. "[R]ioting, in history and by nature, almost invariably occurs as an expression of political, social, or economic reactions, if not ideas." *Dellinger*, 472 F.2d at 359. A riot is closely intertwined with political activity. A rioting crowd is often protesting the policies of a government, an employer, or some other institution, or the social fabric in general. *Id.* A riot may well erupt out of an originally peaceful demonstration. The political nature of a riot increases the risk that the Anti-Riot Act criminalizes a substantial amount of protected expressive activity. To protect citizens' important rights of speech and assembly, courts must be wary of government attempts to censor a particular view, especially on the basis that certain ideas cause "disturbances." New ideas, more often than not, create disturbances. And to this end, speech may best serve its "high purpose." *See Terminiello*, 337 U.S. at 4.

These same concerns animate the last step of the Court's overbreadth analysis, in which the Court balances the social costs of upholding the statute against the costs of striking it down. Invalidating the Anti-Riot Act would not limit the ability of federal and local law enforcement to protect the public from violence or public disturbances. Law enforcement has its pick of statutes to employ towards these ends. *See, e.g.*, Cal. Pen. Code § 404 (incitement of a riot); Cal. Pen. Code § 405 (participation in a riot); 18 U.S.C. § 113 (assault crimes); 18 U.S.C. § 231 (civil disorders); 18 U.S.C. § 241 (conspiracy to "injure, oppress, threaten, or intimidate" any person in the free exercise or enjoyment of rights); 18 U.S.C. § 249 (hate crime acts); 42 U.S.C. § 1985 (conspiracy to interfere with civil rights). Upholding the statute, however, substantially infringes on the rights to free speech and freedom of assembly. The Anti-Riot Act is unconstitutionally overbroad.

Make no mistake that it is reprehensible to throw punches in the name of teaching Antifa some lesson. Nor does the Court condone RAM's hateful and toxic ideology. But the government has sufficient means at its disposal to prevent and punish such behavior without sacrificing the First Amendment.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Indictment is **GRANTED**. The Court finds that the Anti-Riot Act is unconstitutionally overbroad in violation of the First Amendment.[3]

DATED: June 3, 2019

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[3] Since this is a sufficient reason to dismiss the Indictment, the Court does not reach Defendants' other arguments.

JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TYLER LAUBE,<br><br>　　　　Defendant. | Case No.: CR 18-00759-CJC<br><br>**ORDER GRANTING DEFENDANT TYLER LAUBE'S MOTION TO WITHDRAW GUILTY PLEA AND DISMISS INDICTMENT [Dkt. 147]** |

**I. INTRODUCTION & BACKGROUND**

　　Defendant Tyler Laube is charged in the Indictment with one count of conspiracy to commit rioting, in violation of 18 U.S.C. §§ 371, 2101. (Dkt. 47 [Indictment].) On November 20, 2018, he pled guilty to this single count, and he was subsequently released on bond. (Dkts. 72, 79.) Mr. Laube's sentencing is scheduled for August 12, 2019.

On June 3, 2019, the Court granted a joint motion brought by the other defendants, Robert Rundo, Robert Boman, and Aaron Eason, to dismiss all counts in the Indictment. (Dkt. 145.) The Court found that the Anti-Riot Act, 18 U.S.C. § 2101, was unconstitutionally overbroad on its face. Under the First Amendment, the government may not prohibit advocacy of the use of force or of violating the law "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). The Anti-Riot Act is not limited in this way. It criminalizes advocacy of the use of force or of lawless action even where violence or lawless action is not imminent or likely. Because the statute criminalizes a substantial amount of protected expressive activity in relation to its legitimate sweep, the Court found the Anti-Riot Act was unconstitutionally overbroad in violation of the First Amendment. The Court then dismissed the Indictment with respect to Mr. Rundo, Mr. Boman, and Mr. Eason.

Mr. Laube now moves to withdraw his guilty plea and dismiss the Indictment on the same grounds as those raised in the other defendants' joint motion to dismiss. (Dkt. 147.) The government opposes Mr. Laube's motion. (Dkt. 150.) For the following reasons, the motion is **GRANTED**.[1]

## II. ANALYSIS

### A. Withdrawal of Guilty Plea

Mr. Laube requests to withdraw his guilty plea. A defendant may withdraw a guilty plea after a district court accepts the plea but before sentencing if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P.

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Crim. P. 57(b).

11(d)(2)(B). This standard is "applied liberally." *United States v. Ortega-Ascanio*, 376 F.3d 879, 883 (9th Cir. 2004). "[T]he decision to allow withdrawal of a plea is solely within the discretion of the district court." *United States v. Nostratis*, 321 F.3d 1206, 1208 (9th Cir. 2003). Fair and just reasons for withdrawal include "newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea." *Ortega-Ascanio*, 376 F.3d at 883.

There is no question that there is a fair and just reason to withdraw Mr. Laube's plea. Mr. Laube pled guilty to conspiring to violate the Anti-Riot Act. Since he entered his guilty plea, however, the Court found the Anti-Riot Act was unconstitutionally overbroad and dismissed the Indictment with respect to the rest of the defendants. It would be grossly unjust to proceed with sentencing and have Mr. Laube possibly serve time in custody for conspiring to violate a statute that this Court has declared unconstitutional. In opposing Mr. Laube's request, the government seems to suggest Mr. Laube should suffer because he took an early guilty plea instead of joining the other defendants' motion. The government may be unhappy with the Court's June 3, 2019 Order. The dictates of fairness and justice, however, clearly require this Court to allow Mr. Laube to withdraw his guilty plea.

### B. Dismissal of the Indictment

Mr. Laube also asks the Court to dismiss the Indictment on the basis that the Anti-Riot Act is unconstitutionally overbroad in violation of the First Amendment. The Court agrees and adopts by reference its analysis in the June 3, 2019 Order. In opposition, the government contends that the Anti-Riot Act is constitutional as applied to Mr. Laube, based on the acts to which he admitted in his plea agreement and his Federal Rule of Criminal Procedure 11 colloquy. This misses the point. The Court held the Anti-Riot Act was unconstitutional *on its face*, not as applied. It does not matter whether the statute

may be constitutional in *certain* applications, such as the specific acts to which Mr. Laube pled guilty.  Due to concerns over the chilling effect of overbroad statutes, "even a person whose activity is clearly not protected may challenge a law as overbroad under the First Amendment."  *United States v. Sineneng-Smith*, 910 F.3d 461, 470 (9th Cir. 2018).  Here, because the Anti-Riot Act criminalizes a substantial amount of protected expressive activity in relation to its legitimate sweep, the Anti-Riot Act violates the First Amendment.  It cannot serve as a legal basis for the Indictment.

### III.  CONCLUSION

For the foregoing reasons, Defendant's motion to withdraw his guilty plea and dismiss the Indictment is **GRANTED**.  The Court hereby **EXONERATES** his bond.

DATED:    June 11, 2019

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE