1

2

3

4

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

5

6

7

8

9

10

UNITED STATES OF AMERICA,              )
                                       )
                 Plaintiff,            )   <u>**CERTIFIED TRANSCRIPT**</u>
                                       )
         vs.                           )
                                       )   Case No.
ROBERT BOMAN,                          )   2:18-cr-00759-CJC-2
                                       )
                 Defendant.            )
                                       )

11

12

13

14

15

16

17

18

19

20

21

22

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

TUESDAY, FEBRUARY 21, 2023

2:50 P.M.

SANTA ANA, CALIFORNIA

23

24

25

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1          **APPEARANCES OF COUNSEL:**

2

3     **FOR PLAINTIFF:**

4              E. MARTIN ESTRADA
               Acting United States Attorney
5              BY:  MARIA JHAI
                    Assistant United States Attorney
6              312 North Spring Street
               12th Floor
7              Los Angeles, California 90012
               213-894-4138
8              Maria.jhai@usdoj.gov

9     **FOR DEFENDANT:**

10             PETER C. SWARTH LAW OFFICES
               BY:  PETER C.  SWARTH, ESQ.
11             6520 Platt Avenue
               Suite 557
12             West Hills,  California 91307
               818-887-8800
13             Pswarth@gmail.com

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1  **SANTA ANA, CALIFORNIA; TUESDAY, FEBRUARY 21, 2023**

2  **2:50 P.M.**

3  **- - -**

4

02:50PM 5  THE COURTROOM DEPUTY:  Calling Item Number 3,

6  CR-18-000759, United States of America vs. Robert Boman.

7  Counsel, please state your appearances.

8  MS. JHAI:  Good afternoon, Your Honor.  Assistant

9  United States Attorney Maria Jhai on behalf of the Government.

02:50PM 10  THE COURT:  Hello, Ms. Jhai.

11  MR. SWARTH:  Good afternoon, Your Honor.  Peter

12  Swarth appearing on behalf of Robert Boman.  He's present in

13  court, in custody.

14  THE COURT:  Hello, Mr. Boman.

02:50PM 15  Hello, Mr. Swarth.

16  MR. SWARTH:  Good afternoon, Your Honor.

17  THE COURT:  Mr. Boman, I'm going to be asking you a

18  series of questions.  If at any time you don't understand any

19  question I pose to you, you'll let me know, won't you?

02:51PM 20  THE DEFENDANT:  Yes, sir.

21  THE COURT:  If you have any questions about

22  anything, please ask your question, and I'll do my best to

23  answer it.  All right?

24  THE DEFENDANT:  All right.

02:51PM 25  THE COURT:  And then, finally, let's not rush

```
 1    through this proceeding.  If at any time you want to talk to
 2    Mr. Swarth about anything that comes up, just give me the
 3    heads-up or have him do so, and I'll give you as much time as
 4    you need to talk to him.  All right?
 5            THE DEFENDANT:  Thank you.
 6            THE COURT:  Now, I have to place you under oath.
 7    Would you please raise your right hand.
 8            (The defendant was sworn.)
 9            THE COURT:  Sir, you are now under oath, which means
10    you have an obligation to answer all my questions truthfully.
11    To the extent you don't, you subject yourself to penalty --
12    prosecution for perjury.
13            Do you understand?
14            THE DEFENDANT:  Yes.
15            THE COURT:  Could you state your true, full name for
16    the record.
17            THE DEFENDANT:  Robert Edward Cook de Boman III.
18            THE COURT:  And, Mr. Boman, how old are you?
19            THE DEFENDANT:  28.
20            THE COURT:  When were you born?
21            THE DEFENDANT:  June 21st, 1993.
22            THE COURT:  And how much education do you have?
23            THE DEFENDANT:  12th grade.
24            THE COURT:  You graduated from high school?
25            THE DEFENDANT:  I didn't graduate.  It was about
```

1    mid-12th grade.

2           THE COURT:  Okay.  One of my jobs at this hearing is

3    just to make sure that you understand the charges against you

4    in the First Superseding Indictment and that you understand the

02:52PM 5    terms and conditions of the plea agreement and the consequences

6    of entering a guilty plea.  So I have to ask you a few more

7    questions that are a little more personal in nature, but I'm

8    not going to get into any great detail.

9           Have you ever suffered from any type of mental

02:52PM 10   illness in the past?

11          THE DEFENDANT:  No, Your Honor.

12          THE COURT:  Have you ever suffered from any type of

13   drug or alcohol addiction?

14          THE DEFENDANT:  Yes.

02:52PM 15          THE COURT:  Could you tell me what and when

16   approximately.

17          THE DEFENDANT:  From when I was about 15, I started

18   using methamphetamine.  Then I went to prison for a couple

19   years when I was 18 to 21.  And from 21 on is when my addiction

02:53PM 20   was heavy.

21          THE COURT:  Okay.  And you've been clean and sober

22   for a while?

23          THE DEFENDANT:  Yeah.

24          THE COURT:  Good, because there's -- prolonged use

02:53PM 25   of methamphetamine does impact a person's ability to process

information and understand what they're doing.  As you stand
here this afternoon, do you feel you've had any problems
understanding the charges and the terms and conditions of the
plea agreement?

02:53PM 5      THE DEFENDANT:  No, Your Honor.

6      THE COURT:  Okay.  Have you taken any drug or
alcohol within the last 72 hours?

8      THE DEFENDANT:  No, Your Honor.

9      THE COURT:  And, Mr. Swarth, in your dealings with
02:53PM 10 Mr. Bowman, do you have any concern about whether he is
competent to proceed this morning?

12     MR. SWARTH:  No.

13     THE COURT:  All right.  Based on Mr. Boman's answers
to my questions as well as the representation of his counsel,
02:53PM 15 I'll -- I find that he has full possession of his faculties and
is mentally competent to proceed.

17     Mr. Boman, I need to talk to you about the charges
in the First Superseding Indictment, this Count One.  My
understanding is you just visited the magistrate judge, and you
02:54PM 20 were arraigned on these charges; right?

21     THE DEFENDANT:  Yes, Your Honor.

22     THE COURT:  So had you seen a copy of these charges
before you went before the magistrate judge?

24     THE DEFENDANT:  Yes.

02:54PM 25     THE COURT:  Have you had an opportunity to discuss

1   them with Mr. Swarth?

2             THE DEFENDANT:  I have.

3             THE COURT:  All right.  Ms. Jhai, so we're all on

4   the same page, will you tell us what the offense is and the

02:54PM 5   elements of it, please.

6             MS. JHAI:  Yes, Your Honor.

7             For defendant to be guilty of the crime charged in

8   the First Superseding Indictment, that is, conspiracy to commit

9   the crime of rioting in violation of 18 U.S.C., 371, the

02:54PM 10  following must be true:

11            1.  Between on or about March 2017 and October 2nd,

12  2018, there was an agreement between two or more persons to

13  commit at least one crime as charged in the Indictment;

14            2.  Defendant became a member of the conspiracy

02:54PM 15  knowing of at least one of its objects and intending to help

16  accomplish it; and,

17            3.  One of the members of the conspiracy performed

18  at least one overt act for the purpose of carrying out the

19  conspiracy.

