CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JULIA DEIXLER (Bar No. 301954)
(E-Mail: julia_deixler@fd.org)
ERIN M. MURPHY (Bar No. 285087)
(E-Mail: erin_murphy@fd.org.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ROBERT RUNDO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-759-CJC |
| Plaintiff, | **NOTICE OF MOTION; DEFENDANT ROBERT RUNDO'S MOTION TO DISMISS FOR SELECTIVE PROSECUTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL; EXHIBITS A-TT** |
| v. | |
| ROBERT RUNDO, | |
| Defendant. | Hearing Date: February 26, 2024<br>Hearing Time: 9:00 am<br>Hearing Place: Courtroom of the Hon.<br>Cormac J. Carney |

TO: UNITED STATES ATTORNEY E. MARTIN ESTRADA AND ASSISTANT UNITED STATES ATTORNEYS KATHRYNNE SEIDEN AND SOLOMON KIM:

PLEASE TAKE NOTICE that on February 26, 2024, or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Cormac J. Carney, United States District Judge, defendant Robert Rundo, by and through his counsel of record, Deputy Federal Public Defenders Julia Deixler and Erin M. Murphy, will bring for hearing the following motion:

**MOTION**

Robert Rundo, through his counsel of record, Deputy Federal Public Defenders Julia Deixler and Erin M. Murphy, hereby moves to dismiss the First Superseding Indictment, ECF No. 209, because it violates Mr. Rundo's right to equal protection against selective prosecution.  This motion is made pursuant to the U.S. Constitution and Federal Rule of Criminal Procedure 12.  This motion is based on the attached Memorandum of Points and Authorities, exhibits, declarations, all files and records in this case, and any additional evidence and argument presented at or before the hearing on this motion.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  January 15, 2024          By  /s/ Erin M. Murphy

ERIN M. MURPHY
JULIA DEIXLER
Deputy Federal Public Defenders
Attorneys for ROBERT RUNDO

# TABLE OF CONTENTS

**Page**

I. THE GOVERNMENT ABUSED ITS AWESOME POWER BY FOCUSING ANTIRIOT ACT CHARGES ON ONLY PEOPLE WITH ALLEGED WHITE SUPREMACIST VIEWS, WHEN PEOPLE WITH DIFFERENT BELIEFS ENGAGED IN SIMILAR CONDUCT...................................................... 1

II. THE 2016 ELECTION KICKSTARTED EXTRAORDINARY POLITICAL VIOLENCE IN CALIFORNIA WHERE "FAR LEFT" COUNTER-PROTESTORS ORGANIZED TO VIOLENTLY SUPPRESS THE SPEECH OF OTHERS, BUT THE GOVERNMENT FILED ONLY A SINGLE ARA CHARGE: THIS ONE. ........................................................................................... 3

    A.    Foreboding violence breaks out at protests leading up to 2016 election..... 3

    B.    Calls for violence escalate after 2016 election. .............................................. 6

    C.    "Far Left" counter-protestors coordinate against Trump Supporters at "Make America Great Again" at Huntington Beach on March 25, 2017. ...................................................................................................................... 9

    D.    Federal and state agencies track far-left's increasing violence leading up to April 15, 2017 rally in Berkeley, California. ................................... 12

    E.    Far-Left Activists Call for "all in Northern California and beyond to converge in Berkeley" on April 15, 2017 to "deny" Trump supporters and "far-right" the "opportunity to grow and expand their movement".... 13

    F.    Counter-protestor tragically killed in Charlottesville Rally that Mr. Rundo did not attend. ............................................................................. 18

    G.    Violence at "pro-Trump" rallies continue in California as investigation into Mr. Rundo begins................................................................................. 19

    H.    Federal Prosecutions of Anti-Riot Act cases. ............................................ 21

III. PROCEDURAL BACKGROUND ...................................................................22

IV. THIS CASE MUST BE DISMISSED BECAUSE THE GOVERNMENT SELECTIVELY PROSECUTED MR. RUNDO FOR HIS BELIEFS, NOT JUST HIS ALLEGED CONDUCT...................................................................23

    A.    The government violated Mr. Rundo's constitutional rights by selectively prosecuting him based on his political beliefs when similarly-situated people with different beliefs were never charged.........23

        1.    When faced with two groups of similar culpability, the government cannot choose to charge only one group because of their political beliefs. ......................................................................23

        2.    Selecting only Mr. Rundo and his co-defendants to charge under the Anti-Riot Act had a discriminatory effect. ................................24

        3.    The discriminatory purpose of Mr. Rundo's prosecution is clear from the infrequency of ARA charges before this case, and the total absence of charges for similarly-situated people....................26

i

**TABLE OF CONTENTS**

Page

a.  The impact of the charges here is borne entirely by a group with alleged white supremacist and "far right" beliefs............................................................27

b.  The sequence of the charges and the nature of the investigation indicate this case is more about protected beliefs than it is about conduct. ..........................29

4.  The legislative history of the ARA makes these charges even more alarming because they represent what happens when the government chooses "legitimate" speech. .......................31

B.  At a minimum, Mr. Rundo is entitled to discovery because there is "some evidence" of discriminatory effect and discriminatory purpose.....32

1.  The standard for discovery for selective prosecution claims is necessarily lighter than the claim itself. ..........................32

2.  Mr. Rundo shows more than "some evidence" tending to show the essential elements of a selective prosecution claim..................33

V. WE CANNOT ABIDE PROSECUTING PEOPLE FOR THEIR UNPOPULAR BELIEFS BECAUSE IT MEANS NOBODY'S FREE SPEECH, THOUGHTS, OR BELIEFS ARE SAFE. .......................................34

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)....................................................................34

*United States v. Alameh*,
  341 F.3d 167 (2d Cir. 2003) ........................................................27

*United States v. Arenas-Ortiz*,
  339 F.3d 1066 (9th Cir. 2003) .....................................................32

*United States v. Armstrong*,
  517 U.S. 456 (1996)......................................................24, 32, 33

*Ave. 6E Invs., LLC v. City of Yuma*,
  818 F.3d 493 (9th Cir. 2016) .......................................................27

*Board of Education v. Barnette*,
  319 U.S. 624 (1943).......................................................................2

*United States v. Bass*,
  536 U.S. 862 (2002).....................................................................32

*Berger v. United States*,
  295 U.S. 78 (1935).......................................................................23

*United States v. Brown*,
  9 F.3d 1374 (8th Cir. 1993) .........................................................26

*Collin v. Smith*,
  447 F. Supp. 676 (N.D. Ill.)........................................................34

*United States v. Falk*,
  479 F.2d 616 (7th Cir. 1973) (en banc).......................................26

*Giebel v. Sylvester*,
  244 F.3d 1182 (9th Cir. 2001) .....................................................25

*United States v. Gomez-Lopez*,
  62 F.3d 304 (9th Cir. 1995) .........................................................33

**TABLE OF AUTHORITIES**

**Page(s)**

*Gomillion v. Lightfoot,*
   364 U.S. 339 (1960)......................................................................28

*United States v. Jones,*
   159 F.3d 969 (6th Cir. 1998) ......................................................32

*United States v. Lee,*
   786 F.2d 951 (9th Cir. 1986) ......................................................24

*United States v. Nathan Wilson,*
   2:20-CR-00516-FMO, ECF No. 205, Order (C.D. Cal., Aug. 12, 2022)..........28

*United States v. Oakes,*
   11 F.3d 897 (9th Cir. 1993) ...................................................26, 27

*United States v. Steele,*
   461 F.2d 1148 (9th Cir. 1972) ....................................................23

*United States v. Thorpe,*
   471 F.3d 652 (6th Cir. 2006) ......................................................27

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977)............................................................26, 33

*Wayte v. United States,*
   470 U.S. 598 (1985)............................................................23, 24

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886)........................................................23, 27, 28

**Constitutional Provisions**

U.S. Const., Amend. I........................................................2, 25, 34

U.S. Const., Amend. V ............................................................23

U.S. Const., Amend. XIV ..........................................................23

**Federal Statutes**

U.S.C. § 371.......................................................................19

18 U.S.C. § 2101............................................................*passim*

iv

## TABLE OF AUTHORITIES

**Page(s)**

**California Statutes**

Cal. Penal Code § 404.6............................................................11

Cal. Penal Code § 242...............................................................11

Cal. Penal Code § 22810(g).......................................................11

**Legislative Activities**

13 Cong. Rec. 19,363-64 (statement of Rep. Cramer), ..............31

**Other Authorities**

ALJAZEERA, *Protests against Donald Trump's win turn violent,* (Nov. 11, 2016), ..........................................................................7

Amy B. Wang, *Pro-Trump rally in Berkeley turns violent as protesters clash with the president's supporters*, WASHINGTON POST (Mar. 5, 2017) ..............................................................8

Chris Hare, *Counterprotestors vastly outnumber those at 'America First' rally in Laguna Beach*, ORANGE COUNTY REGISTER (Aug. 20, 2017)..............19

Emilie Raguso, *Berkeley teacher Yvette Felarca arrested at Patriot Prayer march,* Berkeleyside *(*Sept. 26, 2017), ..............................21

Emilie Raguso, Frances Dinkelspiel and Tracey Taylor, *Protests end with 20 arrests, 11 injuries,* Berkeleyside (April 15, 2017),....................16