02:55PM 20            The elements of the crime of rioting in violation of

21  18 U.S.C., 2101, which is the object of the conspiracy charged

22  in Count One of the Superseding Indictment, are:

23            1.  Defendant traveled in interstate or foreign

24  commerce or used any facility of any interstate or foreign

02:55PM 25  commerce, including, but not limited to, the mail, telegraph,

```
 1  telephone, radio, or television;

 2           2.  Defendant did so with intent to incite a riot,

 3  to participate in or carry on a riot, or to commit an act of

 4  violence in furtherance of a riot, or to aid and abet any

 5  person in inciting or participating in or carrying on a riot or

 6  committing any act or violence in furtherance of a riot; and,

 7           3.  During the course of such travel or use or

 8  thereafter, defend performed or attempted to perform an overt

 9  act for any purpose specified above.

10           THE COURT:  Very well.  Mr. Boman, any questions for

11  me about these charges, sir?

12           THE DEFENDANT:  No, Your Honor.

13           THE COURT:  You feel you have a good understanding

14  of them?

15           THE DEFENDANT:  Yes.

16           THE COURT:  All right.  Why don't we talk about the

17  plea agreement.  I have a copy of it before me.  Mr. Swarth

18  will get a copy of it before you.

19           First question I want to ask you about is a

20  signature that purports to be yours on page 18, looks like

21  line 10.

22           Do you see that?

23           THE DEFENDANT:  I do, Your Honor.

24           THE COURT:  Is that your signature, Mr. Boman?

25           THE DEFENDANT:  That, it is.
```

02:55PM (line 5)
02:56PM (line 10)
02:56PM (line 15)
02:56PM (line 20)
02:56PM (line 25)

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Did you sign it on February 20th, 2023?

2          THE DEFENDANT:  That, I did, yes.

3          THE COURT:  Then, if you go down the page, there is

4    a very important certification orally -- signed by you on page

02:56PM  5    19, line 5.  Is that also your signature on page 19, line 5?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Did you sign the certification on

8    February 20th, 2023?

9          THE DEFENDANT:  Yes, Your Honor.

02:56PM 10          THE COURT:  Mr. Boman, I'm going to go over these

11   representations in the certification because all of them are

12   quite important, and I need you to confirm that they're

13   accurate.  And, if they're not, you can tell me which ones are

14   not.

02:57PM 15          But the certification represents that you've read

16   the plea agreement in its entirety, and you've had enough time

17   to review and consider the plea agreement, and you've carefully

18   and thoroughly discussed every part of it with your lawyer.

19          Are those representations true?

02:57PM 20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  And then it represent that you

22   understand the terms of the plea agreement; you voluntarily

23   agree to those terms; you discussed the evidence with your

24   attorney; he's advised you of your rights, possible pretrial

02:57PM 25   motions that might be filed, possible defenses that might be

asserted, either prior to or at trial; of the sentencing

factors set forth in 18 U.S.C., Section 3553(a); of relevant

Sentencing Guideline provisions and of the consequences of

entering into the plea agreement.

Are those representations true, Mr. Boman?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  It then goes on to represent that no

promises, inducements, or representations of any kind have been

made to you other than those contained in the plea agreement;

no one has threatened or forced you in any way to enter into

the plea agreement; you're satisfied with the representation

your lawyer has provided to you in this case, and you want to

plead guilty because you are guilty of the charge and wish to

take advantage of the promises set forth in the plea agreement

and not for any other reason.

Are all those representations true?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Now, anything you and the

Government have agreed to, Mr. Boman, I will seriously

consider, but I'm not bound by any agreement or representation

that you and the Government might make to me.  So, if you go

forward and enter a guilty plea, and then I make a decision

that doesn't follow any recommendation you and the Government

make, it's going to be pretty difficult, if not impossible, for

you to withdraw any guilty plea that you might enter this

afternoon.

Do you understand?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Also, I noticed, in the plea agreement, you're going to be giving up very important rights to go to the Court above me called the Ninth Circuit, which I'm sure you're aware of by now.  And, in your plea agreement, you're basically saying, "Hey, I'm not going to challenge any conviction that would result from a guilty plea, nor am I going to challenge any sentence" I would impose in this case as long as it imposed a term of imprisonment within or below a guideline range corresponding to an offense level of 12 and the correct criminal history category.

Do you understand this, sir?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Okay.  There are certain consequences of entering a guilty plea.  I want to make sure you're aware of them or you don't have any questions for me.  But by entering a guilty plea to this offense, you're going to be giving up very important civil rights, like the right to vote, the right to hold public office, the right to sit on a jury, and the right to carry a firearm.

Do you understand?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Out of an abundance of caution -- I

```
 1    don't know if you're a U.S. naturalized citizen.  But, if
 2    you're not, by having a conviction of this on your record, you
 3    would be subjecting yourself to deportation, denial of
 4    citizenship and permanent residency status.
 5              Do you understand this?
 6              THE DEFENDANT:  I do, Your Honor.
 7              THE COURT:  And I asked you this already, Mr. Boman,
 8    in connection with the certification.  I just want to confirm
 9    it.  Other than what's been set forth in the plea agreement,
10    there's been no other promises, handshake deals that the
11    Government's made to you; correct?
12              THE DEFENDANT:  No, Your Honor.
13              THE COURT:  Mr. Swarth, I just want to confirm with
14    you that the plea agreement reflects the entire agreement that
15    was reached in this case.
16              MR. SWARTH:  It does.
17              THE COURT:  And you discussed it with Mr. Boman?
18              MR. SWARTH:  Yes.
19              THE COURT:  You feel it's in his best interest to
20    enter into a guilty plea pursuant to it?
21              MR. SWARTH:  Yes.
22              THE COURT:  Ms. Jhai, to the best of your knowledge,
23    everything that's been promised Mr. Boman is set forth in the
24    plea agreement?
25              MS. JHAI:  That's correct, Your Honor.
```

1          THE COURT:  Okay.  I now have to make sure I advise

2     Mr. Bowman of the statutory maximum penalties and punishments

3     that apply to this offense.  I don't believe there's any

4     mandatory minimum.

03:01PM 5          Ms. Jhai, would you be good enough to advise us what

6     the statutory maximum penalties and punishments are and confirm

7     there's no mandatory minimum.

8          MS. JHAI:  Yes, I will, Your Honor.  And since the

9     Court went over the appellate waivers, I'll just note that

03:01PM 10    there is also a waiver of collateral attack on page 13 that

11    Mr. Boman agreed to.

12          The statutory maximum sentence that the Court can

13    impose for a violation of 18 U.S.C., Section 371, is five

14    years' imprisonment; a three-year period of supervised release;

03:02PM 15    a fine of $250,000 or twice the gross gain or gross loss

16    resulting from the offense, whichever is greatest; and a

17    mandatory special assessment of $100.  And there is no

18    mandatory minimum sentence.