Erika I. Richie, *Laguna Beach police make 4th arrest stemming from America First! Rally*, The Orange County Register (Aug. 23, 2017)...............19

Fox 13 Seattle, *Rallies against Islamic law draw counter-protests, some arrested in Seattle* (June 10, 2017)......................................17

Frances Dinkelspiel, *Berkeley teacher Yvette Felarca arrested on charges of inciting a riot, Berkeleyside* (July 19, 2017), ..............................21

Gregor Aish, Adam Pearce and Karen Yourish, *How Large Is the Divide Between Red and Blue America?*, NY TIMES (Nov. 4, 2016)*? *...........................3

**TABLE OF AUTHORITIES**

Page(s)

Jazmine Ulloa, John Myers, Emily Alpert Reyes and Victoria Kim, *7 stabbed at neo-Nazi event outside Capitol in Sacramento*, LOS ANGELES TIMES (June 26, 2016)...............................................................4

Joe Nelson, *San Bernardino anti-Islamic law rally and counter-protests trigger violence*, ORANGE COUNTY REGISTER (June 10, 2017).........................18

Joint Intelligence Bulletin, *California: Escalation in Anti-Fascist, Right-Wing Extremist Violence*, State Threat Assessment Ctr. & Northern California Regional Intelligence Ctr. (June 26, 2017). ........................................3

Jonah Engel Bromwich and Alan Blinder, *What We Know About James Alex Fields, Driver Charged in Charlottesville Killing*, NY Times (Aug. 13, 2017),......................................................................18

Josh Meyer, *FBI, Homeland Security warn of more 'antifa' attacks*, Politico (Sept. 1, 2017) ...................................................................12

Julie Beck, *How to Cope with Post-Election Stress*, THE ATLANTIC (Nov. 10, 2016) ...................................................................................6

Kyle Swenson, *Black-clad antifa members attack peaceful right-wing demonstrators in Berkeley*, WASHINGTON POST (Aug. 28, 2017)......................19

Laura Anthony, *Berkeley businesses board up windows ahead of dueling Trump protests,* ABC 7 News (Apr. 14, 2017) .................................14

Liam Stack, *Attack on Alt-Right Leader has Internet Asking: Is It O.K. to Punch a Nazi?,* NY TIMES (Jan. 21, 2017) .........................................7

Laura Anthony, *Berkeley businesses board up windows ahead of dueling Trump protests,* ABC 7 News (Apr. 14, 2017) .................................14

Madison Park, Kyung Lah, *Berkeley protests of Yiannopoulos caused $100,000 in damage,* CNN (Feb. 2, 2017) ..........................................8

Martha Mendozaap, *Protesters punch, throw eggs at Trump supporters in San Jose,* ASSOCIATED PRESS (*June 2, 2016) ....................................6

## TABLE OF AUTHORITIES

**Page(s)**

Matt Keller, *San Jose police criticized for not stopping attacks outside Trump rally,* ABC 7 News (June 3, 2016)...........................................................6

Melanie Eversley, Aamer Madhani, and Rick Jervis, *Anti-Trump protests, some violent, erupt for 3rd night nationwide*, USA TODAY (Nov. 11, 2016) .............................................................................................................7

Michael Bodley, A*t Berkely Yiannopoulos protest, $100,000 in damage, 1 arrest,* SF GATE (Feb. 2, 2017) ...........................................................7

Mike Wendling, *Proud Boys and antifa - who are they and what do they want?,* BBC (Sept. 30, 2020)..........................................................4

Paige St. John, *Inside the black bloc militant protest as it rises up against Trump, ,* LA TIMES (Feb. 12, 2017) ...................................................8

Patrick Healy, Jeremy W. Peters, *Donald Trump's Victory is Met with Shock Across a Wide Political Divide*, NY TIMES (Nov. 9, 2016).....................6

Peter Waldman, Lizette Chapman, and Jordan Robertson, *Palantir Knows Everything About You*, Bloomberg Businessweek (April 19, 2018).................30

Pew Research Center , *Partisanship and Political Animosity in 2016* (June 22, 2016) ..........................................................................................3

Ruben Vives, Matt Pearce, Matt Hamilton, *Protests rage outside Trump rally in Orange County; 17 arrested, police car smashed*, LOS ANGELES TIMES (April 28, 2016) ....................................................................6

Samantha Raphelson, *Milo Yiannopoulos' 'Free Speech Week' at Berkeley Falls Apart, Organizers Say,* NPR (Sept. 22, 2017), ........................21

Tom Porter, *Berkeley Mayor Calls for Antifa to be Classified as Crime Gang After Clashes at Weekend Protest*, Newsweek (Aug. 29, 2017) .............20

Veronica Rocha, Peter H. King, *UC Berkeley blames violent 'black bloc' protesters for 'unprecedented invasion,''* LA TIMES (Feb. 5, 2017), bloc' protesters for 'unprecedented invasion' ....................................................7

**TABLE OF AUTHORITIES**

**Page(s)**

U.S. Dep't of Justice, *Over 300 People Facing Federal Charges for Crimes Committed During Nationwide Demonstrations*, U.S. Dep't of Justice (Sept. 24, 2020)...........................................................................28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  THE GOVERNMENT ABUSED ITS AWESOME POWER BY FOCUSING ANTIRIOT ACT CHARGES ON ONLY PEOPLE WITH ALLEGED WHITE SUPREMACIST VIEWS, WHEN PEOPLE WITH DIFFERENT BELIEFS ENGAGED IN SIMILAR CONDUCT.**

Like Robert Rundo, these two counter-protesters were arrested by local authorities for their conduct that day.  Like these two counter-protesters, other "far left wing" or "Antifa" counter-protestors engaged in violence against "far right wing," "alt-right," or "MAGA" supporters at rallies throughout 2016 and 2017.  While the government alleges Mr. Rundo and his co-defendants prepared to engage in violence at these events, other evidence shows that "far-left wing" counter-protesters went to great lengths to ensure violent chaos; they coordinated with each other, brought weapons, and dressed in uniforms--all consistent with their directives to suppress "far right" speech.  In California alone, the violence from "far left wing" groups and "Antifa" ranged from pepper-spraying a woman who marched on Huntington Beach; forcibly taking a Trump supporter's American flag and burning it; pushing elderly people; throwing full cans of soda and eggs at a crowd; bringing weapons to a rally; and triumphantly taking credit for "shutting down" speakers and their supporters because their mission was to stop white supremacists ***By Any Means Necessary.***

---

[1] Ex. A at 3, ▮▮▮▮▮▮▮▮▮ under seal.

[2] Ex. B at 4, ▮▮▮▮▮▮▮▮▮ under seal.

1

To be sure, videos show Mr. Rundo fighting with some of these apparent "far left wing" counter-protestors during rallies. The question here is not if any "side" has a First Amendment right to engage in violence; nobody has that right. The issue is, unlike Mr. Rundo, none of these "far left wing" counter-protestors were charged for violating the Antiriot Act ("ARA"), 18 U.S.C. § 2101. In fact, until this matter was first charged in 2018, not a single ARA case was filed in the Ninth Circuit, let alone in this district, since PACER started keeping track. That is so even though many of these incidents satisfy the government's apparent view of what an ARA violation must be.

The only discernable difference is a forbidden one: Mr. Rundo's beliefs. While the federal government possesses broad discretion in who to charge, that discretion cannot be used to charge one group over another for an improper reason. What people believe—no matter how repugnant or unpopular those beliefs may be—is not a proper basis to charge them, especially when another group with different political beliefs engaged in equally, or more culpable behavior. That is because "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Board of Education v. Barnette*, 319 U.S. 624, 642 (1943).

This case should be dismissed because it violates Mr. Rundo's constitutional right to be free from selective prosecution. Alternatively, if the Court finds Mr. Rundo has failed to assert either claim dispositively, the defense requests an order for discovery from the government.

## II.  THE 2016 ELECTION KICKSTARTED EXTRAORDINARY POLITICAL VIOLENCE IN CALIFORNIA WHERE "FAR LEFT" COUNTER-PROTESTORS ORGANIZED TO VIOLENTLY SUPPRESS THE SPEECH OF OTHERS, BUT THE GOVERNMENT FILED ONLY A SINGLE ARA CHARGE: THIS ONE.

A.   **Foreboding violence breaks out at protests leading up to 2016 election.[3]**

The 2016 U.S. Presidential campaign, election, and aftermath was, at the time, an unprecedented period of deep division in our country.[4]  Americans identifying on the "left" and "right" sides had never agreed less or distrusted each other more.[5]  As divisions took deep root, extreme factions grew deeper in opposition.[6]  Those tensions repeatedly erupted into violence locally and nationally.[7]

For example, on February 27, 2016, a Ku Klux Klan rally in Anaheim erupted in violence when "[s]everal dozen Antifa extremists initiated an altercation with the Klansmen that led to multiple injuries and three stabbings."[8]  The Orange County district attorney's office charged seven "Antifa" members with assault, battery, and resisting arrest while, per press releases, five Klansmen were released without charges.[9]

---

[3] This Motion cites extensively to news articles.  Where an article is only cited for background, we cite a link only.  Where we rely on the article more substantively, we cite the link for ease of reference.  However, to preserve those articles for the record, and to overcome any pay-wall issues for the reader, we compiled these articles into an omnibus exhibit, "Exhibit S."  *See* Murphy Decl., ¶2b.