19          THE COURT:  Is there any issue of restitution?

03:02PM 20          MS. JHAI:  Not known to the Government at this time.

21    I didn't -- it's not included in the plea agreement.  I'm not

22    aware of restitution.

23          THE COURT:  Okay.  Mr. Boman, one of the duties I

24    have at this hearing is to advise you, worst-case scenario,

03:02PM 25    what could happen to you, the statutory maximum penalties and

**UNITED STATES DISTRICT COURT**

punishments.  The law wants me to tell you that because I can't

tell you what your sentence is going to be before you enter a

guilty plea.

So the law says, "Okay, you can't tell Mr. Boman

what his sentence is going to be, but at least let him know

what's the worst-case scenario that could happen to him."

That's important information -- I think you need to know it --

but I don't want you under the impression I'm going to impose

the statutory maximum in your case.

Do you understand?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Do you have any questions for me about

the statutory maximum penalties and punishments?

THE DEFENDANT:  I don't, Your Honor.

THE COURT:  We also no longer have a program of

parole in our federal system.  If you're sentenced to time in

custody for this offense, you're not going to be released early

on any program of parole.

Do you understand that?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Also, once you get out of custody, you'd

be subject to supervised release -- or if it was probation,

similar concept -- to certain terms, conditions, and

restrictions that you must comply with, such as don't violate

any of our criminal laws.  And if you violate any term,

```
 1   condition, or restriction of your supervised release or

 2   probation, the consequences to you are severe.  You'd have to

 3   spend additional time in custody for any such violation.

 4          Do you understand?

 5          THE DEFENDANT:  I do, Your Honor.

 6          THE COURT:  I'm not familiar with your personal

 7   history, Mr. Boman, but if you are on supervised release,

 8   probation, or parole on some earlier case, by entering a guilty

 9   plea this afternoon, you could be violating the terms,

10   conditions, and restrictions of that earlier supervised

11   release, probation, or parole.

12          Do you understand, sir?

13          THE DEFENDANT:  I do.

14          THE COURT:  Let me talk to you about sentencing, how

15   it's going to work.  And if you have any questions, please ask

16   me because I got to believe this is important to you.

17          If you go forward and enter a guilty plea this

18   afternoon, we'll set a date for sentencing, and I'll have the

19   Probation Department prepare a Presentence Investigation

20   Report.  They're going to tell me a little bit more about you,

21   your life, and what you did here.  They're going to calculate

22   the Sentencing Guideline range, which we talked about in

23   connection with your certification.  They'll determine what

24   your offense level is; what are the offense characteristics;

25   what adjustments need to be made, if there's any departures
```

03:03PM 5
03:04PM 10
03:04PM 15
03:04PM 20
03:04PM 25

1    that need to be made or applied.

2         Then the probation officer will determine what

3    criminal history category you fall into based on -- if you have

4    any prior convictions that are not too old, they're assessed

03:05PM  5    certain points.  And then, depending on the number of total

6    points that are assessed, you're placed into criminal history

7    categories; I being the least severe, VI is the most severe.

8         So the probation officer will calculate the offense

9    level, calculate the criminal history category, then go to the

03:05PM 10    sentencing table and determine what the Sentencing Guideline

11    range is for your case.  Where those two components intersect,

12    that's the starting point for the sentencing analysis.

13         The probation officer then will apply to your case

14    those very important objectives and factors of sentencing under

03:05PM 15    that federal sentencing statute we also talked about in

16    connection with your certification, 18 U.S.C., Section 3553.

17    Under that statute, Mr. Bowman, I have to determine the

18    guideline range; then I have to look at the nature and

19    circumstances of your offense, your unique history and personal

03:06PM 20    characteristics, try to identify anything aggravating or

21    mitigating in that regard for you.

22         And then I need to make sure that any sentence I

23    impose will reflect the seriousness of the offense, promote

24    respect for the law, and provide just punishment; that the

03:06PM 25    sentence will deter you and others from engaging in the

criminal conduct; that the sentence will protect the public

from any further crimes you might commit; that the sentence

will provide you with needed educational or vocational

training, medical care, or other correctional treatment; that

03:06PM 5  the sentence will avoid unwarranted sentencing disparities

among people who have been similarly convicted and sentenced

for this type of offense; and then, if there was any issue of

restitution, make sure that restitution is provided.

So the probation officer will calculate the

03:07PM 10  guideline range, apply these factors to your case, and then

tell me what he or she thinks is the appropriate sentence for

you.

The next step in the process, then, will be for

Mr. Swarth, on your behalf, and Ms. Jhai or someone from the

03:07PM 15  United States Attorney's Office, on the Government's behalf, to

submit position papers where they'll tell me what they think is

the guideline range.  They'll tell me how these 3553 factors

apply, and they'll tell me what they think is the appropriate

sentence for you.

03:07PM 20  The next step will be to have the sentencing

hearing.  I'll have reviewed the Presentence Investigation

Report prepared by the Probation Office.  I'll have read the

lawyers' position papers, and then everybody will have an

opportunity to speak to me, including you, if there's anything

03:07PM 25  you'd like to say.  You don't have to speak, but you have a

1    right to do so.

2              After I've heard from everybody and read everything,

3    then I have that humbling task, Mr. Boman, of determining what

4    your sentence would be.  I can't tell you what your sentence is

03:08PM 5    going to be before you enter a guilty plea, but I certainly

6    could answer any questions you have for me about this process

7    and how I go about deciding it.

8              Do you have any questions?

9              THE DEFENDANT:  I can't say I do, Your Honor.  No.

03:08PM 10             THE COURT:  Okay.  Well, if something comes up, let

11   me know.

12             Now I want to talk to you about giving up your

13   fundamental constitutional rights to a trial because, if you go

14   forward, you're going to be giving them up.  I want to make

03:08PM 15   sure you understand that and it is your intent to give them up.

16             You have a -- you'd have the right to persist in a

17   not-guilty plea to these charges and then have a public and

18   speedy trial on them where I would impanel 12 people in the

19   jury box, like that one to your right, to my left, and then the

03:08PM 20   Government would have the burden of proving you guilty, guilty

21   beyond a reasonable doubt.  That is the highest standard of

22   proof we have in our justice system.

23             At the trial, you have the right to an attorney.

24   And if you couldn't afford one, I'd appoint one for you at no

03:09PM 25   cost to you.  At the trial, you have the right to confront and

cross-examine any witness the Government brings into court to
testify against you.  You also, sir, have the right to present
your own evidence.

What I mean by that, if there's somebody out there
saw something, did something, know something, there's any
document or physical bit of evidence you want to show to the
jury, we could issue a subpoena to that person requiring them
to come into court for you, tell the jury what they saw, did,
or know or show that document or physical bit of evidence to
them.