[4] *Partisanship and Political Animosity in 2016*, Pew Research Center (June 22, 2016), http://tinyurl.com/4vme3r3v ("Partisans' views of the opposing party are now more negative than at any point in nearly a quarter of a century.").

[5] Gregor Aish, Adam Pearce and Karen Yourish, *How Large Is the Divide Between Red and Blue America?*, NY TIMES (Nov. 4, 2016) http://tinyurl.com/4vv4wdj5.html4, 2016) http://tinyurl.com/4vv4wdj5.html

[6] *Id.*

[7] *Media reports of violence and Donald Trump presidential campaign, 2016*, Ballotpedia (last accessed Jan. 12, 2023), http://tinyurl.com/2vhtfszz (listing incidents of violence at Trump rallies).

[8] Ex. T at 1, Joint Intelligence Bulletin, *California: Escalation in Anti-Fascist, Right-Wing Extremist Violence*, State Threat Assessment Ctr. & Northern California Regional Intelligence Ctr. (June 26, 2017).

[9] *Id.*

3

"Antifa," which is shorthand for "Anti-fascist," is a "loose affiliation of mostly far-left activists.. . . What sets them apart is their willingness to use violence[.]"[10]  On February 2, 2017, a media collective covering the anarchist perspective published a "manual" on "Forming an Antifa Group."[11]  That manual laid out the "obligations" of anyone in a local Antifa group.  They included: (1) "***Track white nationalist, Far Right, and fascist activity" and then "doxx" them***, i.e., find personal identifying information about people, and then release "enough information to convince an average reader that the target is clearly a racist";  (2) "Oppose public Far Right organizing" by organizing "a counter-demonstration";  and (3) ***"Build a culture of non-cooperation with law enforcement"*** because "[t]he cops will be Trump supporters; do not collaborate with them."[12]  Antifa "recommend[ed] ***regular martial arts training for anti-fascists***, as well as for the larger radical community."[13]  Antifa's manual advised members "to practice with, and carry, everything that is legal—whether that is ***pepper spray, retractable clubs, or other devices***."[14]

Another well known "far left" group, "By Any Means Necessary" ("BAMN"), appeared at rallies hosted by neo-Nazi and white nationalist groups.  On June 26, 2016, a purported neo-Nazi group planned a rally at the state capitol building in Sacramento.[15]  BAMN called for its members to organize and stop the rally: "These racist, would-be murderers have no right to organize their racist violence in California

---

[10] Mike Wendling, *Proud Boys and antifa - who are they and what do they want?,* BBC (Sept. 30, 2020), http://tinyurl.com/2jvwamxx

[11] Ex. U, *Forming An Antifa Group:  A Manual*, ItsGoingDown.org (Feb. 16, 2017).

[12] *Id.* U at 3-4, 16.

[13] *Id.* at 7 (emphasis added).

[14] *Id.* at 8 (emphasis added).

[15] Ex. S at 1, Jazmine Ulloa, John Myers, Emily Alpert Reyes and Victoria Kim, *7 stabbed at neo-Nazi event outside Capitol in Sacramento*, LOS ANGELES TIMES (June 26, 2016), http://tinyurl.com/4vb7fr7d

or anywhere.  Their rally must be stopped ***by any means necessary***."[16]  From BAMN's perspective, "Only an ***organized, mass militant***, integrated youth-led movement that is politically independent can mobilize the social forces necessary to defeat the Nazis/KKK, stop the rise of 'Trumpism,' and finally put this nation on the road to progress once more."[17]

At the Sacramento rally, seven people were stabbed when the groups broke into violence "almost immediately."[18]  Afterward, a reporter asked a BAMN member, Yvette Felarca, about what happened.  She said:

> They were not able to hold any kind of demonstration on the west steps or any steps of the Capitol.  And that was absolutely because of the ***militant, integrated, direct action*** of the people who came out.  ***BAMN mobilized to get people out here to shut them down***. . . . ***To us, there's no free speech for fascists***.[19]

When asked if people "may have traveled from all over the state," Ms. Felarca confirmed, "Absolutely.  This was a very widespread mobilization.  *People came from all over California.  In fact, some places outside of California.*. . . [T]hat's what building a mass militant movement takes."[20]  When the reporter observed that "[l]ives were threatened here today," Ms. Felarca said, referring to the neo-Nazis, "[T]hey are dangerous and we need to keep building this movement.. . .  This is about building a

---

[16] Ex. V at 2, *No "FREE SPEECH" FOR FASCISTS! Mass, militant demonstration shuts down Sacramento Neo-Nazi rally!*,  BAMN: Coalition to Defend Affirmative Action, Integration and Immigrant Rights and Fight for Equality By Any Means Necessary (June 26, 2016) (emphasis added).

[17] *Id.*

[18] Ex. S at 2.

[19] Ex. W at 1, Interview -- Yvette Felarca, BAMN.com (June 26, 2016); *see* Transcript at Ex. W-1.

[20] Ex. W-1 at 2 (emphasis added).

1
2
militant integrated movement that's independent, ***organizes masses of people and takes militant direct action to stop it***." [21]

3
4
5
6
7
8
As the year went on, violence continued to erupt at election events.[22]  On April 28, 2016 in Costa Mesa, counter-protesters outside a Trump rally were "stomping on cars, hurling rocks at motorists and forcefully declaring their opposition to the Republican presidential candidate."[23]  In San Jose on June 2, 2016, "[a] dozen or more people were punched, at least one person was pelted with an egg and Trump hats grabbed from supporters were set on fire on the ground."[24]

9
10
11
12
Police were criticized about their response to "left wing" violence.  One Trump supporter at the San Jose rally reported that he "was just walking right there and they came up behind me and socked me." [25]  When another man went to police to get him help, "They were smug.. . .  They ignored me."[26]

13
**B.   Calls for violence escalate after 2016 election.**

14
15
16
If the division between "right" and "left" was bad in America before the 2016 election, it got worse after.  Many Americans were shocked at the outcome of the election and perceived the Trump presidency as an urgent existential crisis.[27]  Protests

17

18
[21] Ex. W-1 at 3-4 (emphasis added).

19
[22] *See Media reports of violence and Donald Trump presidential campaign, 2016*, Ballotpedia (last accessed Jan. 12. 2023), http://tinyurl.com/2vhtfszz.

20
21
[23] Ex. S at 10, Ruben Vives, Matt Pearce, Matt Hamilton, *Protests rage outside Trump rally in Orange County; 17 arrested, police car smashed*, LOS ANGELES TIMES (April 28, 2016), http://tinyurl.com/kh63rddw.

22
23
[24] *Id.* at 19, Martha Mendozaap, *Protesters punch, throw eggs at Trump supporters in San Jose*, ASSOCIATED PRESS (June 2, 2016), http://tinyurl.com/ypwb444j.

23
24
[25] *Id.* at 21, Matt Keller, *San Jose police criticized for not stopping attacks outside Trump rally*, ABC 7 News (June 3, 2016), http://tinyurl.com/2u472frx

25
[26] *Id.* at 22.

26
27
[27] Patrick Healy, Jeremy W. Peters, *Donald Trump's Victory is Met with Shock Across a Wide Political Divide*, NY TIMES (Nov. 9, 2016), http://tinyurl.com/msk27c9m; *see also* Julie Beck, *How to Cope with Post-Election Stress*, THE ATLANTIC (Nov. 10, 2016), http://tinyurl.com/y23rzny3.

28

6

broke out across the country; many peaceful, others violent.[28]  Counter-protestors started confronting figures whose more extreme views were seen as emboldened by Trump's election.  For example, during Inauguration Day on January 20, 2017, Richard B. Spencer, a far-right activist "who is credited with coining the term alt-right," was "punched in the head . . . by a person clad in black as he was being interviewed by a journalist."[29]  One NY Times reporter surveyed the reactions to the evidently unprovoked punch against Mr. Spencer, capturing how the country's divisive political culture had evolved into accepting unprovoked violence against conservatives and the "alt-right": "Supporters tended to say the punch was funny, and more than a few compared Mr. Spencer's attacker to famous Nazi punchers from pop culture, like Indiana Jones and Captain America."[30]

Shortly after, leftist violence ratcheted up again.  On February 1, 2017, less than two weeks after Inauguration Day, UC Berkeley was set to host Milo Yiannopoulos, a controversial right-wing political commentator.[31]  BAMN encouraged its members to "SHUT DOWN MILO YIANNOPOULOS."[32]  They did.  Two hours before the event was to begin, a group of "100 to 150 agitators had smashed half a dozen windows with barricades, launched fireworks at police and toppled a diesel-powered klieg light, which caused it to burst into flames."[33]  These "black bloc" agitators "dressed 'like

---

[28] *See* Ex. S at 24-27, Melanie Eversley, Aamer Madhani, and Rick Jervis, *Anti-Trump protests, some violent, erupt for 3rd night nationwide*, USA TODAY (Nov. 11, 2016), http://tinyurl.com/bddapxz8; *id.* at 28-38, *Protests against Donald Trump's win turn violent*, ALJAZEERA (Nov. 11, 2016), http://tinyurl.com/yfb4h2ep.