At the trial, you also have the right to take the
witness stand and tell the jury what you did and why you did
it, if you wanted to.  I say "if you wanted to," Mr. Bowman,
because you also have a constitutional right to remain silent
at the trial, not testify.  And that cannot be used against you
in any way by the Government.  Again, it's the Government's
burden to prove you guilty, guilty beyond a reasonable doubt.
It is not your burden to prove your innocence.

And if we had a trial and the jury came back with a
guilty verdict against you, you have the right to appeal that
verdict and any sentence I would impose as a result of it.  But
if we go forward this afternoon and you enter a guilty plea,
you're going to be giving up all these constitutional rights
and then the terms and conditions of your plea agreement are
going to kick in and be binding on you.

1          Do you understand this, sir?

2          THE DEFENDANT:  I do, Your Honor.

3          THE COURT:  Do you give up your constitutional

4   rights to a trial?

03:10PM 5          THE DEFENDANT:  I do, Your Honor.

6          THE COURT:  All right.  And, Counsel, do you join

7   and concur in that waiver?

8          MR. SWARTH:  Yes.

9          THE COURT:  All right.  I'm in a position now to

03:10PM 10  hear a factual basis for a guilty plea.

11          Mr. Boman, I'm going to turn it over to Ms. Jhai.

12  If you could please pay close attention to what she represents

13  because I'm going to follow up and ask you a few questions

14  about it.

03:10PM 15         MS. JHAI:  If this case were to proceed to trial,

16  the Government would be prepared to prove, beyond a reasonable

17  doubt, that, between March 2017 and October 2nd, 2018,

18  defendant, his co-conspirators, and others participated in an

19  organization originally known as the DIY Division that was

03:11PM 20  later rebranded as the Rise Above Movement or RAM.  RAM was

21  located in the Greater Los Angeles, California, area, in the

22  Central District of California, and represented itself as a

23  combat-ready, militant group of a new nationalist white

24  supremacy and identity movement.

03:11PM 25         Under the aegis of RAM, at all relevant times,

defendant and his co-conspirators agreed to attend, and did

attend, within the Central District of California and

elsewhere, rallies with the intent to participate in and carry

on and commit acts of violence in furtherance of a riot with

03:11PM 5  each conspirator aiding and abetting one another in those

objectives.

Defendant and his co-conspirators performed numerous

overt acts in furtherance of their agreement, including the

following, as described more fully below:

03:11PM 10 To prepare for violent physical conflict, defendant,

his co-conspirators, and other RAM members and associates

regularly held hand-to-hand and other combat training sessions.

Defendant attended several such training sessions in 2017.

On various social media platforms, including

03:12PM 15 Twitter, Facebook, Instagram, GAB, and Discord, defendant and

his co-conspirators posted messages and photographs of

themselves preparing for or engaging in violence, accompanied

by statements such as "When the squad's not out smashing

commies," "#rightwingdeathsquad," and "#goodnightleftside."

03:12PM 20 March 25th, 2017, Huntington Beach, California:

On March 15, 2017, defendant, Co-Conspirators

Number 1 and 2, and other RAM members engaged in combat

training in San Clemente, California, to prepare to engage in

violence at political events, including an upcoming political

03:12PM 25 rally on March 25th, 2017, in Huntington Beach, California, the

1    Huntington Beach rally.

2          Defendant and his co-conspirators took the following

3    actions with the intent to incite, participate in, and carry on

4    a riot and to commit acts of violence in furtherance of a riot

03:13PM 5    at the Huntington Beach rally.

6          On March 25th, 2017, defendant attended the

7    Huntington Beach rally along with Co-Conspirators Number 1 and

8    2 and other RAM members.

9          At that event, defendant and his co-conspirators

03:13PM 10   pursued protestors and engaged in acts of violence, including

11   assaulting groups of protestors and other persons.  Defendant

12   personally punched, shoved, and kicked one protestor in the

13   back, while other RAM members and co-conspirators pursued,

14   tackled, and punched protestors.

03:13PM 15         Following that event, news outlets, including

16   various Neo-Nazi and white supremacist websites, published

17   photographs depicting defendant and his co-conspirators engaged

18   in those assaults.

19         Defendant and his co-conspirators celebrated this

03:13PM 20   news coverage, both in person and through text and social media

21   messages, and used the Internet to post statements,

22   photographs, and videos of the assaults in order to recruit

23   members to engage in violent confrontations at future events.

24         For example, on March 26, 2017, defendant posted on

03:13PM 25   his Facebook account a link to an article on *The Daily Stormer*

titled "Trumpenkriegers Physically Remove Antifa Homos in Huntington Beach," along with the comment "We did it, fam."

Similarly, on that same date, defendant posted a photograph on his Facebook account showing himself, other co-conspirators, and other RAM members at the Huntington Beach rally, along with the comment "Hail victory and the alt-reich."

On February 15, 2018, the RAM Twitter account posted a message showing defendant and several other RAM members at the Huntington Beach rally, with the message "Shortly after this pic Antifa was BTFO" -- meaning "blown the eff out" -- "in Huntington Beach."

April 15, 2017:  Berkeley, California:

On April 15, 2017, a political rally was scheduled to occur in Martin Luther King Civic Center Park in Berkeley, California, the Berkeley rally.  Defendant and Co-Conspirators Number 1 and Number 3 took the following actions with the intent to incite, participate in, and carry on a riot and to commit acts of violence in furtherance of a riot at the Berkeley rally.

In anticipation of the Berkeley rally, defendant attended a RAM training on Sunday, April 9, 2017, in San Clemente, California, where participants engaged in hand-to-hand fighting and formation fighting training.

On the evening of April 14, 2017, defendant, Co-Conspirators Number 1 and Number 3, and other RAM members

reserved and rented a van from Airport Van Rental, located at
the Los Angeles International Airport, to drive together to
Richmond, California, where they checked into an international
chain hotel.

03:15PM    On April 15, 2017, defendant and Co-Conspirators
Numbers 1 and 3 prepared to commit acts of violence at the
Berkeley rally by wrapping their hands with athletic tape and
wearing coordinating gray shirts, goggles, and black scarves
and masks to cover the lower half of their faces.

03:15PM    Throughout the day, there were several violent
clashes between opposing groups at the rally.  In one of the
first such instances, defendant, Co-Conspirators 1 and 3, and
other RAM members crossed the barrier that police erected to
separate the opposing groups and punched and kicked several
03:16PM people.  Several minutes later, defendant and Co-Conspirators
Numbers 1 and 3 again crossed the barrier and engaged in fights
with protestors.

    Later in the day, defendant, Co-Conspirator
Number 3, and other RAM members pursued fleeing protestors away
03:16PM from the park through the streets of downtown Berkeley.
Defendant punched at least one fleeing protestor, while another
RAM member attacked another protestor, punching him several
times and stomping on him once.  Another RAM member hurled
ladles of hot beans at the fleeing protestors before throwing
03:16PM the pot itself into the crowd, kicking down a fence that was

blocking the street, and kicking a fleeing protestor from

behind.