[29] *Id.* at 39, Liam Stack, *Attack on Alt-Right Leader has Internet Asking: Is It O.K. to Punch a Nazi?*, NY TIMES (Jan. 21, 2017), http://tinyurl.com/9sck28vn.

[30] Ex. S at 39-42.

[31] *Id.* at 43-47, Michael Bodley, *At Berkely Yiannopoulos protest, $100,000 in damage, 1 arrest*, SF Gate (Feb. 2, 2017), http://tinyurl.com/4cpyxbpm.

[32] Ex. X at 1, *Shut Down Milo Yiannopoulos*, BAMN: Coalition to Defend Affirmative Action, Integration and Immigrant Rights and Fight for Equality By Any Means Necessary (Jan. 31, 2017).

[33] Ex. S at 50, Veronica Rocha, Peter H. King, *UC Berkeley blames violent 'black bloc' protesters for 'unprecedented invasion,'* LA TIMES (Feb. 5, 2017), http://tinyurl.com/4v9hnt3v.

7

ninjas' and marched onto UC Berkeley's Sproul Plaza like a paramilitary force armed with bats, steel rods, fireworks and Molotov cocktails, officials say."[34] Videos showed "black bloc members tackling and assaulting Yiannopoulos supporters."[35] The university cancelled the speech and removed Yiannopoulos "from campus 'amid the violence and destruction of property and out of concern for public safety.'"[36] No ARA charges were filed in connection with this incident.

The FBI reviewed fliers for BAMN meetings posted before and after the Milo Yiannopoulos speaking event.[37] In one of the fliers, BAMN claimed "Victory! Neo-Fascist Milo Yiannopoulos *Shut Down*" and "invite[d] all who support building the mass, militant movement that can defeat Donald Trump and win full equality to join BAMN."[38]

After drawing widespread public attention to their violence, counter-protestors continued their aggression against Trump supporters throughout California. In March 2017, a "March 4 Trump" demonstration was held at the Martin Luther King Jr. Civic Center Park in Berkeley. It "escalated after fights broke out between those who had shown up for the event and counter-protestors."[39] One Trump supporter described the "anarchists" who came: "These people just want to fight[.]"[40] In an email to the Mayor of Berkeley, one Trump supporter who came with her family described what happened:

---

[34] Ex. S at 49.

[35] *Id.* at 59, Paige St. John, *Inside the black bloc militant protest as it rises up against Trump*, LA TIMES (Feb. 12, 2017), http://tinyurl.com/ytd5t8ze.

[36] *Id.* at 63, Madison Park, Kyung Lah, *Berkeley protests of Yiannopoulos caused $100,000 in damage*, CNN (Feb. 2, 2017), http://tinyurl.com/mvmrx67f. 2, 2017), http://tinyurl.com/mvmrx67f.

[37] Ex. Y at 1 and 3, FBI Rpt. re: BAMN Fliers.

[38] *Id.* at 5.

[39] Ex. S at 66, Amy B. Wang, *Pro-Trump rally in Berkeley turns violent as protesters clash with the president's supporters*, WASHINGTON POST (Mar. 5, 2017), http://tinyurl.com/4nemvz8z.

[40] *Id.* at 67.

While we were peacefully standing in the rally, we were pushed by the mob, being thrown with objects, and were hit. A few people came out from the mob, *sprayed pepper spray into my husband's eyes*, *and forcibly took the flag out from his hands. They ran back to the mob and burned the American flag*. My son saw a man that was pushed out by the mob, pushed to the ground and was hit continuously.. . . *Many of the victims were elderly and women*.[41]

At least seven people were injured and at least 10 were arrested.[42]  Trump supporters decried the lack of police response to the violence; exercising free speech had suddenly became life-threatening.  The woman who brought her family informed the Mayor that, "the police stood afar and did not help."[43]  No ARA charges were filed regarding this incident.

**C.**  **"Far Left" counter-protestors coordinate against Trump Supporters at "Make America Great Again" at Huntington Beach on March 25, 2017.**

A few weeks later, and on the heels of the widely reported violence against right-wing supporters in January and February, on March 25, 2017, Mr. Rundo attended a Make America Great Again ("MAGA") march in Huntington Beach.  This rally is the subject of Overt Acts 1 through 11 in Count One of the First Superseding Indictment ("FSI").  (FSI, ECF No. 209 at 4–6.)

Protestors were not the only ones anticipating counter-protestor violence against them.  Per a police report, ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[41] Ex. Z at 1, Citizen Email to Berkeley Mayor Office re: March 4 Trump Rally (March 5, 2017).
[42] Ex. S at 66,
[43] Ex. Z at 1.

9

A video produced in discovery shows one angle of what happened.[49]

---

[44] Ex. C at 3, ████████████ under seal.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] Ex. MM, ████████████████ under seal.
[50] *Id.* at :00-:10.
[51] Ex. MM at :10-:13. under seal.
[52] *Id.* at :13-:20.
[53] Ex. D at 5, ████████ under seal.
[54] *Id.* at 4.
[55] *Id.* at 5.
[56] *Id.*

None were charged federally for violating the ARA.

---

[57] Ex. MM at :20-:53.
[58] *Id.* at :55-1:28.
[59] *Id.* at 1:30-1:44.
[60] *Id.* at 1:48-1:54.
[61] *Id.* at 1:48-1:54.
[62] *Id.* at 1:48-1:54.
[63] Ex. C at 4, <u>under seal</u>.
[64] Ex. E at 3, <u>under seal</u>.
[65] Ex. C at 5, , Ex. D at 5, under seal, and  Ex. under seal.

11

**D.    Federal and state agencies track far-left's increasing violence leading up to April 15, 2017 rally in Berkeley, California.**

A March 15, 2017 law enforcement intelligence bulletin described how Antifa "has grown significantly in the U.S. in response to the election of Trump"; that they "are very active in Anti-Trump demonstrations"; and how "[s]ome Antifa Facebook pages advocate and depict violence, destruction, and the of property against perceived fascists."[66] The same bulletin described the "Anti-Antifa" movement, consisting of "right wing nationalists" "who are engaged in a political battle against Antifa groups," and who engage in similar tactics.[67] By then, federal authorities had "been warning state and local officials . . . that leftist extremists known as 'antifa' had become increasingly confrontational and dangerous, so much so that the [DHS] formally classified their activities as 'domestic terrorist violence,' according to interviews and confidential law enforcement documents obtained" by journalists.[68]

In fact, federal law enforcement investigated Antifa at the Huntington Beach incident described above. On March 28, 2017, a DHS Officer based in Southern California asked a Huntington Beach police officer about the "Antifa/Anarchists" at the event. Recognizing the increased organization and social media coordination of left extremists, the DHS Officer asked for evidence of "pre-planning," or "any [people] from outside the area," or any "repeat offenders from last Berkeley clashes." These were, per the DHS Officer, "the questions asked for the Berkeley event," likely referring to the earlier events at Berkeley. In other words, this DHS Officer was tracking activities of Antifa and even perhaps specific participants at *both* events. When the DHS Officer asked similar questions about the "other" side at Huntington

---

[66] Ex. AA at 1. Officer Awareness Bulletin, *(LES) ANTIFA & ANTI-ANTIFA MOVEMENT SYMBOLS*, Symbol Intelligence Group (March 15, 2017).

[67] *Id.*

[68] Ex. S at 70 , Josh Meyer, *FBI, Homeland Security warn of more 'antifa' attacks*, Politico (Sept. 1, 2017), http://tinyurl.com/db4tttyh.

Beach, the DHS Officer did not ask about "right wing nationalists" or "extreme white supremacists." Instead, the DHS Officer profiled that group as "Pro-Trump."[69]

**E.      Far-Left Activists Call for "all in Northern California and beyond to converge in Berkeley" on April 15, 2017 to "deny" Trump supporters and "far-right" the "opportunity to grow and expand their movement"**

A few weeks later, a free speech rally was planned for April 15, 2017, again at Martin Luther King Jr. Civic Center Park in Berkeley, where the "March 4 Trump" event occurred earlier. This rally is the subject of Count Two, and Overt Act Nos. 12 through 27 in Count One. (FSI, ECF No. 209 at 6–9, 13–14.)

Those on the "left" called for "all in Northern California and beyond to converge in Berkeley on Saturday April 15th and deny the far-Right an opportunity to grow and expand their movement that is killing, burning and bombing [its] way across the US."[70] The Bay Area Committee Against Fascism announced that "Trump supporters are gearing up. In short, the far-Right is coming together against a common enemy: us."[71] "It's time for us to come together as organizers, as people, and as community members and *shut this down*."[72] More pointedly, they urged readers to understand, "THIS IS A MATTER OF LIFE AND DEATH. THIS IS A MATTER OF SELF-DEFENSE. WE CANNOT ALLOW FASCISM TO TAKE ROOT HERE, OR ANYWHERE."[73] Readers were urged to join a private Facebook event group and "invite all your friends and help promote the event."[74] Anti-Fascist News shared links to "helpful information on staying safe and secure," including a pamphlet from Its Going Down called

---

[69] Ex. BB at 1-2, Email from DHS Officer re: Huntington Beach Event (March 28, 2017).