Thereafter, various Neo-Nazi and white supremacist

websites published photographs depicting defendant and his

co-conspirators assaulting protestors and other persons at the

Berkeley rally.  Defendant and his co-conspirators celebrated

this news coverage and used the Internet to post photographs

and videos of the assaults one or more of them had committed in

order to recruit others to engage in violence in furtherance of

a riot at future events.

For example, on April 16th, 2017, defendant posted a

photograph on his Facebook page showing him punching persons at

the Berkeley rally along with the caption "Ooooi vey!!!

Dagoyiiiim knooooow."  Similarly, on that same date, defendant

posted a photograph on his Facebook account containing a

Twitter post in which a journalist identified defendant and one

of his co-conspirators at the Berkeley rally and accused him of

shoving him.  Defendant wrote, "You come face to face with the

enemy, what do you expect."

On April 18, 2017, defendant shared on Facebook a

video depicting RAM's co-founder and other RAM members

assaulting protestors at the Berkeley rally, titled, "Based

Elbow Man & Crew Stomp ANTIFA."

On August 10, 2017, defendant posted a photograph on

his Facebook page showing himself punching a person at the

1    Berkeley rally.

2            In committing the foregoing actions with the intent

3    to incite, participate in, and carry on riots, and to commit

4    violence in furtherance of a riot, defendant and his

03:18PM 5    co-conspirators traveled in and used facilities of interstate

6    and foreign commerce.

7            THE COURT:  All right.  Mr. Boman, are the facts

8    that Ms. Jhai just represented to me true, sir?

9            THE DEFENDANT:  Yes, Your Honor.

03:18PM 10           THE COURT:  Is there any fact she represented that

11   you dispute or need to clarify?

12           THE DEFENDANT:  There's certain of them in there

13   that seems not true.

14           THE COURT:  All right.  Tell me which ones.

03:18PM 15           THE DEFENDANT:  Talking about going through the --

16   crossing the barrier.  There's a barrier set up by police --

17   Berkeley police and -- to separate either sides, the left side,

18   say, and the right side.  And from the left side being --

19   excuse me -- from us being on our side -- right? -- meaning all

03:19PM 20   the gentlemen who I went with, we were holding up a sign that

21   said "Defend America."  And then all these people in black,

22   Antifa, come walking up.  And we're all -- we're all just

23   talking shit back and forth for this, that, and the other.

24           And from when everybody in black, which was Antifa,

03:19PM 25   came walking up -- there was this Black gentleman, this Black

kid, he was about 18 years old, I would say, a little bit

younger -- he had a "Defend America" hat on.  And from when all

these people in black came walking up, we were all on their

side.  So we backed up, backed up, backed up.  And then police

03:19PM 5   came and intervened and told us to back up some more.  So we

did.  But that one kid stayed there.

And we were talking to him, and -- excuse me.  And

from how it just continued and erupted into the riot that it

was, they started jumping this kid.  So me and my buddy Rundo,

03:20PM 10  we ran in there, and we took him out of there.  There's 10, 15

people just stomping on him.  And then from me going up and

wrapping him up -- I was just backing up with him.  And my

buddy Rundo, he was throwing punches and defending me and this

kid.  And, from there, it just erupted, and it just kept on

03:20PM 15  going.

And then Berkeley police got a stand down order, we

heard.  And then it was five hours of just a bunch of nonsense

of what ensued.  And that's all I have to say.

THE COURT:  I appreciate that clarification context.

03:20PM 20  There's two incidents in the factual basis of the plea

agreement, the one Ms. Jhai represented.  You've been talking

about the Berkeley incident.  Your confrontation, your clash,

your fighting, was that all with Antifa protestors?

THE DEFENDANT:  Yes.

03:21PM 25  THE COURT:  Was there any person that you had a

1    conflict with that was not a member of Antifa?

2          THE DEFENDANT:  I can't say so because, whenever

3    they showed up, they would always come in black, fully, from

4    head to toe, and had black face masks, black clothing.  And

03:21PM 5    from -- they were very much an instigator in all this.

6          And we never went there to have a mind to fight or

7    have an altercation, but we went there to protest, in essence.

8    And, from what ensued, we defended ourselves.  We never went

9    out of our way to attack people.  We never went out of our way

03:21PM 10   to just cause harm.  But we went up there to protest.

11         THE COURT:  Did you go up there to protect any of

12   the speakers?

13         THE DEFENDANT:  That was what our -- what we had

14   intended to do as well.  I can't recall the name of the group

03:22PM 15   that we went up there with, but we went as acting security for

16   the speakers that never even happened to speak at the Berkeley

17   rally due to the fact of the riot.  And that's what our

18   intentions were.

19         THE COURT:  All right.  You didn't say anything or

03:22PM 20   make any exception or clarification to the Huntington Beach --

21   that conflict and fighting.  Was it only protestors belonging

22   to Antifa?

23         THE DEFENDANT:  I would say so, yes, to the best of

24   my knowledge.  And the statement where it says I had kicked a

03:22PM 25   protestor in the back, he was pepper-spraying us as we're

```
 1   walking with our signs.  He let out a spray of pepper spray and
 2   then he tripped, and then I kicked him.
 3              THE COURT:  All right.  Well, Counsel, where do you
 4   think we're at?
 5              MR. SWARTH:  We're in a difficult place.  We're in a
 6   difficult place, Your Honor.
 7              (Reporter requests clarification
 8              for the record.)
 9              MR. SWARTH:  We're in a difficult place.  I am --
10   I've done my best to negotiate facts as I could for my client,
11   but he's always been -- as I'm sure the Court is aware,
12   negotiating with U.S. Government is a very difficult prospect
13   at best.  They are the most powerful force ever known, and they
14   swing a very heavy weight.
15              My client has been in custody for almost two years
16   on this matter with a five-year max.  So we got to a point
17   where a plea was going to be more efficient for him than going
18   to trial.
19              And that's where we are.  And that, unfortunately,
20   was just -- I think just revealed to the Court, my client's
21   statement.
22              MS. JHAI:  Your Honor, if I may, this is the first
23   that the Government is hearing about specific disagreements
24   with this factual basis.  And I did understand, going into
25   today, that it had been reviewed with his client, and this was
```

03:23PM (line 5)
03:23PM (line 10)
03:23PM (line 15)
03:24PM (line 20)
03:24PM (line 25)

1    something that was agreed to.

2            So I just want to say on the record, this is a

3    surprise to the Government that -- the defendant's comments

4    here today in response to the plea agreement, which he signed

03:24PM 5    and discussed with his client.

6            THE COURT:  And I appreciate that.

7            This wasn't originally your case.  When did you

8    inherit it?

9            MS. JHAI:  Me?

03:24PM 10            THE COURT:  Yeah.

11            MS. JHAI:  It was sometime in the last year during

12    2022.  That's correct.

13            THE COURT:  Because this isn't the first time I've

14    heard this.  And I vividly recall in discussions at other

03:25PM 15    hearings that this was really the confrontation with Antifa.