[70] Ex. CC at 2, Bay Area Committee Against Fascism, *Why the Bay Area Must Shut Down the Alt-Right Rally on April 15th*, IndyBay - East Bay (April 5, 2017).

[71] *Id.* at 10.

[72] *Id.* at 11 (emphasis in original).

[73] *Id.* at 12 (emphasis in original).

[74] *Id.*

"Message in a bottle; a quick tip pamphlet for street based resistance," which depicts an apparent Molotov cocktail on the front page.[75]  Another pamphlet advises on how to "take action" without being identified by law enforcement, like "[i]f we bring any materials with us, let's wipe them down with rubbing alcohol to remove the fingerprints."[76]  And like the other pamphlet, it depicts a flaming Molotov cocktail.[77]

Law enforcement knew of the potential for violence at the rally.

On April 15, 2017, many counter-protestors showed up to the Civic Center Park, as directed.

---

[75] Ex. DD at 1, Pamphlet, *Message in a Bottle*, It's Going Down (undated).
[76] Ex. EE at 1, Pamphlet, *The Riot is One Night*, It's Going Down (undated).
[77] *Id.*
[78] Ex. F at 1, ▮▮▮▮▮▮▮▮▮▮ under seal.
[79] Ex. G at 1. ▮▮▮▮▮▮▮▮▮▮, under seal.
[80] Ex. S at 79, Laura Anthony, *Berkeley businesses board up windows ahead of dueling Trump protests*, ABC 7 News (Apr. 14, 2017), http://tinyurl.com/mwy58de5.
[81]  Ex. KK. ▮▮▮▮▮▮▮▮▮ under seal.
[82] Ex. H at 3, ▮▮▮▮▮ under seal.
[83] Ex. I at 2, ▮▮▮▮▮ under seal.

14

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████ In

3 contrast to the coordinated and armed violence of the left, the FSI does not allege Mr.

4 Rundo and his co-defendants brought any weapons.  It alleges they "prepared to

5 commit acts of violence at the Berkeley Rally by wearing some combination of

6 *coordinating grey shirts*, *goggles*, *mouth guards*, *athletic tape* around their wrists, and

7 *black face masks with white skeleton designs*."  (FSI, ECF No. 209 at 7:12–16)

8 (emphasis added).

9 ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

---

84 Ex. J at 2, ████████████ under seal.

85 Ex. K at 2, ████████████ under seal; Ex. L at 5, ████████████

under seal.

86 Ex. B at 3, ████████████ under seal.

87 Ex. M at 2-3, ████████████ under seal.

88 *Id.* at 3.

89 Ex. B at 3-4, ████████████ under seal.

90 ████████████████████████████████

████████████ under seal.

91 Ex. KK at 6 ████████████████████

92 *See*, *e.g.*, Ex. NN at 1:18.

93 Ex. NN at 1:28.

94 Ex. N at 2, ████████████ under seal.

parts that day, a number of counter-protestors identified by Berkeley Police allegedly

engaged in similar, if not worse conduct.  These are some examples:

---

[95] *Id.* at 6.

[96] Ex. S at 175, Emilie Raguso, Frances Dinkelspiel and Tracey Taylor, *Protests end with 20 arrests, 11 injuries*, Berkeleyside.org (April 15, 2017), http://tinyurl.com/yuxaut8n.

[97] Ex. O at 3,                    under seal.

[98] Ex. L at 2,                    under seal.

[99] Ex. A at 3,                    under seal.

[100] *Id.,*

[101] Ex. P at 3,                  under seal.

Members of the far-left took to a community on Reddit.com for "Anarchism" to brainstorm how to be better prepared to forcefully shut down right-wing events and demonstrations.  One user asked, "What tactics can we use to disrupt their events, even when there are similar numbers to our own?"[103]  Responses included: (1) "If we wanna take action against them, we need to be better organized and better trained."; (2) "A shocking number of our comrades went in there with absolute [sic] no combat training. We need to set up seminars or something of the sort."; (3) "I honestly think we need a campaign to **get more antifa armed**.  It seems that seems to be the biggest problem with our resistance.  They're mostly armed, why aren't we?"

Of the 20 people arrested at the April 15, 2017 Berkeley rally, only Mr. Rundo and his co-defendants were charged under the ARA.

Nearly three months later, on June 10, 2017, Mr. Rundo and other alleged RAM members allegedly attended an Anti-Sharia protest in San Bernardino.  Across the country, similar protests occurred that day where violence erupted.[104]  Left-wing counter-protestors were notified about the San Bernardino protest on the Its Going Down website.[105]  Mr. Rundo, some of his co-defendants, and left-wing counter-

---

[102] Ex. B at 4, ██████████ under seal (emphasis added).

[103] Ex. FF, Thread, *The troubling implications of the conflict in Berkeley today*, Reddit.com/r/anarchism (April 16, 2017).

[104] Ex. S at 80-83, *Rallies against Islamic law draw counter-protests, some arrested in Seattle*, Fox 13 Seattle (June 10, 2017), http://tinyurl.com/5y9cuwd3.

[105] Ex. GG, *San Bernardino, CA: Counter-Demonstrate Against Islamophobic March*, It's Going Down.org (June 6, 2017).

17

1    protestors attended the rally, which "sparked violence and acts of vandalism," per

2    police.[106]  Three people were arrested in connection with the protest for vandalism.[107]

3    **F.    Counter-protestor tragically killed in Charlottesville Rally that Mr.**

4    **Rundo did not attend.**

5           In August 2017, the tensions between the "far-right" and "far-left" reached a

6    heightened and tragic level at the "Unite the Right" rally in Charlottesville, Virginia.

7    Leading up to the rally, the DHS issued an intelligence bulletin titled "Domestic

8    Terrorist Violence at Lawfully Permitted White Supremacist Rallies Likely to

9    Continue."[108]  It warned "that anarchist extremists' use of violence as a means to

10   oppose racism and white supremacist extremists' preparation to counterattack anarchist

11   extremists are the principal drivers of violence at recent white supremacist rallies."[109]

12   During the "Unite the Right" rally, James Alex Fields, Jr., an apparent white nationalist

13   with no connection whatsoever to R.A.M., drove his car into a crowd of counter-

14   protesters and tragically killed Heather D. Heyer.[110]

15          Notably, the FSI does not charge Mr. Rundo (or his co-defendants) with

16   engaging in any violence in Charlottesville; that is because he was not there at all.  (*See*

17   FSI, ECF No. 209 at 10–11.)

18

19

20          [106] Ex. S at 85. Joe Nelson, *San Bernardino anti-Islamic law rally and counter-
     protests trigger violence*, ORANGE COUNTY REGISTER (June 10, 2017),

21   http://tinyurl.com/485ejadp. .

22          [107] Ex. S at 86.

23          [108] Ex. HH at 1, *Terrorist Violence at Lawfully Permitted White Supremacist
     Rallies Likely to Continue*, Dep't Homeland Security, Office of Intelligence & Analysis
     (Aug. 9, 2017).

24          [109] Ex. HH at 1.

25          [110] Jonah Engel Bromwich and Alan Blinder, *What We Know About James Alex
     Fields, Driver Charged in Charlottesville Killing*, NY Times (Aug. 13, 2017),

26   http://tinyurl.com/4ub86c7e. 13, 2017), http://tinyurl.com/4ub86c7e.

27          [111]                                                    under seal; Ex. R at 2,
     under seal.

28

1
2

**G.      Violence at "pro-Trump" rallies continue in California as investigation into Mr. Rundo begins.**

3   After Charlottesville, violence continued at pro-Trump rallies in California.  In

4   Laguna Beach on August 20, 2017, an "America First!" vigil drew 2,500 people, with

5   counter-protestors vastly outnumbering the pro-Trump group.  "Fearing that white

6   nationalists, neo-Nazis and members of the KKK would assemble, counterprotesters

7   swarmed Main Beach.  There was little evidence, however, of an [alt-right] extremist

8   presence."[112]  Rather, the four people arrested were counter protestors, including one

9   person who hit a man wearing a MAGA shirt "squarely in the face."  The victim told

10  journalists "that he was attacked by someone from the left because he was 'a black man

11  who happens to support President Donald Trump.'"[113]  No ARA charges were filed in

12  connection with this rally.

13  On August 27, 2017, violence erupted again in Berkeley when "about 100

14  anarchists and antifa--'anti-fascist'--members barreled into a protest" at the Civic

15  Center Park."[114]  There were 13 arrests, including several people from out of town and

16

17      Four alleged RAM members were present at the "Unite the Right" rally, and
18  charged for their alleged misconduct in the Western District of Virgina: Benjamin
    Daley, Michael Miselis, Thomas Gillen, and Evan Cole White.  *See United States v.*
19  *Benjamin Daley, et al.*, 3:18-CR-00025-NKM-JCH, Indictment, ECF No. 8, (W.D. Va.
    Oct. 10, 2018).  Three of these defendants challenged the ARA's constitutionality.
20  *United States v. Benjamin Daley, et al.*, 3:18-CR-00025-NKM-JCH, Mtns. to Dismiss,
    ECF Nos. 72, 73, & 74.  The district court denied those challenges.  *United States v.*
21  *Benjamin Daley, et al.*, 3:18-CR-00025-NKM-JCH, Mem. Op. (Moon, J.), ECF No.
    104.  All four men ultimately pleaded guilty to conspiracy to riot, in violation of 18.
22  U.S.C. § 371.  *United States v. Benjamin Daley, et al.*, 3:18-CR-00025-NKM-JCH,
    Plea Agmts., ECF Nos. 58 (White), 101 (Gillen), 110 (Miselis), 113 (Daley).