16    And I recognized then, and I recognize again today, they're not

17    sympathetic victims.  And I don't know if some of these facts

18    are in self-defense, and it's not a crime.

19            But let me ask this question.  Why -- I don't

03:25PM 20    remember ever reviewing Mr. Boman's detention order.

21            MR. SWARTH:  If I may, Mr. Boman was detained during

22    the entire original pendency of the case until the Court

23    dismissed the matter as unconstitutional.  He was, obviously,

24    then released with no bond.  It took almost two and a half

03:26PM 25    years for the Courts of Appeal to act, by which time Mr. Boman

1    had kind of lost himself to the streets.  He was in and out of

2    local custody, but I could never quite get ahold of him so

3    that, when the case was brought back to this Court, I sat

4    without knowing where Mr. Boman was.  I had no voice at that

03:26PM  5    point, and the trial was set almost a year ahead.

6        Shortly thereafter, Mr. Boman came in, but I

7    couldn't get him out of custody.  Because of his drug

8    addiction, because of family having moved away, I just wasn't

9    able to get -- we had at least one, if not two hearings on

03:27PM 10    attempted release.  So --

11        THE COURT:  In front of the magistrate judge?

12        MR. SWARTH:  Yes.  So we got to the point where you

13    do a numbers calculation, if you don't mind, of -- well, we got

14    a five-year max.  I've got this calculation of an offense

03:27PM 15    level.  I've got this hearing.  I have a sense of where

16    sentencing will be.  And I had that hard conversation with my

17    client about, you know, do you stand on principal, or do you

18    stand on getting out?

19        And my disagreement with the facts here is largely

03:27PM 20    that a lot of it is just not necessary to the question of

21    whether or not my client did the bad act.  That has been my

22    problem asserting -- otherwise, the discussion of the facts

23    would reduce itself "He did."  "No, he didn't."  "He did."

24    "No, he didn't," and lay it out at trial and it's all going to

03:28PM 25    be testimony.

1          And I know what I know about the case, about my

2    defendant, and I have to factor in all of these things in

3    determining do I recommend to my client that he goes to trial?

4    Or do I recommend to my client that this is an acceptable plea

03:28PM 5    agreement?  And in the discussions we had -- believe me, we

6    went back and forth quite a bit.

7          But in the end, we came down to this is -- getting

8    to sentencing will be much faster than going through trial.

9    And that's really where things...

03:28PM 10         THE COURT:  You're in a tough spot.  You're in a

11   tough spot, and it's a tough case.  And I'm not trying to

12   aggravate or compound the situation, but I've never taken a

13   guilty plea from someone who may be innocent.

14         MR. SWARTH:  I am very troubled by this case, not

03:29PM 15   just because of whether or not, say, First Amendment question,

16   but I'm troubled because of exactly what the Court says.  This

17   is not a case where I've got my client in a bank with a gun

18   getting the money.  This is all -- a lot of this case is -- has

19   to do with what you believe in terms of your politics, in terms

03:29PM 20   of your idealogy.

21         You're right.  It's -- the more I speak, the more I

22   start to become convinced, "Well, wait a second.  This is

23   politics.  This isn't law."  And I don't want to -- I don't

24   want to get things more confused.

03:29PM 25         I understand the Court's point, and I don't have

```
 1  anything more clarifying to say.
 2          THE COURT:  Well, Ms. Jhai, you've been very
 3  patient, and I appreciate that.  I am going to want to hear
 4  from you, but I want to work with Mr. Swarth for a moment.
 5          I remember vividly seeing photographs of Antifa.  I
 6  vividly recall seeing -- I don't know whether it was the
 7  Huntington Beach or the Berkeley rally.  And I recall a veteran
 8  in a wheelchair being -- water or drinks or beverages were
 9  thrown at him.  I remember an elderly woman being cut because
10  Antifa was throwing stuff at her.  I recall seeing certain
11  speakers, because of their political views, were being shut
12  down by Antifa.
13          So that's the basis for my statements that these
14  aren't some of the most sympathetic victims.  And now I'm
15  hearing -- this is a new fact -- that the person that Mr. Boman
16  was kicking back, he was pepper-spraying people.
17          So, you know, I'm -- I feel I'm in a difficult
18  position.  I get it.  I understand that, you know, what -- he's
19  in custody, and there's a five-year statutory max.  There's
20  many mitigating facts and circumstances here on the sentence;
21  so I get it.
22          But at the same time, the process is really
23  important to me.  I can't start accepting guilty pleas from
24  people who might be innocent of the charges.  I don't want to
25  be in that position.
```

```
  1              MR. SWARTH:  I understand it.  And it's -- I do
  2      quite a bit of practice in state court.  As one might imagine.
  3      It's a different ethos there.  There is the concept of making
  4      deals simply because it's in the defendant's best interest.  I
03:32PM  5      understand that that doesn't -- that that truth is much more
  6      essential to this process and this Court.
  7              THE COURT:  And the feds, too, we don't -- we have
  8      Rule 11, which precludes me from at all getting involved in any
  9      type of plea negotiations too.
03:32PM 10              MR. SWARTH:  Understood.
 11              THE COURT:  As far as -- just so we have all the
 12      facts on the table before Ms. Jhai responds, this period of
 13      time after I dismiss the charges, waiting on appeal -- what
 14      kind of trouble was Mr. Boman getting into?
03:33PM 15              MR. SWARTH:  Mr. Boman has a meth habit.  He was
 16      simply being arrested in the -- by the local authorities -- I
 17      believe it's Torrance police -- because he either had a pipe on
 18      him or he had -- he was under the influence.  It was
 19      repetitive.  They were all $500 bail.  So they wouldn't hold
03:33PM 20      him long enough for me to get my hands on him, as I was trying
 21      to monitor the sheriff's website.
 22              THE COURT:  Any theft offense or acts of violence?
 23              MR. SWARTH:  No.  I think there was one question --
 24      no.  There was no theft, no confrontation.  It was all status
03:33PM 25      offenses.
```

```
 1            THE COURT:  If he was given bail, where would he
 2   stay?
 3            MR. SWARTH:  This was -- this was the problem.  The
 4   defendant's father doesn't have a place for him.  Defendant's
 5   mother moved to Kentucky.  I wanted to get him released to
 6   Kentucky for a time.  He would go there, stay there, hopefully
 7   work, have rehab available.  We weren't able to get that -- get
 8   the judge -- get a magistrate judge to say, "I'll release on
 9   that basis."
10            THE COURT:  All right.  Why don't you two take a
11   seat and be comfortable.
12            Ms. Jhai, you've been very patient.  I appreciate
13   that.  Many issues have come up, but, if you wouldn't mind,
14   let's deal with the first one.
15            I mean, does the Government feel comfortable, me
16   taking a guilty plea with what Mr. Boman just said?
17            MS. JHAI:  Well, the main thing I want to clarify is
18   the Government is 100 percent not in the practice of taking a
19   guilty plea from somebody who is innocent or may be innocent.
20   We're relying on the truthfulness of Mr. Boman's admissions and
21   also on the evidence in the case.
22            So, in this case, when the Government represented
23   what the Government is prepared to -- would be prepared to
24   prove beyond a reasonable doubt, at trial, that was a
25   straightforward representation from the Government based on the
```

evidence in our possession.  Mr. Boman's position to agree or

not to agree could be made for a variety of reasons.