23      [112] Ex. S at 90, Chris Hare, *Counterprotestors vastly outnumber those at*
    *'America First' rally in Laguna Beach*, ORANGE COUNTY REGISTER (Aug. 20, 2017),
24  http://tinyurl.com/rw4vrwj8.

25      [113] *Id.* at 96, Erika I. Richie, *Laguna Beach police make 4th arrest stemming from*
    *America First! Rally*, The Orange County Register (Aug. 23, 2017),
    http://tinyurl.com/3z44b9zr.
26
        [114] *Id.* at 97, Kyle Swenson, *Black-clad antifa members attack peaceful right-*
27  *wing demonstrators in Berkeley*, WASHINGTON POST (Aug. 28, 2017),
    https://www.washingtonpost.com/news/morning-mix/wp/2017/08/28/black-clad-antifa-
28  attack-right-wing-demonstrators-in-berkeley/.

19

outside California.[115]  Some attacks consisted of: "A pepper-spray-wielding Trump supporter was smacked to the ground with homemade shields"; and "[a]nother was attacked by five black-clad antifa members, each windmilling kicks and punches into a man desperately trying to protect himself."[116]  A 60-year-old Berkeley resident who came "for a peaceful rally" said "[w]e felt disappointed and surprised by how many people were not in any way discreet about being with antifa--in fact being very bold and prepared to be violent."[117]  After this rally, the Berkeley Mayor "called for authorities to tackle left-wing violence by classifying members of antifa . . . as a gang."[118]  He reasoned, "They come dressed in uniforms.  They have weapons, almost like a militia[.]"[119]  No ARA charges were filed in connection with this rally.

On September 14, 2017, another controversial conservative figure, Ben Shapiro, was invited to speak at UC Berkeley by Berkeley's College Republicans group.[120] Outside the event, "a few hundred demonstrators" rallied on the street behind concrete barricades and police in riot gear. [121]  Nine arrests were made, including three for possession of a banned weapon, and battery of a police officer. [122]  No ARA charges were filed in connection with this rally.

---

[115] Ex. JJ at 1, *Berkeley Police make 13 arrests during today's demonstrations*, Nixle Notification - Berkeley Police Dep't (Aug. 27, 2017).

[116] Ex. S at 97.

[117] *Id.* at 99,

[118] *Id.* at 103, Tom Porter, *Berkeley Mayor Calls for Antifa to be Classified as Crime Gang After Clashes at Weekend Protest*, Newsweek (Aug. 29, 2017), http://tinyurl.com/bdzhv5u6.

[119] *Id.*

[120] *Id.* at 105. *Protesters rally against conservative speech at UC Berkeley by former Breitbart editor,* ABC News (Sept. 14, 2017), http://tinyurl.com/24ynt2fr.

[121] *Id.*

[122] Ex. S at 106.

20

The next week, "Free Speech Week" at UC Berkeley was cancelled.[123]   The event would have featured prominent "right-wing" speakers. [124]   Instead, on September 26, 2017, a group of about 50 protestors and speakers met on Berkeley's campus, "[b]ut they quickly were drowned out by protestors from [BAMN] and Refuse Fascism, who rallied there to oppose the other side's presence."[125]   Ms. Felarca, a BAMN activist, was there, even though she faced felony charges for the 2016 Sacramento riot, discussed above. [126]   No ARA charges were filed in connection with this rally, either.

## H.   Federal Prosecutions of Anti-Riot Act cases.

In the last 20 years, the United States Attorney's Office ("USAO") for the Central District of California has filed only one case alleging a violation of the ARA, 18 U.S.C. § 2101; this one.[127]   In fact, as far as the defense can tell, in the last 20 years, this is the *only* ARA case in the Ninth Circuit.[128]   Nationally, before this case and based on the information available, the defense can only identify *eight* ARA cases over the previous *51* years.[129]   Since this case and its related case in Virginia, there has been a proliferation of ARA charges across the nation.  In only five years, at least 23 ARA cases were charged across the country, an increase of over three times as many such cases in a tenth of the time.[130]   Still, none of these cases appear to charge a member of Antifa, BAMN, or any other "far left" group for misconduct in protesting conservative

---

[123] *Id*. at 107, Samantha Raphelson, *Milo Yiannopoulos' 'Free Speech Week' at Berkeley Falls Apart, Organizers Say*, NPR (Sept. 22, 2017), http://tinyurl.com/3u8v692a.

[124] *Id*. at 108.

[125] Ex. S at 123, Emilie Raguso, *Berkeley teacher Yvette Felarca arrested at Patriot Prayer march*, Berkeleyside (Sept. 26, 2017), http://tinyurl.com/4zskxvm3.

[126] *Id.* at 135, Frances Dinkelspiel, *Berkeley teacher Yvette Felarca arrested on charges of inciting a riot*, Berkleyside (July 19, 2017), http://tinyurl.com/ybpyde63.

[127] Ex. RR, Klein Decl., at 1–2, *id.* at 5–12 (Chart).

[128] Ex. RR at 5–12 (Chart).

[129] *Id.*

[130] *See id.*

political rallies.[131]  Rather, the vast majority charge conduct where the defendants planned to damage property or loot from stores in the aftermath of police-involved shootings (*e.g.* protests and looting after the deaths of George Floyd, Breonna Taylor, Freddie Gray, and others), or to damage property during anti-Capitalist protesting in Portland in 2021, and one case in connection with the January 6, 2021 violence in Washington D.C.[132]

### III.  PROCEDURAL BACKGROUND

This case was first filed in October 2018.  (Compl., ECF No. 1.)  Mr. Rundo and his co-defendants were charged with conspiracy to violate the ARA and a substantive violation of the ARA, 18 U.S.C. § 2101.  (Indictment, ECF No. 47.)  In essence, the Indictment charged them with being members of a "white supremacist organization known as the 'Rise Above Movement,' or 'RAM'" that trained and organized to attend various political rallies in 2017, during which they engaged in riots.  (*See id.* at 1, ¶1.)

On June 3, 2019, this Court granted a Motion to Dismiss, finding the ARA unconstitutional.  (Order, ECF No. 145.)  On March 4, 2021, the Ninth Circuit reversed and remanded the matter back to this Court.  (Opinion, ECF No. 158.)  On January 3, 2023, the government filed its First Superseding Indictment ("FSI"), charging Mr. Rundo and his co-defendants again in Count One with conspiracy to violate the ARA, and with a substantive violation of the ARA in Count 2.  (FSI, ECF No. 209.)  Trial is set for March 26, 2024.  (Order on Stip., ECF No. 263.)

---

[131] *See id.*

[132] *See id.* at 9, 12.

22

1
2
3

## IV.  THIS CASE MUST BE DISMISSED BECAUSE THE GOVERNMENT SELECTIVELY PROSECUTED MR. RUNDO FOR HIS BELIEFS, NOT JUST HIS ALLEGED CONDUCT.

4
5
6

**A.   The government violated Mr. Rundo's constitutional rights by selectively prosecuting him based on his political beliefs when similarly-situated people with different beliefs were never charged.**

7       Instead of applying the ARA equally, the government chose to charge only Mr.

8  Rundo and his co-defendants for their conduct at political rallies.  Other, similarly

9  situated people could have been charged for similar, if not worse, misconduct.  The

10  only discernible difference is their beliefs.  Charging someone because of their beliefs

11  violates the Fifth and Fourteenth Amendments.  The FSI must be dismissed.

12
13
14

**1.   When faced with two groups of similar culpability, the government cannot choose to charge only one group because of their political beliefs.**

15       Prosecutorial discretion is broad, but it is not "'unfettered.'  Selectivity in the

16  prosecution of criminal laws is . . . subject to constitutional constraints." *Wayte v.*

17  *United States*, 470 U.S. 598, 608 (1985) (citation omitted).  One such constraint is

18  contained in the equal protection component of the Fifth Amendment.  *Id.* at 608 & n.9.

19  At its core, this constraint prohibits any prosecution "deliberately based upon an

20  unjustifiable standard such as race, religion, or other arbitrary classification, . . .

21  including the exercise of protected statutory and constitutional rights."  *Id.* at 608

22  (internal quotation marks omitted); *cf. Berger v. United States*, 295 U.S. 78, 88 (1935)

23  (explaining the federal government's "obligation to govern impartially is as compelling

24  as its obligation to govern at all").  This limit recognizes the risk of any law "applied

25  and administered by public authority with an evil eye and an unequal hand";  that is,

26  "the denial of equal justice[.]"  *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886).

27       Accordingly, "[a] defendant cannot be convicted if he proves unconstitutional

28  discrimination in the administration of a penal statute."  *United States v. Steele*, 461

1  F.2d 1148, 1151 (9th Cir. 1972) (citing *Two Guys from Harrison-Allentown, Inc. v.*

2  *McGinley*, 366 U.S. 582, 588 (1961)).  Such selective prosecution claims are analyzed

3  according to "ordinary equal protection standards." *United States v. Armstrong,* 517

4  U.S. 456, 465 (1996) ; *Wayte*, 470 U.S. at 608.  "To establish impermissible selective

5  prosecution, a defendant must show that others similarly situated have not been

6  prosecuted and that the prosecution is based on an impermissible motive." *United*

7  *States v. Lee*, 786 F.2d 951, 957 (9th Cir. 1986) (citing *Wayte*, 470 U.S. at 608).