In terms of whether the Court should accept a plea,

the Court should accept a plea if he can say that these are

03:35PM  truthful admissions.  I'm sure that that is either written into

the letter of Rule 11 or in the spirit of it.  Mr. Boman should

admit things that he's prepared to admit and say are true.

Now, that kind of negotiation -- so, for example,

addressing a factual basis in a plea agreement and saying "I

03:35PM  don't think this" or "I don't think that" or "I don't agree

with certain things" -- that kind of negotiation could have

happened in advance, after we sent this plea agreement to

defense counsel, and did not.  So there wasn't dialogue of that

nature with respect to particular disagreements.

03:35PM  The main concern from the Government's perspective,

obviously, is the elements.  So if Mr. Boman doesn't admit the

factual truth of the Government's proof of the elements of the

crime, then he should not enter a guilty plea today.

Now, if it would be fruitful, I will sit down with

03:36PM  Mr. Swarth and Mr. Boman, and we can line-item -- you know, go

through the Indictment -- sorry -- the factual basis line by

line and talk about any specific areas of disagreement.

The main thing that stood out from the Government's

perspective in what Mr. Boman just said was denying traveling

03:36PM  with the intent to participate in acts of violence.  And that

intention to engage in acts of violence is a core part of the
crime that he's being charged with.  And if Mr. Bowman chooses
not to plead guilty, the Government would be prepared to prove
beyond a reasonable doubt at trial.

03:36PM        In particular -- just one moment, if you don't mind.
I'm sorry, I didn't hear if you were getting ready to interrupt
me.

        The defendant traveled in interstate commerce with
the intent to incite a riot, to participate in or carry on a
03:37PM riot, or commit an act of violence in furtherance of a riot.
That's the core fact that the Government is prepared to prove,
that this wasn't travel to protest in order to stand quietly by
and only act in the need for self-defense.

        The other thing -- I think that is the main point
03:37PM from the Government's perspective.  We're willing to sit down
and talk with Mr. Swarth and Mr. Boman regarding a factual
basis that he can agree to, but we're also prepared to go to
trial and prove the facts beyond a reasonable doubt.

        With respect to Antifa, from the Government's
03:37PM perspective, the victim -- the victim is not an element of the
crime.  Whether somebody else had savory or unsavory, you know,
views on the other side of the gate, if Mr. Boman traveled in
interstate commerce with the intent to commit acts of violence
in furtherance of a riot, then that alone is an offense under
03:38PM the statute.

1          With respect to bail and bond, I --

2          THE COURT:  Before we go to bail, let's talk a

3     little bit more about the factual basis.

4          MS. JHAI:  Sure.

03:38PM  5          THE COURT:  I have no question that that's what you

6     intend to prove if we had a trial.  But, again, from the prior

7     hearings I had and the arguments, these -- even though it was a

8     legal issue that was before me on the statute, there was a lot

9     of as-applied arguments being made.  And what I took from the

03:38PM 10     defendants at the time, and now I'm hearing it again here, is

11     that "We knew there was going to be violence because Antifa was

12     there.  We're going to be prepared because we're going to fight

13     them.  And Antifa will start this, and," the mentality is,

14     "we'll finish it."  If that's true, I don't know if that's a

03:39PM 15     crime.

16          And, again, now I've heard there is this young black

17     man who was about ready to get attacked by Antifa, and so

18     Mr. Bowman is going to his rescue.

19          I don't see how those statements, Ms. Jhai, are

03:39PM 20     consistent with the factual basis.  You know, now I kind of had

21     a sense of them before, and now I'm hearing them again.  I

22     don't know, candidly, if you can negotiate a factual basis

23     without him recanting and saying, "Well, I didn't mean what I

24     just represented to you under oath, Judge."

03:40PM 25          MS. JHAI:  The Government has no interest in

proceeding with the plea if Mr. Boman isn't representing

himself and his belief about his culpability truthfully to the

Court.  And if the facts that Mr. Boman represents, just as he

just did, are inconsistent with guilt of the offense, then the

03:40PM 5  Court shouldn't accept the plea.

Now, the accuracy of those facts, that's for the

fact-finder, we'll get to trial.  We'll present the evidence on

both sides.  But at the change of plea hearing, Mr. Boman

shouldn't plead guilty unless he agrees that he is guilty and

03:40PM 10  admits truthful facts consistent with that plea.

THE COURT:  Okay.  Now, I know we have the trial set

for December.  I would -- based on that proffer, Mr. Swarth,

that you made, I would consider giving Mr. Boman bail.  But

what I would want is discussions with the Pretrial Services

03:41PM 15  office to make sure that they can find suitable, acceptable

housing and then any other treatment, whether that be a drug

treatment program -- I know he's been in custody, but the

temptations are extreme.

MR. SWARTH:  Thank you for that, Your Honor.  Yes,

03:41PM 20  we had made quite a bit of effort to try and work with Pretrial

Services, see if we can find a program.  We got caught in the

Catch-22 of he needs Medi-Cal, but he can't get Medi-Cal

insurance while he's incarcerated.  And they didn't have enough

available beds that are under contract with the Government.

03:41PM 25  And so that was another idea that we were trying as a "Okay.

```
 1   Well, at least we can get something accomplished while I
 2   prepare the case for trial."  So the Court is in -- thinking in
 3   the right way.
 4           I wish I could remember with real accuracy what
 5   are -- why we didn't get the bond that we sought.  I think it
 6   was back in October -- September or October was the last time
 7   we appeared.  And we -- the other problem was there are no
 8   financial resources --
 9           THE COURT:  I understand.
10           MR. SWARTH:  -- available.
11           THE COURT:  I understand.
12           MR. SWARTH:  But I know that his mother was very
13   eager and willing to take him in.  His father was willing and
14   eager to drive him.  Mom now lives in Kentucky, and she was
15   very willing and eager to have him come and stay and start to
16   rehab himself.  And if that would -- that would be possible,
17   yeah, this is a case that I would otherwise try.
18           THE COURT:  What makes me a little uncomfortable is
19   Kentucky.  Is there any way we can set up conditions here?
20           MR. SWARTH:  The problem is -- no.  The problem is
21   "I had friends, but no."  "I had some family, but no."  I don't
22   mean to speak too colloquially.  But it's just not -- it's one
23   of those very difficult situations where there just aren't the
24   resources available the way we're used to and what we'd like to
25   see.
```

1          THE COURT:  Yeah, I've been running against this.

2     So I don't know if it's possible.  Is there any way we could

3     try to get a residential treatment facility, drug treatment

4     facility?