8      2.    **Selecting only Mr. Rundo and his co-defendants to charge under**

9               **the Anti-Riot Act had a discriminatory effect.**

10       In almost 20 years, not one ARA case was brought in this district until this case

11  against Mr. Rundo and his co-defendants.  The government believes they are white

12  supremacists who came to the rallies alleged in the FSI to riot.  As set forth above,

13  though, a legion of Antifa, BAMN, and other "far left" counter-protestors came to

14  rallies throughout 2016 and 2017 to commit--and did commit--similar, if not worse,

15  misconduct as charged here.  The counter-protestors are similarly situated to Mr.

16  Rundo, and yet were not charged.  This establishes a discriminatory effect because the

17  only discernable difference between these two groups is their beliefs.

18       The best comparison group here are the "left wing" individuals who engaged in

19  violence at the same or similar events during the same period of time.  If the

20  government believes Mr. Rundo is guilty of violating the ARA based on alleged

21  "training," social media posts, and alleged violence at these events, then the

22  government should also believe these other individuals are guilty of it, too.  As set forth

23  above, during this period in California alone, there were at least *12* events where left-

24  wing counter-protestors acted violently at right-wing political rallies and were arrested

25  by local law enforcement, based just on publicly available information.  Such violence

26  included assaulting people with pepper-spray in unprovoked attacks, causing $100,000

27  in property damages, and throwing eggs and full soda cans at Trump supporters.  They

28  used the internet to coordinate their attendance at these rallies and evidently attended

with the intent to commit violence.   After all, two forces apparently behind many of these counter-protests—Antifa and BAMN—made no secret about their intentions. They promoted the protests online as opportunities to "shut down" the far-right and gave specific advice about how to do that, including weapons to carry.  Pamphlets were emblazoned with Molotov cocktails, and a "handbook" encouraged doxxing, physical training, and even arming oneself with a weapon.  They dressed the same; all black and with face coverings.  As the Mayor of Berkeley put it, "They come dressed in uniforms. They have weapons, almost like a militia[.]"  They claimed "victory" against the far-right.  They strategized about training or bringing weapons.

The government knew of left-wing counter-protestors who fit squarely within the government's view of a rioter, if not worse:  a man who brought explosives to Berkeley on April 15, 2017 "to end the riot" and black-clad counter-protestors who coordinated bringing pepper spray to Huntington Beach on March 28, 2017, and then assaulted people with that pepper spray.

None of this is to suggest that "one side" is "worse" or "better" than the other. And the question is not whether Mr. Rundo or *anyone* can immunize violence within the cloak of the First Amendment.  The issue here is simpler than that:  the government, facing two groups with similar alleged misconduct, chose to charge only one group. The only meaningful difference between these two groups is their beliefs.  Those on the "left wing" side, despite subscribing to violence, presumably rejected white supremacist beliefs, and the government believes Mr. Rundo and his co-defendants embrace those beliefs.  Thus, charging only Mr. Rundo and his co-defendants for violating the ARA had a discriminatory effect; the government only charged people who allegedly believe in white supremacy.

This is viewpoint discrimination and it violates the First Amendment.  *See Giebel v. Sylvester*, 244 F.3d 1182, 1188–90 (9th Cir. 2001) ("'[V]iewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject" and "it is 'axiomatic' that viewpoint-

based suppression of speech is impermissible[.]" (quoting *Rosenberger v. Univ. of Va.*, 515 U.S. 819, 828 (1995)).  No matter how abhorrent the government might find a group's beliefs, the government cannot punish individuals more harshly simply for being "a member of a group unpopular with the government." *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (en banc); *see also United States v. Oakes*, 11 F.3d 897, 898–99 (9th Cir. 1993) (explaining that "proof of discrimination based on . . . personal beliefs" would be enough to trigger a court's constitutional scrutiny of prosecutorial charging discretion).

3.   **The discriminatory purpose of Mr. Rundo's prosecution is clear from the infrequency of ARA charges before this case, and the total absence of charges for similarly-situated people.**

"Discriminatory purpose . . . . 'implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *United States v. Brown*, 9 F.3d 1374, 1376 (8th Cir. 1993) (quoting *Wayte*, 470 U.S. at 610); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (asking if discriminatory purpose was "*a motivating factor* in the decision") (emphasis added)).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266 (1977).  Relevant factors may include: (1) "[t]he impact of the official action," namely whether it "bears more heavily on one race [or protected class] than another"; (2) "[t]he historical background of the decision"; (3) "[t]he specific sequence of events leading up to the challenged decision"; (4) "[d]epartures from the normal procedural sequence," as well as certain [s]ubstantive departures"; and (5) "[t]he legislative or administrative history," including contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266–68.  This list of factors is "non-exhaustive," and a

1  challenger "need not establish any particular element" to show discriminatory intent.

2  *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016).

3       Applied here, these factors confirm an invidious, discriminatory purpose in the

4  charges against Mr. Rundo and his co-defendants.  They require dismissal.

5               a.      **The impact of the charges here is borne entirely by a group**

6                       **with alleged white supremacist and "far right" beliefs.**

7       The impact of the official action here—these charges—weighs far more heavily

8  on those who, per the government, embrace white supremacist views.  *See Oakes*, 11

9  F.3d at 898–99 (explaining that "proof of discrimination based on . . . personal

10 beliefs" would be enough to trigger a court's constitutional scrutiny of prosecutorial

11 charging discretion).  As described above, public information alone reveals the many

12 similarly situated people in these alleged riots, and other similar protests where

13 counter-protestors violently confronted Trump supporters.  Those people rejected white

14 supremacist views and "far right" conservative beliefs.  Between these two groups, the

15 government chose only to charge those who allegedly embrace those views, i.e., Mr.

16 Rundo and his co-defendants.  Put differently, zero percent of the violent "left wing"

17 counter-protestors were charged under the ARA, and 100 percent of the ARA charges

18 in this district are against alleged white supremacists.

19      These statistics alone evince the discriminatory purpose of the charges here.

20 Indeed, appellate courts have recognized that it is proper to infer "some evidence" of

21 discriminatory intent from statistical evidence of discriminatory effect in a selective

22 prosecution case.  *United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) ("[T]he

23 government exaggerates by implying that statistical evidence of discriminatory effect . .

24 . can never raise an inference of discriminatory intent."); *see also, United States v.*

25 *Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) ("[Discriminatory] purpose may . . . be

26 demonstrated through . . . statistical evidence.").

27      The Supreme Court's decision in *Yick Wo*, 118 U.S. 356, is on point.  There, the

28 Court invalidated a San Francisco ordinance that prohibited the operation of laundries

27

in wooden buildings.  *Id.* at 366.  The ordinance authorized the City's Board of Supervisors to grant or deny laundry licenses in its discretion.  *Id.*  But the Board denied 200 applications from individuals who were of Chinese descent, and granted 80 applications from individuals who were not.  *Id*. at 374.  Based on this statistical disparity, the Court concluded that the ordinance was "applied by the public authorities . . . with a mind so unequal and oppressive as to amount to a practical denial by the state of . . . equal protection."  *Id.* at 373; *see also Gomillion v. Lightfoot*, 364 U.S. 339, 340–41 (1960) (recognizing an equal protection violation in the exclusion of all but four or five of 400 possible Black voters in the City of Tuskegee, but not a single eligible white voter).

Here, the statistics paint a similar picture.  In *Yick Wo*, the numbers indicated that the government was far more likely to deny a Chinese person an application than a non-Chinese person.  From the 2016 and 2017 protests in California, the government *only* charged ARA violations against people with alleged white supremacist beliefs, this case and its companion case in Virginia.

The government may suggest that the subsequent increase in ARA cases across the country shows that it did not file *these* charges selectively.  After all, the government might say it charged people that could be described as politically "left-leaning," or even Antifa members since this case.[133]  That is a red herring.  As noted above, those subsequent ARA charges seem to involve only one identifiable group of people engaged in the riot—looters or arsonists during George Floyd-related protests, anti-Capitalist activity in Portland, or someone who shot at a car on January 6, 2021.[134]

---

[133] *See United States v. Nathan Wilson*, 2:20-CR-00516-FMO, ECF No. 205, Order (C.D. Cal., Aug. 12, 2022) (ordering government to disclose discovery on selective prosecution claim where former President Trump and Attorney General explicitly stated their intent to charge people in the midst of George Floyd-related protests); *see also Over 300 People Facing Federal Charges for Crimes Committed During Nationwide Demonstrations*, U.S. Dep't of Justice (Sept. 24, 2020), http://tinyurl.com/4yxejssx. 24, 2020), http://tinyurl.com/4yxejssx.

[134] *See* Ex. RR at 5–12.