03:43PM 5          MR. SWARTH:  Again, I would love to if I could get

6     one of the beds that the Government has contracts for.  I

7     cannot achieve it for him -- and made extensive inquiry, but I

8     can't achieve it for him without insurance, and I can't get

9     insurance for him while he's in custody.

03:44PM 10         THE COURT:  Excuse my ignorance, but I have -- I've

11    had cases where people didn't have insurance.  And if it's an

12    order of the Court, they put him in there and the Government

13    pays; right?

14         MR. SWARTH:  Right.  But that -- my understanding --

03:44PM 15    and I'm not fully conversant either -- is that Pretrial

16    maintains a certain number of contractual relationships with

17    organizations and facilities that are available for that

18    purpose and that there just -- there's just not enough

19    available.

03:44PM 20         THE COURT:  Okay.

21         MS. JHAI:  Your Honor, I was present for the last

22    detention hearing and argued that I believe -- and I don't have

23    the record at the tip of my recollection right now, but there

24    is a written order with findings on the docket made by the

03:45PM 25    magistrate judge.  And, as I recall, some of the issues were,

as Mr. Swarth has said, not having a residence or stable

residence, possibly not bail resources.  But, also, I believe

there was an issue of use of an alternate name that the

magistrate judge found significant, and then the drug use and,

03:45PM  I believe, an instance of flight.

So there were a number of reasons for the Court's

detention decision grounded in Mr. Boman's conduct.  And so the

Government, at this time, still does continue to oppose bail.

THE COURT:  I understand.  And I was going to --

03:45PM  wasn't going to put you in a spot where you had to make a

decision.  I was just putting the issues --

MS. JHAI:  Yeah.

THE COURT:  Well, I don't feel comfortable accepting

a guilty plea based on what I heard before and then what

03:45PM  Mr. Boman said today.  I will entertain -- I'm not promising,

Mr. Boman, that I would grant it, but I will seriously consider

giving him bail.

MR. SWARTH:  I'll do what I can.

THE COURT:  I'd have a much better chance of giving

03:46PM  him bail if I could get a residential facility out here and put

him in.

MR. SWARTH:  I will -- as soon as I walk out of this

courtroom, I will get on the phone with Pretrial Services.

I'll also line up whatever family -- I'll go through the whole

03:46PM  cycle all over again to see if I can make some sort of

**UNITED STATES DISTRICT COURT**

```
 1   arrangement that would keep him local.
 2              THE COURT:  And that would be my strong preference.
 3   If we can't do that, then, back-up plan, put a proposal
 4   together for Kentucky.  But I'm not enthusiastic about that.
 5              MR. SWARTH:  Understood.
 6              THE COURT:  But it is what it is.  And then we can
 7   have -- give the Government a chance to object in written
 8   opposition, and then we can have a hearing, and we can discuss
 9   it.
10              So I'm going to leave the ball in your court,
11   Mr. Swarth.  And you get with Ms. Jhai on a briefing and
12   hearing schedule.  My preference would be sooner rather than
13   later.  And I will ask Pretrial to confer with you --
14              Rolls, could you make that an order of the Court,
15   that Pretrial is to confer with Mr. Swarth to see what
16   realistically they can do and the timing of what they could do.
17              THE COURTROOM DEPUTY:  Okay.  Will do, Your Honor.
18              MR. SWARTH:  I would note one other thing,
19   Your Honor.  My client did not participate in the most recent
20   stipulation regarding the trial date.  My client, as far as --
21   unless I've missed something in the ruling, my client still has
22   a trial date at the end of March.
23              MS. JHAI:  A motion for severance hasn't been
24   granted.  I believe the order Your Honor issued specifically
25   referred only to Defendant Rundo and Defendant Laube, but
```

```
 1    there's no motion for severance.  And that was the basis of the

 2    speedy trial stipulation, was that severance hadn't been

 3    granted.

 4            But I do agree with Mr. Swarth, and I would ask, if

 5    defendant is agreeing today, for the Court to take defendant's

 6    waiver on the record so that we could have a consistent trial

 7    date and a record of his agreement.

 8            THE COURT:  Well, am I reading you wrong?  Am I

 9    hearing that you're going to file a motion for severance?  I

10    have the March 28th trial date available.  I have a civil case

11    April 4, but this takes priority over any civil case.  So I'll

12    kick that.

13            MR. SWARTH:  I need a day or two to be able to say

14    whether I will file a motion for severance.

15            THE COURT:  Okay.

16            MR. SWARTH:  I hadn't thought of going that route,

17    but -- and I'm not sure whether one would be well taken.  I

18    don't want to make a motion to the Court that doesn't make

19    sense.

20            THE COURT:  Okay.  So I don't think I can, then,

21    take a time waiver from you today.

22            MR. SWARTH:  We'll work on that issue as well.

23            THE COURT:  Yeah, if you could confer about that.

24    Okay.

25            MS. JHAI:  I believe so.  So, just to be clear,
```

1    defendant is not -- is not agreeing to waive time today?  I

2    believe that's what I'm taking from the record.

3            THE COURT:  That's what you're taking.  He might.

4    He might, but he's not willing to do that.

03:49PM  5            And you are correct, there's no -- he hasn't been

6    severed.  So I can do that, but he's going to contemplate

7    whether -- bringing the motion for severance.  And then

8    everybody will be given notice and opportunity to be heard.

9    And I'll review and consider that on an expedited basis

03:50PM 10   because, obviously, the 28th is going to be here before you

11   know it.

12           MR. SWARTH:  Your Honor, if I may, I've spoken with

13   my client about it.  I don't think we can get to a final

14   position today.  But I understand the Court's position.  I

03:50PM 15   understand the Government's position.  And I can promise the

16   Court that I and the Government and my client will work to

17   solve the speedy trial issue quickly as well as try and give

18   the Court some indication of where we're going to go in the

19   longer term as quickly as possible.

03:50PM 20           THE COURT:  All right.  Now, before I let you leave,

21   is there anything you need from me to help you contact Pretrial

22   or you have your -- I'm not suggesting that I should.  I just

23   want to -- because time is a little bit of the essence here.

24           MR. SWARTH:  No, I think I can make what sense I can

03:51PM 25   make of everything that's happened today and communicate it to

UNITED STATES DISTRICT COURT

 1   Pretrial and see if they can work with us.

 2              THE COURT:  And, Rolls, you'll have in your minute

 3   order something that I -- I want Pretrial to confer with

 4   Mr. Swarth; right?

 5              THE COURTROOM DEPUTY:  Will do, Your Honor.

 6              THE COURT:  So then they'll know that too.

 7              Okay.  So then I'll just be in a holding pattern.

 8   All right.  Thank you.

 9              THE COURTROOM DEPUTY:  All rise.

10              **(Proceedings concluded at 3:52 p.m.)**

11                          **--oOo--**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES   )
                             )
 4   STATE OF CALIFORNIA     )

 5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, in and for the United States District Court for

 7   the Central District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  March 9, 2023

16

17

18

19                                 /S/ DEBBIE HINO-SPAAN

20                           Debbie Hino-Spaan, CSR No. 7953
                             Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**