28

In other words, as far as the defense is aware, this case and its related case in Virginia are the only cases where two groups with different political beliefs engaged in the same or similar behavior, but the government chose to charge under the ARA against only one group; those with alleged white supremacist and "far right" conservative beliefs. This evinces a mind to deny Mr. Rundo the equal protection of the law because of his beliefs, not just his conduct.

    b. **The sequence of the charges and the nature of the investigation indicate this case is more about protected beliefs than it is about conduct.**

   The discriminatory purpose is also plain from the background and sequence of events leading up to the charging decision. The last rally alleged in the FSI was Charlottesville in August 2017. (FSI, ECF No. 209 at 10–11.) The decision to investigate Mr. Rundo began in March 2018, after the tragedy in Charlottesville. By then, the federal government was aware of numerous incidents where Antifa and BAMN engaged in behavior that, per the government's views here, would justify ARA charges. Until then, local authorities handled charging individuals at the rallies.

   After Charlottesville, such behavior from "far left" activists continued in California—even from Ms. Felarca, BAMN, and Antifa. Yet the federal focus apparently remained on Mr. Rundo, his co-defendants, and other alleged members of R.A.M. who attended the rallies in Charlottesville. This shows a "departure from the normal procedural sequence"; when it came to alleged white supremacists, the federal government decided it would no longer defer to local authorities' charging decisions regarding wholly intrastate "riot" conduct.

   The political nature of the government's focus is evident in its investigation of Mr. Rundo and his alleged associates. The government expended incredible resources investigating Mr. Rundo's beliefs, and those people who ostensibly shared those beliefs. ███████████████████████████████████████████ ██████████████ whose software "combs through disparate data sources—financial

29

documents, airline reservations, cellphone records, social media postings—and searches for connections that human analysts might miss."[135]  Scholars describe it "as a 'secondary surveillance network,' since it extensively catalogs and maps interpersonal relationships between individuals, even those *who aren't suspected of a crime*."[136]

Using this constitutionally risky, invasive, privately-farmed data,

conduct without regard to his beliefs, then expansively exploiting such Orwellian methods to profile innocent people (but people whose beliefs might offend the government) makes no sense.

---

[135] Ex. S at 145, Peter Waldman, Lizette Chapman, and Jordan Robertson, *Palantir Knows Everything About You*, Bloomberg Businessweek (April 19, 2018), *available at* http://tinyurl.com/f99hrfzk.

[136] Ex. II at 3, *Revealed: This is Palantir's Top-Secret User Manual for Cops*, Vice News (July 12, 2019) (emphasis added).

[137] Ex. LL at 2, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under seal.

[138] *Id.* at 2, 6, 11, 15–16, 27.

4.  **The legislative history of the ARA makes these charges even more alarming because they represent what happens when the government chooses "legitimate" speech.**

The sequence of these charges, these statistics, and the government's methods become even more disturbing when remembering the legislative history of the ARA. The ARA's aim was to prevent "professional agitators" from traveling state to state, "inflam[ing] the people," and "then leav[ing] the jurisdiction before the riot begins."[139]

One of its architects assured the ARA "would protect the *legitimate* civil rights leaders in America and put the illegitimate, rabble-rousing, hatemongering so-called leaders out of business."[140]  While the ARA feebly attempted to draw lines between "legitimate" activism and "hatemongering," its conception suffered from the fatal flaw animated here.  As the filer of charges, the government decides who are "legitimate" activists, and who are criminals.  Indeed, the highest profile use of the ARA was against the Chicago Seven, anti-war protesters whose questionable treatment is the stuff of movies.  Today, the ARA remains a potent tool in smothering dissent that the Executive doesn't like—for example, when the DOJ used it in numerous George Floyd related cases, and only one relating to the events of January 6th.[141]

Here, members of the "far left" organized to counter-protest pro-Trump and conservative rallies to suppress political views they did not like.  They did so with force, violence, and property damage.  It happened numerous times, to the point the federal government identified their methods right before Charlottesville as the "principal drivers of violence at recent white supremacist rallies."[142]  And yet, none

---

[139] 13 Cong. Rec. 19,363-64 (statement of Rep. Cramer), https://tinyurl.com/y8w7c95n.

[140] *Id.*

[141] *See* Ex. RR at 5–12.

[142] Ex. HH at 1.

31

1  were charged under the ARA.  Only alleged white supremacists were.  That is selective

2  prosecution based on viewpoint-discrimination.  This case must be dismissed.

3  **B.      At a minimum, Mr. Rundo is entitled to discovery because there is**

4  **"some evidence" of discriminatory effect and discriminatory purpose.**

5         On December 13, 2023, Mr. Rundo requested the government disclose the items

6  referenced in the proposed order to compel discovery filed with this motion.[143]  On

7  January 9, 2024, the government responded to the discovery request with a letter

8  explaining why it believed the requested materials should not be turned over.[144]  Mr.

9  Rundo is entitled to discovery on his claim of selective prosecution because there is

10  more than just "some evidence" tending to show the existence of the essential elements

11  of the defense.  *Armstrong*, 517 U.S. at 468.

12         1.      **The standard for discovery for selective prosecution claims is**

13  **necessarily lighter than the claim itself.**

14         To obtain discovery on a selective prosecution claim a defendant must show only

15  "some evidence tending to show the existence of the essential elements of the defense,

16  discriminatory effect and discriminatory intent."  *Armstrong*, 517 U.S. at 468 (internal

17  quotation marks omitted)*; see also, United States v. Bass*, 536 U.S. 862, 863 (2002) ("a

18  defendant who seeks discovery on a claim of selective prosecution must show some

19  evidence of both discriminatory effect and discriminatory intent").  "The showing

20  necessary to obtain discovery is *somewhat less*" than the showing necessary to establish

21  an equal protection violation.  *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th

22  Cir. 2003) (emphasis added)*; see also United States v. Jones*, 159 F.3d 969, 978 (6th

23  Cir. 1998) ("Obviously, a defendant need not prove his case in order to justify

24  discovery on" on a selective prosecution claim).

---

26  [143] Ex. PP, Discovery Request.

27  [144] Ex. QQ, Discovery Response.

1   For discriminatory effect, "some evidence" means "a credible showing" that
2   "similarly situated individuals . . . were not prosecuted." *Armstrong*, 517 U.S. at 465,
3   470.  For discriminatory intent, neither the Ninth Circuit nor the Supreme Court has had
4   occasion to explain what "some evidence" means in the context of discriminatory intent
5   for selective prosecution.  But in the equal protection context, from which standards
6   selective prosecution claims draw, *id*. at 465, courts look to the "impact," "pattern,"
7   "historical background," "sequence of events," "departure from normal procedural
8   sequence," and "contemporary statements by the decision-maker," *Arlington Heights*,
9   429 U.S. at 266-68.

10   If a defendant is entitled to discovery on a selective prosecution claim, "the scope
11   of discovery must bear a reasonable relationship to the decision to prosecute the
12   particular defendant." *United States v. Gomez-Lopez*, 62 F.3d 304, 306 (9th Cir. 1995).

13   2.   **Mr. Rundo shows more than "some evidence" tending to show the**
14   **essential elements of a selective prosecution claim.**

15   Even if the Court finds a selective prosecution claim is premature here, it should
16   find "some evidence" of that claim justifies discovery.  The government was aware of
17   numerous pro-Trump and/or "far right" political rallies in California where "far left"
18   counter-protestors from groups like Antifa and BAMN organized to suppress political
19   speech "by any means necessary," including violence.  This happened again and
20   again—including at Huntington Beach and Berkeley—until matters hit a fever pitch in
21   Charlottesville in August 2017.  Yet the only people charged with federal ARA
22   violations for any of these political rallies were people holding alleged white
23   supremacist views; Mr. Rundo, his co-defendants, and other RAM members in
24   Charlottesville.  The nature of the investigation itself shows that this action was not
25   aimed merely at the alleged conduct, but beliefs.  The impact of these charges and the
26   pattern (or virtual absence) of ARA charges confirm that deliberate and improper aim.
27   At a minimum, the government must disclose the evidence requested.

28

## V.  WE CANNOT ABIDE PROSECUTING PEOPLE FOR THEIR UNPOPULAR BELIEFS BECAUSE IT MEANS NOBODY'S FREE SPEECH, THOUGHTS, OR BELIEFS ARE SAFE.

Again, and at last, the question is not whether "one side" is worse or better, or more justified in their beliefs or even their violent actions.  The issue is whether the government can pick and choose which group of citizens to punish *because* of their beliefs.  The First Amendment says no.  *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 595 (2023) ("Nor, in any event, do the First Amendment's protections belong only to speakers whose motives the government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive.").  Failing to protect even the most unpopular beliefs means we protect no beliefs at all.  *See Collin v. Smith*, 447 F. Supp. 676, 702 (N.D. Ill.), *aff'd*, 578 F.2d 1197 (7th Cir. 1978) ("The ability of American society to tolerate the advocacy even of the hateful doctrines espoused by the plaintiffs without abandoning its commitment to freedom of speech and assembly is perhaps the best protection we have against the establishment of any Nazi-type regime in this country.").  These charges must be dismissed.  Alternatively, the government should be ordered to disclose the requested discovery.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  January 15, 2024          By  */s/ Erin M. Murphy*
_____

ERIN M. MURPHY
JULIA DEIXLER
Deputy Federal Public Defenders
Attorneys for ROBERT RUNDO

34