# EXHIBIT RR

## DECLARATION OF BRITTANY KLEIN

I, Brittany Klein, declare:

1.      I am employed as a paralegal with the Office of the Federal Public Defender for the Central District of California.

2.      Under the direction of the attorneys appointed to represent Mr. Rundo in this case, I researched instances of the Anti-Riot-Act being charged in all ninety four district court jurisdictions across the county.  I did this using PACER and Westlaw.

3.      While conducting this research on PACER, I searched "Criminal Case Reports" in each accessible jurisdiction, selecting all "Offices" or "Divisions in each jurisdiction; selecting "criminal" under "case type;" citation type "18 U.SC. § 2101;" both "pending "and "disposed" under "count type"; filing date (date original charging document was filed) from November 23, 2001 through November 30, 2023,  and both pending and terminated defendants.

4.      The only federal trial court jurisdiction I was unable to obtain report information for was the Northern District of Georgia, due to restrictions in their criminal case report dates that differed from all other federal jurisdictions.

5.      In addition to the search in PACER, I also reviewed (i) A Westlaw Edge report for citing references to "§ 2101. Riots" within all federal jurisdictions; and (ii) citing references to *United States v. Dellinge*r, 472 F.2d 340 (1972) to locate references to older litigated cases where the Anti-Riot Act was charged.

6.      The results of my researched are reflected in the attached charts, at pages 3-4 and  pages 5-12.

7.      In both summary charts, I indicated that seven cases in which defendants ultimately pleaded guilty to 18 U.SC. § 2101, but where the defendants were initially charged with arson.

8.      The cases noted in the summary chart at pages 5-12 contain brief descriptions of each case I came upon during my research where the Anti-Riot Act was charged..

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 15, 2024, at Los Angeles, California.


*/s/ Brittany Klein* .
Brittany Klein, Paralegal

| District | Cir | Charged § 2101 | Other Initial Charge | Case Names/Numbers |
|---|---|---|---|---|
| Alabama Middle | 11 | 0 | 0 | |
| Alabama Northern | 11 | 0 | 0 | |
| Alabama Southern | 11 | 0 | 0 | |
| Alaska | 9 | 0 | 0 | |
| Arizona | 9 | 0 | 0 | |
| Arkansas Eastern | 8 | 0 | 0 | |
| Arkansas Western | 8 | 0 | 0 | |
| California Central | 9 | 1 | 0 | 2:18-cr-00759-CJC, US v. Rundo, et al. |
| California Eastern | 9 | 0 | 0 | |
| California Northern | 9 | 0 | 0 | |
| California Southern | 9 | 0 | 0 | |
| Colorado | 10 | 0 | 0 | |
| Connecticut | 2 | 0 | 0 | |
| Delaware | 3 | 0 | 0 | |
| District of Columbia | DC | 1 | 0 | 973-71, USA v. Hoffman |
| Florida Middle | 11 | 0 | 0 | |
| Florida Northern | 11 | 1 | 0 | US v. Briggs, et al. (1972, case number unknown) |
| Florida Southern | 11 | 0 | 0 | |
| Georgia Middle | 11 | 0 | 0 | |
| Georgia Northern | 11 | | | No data available |
| Georgia Southern | 11 | 0 | 0 | |
| Guam | 9 | 0 | 0 | |
| Hawaii | 9 | 0 | 0 | |
| Idaho | 9 | 0 | 0 | |
| Illinois Central | 7 | 2 | 0 | 1:20-cr-10041-JES-JEH, USA v. Gibson; 2:20-cr-20047-MMM-EIL, USA v. Betts |
| Illinois Northern | 7 | 2 | 0 | 1:21-cr-00142, USA v. Massey, USA v. Dellinger (1968, case number unknown) |
| Illinois Southern | 7 | 0 | 0 | |
| Indiana Northern | 7 | 0 | 0 | |
| Indiana Southern | 7 | 0 | 0 | |
| Iowa Northern | 8 | 0 | 0 | |
| Iowa Southern | 8 | 0 | 0 | |
| Kansas | 10 | 0 | 0 | |
| Kentucky Eastern | 6 | 0 | 0 | |
| Kentucky Western | 6 | 1 | 0 | 3:21-cr-00022-BJB, USA v. Subleski |
| Louisiana Eastern | 5 | 0 | 0 | |
| Louisiana Middle | 5 | 0 | 0 | |
| Louisiana Western | 5 | 0 | 0 | |
| Maine | 1 | 0 | 0 | |
| Maryland | 4 | 0 | 1 | 1:15-cr-00400-ELH, USA v. Carter |
| Massachusetts | 1 | 0 | 0 | |
| Michigan Eastern | 6 | 0 | 0 | |
| Michigan Western | 6 | 0 | 0 | |
| Minnesota | 8 | 3 | 0 | 0:20-cr-00104-NEB-TNL, USA v. Rupert; 0:20-cr-000250-MJD-ECW, USA v. Hunter, 0:20-cr-00282-PAM-ECW, USA v. Edwards |
| Mississippi Northern | 5 | 0 | 0 | |
| Mississippi Southern | 5 | 0 | 0 | |
| Missouri Eastern | 8 | 1 | 0 | 4:20-mj-7fl180, USA v. Avery |
| Missouri Western | 8 | 0 | 0 | |
| Montana | 9 | 0 | 0 | |
| Nebraska | 8 | 0 | 0 | |
| Nevada | 9 | 0 | 0 | |
| New Hampshire | 1 | 0 | 0 | |
| New Jersey | 3 | 1 | 0 | 1:22-cr-00510-CPO, USA v. Matchett (Rule |
| New Mexico | 10 | 0 | 0 | |
| New York Eastern | 2 | 0 | 1 | 1:22-cr-00103-PKC, USA v. John Doe (prob |
| New York Northern | 2 | 1 | 0 | USA v. Markiewicz, et al. (1988, case numb |

| | | | | |
|---|---|---|---|---|
| New York Southern | 2 | 0 | 0 | |
| New York Western | 2 | 0 | 7 | 1:20-cr-00080-RJA-JJM, USA v. Renford; 6:20-cr-06172-CJS, USA v. Hardy; 6:21-cr-06038-CJS, USA v. Tindale, 6:21-cr-06064-DGL, USA v. Drechsler; 6:21-cr-06065-DGL, USA v. Sanks; 6:21-cr-06126-CJS, USA v. Ramos; 6:22-cr-06022-CJS, USA v. Frasier |
| North Carolina Eastern | 4 | 1 | 0 | 5:20-cr-00305-M, USA v. Pittman |
| North Carolina Middle | 4 | 0 | 0 | |
| North Carolina Western | 4 | 0 | 0 | |
| North Dakota | 8 | 0 | 0 | |
| Northern Mariana Islands | 9 | 0 | 0 | |
| Ohio Northern | 6 | 1 | 0 | 1:20-cr-00290-PAG, USA v. Long/Poland |
| Ohio Southern | 6 | 0 | 0 | |
| Oklahoma Eastern | 6 | 0 | 0 | |
| Oklahoma Northern | 10 | 0 | 0 | |
| Oklahoma Western | 10 | 0 | 0 | |
| Oregon | 9 | 2 | 0 | 3:23-cr-00049, USA v. Harold, USA v. Burgwin (1973) |
| Pennsylvania Eastern | 3 | 0 | 0 | 2:22-cr-00251-JS (Rule 20 Transfer from New Jersey) |
| Pennsylvania Middle | 3 | 0 | 0 | |
| Pennsylvania Western | 3 | 0 | 0 | |
| Puerto Rico | 1 | 0 | 0 | |
| Rhode Island | 1 | 0 | 0 | |
| South Carolina | 4 | 1 | 0 | 2:20-cr-00543-RMG, USA v. King |
| South Dakota | 8 | 0 | 0 | |
| Tennessee Eastern | 6 | 1 | 0 | 3:20-cr-00055-KAC-DCP, USA v. Brown |
| Tennessee Middle | 6 | 0 | 0 | |
| Tennessee Western | 6 | 0 | 0 | |
| Texas Eastern | 5 | 0 | 0 | |
| Texas Northern | 5 | 0 | 0 | |
| Texas Southern | 5 | 0 | 0 | |
| Texas Western | 5 | 0 | 0 | |
| Utah | 10 | 0 | 0 | |
| Vermont | 2 | 0 | 0 | |
| Virgin Islands | 3 | 0 | 0 | |
| Virginia Eastern | 4 | 0 | 0 | |
| Virginia Western | 4 | 1 | 0 | 3:18-cr-00025-NKM-JCH, USA v. Daley, et al. |
| Washington Eastern | 9 | 0 | 0 | |
| Washington Western | 9 | 1 | 0 | USA v. Lerner, et al. (1970, case number u |
| West Virginia Northern | 4 | 0 | 0 | |
| West Virginia Southern | 4 | 0 | 0 | |
| Wisconsin Eastern | 7 | 3 | 0 | 2:17-cr-00129-LA, USA v. Ruffin; 2:17-cr-00190-PP-1, USA v. Carter; 2:18-cr-00154-PP-1, USA v. Mayes |
| Wisconsin Western | 7 | 0 | 0 | |
| Wyoming | 10 | 0 | 0 | |
| | | | | |
| Total | | 25 | 9 | |

**Anti-Riot Act Charged Cases Across U.S. District Courts**

Color Coding

| | |
|---|---|
| Related to George Floyd/Breonna Taylor/Officer-Involved Shooting death protests **Where the Case Information is *bold and italicized,* that means the case was initially charged as Arson, and the ARA charge was filed as part of a plea disposition** | Related to January 6 attack on U.S. Capitol |
| Related to Anti-Vietnam War protests | Uncategorized |

| | Defendant | District | Case No. | Nature of Charged Conduct |
|---|---|---|---|---|
| 1. | Avery, Michael J. | E.D. Mo. | 4:20-mj-7fl180 | Several days after George Floyd death, Mr. Avery posted on Facebook suggesting he was leaving Minneapolis to travel to the Ferguson Police Station and encouraging people to come out and participate in protests, looting, and calling "all the shooters" and St. Louis people interested in "level RED ACTION," which the FBI "associated with a high level of violence." (Dkt. 2, Compl. Aff., pp. 2-3.) |
| 2. | Betts, Shamar N. | C.D. Ill. | 2:20-cr-20047 | Mr. Betts posted a flyer with instructions to meet hours later to "RIOT" at a mall. (Dkt. 1, Compl. ¶¶6–7.)  The post included instructions like "let's get busy Justice for George, FUCK12 ("12" in this context is a slang term directed at law enforcement)" "bring friends & family, posters, bricks, bookbags, etc." and "After the mall we hitting the whole Prospect & Neil." (*Id.*)  The statements were overlayed across images of a burning car. (*Id.*)  Police responded to the designated area and found 50 to 75 people, who eventually began "breaking out the windows at businesses" and looting them.  (*Id.* at ¶¶8–9.)  Matching Mr. Betts's social media to known pictures of him, law enforcement confirmed he was present during the looting. (*Id.* at ¶¶10–12.) |
| 3. | Briggs, John, *et al.* | N.D.F.L. | 1972, case number unknown | Mr. Briggs and seven other war veterans are arrested for planning an anti-war demonstration at the Republican National Convention in Miami in 1972, Nicole Janok (September 2, 2003). *Gainesville Eight reunite.* archived from The Independent Florida Alligator on October 2, http://tinyurl.com/3fmx8xsm, *United States v. Briggs,* 514 F.2d 794, 798 (5th Cir. 1975) |

|  | Defendant | District | Case No. | Nature of Charged Conduct |
|---|---|---|---|---|
| 4. | Brown, Dominic | E.D. Tenn. | 3:20-cr-00055-WDC-DCP | On or about May 30, 2020, Mr. Brown used Snapchat to post "we are not each other's enemy only enemy is 12," a term "directed towards law enforcement officers." (Dkt., Compl., ¶10.)  In another post, Mr. Brown instructed people when to arrive at a mall that could be raided "if we get at least 300 people."  (*Id.*)  He encouraged people to "lace your shoes, wear masks and gloves.  Bring hammers bricks whatever you want." (*Id.* at ¶11a.) He posted updates on his own participation. (*Id.* at ¶12.) |
| 5. | Carter, Raymon | D. Maryland | 1:15-cr-00400-ELH | Mr. Carter, initially charged with arson and later pleaded guilty to 18 U.S.C. § 2101, knowingly set fire to a CVS in Baltimore on April 25, 2015. (Dkt. 8, Information), six days after the death of Freddie Gray, who died while in police custody in Baltimore.[1] |
| 6. | Carter, Toronse | E.D. Wisconsin | 2:17-cr-00190-PP | Mr. Carter, initially charged with arson and A.R.A, later pleaded guilty only to 18 U.S.C. § 2101, after setting fire to a BP gas station on August 13, 2016 (Dkt 1, Indictment).  This was hours after a fatal police shooting that same evening.[2] |
| 7. | Daley, Benjamin (et al) | E.D.V.A. | 3:18-cr-00025-NKM-JCH | Related conduct to the instant case for conduct in Charlottesville, Virginia ("Unite the Right Rally, etc.) |
| 8. | Dellinger, David T. (et al) | N.D. Illinois | 1968 | The lead defendant of the "Chicago Eight," eight (later seven) individuals are charged in connection with Anti-Vietnam war protests at the Democratic National Convention.[3] |

---

[1] *See* Lopez, German, *The Baltimore protests over Freddie Gray's death, explained,* Vox.com (Aug. 18, 2016), https://www.vox.com/2016/7/27/18089352/freddie-gray-baltimore-riots-police-violence.

[2] Holley, Peter, *Milwaukee protests turn violent after officer fatally shoots fleeing man,* THE WASHINGTON POST (Aug. 14, 2016), available at https://www.washingtonpost.com/news/morning-mix/wp/2016/08/14/milwaukee-protests-turn-violent-after-officer-fatally-shoots-fleeing-man/.

[3] https://www.chicagohistory.org/chicagoseven/

| | Defendant | District | Case No. | Nature of Charged Conduct |
|---|---|---|---|---|
| *9.* | ***Dreschler, Mackenzie*** | *W.D.N.Y.* | *6:21-cr-06064-DGL* | Prompted by the death of George Floyd, Ms. Dreschler participated in a public protest on May 30, 2020, in Rochester.  Photos show her setting fire to two government vehicles (Dkt 1, Compl. Aff., ¶¶5–7.)  This conduct was initially charged as arson with a superseding information (with the plea agreement to 18 U.S.C. § 2101). (*Id.* at 8; *see* Dkt. 26, Plea Agmt.) |
| 10. | Edwards, Victor Devon | D. Minn | 0:20-cr-00282-PJS-ECW-2 | Facebook Live video depicted Mr. Edwards looting a department store. (Aff. of Sara Thomas, Dkt. 1-1, ¶8.)  Surveillance footage showed Mr. Edwards assisting another individual setting multiple fires inside Target headquarters on August 26, 2020. (*Id.* at ¶¶19–26). This conduct was apparently related to violent protests that erupted after a viral false report of an officer-involved shooting in Minneapolis that same day.[4] (*See id.* at ¶5.) |
| *11.* | ***Frasier, Marquis*** | *W.D.N.Y.* | *6:22-cr-06022-CJS* | After the death of George Floyd, public protests were scheduled at a public building on May 30, 2020 in Rochester.  (Compl. Aff., Dkt. 1, ¶¶5–6.)  In a Facebook live video, Mr. Frasier set fire to a mobile police office with a Molotov cocktail. (Compl. Aff., Dkt. 1, ¶¶ 7-9). This conduct was initially charged as arson with a superseding information and plea agreement to 18 U.S.C. § 2101.  (Dkts. 54, Info.; Dkt. 55, Plea Agmt.) |
| 12. | Gibson, Ca'Quintez | C.D. Ill. | 1:20-cr-10041 | On the night of May 31, 2020, Mr. Gibson posted "Fuck 12" and various Facebook messages encouraging people to show up at a mall to loot (*e.g.*, "All I need is 50 motherfuckers there at Northwoods Mall at 9 o'clock"). (Compl., Dkt. 1, ¶¶ 5, 10.) |
| *13.* | ***Hardy, Javon*** | *W.D.N.Y.* | *6:20-cr-06172-CJS* | After the death of George Floyd, Mr. Hardy participated in a public protest on May 30, 2020, in Rochester. He was caught on Facebook live video setting fire to a mobile office with a substance in milk jug and stating, "let that bitch burn". (Compl. Aff., Dkt. 1, ¶¶7–8.)  This conduct was initially charged as arson with a superseding information and plea agreement to 18 U.S.C. § 2101. (Dkt. 18, Info.; Dkt. 19, Plea Agmt.) |

[4] Hutchinson, Bill, *6 arrested as violent protest erupts in Minneapolis over false reports of fatal shooting involving police,* ABC News (Aug. 27, 2020), https://abcnews.go.com/US/arrested-violent-protest-erupts-minneapolis-false-reports-fatal/story?id=72644836.

|    | Defendant | District | Case No. | Nature of Charged Conduct |
|----|-----------|----------|----------|---------------------------|
| 14. | Harold, Kenneth George | D. Oregon | 3:23-cr-00049-IM | Mr. Harold (who was an active member of the Army in WA state at the time) is charged with planning with at least one individual to break windows in several buildings in connection with protests in Portland between February and April 2021. (Indictment, Dkt 1.) Per the Indictment, he was involved in "direct action," which included "violence and interference against law enforcement, property destruction, or vandalism." (*Id.* at 1.) Allegations in the Indictment suggest Mr. Harold and his co-conspirator targeted businesses because of their anti-capitalist views. (*Id.* at 3.) |
| 15. | Hoffman, Abbott, et al. | D.D.C. | 973-71 | Mr. Hoffman (one of the Chicago Eight three years earlier) was indicted in the District of Columbia for April 1971 travel to the District of Columbia to participate in large-scale Anti-war demonstrations on May Day. *United States v. Hoffman*, 334 F. Supp. 504, 509 (D.D.C. 1971); *The Most Influential Protest You've Never Heard Of: May Day, 1971*, Georgetown University Library (Apr. 26, 2021), available at: https://library.georgetown.edu/exhibition/most-influential-protest-you%E2%80%99ve-never-heard-may-day-1971 |
| 16. | Howe, Ryan | W.D.N.Y. | 6:21-cr-06100-CJS-1 | On September 23, 2020, it was announced that charges would not be filed against officers involved in the death of Breonna Taylor. (Plea Agmt., Dkt. 16, ¶4c.) In the wake of that announcement, several members of the public "declared their intention to protest" the following night, September 24, and indicated "a desire to burn down the" city. (*Id.*) On the morning of September 24, Mr. Howe posted a message on Facebook which read, "Good morning to everyone ready to burn this whole fuckin country to the ground!" He also posted a recipe for a Molotov cocktail with instructions on how to use it against police. (*Id.* at ¶4f.) Mr. Howe pleaded guilty to civil disorder, 18 U.S.C. § 231(a)(3). (*Id.* at 1.) |
| 17. | Hunter, Ivan Harrison | D. Minn. | 0:20-cr-00250 | Mr. Hunter was a member of the "Boogaloo Bois," an anti-government group. (Compl. Aff. Dkt. 1, ¶5.) Around May 26, 2020, Mr. Hunter traveled from Texas to Minnesota in response to a public Facebook request from another "Boogaloo Bois" member. (*Id.* at ¶¶5–7.) They were organizing a group to travel to the unrest unfolding in Minneapolis after the death of George Floyd. (*Id.*) On May 27, 2020, Mr. Hunter was among several individuals connected with setting fire to a police building with Molotov cocktails, yelling "Justice for Floyd," and shooting rounds from an AK-47 at the building. (*Id.* at ¶¶9–12.) |

| | Defendant | District | Case No. | Nature of Charged Conduct |
|---|---|---|---|---|
| 18. | King, Orlando | D.S.C. | 2:20-cr-00543-rmg | On May 30-31, 2020, after the death of George Floyd, Mr. King participated in looting in Charleston.  Per a DOJ press release, Mr. King livestreamed stealing beer from a market.[5] |
| 19. | Lerner, Michael (et al) (Seattle Liberation Front) | W.D. Wash. | 1970 | Seven individuals protesting the sentencing of the Chicago Seven (*Dellinger*) were arrested after some threw paint and rocks at a federal courthouse.  The trial ended in a mistrial and the defendants end up serving time on contempt charges arising from what took place during trial.[6] |
| 20. | Long, Althof & Poland, Devon | N.D. Ohio | 1:20-cr-00290-pag | These defendants were arrested together in violation of a curfew on May 30, 2023, after a public protest that had devolved into disorder and looting.  (Compl. Aff., Dkt. 1-1 at 4–6.)  They messaged each other in the hours before the looting about traveling from Pennsylvania to Ohio to "riot watch."  (*Id.* at 11.)  Poland asked "should we bring Molotov supplies," and Long said he already had the supplies in his car. (*Id.* at 12.)  Defs. were arrested with a backpack containing a hammer, spray paint, instant flame gel, and a loaded Glock in their vehicle. (*Id.* at 9.) |
| 21. | Markiewicz, Duane, et al. | N.D.N.Y. | 1988 | Several tribal members charged with damaging a gas station, a break-in, assault, and a confrontation with television reporters who were visiting in 1988, after a dispute over misuse of tribal proceeds. *United States v. Markiewicz*, 978 F.2d 786, 795 (2d Cir. 1992). |
| 22. | Massey, James | N.D. Ill | 1:21-cr-00142 | On August 9, 2020, Mr. Massey used Facebook to post a live video saying: "attention attention lotting [sic] start at 12am tonight . . . Downtown area and up north area only bring ya tools ski masks and glvoes #letsgooooo" and "let's get ready to steal bitch." (Indictment, Dkt. 11 at 2.)  He purportedly "sent everybody the location to link up at bro.. . . I need to hit a couple stores." (*Id.* at 3.) Early the next morning, he and several individuals broke into and looted several stores.  (*Id.*) |

[5] https://www.justice.gov/usao-sc/pr/charleston-rioter-who-livestreamed-looting-and-firing-gun-sentenced-24-months-federal
[6] Hollingsworth, Josie, *How a protest spawned the Seattle Seven, a contentious court battle — and 'The Big Lebowski,* THE SEATTLE TIMES (Feb. 17, 2017), available at https://www.seattletimes.com/seattle-news/how-a-protest-spawned-the-seattle-seven-a-contentious-court-battle-and-the-big-lebowski/

|  | Defendant | District | Case No. | Nature of Charged Conduct |
|---|---|---|---|---|
| 23. | Matchett, Carlos | D.N.J.<br><br>Rule 20 to ED PA | 1:20-mj-5557-KMW<br><br>1:22-cr-00510-CPO<br><br>PA: 2:22-cr-00251-JS-1 | On May 31, 2020, after peaceful protests, Mr. Matchett was arrested during a looting of a shopping center.  (*United States v. Matchett*, 1:20-mj-5557-KMW, Dkt. 1, Compl. Aff. (D.N.J.).)  He yelled and encouraged others to join in the looting.  (*Id.* at 2.)  Only hours before his arrest, he posted a message on Facebook that said, "Let's start a riot."  (*Id.* at 6.)  He also posted video of himself encouraging people to enter stores and take property and promising to provide cover so they could steal goods.  (*Id.* at 6–7.) |
| 24. | Mayes, Van | ED Wisconsin | 2:18-cr-00154-PP-1 | In the wake of widespread protests in Milwaukee after the-officer-involved shooting of Sylvelle Smith in August 2016, ATF received a tip that Mr. Mayes and others took steps to firebomb the Milwaukee Police Department with Molotov Cocktails. (Compl. Aff., Dkt. 1, ¶¶10–11, ¶17.)  He also encouraged youth he mentored to throw rocks at the police and they were present for manufacturing Molotov cocktails.  (*Id.* at ¶¶20–21.)  Mr. Mayes made a Facebook posts stating, "Y'all know what to do . . . Let's get this out!!" and "fuck the police," with a photo of the officer involved in the shooting death.  (*Id.*, ¶¶ 24-30). |
| 25. | Peavy, Jaywuan | N.D. Ohio | 4:20-mj-6092 | On May 30, 2020, Mr. Peavy created a Facebook page called "Mansfield Riot," circulated a scheduled date, time and location for a "RIOT."  (Compl. Aff., Dkt. 1-1, ¶¶9–10.)  He posted statements including: "we will be launching 3 attacks on Mansfield stores . . . this is only the beginning" and "I'm finna lead the riot we finna come up."  (*Id.* at ¶¶10, 14.) |
| 26. | ***Pittman, Charles*** | ***E.D.N.C.*** | ***5:20-cr-00305*** | On May 30, 2020, according to still-shots from Facebook Live feeds, Mr. Pittman poured gasoline on top of a government-owned historic building that was later seen on fire.  (Compl. Aff., Dkt. 1, ¶¶5–9).  Earlier in the day, he posted a video to Facebook where he neared the building, and said, "I'm out here doing the scope. Scoping the scene" and "It looks like it's there for the taking."  (*Id.* at ¶5.)  Noting that police were there, he said, "[w]e'll be back."  (*Id.*) |
| 27. | ***Ramos, Miguel*** | ***W.D.N.Y.*** | ***6:21-cr-06126-CJS-1*** | On May 30, 2020, protests turned violent near a public safety building.  (Compl. Aff., Dkt. 1, ¶5.)  Mr. Ramos set fire to a police car.  (*Id.* at ¶8.)  Mr. Ramos took photos of himself at the riot and sent those photos to friends encouraging them to participate in the riot. (Plea Agmt., Dkt. 75, ¶4d). |

|  | Defendant | District | Case No. | Nature of Charged Conduct |
|---|---|---|---|---|
| 28. | ***Renford, Courtland*** | ***W.D.N.Y.*** | ***1:20-cr-00080-RJA-JJM*** | On May 30, 2020, amidst a protest, Mr. Renford threw a burning laundry basket into Buffalo City Hall. (Compl. Aff., Dkt 1, ¶¶3–5.) |
| 29. | Ruffin, Stephen | ED Wisconsin | 2:17-cr-00129-LA | There were widespread protests in Milwaukee after the-officer-involved shooting of Sylvelle Smith in August 2016. (Compl. Aff., Dkt. 1, ¶6.)  Amidst those protests, Mr. Ruffin was one of several people who set a fire outside a liquor store. (*Id.* at ¶¶10–19.)  The morning of the arson, he sent a text saying, "I'm rioting with them." (*Id.* at ¶21.) |
| 30. | Rundo, Robert, et a. | C.D. Cal. | 2:18-cr-00759-CJC | The instant matter. |
| 31. | Rupert. Matthew Lee | D. Minn. | 0:20-cr-00104-NEB-TNL | On May 28, 2020, Mr. Rupert traveled from Illinois to Minneapolis to participate in protests surrounding the death of George Floyd. (Indictment, Dkt. 12 at ¶¶3–4.)  He posted his intent do travel to Minnesota on Facebook, book hotel rooms, and asked "who coming[.]"  (*Id.* at ¶3.)  The next day, he posted a Facebook Live video showing him passing out explosives, damaging property, and making statements that include: "They got SWAT trucks up there . . . I've got some bombs if some of you all want to throw them back . . . bomb them back . . . here I got some more . . . light it and throw it" and "Let's go fuck up the liquor store."  (*Id.*, at ¶¶4–5.) |
| 32. | ***Sanks, Shakell*** | ***W.D.N.Y*** | ***6:21-cr-06065-DGL*** | Mr. Sanks participated in a public protest in response to the death of George Floyd on May 30, 2020.  (Compl. Aff., Dkt. 1 at ¶5.)  A Facebook Live video shows him setting fire to a government vehicle. (*Id.* at ¶¶5–8.)  This conduct was initially charged as arson (*Id.*) with a superseding information (with the plea agreement to18 U.S.C. § 2101). *United States v. Sanks,* W.D.N.Y., 6:21-cr-06065-DGL (Aug. 16, 2021). |

|  | Defendant | District | Case No. | Nature of Charged Conduct |
|---|---|---|---|---|
| 33. | Subleski. John | W.D. Ky. | 3:21-cr-00022-BJB-1 | From October 2020 to January 2021, Mr. Subleski, a self-identified "Boogaloo Boi," posted a number of anti-government messages and pictures of himself armed. (Compl. Aff., Dkt. 1, 4–10.)  During the attack on the U.S. Capitol on January 6, 2021, he posted messages on social media "calling people to get into the streets and begin the 'LUAU,' a reference to a new civil war and violence towards government figures." (*Id.* at 19.)  He later posted, "Time to storm LMPD," referring to the local police department.  (*Id.* at 20.)  With a group of about 30 to 50 others, he marched in the city and was later captured on video shooting a rifle at an SUV. (*Id.* at 26.) |
| 34. | ***Tindale, Christopher*** | ***W.D.N.Y.*** | ***6:21-cr-06038-CJS-1*** | During a protest on May 30, 2020, Mr. Tindale set fire to a police car. (Compl. Aff., Dkt. 1 at 2–3.)  He used Facebook Live and his cell phone to communicate with people with riotous intent.  (Plea Agmt., Dkt. 29, ¶4e.) |

Case 2:18-cr-00759-CJC Document 281-28 Filed 01/15/24 Page 14 of 277 Page ID
Case 4:20-mj-07180-SPM Document 1 Filed 06/01/20 Page 3 of 4 PageID #:12
#:2030

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Ryan Monahan, being duly sworn, deposes and states:

I have been a Special Agent with the Federal Bureau of Investigations (FBI) since September 20, 2015. During my tenure, I have been trained on numerous investigative methods and techniques in relation to criminal and counterterrorism investigations. I am currently assigned to the St. Louis Field Office. My responsibilities include conducting searches and arrests based on probable cause for violations of the United States criminal code. I have been thoroughly trained on the procedures and methods needed to conduct these investigations, including but not necessarily limited to the identification and cultivation of social media accounts and the internet more generally.

Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested criminal complaint, I have not included each and every fact known to me about the subject named herein or this investigation as a whole. Rather, I have included only those facts which I believe to be necessary to establish the requisite probable cause. The recitation of facts contained herein is derived from my personal observations and investigations and, where indicated, information provided by fellow law enforcement officers.

On or about May 25, 2020, George Floyd, an African-American man, was killed after he was forcibly restrained by white police officers in Minneapolis, Minnesota. Mr. Floyd's death sparked days of civil unrest in Minneapolis and elsewhere. Within days, protests spread to multiple major cities, including St. Louis, Missouri. Many of these protests began peacefully but devolved into violence, vandalism, and looting. In an effort to identify potential flashpoints for violence, your affiant and other investigators monitored social media activity for evidence of imminent acts of violence. During the course of that monitoring, investigators identified a

specific Facebook account with the username "Mike Avery."  Based upon a comparison between photographs posted on the "Mike Avery" Facebook page and photographs available through the Missouri Department of Revenue, the person utilizing the "Mike Avery" Facebook page is believed to be Michael J. Avery.

On May 28, 2020, Facebook user Mike Avery (UID:100012403447165) posted information tending to suggest that he was located in Minnesota.  More specifically, he made a Facebook Live video post wherein he appears frustrated.  Avery addressed some of his comments to "St. Louis activists," whom he wanted to "tune into [his] live [videos]."  Avery, who is visible in the video and can be heard speaking, specifically referenced being located in Minnesota.

On May 29, 2020, Avery posted further information indicating that he was still located in Minnesota.  He wrote, "Out of everything that I have seen so far since I been down here in MN, hands down the way that people has stuck together and supported one another has been a beautiful site. Well we about to hit the streets, phones fully charged, tell FB to leave me alone so I can bring yall live footage."  Later the same day, Avery posted videos appearing to corroborate that he was located in Minneapolis.  He also posted "Curfew just started and it's a standoff by the pd everybody in MN get here right now."

Shortly before the foregoing post earlier in the day, Avery suggested that he was leaving Minnesota to travel to St. Louis.  Avery posted "Anybody in STL interested in being a part of a level RED ACTION AND CAN BE AVAILABLE SATURDAY NIGHT PLEASE INBOX ME BEFORE I LEAVE MN. PLS SHARE THIS POST WIDELY, CALLING OUT ALL THE SHOOTERS, ALL THE PEOPOLE WHO DON'T GIVE AF. ALL THE PEOPLE WHO HAS HAD ENOUGH. AND IF IK THAT THIS ISN'T THE TYPE OF ACTION FOR YOU, I WILL

NOT RESPOND TO YOUR INBOX CAUSE THIS IS NOT FOR YOU. SHARE, SHARE, SHARE." The FBI assesses level RED ACTION to be associated with a high level of violence.

On May 30, 2020, Avery posted information suggested that he was en route from Minnesota to St. Louis.  Among other things, Avery posted, "STL WE ON THE WAY."  He went on to write, "BUT REAL QUICK I WANT TO SHARE WITH YOU HOW THE YOUNG PEOPLE OF MN ORGANIZED THEY LOOTING." Avery included specific details about looting that had occurred in Minneapolis.  For example, "SO HOW THEY DID THIS WAS THEY ONLY ALLOWED 3 TO 4 PPL TO GATHER THINGS AND THEY THREW EVERYTHING ONTO THE PARKING LOT THAT WAY PPL DIDN'T HAVE TO GO INTO THE STORES". The same post also noted that looters in Minnesota "HAD A CERTAIN COLOR SPRAY PAINT AND THEY MARKED ALL THE BLACK OWNED BUSINESSES OR BUILDINGS THAT WERE NOT TO BE TOUCHED UNDER NO CIRCUMSTANCES".  Avery encouraged large numbers of men to participate in the looting in St. Louis, suggesting that women should not be required to do so.  Near the end of the lengthy post, Avery wrote, "BRING THE MASSES OUT."

On the evening of May 30, 2020, a number of individuals assembled outside the Ferguson Police Station to demonstrate in protest of the death of George Floyd.  The protest began peacefully, but over the course of the evening, devolved into property damage and violence. Windows at the Ferguson Police Department, as well as at least one local business, were smashed as protesters threw rocks and bottles at police.  On the same evening, May 30, 2020, Avery made a post calling for men in St. Louis to stand up and "get to Ferguson pd right now." Several minutes later Avery posted, "RED ALERT EVERYONE GET TO FERGUSON PD RIGHT NOW."  Earlier on the same day, Avery posted a call for others to provide him with

names of police officers. Among other things, Avery wrote, "I need first and last names of any bike cops yall remember anybody who was involved in some shit and got away with it I need names and now."

Based upon my training and experience, as well as my analysis of the events of the past 72 hours, Michael M. Avery, Jr. utilized the internet to broadcast videos and post written information from Minnesota, where he was participating with others in looting businesses incident to protests surrounding the death of George Floyd. Avery specifically directed at least some of his comments to "St. Louis activists." Prior to leaving Minnesota, Avery urged "shooters" to assemble with him in St. Louis. He also encouraged others reading his posts to share them with others for purposes of "calling out all the shooters." Avery provided tutelage as to how looting occurred in Minnesota, describing how certain businesses were vandalized and others were left intact. Avery also encouraged "masses" to participate in such activities in St. Louis.

**I state under the penalty of perjury that the foregoing is true and correct.**

_____     5/31/2020
Ryan Monahan                                     Date
Special Agent, FBI

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.**

_____     5/31/2020
Honorable Magistrate Judge Shirley P. Mensah          Date

4

E-FILED
Friday, 05 June, 2020 03:06:05 PM
Clerk, U.S. District Court, ILCD

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

United States of America
v.

SHAMAR N. BETTS

*Defendant(s)*

Case No.

20-MJ- 7081

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 31, 2020 _____ in the county of _____ Champaign _____ in the
_____ Central _____ District of _____ Illinois _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2101 | Inciting a riot |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

s/Andrew M. Huckstadt

*Complainant's signature*

Andrew M. Huckstadt, Special Agent, FBI
*Printed name and title*

by e-mail.
Sworn to before me and signed in my presence.
Attested to by telephone under oath.

s/Eric I. Long

Date: _____ 06/05/2020 _____

*Judge's signature*

City and state: _____ Urbana, Illinois _____

Eric I. Long, United States Magistrate Judge
*Printed name and title*

<u>**A F F I D A V I T**</u>

I, Andrew M. Huckstadt, being first duly sworn on oath, depose and state as

follows:

<u>**INTRODUCTION**</u>

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI),

currently assigned to the Champaign, Illinois, Resident Agency of the Springfield,

Illinois, FBI Field Office.  Previously, I was assigned to the Memphis, Tennessee, FBI

Field Office.  I have been a Special Agent with the FBI since August 2008.  Through my

employment with the FBI, I have investigated numerous criminal violations relating to

child exploitation, violent incident crime, kidnapping, drug trafficking, public

corruption, civil rights and fraud.  I have received training in these areas and have had

the opportunity to investigate, and assist in the investigation of, these and other

offenses – to include having been the affiant on numerous search warrants, arrest

warrants, and criminal complaints.

2.      I am also a member of the FBI Joint Terrorism Task Force. I investigated

domestic terrorism matters while at the Memphis, Tennessee, FBI Field Office. I have

been assigned to work domestic terrorism matters since December of 2019.

3.      This affidavit is made in support of an arrest warrant and criminal

complaint charging SHAMAR N. BETTS (DOB:               ) (hereinafter referred to as

"BETTS") with inciting a riot in violation of Title 18, United States Code, Section 2101.

4.      The statements contained in this affidavit are based in part on my own

investigation, information provided by other law enforcement officers, information provided by other witnesses, and my experience and background as a law enforcement officer. The information contained in this affidavit is not an exhaustive account of everything I know about this case. Rather, it is only the facts that I believe are necessary to establish probable cause to issue the requested warrant. If called as a witness to testify, I would testify as follows.

## STATUTORY AUTHORITY and TERMS

5.     This investigation concerns violations of Title 18, United States Code, Section 2101, relating to the intent to incite a riot or to organize, promote, encourage, participate in, or carry on a riot.

    a.     18 U.S.C. § 2101 prohibits anyone from traveling in interstate or foreign commerce, or using any facility of interstate of foreign commerce, including but not limited to the mail, telegraph, telephone, radio, or television with intent

        i.     To incite a riot; or

        ii.     To organize, promote, encourage, participate in, or carry on a riot; or

        iii.     To commit any act of violence in furtherance of a riot; or

        iv.     To aid or abet any person inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;

        v.     And who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified above.

    b.     The internet is a facility of interstate commerce.

    c.     "Riot" means a public disturbance involving (1) an act or acts of

2

violence by one or more persons part of an assemblage of three or
more persons, which act or acts shall constitute a clear and present
danger of, or shall result in, damage or injury to the person of any
other individual or (2) a threat or threats of the commission of an
act or acts of violence by one or more persons part of an assemblage
of three or more persons having, individually or collectively, the
ability of immediate execution of such threat or threats, where the
performance of the threatened act or acts of violence would
constitute a clear and present danger of, or would result in, damage
or injury to the property of any other person or to the person of any
other individual.

d.     The term "to incite a riot", or "to organize, promote, encourage,
participate in, or carry on a riot", includes, but is not limited to,
urging or instigating other persons to riot, but shall not be deemed
to mean the mere oral or written (1) advocacy of ideas or
(2) expression of belief, not involving advocacy of any act or acts of
violence or assertion of the rightness of, or the right to commit, any
such act or acts.

e.     Facebook is a social networking website/application allowing users
to post and view videos and pictures, send private messages, join
groups with common interests, and add friends.

f.     Facebook also has a feature called "Facebook Live". Facebook Live
allows a user to post a live feed video to their page allowing other
users to view the live feed and also post comments that are
viewable in real time.

## PROBABLE CAUSE

6.     Through the performance of my official duties as a Special Agent with the

FBI, I have become acquainted with the following facts. On May 31, 2020 at approximately

10:31 a.m., Champaign Police Department Intelligence Analyst (IA) Sarah Burgener

observed a Facebook post made by Facebook user "Shamar Bett's" (Facebook URL:

https://www.facebook.com/shamar.betts.144/UserID#100044203782670). The

post, which was preserved by IA Burgener, stated as follows (with the exclusion of several

3

emoji characters): "I'm just the messenger We're literally sitting on our ass watching the

whole country and even others fight for our black rights Y'all think we don't suffer

through inequality here EVERYDAY We gotta put Champaign/Urbana on the map mfs

gone hear and fear us too. SLIDE let's get busy Justice for George FUCK12." A copy of this

post is attached hereto as Exhibit A.

7.      This post was accompanied by a flyer advocating for a riot at Market Place

Mall (located at 2000 N. Neil Street, Champaign, Champaign County, in the Central

District of Illinois). The flyer further contained a meeting time of 3 p.m. and specific

instructions to "Bring friends & family, posters, bricks, bookbags etc." as well as a

statement indicating "After the mall we hitting the whole PROSPECT & NEIL." These

words were overlaid on a stock image of a riot including a burning vehicle. A copy of this

post is attached hereto as Exhibit B.

8.      Officers of the Champaign Police Department responded to the area to

observe the protest and respond to any acts of violence. At approximately 2:36 p.m., a

group of approximately 50 to 75 people were reported gathering at the mall. The group

continued to grow in size. At approximately 3:12 p.m. the group began breaking out

windows at businesses located in the mall and looting merchandise from within.

9.      Facebook user "Shamar Bett's" posted a Facebook Live video during this

time stating, "Look what a nigga just started…look what a nigga just started.  We out

here…we out here…we out here…we out here.  All ya'll talking that shit under my

post…we out here.  Fuck that I needs that…we out here. " The user can also been seen

carrying multiple items, to include numerous pairs of khaki pants with Old Navy tags on

4

them. Although the user's face cannot be seen on the video, at one point his left leg and

foot are visible and he can been seen wearing blue jogger-style pants and black shoes

identical to those depicted in a Facebook photograph posted by "Shamar Bett's" on May

31, 2020 at 1:29 p.m.

10.     Additional law enforcement resources were deployed to the Market Place

Mall to respond to the riot and attempt to control the group, which continued to grow in

size and began vandalizing and/or looting other businesses in the area including

Gordman's, Kohls and TJ Maxx. The group then moved on to the shopping portion of N.

Prospect Avenue and continued vandalizing and/or looting numerous stores in the area,

to include Meijer, Best Buy, Shoe Carnival and Walmart. This activity continued

throughout the night and into the early morning hours of June 1, 2020. By the end of the

night, approximately 50 businesses in the area had been vandalized and/or looted.

11.     Champaign Police Department investigators searched local law enforcement

databases and obtained a known photograph of BETTS. The known photograph of BETTS

appeared to be the same individual depicted in photographs on "Shamar Bett's" Facebook

page. In addition, a known photograph of BETTS obtained from the Urbana Park District

Forest Preschool Handbook appeared to be the same individual depicted on "Shamar

Bett's" Facebook page as well as the known photograph of BETTS.

12.     On May 31, 2020 at approximately 4:30 p.m., Champaign Police Department

Detective Corey Phenicie obtained video footage of the group's looting activities. This

video was recorded live and also was available later online. At approximately the 1

minute and 41 second mark of the video, an individual matching BETTS' description can

5

be seen exiting the Old Navy store located at the Market Place Mall with a handful of clothing items to include what appear to be multiple pairs of khaki pants. The clothing worn by this individual appears to be the same as the clothing worn by the user depicted in the aforementioned Facebook Live video.

13.     Champaign Police Department investigators submitted a preservation request to Facebook on June 1, 2020 after the initial post by "Shamar Bett's" inciting the riot appeared to have been deleted. Following the initial referenced post, another post was found on "Shamar Bett's" account, which reads as follows (with the exclusion of several emoji characters): "They tryna portray me to be some type of monster yet I'm a fucking hero if we don't stand for something we'll fall for anything love my black people #J4G."

6

14.     On the evening of June 1, 2020, Champaign Police Department obtained a state arrest warrant for BETTS charging him with Burglary in violation of Illinois state law, 720 ILCS 5/19-1(a). On the morning of June 5, 2020, Betts was located by the United States Marshals Service in the State of Mississippi.

FURTHER AFFIANT SAYETH NOT.

s/Andrew M. Huckstadt

Special Agent Andrew M. Huckstadt
Federal Bureau of Investigation
Champaign, Illinois

Subscribed and sworn to before me this 5th day of June 2020.
By e-mail and attested to
by telephone.                          s/Eric I. Long

ERIC I. LONG
United States Magistrate Judge

7

## EXHIBIT A



I'm just the messenger 🗣️ We're literally sitting on our ass watching the whole country and even others fight for our black rights 💯 Y'all think we don't suffer through inequality here EVERYDAY 🧍🏾 We gotta put Champaign/Urbana on the map mfs gone hear and fear us too. SLIDE let's get busy 🆗‼️ Justice for George FUCK12🗣️

8

**EXHIBIT B**



AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Tennessee

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| DOMINIC BROWN | ) | 3:20-MJ- 1088 |
| | ) | |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   May 30, 2020 and May 31, 2020   in the county of   Knox   in the

Eastern   District of   Tennessee   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2101 | Riots |
| 18 U.S.C. § 231(a)(3) | Civil Disorder |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent Mollie G. Treadway.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Mollie G. Treadway, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   06/04/2020

_____
*Judge's signature*

City and state:   Knoxville, Tennessee

Hon. Debra C. Poplin, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA

v.

DOMINIC BROWN

Case No. 3:20-MJ-1088

## **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Mollie G. Treadway, being duly sworn, do depose and state as follows:

### **INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2009.  I currently work in the Knoxville Field Office of the FBI and am assigned to the Joint Terrorism Task Force.  During my tenure as an FBI Special Agent, I have investigated numerous crimes including, but not limited to, gangs and organized crimes, weapons violations, narcotics trafficking, money laundering, kidnapping and fugitive investigations.  I have received training and have gained experience in interview and interrogation techniques, as well as debriefing witnesses, informants and others who may have knowledge of criminal activities.   Additionally, I have received training and have gained experience in arrest procedures, search warrant applications, the execution of searches, electronic surveillance, and various other criminal laws and procedures.

2.      This affidavit is submitted in support of a criminal complaint against Dominic BROWN, charging him with violating 18 U.S.C. § 2101 (Riots) and 18 U.S.C. § 231 (a)(3) (Civil Disorder).

3.      Title 18, United States Code, Section 2101 provides in relevant part: "[w]hoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce"

with the intent to (1) incite a riot, (2) organize, promote, encourage, participate in, or carry on a riot; (3) commit any act of violence in furtherance of a riot; or (4) aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence of violence in furtherance of a riot; "and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose" enumerated above has committed a federal crime.

4.    Section 2102(a) defines the term "riot" to mean the following:

a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or

(2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability to immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.

5.    Section 2102(b) provides the following:

the term 'to incite a riot', or 'to organize, promote, encourage, participate in, or carry on a riot', includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.

6.    Title 18, United States Code, Section 231(a)(3) provides in relevant part: "[w]hoever commits or attempts to commit any act to obstruct, impede, or interfere with any ... law enforcement officer lawfully engaged in the lawful performance of his official duties... during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce ..." has committed a federal crime.  The term "civil disorder" means "any public disturbance involving acts of violence by assemblages of three or more persons,

2

which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

7.      I am familiar with the facts and circumstances in this affidavit as a result of my personal participation in this investigation as well as my review of official reports and records and conversations with other law enforcement officers described below.  Because this affidavit is being submitted for the limited purpose of supporting probable cause, I have not included each and every fact known to me concerning this investigation.

## PROBABLE CAUSE

8.      On May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department.  The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny.  Following Mr. Floyd's death, public protests began in Minneapolis and expanded throughout the country including in Knoxville, Tennessee.  In some instances, these public protests have become violent resulting in the destruction of property, serious bodily injury, and even death.

9.      I have reviewed images of posts made on Snapchat,[1] a social media application, by an account bearing the username "bred" (hereinafter "Snapchat Account").  I believe that this Snapchat Account is operated by Dominic BROWN, a resident of Heiskell, Tennessee.[2]

---

[1] Snapchat is a multimedia messaging application that is typically accessed by downloading the Snapchat application onto a mobile device such as a mobile telephone.  In order to send and receive content on Snapchat, a user typically must be connected to the internet or to a cellular telephone service.

[2] I have reviewed a video posted on the Snapchat Account that depicts BROWN discussing some of the events described herein, including his arrest on May 31, 2020.  During the video, BROWN also showed the booking photo of him taken by law enforcement officers in connection with his May 31, 2020 arrest.

3

10.     On or about May 30, 2020, BROWN made several posts on his Snapchat Account which were intended to incite and organize a riot at the West Town Mall located in Knoxville, Tennessee.

a.     In one such post, BROWN stated "we are not each other's enemy only enemy is 12 [middle finger emoji]."[3]  I know from training and experience that the reference to the number "12" in this context is a slang term directed towards law enforcement officers.  In this post, BROWN provided the street address of a Target store that is located in close proximity to the West Town Mall.

b.     In another post, BROWN stated the following in connection with a published news story that law enforcement officers were taking threats to West Town Mall seriously: "ok bet lol. Fuck 12 they ain stopping shit haha I done got felonies and y'all ain stop shit fuck outta here."

c.     BROWN made two separate posts on his Snapchat Account containing images depicting maps of the interior of West Town Mall and another post which stated in part, "If we get at least 300 people we can raid the mall and everything in there...."

11.     Using his Snapchat Account, BROWN also provided instructions to others as well as updates on his own preparations for the riot.

a.     For example, in one post BROWN instructed, "be there by 10:30, lace your shoes, wear masks and gloves. Bring hammers bricks whatever you want."  This post also depicted the legs and feet of an individual [believed to be BROWN] standing in a bedroom.

---

[3] This quote and those that follow include a number of grammar and punctuation errors originally made by BROWN who is quoted without the use of "sic."

4

b.      In another post, BROWN stated, "clique up before all y'all get active so we all show up at once fuck the waiting a hour on slow pokes clear your agenda if you comin. 10:30." This post depicted the legs and feet of an individual [believed to be BROWN] who appears to be sitting inside the passenger seat of a motor vehicle.

c.      In a post that purportedly depicted BROWN's arrival at the aforementioned Target store, BROWN stated, "Target beside the mall." This post contained a photograph of the legs and feet of an individual [believed to be BROWN] standing next to a motor vehicle in what appears to be a paved parking lot.

12.    Later on or about May 30, 2020, BROWN made the following post to his Snapchat Account, "went to target it was dead headed to downtown."

13.    In the early morning on May 31, 2020, at approximately 1:20 am, Knoxville Police Department ("KPD") Officers responded to a civil disorder in the Market Square area in downtown Knoxville, Tennessee. Market Square is a pedestrian mall that contains offices, several retail shops, restaurants, and entertainment venues. Some participants in the civil disorder vandalized the offices, retail shops, and restaurants in Market Square, resulting in the damage of property.

14.    According to a police report, KPD Officers observed BROWN tell a group of approximately 80 individuals to stay together when the riot begins. KPD Officers issued several warnings for the crowd to disperse.

15.    Approximately an hour later, KPD Officers observed BROWN return to Market Square and begin vandalizing flower pots in front of various retail locations throughout Market Square. KPD Officers followed BROWN to the corner of Gay Street and Union Avenue. While at that location, KPD Officers observed BROWN pick up a trash can lid filled with an unknown

5

liquid and strike another KPD Officer in the head.  The KPD Officer was sitting in a marked

police vehicle.

16.     BROWN then attempted to flee the area but was ultimately arrested by KPD

Officers and charged with state crimes of assault, disorderly conduct, evading arrest, resisting

arrest, and inciting to riot.

## **CONCLUSION**

17.     Based on the foregoing, I respectfully submit that there is probable cause to

believe that, within the Eastern District of Tennessee, BROWN has violated Title 18, United

States Code, Sections 2101 (Riots) and 231 (a)(3) (Civil Disorder).

Respectfully submitted,

Mollie G. Treadway
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on June 4, 2020:

United States Magistrate Judge

6

Case 2:18-cr-00759-CJC  Document 281-28  Filed 01/15/24  Page 35 of 277  Page ID
#:2681
Case 1:15-cr-00400-ELH  Document 8  Filed 09/15/15  Page 1 of 1

sw/USAO# 2015R00421

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

2015 SEP 15  PM 4: 15

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO.  ELH 15-0400 |
| v. | * | |
| | * | (Rioting, 18 U.S.C. § 2101(a)(2)) |
| RAYMON CARTER, | * | |
| Defendant | * | |

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

\*\*\*\*\*\*

**INFORMATION**

**COUNT ONE**

The United States Attorney for the District of Maryland charges that:

On or about April 27, 2015, in the District of Maryland, the defendant,

**RAYMON CARTER,**

used a facility of interstate and foreign commerce with intent to participate in and carry on a riot,

as defined in Title 18, United States Code, Section 2102(a), and during the course of such use,

and thereafter, performed and attempted to perform an overt act for the purpose of participating

in and carrying on a riot; *to wit*, the defendant did damage and destroy, by means of fire, the

CVS Pharmacy, located at 2509 Pennsylvania Avenue, Baltimore, Maryland, 21217.

18 U.S.C. § 2101(a)(2)

_____
Rod J. Rosenstein
United States Attorney

Date:  September 15, 2015

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

2017 NOV 7 P 3 20

STEPHEN C. DRIES
CLERK

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

        Case No. 17-CR- **17 - CR - 190**
        [18 U.S.C. §§ 2101(a)(2), 844(i),
        844(h)(1), and 2]

TORONSE CARTER,

        Defendant.

---

## INDICTMENT

---

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

On or about August 13, 2016, in the State and Eastern District of Wisconsin,

**TORONSE CARTER,**

used a facility of interstate commerce to participate in or carry on a riot, as defined in Title 18, United States Code, Section 2102(a), and during the course of such use, performed and attempted to perform an overt act for the purpose of participating in or carrying on a riot; *to wit*: the defendant did maliciously damage, by means of fire, the BP Gas Station, located at 3114 N. Sherman Blvd., Milwaukee, Wisconsin.

    All in violation of Title 18, United States Code, Sections 2101(a)(2) and 2.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about August 13, 2016, in the State and Eastern District of Wisconsin,

**TORONSE CARTER,**

maliciously damaged, by means of fire, the BP Gas Station, located at 3114 N. Sherman Blvd., Milwaukee, Wisconsin, which was in a building used in interstate commerce.

All in violation of Title 18, United States Code, Sections 844(i) and 2.

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about August 13, 2016, in the State and Eastern District of Wisconsin,

### TORONSE CARTER,

knowingly used fire at the BP Gas Station, located at 3114 N. Sherman Blvd., Milwaukee,

Wisconsin to commit a felony prosecutable in a court of the United States, *to wit*: rioting

in violation of Title 18, United States Code, Section 2101(a)(2), as charged in Count One

of this Indictment.

All in violation of Title 18, United States Code, Sections 844(h) and 2.

A TRUE BILL:

FOREPERSON

Date:_____ _11 - 7 - 17_

GREGORY J. HAANSTAD
United States Attorney

AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

United States of America

v.

**MACKENZIE DRECHSLER,**

_____
*Defendants*

Case No. 20-MJ-0675

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about May 30, 2020, in the County of Monroe, in the Western District of New York, **MACKENZIE DRECHSLER** did knowingly and unlawfully commit arson , in violation of Title 18, United States Code, Sections 844(i) and 2 (arson).

This Criminal Complaint is based on these facts:

☒  Continued on the attached sheet.

_____
*Complainant's signature*

ATF SPECIAL AGENT RYAN J. SZWEJBKA
*Printed name and title*

Affidavit and Criminal Complaint submitted electronically by email in .pdf format.  Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim.P. 4.1 and 4(d) on:

Date:  _____June 30_____, 2020

_____
*Judge's signature*

HONORABLE MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State:  Rochester, New York

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

-v-

MACKENZIE DRECHSLER,                                        20-MJ-0675

                    Defendant.

_____

State of New York    )
County of Monroe     )  ss:
City of Rochester    )

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

**RYAN J. SZWEJBKA**, being duly sworn, deposes and says:

1.      I am a Senior Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, & Explosives ("ATF"), and I am assigned to the Rochester, New York Field Office.  Accordingly, I am the kind of Special Agent delineated in Title 18, United States Code, Section 3051.

2.      I am a graduate of the Criminal Investigator School and the ATF National Academy, both located at the Federal Law Enforcement Training Center in Glynco, Georgia. I have been employed as an ATF Special Agent for over 18 years.  As part of my professional experience, I have participated in state and federal investigations involving the illegal possession of firearms, narcotics, and violations of federal laws to include Titles 18 and 26, United States Code and am familiar with various federal arson laws.  Previously, I was

employed by the State of South Carolina as a Probation and Parole Agent for one and one half years.  I earned a Bachelor's of Science Degree from the University of South Carolina (USC) in Criminal Justice in 1996.  I received my Master's Degree from USC in Criminal Justice in 1999.  I have participated in the service of State and Federal search and seizure warrants and have seized or assisted in seizing contraband, including firearms, ammunition, documentary evidence and contraband.

## PURPOSE OF AFFIDAVIT

3.      This affidavit is submitted in support of a criminal complaint which alleges there is probable cause to believe that on or May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial District of New York, the defendant, MACKENZIE DRECHSLER (hereinafter DRECHSLER), did violate Title 18, United States Code, 844(i) and 2 (arson).

4.      The assertions made herein are based upon my personal knowledge and upon information that I have received from this investigation, including to but not limited to the review of police reports and discussions with other law enforcement agents and officers, all of which are true and correct to the best of my knowledge and belief.  Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I know concerning this investigation.  Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that the defendant committed the above-mentioned offenses.  In support thereof, I respectfully state the following:

**PROBABLE CAUSE**

5.      On May 30, 2020, protests were scheduled at the Public Safety Building (PSB),
185 Exchange Boulevard, City of Rochester, Western Judicial District of New York, in
response to the death of George Floyd in Minneapolis, Minnesota.  During the evening, the
protests turned violent resulting in damaged property, looting, and fires.


6.      At the time of the protests, a black 2009 Chevy Impala with New York State
registration ELX-3493 and VIN 2G1WB57N891278013 owned by the New York State
Attorney General's Office (hereinafter "NYS AG CAR") was set on fire.  NYS AG CAR was
parked in the parking lot next to the NYS Attorney General's Office near 144 Exchange
Boulevard, Rochester, County of Monroe, Western Judicial District of New York.  The
vehicle had identifying features displaying it was an official government car.  The vehicle also
had an additional antenna, undercover lights, and a police radio inside the vehicle.  At
approximately 5:57 p.m., surveillance cameras showed a black female wearing grey pants and
a black t-shirt, later identified as DRECHSLER, at the vehicle.  As depicted in the photograph
below, DRECHSLER placed cardboard inside NYS AG CAR and then walked away.
Approximately one minute later, smoke began billowing from the car.  As the fire grew, the
car became engulfed in flames.



7.     A white Ford Focus with New York registration AE5736 and VIN 1FAHP3EN6BW122355 owned by City of Rochester Family Crisis Intervention Team (hereinafter known as "FACIT CAR") was also parked in the vicinity of 144 Exchange Boulevard on the evening of May 30, 2020.  FACIT CAR was marked with City of Rochester logos on the outside of the vehicle and also had City of Rochester license plates.  Photographs captured a black female wearing grey pants and a black t-shirt, later identified as DRECHSLER, and a male in a white t-shirt reaching inside the upside down FACIT CAR. See the below photograph.  Nearby surveillance footage appears to have captured the moment the photograph was taken.  At approximately 6:18 p.m., the surveillance camera shows two

individuals wearing similar clothing and in the same area at the vehicle. At approximately 6:19:08 p.m., the camera shows a male kneel down to take a photograph of the two individuals at the car. At approximately 6:20:30 p.m., FACIT CAR began to smoke and shortly thereafter became engulfed in flames.



8. DRECHSLER's photograph was released to the public in an attempt to identify her. On June 4, 2020 at approximately 3:50 p.m., investigators spoke to DRECHSLER's mother, who identified her daughter at the riot at the Public Safety Building at 185 Exchange Boulevard. At approximately 5:08 p.m., Investigator Matthew Klein of the Rochester Police Department spoke to DRECHSLER via telephone. During the phone conversation, DRECHSLER said she was wearing grey leggings and a black shirt while she was at the riots.

Inv. Klein described a published photograph of her where she was breaking glass and
DRECHSLER confirmed it was a photograph of herself.  DRECHSLER also has several
unique tattoos that are easily identifiable in the surveillance footage, including but not limited
to an AK-47 style assault rifle filled in with a rose pattern on the outside of her left forearm.
Below is a photograph of DRECHSLER after she set fire to one of the vehicles where her
tattoos are visible.



9.      Due to the violence and rioting the night of May 30, 2020, NYS AG CAR and
the FACIT CAR were towed away from the PSB and secured at the city of Rochester's

Equipment Services Facility located at 945 Mount Read Boulevard.  At this location, fire investigators conducted their investigations. After direct examinations and review of supportive video/photographic evidence, fire investigators concluded the damage to the vehicles were incendiary; intentionally set fires, set by human hands.  The fire damage of NYS AG CAR and the FACIT CAR were both a total loss since the cars were engulfed in flames and completely burned.

10.     Based on information provide to me, FACIT CAR is the property of the City of Rochester government.  NYS AG CAR is property of New York State.  The City of Rochester government and New York State government both conduct business in interstate commerce, for instance by purchasing vehicles and other equipment and supplies in interstate commerce.  Additionally, investigators have verified that neither vehicle was manufactured in the state of New York, and therefore affected intestate and/or foreign commerce.

## CONCLUSION

11.    Based upon the above information, I submit that there is probable cause to

believe that on May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial

District of New York, the defendant, MACKENZIE DRECHSLER did commit a violation

of Title 18, United States Code, 844(i) and 2 (arson).

RYAN J. SZWEJBKA
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Affidavit and Criminal Complaint submitted
electronically by email in .pdf format.  Oath
administered, and contents and signature, attested
to me as true and accurate telephonically pursuant to
Fed.R.Crim.P. 4.1 and 4(d) on this 30th day of June        2020.

HON. MARK W. PEDERSEN
United States Magistrate Court Judge

8

20-mj-807 BRT

STATE OF MINNESOTA

                         ss.        AFFIDAVIT OF SARA R. THOMAS

COUNTY OF RAMSEY

I, Sara R. Thomas being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since December 2016. I was previously assigned to ATF Atlanta Field Division's Firearms Trafficking Group, which specialized in criminal investigations related to the movement of firearms from the legal market to the illegal market. Since September 2018, I have been assigned to the ATF St. Paul Field Division, where I am involved in various facets of ATF's enforcement programs. Before I joined ATF, I served as a sworn law enforcement officer with other agencies and departments, holding this title since 2007.

2. During my time with ATF, I have investigated multiple cases falling within ATF's Arson and Explosives jurisdiction. I have received a significant amounts of training on the subject-matter over which the ATF holds jurisdiction. This training included four weeks at the ATF National Academy and over four weeks of separate training on ATF's Arson and Explosives mission. Additionally, I have participated in advanced explosives training at the National Center for Explosives Training Research (NCETR) in Huntsville, Alabama, which focused on improvised explosives devices. I have further attended advanced explosives training at New

Mexico Tech Energetic Materials Research and Training Center, which focused on homemade explosives and various responses to a variety of bombing incidents.

3.     The facts in this affidavit are based on my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not set forth all of my knowledge about this matter.

4.     This affidavit is being submitted in support of the criminal complaint for VICTOR DEVON EDWARDS (DOB: XX/XX/1989).[1]  Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that EDWARDS has aided and abetted the commission of arson in violation of 18 U.S.C. § 844(i) (arson) and 18 U.S.C. § 2 (aiding and abetting).

## FACTS ESTABLISHING PROBABLE CAUSE

*Case History*

5.     On August 26, 2020, Minneapolis experienced arson, rioting, and vandalism of numerous business.  The arson, rioting, and vandalism was, in part, a response to the death by suicide of a suspect in a homicide that occurred at approximately 2:00 p.m. on the same date.  When officers approached the suspect at approximately 6:30 p.m., he committed suicide on the 800 block of Nicollet Mall in downtown Minneapolis.

---

[1] I have partially redacted the dates of birth of person(s) listed herein pursuant to local rules. The full dates of birth are known to me and will be made available to the Court on request.

6.     The arson, rioting, and vandalism that followed was concentrated in downtown Minneapolis, particularly in the Nicollet Mall area.  One of the businesses set on fire was the Target Headquarters building, located at 1000 Nicollet Mall.

***EDWARDS Presence in Downtown Minneapolis Prior to the Target Arson***

7.     Hennepin County Sheriff's Office Criminal Information Analyst Nicole Hughes informed me that Saks Fifth Avenue, located at 600 Nicollet Mall, was broken into on August 26, 2020, and was heavily vandalized and looted.  Twitter video from "Courtney Godrey, Fox 9 - Twitter" recorded on August 26, 2020, showed EDWARDS and others standing outside of Saks Fifth Avenue while the store was being looted.  EDWARDS was wearing a dark colored shirt with a white design, a dark colored hat with a unique logo, and dark shorts.  The video was timestamped 9:24 p.m. *See* https://twitter.com/courtneygodfrey/media?lang=en.



8.     While EDWARDS was waiting outside the Saks Fifth Avenue store,  an individual later identified as Shador Tommie Cortez Jackson[2] was inside stealing

---

[2] I arrested Jackson for committing Arson pursuant to a federal complaint on September 10, 2020. (*See* Docket No. 20-mj-681 (TNL)).

merchandise from the store. The store surveillance footage showing Jackson looting the store was timestamped 9:21 p.m. Following the looting, Jackson fled the store.



9.     Analyst Hughes also provided me with a Facebook video related to this investigation of EDWARDS. The video shows the individuals that I identified as EDWARDS and Jackson in downtown Minneapolis on August 26, 2020, at approximately 10:40 p.m., shortly before the arson that occurred at the Target Headquarters building a few blocks away.

10.     The video was posted by Facebook user "Raheem Checkabag Martin," and streamed live on August 26, 2020, starting at 10:33 p.m. The user name "Raheem Checkabag Martin" was identified as Dearlo Martin. The associated link to the video was https://www.facebook.com/dearlo.martin/videos/3341123979281513. Analyst Hughes recorded the video as it was streamed live.

11.     The beginning of the Facebook live video was timestamped 10:33 p.m., and filmed by Martin while he was standing at the intersection of 10th Street and 2nd Avenue in downtown Minneapolis.  Martin was standing across from the

Ruth's Chris Steak House, 920 2nd Avenue South, as the restaurant was being looted. Martin commented that numerous people had broken into the restaurant and were stealing items. Martin then commented, "they gonna start blowing that bitch down." Two loud noises were heard. Martin stated, "they just shot some shit. That's 12."[3]

12. At five minutes and forty-seven seconds into the video, at approximately 10:39 p.m. based on the timestamp, a group of unidentified individuals ran towards the camera. Several individuals had liquor or wine bottles. An unidentified black female wearing a red sweatshirt was limping and two unidentified individuals helped her across 10th Street. EDWARDS and Jackson walked closely behind the female.



13. Once the group crossed 10th Street, they hid around the corner of a building at the intersection of 2nd Avenue. EDWARDS was standing next to Jackson, looking towards the street. Martin said, "She got hit with a rubber bullet."

---

[3] Based on my training and experience, I understand "12" to refer to law enforcement.

14.   EDWARDS and Jackson then walked to the corner of the building and looked west on 10th Street, towards the direction of law enforcement.  EDWARDS and Jackson appeared to be angry while speaking with each other.



15.   After speaking with EDWARDS, Jackson yelled, "Who got a bottle? They coming. Give me a bottle! Give me a bottle!" An unidentified individual handed Jackson a glass bottle.  Liquid splashed out of the bottle.

16.   Martin said, "He [Jackson] goin' crazy. He about to throw a bottle at the n---. At the police!"  The crowd started yelling, "12. Get out!"  Martin then ran away from Jackson, and bottles were heard shattering.  Several loud noises were heard, and then Martin stated, "they shooting them bitches."  Martin indicated that law enforcement was using less-than-lethal methods to control the crowd.  Martin then stated that law enforcement had saturated the area.

17.   EDWARDS, Jackson, and other members of the group fled, running south on 2nd Avenue.  Martin continued to record in the area and did not follow them.

*The Target Headquarters Arson*

18.     At approximately 10:55 p.m., approximately three blocks away, Target surveillance video showed Jackson use a "Sidewalk Closed" construction sign to break through one of the glass doors into the Target Headquarters building. The door was located on 10th Street South between LaSalle Avenue and Nicollet Mall. A second unidentified individual broke into the second door, allowing access into the building. EDWARDS and other individuals then followed Jackson into the building.

19.     Target surveillance video, taken from inside the store, then showed Jackson place a white article of clothing around his head. Once inside, EDWARDS spoke with Jackson while standing directly next to him inside the store.



20.     Target surveillance video showed that both EDWARDS and Jackson then went through a second door and together entered into the Target Headquarters mailroom.

7

**Exhibit RR - Page 53 of 276**

21.    Jackson set a fire on a counter inside of the mailroom at approximately 10:57 p.m.



22.    As Jackson set the fire, EDWARDS walked towards him from a few feet away.



23.    At 11:57:58 p.m., Jackson attempted to light a second fire on top of cardboard boxes.  Jackson had a lighter in his right hand and a bottle of ignitable liquid in his left hand.

8



24.     On October 27, 2020, I, together with ATF Special Agent Certified Fire Investigator (SACFI) Nicole Hajny, reviewed video surveillance provided by Target Headquarters Security. The video surveillance contained footage from multiple camera angles on the interior and exterior of Target Headquarters. The footage shows that at 10:58:34 p.m., EDWARDS exited the loading dock and walked over to the first fire set by Jackson.  At 10:58:56 p.m., EDWARDS appeared to hold a container above the flame with his left hand. The container was tilted in a diagonal manner, consistent with a pouring or squirting motion. After EDWARDS' movement with his left hand towards the fire, the video shows the fire appear to grow in both size and intensity.  As EDWARDS walked away from the fire, his hat, shirt, and mask were illuminated by the fire.

25.     At approximately 11:02 p.m., Target surveillance video showed EDWARDS and Jackson run out of the building together, using the same door, and head southeast on 10th Street toward Nicollet Mall.

26.     At approximately 11:02 p.m., Minneapolis city surveillance video showed EDWARDS and Jackson walking southeast on 10th Street toward the 1000 block of Nicollet Mall. EDWARDS and Jackson stopped and looked into the main Target entrance door located at 1000 Nicollet Mall, in the direction of the fire, multiple times.   EDWARDS and Jackson then continued walking southeast on 10th Street toward Nicollet Mall.





27.     At 11:04 p.m., EDWARDS and Jackson walked south on Nicollet Mall, next to the Target Headquarters' building.  They looked into the Target Headquarters building again, toward the location of the fire, and continued walking south on Nicollet Mall.

28.     EDWARDS and Jackson were seen several more times over the next three minutes walking together past the Target headquarters' building doors. They repeatedly looked at the building, towards the direction of the fire.





29.     At approximately 11:29 p.m., city surveillance cameras showed EDWARDS and Jackson near the intersection of 11th Street South and Nicollet Mall. Jackson was seen next to a white Ford Explorer with Minnesota license plate number ERG561. City surveillance cameras then showed EDWARDS exit the

driver's side of a black Ford Taurus, bearing the Minnesota license plate number BLV626, which was parked directly behind the Explorer. EDWARDS and Jackson talked in the street, and then Jackson pointed an object towards the Ford Explorer. The lights of the Explorer flashed in the way that vehicle lights flash when a keyless entry remote is used to unlock a vehicle. Jackson then opened the Explorer's driver's door, reached into the Explorer, got out of the Explorer, and used the keyless entry remote (signified by the same flashing of the vehicle's lights) to lock the Explorer. EDWARDS returned to the Ford Taurus and got into the driver's seat. Jackson then entered the Ford Taurus with EDWARDS, and together they drove away in the vehicle.



***The Identification of EDWARDS***

30.     I queried Minnesota license plate number BLV626—the license number associated with the black Ford Taurus that EDWARDS and Jackson were seen driving away in on the evening of the Target Headquarters arson—through law

enforcement databases and determined that was the license plate number was registered to Community Invested Rental Cars in Minneapolis.

31.    On September 21, 2020, ATF Special Agents Dave Voth and Bryan Lervoog interviewed the owner of Community Invested Rental Cars. The owner indicated that the Ford Taurus bearing the Minnesota license plate number BLV626 was rented by Dernesha Holliday for her boyfriend, EDWARDS.  The owner stated that EDWARDS had been using the vehicle since July 2020, and that EDWARDS was still actively making payments using a phone application called "Cash App."  The owner stated that the driver of the vehicle's Cash App name was "Victor" (EDWARDS' first name) and the user name was "$BigGeneral7414."

32.    Also on September 21, 2020, Analyst Hughes queried the Minnesota Crime Information System (MNCIS) / Odyssey Assistant and determined that the Brooklyn Park Police Department conducted a traffic stop on a black 2015 Ford Taurus bearing the Minnesota license plate BVL626 on July 9, 2020, at 10:58 p.m. The driver of the vehicle was EDWARDS.  EDWARDS was arrested for providing a false name to law enforcement (Minn. Stat. § 609.506.1) and for driving on a suspended license (Minn. Stat. § 171.24.5).  I obtained a copy of Incident Report number 2020-00028530 associated with the traffic stop.

33.    Analyst Hughes obtained a photograph of EDWARDS from Hennepin County Repository of Arrest Photos.  According to the booking photograph, EDWARDS was 5'06" and weighed 135 lbs.  The photograph and booking information

13

**Exhibit RR - Page 59 of 276**

are consistent with the profile of EDWARDS as captured in surveillance through this investigation.



34.    Analyst Hughes queried the Hennepin County Jail Management System and determined that Dernesha Holliday was listed as a friend on EDWARDS' jail contact list.

35.    Analyst Hughes queried Minneapolis Police Department PIMS records related to EDWARDS.  EDWARDS listed Jackson as a sibling.  Minneapolis Police Department records additionally identified Dernesha Holliday as EDWARDS' girlfriend.

***Social Media Posts Corroborating EDWARDS' Identification***

36.    I am aware from my investigations into crimes committed during the riots that followed the death of George Floyd in late May 2020 and the suicide of the homicide suspect in August 2020 that numerous people both recorded and live-streamed videos of themselves committing criminal acts and posted those videos

to social media platforms, including Facebook. Additionally, many people commented and shared information about their criminal acts with other users. Beyond strictly social posts, Facebook also was a frequently used platform in which individuals participating in these riots showed off their destructive actions to associates and other like-minded individuals. Facebook served as a means for people to communicate with others while the riots were in progress to discuss where and how law enforcement resources were deployed so as to be avoided or targeted, the status of the protests, other businesses in both Minneapolis and St. Paul that could be targeted for looting or fires, as well as the status of buildings that had already been set on fire.

37. In addition to the sharing of media and comments, social media platforms served as a platform for communication for participants in the riots. Based on my training and experience, I know that Facebook users often use the Facebook messaging feature and video calling function to communicate with other associates. Some users utilize these features to communicate before and during criminal activity because they believe they are more secure than text messages or phone calls.

38. Based on my training and experience, I know that users often communicate spur of the moment thoughts on social media platforms such as Facebook that can provide insight into an individual's mindset and frame of mind at a particular moment in time.

39. Analyst Hughes conducted a search of social media and located a Facebook profile for EDWARDS at https://www.facebook.com/devon.edwards.9235. The name associated with the account was "Devon Edwards."

40.    Analyst Hughes located a picture of EDWARDS holding a black t-shirt with a white logo, posted by Facebook user "Devin Woods" on July 22, 2020, as shown below.  The Facebook post noted "with Devon Edwards" in the posting description.



41.    The shirt in the above photograph appears visually identical to the distinctive shirt worn by EDWARDS a month later on the night of the arson, August 26, 2020, as shown below.



42.    The Facebook picture above also showed a portion of a black vehicle.  The black vehicle was visually consistent with the black 2015 Ford Taurus that

EDWARDS was using based on a rental from Community Invested Rental Cars, that was seen on city video camera surveillance on the night of the arson, as shown below:



43. I also reviewed EDWARDS' Facebook account and located a photograph posted by EDWARDS on August 18, 2020. The picture shows EDWARDS wearing a hat with a unique logo, visually similar to the hat worn by EDWARDS on the night of the arson on August 26, 2020, as shown in the below pictures.





44.    I located a photograph posted by EDWARDS on June 12, 2020, of himself standing in front of a vehicle. The vehicle was visually consistent with the black 2015 Ford Taurus that EDWARDS was using based on a rental from Community Invested Rental Cars, that was seen on city video camera surveillance on the night of the arson on August 26, 2020.  The vehicle was also identical in make, model, year, and color.



45.     I located a photograph posted by EDWARDS on May 20, 2020. The photograph depicted a Cash App profile account with the name "Victor" and user name "$BigGeneral7414," as shown in the below photograph:



46.     The profile account matched the Cash App account of the individual paying for the 2015 Ford Taurus (Minnesota license plate number BVL626) rented from Community Invested Rental Cars that was used on the night of the arson:



19

*The Arson Determination by the Minneapolis Fire Department*

47.    On August 27, 2020, ATF Special Agent Certified Fire Investigator (SACFI) Nicole Hajny and Minneapolis Fire Department Investigator Larry Oker examined the fire scene located at 1000 Nicollet Mall.  At the time of the initial fire scene examination, Investigator Oker identified a single area of origin as the center of a desktop near the mailroom entrance:



This is the location at which Jackson was seen on Target surveillance video starting a fire and where EDWARDS was observed adding additional fuel to the fire, suspected to be an ignitable liquid, which caused the fire to grow in size and intensity. Investigator Oker additionally noted forced entry and numerous broken windows to the structure that occurred during the civil unrest around the time of the fire. Investigator Oker classified the fire as "incendiary" (i.e. arson).

48.    Following subsequent review of the Target surveillance video footage, investigators identified a second area of origin of fire inside the building.  After reviewing the surveillance video, investigators determined that a third individual attempted to set a second fire inside the building front entrance vestibule area.  The

second fire is still under investigation but likely did not involve EDWARDS or Jackson.

49.     Initial estimates put the fire, smoke, and water damage to the building at approximately $900,000.

**_The Target Headquarters Building and Interstate Nexus_**

50.     Target Corporation is a large corporation with its corporate headquarters in Minneapolis, Minnesota. Target has numerous retail outlets throughout the United States. Target sources some of its inventory from outside the United States, including Guatemala, China, and India.

51.     Target corporate headquarters is located in two adjacent buildings, Target Plaza South and Target Plaza North. The buildings are connected via skyway. The buildings cover two city blocks, and extend to the area of 10th Avenue South and LaSalle Avenue. A Target retail store is located one block away on 9th Avenue, which also can be reached via skyway. That retail store was looted during the civil unrest described above.

52.     The mailroom, where the fire started, receives a high volume of mail and merchandise samples from vendors. These samples are provided to employees, housed in Target Headquarters, for evaluation to determine whether those items will be sold in Target retail stores.

53.     Furthermore, Target stock is traded on major U.S. stock exchanges. In short, Target Headquarters in Minneapolis is a building used in interstate and foreign commerce and in activities affecting interstate and foreign commerce.

*Jackson's Arrest and Federal Complaint*

54.     Jackson was arrested and charged with Arson by federal complaint on September 10, 2020. *See United States v. Jackson*, 20-mj-681 (TNL). Jackson was ordered detained pending trial following a detention hearing on September 16, 2020. On October 6, 2020, and November 2, 2020, the Court granted a continuance to allow the parties to negotiate a plea resolution. (*See* Docket Nos. 15 & 17.) Since Jackson's arrest, I have continued the investigation and believe that EDWARDS aided and abetted Jackson in the arson at Target Headquarters.

## CONCLUSION

55.     Based on these facts, I believe there is probable cause that EDWARDS has violated Title 18, United States Code, Sections 2 and 844(i), in that he aided and abetted Jackson in maliciously damaging by means of fire the Target Headquarters building located at 1000 Nicollet Mall, Minneapolis, Minnesota, a building used in interstate commerce.

Further Your Affiant Sayeth Not.

Sara R. Thomas
ATF Special Agent

SUBSCRIBED and SWORN to before me by reliable
electronic means (FaceTime and email) pursuant to
Fed. R. Crim. P. 41(d)(3) on this 4th day of November, 2020.

The Honorable Becky R. Thorson
United States Magistrate Judge

22

AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

## for the
### Western District of New York

**United States of America**

v.

Case No. 20-MJ- 680

**MARQUIS FRAISER,**

_____

*Defendants*

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about May 30, 2020, in the County of Monroe, in the Western District of New York, **MARQUIS FRAISER** did knowingly and unlawfully commit arson , in violation of Title 18, United States Code, Sections 844(i) and 2 (arson).

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim.P. 4.1 and 4(d) on:

**ATF SPECIAL AGENT RYAN J. SZWEJBKA**
*Printed name and title*

Date: June 30, 2020

_____
*Judge's signature*

City and State:  Rochester, New York

**HONORABLE MARK W. PEDERSEN**
**UNITED STATES MAGISTRATE JUDGE**
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

-v-

                                                      20-MJ-680

MARQUIS FRASIER,

                Defendant.
_____

State of New York  )
County of Monroe  )  ss:
City of Rochester   )

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

**RYAN J. SZWEJBKA**, being duly sworn, deposes and says:

1.    I am a Senior Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, & Explosives ("ATF"), and I am assigned to the Rochester, New York Field Office.  Accordingly, I am the kind of Special Agent delineated in Title 18, United States Code, Section 3051.

2.    I am a graduate of the Criminal Investigator School and the ATF National Academy, both located at the Federal Law Enforcement Training Center in Glynco, Georgia. I have been employed as an ATF Special Agent for over 18 years.  As part of my professional experience, I have participated in state and federal investigations involving the illegal possession of firearms, narcotics, and violations of federal laws to include Titles 18 and 26, United States Code and am familiar with various federal arson laws.  Previously, I was

employed by the State of South Carolina as a Probation and Parole Agent for one and one
half years.  I earned a Bachelor's of Science Degree from the University of South Carolina
(USC) in Criminal Justice in 1996.  I received my Master's Degree from USC in Criminal
Justice in 1999.  I have participated in the service of State and Federal search and seizure
warrants and have seized or assisted in seizing contraband, including firearms, ammunition,
documentary evidence and contraband.

## PURPOSE OF AFFIDAVIT

3.     This affidavit is submitted in support of a criminal complaint which alleges
there is probable cause to believe that on or May 30, 2020, in the City of Rochester, County
of Monroe, Western Judicial District of New York, the defendant, MARQUIS FRAISER
(hereinafter FRAISER), did violate Title 18, United States Code, 844(i) and 2 (arson).

4.     The assertions made herein are based upon my personal knowledge and upon
information that I have received from this investigation, including to but not limited to the
review of police reports and discussions with other law enforcement agents and officers, all of
which are true and correct to the best of my knowledge and belief.  Since this affidavit is being
submitted for a limited purpose, I have not included each and every fact that I know
concerning this investigation.  Rather, I have set forth only those facts that relate to the issue
of whether probable cause exists to believe that the defendant committed the above-
mentioned offenses.  In support thereof, I respectfully state the following:

**PROBABLE CAUSE**

5.      On May 30, 2020, protests were scheduled at the Public Safety Building (PSB), 185 Exchange Boulevard, City of Rochester, Western Judicial District of New York, in response to the death of George Floyd in Minneapolis, Minnesota.  During the evening, the protests turned violent resulting in damaged property, looting, and fires.

6.      At the time of the protests, a 32 foot by 8 foot mobile office made by the Penn Lyon Homes Company with serial #MDS-291649 (hereinafter MOBILE OFFICE) was set on fire.  The MOBILE OFFICE was located in the parking lot at the corner of Court Street and Exchange Boulevard, City of Rochester, Western Judicial District of New York.  Michels Corporation, 1775 East Shady Lane, Neenah, Wisconsin, had rented the MOBILE OFFICE from ModSpace, 145 Canada Drive, East Syracuse, New York, for a construction project. The MOBILE OFFICE contained work equipment, tools, a printer, camera, and wi-fi device, among other items.

7.      Facebook Live video footage posted by an individual with the initials W.G. shows a fire was started inside the MOBILE OFFICE at approximately 1 hour 40 minutes and 50 seconds into the Live video.  Specifically, the video shows a box inside the trailer on fire.  At approximately 1 hour 41 minutes and 40 seconds into the video, a shirtless black male with a shirt over his shoulder, wearing cropped jeans, a black hat and black sneakers appears holding a bottle with rag coming from the top.  The bottle was later determined to be a Molotov cocktail.  See the photograph below.  The male then walked up the steps of the trailer and the video pans away.  The male was later identified as FRASER.



8. Additional Facebook video posted by an individual with the initials Q.M. also shows FRAISER with the Molotov cocktail. The video shows FRAISER walk up the steps of the MOBILE OFFICE, throw something inside, and immediately run down the steps. Blue light camera footage shows the events from a distance. At approximately 6:28:10 p.m., FRAISER walked up to the trailer steps, quickly runs back down the steps, and people begin to scatter from the MOBILE OFFICE. About three to four minutes later, the MOBILE OFFICE began to smoke and by approximately 6:36:30 p.m. flames are visible.

9.      On June 22, 2020 at approximately 8:45 a.m., FRAISER arrived at the PSB. Investigators met him in the lobby and when asked what he was doing at the PSB, FRAISER said "I am turning myself in.  I was at the riots down here."  FRAISER was escorted to an interview room and advised of his <u>Miranda</u> rights.  After indicating he understood his rights he agreed to waive them and speak with investigators.  During the interview, FRAISER admitted that he was at the PSB when the riots occurred on May 30, 2020.  He further admitted to spray painting, smashing out windows of a truck, breaking glass for the back entrance doors of the Court Exchange Building located at 144 Exchange Boulevard, and stealing beverages out of vending machines inside the building.  FRAISER also admitted to having a Molotov cocktail that he attempted to light but was unsuccessful.  He described the Molotov cocktail as a Cuervo tequila bottle that contained 1/3 tequila and a dish rag. FRAISER told the investigators that he threw the Molotov cocktail inside the back window of the trailer and that there was already a fire inside the trailer when he threw it.   Based upon my training and experience, alcohol is an accelerant that when added to an already lit fire will speed up the burning process.  Because the glass bottle contained an accelerant and had a wick, it is considered a Molotov cocktail.   FRAISER identified himself in several still photographs from the riots including the one below.



10.    The MOBILE OFFICE was completely burned along with combustibles located within that were placed inside by rioters including FRAISER.    After direct examinations and review of video/photographic evidence, fire investigators concluded the damage to the MOBILE OFFICE was an incendiary, intentionally set fire, set by human hands.  The below photograph depicts the damage to the MOBILE OFFICE.



11.     Based on information provided to me, the MOBILE OFFICE is the property of the ModSpace, 145 Canada Drive, East Syracuse, New York.  ModSpace is a subsidiary of Willscott Corporation and has offices in the United States and Canada.  Michels Corporation, a company head quartered in Wisconsin, had rented the MOBILE OFFICE to conduct business in Rochester, New York.  Therefore, both companies conduct business in and affecting interstate commerce.

## CONCLUSION

12.    Based upon the above information, I submit that there is probable cause to

believe that on May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial

District of New York, the defendant, MARQUIS FRAISER did commit a violation of Title

18, United States Code, 844(i) and 2 (arson).

RYAN J. SZWEJBKA
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Affidavit and Criminal Complaint submitted
electronically by email in .pdf format.  Oath
administered, and contents and signature, attested
to me as true and accurate telephonically pursuant to
Fed.R.Crim.P. 4.1 and 4(d) on this 30th day of June        2020.

HON. MARK W. PEDERSEN
United States Magistrate Court Judge

**Exhibit RR - Page 77 of 276**

E-FILED
Thursday, 04 June, 2020  03:39:37 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,      )
                                )
                    Plaintiff,  )
                                )
vs.                             )      CASE NUMBER: 20-
                                )
                                )      FILED UNDER SEAL
Ca'Quintez Gibson,              )
                                )
                    Defendant.  )

## CRIMINAL COMPLAINT
### (Inciting a Riot)

I, Kurt Bendoraitis, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

On or about May 31, 2020, at Peoria, in the Central District of Illinois and elsewhere,

**Ca'Quintez Gibson,**

defendant herein, using a facility of interstate commerce, including the Internet, did knowingly organize, promote, encourage, participate in, and carry on a riot and during the course of such use of a facility of interstate commerce, thereafter performed any other overt act for the purpose of organizing, promoting, encouraging, participating in and carrying on a riot and committing any act of violence in furtherance of a riot, in violation of Title 18, United States Code, Section 2101.

1

# INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation and have
been since May 14, 2017. As part of my duties, I investigate violations of federal law,
including the online exploitation of children, particularly in relation of violations of
Title 18, United States Code, Sections 1591, 2251, 2252A, and 2422 which criminalize,
among other things, the production, advertisement, possession, receipt, transportation
of child pornography, individuals attempting to persuade, induce, and entice minors to
engage in sexual activity, and underage prostitution. I have gained experience in the
conduct of such investigations and the use of the Internet, Facebook, and other social
media through training in classes and work related to conducting these types of
investigations.   As a federal agent, I am authorized to investigate and assist in the
prosecution of violations of laws of the United States, and to execute arrest warrants
and search warrants issued by federal courts.

2.      The statements contained in this affidavit are based on my personal
knowledge as well as on information provided to me by other law enforcement officers.
This affidavit is being submitted for the limited purpose of securing an arrest warrant,
and I have not included each and every fact known to me concerning this investigation.
I have set forth only the facts that I believe are necessary to establish probable cause to
believe that Ca'Quintez Gibson committed violations of Title 18, United States Code,
Section 2101.

3.

2

## STATUTORY AUTHORITY and TERMS

4.      This investigation concerns violations of Title 18, United States Code,

Section 2101, relating to the intent to incite a riot or to organize, promote, encourage,

participate in, or carry on a riot.

   a.  18 U.S.C. 2101 prohibits anyone from traveling in interstate or foreign
       commerce, or using any facility of interstate of foreign commerce,
       including but not limited to the mail, telegraph, telephone, radio, or
       television with intent

      i.  To incite a riot; or

      ii.  To organize, promote, encourage, participate in, or carry on a riot;
           or

      iii.  To commit any act of violence in furtherance of a riot; or

      iv.  To aid or abet any person inciting or participating in or carrying on
           a riot or committing any act of violence in furtherance of a riot;

      v.  And who either during the course of any such travel or use or
          thereafter performs or attempts to perform any other overt act for
          any purpose specified above.

   b.  The internet is a facility of interstate commerce.

   c.  "Riot" means a public disturbance involving (1) an act or acts of violence
       by one or more persons part of an assemblage of three or more persons,
       which act or acts shall constitute a clear and present danger of, or shall
       result in, damage or injury to the person of any other individual or (2) a
       threat or threats of the commission of an act or acts of violence by one or
       more persons part of an assemblage of three or more persons having,
       individually or collectively, the ability of immediate execution of such
       threat or threats, where the performance of the threatened act or acts of
       violence would constitute a clear and present danger of, or would result
       in, damage or injury to the property of any other person or to the person
       of any other individual.

3

d.  The term "to incite a riot", or "to organize, promote, encourage, participate in, or carry on a riot", includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.

e.  Facebook is a social networking website/application allowing users to post and view videos and pictures, send private messages, join groups with common interests, and add friends.

f.  Facebook also has a feature called "Facebook Live". Facebook Live allows a user to post a live feed video to their page allowing other users to view the live feed and also post comments that are viewable in real time.

## Investigation

5.      On or about May 31, 2020 at approximately 5:15 p.m., Ca'Quintez Gibson posted a Facebook Live video to Facebook utilizing a Facebook Account with display name "Ca'Quintez Gibson Sr". The video was approximately four minutes and 21 seconds long.) The following is a summary of the live feed video: The video is of a black male, approximately 25 to 30 years of age, matching the identification photograph of Ca'Quintez Gibson, DOB REDACTED. Gibson is speaking to the camera during the video feed. During the video, Gibson made the following comments, among others:

- "Y'all gonna see me there. And we ain't with that peaceful shit"

- "I'm not watchin' no other city on motherfuckin' TV. They sent that bitch up. Nigga. Let's send our shit up."

- "Somebody drop a location. Let me know something. Let me know something. Is we at City Fashion (believed to be a clothing store), 6:30? I'm at Northwoods (believed to be a reference to the Northwoods Mall in Peoria) at 9:00."

4

- "You just talking about motherfuckin' hitting up Best Buy (an electronics store). Now we fittin' ta hit that shit nigga. I want to see everybody at that bitch. I'm gonna go into City Fashion at whatever you all talkin' about. 6:30?"

- "All I need is 50 motherfuckers there at Northwoods Mall at 9 o'clock, and we in that bitch. And, and, we in that bitch. Period. And wherever the fuck else you all wanna go."

- "Y'all getter get y'all gear ready. Better get y'all some garbage bags. Y'all better empty out your motherfuckin' trunks. It's going down. The city going up."

- "It's going up tonight. Long as you all at Northwoods Mall, it's going up. Period. 'Cause I know it's more than just me gonna step. Period."

- "Where you all at with the early ones, though? 'Cause mine's at 9:00. Let me know where the early ones' at."

6.     On May 31, 2020 at approximately 9:10 p.m., Gibson conducted another Facebook Live video utilizing a Facebook Account with the display name "REDA CTED REDA CTED " and URL www.facebook.com/REDACTED . The video was approximately three minutes and six seconds long.

7.     The following is a summary of the Facebook Live video: The video is mainly of Gibson sitting in the passenger side of a car and talking to the camera. Gibson asks where everybody is at and states that Gibson is at the Metro Center (a shopping area in Peoria, Il). Gibson states the police are already here because somebody "dropped" the locations. Gibson then yells "Fuck 12" (12 is a slang term for Police). Gibson tells everyone to meet at the Landmark (a recreational complex in Peoria, IL).

5

Flashing police lights are then seen behind the vehicle. The female driver stopped the car. The police officer can be heard on the Facebook Live video asking the female driver for her license and insurance.

8.      On May 31, 2020 at approximately 9:12 p.m., Peoria Police Officer Grice and Sergeant Sinks conducted a traffic stop of a silver Mercury with Illinois License plate REDACTED. The driver was REDACTED and the passenger was Gibson.

9.      On May 31, 2020 at approximately 9:18 p.m., Gibson conducted another Facebook Live video utilizing a Facebook Account with display name "REDACTED". The video was approximately ten minutes and 12 seconds long.

10.     The following is a summary of the Facebook Live video: Gibson was yelling "fuck 12" at the officers conducting the traffic stop. A female voice can be heard stating, "This is why people don't want to participate." Gibson told the officers that you wonder why the world's being burned down because of all the "shit" the officers have been doing. Gibson called the officers racist. At the end of the traffic stop, Gibson stated, "The only thing I want to add is, you're a dick head" and "This is why I want to burn this bitch down." Gibson then continued to ask, "Where y'all at?" Gibson commented that it was "dry" out there and that's why the police were only chasing him. Gibson also commented, "Y'all better burn this motherfucker down". Gibson also asked, "Where y'all at? You ain't trying to protest for shit." Gibson stated they got everything "sewed" out there.

11.     Gibson then directs the camera out the car window. There was a Wendy's and a Target in the background and appeared to be the Wendy's located at 5001 N Big

6

Hollow Road, Peoria, IL 61615. A police vehicle can also be seen. Throughout the video, Gibson asks where everyone was at and telling people to meet at the Landmark. Gibson also made the comment, "And for everybody talking about motherfucking gonna loot the mall, fucking mall, fucking money? Look, I got money. C'mon, man. Nigga's got money. That ain't shit." Towards the end of the video, Gibson stated "They already tore Champaign up" and "I'm not fittin' ta drive all the way to Champaign to tear it up when they already tore it up. Tear this bitch up. Fuck, it's peaceful as hell."

12.     On or about the afternoon of May 31, 2020, Champaign, IL was the site of violent protests and property damage.

13.     On or about May 31, 2020 at approximately 9:35 p.m., Gibson conducted another Facebook Live video utilizing Facebook Account with display name "REDACTED

██████ video was approximately ten minutes and 27 seconds long.

14.     The following is a summary of the Facebook Live video: The video was of Gibson mostly talking to the camera while sitting in the passenger side of a car. Gibson stated multiple times he was giving "y'all" ten minutes to come to the Landmark. Throughout the video, Gibson tells everyone to come to the Landmark and numerous times asks where everyone was at. Gibson panned to the parking lot of the Landmark Recreation Center to show where Gibson was located. Gibson stated he was parked by the offices. Gibson stated he needed 50 people to come out to the Landmark. Gibson tells the camera this is everyone's opportunity. Gibson commented "Tear this bitch up. Period. Send this mother fucker up." Gibson stated there was one car in the parking lot

7

with him. Gibson then panned over to a vehicle running with the lights on in the parking lot.

15.    At approximately eight minutes and two seconds into the video, Facebook User with display name "REDACTE" posted a comment, "Man wya ? What's the move? Let's fuck some shit up". At approximately the nine minute mark into the video, Gibson stated "I'm at the Landmark. That's the move. We gonna meet up here. When everybody get here we gonna discuss that shit. There's too many motherfuckers attack me to the police. Share my shit to the police all that shit. I'm trying to stand up for my motherfucks. Y'all better off going to watch the other cities."

16.    On May 31, 2020, Facebook user with display name "Ca'Quintez Gibson Sr." made the following posts:

- 3:31 p.m. – "Bra y'all letting little ole Champaign out do us?" Attached was a video of groups attempting to break into stores in a strip mall.

- 4:14 p.m. – "PSA !! !! WE FENNA SEND PEORIA UP TONIGHT .. SHARE DIS ..NORTHWOODS MALL AT 9!! !!" (The post was shared 294 times)

- 4:21 p.m. – "IMA GO LIVE AT 9 AND IF DONT NOBODY SHOW UP I DONT WANNA HEAR SHIT ABOUT NO JUSTICE NO PEACE"

- 5:26 p.m. – "SHARE SHARE SHARE NORTHWOODS MALL @9 !! !! !! !! !! !! !! [fist emoji] #SendTheCityUp"

- 6:28 p.m. – "If 12 INFRONT OF ANYTHING WE HITTING THE NTEXT STORE !! !! !! !!" [fist emoji]

- 8:27 p.m. – "MEET UP AT METRO CENTRE @9 ..ONCE ENOUGH PEOPLE ARE THERE I WILL EXPLAIN THE DETAILS !! !! !! !! !! #BlackLivesMatter" [fist emoji]

8

17.     On May 31, 2020 at approximately 7:48 p.m., Facebook User with display name "REDACTED" made a post on Facebook stating, "Yeah they got the mall already policed out @Ca'Quintez Gibson Sr." The following are the comments to the post:

- Ca'Quintez Gibson Sr. – "That's exactly what I wanted." [smiley face emoji] "now we hitting the other stores"

- REDACTED. – "Sir size 11 all black lows" [sideways smiley face emoji]

- Ca'Quintez Gibson Sr. – [smiley face emoji] "gotta come out tonight bro you don't wanna miss this"

- REDACTED: "Bass pro shop" [pondering face emoji]

- Ca'Quintez Gibson Sr. – "Uma drop a meet up location @830 then from dere it's up"

- REDACTED. – "I'm at work blew. Police just came through chase bank on the rooftop they had that mf jukin"

18.     During May 31, 2020 at approximately 9:00PM through June 1, 2020 6:00AM the following events happened in Peoria, IL and reported to the Peoria Police Department:

- There were approximately 27 business burglaries reported, including the following: JB Hawks located at 3723 N Sterling Avenue, Boost Mobile located at 612 Western Avenue, Beauty Empire located at 614 Western Avenue, Target located at 5001 W Glen Hollow, Dollar General located at 4003 SW Adams Street, and Pinnacle Gun and Ammo.

9

- There were approximately 14 criminal damage to property reports, including the following: Shell Gas Station located at 1900 N Knoxville, Bremer's Jewelry located at 4707 N University.

- There were several arson police reports taken, including the following businesses that reported possible arson: Tire King located at 617 W Loucks and Uftring Weston located at 1600 W War Memorial Drive.

19.     On June 1, 2020, Facebook user with display name "Ca'Quintez Gibson Sr." made the following posts:

- 1:13AM 13 a.m. – [smiling emoji with tears] "YEAAAAAA SEND THIS BITCH UP !! !! !! !! !! !! #" [fist emoji]

- 6:28 a.m. – "MISSION #SendPeoriaUp ACOMPLISHED" [flexing bicep emoji] .."I KNEW YALL WOULD ACT A ASS WITH ME YALL JUST NEEDED A LIL PUSH"

10

## Conclusion

20. Based on the foregoing, I submit that there is probable cause to believe that May 31, 2020, **SUBJECT** using a facility and means of interstate commerce, the Internet, to access the Internet, knowingly organized, promoted, encouraged, participated, in or carry on a riot in violation of 18 U.S.C. 2101.

FURTHER AFFIANT SAYETH NOT. REDACTED

_____

Kurt Bendoraitis, FBI Special Agent

Sworn and subscribed to me telephonically pursuant to Fed. R. Crim. P. 41(d)(3) and Rule 4.1 this 2nd day of June, 2020 at _____ (Central Standard Time).

Sworn and subscribed to before me this ____ day of June 2020.
REDACTED

JONATHAN HAWLEY, Magistrate Judge

United States District Court

11

AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

## for the
### Western District of New York

| | |
|---|---|
| **United States of America** | |
| **v.** | Case No. 20-MJ-0682 |
| **JAVON HARDY,** | |
| *Defendant* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about May 30, 2020, in the County of Monroe, in the Western District of New York, **JAVON HARDY,** did knowingly and unlawfully commit arson , in violation of Title 18, United States Code, Sections 844(i) and 2 (arson).

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

ATF SPECIAL AGENT STACEY L. HULL
*Printed name and title*

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim.P. 4.1 and 4(d) on:

Date: July 8 , 2020

_____
*Judge's signature*

HONORABLE MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State: Rochester, New York

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA


-v-

20-MJ-0682

JAVON HARDY,

        Defendant.
_____

State of New York  )
County of Monroe  )  ss:
City of Rochester  )

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

**STACEY L. HULL**, being duly sworn, deposes and says:

1.    I am a Senior Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, & Explosives ("ATF"), and I am assigned to the Rochester, New York Field Office.  Accordingly, I am the kind of Special Agent delineated in Title 18, United States Code, Section 3051.


2.    I am a graduate of the Criminal Investigator School and the ATF National Academy, both located at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have been employed as an ATF Special Agent for approximately four years.  As part of my professional experience, I have participated in state and federal investigations involving the illegal possession of firearms, narcotics, and violations of federal laws to include Titles 18 and 26, United States Code and am familiar with various federal arson laws.  Previously, I was

employed by the Town of Gates Police Department in Rochester, New York for approximately six years.  I earned a Master of Arts Degree in Forensic Psychology from the Chicago School of Professional Psychology in 2014.  I also received a Bachelor's Degree in both Psychology and Criminal Justice from Roberts Wesleyan College in 2009.  I have participated in the service of state search and seizure warrants and have seized or assisted in seizing contraband including firearms, ammunition, documentary evidence, and contraband.

### PURPOSE OF AFFIDAVIT

3.     This affidavit is submitted in support of a criminal complaint which alleges there is probable cause to believe that on or May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial District of New York, the defendant, JAVON HARDY (hereinafter HARDY), did violate Title 18, United States Code, 844(i) and 2 (arson).

4.     The assertions made herein are based upon my personal knowledge and upon information that I have received from this investigation, including to but not limited to the review of police reports and discussions with other law enforcement agents and officers, all of which are true and correct to the best of my knowledge and belief.  Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I know concerning this investigation.  Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that the defendant committed the above-mentioned offenses.  In support thereof, I respectfully state the following:

## **PROBABLE CAUSE**

5.      On May 30, 2020, protests were scheduled at the Public Safety Building (PSB), 185 Exchange Boulevard, City of Rochester, Western Judicial District of New York, in response to the death of George Floyd in Minneapolis, Minnesota.  During the evening, the protests turned violent resulting in damaged property, looting, and fires.

6.      At the time of the protests, a 32 foot by 8 foot mobile office made by the Penn Lyon Homes Company with serial #MDS-291649 (hereinafter MOBILE OFFICE) was set on fire.  The MOBILE OFFICE was located in the parking lot at the corner of Court Street and Exchange Boulevard, City of Rochester, Western Judicial District of New York.  Michels Corporation, 1775 East Shady Lane, Neenah, Wisconsin, had rented the MOBILE OFFICE from ModSpace, 145 Canada Drive, East Syracuse, New York, for a construction project. The MOBILE OFFICE contained work equipment, tools, a printer, camera, and wi-fi device, among other items.

7.      Facebook Live video footage posted by an individual with the initials W.G. shows a male in a black hoody with a blue bandana on his face carrying a milk jug at the back door of the trailer.  See the photograph below.  The male was later identified as HARDY.  At approximately 1 hour 40 minutes and 50 seconds into the Live video, HARDY walks down the trailer steps and yells "Let that bitch burn" and "If it's not on fire, I didn't do my job." The video then shows a fire burning inside the MOBILE OFFICE.  Blue light camera footage shows the events from a distance occurring at approximately 6:28:00 p.m.  About three to

four minutes later, the MOBILE OFFICE began to smoke and by approximately 6:36:30 p.m. flames are visible.



8. A photograph of HARDY was distributed in an attempt to identify him. Investigators developed HARDY as a suspect based upon a Crime Stopper tip. Upon researching HARDY, investigators learned that he posted an approximately 36 minute live video on Facebook admitting to being at the riots. During his live video he also held up a blue bandana that he was wearing during the incident. See the photograph below. The bandana appeared to be the same bandana as the one depicted in the photograph above.



9.      HARDY was arrested the evening of July 2, 2020.  At approximately 10:58 p.m., RPD Investigator Nicholas Mazzola and Investigator Matthew Klein met with HARDY in an interview room.  HARDY was advised of his <u>Miranda</u> rights and indicated he understood them.  He also agreed to waive his rights and speak with investigators.  During the recorded interview, HARDY admitted to being at the riots on May 30, 2020.  Initially he said he was trying to get people to stop setting property on fire.  However, after the investigators showed HARDY video footage from the incident, he admitted to setting items inside the trailer on fire but said he thought the fire went out.  At approximately 11:54 p.m., HARDY asked Investigator Mazzola, "this is not on the record, right?" and admitted that he went back to the trailer to re-set the fire.  He further admitted that he knew what he was doing was wrong.

10.     The MOBILE OFFICE was completely burned.  After direct examinations and review of video/photographic evidence, fire investigators concluded the damage to the MOBILE OFFICE was an incendiary, intentionally set fire, set by human hands.  The below photograph depicts the damage to the MOBILE OFFICE.



11.     Based on information provided to me, the MOBILE OFFICE is the property of the ModSpace, 145 Canada Drive, East Syracuse, New York.  ModSpace is a subsidiary of Willscott Corporation and has offices in the United States and Canada.  Michels Corporation, a company head quartered in Wisconsin, had rented the MOBILE OFFICE to conduct business in Rochester, New York.  Therefore, both companies conduct business in and affecting interstate commerce.

**CONCLUSION**

12.     Based upon the above information, I submit that there is probable cause to believe that on May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial

District of New York, the defendant, JAVON HARDY did commit a violation of Title 18,

United States Code, 844(i) and 2 (arson).

_Stacey L. Hull_

STACEY L. HULL
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Affidavit and Criminal Complaint submitted
electronically by email in .pdf format. Oath
administered, and contents and signature, attested
to me as true and accurate telephonically pursuant to
Fed.R.Crim.P. 4.1 and 4(d) on this 8 ___ day of July 2020.

_Mark W. Pedersen_

HON. MARK W. PEDERSEN
United States Magistrate Court Judge

FILED 08 FEB '23 16:04 USDC-ORP

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:23-cr-00049-IM |
| v. | INDICTMENT |
| KENNETH GEORGE HAROLD. | 18 U.S.C. § 2101 |
| Defendant. | |

## THE GRAND JURY CHARGES:

### COUNT 1
### (Interstate Riot)
### (18 U.S.C. § 2101)

1.      At all times relevant to the offense alleged in this Indictment, defendant **Kenneth George HAROLD** was an active member of the U.S. Army stationed at Joint Base Lewis-McChord in the State of Washington and resided in the State of Washington. He separated from the Army in May 2022.

2.      "Direct Action" or "DA" is a term often used by individuals engaged in illegal behavior to describe unlawful activity, including violence and interference against law enforcement, property destruction, or vandalism.

**Indictment**                                        **Page 1**

3.      **HAROLD** used facilities of interstate commerce and traveled in interstate

commerce, to incite and participate in riots and acts of violence and property destruction in

Portland, Oregon.

4.      **HAROLD** frequently communicated by text message with others about his intent

to engage in acts of violence and property destruction in Portland, Oregon.

5.      On February 17, 2021, **HAROLD** told a contact by text message that "We need to

break the windows and distract them [law enforcement] again ugh bring back every night god

damn it!"

6.      On February 25, 2021, a contact of **HAROLD** messaged "The cool thing about

Portland is that there are a ton of people that show up so it's easier to perform the type of direct

action I like to do like throwing smoke bombs so that the pigs can see us or I would cut loose

with a mortar fir sure." HAROLD responded, "I totally agree it's way different then Seattle and

so much easier to do da it seems like there!"

7.      On March 10, 2021, **HAROLD** told a contact in Oregon that "I may or may not

have found this new tool too allegedly use on windows I might test Friday night!"

8.      On March 12, 2021, **HAROLD** told another contact "I'm going to try and use the

tool tonight I hope! I feel almost more comfortable doing it in pdx sense things go so crazy here

all the time it's normal." He also wrote "I hope things start to kick up in Seattle soon or we might

have to start going to pdx way more if they don't."

9.      A couple of days later on March 14, 2021, **HAROLD** tells that same contact

"Last night was so fun!! Well I mean after the protest at least!! And finding out the tool worked

as good as it did was amazing too!"

**Indictment**                                                                                    **Page 2**

10.     On March 16, 2021, **HAROLD** sent a message to a contact to whom **HAROLD** had provided the above-mentioned window breaking tool. The contact responded that they handed the tool to another person. **HAROLD** replied "You handed it back to [another contact of **HAROLD**'s] who was on umbrella duty hehe so yea we got it back, hey did you get the window good at least??"

11.     On March 25, 2021, a contact asked **HAROLD** to get spray paint and a hammer. **HAROLD** responded "if you busting out the hammer I'm busting out the tool tonight too lol."

12.     On April 2, 2021, **HAROLD** told a contact "the windows we love to see shattered but it's so easy to replace too. Minneapolis made the biggest impact with burning it down."

13.     On April 19, 2021, **HAROLD** told a contact he was going to Portland. Later that night HAROLD texted "Hey just got back to car! A ton of window decorating but barely and escalation with PPB."

### *The April 20, 2021 Incident*

14.     On April 20, 2021, when discussing the breaking of windows of the Boys and Girls Club in Portland, a contact of **HAROLD**'s in Oregon texted him "they're a slimy non-profit just like the rest." HAROLD responded "I'm happy we got their windows now!"

15.     Earlier that day, that same contact told **HAROLD** "you guys should just smash anything. Every business upholds capitalism. The more destruction the more clearly people realize we're angry and actually mean it." **HAROLD** responded "Yea we did for a long time and now there's nothing barely lol also I really love that about you guys you always smash so many things and it makes sense I get it!" **HAROLD** and that contact then discussed whether **HAROLD** should travel to Portland or Seattle that night.

Indictment                                                                                      Page 3

16.      That same day, **HAROLD** sent a message to another contact that he could make it to Portland but might be late. **HAROLD** added "It's at the justice center I've always wanted to do one of those ones!! Those nights go insane!" **HAROLD** then confirmed he would go to Portland.

17.      On or about April 20, 2021, in the District of Oregon, defendant **Kenneth George HAROLD**, who had traveled in interstate or foreign commerce or had used facilities of interstate or foreign commerce with intent to incite a riot, to participate in or carry on a riot or to commit any act of violence in furtherance of a riot, that is, he traveled from the state of Washington to the state of Oregon and used cellular phones, and during such travel or use or thereafter performed or attempted to perform an overt act for one or more of the purposes specified above, that is, he broke large glass windows of a business located in downtown Portland, Oregon, causing approximately $11,188.43 of damage;

In violation of Title 18, United States Code, Section 2101.

Dated: February ___, 2023.

A TRUE BILL

OFFICIATING FOREPERSON

Presented by:

NATALIE K. WIGHT
United States Attorney

ANDREW T. HO, OSB #185047
Assistant United States Attorney

**Indictment**                                                                                          **Page 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                  21-CR-6100-CJS

RYAN HOWE a/k/a Rylea Autumn,

Defendant.

### PLEA AGREEMENT

The defendant, RYAN HOWE, and the United States Attorney for the Western
District of New York (hereinafter "the government") hereby enter into a plea agreement with
the terms and conditions as set out below.

### I. THE PLEA AND POSSIBLE SENTENCE

1.    The defendant agrees to waive indictment and plead guilty to a one-count
Information which charges a violation of Title 18, United States Code, Section 231(a)(3) (civil
disorder), for which the maximum possible sentence is a term of imprisonment of 5 years, a
fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of 3
years. The defendant understands that the penalties set forth in this paragraph are the
maximum penalties that can be imposed by the Court at sentencing.

2.    The defendant understands that, if it is determined that the defendant has
violated any of the terms and conditions of the defendant's term of supervised release, the
defendant may be required to serve in prison all or part of the term of supervised release, up
to 2 years, without credit for time previously served on supervised release. As a consequence,

in the event the defendant is sentenced to the maximum term of incarceration, a prison term imposed for a violation of supervised release may result in the defendant serving a sentence of imprisonment longer than the statutory maximum set forth in ¶ 1 of this agreement.

## II. ELEMENTS AND FACTUAL BASIS

3.    The defendant understands the nature of the offense set forth in ¶ 1 of this agreement and understands that if this case proceeded to trial, the government would be required to prove beyond a reasonable doubt the following elements of the crime:

First, that a civil disorder existed at the time of the violation;

Second, that such civil disorder obstructed, delayed, or adversely affected, in any way or degree, commerce or the movement of any article or commodity in commerce;

Third, that the one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties incident to and during the commission of such civil disorder;

Fourth, that the defendant attempted to commit an act for the intended purpose of obstructing, impeding, or interfering, either by himself or with someone else, with such law enforcement officer or officers; and

Fifth, that such attempt to act was done willfully and knowingly.

A "civil disorder" is defined as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

2

## FACTUAL BASIS

4.    The defendant and the government agree to the following facts which form the

basis for the defendant's guilty plea including relevant conduct:

a.    On or about September 24, 2020, in the City of Rochester, in the Western District of New York, the defendant, RYAN HOWE a/k/a Rylea Autumn, together with others, attempted to commit acts to obstruct, impede and interfere with any law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed and adversely affected commerce and the movement of any article and commodity in commerce.

b.    During the month of September 2020, there were periods of civil unrest in the City of Rochester in response to incidents involving the deaths of George Floyd and Daniel Prude after encounters with law enforcement officers. There were nights of violent protests that resulted in property damage and looting, and injury to Rochester Police Department (RPD) officers. On September 4, 2020, a group of protesters damaged property and turned over tables at two restaurants, causing numerous patrons to leave. On September 5, 2020, a group of approximately 1,500 protesters blocked an intersection in the City of Rochester for hours, during which time some of the protesters hurled rocks, bottles, lit fireworks, and other objects at police officers, and pointed lasers at police officers, while the police officers were manning metal barricades and engaging in crowd control at the intersection. In addition, one protester struck a police officer in the head with a wooden shield. In connection with the protests on September 5, 2020, law enforcement shut down Exit 14 on Interstate 490 in the City of Rochester for approximately eight hours and the State Street exit on the Inner Loop in the City of Rochester for approximately an hour. On the evening of September 8, 2020, a group of approximately 400 protesters again blocked an intersection in the City of Rochester, and at least one member of the group pointed lasers in the eyes of several police officers who were positioned in the area of the Public Safety Building (PSB). The defendant was not physically present during the protests in Rochester between September 4, 2020, and September 24, 2020, but the defendant was aware of them.

c.    On September 23, 2020, the Kentucky Attorney General announced that a grand jury had declined to indict police officers in relation to the death of Breonna Taylor. In the wake of the Kentucky Attorney General's announcement, several members of the public – including individuals and groups in Rochester – expressed their disagreement with the decision not to charge the officers and declared their intention to

3

protest in the evening on September 24, 2020. Through social media, several of these individuals expressed, in sum and substance, a desire to burn down the City of Rochester. A group of approximately 250 people protested in the streets of Rochester in the evening on September 24, 2020. RPD officers were present at the protest for the purposes of, among other things, ensuring the safety of protesters and the public, and protecting property from damage.

d.    The defendant admits and agrees that the actions of the protesters during the month of September 2020 (including September 24, 2020), constituted a civil disorder within the meaning of 18 U.S.C. § 232(1), and that such civil disorder obstructed, delayed, and adversely affected commerce within the meaning of 18 U.S.C. § 232(2).

e.    On September 23, 2020, the defendant posted a Facebook message, which included a link to an article about the grand jury's decision not to indict certain officers in the Breonna Taylor case and the statement, "Burn this shit to the fucking ground." The next day, on September 24, 2020, the defendant posted a Facebook message, which read, "Good morning to everyone ready to burn this whole fuckin country to the ground!"

f.    On September 24, 2020, at approximately 8:32 a.m., the defendant posted a message on the defendant's Facebook account that consisted of a recipe for a Molotov cocktail and guidance on how to use one against law enforcement officers. Specifically, the Facebook post read as follows:

> 1 part gasoline
> 1 part used motor oil
> 1 part crushed Styrofoam
> Mix until the consistency of a thick paste
> Place in glass containers
> Soak rag in gasoline, tie a knot in the end just big enough to fit through the hole of the bottle, but won't rip out.
> Light wick
> Aim at cop
> Throw

h.    At the time of the Facebook post in ¶ 4(f), law enforcement officers from RPD and other agencies were involved in responding to the civil unrest that was occurring in Rochester. Those law enforcement officers were lawfully engaged in the lawful performance of their official duties, that is, they were engaged in, among other things, protecting protesters and members of the public from physical harm, and property from damage and looting. In making the Facebook post, the defendant intended to

4

induce and cause others to obstruct, impede and interfere with law enforcement officers' efforts to perform those official duties by making and throwing Molotov cocktails at such officers.

## III. SENTENCING GUIDELINES

5.    The defendant understands that the Court must consider but is not bound by the Sentencing Guidelines (Sentencing Reform Act of 1984).

## BASE OFFENSE LEVEL

6.    The government and the defendant agree that Guidelines § 2A2.4(a) applies to the offense of conviction and provides for a base offense level of 10.

## ACCEPTANCE OF RESPONSIBILITY

7.    At sentencing, the government agrees not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines § 3E1.1(a) (acceptance of responsibility), which would result in a total offense level of 8.

## CRIMINAL HISTORY CATEGORY

8.    It is the understanding of the government and the defendant that the defendant's criminal history category is I. The defendant understands that if the defendant is sentenced for, or convicted of, any other charges prior to sentencing in this action the defendant's criminal history category may increase. The defendant understands that the defendant has no right to withdraw the plea of guilty based on the Court's determination of the defendant's criminal history category.

5

## GUIDELINES' APPLICATION, CALCULATIONS AND IMPACT

9.      It is the understanding of the government and the defendant that with a total offense level of 8 and criminal history category of I, the defendant's sentencing range would be a term of imprisonment of **0 to 6 months, a fine of $2,000 to $20,000, and a period of supervised release of 1 to 3 years**. Notwithstanding this, the defendant understands that at sentencing the defendant is subject to the maximum penalties set forth in ¶ 1 of this agreement.

10.      The government and the defendant agree to the correctness of the calculation of the Sentencing Guidelines range set forth above. The government and the defendant, however, reserve the right to recommend a sentence outside the Sentencing Guidelines range. This paragraph reserves the right to the government and the defendant to bring to the attention of the Court all information deemed relevant to a determination of the proper sentence in this action.

11.      The defendant understands that the Court is not bound to accept any Sentencing Guidelines calculations and the defendant will not be entitled to withdraw the plea of guilty based on the sentence imposed by the Court.

12.      In the event the Court contemplates any Guidelines adjustments, departures, or calculations different from those agreed to by the parties above, the parties reserve the right to answer any inquiries by the Court concerning the same.

## IV. **STATUTE OF LIMITATIONS**

13.      In the event the defendant's plea of guilty is withdrawn, or conviction vacated, either pre- or post-sentence, by way of appeal, motion, post-conviction proceeding, collateral attack or otherwise, the defendant agrees that any charges dismissed pursuant to this

6

agreement shall be automatically reinstated upon motion of the government and further agrees not to assert the statute of limitations as a defense to any federal criminal offense which is not time barred as of the date of this agreement. This waiver shall be effective for a period of six months following the date upon which the withdrawal of the guilty plea or the vacating of the conviction becomes final.

## V. REMOVAL

14.     The defendant represents that the defendant is a citizen of the United States. However, if the defendant is not a citizen of the United States, the defendant understands that, if convicted, the defendant may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## VI. GOVERNMENT RIGHTS AND RESERVATIONS

15.     The defendant understands that the government has reserved the right to:

a.      provide to the Probation Office and the Court all the information and evidence in its possession that the government deems relevant concerning the defendant's background, character and involvement in the offense charged, the circumstances surrounding the charge and the defendant's criminal history;

b.      respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government;

c.      advocate for a specific sentence consistent with the terms of this agreement including the amount of restitution and/or a fine and the method of payment;

d.      modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines including criminal history category, in the event that subsequent to this agreement the government receives previously unknown information, including conduct and statements by the defendant subsequent to this agreement, regarding the recommendation or factor; and

e.      oppose any application for a downward departure and/or sentence
outside the Guidelines range made by the defendant.

16.     At sentencing, the government will move to dismiss the complaint currently
pending against the defendant under Magistrate No. 20-MJ-4198.

17.     The defendant agrees that any financial records and information provided by
the defendant to the Probation Office, before or after sentencing, may be disclosed to the
United States Attorney's Office for use in the collection of any unpaid financial obligation.

## VII. APPEAL RIGHTS

18.     The defendant understands that Title 18, United States Code, Section 3742
affords a defendant a limited right to appeal the sentence imposed. The defendant, however,
knowingly waives the right to appeal and collaterally attack any component of a sentence
imposed by the Court which falls within or is less than the sentencing range for imprisonment,
a fine and supervised release set forth in Section III, ¶ 9 above, notwithstanding the manner
in which the Court determines the sentence. In the event of an appeal of the defendant's
sentence by the government, the defendant reserves the right to argue the correctness of the
defendant's sentence. The defendant's knowing and voluntary waiver of the right to appeal
or collaterally attack the conviction and sentence includes waiving the right to raise on appeal
or on collateral review any argument that the statute to which the defendant is pleading guilty
(18 U.S.C. § 231(a)(3)) is unconstitutional and that the admitted conduct does not fall within
the scope of the statute.

19.     The defendant understands that by agreeing to not collaterally attack the
sentence, the defendant is waiving the right to challenge the sentence in the event that in the
future the defendant becomes aware of previously unknown facts or a change in the law which
the defendant believes would justify a decrease in the defendant's sentence.

8

20.     The government waives its right to appeal any component of a sentence imposed by the Court which falls within or is greater than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 9 above, notwithstanding the manner in which the Court determines the sentence. However, in the event of an appeal from the defendant's sentence by the defendant, the government reserves its right to argue the correctness of the defendant's sentence.

## VIII.  TOTAL AGREEMENT AND AFFIRMATIONS

21.     This plea agreement represents the total agreement between the defendant, RYAN HOWE a/k/a Rylea Autumn, and the government. There are no promises made by anyone other than those contained in this agreement. This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

JAMES P. KENNEDY, JR.
United States Attorney
Western District of New York

By:     _Brett A. Ha___/_
        BRETT A. HARVEY
        Assistant U.S. Attorney

Dated:  June 24, 2021

9

I have read this agreement, which consists of pages 1 through 10. I have had a full opportunity to discuss this agreement with my attorney, Steven G. Slawinski, Esq. I agree that it represents the total agreement reached between me and the government. No promises or representations have been made to me other than what is contained in this agreement. I understand all of the consequences of my plea of guilty. I fully agree with the contents of this agreement. I am signing this agreement voluntarily and of my own free will.

RYAN HOWE
Defendant

Dated: June 24, 2021

STEVEN G. SLAWINSKI, ESQ.
Attorney for the Defendant

Dated: June 24, 2021

10

**Exhibit RR - Page 110 of 276**

ARW:rlr
AO 442 (Rev. 11/11) Arrest Warrant

F I L E D  2020R00270

# United States District Court
### for the
District of Minnesota

OCT 2 2 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA

v.

IVAN HARRISON HUNTER

SA:20-MJ-1291

Case No. 20-MJ-758 (HB)

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     IVAN HARRISON HUNTER,

who is accused of an offense or violation based on the following document filed with the court:

___ Indictment     ___ Superseding Indictment     ___ Information     ___ Superseding Information     _X_ Complaint

___ Probation Violation Petition     ___ Supervised Release Violation Petition     ___ Violation Notice     ___ Order of the Court

From on or about May 27, 2020, through on or about May 28, 2020, in Hennepin County, in the State and District of Minnesota, traveled in interstate commerce with intent (a) to incite a riot, (b) to organize, participate in, and carry on in a riot, (c) to commit an act of violence in furtherance of a riot, and (d) to aid or abet any person inciting and participating in or carrying on in a riot and committing any act of violence in furtherance of a riot; and during the course of such travel or thereafter performed or attempted to perform an overt act, for any of the foregoing purposes either during the course of any such travel or use thereafter, in violation of Title 18, United States Code, Section 2101.

Date: Oct. 19, 2020

_____
*Issuing officer's signature*

City and State: Minneapolis, MN

The Honorable Hildy Bowbeer
United States Magistrate Judge
*Printed Name and Title*

| Return |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ at *(city and state)* _____. |
| Date: _____ |

_____
*Arresting officer's signature*

_____
*Printed name and title*

ARW:rls
AO 91 (Rev. 11/11) Criminal Complaint

F I L E D 2020R00270

## UNITED STATES DISTRICT COURT

for the

District of Minnesota

OCT 22 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA

v.

IVAN HARRISON HUNTER,

SA:20-MJ-1291

Case No. 20-MJ-758 (HB)

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge

and belief. From on or about May 27, 2020, through on or about May 28, 2020, in Hennepin County, in the State and

District of Minnesota, defendant

traveled in interstate commerce with intent (a) to incite a riot, (b) to organize, participate in, and carry on in a riot, (c) to commit an act of violence in furtherance of a riot, and (d) to aid or abet any person inciting and participating in or carrying on in a riot and committing any act of violence in furtherance of a riot; and during the course of such travel or thereafter performed or attempted to perform an overt act, for any of the foregoing purposes either during the course of any such travel or use thereafter, in violation of Title 18, United States Code, Section 2101.

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒Yes ☐ No

_____
Complainant's signature

Jason Bujold, Special Agent
Federal Bureau of Investigation
Printed name and title

SUBSCRIBED and SWORN before me
by reliable electronic means (Facetime and
email) pursuant to Fed. R. Crim. P. 41(d)(3). On
this ___ day of October, 2020.

Date: 10/19/2020

City and State: Minneapolis, MN

_____
Judge's Signature

The Honorable Hildy Bowbeer
United States Magistrate Judge
Printed Name and Title

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT

I, **Jason Bujold,** being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since May of 2017. I am currently assigned to the Minneapolis Field Office Counterterrorism squad, where I primarily investigate crimes concerning international terrorism. My experience as an FBI Agent has included the investigation of cases involving terrorist activities. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence identification, DNA evidence, and various other criminal laws and procedures. I am also familiar with strategy, tactics, methods, tradecraft, and techniques of terrorists and their agents. 1 have personally participated in the execution of search warrants involving the search and seizure of evidence.

2.      I make this Affidavit in support of an application for a criminal complaint for Ivan Harrison Hunter, residing in Boerne, Texas, for violating Title 18, United States Code, § 2101, Riot.

3.      The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events

and circumstances described herein, and information gained through my training and experience. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## STATUTORY AUTHORITY

4.     Title 18, United States Code, § 2101, provides that "Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent 1) to incite a riot; or 2) to organize, promote, encourage, participate in, or carry on a riot; or 3) to commit any act of violence in furtherance of a riot; or 4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot; and who either during the course of any such travel or use or thereafter performs or attempts to perform any overt act for any purpose specified" in 1-4 above, shall be guilty of a federal offense. Title 18, United States Code, § 2101(a) defines "riot" as "a public disturbance involving an act or acts of violence by one or more persons part of an assemblage of threat or more persons which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual."

## FACTS ESTABLISHING PROBABLE CAUSE

5.     In late May of 2020, the FBI initiated an investigation into members of the "Boogaloo Bois" based on information that members were discussing committing crimes of violence and were maintaining an armed presence on the streets of Minneapolis during civil unrest following the death of George Floyd. Your affiant knows that the "Boogaloo Bois" are a loosely-connected group of individuals espousing violent anti-government sentiments. The term "Boogaloo" itself references a supposedly impending second civil war in the United States and is

associated with violent uprisings against the government. Defendant Ivan Harrison Hunter (HUNTER) claims to be a member of the Boogaloo Bois.

6.    Beginning in the evening hours of Tuesday, May 26, 2020, Minneapolis and St. Paul experienced widespread arson, rioting, and looting.[1]  This unrest, and the associated damage and destruction, was, in part, a response to the death of George Floyd during an encounter with the Minneapolis Police Department and lasted for several days and continued until the early morning hours of May 30. During this time period, hundreds of individuals carried on into the night, vandalized and looted local businesses, and destroyed buildings, vehicles, and other property through arson, smashing doors and windows, and throwing objects. The Minneapolis neighborhood surrounding the East Lake Street/Hiawatha intersection, near the site of the police's encounter with Mr. Floyd, was particularly hard hit, with numerous business in the neighborhood looted and partially destroyed by vandalism and arson. On the evening of May 27, for example, individuals broke into the Target Store and Cub Foods near that intersection, vandalized and looted the businesses, and then set fires inside. Numerous other businesses in the neighborhood, and in the City of St. Paul, were looted or partially destroyed by vandalism and/or fires. As will be discussed in more detail below, on Thursday night, May 28, the Minneapolis Third Precinct police building, which is also located near the East Lake Street/Hiawatha Intersection, was overrun and heavily damaged by fire. The civil unrest received nationwide media coverage and was widely discussed across numerous social media platforms.

7.    On May 26 at 10:56 a.m., Boogaloo Bois member Michael Solomon ("Solomon"), a resident of Minnesota, posted publically on Facebook the following message: "I

---

[1] Hereinafter, unless otherwise specified all dates referenced in this affidavit are in the year 2020.

need a headcount. If you have keybase[2] message me on there 'bigboogboi' if not pm[3] me." HUNTER, a resident of Texas, responded to Solomon's request with the following messages at 4:30 p.m. on May 27: "72 hours out" and "can you give me any confirmation of KIAs [killed in action]?" HUNTER also posted privately on Facebook "headed to Minneapolis today." Benjamin Ryan Teeter ("Teeter"), a resident of North Carolina and admitted Boogaloo Bois member, publically posted the following on Facebook the same day: "Lock and load boys. Boog flags are in the air, and the national network is going off." Facebook messages recovered during the investigation show that HUNTER communicated with Teeter as both men departed their respective states for Minnesota.[4] On May 27 at 7:12 p.m., Teeter messaged HUNTER: "We're still in route. Once we arrive we're going to get a central command established and primary and secondary comms channels." HUNTER replied to Teeter at 7:39 p.m., "I'm leaving tonight." Teeter immediately responded with a thumbs-up emoji.[5]

8.    On May 28, Solomon sent a private direct message to HUNTER, "Rally point will be Cub (Foods) at 6…The Cub by the 3rd precinct in Minneapolis." HUNTER messaged Solomon at 8:30 p.m. stating: "We have a team of 5." At 10:04 p.m. on May 28, two men

---

[2] "Keybase" is a secure messaging and file sharing service that utilizes end-to-end encryption.

[3] I believe "pm" is an abbreviation for "private message".

[4] Historical cell tower information obtained through search warrant shows the location of a cell phone associated with HUNTER moving from the Boerne, Texas, region to Minnesota during the May 27-28 timeframe.

[5] In September, Solomon and Teeter were arrested and indicted for attempting to provide material support to a designated foreign terrorist organization; to wit, Hamas. Solomon and Teeter are alleged to have built illegal firearm suppressors for individuals they believed to be members of Hamas in exchange for financial backing of the Boogaloo Bois' activities. *See* 20-CR-193 (MJD/ECW), Doc. #19.

entered the Minneapolis Police Department's Third Precinct building with Molotov cocktails and set the building on fire.[6] At 10:30 p.m. on May 28, HUNTER sent his precise location information – two blocks from MPD's Third Precinct building – in a private message to Solomon. Solomon replied to HUNTER, "2 min, you'll hear my truck".

9.      Federal agents have obtained a video taken during the civil unrest which shows an individual walking up to a door to the Third Precinct building and discharging 13 rounds from what appears to be an AK-47 style semiautomatic rifle. The following is a screen capture from the video depicting the shooter firing into the precinct building:



10.     The shooter then walks toward the camera, high-fives another individual and yells, "Justice for Floyd!" The shooter is wearing a skull mask covering the lower-half of his face and can be seen wearing glasses, a distinctive baseball cap, and tactical gear. The following is a screen-capture from this video depicting the shooter as he walked away from the precinct

---

[6] Two men have been charged in the District of Minnesota with arson in relation to the burning of the Third Precinct building. Time-stamped surveillance video from the Third Precinct captured images of the two men entering the structure and lighting one or more Molotov cocktails. Investigators are presently unaware of any connection between these two men and the Boogaloo Bois.

building (your Affiant believes the text appearing in the screen capture was added by the creator

of the video):



11.     The following photograph is a screen capture from the video which depicts the

bullet holes in the door and windows at the entrance to MPD's Third Precinct building:



12.    A cooperating defendant[7] has identified HUNTER as the individual who fired an AK-47 style rifle at the precinct building during the evening hours of May 27. This person informed investigators that at the time HUNTER fired the shots, there were other people believed to be looters still inside the building. In the video it appears that lights are on inside the precinct building at the time HUNTER shoots at the structure. Discharged rifle casings consistent with an AK-47 style firearm were recovered from the scene of the shooting the next day.

13.    On June 8, Boogaloo Bois member Michael Solomon posted publicly the following photograph on Facebook.

---

[7] This individual is charged with a federal crime and is cooperating with law enforcement with the hopes of a reduced sentence.



The above photograph was taken by a reporter outside the Cub Foods store on E. Lake Street during the early morning hours of May 28 – just hours after the shots were fired at the Third Precinct building. The cooperating defendant referenced above has identified the individual armed with a rifle standing second from the right as HUNTER. I have compared the clothing worn by the shooter in the aforementioned video with the clothing worn by the person identified as HUNTER in the above photograph and have concluded that the baseball hat and distinctive skull face mask appear to match. Further, a Facebook account linked to HUNTER includes the following photograph of an individual believed to be HUNTER wearing what appears to be the same skull mask:



The banner of HUNTER's Facebook page bears the image of a black panther. As set forth below, HUNTER makes reference to his support of black panthers in social media postings.

14. A search of Teeter's Facebook account revealed the following two photographs posted on May 28 at 8:57 p.m.:

 

I have compared known driver's license photographs of HUNTER with the above photographs posted by Teeter and have concluded that the male wearing glasses in both photographs is HUNTER and the other individual is Teeter. One day after Teeter posted these photographs, Teeter sent HUNTER a message on Facebook telling him they are "battle buddies."

15. Investigation revealed that HUNTER returned to Texas the day after shooting at the Third Precinct building. HUNTER immediately made various statements on social media about his actions in Minneapolis. For example, On May 30, HUNTER sent a message to another individual stating, "I set fire to that precinct with the black community," followed by "Minneapolis third precinct." On May 31, HUNTER sent the following message to another individual: "My mom would call the fbi if she knew what I do and at the level I'm at w[ith] it." Along with this message, HUNTER posted the following photographs of what appear to be an AK-47 style assault rifle with a distinctive floral-patterned magazine inserted into the firearm:




16.    On June 2, 2020, HUNTER posted messages on Facebook stating, "Protesters shoot back" and "Tbh [to be honest] I don't expect to be here next year."

17.    On June 3, HUNTER was present at a George Floyd protest near Austin, Texas. At approximately 2:00 a.m., Austin Police Department ("APD") officers observed HUNTER and two other men wearing tactical gear and carrying rifles. After the three men entered a pick-up truck and drove off, officers watched the vehicle commit numerous traffic violations. During the ensuing traffic stop, officers observed a baggie of suspected marijuana in plain view. HUNTER – the front seat passenger – claimed ownership of the marijuana. Officers saw that HUNTER had six loaded magazines for an AK-47 style assault rifle affixed to his tactical vest while the two other men had AR-15 magazines affixed to their vests. Officers found an AK-47 style rifle and two AR-15 rifles on the rear seat of the vehicle plus one pistol in plain view next to the driver's seat and another pistol in the center console. The AK-47 was loaded with a magazine bearing

the same distinctive floral pattern as that depicted in the above photographs posted on Facebook by HUNTER four days earlier. The following is an APD photograph of the AK-47 magazines seized from HUNTER on June 3, as well as the distinctive floral-patterned magazine that was inserted in the AK-47:



The following is a photograph of the AK-47 style rifle found on the back seat by APD officers. The rifle appears to match the one depicted in the photographs posted by HUNTER on May 31.



HUNTER denied owning any of the weapons found in the vehicle but volunteered to APD officers that he was the leader of the Boogaloo Bois in South Texas and that he was present in Minneapolis when the Third Precinct was set on fire. After the marijuana, weapons, and ammunition were seized by APD, HUNTER and the two other men were released from the scene.

18.    The next day, June 4, HUNTER posted on Facebook: "we need to riot."

19.    Several days after the June 3 traffic stop, FBI agents in San Antonio became aware of HUNTER's affiliation with Boogaloo Bois member Steven Carrillo. Carrillo has been charged by federal authorities in the Northern District of California with the May 29 murder of a contract Federal Protective Service ("FPS") Officer in Oakland, California. Carrillo also was charged by state authorities with the June 6 murder of a Santa Cruz County Sheriff's Deputy in Ben Lomond, California. Agents obtained information from Facebook showing that HUNTER and Carrillo communicated with each other before, during, and after the Minneapolis Third Precinct building shooting and the murders in California. For example, on March 14, HUNTER messaged Carrillo, "Start drafting that op. The one we talked about in December. I'ma green light some shit." Carrillo replied, "Sounds good, bro!" Approximately four hours after the murder of the FPS officer took place, and approximately two hours after the burning of the Third Precinct building in Minneapolis, HUNTER contacted Carrillo via a social media application and had the following exchange (the original information arrived in UTC format which is seven hours ahead of Pacific Daylight Time):

> 8:37:09AM UTC (1:37:09AM PDT):
> **Hunter** to Carrillo: Go go go
>
> 8:37:23AM UTC (1:37:23AM PDT):
> Carrillo to **Hunter**: ?

8:37:28AM UTC (1:37:28AM PDT):
Hunter to Carrillo: Boog

8:37:35AM UTC (1:37:35AM PDT):
Carrillo to Hunter: Did

8:37:42AM UTC (1:37:42AM PDT):
Hunter to Carrillo: Luv

8:37:44AM UTC (1:37:44AM PDT):
Carrillo to Hunter: Currently in hide mode

8:37:53AM UTC (1:37:53AM PDT):
Hunter to Carrillo: Go for police buildings

8:38:01AM UTC (1:38:01AM PDT):
Carrillo to Hunter: I did better lol

8:38:20AM UTC (1:38:20AM PDT):
Hunter to Carrillo: Hold

8:38:32AM UTC (1:38:32AM PDT):
Carrillo to Hunter: ["ok" hand emoji]

20.    In a June 1 Facebook message exchange, HUNTER asked Carrillo for money. Carrillo – who said he was going to "be in the woods for a bit" – responded by sending HUNTER $200 via a cash application. HUNTER thanked Carrillo, telling him "now I stand a better chance Steve." In the exchange, Carrillo told HUNTER that he was "doing good shit out there" and to "stay safe." HUNTER replied, "You too king!"

21.    On June 7, HUNTER sent Teeter a private message through Facebook containing a link to a news article regarding the June 6 arrest of Steven Carrillo for the murder of the Santa Cruz Sheriff's Deputy, to which Teeter responded, "Well shit." Your Affiant is aware that Carrillo opened fire on deputies who were attempting to arrest him. Carrillo then stole a car and

when later arrested, officers found he had written the word "boog" on the hood of the vehicle in what appeared to be his own blood.

22.     HUNTER posted other messages on Facebook about his activities in Minneapolis. On June 10, HUNTER posted "I've burned police stations with black panthers in Minneapolis" and "I helped the community burn down that police station in Minneapolis." HUNTER also posted, "I didn't' protest peacefully Dude…Want something to change? Start risking felonies for what is good."[8] On June 11, HUNTER posted, "The BLM protesters in Minneapolis loved me [sic] fireteam and I."

23.     In August, the FBI began receiving information about HUNTER through a confidential human source (hereinafter "CHS").[9]  HUNTER admitted to the CHS that he had fired his AK-47 into the precinct building in Minneapolis, had helped set the structure on fire, and had participated in looting. HUNTER told the CHS that he is a Boogaloo Bois member and that he and Carrillo were founding members of the "Happy Friends Group" which, according to HUNTER, is a "fire team" that responds with violence if the police try to take their guns away. HUNTER also referred to himself as a "terrorist."

24.     According to the CHS, when HUNTER learned of Teeter's federal arrest in Minnesota in September, HUNTER became angry and threatened to start "killing people" in

---

[8] HUNTER's Facebook account shows that as early as January of 2020, he posted statements about committing violent acts against the government. Specifically, on January 1, 2020, HUNTER had a Facebook message exchange with another known Boogaloo Bois member in which HUNTER said "it starts with you and me" he would "throw the fist [sic] cocktail if I have to…then we steam roll them", "do blow in the capital" and "we could raid the coast guard armory in port A." Your affiant knows the U.S. Coastguard maintains a station in Port Aransas, Texas.

[9] The CHS is being paid by the FBI for information in this investigation.

retaliation. HUNTER referred to federal agents in derogatory terms and stated it was "time to start shooting." HUNTER also stated that he would "go down shooting" if law enforcement came to arrest him or his friends.

## CONCLUSION

25. Based on the information set forth in this affidavit, I submit that there is probable cause to believe:

26. From on or about May 27, 2020, through on or about May 28, 2020, Defendant IVAN HARRISON HUNTER traveled in interstate commerce from Texas to Minneapolis, Minnesota, within the District of Minnesota, with intent (a) to incite a riot, (b) to organize, participate in, and carry on in a riot, (c) to commit an act of violence in furtherance of a riot, and (d) to aid or abet any person inciting and participating in or carrying on in a riot and committing any act of violence in furtherance of a riot; and during the course of such travel or thereafter performed or attempted to perform an overt act, for any of the foregoing purposes either during the course of any such travel or use thereafter, in violation of Title 18, United States Code, Section 2101.

Based on the forgoing, I request that the Court issue the proposed arrest warrant.

Further your Affiant sayeth not.

Jason Bujold
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me
by reliable electronic means (Facetime and
email) pursuant to Fed. R. Crim. P.
41(d)(3). On this 15th day of October,
2020.

The Honorable Hildy Bowbeer
United States Magistrate Judge

2020R00270

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-MJ-758 (HB)

UNITED STATES OF AMERICA,

Plaintiff,

v.

IVAN HARRISON HUNTER,

Defendant.

SA 20-MJ-1291
**FILED UNDER SEAL
PURSUANT TO ORDER**

**MOTION TO SEAL**

The United States of America, by its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Andrew R. Winter, Assistant United States Attorney, respectfully submits this motion to file the Complaint and accompanying Affidavit of Special Agent Jason Bujold under seal.

The United States seeks to seal the Complaint and affidavit because the defendant Ivan Harrison Hunter, is not yet in federal custody and the FBI is continuing to investigate active leads concerning the defendants ties to others. Accordingly, clear and convincing reasons to seal the affidavit exist because the premature disclosure of this investigation will jeopardize the FBI's efforts to pursue active leads in this investigation and the ongoing investigation.

Dated: October 19, 2020

Respectfully submitted,

ERICA H. MACDONALD
United States Attorney

*s/    Andrew R. Winter*

BY:    ANDREW R. WINTER
         Assistant U.S. Attorney

2020R00270

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
Criminal No. 20-MJ-758 (HB)

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

IVAN HARRISON HUNTER,
            Defendant.

**FILED UNDER SEAL
PURSUANT TO ORDER**

**ORDER TO SEAL**

The United States submitted a motion requesting that the Court seal the Complaint and accompanying Affidavit in the above-referenced case until the defendant, Ivan Harrison Hunter, is arrested on a federal warrant, which is tentatively scheduled for October 21, 2020. The Court determines that good cause exists to allow the request for temporarily sealing.

Accordingly, IT IS HEREBY ORDERED that the United States' motion to seal is GRANTED.

Dec. 19, 2020
Dated

The Honorable Hildy Bowbeer
United States Magistrate Judge

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No: 2:20-543 |
| v. | |
| **ORLANDO SHALROCKO KING** | **PLEA AGREEMENT** |

### General Provisions

This PLEA AGREEMENT is made this 13th day of April, 2021, between the United States of America, as represented by Acting United States Attorney M. RHETT DEHART, Assistant United States Attorney Emily Limehouse; the Defendant, **ORLANDO SHALROCKO KING**, and Defendant's attorney, Christopher Adams.

IN CONSIDERATION of the mutual promises made herein, the parties agree as follows:

1.  The Defendant agrees to waive indictment and plead guilty to an Information charging riot, in violation of Title 18 U.S.C. § 2101 (Count 1), and possession of a firearm by a convicted felon, in violation of Title 18 U.S.C. § 922(g) (Count 2).

    In order to sustain its burden of proof, the Government is required to prove the following:

### Count 1

That on or about May 30, 2020 and May 31, 2020 in the District of South Carolina:

A.  That the Defendant travelled in interstate commerce, or used any facility in interstate commerce;

B.  That the Defendant did so with the intent to: incite a riot, organize, participate in, or carry on a riot, commit any act of violence in furtherance of a riot, or aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot; and

Page 1 of 6

**Exhibit RR - Page 130 of 276**

C. Either during the course of such travel or use of a facility of interstate commerce, or after such travel or use of a facility in interstate commerce, the Defendant did, or attempted to do an overt act for the purpose of inciting a riot, committing an act of violence in furtherance of a riot, or aiding or abetting any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot.

The penalty for this offense is a maximum term of imprisonment of five years, fine of $250,000.00, supervised release up to one year, and a special assessment of $100.00.

### Count 2

That beginning in or about ~~May~~ Apr: March cWA 2020 and continuing up until on or about April 25, 2020,

in the District of South Carolina,

A. The defendant knowingly possessed a firearm and ammunition; and

B. At the time of the charged act, the defendant had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year; and

C. At the time of the charged act, the defendant knew that he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year; and

D. Such possession was in or affecting commerce or the firearm and ammunition had been transported in interstate or foreign commerce.

The penalty for this offense is a maximum term of imprisonment of 10 years, $250,000.00 fine, supervised release of 3 years, and a special assessment of $100.00.

2.  The Defendant understands and agrees that monetary penalties [i.e., special assessments, restitution, fines and other payments required under the sentence] imposed by the Court are due and payable immediately and subject to enforcement by the United States as civil judgments, pursuant to 18 U.S.C. § 3613. In the event the Court imposes a schedule for payment of restitution, the Defendant also understands that payments made in accordance with installment schedules set by the Court are minimum payments only and do not preclude the Government from seeking to enforce the judgment against other assets of the Defendant at any time, as provided in 18 U.S.C. §§ 3612, 3613 and 3664(m). The

**Exhibit RR - Page 131 of 276**

Defendant further agrees to enter into the Bureau of Prisons Inmate Financial Repayment Program if sentenced to a term of incarceration with an unsatisfied monetary penalty. The Defendant further understands that any monetary penalty imposed is not dischargeable in bankruptcy.

    A.    Special Assessment: Pursuant to 18 U.S.C. §3013, the Defendant must pay a special assessment of $100.00 for each felony count for which he is convicted. This special assessment must be paid at or before the time of the guilty plea hearing or during participation in the Bureau of Prisons Inmate Financial Repayment Program if this plea results in incarceration.

    B.    Restitution: The Defendant agrees to make full restitution under 18 U.S.C. § 3556 in an amount to be determined by the Court at the time of sentencing, which amount is not limited to the count(s) to which the Defendant pled guilty, but will include restitution to each and every identifiable victim who may have been harmed by his scheme or pattern of criminal activity, pursuant to 18 U.S.C. § 3663. The Defendant agrees to cooperate fully with the Government in identifying all victims. Upon demand, the Defendant shall submit a personal financial statement under oath and submit to interviews by the government and the U.S. Probation Office regarding the Defendant's capacity to satisfy any fines or restitution. The Defendant expressly authorizes the U.S. Attorney's Office to immediately obtain a credit report on the Defendant in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. The Defendant understands that the Defendant has a continuing obligation to pay in full as soon as possible any financial obligation imposed by the Court.

    C.    Fines: The Defendant understands that the Court may impose a fine pursuant to 18 U.S.C. §§ 3571 and 3572.

3.    The Defendant understands that the obligations of the Government within the Plea Agreement are expressly contingent upon the Defendant's abiding by federal and state laws and complying with any bond executed in this case. In the event that the Defendant fails to comply with any of the provisions of this Agreement, either express or implied, the Government will have the right, at its sole election, to void all of its obligations under this Agreement and the Defendant will not have any right to withdraw his/her plea of guilty to the offense(s) enumerated herein.

**Exhibit RR - Page 132 of 276**

**Forfeiture**

4.     The Defendant agrees to voluntarily abandon all right, title, interest and claim in the firearm(s) and ammunition seized from him/her, to wit: a Sig Sauer, model P320 (serial number 58AI08850) and .9 mm ammunition.

5.     The Defendant also agrees to voluntarily transfer all right, title, interest and claim in the above-described property and/or assets to the United States of America. Furthermore, the Defendant attests, under penalty of perjury, that the Defendant owns the above-described property and/or assets free of any liens and encumbrances, and that no other person or entity has a claim to the above-described property and/or assets.

**Merger and Other Provisions**

6.     The Defendant represents to the court that he/she has met with his/her attorney on a sufficient number of occasions and for a sufficient period of time to discuss the Defendant's case and receive advice; that the Defendant has been truthful with his/her attorney and related all information of which the Defendant is aware pertaining to the case; that the Defendant and his attorney have discussed possible defenses, if any, to the charges in the Indictment including the existence of any exculpatory or favorable evidence or witnesses, discussed the Defendant's right to a public trial by jury or by the Court, the right to the assistance of counsel throughout the proceedings, the right to call witnesses in the Defendant's behalf and compel their attendance at trial by subpoena, the right to confront and cross-examine the Government's witnesses, the Defendant's right to testify in his own behalf, or to remain silent and have no adverse inferences drawn from his/her silence; and that the Defendant, with the advice of counsel, has weighed the relative benefits of a trial by jury or by the Court versus a plea of guilty pursuant to this Agreement, and has entered

this Agreement as a matter of the Defendant's free and voluntary choice, and not as a result of pressure or intimidation by any person.

7.    The Defendant is aware that 18 U.S.C. § 3742 and 28 U.S.C. § 2255 afford every defendant certain rights to contest a conviction and/or sentence.  Acknowledging those rights, the Defendant, in exchange for the concessions made by the Government in this Plea Agreement, waives the right to contest either the conviction or the sentence in any direct appeal or other post-conviction action, including any proceedings under 28 U.S.C. § 2255. This waiver does not apply to claims of ineffective assistance of counsel, prosecutorial misconduct, or future changes in the law that affect the Defendant's sentence. This agreement does not affect the rights or obligations of the Government as set forth in 18 U.S.C. § 3742(b). Nor does it limit the Government in its comments in or responses to any post-sentencing matters.

8.    The Defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

9.    The parties hereby agree that this Plea Agreement contains the entire agreement of the parties; that this Agreement supersedes all prior promises, representations and statements of the parties; that this Agreement shall not be binding on any party until the Defendant tenders a plea of guilty to the court having jurisdiction over this matter; that this Agreement may be modified only in writing signed by all parties; and that any and all other promises,

**Exhibit RR - Page 134 of 276**

representations and statements, whether made prior to, contemporaneous with or after this

Agreement, are null and void.

_4/14/21_
Date

Orlando Shalrocko King,
Defendant

Christopher W. Adams, Esquire
Defense Attorney

_4/14/21_
Date

M. RHETT DEHART
ACTING UNITED STATES ATTORNEY

_4/13/21_
Date

Emily Evans Limehouse (#12300)
Assistant United States Attorney

**Exhibit RR - Page 135 of 276**

**AFFIDAVIT**                                    1:20MJ2120

I, JENNIFER KIESEL, Special Agent of the Federal Bureau of Investigation (FBI),

United States Department of Justice (DOJ), being duly sworn and deposed, state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.        Your Affiant is a Special Agent with the Federal Bureau of Investigation, and as

such, is an investigative or law enforcement officer of the United States within the meaning of

Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.  Your Affiant is filing this

Affidavit to obtain a Complaint and Arrest Warrant for DEVON BRYCE POLAND for

violations listed herein.  Your Affiant is engaged in the enforcement of criminal laws and is

within the category of officers authorized by the Attorney General to request and execute arrest

and search warrants pursuant to Title 18 U.S.C. § 3052 and 3107; and DOJ regulations set forth

at Title 28 C.F.R. § 0.85 and 60.2(a).

2.        I am a Special Agent with the Cleveland Division of the Federal Bureau of

Investigation, (hereinafter "FBI"), and have been since February 28, 2010. Your Affiant is

currently assigned to the Joint Terrorism Task Force at the FBI's Cleveland Field Office. Affiant

graduated from the FBI Academy in Quantico, Virginia in July, 2010. As a Special Agent, Affiant

is engaged in the enforcement of criminal laws and has participated in several complex

investigations. Your Affiant has requested and obtained numerous applications for arrest and

search warrants in furtherance of investigations into various types of Federal violations. Affiant has

received training and has experience in interviewing and interrogation techniques, arrest

procedures, search and seizure, search warrant applications and various other investigative

techniques. Writer has written and executed search warrants for approximately 50 electronic devices, including Apple iPhones and other Apple devices.

      3.    The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, and witnesses. This Affidavit is intended to show only that there is sufficient probable cause to arrest DEVON BRYCE POLAND for the requested warrant and does not set forth all of my knowledge about this matter. Actions, conversations, and statements are described in substance and in part, except where otherwise indicated.

      4.    Based on the facts set forth in this Affidavit, there is probable cause to believe that DEVON BRYCE POLAND has committed violations of Title 18, United States Code, Sections 231(a)(2); 844(h)(1) and (m) and 2101(a)(2) and (4), as set forth below:

      a.    18 U.S.C. § 231(a)(2): Whoever transports or manufactures for transportation in commerce any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder;

      b.    18 U.S.C. § 844(h)(1) and (m): Whoever conspires to use fire or an explosive to commit any felony which may be prosecuted in a court of the United States;

      c.    18 U.S.C. § 2101(a): Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent--

      (2) to organize, promote, encourage, participate in, or carry on a riot; or

      (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;

2

And who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph (A),(B), (C), or (D) of this paragraph.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested complaint and arrest warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2711, 2703(a), 2703(b)(1)(A), and 2703 (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      Your Affiant states that on May 30, 2020, there was a protest march planned in Cleveland, Ohio, in the Northern District of Ohio, starting at Willard Park, on the northwest corner of Lakeside Avenue and East 9th Street, and ending at the Justice Center, located on Lakeside Avenue between Ontario Avenue and West 3rd Street.  The march began at approximately 2 p.m. and was scheduled to end at 5 p.m.

7.      Your Affiant is aware that this march was widely billed on social media and other outlets as a peaceful protest.

8.      At approximately 3:30 p.m. protesters in front of the Justice Center began throwing rocks, bottles, and other items at law enforcement officers.  Protesters also used spray paint to vandalize buildings, streets, and other structures with anti-police and anti-government slogans.

9.      At approximately 3:50 p.m. members of the Cuyahoga County Sherriff's began using non-lethal techniques to disperse the crowds in front of the Justice Center.  The crowds

3

continued to throw items at the police and vandalize structures. At least three Cleveland Police Department zone cars were set on fire by the crowd.

10. From approximately 4 p.m. until 9:45 p.m. demonstrators continued to break windows of the Justice Center and surrounding buildings, knock over garbage cans and conduct other acts of vandalism. An additional four city-owned cars were set on fire during this time. The Cleveland Police Department and City of Cleveland issued orders for the demonstrators to disperse via megaphone, Twitter, social media, and contact with news outlets.

11. At approximately 7:30 p.m. the Cleveland Police Department and City of Cleveland issued a curfew to begin at 8:00 p.m. until 12:00 p.m. on May 31, 2020.

12. At approximately 7:30 p.m. the Cleveland Police Department and City of Cleveland issued an order establishing a civil order prohibiting any persons to be on the streets or in a vehicle in downtown Cleveland.

13. The police report indicated the following: At approximately 11:55 p.m. on May 30, 2020, Det. Habeeb and Cmdr. Connelly entered the intersection of East 8th St. and Huron Ave. in downtown Cleveland, Ohio. East 8th St. is an alley that runs in a one-way direction from south to north and ends at Huron Ave. Det. Habeeb and Cmdr. Connelly took up a position on Huron facing east to observe and report on rioting and looting which was underway in the area. At approximately 11:55pm, Det. Habeeb and Cmdr. Connelly observed a dark SUV parked on East 8th Street midway up the alley facing south, which is opposite the posted direction of travel for the one-way road. The vehicle had dark tinted window, which did not allow Det. Habeeb and Cmdr. Connelly to observe if there were any occupants.

4

14.     Det. Habeeb and Cmdr. Connelly observed a large framed white male wearing a commercial style filter mask walking out of the alley from near the SUV and north bound towards Det. Habeeb and Cmdr. Connelly's position onto Huron Road west bound.  Det. Habeeb and Cmdr. Connelly observed the male walk in a circular route on the sidewalk and then back towards the alley.  The male walked around Det. Habeeb and Cmdr. Connelly's vehicle and appeared to be observing Det. Habeeb and Cmdr. Connelly.  The male was on the streets in public during civil unrest in violation of a mandatory curfew put into place by the public order of the Mayor of the City of Cleveland which went into effect at 8:00pm.

15.     Det. Habeeb and Cmdr. Connelly positioned their vehicle in the intersection of the alley facing south about 50 feet behind the SUV and activated the law enforcement light set to signal Det. Habeeb and Cmdr. Connelly were police officers.  It was at this moment that the male Det. Habeeb and Cmdr. Connelly had been observing began to walk back towards the passenger side of Det. Habeeb and Cmdr. Connelly's vehicle on the south sidewalk towards the passenger door where Det. Habeeb was seated.  Det. Habeeb exited the vehicle and stated, "Cleveland Police" at the same time the male said, "That's my vehicle" and gestured towards the alley. CPD Radio Dispatch had just come returned information indicating the registered owner of the dark SUV was BRANDON MICHAELALTHOF LONG.

16.     Det. Habeeb stated, "Are you Brandon?" to which he replied in the affirmative. ALTHOF LONG then stated unsolicited, "I'm looking for my wallet, I lost it over there somewhere", pointing towards the area of the 700 block of Huron.  Based on the appearance and statements of ALTHOF LONG and Det. Habeeb and Cmdr. Connelly's observations of the

5

vehicle, Det. Habeeb and Cmdr. Connelly detained ALTHOF LONG for violation of the curfew order.

17.     Based on Det. Habeeb and Cmdr. Connelly's previous observations of groups of rioters and looters having entered the businesses at the intersection and carrying off looted property from several area liquor establishments, Det. Habeeb and Cmdr. Connelly believed that the vehicle was involved in criminal activity.

18.     Det. Habeeb and Cmdr. Connelly observed the vehicle with Pennsylvania tag KXJ-2536, and radioed in to give the plate and location, requesting a description of the vehicle owner to compare with the male Det. Habeeb and Cmdr. Connelly were observing.  During this time Det. Habeeb and Cmdr. Connelly saw the rear lights of the vehicle flash on and then off again, indicating the SUV was occupied.  Det. Habeeb and Cmdr. Connelly radioed they would be out to check the vehicle and requested additional law enforcement support.

19.     Det. Habeeb ordered ALTHOF LONG to stop and place his hands on the wall at the south west corner of Huron and E. 8th St. to which ALTHOF LONG complied.  Det. Habeeb began a pat down of ALTHOF LONG's person for weapons and asked ALTHOF LONG directly, "Do you have any weapons on you?", to which ALTHOF LONG replied, "I don't think so."  Det. Habeeb began the pat down and discovered no weapons.  ALTHOF LONG was ordered to remain in position and not to move, to which ALTHOF LONG complied.  Det. Habeeb informed ALTHOF LONG that he was in violation of the curfew order and subject to arrest.  ALTHOF LONG stated he was just looking for his wallet and that he had lost it during the disruption on the street.  Det. Habeeb asked him, "so you lost your wallet

6

while you were rioting?" to which ALTHOF LONG replied that he was just taking pictures and videos of the rioting and looting.

20.     Det. Habeeb asked if there were any other occupants in his SUV to which he stated that his friend "Devon", later identified as DEVON BRYCE POLAND, was in the passenger seat of the SUV.  Det. Habeeb and Cmdr. Connelly radioed again for additional support from CPD.

21.     After several minutes, additional police units arrived to assist Det. Habeeb and Cmdr. Connelly.  After their arrival, Det. Habeeb and Cmdr. Connelly, along with the additional supporting officers, advanced up the alley and took positions at the rear of the SUV and issued verbal orders to the occupant in the front passenger seat to exit facing away with his hands in the air, to which he complied.  The male from the SUV was then identified as POLAND.  Det. Habeeb conducted a pat down of the POLAND against the rear of the SUV and recovered a folding knife that had been clipped to the front pocket of POLAND's hooded sweatshirt.  POLAND had no ID or wallet on his person.  Det. Habeeb asked POLAND where his ID was and POLAND stated he didn't know.

22.     Det. Habeeb asked POLAND if there were any weapons in the vehicle to which POLAND stated there was a BB gun and a knife in the car.  I asked why there was a BB gun to which he stated "Brandon uses it for real estate I think."  Det. Habeeb ordered POLAND to walk up the alley and place his hands against the wall next to ALTHOF LONG.  Both POLAND and ALTHOF LONG remained at the corner for the remainder of the interaction without incident.

7

23.     The vehicle was visually cleared from outside the vehicle with the doors open and found to have no additional passengers.  In plain sight in the front and rear passenger compartments were backpacks, a hammer, a bottle of Fireball cinnamon whiskey liquor with a pour top like those used in bars, a BB gun resembling a pistol, and a red plastic bottle of liquid fire starter.

24.     Your Affiant is aware that restaurants and bars were robbed during the riots and items stolen included bottles of alcohol.

25.     ALTHOF LONG and POLAND were advised of their rights under Miranda which they acknowledged.  ALTHOF LONG was asked about the bottle of liquor, which Det. Habeeb and Cmdr. Connelly suspected was looted property.  When asked where it was obtained, both POLAND and ALTHOF LONG stated they found it on the sidewalk but neither could give an exact location.  Both parties stated that it was found by POLAND.

26.     Det. Habeeb again asked ALTHOF LONG if there were any weapons in the SUV and he mentioned the BB gun and a knife.  Det. Habeeb then informed ALTHOF LONG that Det. Habeeb and Cmdr. Connelly would be recovering suspected contraband from his vehicle and again asked if there was any other weapons.  ALTHOF LONG stated that he had a Glock 45 cal. pistol in his center compartment, but that it wasn't loaded.  Det. Habeeb asked why ALTHOF LONG had a pistol to which he stated he had it for protection but never carried it during the riot.

27.     A search of the vehicle compartment resulted in the following items being observed and recovered:

8

a. One black backpack with brand Outdoor Products
b. One open bottle of Fireball brand cinnamon whiskey, topped with a commercial pourer
c. Two one-pound bottles of Sterno Firestarter Instant Flame gel
d. One black Herschel brand backpack, with brown leather bottom and white paint streaks along the zipper
e. Two Glock brand magazines, each loaded with 17 rounds of ammunition (34 rounds total)
f. Blister packs of decongestant and ibuprofen
g. One yellow Stanley brand hammer
h. One can of red Rust-oleum brand paint and primer spray paint
i. One Glock 45 pistol, serial number BMFE182
j. One black "Bulldog Cases" leather pistol holster
k. One pocket knife
l. $40 in cash, consisting of two $20 bills
m. One Apple iPhone, white and rose gold in color, stored in a blue and grey OtterBox case
n. One Apple iPhone model A1549, silver in color, IMEI: 355783074741598

28.     The following photographs are of the firearm, the firestarting gel and the

hammer:



9





29.     A federal search warrant was obtained on May 31 for the two Apple iPhones listed above.  Your Affiant states that on June 4, 2020, she reviewed Facebook Messenger posts between ALTHOF LONG and POLAND recovered from POLAND's cellular telephone.  Your Affiant affirms that texts between the two on May 30, 2020, contain statements that demonstrate an intent by ALTHOF LONG and POLAND to travel from Pennsylvania to Ohio on May 30, 2020, to participate in, promote, encourage, and aid and abet the criminal riots.

30.     Specifically, your Affiant reviewed the following Facebook Messenger posts, all posts were sent and received on May 30, 2020:

10

a.  At approximately 5:17 p.m., ALTHOF LONG messaged POLAND asking, in sum and substance "Wanna go to Pittsburgh and watch the riots;"

b.  At approximately 5:19 p.m., POLAND replied, in sum and substance, "Is there actually riots? IK (I know) philly is wilding;"

c.  At approximately 5:20 p.m., ALTHOF LONG messaged POLAND, in sum and substance, "They lit it on fire lmao (laugh my a** off);"

d.  At approximately 5:24 p.m. POLAND responded, in sum and substance, "I wanna s**t kinda but my future wife needs me;"

e.  At approximately 5:25 p.m., ALTHOF LONG responded, in sum and substance, "This is a once in a life time thing you can witness and maybe participate in;"

f.  At approximately 5:25 p.m., ALTHOF LONG posted to POLAND, in sum and substance "Or tell her you gotta go overthrow the govt first;"

g.  At approximately 6:10 p.m. and 6:11 p.m., ALTHOF LONG wrote to POLAND, in sum and substance, "Unless things change. Cleveland seems like a better spot to riot watch.  Police shooting teargas and flash bangs, Pittsburgh hasn't had much of that;"

h.  At approximately 7:09 p.m. ALTHOF LONG messages POLAND about buying supplies for their travel to Clevleand, he asked if POLAND wanted goggles, POLAND replied "Yes," and also asked for "a bandana" and a "backpack;"

11

    i.    At approximately 7:10 p.m. POLAND messaged ALTHOF LONG asking, in sum and substance, "Should we bring Molotov supplies?"

    j.    At approximately 7:17 p.m. ALTHOF LONG responded, in sum and substance, "Sadly enough I think I have everything needed for a Molotov in my car. Like normally;"

    k.    At approximately 7:48 p.m. and 7:49 p.m. POLAND wrote ALTHOF LONG stating, in sum and substance, "Pittsburgh is s**t down," and "The city is blocked shut bro;"

    l.    At approximately 7:50 p.m. and 7:56 p.m. ALTHOF LONG responded, stating, in sum and substance, "Cleveland is more lit anyway," and "And if not Pittsburgh then we can hit Cleveland OH."

    m.    At approximately 8:02 p.m. ALTHOF LONG messaged POLAND that he was leaving to pick him up and at approximately 8:04 p.m. POLAND responded by providing ALTHOF LONG the address in Erie, Pennsylvania where ALTHOF LONG should go.

31.    Your Affiant believes that these Facebook posts support the assertion that ALTHOF LONG and POLAND traveled from out of state with the intent to participate, encourage, or carry on in the ongoing riot in Cleveland, Ohio. Based on the fact that they discussed purchasing the ingredients for a Molotov cocktail, and recognized that ALTHOF LONG, by his own admission, had such items already in his possession, your Affiant further avers that there is probable cause they conspired with each other with the intent to use fire to

12

further their participation, encouragement, or carrying on of a riot. Finally, your Affiant believes that based on the presence of a firearm, a hammer, stolen alcohol and other items in the possession of ALTHOF LONG and POLAND, the two subjects conspired together with the intent to engage in rioting and robbery in Cleveland, Ohio.

13

## CONCLUSION

32.    Based on the aforementioned factual information, Affiant respectfully submits
that there is probable cause to support a complaint and arrest warrant charging DEVON
BRYCE POLAND for engaging in, and conspiring to engage in, interstate travel with a firearm
and with the intent to use fire to engage in, promote, aid or abet, encourage or participate in
civil unrest and riot, pursuant to Title 18 U.S.C. § 231(a)(2), Use of Fire to Commit a Felony,
pursuant to Title 18 U.S.C. § 844(h)(1) and (m), and Rioting, pursuant to Title 18 U.S.C.
§ 2101(a)(2) and (4).

Respectfully submitted,

Jennifer Kiesel
Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable electronic
means. Fed. R. Crim. P. 3, 4(d), and 4.1, on this __4th__ , day of
June, 2020.

DAVID A. RUIZ
UNITED STATES MAGISTRATE JUDGE

14

**Exhibit RR - Page 149 of 276**



FILED
3/15/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

CP

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 21 CR 142 |
| v. | Violations: Title 18, United States Code, Sections 2101(a)(1), (2) |
| JAMES MASSEY, also known as "Steve Nash" | JUDGE KENNELLY<br>MAGISTRATE JUDGE HARJANI |

The SPECIAL NOVEMBER 2020 GRAND JURY charges:

1.    At times material to this indictment:

a.    Defendant maintained an account on Facebook under the name "Steve Nash" and used the account to post videos and photographs that could be viewed on the internet by Facebook users. Defendant also used that account to send messages to various Facebook users.

b.    On or about August 9, 2020, and August 10, 2020, there was civil unrest in the City of Chicago that resulted in property damage to numerous businesses, including property damage to Store A, Store B, Store C, and Store D, each of which was a business located in the City of Chicago.

2.    From on or about August 9, 2020 to on or about August 10, 2020, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

JAMES MASSEY, also known as "Steve Nash,"

defendant herein, used a facility of interstate commerce, namely, a telephone and the internet, including Facebook, with intent (1) to incite a riot; and (2) to participate in, and carry on, a riot; and during the course of such use, and thereafter, intentionally

performed and attempted to perform any other overt act, including, but not limited to those listed below, for the purpose of inciting a riot and participating in, and carrying on, a riot.

<u>OVERT ACTS</u>

3.      Defendant performed one or more overt acts in the Northern District of Illinois, constituting an incitement of a riot, and participating in, and carrying on a riot, which overt acts included but were not limited to the following:

a.      On or about August 9, 2020, defendant posted a live video to his Facebook account with the accompanying caption: "ATTENTION ATTENTION LOTTING [*sic*] START AT 12am tonight …WE WILL NOT BE FUCKING UP THE SOUTH SIDE EAST SIDE OR WEST SIDE DOWNTOWN AREA AND UP NORTH AREA ONLY BRING YA TOOLS SKI MASK AND GLOVES #LETSGOOOOO."

b.      On or about August 9, 2020, at approximately 7:54 p.m., defendant sent a message from his Facebook account to a group of Facebook users stating, "Bro im hitting phone store."

c.      On or about August 9, 2020, at approximately 9:13 p.m., defendant sent a message from his Facebook account to the same group of Facebook users referenced in paragraph 3(b) stating, "WE LIVE TOGETHER WE DIE TOGETHER."

d.      On or about August 9, 2020, at approximately 11:27 p.m., defendant posted a picture on his Facebook account with the caption, "Lets get ready to steal bitch."

2

e.     On or about August 9, 2020, at approximately 11:30 p.m., defendant posted a live video on his Facebook account in which he said, "I finna link up with everybody. I driving [Individual A] right now, y'all. I driving [Individual A] right now. Y'all ready? I sent everybody the location to link up at bro. I trying to get something. I need to hit a couple stores."

f.     On or about August 9, 2020, at approximately 11:43 p.m., defendant posted a live video on his Facebook account in which he said, "Fitting to go fuck them up. I ain't missing out. I am ready to steal."

g.     On or about August 10, 2020, defendant and other individuals traveled in his vehicle to Store A, Store B, Store C, and Store D.

h.     On or about August 10, 2020, at approximately 1:00 a.m., multiple individuals, including defendant, assembled near Store A, which was located in the area of the 900 block of West Weed Street in Chicago. Defendant and the assemblage, which included three or more persons, used tools that were inside defendant's vehicle to gain entry into Store A. The assemblage broke the window of Store A and damaged the property of Store A to gain entry to Store A. The assemblage entered Store A and stole merchandise and store property from Store A.

i.     On or about August 10, 2020, at approximately 1:25 a.m., defendant and other individuals assembled near Store B, which was located in the area of the 800 block of North Michigan Avenue in Chicago. The assemblage, which included three or more persons, damaged the property of Store B by breaking a

3

window of Store B to gain entry to Store B. The assemblage, including defendant, entered Store B and stole Store B's merchandise.

        j.    On or about August 10, 2020, at approximately 5:06 a.m., defendant and other individuals assembled near Store C, which was located in the area of the 700 block of South Clark Street in Chicago. The assemblage, which included three or more persons, broke in through the front door of Store C to gain entry to Store C. The assemblage, including defendant, entered Store C and stole certain Store C merchandise. The assemblage damaged Stores C's property while inside Store C.

        k.    On or about August 10, 2020, at approximately 5:44 a.m., defendant and other individuals assembled near Store D, which was located in the area of the 300 block of West Washington Street in Chicago. The assemblage, which included three or more persons, damaged the property of Store D by breaking a window to gain entry to Store D. The assemblage, including defendant, entered Store D and stole certain Store D merchandise.

In violation of Title 18, United States Code, Sections 2101(a)(1) and 2101(a)(2).


               A TRUE BILL:


               _____

               FOREPERSON


_____
signed by Steven J. Dollear on behalf of the
UNITED STATES ATTORNEY


4

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| CARLOS A. MATCHETT | ) Case No. |
| | ) 20-5557 (KMW) |
| | ) |
| | ) |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     May 31, 2020     in the county of     Atlantic     in the
     District of     New Jersey     , the defendant(s) violated:

| Code Section | Description of Offenses |
|---|---|
| 18 U.S.C. § 2101 | Use of a facility of interstate commerce to organize, promote, encourage, participate in, and carry on a riot (See Attachment A) |

This criminal complaint is based on these facts:

See Attachment B

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Brian J. Corcoran, Jr., FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
     telephone     *(specify reliable electronic means)*.

Date:     06/03/2020

*Judge's signature*

City and state:     District of New Jersey          Hon. Karen M. Williams, U.S. Magistrate Judge
*Printed name and title*

**Exhibit RR - Page 154 of 276**

CONTENTS APPROVED

UNITED STATES ATTORNEY

By: _____

Gabriel J. Vidoni, Assistant U.S. Attorney

Date: June 3, 2020

## ATTACHMENT A

On or about May 31, 2020, in Atlantic County, in the District of New Jersey, defendant

### CARLOS A. MATCHETT

used a facility of interstate and foreign commerce, namely, a cellular telephone and the social media platform Facebook, Inc., with intent to participate in and carry on a riot, as defined in Title 18, United States Code, Section 2102(a), and during the course of such use, and thereafter, performed and attempted to perform an overt act for the purpose of participating in and carrying on a riot, namely, by assisting in the looting of retail locations in Atlantic City, New Jersey, disrupting traffic, and refusing to disperse upon direction from law enforcement officers.

In violation of Title 18, United States Code, Section 2101.

**ATTACHMENT B:**

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Brian J. Corcoran, Jr., being duly sworn, do hereby state the following:

## I.     INTRODUCTION

1.       I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I have been a Special Agent with the FBI since April 2010.  I am currently assigned to the Newark, New Jersey Field Office, Atlantic City Resident Agency.  Prior to my assignment to this office, I worked as a Special Agent in Boston, Massachusetts.  I have training and experience in investigations including counter-terrorism and explosive related matters.  I have also received training and experience in interview and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, computer evidence identification, computer evidence seizure and processing, and various other criminal laws and procedures.  I have been involved in investigating and enforcing laws involving racially motivated violent extremism, anti-government/anarchist extremism, and various weapons charges to include explosive, incendiary, and destructive devices.  I have not included every detail of my training, education, and experience, but have highlighted those areas that I believe are most relevant to this application.  As a federal agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

2.       I am familiar with the facts and circumstances set forth herein based on information provided to me by other law enforcement officers involved in the investigation, including but not

–1–

limited to officers from the Atlantic City Police Department, as well as my review of investigative reports, social media platforms, records, and other information.

3.      This Affidavit is submitted for the limited purpose of setting forth probable cause for the issuance of the requested criminal complaint and arrest warrant.  For that reason, I have not included every fact known to me regarding this investigation.  Rather, I have set forth only those facts which I believe are necessary to establish probable cause to support issuance of the requested criminal complaint and arrest warrant.

## II.      **PROBABLE CAUSE**

4.      During the evening of May 31, 2020, following peaceful protests in Atlantic City, New Jersey, a group of persons engaged in a spree of rioting, destruction, and looting of stores located in and around the Tanger Outlets (locally referred to as "the Walk").  Atlantic City Police Department officers responded to this area in order to ensure the safety of residents and in an effort to protect commercial spaces and apprehend persons engaged in this ongoing criminal conduct.

5.      Around approximately 8:30 p.m., responding officers observed MATCHETT standing in the middle of a roadway near the Tanger Outlets yelling obscenities at police and enticing persons around him to join in looting.  Officers ordered MATCHETT to disperse several times.  After he refused, officers placed MATCHETT under arrest.  During a search-incident-to-arrest, officers located within MATCHETT's book bag a folding knife, a hatchet, and a jar containing a liquid that appeared to be gasoline based on its appearance and odor.

6.      The following day, on or about June 1, 2020, I conducted a search of the social media platform Facebook for any accounts associated with MATCHETT and the riot and looting

–2–

that took place in Atlantic City, New Jersey, the night before.  During my search, I located a publicly accessible Facebook page in the name "Carlito Matchett (Carlito's Way)[,]" which featured numerous profile pictures of MATCHETT.

7.       Upon inspection of MATCHETT's Facebook page, I observed that shortly before his arrest the night before, on May 31, 2020 at 6:42 p.m., MATCHETT authored a post on his Facebook page which stated "LET'S START a RIOT" and featured a link to a news article about the ongoing riots and looting taking place at the time in Philadelphia, Pennsylvania.

8.       In addition, I observed among MATCHETT's most recent Facebook posts a video that appeared to have been recorded on May 31, 2020 by MATCHETT using a cellular telephone.[1] The video, which has since been removed,[2] depicted scenes of looting and rioting in and around the Tanger Outlets in Atlantic City, New Jersey.  During the video, I heard MATCHETT yell obscenities and derogatory remarks at police officers who were visible nearby.  Afterwards, MATCHETT approached a group of persons standing near a storefront with a broken window. MATCHET made statements to these persons encouraging and directing them to enter the store and take property.  MATCHETT also made statements to them indicating that he would provide

---

[1] Although MATCHETT was not visible due to the vantage point, I believe that he was the person who made the video based on the sound and inflection of his voice and my subsequent review of other videos on MATCHETT's Facebook page showing him speaking into the camera.

[2] FBI personnel attempted to download the video, but were unable to do so prior to its removal from the Facebook page.  A preservation request has been submitted to Facebook, Inc. for MATCHETT's Facebook page.

–3–

cover so that they could steal goods from within. Around the same time, I observed persons breaking into and looting stores, including the one nearest to where MATCHETT stood.

### III.   CONCLUSION

9.     Wherefore, your Affiant submits that, based upon the facts described above, there is probable cause to support issuance of the requested criminal complaint and arrest warrant.

10.     Because this application and the Affidavit pertain to an ongoing criminal investigation, and because disclosure of the information contained herein as well a disclosure of the arrest warrant being requested may compromise the investigation and increase the risk of harm for law enforcement officers who are responsible for conducting the arrest, I request that this Affidavit, the application in support of it, the resulting arrest warrant, and all related documents be filed under seal until further order of the Court, except for a copy of the arrest warrant and may be served at the time of execution.

11.     The information contained in this Affidavit is known to be true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

BRIAN J. CORCORAN, JR.
SPECIAL AGENT, FBI

Pursuant to Fed. R. Crim. P. 4.1, Special Agent Brian J. Corcoran, Jr. was sworn and attested to the contents of this affidavit in support of the criminal complaint and arrest warrant requested herein.

_____          Date: June 3, 2020
HON. KAREN M. WILLIAMS
United States Magistrate Judge

–4–

**Exhibit RR - Page 160 of 276**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

Eastern District of Wisconsin

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 18-892 m(N) |
| Van L. Mayes | ) |
| DOB: xx/xx/1987 | ) |
| | ) |
| | ) |
| _Defendant(s)_ | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____August 13-14 2016_____ in the county of _____Milwaukee_____ in the
_____Eastern_____ District of _____Wisconsin_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C § 844(i) | Attempted arsons |
| Title 18 U.S.C § 922(g) | Possession of a firearm by a prohibited person |
| Title 18 U.S.C § 924(c)(1)(B)(ii) | Possession of a destructive device in relation to a crime of violence |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_Complainant's signature_

Special Agent Rick Hankins, ATF
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____6-27-18_____

_Judge's signature_

City and state: _____Milwaukee, Wisconsin_____

Honorable Nancy Joseph, Magistrate Judge
_Printed name and title_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTER DISTRICT OF WISCONSIN

### AFFIDAVIT FOR A CRIMINAL COMPLAINT AND ARREST WARRANT

1.      I am a Special Agent of the United States Justice Department, Bureau of

Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee

Field Office.  I have been so employed since April 2003.  My duties as a Special Agent

with ATF include investigating alleged violations of the federal firearms, explosives,

and arson statutes.

2.      I have completed approximately 26 weeks of training at the Federal Law

Enforcement Training Center (Glynco, Georgia), as well as the ATF National Academy.

That training included various legal courses related to Constitutional Law as well as

search and seizure authority.  Additionally, I have received training on how to conduct

various tasks associated with criminal investigations, such as: interviewing,

surveillance, and evidence collection.

3.      In addition to my duties as a criminal investigator, I am also an ATF

Certified Fire Investigator (CFI).  As an ATF CFI, I am tasked with providing expert

opinions as to the origin and cause of fires.  I obtained the ATF CFI certification in 2009

following a two-year training program that centered on various fire science topics

including, but not limited to: chemistry, fire dynamics, and building construction.  The

two-year ATF CFI certification program consisted of college courses, written exams,

research papers, reading assignments, practical training exercises, and test burns of

various materials.  I am re-certified annually as an ATF CFI. To date, I have participated

1

in over 235 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,200 class hours of fire related training. Furthermore, I have been an instructor regarding fire related topics on 38 occasions for the following agencies and institutions: The National Fire Academy (FEMA), International Association of Arson Investigators Chapter 25, Waukesha County Technical College, and Blackhawk Technical College. I have also participated in over 185 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from August 2015 – August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

4.     I have previously applied for and received search warrants related to the crime of arson, firearms trafficking, illegal possession of firearms, as well as other crimes.

5.     Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

6.     As a federal law enforcement officers, I am empowered by law to conduct investigations of, and to make arrests for, federal felony offenses.

2

7.     This affidavit is being submitted in support of a criminal complaint for
Van L. MAYES (age 31). Because this affidavit is being submitted for the limited
purpose of establishing probable cause for a criminal complaint, I have not included
every detail of every aspect of the investigation. Rather, I have set forth only those facts
that I believe necessary to establish probable cause. The information contained in this
affidavit is based upon my personal knowledge, my review of documents and other
evidence, and my conversations with other law enforcement officers and other
individuals.

8.     I respectfully submit that there is probable cause to believe that on or
about August 15, 2016, MAYES committed crimes in violation of 18 U.S.C §§ 844(i)
(attempted arson), 922(g) (possession of a firearm by a prohibited person), and
924(c)(1)(B)(ii) (possession of a destructive device in relation to a crime of violence).

9.     The victim in this case include the Milwaukee Police Department
(hereinafter "MPD"). MPD is a municipal police agency that provides law enforcement
services to the City of Milwaukee, Wisconsin. Activities of MPD include patrolling
traffic on the interstate and other roads, checking whether stopped persons or vehicles
are wanted by federal or out-of-state authorities, and investigating or arresting
individuals who live or conduct business outside of Wisconsin. As such, I respectfully
submit that activities of MPD affect interstate commerce.

## PROBABLE CAUSE

10.     On August 13 and 14, 2016, Milwaukee experienced widespread arson,
rioting, and looting in the area surrounding Sherman Park. The rioting and looting was,

3

in part, a response to Milwaukee Police Officer Dominique Heaggan-Brown's shooting
of Sylville Smith at the intersection of N. 44th Street and W. Auer Ave.

11.     Through an investigation into these arsons, the United States Bureau of
Alcohol, Tobacco, Firearms, and Explosives (hereinafter "ATF") discovered that several
individuals, known and unknown and including Van L. MAYES, conspired and
attempted to use Molotov cocktails[1] to firebomb the Milwaukee Police Department
(MPD) District Seven Station located at 3626 W. Fond du Lac Ave. Milwaukee, WI,
which is a building used in interstate commerce.

12.     On August 23, 2016, ATF was contacted regarding Molotov cocktails
located within a dumpster at XX8X N. Sherman Blvd., Milwaukee. Inside of the
dumpster, ATF Special Agents located a brown cardboard box holding ten glass bottles
containing gasoline with a dark-colored fabric wick inserted into the openings. From
training and experience, the agents identified these devices as Molotov cocktails. The
Molotov cocktail bottles were labeled as Mike's Hard Lemonade, Everfresh Juice, Mistic
Juice, and Seagram's Escape Wine Coolers, which had been shipped or transported in
interstate commerce.

13.     ATF identified Van L. MAYES as a person of interest; and on August 29,
2016, agents conducted a search warrant at MAYES' residence. In his residence, agents
located Seagram's Escape Wine Cooler and Everfresh Juice bottles. These bottles were

---

[1] A Molotov cocktail is a glass container or bottle that holds a flammable liquid, often gasoline. A wick is inserted
into the container or bottle and then lit. The container or bottle is thrown causing fire to spread upon impact.

4

the same brands of the bottles that were used in the construction of the Molotov

cocktails recovered by agents on August 23.

14.     On August 30, 2016, ATF agents conducted a search at an apartment

located at XX8X N. Sherman Blvd. During the search, agents located evidence of

Molotov cocktails: ripped dark-colored fabric consistent with the fabric found in the

recovered Molotov cocktails; two partially empty gas cans inside of a bedroom; a gas

can nozzle within the apartment's yard; a Mike's Hard Lemonade bottle; and Seagram's

Escape and Mistic Juice bottle caps, which were consistent with the types of bottles used

to construct the recovered Molotov cocktails.

15.     On September 20, 2016, ATF Agents informed MAYES that bottles that

came from MAYES' residence may have been used to manufacture Molotov cocktails.

MAYES said that the bottles came from his residence so his DNA would be on them.

MAYES said that he drank from Everfresh Juice and Seagram's Escape bottles.

16.     From the investigation, ATF agents discovered that MAYES was a

coordinator of "Program the Parks," which was an organization focused on mentoring

for Sherman Park teenagers.

17.     Source of Information-1 (SOI-1) stated that a few days after the rioting on

or about August 15, MAYES, C.E., C.M., B.H., and others met by the burned down BP

Gas Station in Sherman Park and discussed firebombing the police station located at

3626 W. Fond Du Lac Ave. The group agreed to meet at the apartment located at XX8X

N. Sherman Blvd. to further the plan. XX8X N. Sherman Blvd is approximately a half of

a mile from the police station located at 3626 W. Fond Du Lac Ave. SOI-1 stated that

5

MAYES brought gas cans and glass bottles to the location. MAYES, C.M., and M.W. began to manufacture the Molotov cocktails. SOI-1 said some of the bottles were juice bottles, and there was a black coat that was ripped and used for the Molotov cocktail wicks. SOI-1 said D.M. acted as lookout while the Molotov cocktails were being manufactured. The finished Molotov cocktails were placed into a cardboard box. SOI-1 saw B.H. and others bring a bag of rocks to XX8X N. Sherman Blvd. B.H. was organizing Sherman Park teenagers and telling them about the plan to firebomb the police station. SOI-1 said the plan to attack the police station did not happen because C.M. thought too many people knew of the plan.

18.     In February 2017, Source of Information-2 (SOI-2) stated that on or about August 15, he was at XX8X N. Sherman Blvd., and there were approximately twenty adults and teenagers there. SOI-2 identified D.M. and a "large dude" as the people who were manufacturing Molotov cocktails when SOI-2 was there. D.M. asked SOI-2 if he would throw rocks at police so others could firebomb the police station with the Molotov cocktails. SOI-2 stated that the adults voted not to firebomb the police station that night. SOI-2 saw the bag of rocks and the box of Molotov cocktails placed into C.M's car.

19.     In February 2017, Source of Information-3 (SOI-3) stated that on or about August 15, SOI-3 met B.H. to discuss some events that followed the evening of the fires. B.H. told SOI-3 that police recovered Molotov cocktails and gas cans from XX8X N. Sherman Blvd. B.H. told SOI-3 that they "covered up" the gas cans by saying that they were used for a generator.

6

20.     In November 2016, Source of Information-4 (SOI-4) stated that after the shooting of Sylville Smith on August 13, SOI-4 heard MAYES say that Sylville Smith needs justice. SOI-4 stated that on or about August 15, s/he went to XX8X N. Sherman Blvd. with about twenty other adults and teenagers. While at the location, SOI-4 saw MAYES, C.E., and B.H. SOI-4 saw MAYES sitting next to a black fabric bag filled with rocks. Also next to MAYES, SOI-4 saw a box with several empty glass bottles. SOI-4 said that MAYES was wearing gloves and filling the bottles with gasoline, dipping ripped shirts into a bowl of gasoline, and placing the soaked fabric into the tops of the bottles. SOI-4 said some of the bottles were Everfresh Juice bottles. At this gathering, SOI-4 heard adults discussing a plan to firebomb the MPD district police station located at 3626 W. Fond Du Lac Ave. SOI-4 stated that s/he and others drove by the police station located at 3626 W. Fond Du Lac Ave. and saw police on the building's rooftop. SOI-4 and the others went back to XX8X N. Sherman Blvd. and told the others that the police were ready for them. SOI-4 stated that because of the heavy police presence, the group decided against attacking the police station that night.

21.     From the investigation ATF agents discovered that some of the youth who participated in MAYES' "Program the Parks" were present for the manufacturing of the Molotov cocktails and were asked to throw rocks at police.

22.     From electronic evidence recovered from MAYES' residence during the August 29 search warrant, ATF discovered several videos recorded by MAYES during the rioting on August 13 and 14.

7

23.     In Video 1 from MAYES' cellphone, he recorded himself during the civil unrest on August 13. During this video, a large group is seen in front of a line of Milwaukee Police Officers. In the video, MAYES is heard saying, "Where the rocks at? Who got the rocks?" and "Fuck you all! Punk ass cops. Getting they ass rocked!"

24.     In Video 2 recovered from MAYES' cellphone, he recorded himself during the civil unrest on August 13. In this video, MAYES has his face covered with a mask and is heard saying, "They killing their ass with these motherfucking rocks. Rocking their shit. Shit going down."

25.     In Video 3 recovered from MAYES' cellphone, he recorded a group of individuals who were damaging a police squad car during the rioting.

26.     ATF also viewed videos from MAYES' Facebook account.

27.     On August 14, 2016, at approximately 12:33 a.m., MAYES posted a Facebook video that captured MAYES walking near the intersection of Fond du Lac and Burleigh. In that video, MAYES stated that Milwaukee rioting "[T]urned into Baltimore. It turned into Ferguson. And it was necessary." In this same video, MAYES is heard describing the police district station located at 3626 W. Fond Du Lac Ave. as one of the "worst police departments, District Seven."

28.     On August 15, 2016, at approximately 7:12 p.m., MAYES posted a collage of photos to his Facebook page of Milwaukee Police Officer Dominique Brown Heaggan with the following statement: "Officer Dominique Brown Heaggan killed #SyvilleSmith. Yall know what to do…Let's get this out!!! #Fuckem #FTP." FTP is an acronym for "fuck the police."

8

29.     Further examination of MAYES' Facebook records showed that MAYES sent a private message at approximately 9:13 p.m. on August 15 to a person believed to be his sister, and the message stated, "Fa sho... Shit bout to get real tonight. Just so u know."

30.     Also on August 15, MAYES posted a video to Facebook at approximately 9:50 p.m. in which he announced to people walking near Sherman Park, "It's about to get real. Y'all are leaving. Y'all ain't going to see how real it's going to get."

31.     MAYES' cellphone records from August 15, 2016 show that his cellphone, at time that the Molotov cocktails were being manufactured, was utilizing a cell tower that provided coverage in the area of XX8X N. Sherman Blvd.

32.     A Molotov cocktail is a destructive device and a firearm.[2]

33.     MAYES is prohibited from possessing firearms because he has a felony conviction from Milwaukee County Case 2005-CF-2586 (Drive/Operate a Vehicle Without Consent). That conviction remains of record and unreversed.

---

[2] Under 18 U.S.C. § 921(a)(3, 4), the definition of "firearm" includes a "destructive device", which includes: "(i) any explosive, incendiary, or poison gas (ii) bomb, (iii) grenade, (iv) rocket having a propellant charge of more than four ounces, (v) missile having an explosive or incendiary charge of more than one-quarter ounce, (vi) mine, or (vii) device similar;... and any combination of parts either designed or intended for use in converting any device into a destructive device...."

9

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of Ohio

**FILED**
6:55 pm Jun 05 2020
**Clerk U.S. District Court**
**Northern District of Ohio**
**Youngstown**

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| JAYWUAN PEAVY | )   Case No.   4:20M6092 |
| | ) |
| | ) |
| | ) |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 30, 2020, _____ in the county of _____ Richland _____ in the
_____ Northern _____ District of _____ Ohio _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. Sections 2101(a)(1) and (2) | Use of a facility of interstate or foreign commerce with the intent to organize, promote, encourage, participate in, or carry on a riot |

This criminal complaint is based on these facts:

On or about May 30, 2020, JAYWUAN PEAVY did unlawfully, knowingly use a facility of interstate or foreign commerce with the intent to organize, promote, encourage, participate in, or carry on a riot, in violation of Title 18 U.S.C. Section 2101(a)(2).

☑ Continued on the attached sheet.

_____
*Complainant's signature*

John R. Minichello, Special Agent, FBI
*Printed name and title*

Sworn to via telephone after submission by
reliable electronic means. Crim.Rules. 4.1; 41(d)(3).

Date:  June 5, 2020                          /s/George J. Limbert
                                             *Judge's signature*

City and state:          Youngstown, Ohio          George J. Limbert, U.S. Magistrate Judge
                                             *Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

CLEVELAND DIVISION

UNITED STATES OF AMERICA

Case No. ___4:20M6092___

v.

**Filed Under Seal**

JAYWUAN PEAVY

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT AND CRIMINAL COMPLAINT

I, John R. Minichello, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent ("SA") with the FBI and served in that capacity since
graduating from the basic agent training program at the FBI Academy in Quantico, Virginia in
2010.  I am currently assigned to the FBI Cleveland Division.  As such, I am an "investigative or
law enforcement officer" of the United States within the meaning of Title 18, United States
Code, Section 2510(7), that is, an officer of the United States who is empowered by law to
conduct investigations of and to make arrests for offenses enumerated in Title 18, United States
Code, Section 2516(1).

2.      Prior to serving as an SA with the FBI, I served as an infantry officer in the United States Army for five years. In this role, in addition to my duties as a leader of troops in combat, I conducted investigations into criminal misconduct under the Uniform Code of Military Justice.

3.      As a federal law enforcement officer, I have participated in and conducted investigations involving the violation of federal narcotics and terrorism statutes.

4.      I have participated in investigations involving the search and exploitation of communications facilities, social media accounts, and digital media. During these investigations, I have participated in interviewing witnesses and cooperating sources regarding illegal trafficking in controlled substances and I have read official reports of similar interviews by other officers.

5.      I am familiar with the methods with which individuals mask their identity in order to evade law enforcement while engaging in criminal activity using the internet.

6.      I have been involved in numerous investigations into individuals transmitting threats or threatening information via the internet and as part of those investigations, I have drafted search warrants, including affidavits for the search of digital media and social media accounts, and have executed search warrants and arrests based on these warrants.

Exhibit RR - Page 173 of 276

7.    Your Affiant bases this affidavit upon personal knowledge and observations made during the course of this investigation, and upon my personal review of records, documents, and items lawfully obtained by third parties, public records, and interviews.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.  The Affiant is familiar with the information contained in this affidavit based upon the investigation I have conducted to date and based on my conversations with other law enforcement officers who have been involved in this investigation, some of whom have also been engaged in numerous investigations involving domestic terrorism. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of an arrest warrant, I have not included each and every fact I know about the investigation.

8.    Title 18, United States Code, Section 2101, provides that "Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent 1) to incite a riot; or 2) to organize, promote, encourage, participate in, or carry on a riot; or 3) to commit any act of violence in furtherance of a riot; or 4) to aid or abet any person in inciting or participating in  or carrying on a riot or committing any act of violence in furtherance of a riot" shall be guilty of a federal offense.

3

## BACKGROUND

9.      On or about June 2, 2020, an identified individual provided the Mansfield Ohio

Police Department with images of a Facebook account with username "Mansfield Riot."  The

images included text of the following statements: (1) "PARK AVE RIOT JUNE 5TH @7PM we

hit the streets to endure on destruction!!!" (2) "We will be launching 3 attacks on Mansfield

stores and will not be announcing once its commenced this is only the beginning

#BLACKLIVESMATTER #ENDOFMANSFIELDPARTY," and (3) "me and my squad will be

flooding park ave to protest for #GeorgeFloyd and the city of Mansfield Please join us Friday

June 5th 2020 @ 7pm."  Based upon the timestamp, the first statement appears to have been

posted on Saturday, May 30, 2020, with the latter statements being posted on a subsequent day.

Investigators attempted to access the Facebook page but it was inaccessible.

10.     The images provided to the Mansfield Police Department were as follows:




4



## PROBABLE CAUSE

11.     On or about June 3, 2020, based on the threatening nature of the Facebook posts, investigators obtained a search warrant signed by the Richland County Municipal Magistrate Judge for the identified Facebook account. In response to the warrant, Facebook provided identifying geolocation information and IP addresses associated with the account mansfield.riot.9, username "Mansfield Riot." Facebook also provided the account creation date of 2020-05-30 19:24:45 UTC and IP address associated with the account as 2605:a000:122a:4808:b154:34b9:3f91:f26f.

12.     Investigators identified the provider for the Internet Protocol address associated with the user of the account as Spectrum/Charter Communications. At the request of investigators, Spectrum/Charter Communications advised the IP address was issued to subscriber Jaywuan Peavy of 1165 Harwood Dr Apt D Mansfield, Ohio 44906.

5

13. Based on this and other information, investigators obtained an arrest warrant for Jaywuan Peavy. On or about June 4, 2020, investigators arrested Peavy at 1165 Harwood Dr Apt D Mansfield, Ohio, and executed a search warrant issued for this same location. Investigators obtained a firearm, suspected heroin, as well as a cellular telephone belonging to Jaywuan Peavy.

14. Following his arrest or about June 4, 2020, investigators interviewed Jaywuan Peavy. During the recorded interview, Peavy agreed that he was read his Miranda Warning and that he was giving a statement of his own free will. Peavy admitted that he created the "Mansfield Riot" Facebook page and that he also uses a second Facebook page with username "Jaywuan Nabron Peavy." On the "Mansfield Riot" account, he admitted to posting, "We will be launching 3 attacks on Mansfield stores and will not be announcing once its commenced this is only the beginning #BLACKLIVESMATTER #ENDOFMANSFIELDPARTY." Peavy also admitted to posting, "The mayor of Mansfield never cared for the city me and my squad will be flooding park ave to protest for #GeorgeFloyd and the city of Mansfield Please join us Friday June 5th 2020 @7pm." Peavy also admitted to posting, "Mansfield Police Department is a racist bias police department portraying using a Weed small to arrest black people and quick to drawn a weapon when interacting with black people PARK AVE RIOT JUNE 5th @7pm we hit the streets to Endure on Destruction!!!" On the "Jaywuan Nabron Peavy" Facebook account, Peavy admitted that he posted, "N***a I'm finna lead the riot we finna come up."

## CONCLUSION

15. Based on the information set forth in this affidavit, I submit that there is probable cause to believe:

16. On or about May 30, 2020, Defendant Jaywuan Peavy used a facility of interstate

6

commerce with the intent (a) to incite a riot, and (b) to organize, promote, encourage, participate in, and carry on a riot, in violation of Title 18, United States Code, Sections 2101(a)(1) and (2).

17.     Based on the aforementioned factual information, Affiant respectfully submits that there is probable cause to support a complaint and arrest warrant charging JAYWUAN PEAVY with using a facility of interstate or foreign commerce with the intent to organize, promote, encourage, participate in, or carry on a riot, pursuant to Title 18 U.S.C. § 2101(a)(2) and (4).

Respectfully submitted,

John R. Minichello
Special Agent
FBI

Subscribed and sworn to before me on _____June 5,_____, 2020.

/s/George J Limbert
UNITED STATES MAGISTRATE JUDGE

7

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of North Carolina

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   5:20-MJ-1575-JG |
| | ) | |
| Charles Anthony PITTMAN | ) | |
| | ) | |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 30, 2020 _____ in the county of _____ Cumberland _____ in the

____ Eastern ____ District of ____ North Carolina ____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. §§ 844 (f)(1), (f)(2) and 2 | Maliciously damaged by means of fire a building, which building is in part owned and possessed by the City of Fayetteville, an organization receiving Federal financial assistance, and such conduct created a substantial risk of injury to other persons, and aiding and abetting. |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

On this day, _J&ff Silver_
appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Complaint.

_5 June 2020_
Date: ~~06/04/2020~~

City and state:                Raleigh, NC

_Jeffrey M Silver_
Complainant's signature

Jeff Silver, Special Agent
Printed name and title

_[signature]_
Judge's signature

James E. Gates, U.S. Magistrate Judge
Printed name and title

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

**Probable Cause Affidavit**

I, Jeff Silver, hereinafter designated as affiant, having been duly sworn according to law, deposes and states that:

1. Affiant is a Special Agent with the United States Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Affiant has been so employed since December of 2013 and is currently assigned to the Fayetteville, North Carolina Field Office within the Charlotte, North Carolina Field Division. Affiant graduated from the Special Agent Basic Training Academy (ATF National Academy) and the Federal Law Enforcement Training Center in July of 2014. Affiant has received extensive training at the ATF National Academy in the investigation of firearms, arson, and explosives offenses. Affiant is also a member of the ATF National Response Team (NRT), which responds to major fire and explosive incidents nationwide, since June of 2017.

2. Affiant's duties include, but are not limited to, enforcing the Federal firearms laws as well as other laws committed in violation of Federal Statutes. During Affiant's employment with ATF, Affiant has conducted and assisted in numerous firearms, narcotics, and fire investigations. Prior to being hired with ATF, Affiant was an eighteen year veteran of the fire service in both career and volunteer leadership positions.

3. As a result of Affiant's training and experience as an ATF Special Agent, Affiant is familiar with Federal criminal laws and has participated in the investigations of criminal violations of federal law, including, but not limited to Title 18 United States Code Section 844.

4. This affidavit is based on personal knowledge gained from participating in this investigation, interviews by the Affiant or other participating agents or officers during the investigation, and conclusions the Affiant has reached based off of training and experience in the investigation of offenses involving federal arson violations. Affiant is not including every fact of the investigation, but only the necessary information needed to obtain probable cause.

**Facts in Support of Probable Cause**

5. On or about May 30, 2020, a protest took place in downtown Fayetteville, North Carolina. At approximately 7:15 p.m., the previously peaceful protest turned violent as multiple individuals, both known and unknown, set fire to a federal historic landmark known as the Market House. The Market House, located at One Market Square in Fayetteville, N.C. 28301, was built in 1832 and was entered into the National Register of Historic Places on



September 15, 1970.  The Market House is owned and operated by the City of Fayetteville,
which receives federal funding annually—as confirmed by City officials.

6.  One individual identified as taking part in setting the Market House ablaze is Charles
Anthony PITTMAN, dob 10/10/1987.  Local media covering the protest filmed PITTMAN
standing on the second story balcony of the Market House holding a red, plastic gasoline
container.  PITTMAN wore a black t-shirt with a black and white photo of Martin Luther
King, Jr. addressing a crowd on the National Mall.  PITTMAN also wore white ear-buds
which were dangling from one ear, down his chest, and partially tucked into the neckline of
his t-shirt.



7.  PITTMAN spread gasoline throughout the second story floor of the Market House.  An
employee, who responded to the Market House when the alarm went off, witnessed several
individuals on the second floor busting out windows and breaking furniture.  One of those
individuals, who the employee later identified as PITTMAN, went to an open window to
show the crowd below the red gasoline container in his hands.  The employee watched as
PITTMAN began to douse the floor of the second story with the gasoline.  The employee's
attention turned to the other individuals.  However, when the employee turned back to
PITTMAN, he noticed PITTMAN standing next to a fire—right where the employee
witnessed PITTMAN pour gasoline.  PITTMAN then ran out of the Market House.

8.  The next day, a crime analyst from the Fayetteville Police Department confirmed
PITTMAN's identity from the live television image and other social media outlets.  The
analyst provided a Facebook Live video from PITTMAN's profile, Charles KingCappo
Pittman, to ATF Agents.  The video, recorded earlier in the day on May 30, 2020, showed

PITTMAN driving his vehicle in downtown Fayetteville. PITTMAN wore the same black t-shirt with the black and white photo of Martin Luther King, Jr., as well as the white ear-buds.



9. In the video, PITTMAN discussed the Market House. PITTMAN started with saying, "I'm out here doing the scopey scopey. I'm out here doing the scope. Scoping out the scene." As PITTMAN pulled up to the traffic circle with the Market House in the middle, he said, "It looks like it's there for the taking." As he passed a Fayetteville Police Department patrol car, PITTMAN said, "But they know it's coming. They are waiting." After discussing whether slaves were sold at the Market House, PITTMAN declared, "maybe it should come down." As PITTMAN pulled away from the Market House he told the Facebook Live crowd, "We'll be back. We'll be back...I'll be back y'all. 100."

10. In the video, the steering wheel of PITTMAN's car can be seen with a Mercedes Benz emblem in the middle. A North Carolina Department of Motor Vehicles records check confirmed a 2001 Mercedes Benz E320 is registered to PITTMAN.

11. The Market House sustained damage as a result of the fires on May 30, 2020. This damage includes charring and discoloration on the exterior stairway and supportive railing; charring



and discoloration to the wooden stairs and supportive railing; charring and discoloration to
the wooden safety rail located on the exterior second floor balcony; discoloration and soot
on the interior walls around the entrance doorway and wooden stairs that accessed the
second floor; and charring and mass loss to the wood flooring on the second floor.

12. Based on the foregoing investigation, probable cause exists to believe that the subject,
Charles Anthony PITTMAN, aiding and abetting others, did violate Federal law including
Title 18, United State Code Sections 844(f)(1), (f)(2), and 2.  I respectfully request that a
complaint warrant be issued for Charles Anthony PITTMAN.


_____ *Jeffrey M Silver* _____
Jeff Silver
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


On this ___5___ day of June 2020, Jeff Silver appeared before me via reliable electronic means,
was placed under oath, and attested to the contents of this affidavit.

_____
JAMES E. GATES
UNITED STATES MAGISTRATE JUDGE

AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

**for the**
**Western District of New York**

United States of America

v.

**Case No. 20-MJ-676**

**DYSHIKA MCFADDEN**
**-and-**
**MIGUEL RAMOS,**

*Defendants*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about May 30, 2020, in the County of Monroe, in the Western District of New York, **DYSHIKA MCFADDEN and MIGUEL RAMOS** did knowingly and unlawfully conspire to commit arson, in violation of Title 18, United States Code, Section 844(n) (conspiracy to commit arson) and Title 18, United States Code, 844(i) and 2 (arson).

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim.P. 4.1 and 4(d) on:

ATF SPECIAL AGENT RYAN J. SZWEJBKA
*Printed name and title*

Date: _____ June 30 _____ , 2020

_____
*Judge's signature*

City and State:  Rochester, New York

HONORABLE MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

 IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

-v-

DYSHIKA MCFADDEN                              20-MJ-0676

       -and-

MIGUEL RAMOS,

              Defendants.
_____

State of New York   )
County of Monroe    )   ss:
City of Rochester   )

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

**RYAN J. SZWEJBKA**, being duly sworn, deposes and says:

1.      I am a Senior Special Agent ("SA") with the United States Department of
Justice, Bureau of Alcohol, Tobacco, Firearms, & Explosives ("ATF"), and I am assigned to
the Rochester, New York Field Office.   Accordingly, I am the kind of Special Agent
delineated in Title 18, United States Code, Section 3051.


2.      I am a graduate of the Criminal Investigator School and the ATF National
Academy, both located at the Federal Law Enforcement Training Center in Glynco, Georgia.
I have been employed as an ATF Special Agent for over 18 years.  As part of my professional
experience, I have participated in state and federal investigations involving the illegal
possession of firearms, narcotics, and violations of federal laws to include Titles 18 and 26,

United States Code and am familiar with various federal arson laws.  Previously, I was employed by the State of South Carolina as a Probation and Parole Agent for one and one half years.  I earned a Bachelor's of Science Degree from the University of South Carolina (USC) in Criminal Justice in 1996.  I received my Master's Degree from USC in Criminal Justice in 1999.  I have participated in the service of State and Federal search and seizure warrants and have seized or assisted in seizing contraband, including firearms, ammunition, documentary evidence and contraband.

## PURPOSE OF AFFIDAVIT

3.      This affidavit is submitted in support of a criminal complaint which alleges there is probable cause to believe that on or May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial District of New York, the defendants, DYSHIEKA MCFADDEN (hereinafter MCFADDEN) and MIGUEL RAMOS (hereinafter RAMOS) did commit violations of Title 18, United States Code, Section 844(n) (conspiracy to commit arson) and Title 18, United States Code, 844(i) and 2 (arson).


4.      The assertions made herein are based upon my personal knowledge and upon information that I have received from this investigation, including to but not limited to the review of police reports and discussions with other law enforcement agents and officers, all of which are true and correct to the best of my knowledge and belief.  Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I know concerning this investigation.  Rather, I have set forth only those facts that relate to the issue

of whether probable cause exists to believe that the defendant committed the above-mentioned offenses.  In support thereof, I respectfully state the following:

## **PROBABLE CAUSE**

5.      On May 30, 2020, protests were scheduled at the Public Safety Building (PSB), 185 Exchange Boulevard, City of Rochester, Western Judicial District of New York, in response to the death of George Floyd in Minneapolis, Minnesota.  Officers employed by the Rochester Police Department (RPD) were assigned to assist with crowd control during the protests.  Marked patrol vehicles, including patrol vehicle with plate number 463, VIN #2G1WD5E38C1317282 (hereinafter RPD CAR 463) was parked in the front loop of the PSB.  RPD CAR 463 was readily identifiable as a law enforcement vehicle by markings on all sides of the vehicle and a light bar on top.

6.      During the evening, the protests turned violent resulting in damaged property, looting, and fires.  At approximately 5:05 p.m., RPD CAR 463 was damaged by fire.  Due to the violence and rioting, RPD CAR 463 was towed away from the PSB and secured at 945 Mount Read Boulevard, which is the Equipment Services Facility for the City of Rochester.  Once secured, fire investigators conducted an investigation to determine the cause of the fire.  The front passenger seat, driver seat, and the entire front inside compartment of the vehicle were damaged by fire.  The vehicle was determined to be a total loss.  After review of video and photographic evidence, the fire investigators concluded the damage to the vehicle was caused by intentional fire.  Fire investigators removed fire debris samples from the burned seat of RPD CAR 463 for lab analysis.

7.      Upon review of various video footage, including but not limited to City of Rochester blue light cameras, footage from a law enforcement aerial drone, and Facebook Live videos, the RPD Major Crimes Unit was able to identify MCFADDEN and RAMOS as the individuals who intentionally set fire to RPD CAR 463.

8.      Specifically, the videos show a black male with braids wearing a gray RIT hooded sweatshirt and jeans with rips on the quadriceps, later identified as MCFADDEN, spray an apparent aerosol can while using an open flame into the driver side of RPD CAR 463.  A black male wearing a red and blue jacket, jeans, white sneakers, and hat holding a protest sign, later identified as RAMOS, then also used an aerosol can and open flame to set fire inside RPD CAR 463.  These acts led to a fire inside the vehicle.  The photos below are stills from a Facebook Live video that show MCFADDEN and RAMOS lighting RPD CAR 463 on fire.

  

9.　　　At approximately 7:20 p.m. on June 1, 2020, Police Officer Mike Daly from the Town of Gates Police Department viewed a photograph with three males from the protests.  Officer Daly identified the black male with braids wearing a gray RIT hooded sweatshirt and jeans with rips on the quadriceps as MCFADDEN.  Officer Daly had personal knowledge of MCFADDEN based upon two prior encounters with him in the Town of Gates. Officer Daly also had the opportunity to view his Facebook page and identified MCFADDEN from a Facebook Live video clip.

10.　　　On June 3, 2020 at approximately 1:45 p.m., Rochester Fire Investigator Thomas Dorrer and Rochester Police Investigator Nicholas Mazzola spoke to MCFADDEN at the PSB.  MCFADDEN was advised of his Miranda Rights.  He indicated he understood his rights and agreed to waive them and speak with the investigators.  In sum and substance, MCFADDEN acknowledged being at the protest on May 30, 2020.  During the interview, he identified himself in photographs taken from the protests.  In the first photograph, he initially pointed to himself in the RIT sweatshirt but then denied being in the photo.  Later he was shown another photo and identified himself as the male with the braids and blue jeans. Investigators showed him a third photograph during the interview where he identified himself as the individual in the RIT sweatshirt.  During the interview, MCFADDEN admitted to jumping on top of a police car, lighting a marked police car on fire using a lighter and a spray can, helping to flip a vehicle onto its hood, spraying graffiti, and climbing onto a moving fire truck.  MCFADDEN also told investigators that he recorded the riots on his phone.

MCFADDEN's mother brought his phone to the PSB and MCFADDEN reviewed several clips with the investigators.

11.    On June 3, 2020, Investigator Mazzola met with Rochester Police Officer Allen and Officer Mason regarding RAMOS.  Officers Allen and Mason arrested RAMOS on May 30, 2020 at approximately 9:40 p.m. for Riot in the First Degree based upon his actions during the evening.  After reviewing surveillance footage from the torching of RPD CAR 463, Officer Allen and Officer Mason recognized the male wearing a red and blue jacket as RAMOS. Offiers Allen and Mason were able to identify RAMOS based upon their interactions with him during the May 30th arrest.

12.    Based on information provided to me, RPD CAR 463 is the property of the City of Rochester government.  Both the RPD and City of Rochester government conduct business in interstate commerce, for instance by purchasing vehicles and other equipment and supplies in interstate commerce.  Additionally, investigators have verified that RPD CAR 463 was manufactured outside of the state of New York, and therefore affected intestate and/or foreign commerce.  The activities of the RPD and the City of Rochester government in enforcing laws also affect interstate commerce.

**CONCLUSION**

13.    Based upon the above information, I submit that there is probable cause to believe that on May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial District of New York, the defendants, DYSHIEKA MCFADDEN and MIGUEL RAMOS,

did commit violations of Title 18, United States Code, Section 844(n) (conspiracy to commit

arson) and Title 18, United States Code, 844(i) and 2 (arson).

RYAN J. SZWEJBKA
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Affidavit and Criminal Complaint submitted
electronically by email in .pdf format. Oath
administered, and contents and signature, attested
to me as true and accurate telephonically pursuant to
Fed.R.Crim.P. 4.1 and 4(d) on this 30th day of _June_ 2020.

HON. MARK W. PEDERSEN
United States District Court

7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

              v.

MIGUEL RAMOS,

              Defendant.

21-CR-6126

_____

## PLEA AGREEMENT

The defendant, MIGUEL RAMOS, and the United States Attorney for the Western District of New York (hereinafter "the government") hereby enter into a plea agreement with the terms and conditions as set out below.

## I. THE PLEA AND POSSIBLE SENTENCE

1.    The defendant agrees to waive indictment and plead guilty to a one-count Information which charges a violation of Title 18, United States Code, Section 2101(a) (Riot), for which the maximum possible sentence is a term of imprisonment of 5 years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of 3 years. The defendant understands that the penalties set forth in this paragraph are the maximum penalties that can be imposed by the Court at sentencing.

2.    The defendant understands that, if it is determined that he has violated any of the terms and conditions of his term of supervised release, he may be required to serve in prison all or part of the term of supervised release, up to 2 years, without credit for time previously served on supervised release. As a consequence, in the event the defendant is

sentenced to the maximum term of incarceration, a prison term imposed for a violation of supervised release may result in the defendant serving a sentence of imprisonment longer than the statutory maximum set forth in ¶ 1 of this agreement.

## II. ELEMENTS AND FACTUAL BASIS

3.     The defendant understands the nature of the offense set forth in ¶ 1 of this agreement and understands that if this case proceeded to trial, the government would be required to prove beyond a reasonable doubt the following elements of the crime:

First, that the defendant used any facility of interstate or foreign commerce with the intent to commit any act of violence in furtherance of a riot, or to organize, participate in, or carry on a riot.

Second, that the defendant, during the course of such use, or thereafter, performed, or attempted to perform, any other overt act for the purpose of committing any act of violence in furtherance of a riot, or organizing, participating in, or carrying on a riot.

A "riot" means a public disturbance involving an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person.

## FACTUAL BASIS

4.     The defendant and the government agree to the following facts which form the basis for the defendant's guilty plea including relevant conduct:

a.     On or about May 30, 2020, in the City of Rochester, in the Western District of New York, the defendant, **MIGUEL RAMOS,** participated with numerous other individuals (exceeding three persons) in a public protest near the Public Safety Building located at 185 Exchange Street,

2

Rochester, Western District of New York. At various times during the public protest, the gathering turned violent, resulting in significant property damage and looting.

b.    During the course of the riot, the defendant and others used an aerosol can and an open flame to set fire to a marked Rochester Police Department patrol vehicle with license plate number 463, VIN #2G1WD5E38C1317282 (hereinafter "RPD CAR 463") parked in front of the Public Safety Building. RPD CAR 463 was the property of the Rochester Police Department and the City of Rochester government.

c.    The burning of RPD CAR 463 was broadcast and recorded on Facebook Live, which streamed the burning of RPD CAR 463 online in real time. RPD CAR 463 was completely destroyed by fire. The defendant does not contest that the fire was an incendiary, intentionally set fire, set by his own hands with assistance of others.

d.    The defendant further admits and agrees that he utilized his cellular telephone, a facility of interstate or foreign commerce, to communicate with and broadcast to any person or group of persons with the intent to incite, organize, promote, encourage, participate in, carry on, and commit an act of violence in furtherance of a riot. Specifically, the defendant utilized his cellular telephone to take photographs of himself at the riot and sent those photographs to others via text message to encourage them to participate in the riot.

## III. SENTENCING GUIDELINES

5.    The defendant understands that the Court must consider but is not bound by the Sentencing Guidelines (Sentencing Reform Act of 1984).

## BASE OFFENSE LEVEL

6.    The government and the defendant agree that Guidelines §§ 2K1.4(a)(2)(A) applies to the offense of conviction and provides for a base offense level of 20.

3

## ACCEPTANCE OF RESPONSIBILITY

7.     At sentencing, the government agrees not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines §3E1.1(a) (acceptance of responsibility), and further agrees to move the Court to apply the additional one (1) level downward adjustment of Guidelines §3E1.1(b), which would result in a total offense level of 17.

## CRIMINAL HISTORY CATEGORY

8.     It is the understanding of the government and the defendant that the defendant's criminal history category is I. The defendant understands that if the defendant is sentenced for, or convicted of, any other charges prior to sentencing in this action the defendant's criminal history category may increase. The defendant understands that the defendant has no right to withdraw the plea of guilty based on the Court's determination of the defendant's criminal history category.

## GUIDELINES' APPLICATION, CALCULATIONS AND IMPACT

9.     It is the understanding of the government and the defendant that with a total offense level of 17 and criminal history category of I, the defendant's sentencing range would be a term of imprisonment of **24 to 30 months, a fine of $10,000 to $95,000, and a period of supervised release of 1 to 3 years**. Notwithstanding this, the defendant understands that at sentencing the defendant is subject to the maximum penalties set forth in ¶ 1 of this agreement.

10.     The government and the defendant agree to the correctness of the calculation of the Sentencing Guidelines range set forth above. The government and the defendant, however, reserve the right to recommend a sentence outside the Sentencing Guidelines range. This paragraph reserves the right to the government and the defendant to bring to the attention

4

of the Court all information deemed relevant to a determination of the proper sentence in this action.

11.     The defendant understands that the Court is not bound to accept any Sentencing Guidelines calculations and the defendant will not be entitled to withdraw the plea of guilty based on the sentence imposed by the Court.

12.     In the event that the Court contemplates any Guidelines adjustments, departures, or calculations different from those agreed to by the parties above, the parties reserve the right to answer any inquiries by the Court concerning the same.

## IV.  STATUTE OF LIMITATIONS

13.     In the event the defendant's plea of guilty is withdrawn, or conviction vacated, either pre- or post-sentence, by way of appeal, motion, post-conviction proceeding, collateral attack or otherwise, the defendant agrees that any charges dismissed pursuant to this agreement shall be automatically reinstated upon motion of the government and further agrees not to assert the statute of limitations as a defense to any federal criminal offense which is not time barred as of the date of this agreement. This waiver shall be effective for a period of six months following the date upon which the withdrawal of the guilty plea or the vacating of the conviction becomes final.

## V.  REMOVAL

14.     The defendant represents that he is a citizen of the United States. However, if the defendant is not a citizen of the United States, the defendant understands that, if convicted, the defendant may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## VI. <u>GOVERNMENT RIGHTS AND RESERVATIONS</u>

15.     The defendant understands that the government has reserved the right to:

a.      provide to the Probation Office and the Court all the information and evidence in its possession that the government deems relevant concerning the defendant's background, character and involvement in the offense charged, the circumstances surrounding the charge and the defendant's criminal history;

b.      respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government;

c.      advocate for a specific sentence consistent with the terms of this agreement including the amount of restitution and/or a fine and the method of payment;

d.      modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines including criminal history category, in the event that subsequent to this agreement the government receives previously unknown information, including conduct and statements by the defendant subsequent to this agreement, regarding the recommendation or factor; and

e.      oppose any application for a downward departure and/or sentence outside the Guidelines range made by the defendant.

16.     At sentencing, the government will move to dismiss the complaint currently pending against the defendant under Magistrate No. 20-MJ-676.

## VII. <u>RESTITUTION AND FINANCIAL PENALTY PROVISIONS</u>

17.     The defendant understands, and the parties agree, that the Court must require restitution to be paid to the victim(s) of the offense as part of the sentence pursuant to Sentencing Guidelines § 5E1.1 and Title 18, United States Code, Section 3663A. The restitution amount will be determined by the Court at the time of sentencing. The defendant

6

understands that defendant will not be entitled to withdraw the plea of guilty based upon any restitution amount ordered by the Court.

18.    The defendant agrees to disclose fully and completely all assets in which the defendant either has any property interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.  The defendant agrees to make complete financial disclosure to the United States by truthfully executing a sworn financial statement by the deadline set by the United States, or if no deadline is set, no later than two weeks prior to the date of sentencing.  The defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms for the United States to obtain tax information, bank account records, credit history, and social security information.  The defendant agrees to discuss or answer any questions by the United States relating to the defendant's complete financial disclosure.  The defendant will submit to an examination under oath and/or a polygraph examination conducted by an examiner selected by the U.S. Attorney's Office on the issue of the defendant's financial disclosures and assets, if deemed necessary by the U.S. Attorney's Office.  The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by the agreement and/or that may be imposed upon the defendant by the Court.  In addition, the defendant promises that the defendant will make no such transfers in the future.

19.     The defendant agrees that any financial records and information provided by the defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

20.     The defendant understands and agrees that the Court, at the time of sentencing, will order that all monetary penalties imposed at that time (including any fine, restitution, or special assessment imposed in accordance with the terms and conditions of this plea agreement) are to be due and payable in full immediately and will be (i) subject to immediate enforcement as provide for in Title 18, United States Code, Section 3613, and (ii) submitted to the Treasury Offset Program ("TOP") so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts but will not affect any periodic payment schedule set by the Court.

21.     The defendant understands and acknowledges that any schedule of payments imposed by the Court at the time of sentencing is merely a minimum schedule of payments and does not, in any way, limit those methods available to the United States to enforce the judgment.

22.     The defendant agrees that any funds and assets in which the defendant has an interest, which have been seized or restrained by the government or law enforcement as part of the investigation underlying this plea agreement, and not subject to forfeiture, will be used to offset any judgment of restitution and fine imposed pursuant to this plea agreement, or to satisfy any debts owed by the defendant to the United States and/or agencies thereof.

23.     To the extent that the defendant has an interest, the defendant authorizes the District Court Clerk to release any funds posted as security for the defendant's appearance

bond in this case, which funds shall be applied to satisfy the financial obligation(s) of the defendant pursuant to the judgment of the Court.

24.     The defendant is aware that voluntary payment of restitution prior to adjudication of guilt is a factor in considering whether the defendant has accepted responsibility under the United States Sentencing Guidelines § 3E1.1.

## VIII.  APPEAL RIGHTS

25.     The defendant understands that Title 18, United States Code, Section 3742 affords a defendant a limited right to appeal the sentence imposed. The defendant, however, knowingly waives the right to appeal and collaterally attack any component of a sentence imposed by the Court which falls within or is less than the sentencing range for imprisonment set forth in Section III, ¶ 9 above, notwithstanding the manner in which the Court determines the sentence. The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pre-trial motions, discovery and the guilty plea, the constitutionality of the statute to which the defendant is pleading guilty and whether the defendant's conduct falls within the scope of the statute. In the event of an appeal of the defendant's sentence by the government, the defendant reserves the right to argue the correctness of the defendant's sentence.

26.     The defendant understands that by agreeing to not collaterally attack the sentence, the defendant is waiving the right to challenge the sentence in the event that in the future the defendant becomes aware of previously unknown facts or a change in the law which the defendant believes would justify a decrease in the defendant's sentence.

27.     The defendant understands that, pursuant to this plea agreement, the government has agreed not to charge the defendant with a violation of Title 18, United States Code, Section 844(i)(arson), which, if convicted on such charge, would subject the defendant to a mandatory minimum term of imprisonment of 5 years up to a maximum term of 20 years.

28.     The government waives its right to appeal any component of a sentence imposed by the Court which falls within or is greater than the sentencing range for imprisonment set forth in Section III, ¶ 9 above, notwithstanding the manner in which the Court determines the sentence. However, in the event of an appeal from the defendant's sentence by the defendant, the government reserves its right to argue the correctness of the defendant's sentence.

## IX.  **TOTAL AGREEMENT AND AFFIRMATIONS**

29.     This plea agreement represents the total agreement between the defendant, MIGUEL RAMOS, and the government. There are no promises made by anyone other than those contained in this agreement. This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

JAMES P. KENNEDY, JR.
United States Attorney
Western District of New York

By:     _____

CASSIE M. KOCHER
Assistant U.S. Attorney

Dated: September 2, 2021

10

**Exhibit RR - Page 201 of 276**

I have read this agreement, which consists of pages 1 through 11. I have had a full opportunity to discuss this agreement with my attorney, Peter J. Pullano, Esq. I agree that it represents the total agreement reached between me and the government. No promises or representations have been made to me other than what is contained in this agreement. I understand all of the consequences of my plea of guilty. I fully agree with the contents of this agreement. I am signing this agreement voluntarily and of my own free will.

_____
MIGUEL RAMOS
Defendant

Dated:  September 2, 2021

_____
PETER J. PULLANO, ESQ.
Attorney for the Defendant

Dated: September 2, 2021

11

AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

**United States of America**

v.

**Courtland Renford**

_____
_Defendant_

Case No. 20-mj-1043

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 30, 2020, in the Western District of New York, the defendant, COURTLAND RENFORD, did maliciously damage or destroy, and attempt to damage or destroy, by means of fire, Buffalo City Hall, which is a building used in interstate commerce and in any activity affecting interstate commerce, in violation of Title 18, United States Code, Section 844(i).

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
_Complainant's signature_

GERARD M. O'SULLIVAN
SPECIAL AGENT
BUREAU    OF    ALCOHOL,    TOBACCO,
FIREARMS, AND EXPLOSIVES
_Printed name and title_

Sworn to telephonically.

Date: June ____ / ____, 2020

City and State:  Buffalo, New York

_____
_Judge's signature_

HONORABLE JEREMIAH J. MCCARTHY
UNITED STATES MAGISTRATE JUDGE
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK   )
COUNTY OF ERIE       )    SS:
CITY OF BUFFALO     )

**GERARD M. O'SULLIVAN**, being duly sworn deposes and says:

1.     Your affiant has been employed as a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for over twenty-eight years. Your affiant has attended the Department of Homeland Security's Criminal Investigator School, and the ATF National Academy. Through these schools, your affiant has received specific instruction of Federal Firearms and Arson laws. During your affiant's tenure with ATF, your affiant has written numerous affidavits in support of criminal complaints involving violations of the federal firearms laws.

2.     This affidavit is written in support of a criminal complaint against **COURTLAND RENFORD**, charging him with a violation of Title 18, United States Code, Section 844(i), that is maliciously damaging or destroying, or attempting to damage or destroy, by means of a fire or an explosive, Buffalo City Hall, a building used in or affecting interstate commerce. Your affiant makes this affidavit based not only on upon his own personal knowledge of the facts of this case and his own investigation, but also based upon his conversations with other law enforcement officers involved in the investigation of this

case, concerning their investigation of this case and a review of various documents involved in this investigation and case.

## PROBABLE CAUSE

3.       On May 30, 2020, protesters had gathered in Niagara Square, Buffalo, New York.  At approximately 11:25 p.m., an individual captured on video was seen walking up the steps of Buffalo City Hall, located at 65 Niagara Square, carrying a green laundry basket that contained a fire.  The individual then threw the burning laundry basket into the window of Buffalo City Hall, wherein a fire ensued.  Buffalo Police Officers and Fire Department personnel entered City Hall in an effort to extinguish the fire.  Fire Department personnel extinguished the fire. According to Fire Department personnel, items inside Buffalo City Hall had been destroyed and/or damaged.  The individual who threw the fire into Buffalo City Hall was captured on video and can be described as a light to medium skinned black male, skinny build with brown hair.  This individual was captured on video wearing a distinct Chanel face mask.  News cameras captured this individual throw his hands up after he had thrown the lighted laundry basket into Buffalo City Hall.

4.       Based on this information, law enforcement sent out an alert with the individual's picture.  Law enforcement personnel notified Buffalo Police Department personnel that the individual captured on video was **COURTLAND RENFORD** and provided his address in Buffalo, NY.  Buffalo Police and Fire Department personnel went to **RENFORD's** address where they met two (2) females.  Both females gave consent to search the residence.  Inside the residence, Buffalo Police and Fire Department personnel searched

2

the residence and found **RENFORD** hiding behind clothes on the second floor. **RENFORD** was detained and brought to a Buffalo Police Department police vehicle. Buffalo Fire Department personnel verbally read **RENFORD** his Miranda rights, which he acknowledged and agreed to waive. **RENFORD** admitted to setting Buffalo City Hall on fire. Officers also recovered the same distinctive Chanel face mask worn by **RENFORD** inside the residence.

5.    **RENFORD** was transported to the Buffalo Police Department for further questioning. At this point, I conducted a videotaped interview of **RENFORD**. **RENFORD** was advised of his Miranda rights verbally and in writing, which the defendant acknowledged and agreed to waive. **RENFORD** admitted that he was the individual who threw the fire burning inside the laundry basket into Buffalo City Hall. **RENFORD** stated that he watched the fire begin to progress after he threw the burning laundry basket into Buffalo City Hall.

6.    Buffalo City Hall, located at 65 Niagara Square, is a building that is used or engages in activity affecting interstate commerce. The building is comprised of various offices designed to support the City of Buffalo. Buffalo City Hall consists of the following types of offices: the Mayor's Office, Common Council, City Clerk, Executive Departments and Agencies, the Comptroller, Public Authorities, and various Boards and Commissions. The City Clerk, for example, processes birth certificates, death certificates, marriage certificates, issues dog license, and records ordinances enacted by the Buffalo Common Council and every local law. As for the Executive Departments, the Assessment and Taxation Department assesses and oversees the taxes coming into the City of Buffalo. The Administration, Finance, Policy & Urban Affairs, performs financial analysis and recommendations for City of Buffalo projects and operations. The Permit and Inspection Services oversees all development and

3

uses of private property in the City of Buffalo. The Buffalo Urban Renewal Agency is an agency dedicated to redevelopment in the City of Buffalo. Also located in Buffalo City Hall is Sue's Deli, a business involved in sale of food and merchandise in New York and elsewhere. These offices and businesses, along with other offices and businesses are involved in interstate commerce or engage in services that affect interstate commerce. See United State v. Dye, 538 Fed. Appx. 654, 660 n.3 (6th Cir. 2013) (discussing fire set to City Hall that held a courtroom is sufficient to establish interstate nexus) and United States v. Saleh, 2020 U.S. App. LEXIS 16111 (2d Cir. 2020) (finding that a deli satisfies interstate commerce element).

7.    Based on the forgoing facts, your affiant believes probable cause exists that **COURTLAND RENFORD** violated the offense as laid out in the attached complaint.

GERARD M. O'SULLIVAN
Senior Special Agent
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Sworn to telephonically

this ⟨⟨ day of June, 2020.

HONORABLE JEREMIAH J. MCCARTHY
United States Magistrate Judge

4

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 17-910 M (WJ) |
| Stephen Ruffin<br>DOB: xx/xx/1988 | ) ) ) ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 13 and August 14, 2016___ in the county of ___Milwaukee___ in the

___Eastern___ District of ___Wisconsin___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2101(a)(2) | Use of an interstate facility to organize, promote, encourage, participate in, or carry on a riot |
| 18 U.S.C. § 844(i) | Malicious use of fire |
| 18 U.S.C. § 844(h)(1) | Use of fire or explosives to commit any felony prosecutable in federal court |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA Ryan Arnold, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___July 18, 2017___

_____
*Judge's signature*

City and state:            ___Milwaukee, Wisconsin___

Honorable Nancy Joseph, Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and

Explosives (ATF), and have been an agent since April 2014. As an ATF Special Agent, I

have participated in numerous investigations regarding unlawful possession of firearms

by convicted felons, unlawful use of firearms, firearms trafficking, and arson. Prior to my

employment with ATF, I was a Special Agent with the United States Secret Service (USSS)

for approximately 5 years. My duties included providing and planning dignitary

protection, drafting and executing federal search warrants, and investigating organized

fraud networks, counterfeit currency operations, and other financial crimes. Previous to

my tenure with the USSS, I served as a police officer with the Chicago Police Department

(CPD). During part of my career as a CPD Officer, I was assigned to the Organized Crime

Division-Gang Enforcement Unit.

2.      As a law enforcement officer for the United States, I am empowered by law

to conduct investigations of, and to make arrests for, federal felony offenses.

3.      This affidavit is being submitted for the limited purpose of a criminal

complaint for Stephen Ruffin (DOB: 1988). Because this affidavit is being submitted for

the limited purpose of establishing probable cause for a criminal complaint, I have not

included every detail of this investigation. Rather, I have set forth only those facts

necessary to establish probable cause. The information contained in this Affidavit is

1

based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers.

4.    I respectfully submit that there is probable cause to believe that Stephen Ruffin has committed the crimes of: **Rioting** in violation of 18 U.S.C. § 2101(a)(2) (use of an interstate facility to organize, promote, encourage, participate in, or carry on a riot); **Arson** in violation of 18 U.S.C. § 844(i) (malicious use of fire to damage or destroy a building used in interstate commerce); and **Arson in Connection with any Federal Felony** in violation of 18 U.S.C. § 844(h)(1) (use of fire or explosives to commit any felony prosecutable in federal court).

5.    The victim in this case is Big Jim's Liquor store (Big Jim's) located on 2161 W. Hopkins St., Milwaukee, Wisconsin. At all times relevant to this complaint, Big Jim's sold articles and commodities in commerce and was engaged in an activity affecting interstate commerce, and therefore, was operating in a facility used in interstate commerce.

## PROBABLE CAUSE

### Case Background

6.    On August 13 and 14, 2016, Milwaukee experienced widespread rioting and looting in the area surrounding Sherman Park. The rioting and looting followed a Milwaukee Police Officer involved shooting that occurred at the intersection of N. 44 St. and W. Auer Ave. on August 13, 2016.

7.    During the rioting and looting, individuals set fires at the following seven commercial businesses: BP Gas Station, 3114 N. Sherman Blvd., Milwaukee; O'Reilly's

2

Auto Parts, 3405 W. Fond Du Lac Ave., Milwaukee; Jet Beauty, 3501 W. Burleigh St., Milwaukee; BMO Harris Bank, 3536 W. Fond Du Lac Ave., Milwaukee; PJ's Market, 3079 N. 21st St., Milwaukee; MJM Liquor, 2229 W. Fond Du Lac Ave.; Milwaukee; and Big Jim's Liquor, 2161 N. Hopkins Ave., Milwaukee.

8.      On August 14, 2016 at approximately 1:54 a.m., the arson occurred at Big Jim's.

**August 13 Big Jim's Surveillance Footage**

9.      Big Jim's surveillance footage showed that on August 13, 2016 at approximately 8:14 p.m., K.E. and Stephen Ruffin entered Big Jim's to purchase alcohol. Ruffin, who has a shaved head, was wearing an orange shirt with "Safety First" written on the back, khaki cargo shorts, and blue Adidas shoes with white stripes.

**August 14 Big Jim's Surveillance Footage**

10.      Big Jim's surveillance footage from the rear of the business showed that on August 14, 2016 at approximately 12:17 a.m., a black male with a shaved head, who was wearing an orange shirt with "Safety First" written on the back, khaki cargo shorts, and blue Adidas shoes with white stripes arrived at the rear entry door to Big Jim's. This person matched Ruffin's body build and clothing from the August 13 Big Jim's surveillance footage. Ruffin is observed on this surveillance footage carrying bolt cutters. Ruffin is joined by two additional unidentified men. Ruffin and the two unidentified men made numerous attempts to breach the rear entry door to Big Jim's. Ruffin appeared to use his cellphone during this time, which corroborates Ruffin's cellphone data showing

3

him in the area at this time. Unable to gain entry, Ruffin and the two unidentified men departed at approximately 12:24 a.m.

11.     At approximately 1:48 a.m., two black males again approached the rear entry to Big Jim's. One man was wearing khaki cargo shorts, blue Adidas shoes with white stripes, and a dark colored hooded sweatshirt. This man covered his face with what appeared to be an orange shirt that he was wearing under the sweatshirt. This orange shirt was consistent with the orange "Safety First" shirt worn by Ruffin. This person's body build and clothing matched Ruffin's appearance as seen in the previous Big Jim's surveillance footage from August 13 and 14. The other man is unidentified at this time.

12.     At approximately 1:49 a.m., Ruffin is observed with what appears to be a container of charcoal lighter fluid. The unidentified man is observed a short time later spraying the contents of this container around the business' air conditioning unit, which was next to Big Jim's rear entry door.

13.     At approximately 1:54 a.m., Ruffin attempted to breach the rear entry door, and he was again in possession of what appears to be a charcoal lighter fluid container. Moments later, Ruffin and the unidentified man ignited an item that appeared to be paper and placed it near Big Jim's rear entry door. A fire began to spread on the exterior of the building. Ruffin was observed placing a plastic container onto the fire.

14.     At approximately 1:55 a.m., Ruffin and the unidentified man left the area while the fire continued to burn near Big Jim's rear entry door. The arson caused structural damage to the building and to the exterior of Big Jim's.

4

**The Identification of Stephen Ruffin**

15.     ATF Special Agents interviewed K.E. who verified that he was with Ruffin as seen in the August 13 Big Jim's surveillance footage. K.E. stated that Ruffin was the person with the shaved head who was wearing an orange shirt with "Safety First" written on the back, khaki cargo shorts, and blue Adidas shoes with white stripes.

16.     SOI-1 watched the August 13 Big Jim's surveillance footage, and SOI-1 identified Ruffin as the man with the shaved head who was wearing an orange shirt with "Safety First" written on the back, khaki cargo shorts, and blue Adidas shoes with white stripes.

17.     SOI-2 stated that he/she has known Ruffin for several years. SOI-2 identified Ruffin and K.E. in the August 13 Big Jim's surveillance footage. SOI-2 was also able to identify Ruffin in the August 14 Big Jim's surveillance footage, which showed the arson. SOI-2 identified Ruffin as the man with the shaved head who was wearing an orange shirt with "Safety First" written on the back, khaki cargo shorts, and blue Adidas shoes with white stripes and as the man in the dark colored hooded sweatshirt.

18.     SOI-3 stated that he/she has known Ruffin for many years. SOI-3 identified Ruffin from the August 13 Big Jim's surveillance footage. SOI-3 identified Ruffin as the man with the shaved head who was wearing an orange shirt with "Safety First" written on the back, khaki cargo shorts, and blue Adidas shoes with white stripes.

19.     During the search of the Ruffin's residence, law enforcement located Ruffin's cellphone and clothing, which matched the clothing of the Big Jim's arsonist: khaki cargo shorts and blue Adidas shoes with white stripes.

5

**Search of Ruffin's Cellphone**

20.     An analysis of Ruffin's cellphone records was conducted to obtain information regarding Ruffin's cellphone usage. The cellphone records showed that Ruffin's cellphone was used in the area of Big Jim's several times around the time of the arson on August 14.

21.     Furthermore, text messages obtained from Ruffin's cellphone showed that on August 14 he was participating in rioting around Milwaukee. The following are text messages found on Ruffin's cellphone from August 14. At 12:06 a.m., Ruffin received a text message asking if he was at home. At 12:08 a.m., Ruffin responded to that text message by writing, "I'm rioting with em." At 1:21 a.m., Ruffin received a text message asking why he had not called. At 1:22 a.m., Ruffin responded to that text message by writing, "It's a riot out here." The Big Jim's arson occurred at approximately 1:54 a.m.

22.     On September 13, 2016, ATF forensic analysts examined samples collected from the arson. Analysts detected a medium to heavy petroleum distillate, which is consistent with the use of charcoal lighter fluid.

23.     Based on the foregoing, I submit that there is probable cause to issue a criminal complaint and arrest warrant for **Stephen Ruffin**, charging him with violations of **Rioting** in violation of 18 U.S.C. § 2101(a)(2) (use of an interstate facility to organize, promote, encourage, participate in, or carry on a riot); **Arson** in violation of 18 U.S.C. § 844(i) (malicious use of fire to damage or destroy a building used in interstate commerce); and **Arson in Connection with any Federal Felony** in violation of 18 U.S.C. § 844(h)(1) (use of fire or explosives to commit any felony prosecutable in federal court).

6

CR 20·10 4 NEBHNL

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

          Plaintiff,

      v.

MATTHEW LEE RUPERT,

          Defendant.

**INDICTMENT**

18 U.S.C. § 2
18 U.S.C. § 231(a)(3)
18 U.S.C. § 844(i)
18 U.S.C. § 2101(a)

THE UNITED STATES GRAND JURY CHARGES THAT:

**AT TIMES RELEVANT TO THIS INDICTMENT:**

1.    On May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department. The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny. Almost immediately following Mr. Floyd's death, public protests began in Minneapolis and expanded throughout the Twin Cities. Since that time, these predominately peaceful protests have continued in the Minneapolis area and throughout the United States and elsewhere.

2.    In addition to peaceful protests, civil disorders occurred in Minneapolis and around the Twin Cities. These civil disorders included acts of violence, arson, looting, and other malicious damage to property. Large numbers of law enforcement officers and the National Guard were deployed in an effort to quell these civil disorders and protect those individuals engaged in peaceful protests. These civil disorders caused damage to numerous businesses engaged in interstate commerce, and thus obstructed, delayed, and adversely affected interstate commerce. These civil

**Exhibit RR - Page 215 of 276**



SCANNED
JUN 10 2020
U.S. DISTRICT COURT MPLS

United States v. Matthew Lee Rupert

disorders also obstructed, delayed, and adversely affects a federally protected function.

3.     On or about May 28, 2020, Matthew Lee RUPERT—a resident of Galesburg, Illinois—posted to one of his Facebook Accounts "I'm going to Minnesota tomorrow who coming only goons I'm renting hotel rooms."  Earlier that same evening, RUPERT posted other messages to his Facebook Account referencing the public protests occurring in the Twin Cities following the death of Mr. Floyd.

4.     On or about May 29, 2020, at 7:54 p.m., RUPERT posted a video to his Facebook Account indicating that he was in Minneapolis, Minnesota.  The video —filmed by RUPERT holding his own cell phone—was marked as a "live" video and lasted approximately 2 hours and 6 minutes.  The video depicts RUPERT passing out explosive devices he indicates he possessed, encouraging others to throw his explosive devices at law enforcement officers responding to the public protests, actively damaging public property, claiming to light a building on fire, and looting businesses in Minneapolis.

5.     For example, RUPERT'S video depicted the following:

- At timestamp 0:01, RUPERT stated "There are SWAT trucks up there.  They got SWAT trucks up there . . . I've got some bombs if some of you all want to throw them back . . . bomb them back . . . here I got some more . . . light it and throw it."  RUPERT made these statements as he handed out an item with brown casing and a green wick to other individuals.

2

United States v. Matthew Lee Rupert

- At timestamp 0:31, RUPERT stated "Light that bitch and throw it at them." Another unknown male then lit an explosive and threw it. RUPERT goes on to state "he's throwing my bombs" . . . "they're going to bomb the police with them." Shortly thereafter, an explosion is audible in the video and RUPERT repeatedly yelled "good shot my boy" and "Fuck 12."[1] At time stamp 5:11, RUPERT stated "we came to riot."

- At timestamp 41:15, RUPERT stated "Let's go fuck up the liquor store." RUPERT provided a tool that is used to pry a plywood board loose. Shortly thereafter, at time stamp 42:14, RUPERT stated "We need to start on a different board." Rupert volunteered to go into the structure and then confirmed the liquor store was empty.

- At time stamp 1:41:40, RUPERT asked for lighter fluid. RUPERT then entered a Sprint store and, at time stamp 1:45:17, RUPERT stated, "I lit it on fire." RUPERT then goes to a nearby Office Depot and, at time stamp 1:52:54, stated "I'm going in to get shit." At time stamp 1:54:59, RUPERT records himself taking items from the store.

---

[1] The term "Fuck 12" is a derogatory phrase often directed at law enforcement officers.

3

United States v. Matthew Lee Rupert

## COUNT 1
### (Civil Disorder)

6. Paragraphs 1 through 5 are incorporated by reference as if fully set forth herein.

7. On or about May 29, 2020, in the State and District of Minnesota, the defendant,

**MATTHEW LEE RUPERT,**

did knowingly commit acts to obstruct, impede, and interfere with any law enforcement officer lawfully engaged in the lawful performance of official duties incident to and during the commission of a civil disorder, which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function, all in violation of Title 18, United States Code, Section 231(a)(3).

## COUNT 2
### (Riot)

8. Paragraphs 1 through 5 are incorporated by reference as if fully set forth herein.

9. On or about May 29, 2020, in the State and District of Minnesota, the defendant,

**MATTHEW LEE RUPERT,**

did move and travel in interstate commerce from Galesburg, Illinois, to Minneapolis, Minnesota, with intent (1) to incite a riot, (2) to organize, promote, encourage, participate in, and carry on a riot, (3) to commit an act of violence in furtherance of a

4

United States v. Matthew Lee Rupert

riot, and (4) to aid and abet any person in inciting and participating in or carrying on a riot and committing any act of violence in furtherance of a riot; and during the course of such travel or thereafter performed or attempted to perform any other overt act. Overt acts include, but are not limited to, that on or about May 29, 2020, **MATTHEW LEE RUPERT** incited, promoted, encouraged, participated in, and carried on a riot, committed acts of violence in furtherance of a riot, and aided and abetted other persons inciting and participating in and carrying on a riot and committing acts of violence in furtherance of a riot, all in violation of Title 18, United States Code, Section 2101(a).

### COUNT 3
(Arson)

10.     Paragraphs 1 through 5 are incorporated by reference as if fully set forth herein.

11.     On or about May 29, 2020, in the State and District of Minnesota, the defendant,

**MATTHEW LEE RUPERT**

while aiding and abetting others, and being aided and abetted by others—known and unknown to the Grand Jury—did maliciously damage by means of fire, the Sprint Store located at 3009 Nicollet Avenue in Minneapolis, Minnesota 55408, a building used in interstate commerce, all in violation of Title 18, United States Code, Sections 2 and 844(i).

5

**Exhibit RR - Page 219 of 276**

United States v. Matthew Lee Rupert

## **FORFEITURE ALLEGATIONS**

If convicted of Counts 1, 2, or 3 of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 924(d)(1) and Title 28, United States Code, Section 2461(c), any firearms, destructive devices, ammunition, and accessories involved in, connected with, or used in the commission of such violations.

A TRUE BILL

_____          _____
UNITED STATES ATTORNEY          FOREPERSON

6

**Exhibit RR - Page 220 of 276**

AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

**United States of America**

**v.**

**SHAKELL SANKS,**

_Defendant_

Case No. 20-MJ-<u>0681</u>

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about May 30, 2020, in the County of Monroe, in the Western District of New York, **SHAKELL SANKS,** did knowingly and unlawfully commit arson , in violation of Title 18, United States Code, Sections 844(i) and 2 (arson).

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_Complainant's signature_

ATF SPECIAL AGENT STACEY L. HULL
_Printed name and title_

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim.P. 4.1 and 4(d) on:

Date: July <u>8, 2020</u>

_Judge's signature_

HONORABLE MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE
_Printed name and title_

City and State:  Rochester, New York

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA


-v-

                                                        20-MJ-0681

SHAKELL SANKS,

                    Defendant.
_____

State of New York    )
County of Monroe     )  ss:
City of Rochester    )

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

**STACEY L. HULL**, being duly sworn, deposes and says:

1.     I am a Senior Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, & Explosives ("ATF"), and I am assigned to the Rochester, New York Field Office.   Accordingly, I am the kind of Special Agent delineated in Title 18, United States Code, Section 3051.


2.     I am a graduate of the Criminal Investigator School and the ATF National Academy, both located at the Federal Law Enforcement Training Center in Glynco, Georgia. I have been employed as an ATF Special Agent for approximately four years.  As part of my professional experience, I have participated in state and federal investigations involving the illegal possession of firearms, narcotics, and violations of federal laws to include Titles 18 and 26, United States Code and am familiar with various federal arson laws.  Previously, I was

employed by the Town of Gates Police Department in Rochester, New York for approximately six years. I earned a Master of Arts Degree in Forensic Psychology from the Chicago School of Professional Psychology in 2014. I also received a Bachelor's Degree in both Psychology and Criminal Justice from Roberts Wesleyan College in 2009. I have participated in the service of state search and seizure warrants and have seized or assisted in seizing contraband including firearms, ammunition, documentary evidence, and contraband.

## PURPOSE OF AFFIDAVIT

3.      This affidavit is submitted in support of a criminal complaint which alleges there is probable cause to believe that on or May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial District of New York, the defendant, SHAKELL SANKS (hereinafter SANKS), did violate Title 18, United States Code, 844(i) and 2 (arson).

4.      The assertions made herein are based upon my personal knowledge and upon information that I have received from this investigation, including to but not limited to the review of police reports and discussions with other law enforcement agents and officers, all of which are true and correct to the best of my knowledge and belief. Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I know concerning this investigation. Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that the defendant committed the above-mentioned offenses. In support thereof, I respectfully state the following:

## PROBABLE CAUSE

5.      On May 30, 2020, protests were scheduled at the Public Safety Building (PSB),
185 Exchange Boulevard, City of Rochester, Western Judicial District of New York, in
response to the death of George Floyd in Minneapolis, Minnesota.  During the evening, the
protests turned violent resulting in damaged property, looting, and fires.


6.      At the time of the protests, a white Ford Focus with New York registration
AE5736 and VIN 1FAHP3EN6BW122355 owned by City of Rochester Family Crisis
Intervention Team (hereinafter known as "FACIT CAR") was parked in the vicinity of 144
Exchange Boulevard on the evening of May 30, 2020.  FACIT CAR was marked with City
of Rochester logos on the outside of the vehicle and also had City of Rochester license plates.
Facebook Live video posted by an individual with the initials W.G. recorded much of the
riot.  At approximately 1 hour and twenty-eight minutes into the Facebook Live video, a male
in a white t-shirt, later identified as SANKS, assisted others in attempting to light fabric on
fire.  The fabric was stuffed into the gas tank of the FACIT CAR.  See the photograph below.



7.      Photographs also captured the same male in a white t-shirt, later identified as SANKS, with a black female wearing grey pants and a black t-shirt, reaching inside the upside down FACIT CAR.  See the below photograph.  Nearby surveillance footage appears to have captured the moment the photograph was taken.  At approximately 6:18 p.m., the surveillance camera shows two individuals wearing similar clothing and in the same area at the vehicle.  At approximately 6:19:08 p.m., the camera shows a male kneel down to take a photograph of the two individuals at the car.  At approximately 6:20:30 p.m., FACIT CAR began to smoke and shortly thereafter became engulfed in flames.



8.      A photograph of SANKS was released to the public in an attempt to identify him.  On or about June 12, 2020, investigators received a tip that SANKS was the individual in the photographs on the news. On June 29, 2020 investigators met with the citizen and conducted a confirmatory identification procedure.


9.      On or about July 3, 2020, SANKS was arrested by members of the Rochester Police Department.  At approximately 12:10 p.m., RPD Investigator Nicholas Mazzola and Investigator Matthew Klein spoke with SANKS at the PSB.  SANKS was advised of his Miranda warnings and agreed to waive his rights and speak with the investigators.  During the recorded interview, SANKS admitted to being at the riots and at the FACIT CAR.  He also identified himself in a photograph from the scene.  Initially, SANKS said he was fanning

the fire in an attempt to put the fire out.  As the interview progressed, SANKS continued to deny setting the fire but did admit to helping the fire burn.  While speaking with SANKS, the investigators were able to view SANKS' tattoos and confirmed that they were consistent with the tattoos on the individual depicted in the photograph above.

10.     Due to the violence and rioting the night of May 30, 2020, FACIT CAR was towed away from the PSB and secured at the city of Rochester's Equipment Services Facility located at 945 Mount Read Boulevard.  At this location, fire investigators conducted their investigation.  After direct examinations and review of supportive video/photographic evidence, fire investigators concluded the damage to the vehicle was incendiary; intentionally set fires, set by human hands.  The fire damage of FACIT CAR was a total loss as the car was engulfed in flames and completely burned.

11.     Based on information provide to me, FACIT CAR is the property of the Rochester Police Department and the City of Rochester government.  Both the Rochester Police Department and the City of Rochester government conduct business in interstate commerce, for instance by purchasing vehicles and other equipment and supplies in interstate commerce.  The activities of the Rochester Police Department and the City of Rochester government in enacting and enforcing laws of the state of New York affect interstate commerce.

## CONCLUSION

12. Based upon the above information, I submit that there is probable cause to believe that on May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial District of New York, the defendant, SHAKELL SANKS did commit a violation of Title 18, United States Code, 844(i) and 2 (arson).

_Stacey L. Hull_
STACEY L. HULL
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Affidavit and Criminal Complaint submitted
electronically by email in .pdf format. Oath
administered, and contents and signature, attested
to me as true and accurate telephonically pursuant to
Fed.R.Crim.P. 4.1 and 4(d) on this __8__ day of July 2020.

_Mark Pedersen_
HON. MARK W. PEDERSEN
United States Magistrate Court Judge

7

**FILED**

JAMES J. VILT JR.,
CLERK

2/9/21

U.S. DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
## WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.   3:21-mj-65 |
| **JOHN SUBLESKI** | ) | |
| *Defendant* | ) | |

### CRIMINAL COMPLAINT

I, the complainant in this case, state the following is true to the best of my knowledge and belief.

In about January 6, 2021 and in the county of Jefferson in the Western District of Kentucky, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2101 | Riot Act |

This criminal complaint is based on these facts:

    *See* attached affidavit.

X    Continued on the attached sheet

_____
Peter L. Summers, Special Agent FBI

Sworn out via telephone.

Date: February 9, 2021

_____
Regina S. Edwards, U.S. Magistrate Judge

City and State: Louisville, Kentucky

*JDJ (AUSA initials)*

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 2 of 31 PageID #: 2
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 231 of 277   Page ID
#:2247

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Peter L. Summers, first being duly sworn, hereby depose and state as follows:

## BACKGROUND

1.        Since on or about May 2020, protesters have gathered in Louisville public areas to protest the death of Breonna Taylor.  One of the predominate protest areas was known as Jefferson Square Park located within the downtown area of Louisville.  Marches departing from this area and continuing through downtown Louisville have become almost commonplace.

2.        JOHN SUBLESKI and members of the militia known as United Pharaoh's Guard (UPG) often participate in the protests and act as "security".  SUBLESKI, and multiple members of UPG define themselves as Boogaloo Bois (BB).

3.        "Boogaloo" is a term referencing a violent uprising or impending civil war. The term is sometimes used by militia extremists and racially or ethnically motivated violent extremists (RMVE), who allude to it using shorthand such as "big igloo" or "big luau" and imagery such as igloos or Hawaiian shirts. The term has particularly resonated with militia extremists, who have adopted it to reference an impending politically-motivated civil war or uprising against the government following perceived incursions on Constitutional rights—including the Second Amendment—or other perceived government overreach. Some RMVEs have used the term to reference an impending war—or other conflict that will lead to the collapse of the "system," including the US government, society, etc. The Boogaloo is not a single cohesive group, but rather a loose concept arising from internet platforms, which has become a rallying point for some extremists.

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 3 of 31 PageID #: 3
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 232 of 277   Page ID
#:2248

## INTRODUCTION

4.     I am a Special Agent with the Federal Bureau of Investigation, (hereinafter "FBI"), and have been since February 2012. Your Affiant is currently assigned to the Joint Terrorism Task Force at the FBI's Louisville Field Office. Affiant graduated from the FBI Academy in Quantico, Virginia in as a Special Agent, Affiant is engaged in the enforcement of criminal laws and has participated in several complex investigations. Affiant has requested and obtained numerous applications for arrest and search warrants in furtherance of investigations into various types of Federal violations. Affiant has received training and has experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications and various other investigative techniques.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on my training and experience and the facts as set forth affidavit is being submitted in support of a criminal complaint and an arrest warrant based on probable cause to believe JOHN SUBLESKI has committed offenses in violations of Title 18, United States Code, 2101 (Riot Act).

## STATUTORY OFFENSES

7.     Title 18, United States Code, Section 2101 prohibits travel in interstate or foreign commerce or the use of any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent (1) to incite a riot; (2) to

2

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 4 of 31 PageID #: 4
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 233 of 277   Page ID
#:2249

organize, promote, encourage, participate in, or carry on a riot; or  (3) to commit any act of

violence in furtherance of a riot; or  (4) to aid or abet any person in inciting or participating in or

carrying on a riot or committing any act of violence in furtherance of a riot; and who either

during the course of any such travel or use or thereafter performs or attempts to perform any

other overt act for any purpose specified [in (1)-(4) ].  A Riot is defined broadly in the statute,

and includes: "a public disturbance involving (1) an act or acts of violence by one or more

persons part of an assemblage of threat or more persons which act or acts shall constitute a clear

and present danger of, or shall result in, damage or injury to the property of any other person or

to the person of any other individual."  18 U.S.C. 2102(a).

8.      The facts and information contained in this affidavit are based on my personal knowledge

and observations, my review of records and documents obtained during this investigation,

information received from other individuals, and my experience and training as a Special Agent.

9.      This affidavit is intended to show merely that there is sufficient probable cause for the

requested warrant and does not set forth all of m knowledge about the matter.

## STATEMENT OF FACTS

10.     The publicly posted below above shows Subleski seated at a window in his apartment

located in downtown Louisville, Kentucky.  Affiant believes Subleski is using the term

"Bigigloo" as another term used by BB for civil war, or violence.  Affiant believes the post is a

reference to using the window to fire a rifle because of the reference to a scope, and an elevated

position in his new apartment.  In addition, the reference to silent treatment may be a reference to

a rifle suppressor.  Affiant believes that Subleski is threating some form of violence from his

window.  Subleski has posted public video of himself looking through his rifle at buildings from

3

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 5 of 31 PageID #: 5
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 234 of 277   Page ID
#:2250

his apartment window. He has also publicly posted photos of himself aiming a rifle into the

downtown area at unknown targets.



4

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 6 of 31 PageID #: 6
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 235 of 277   Page ID
#:2251



John Subleski
2h · 🌐

Okay so someone point me in the direction of a system that I can use
for this drone to be able to carry and drop....umm-uh..Stuff 😊

11.     October 2020, Subleski's Facebook post referenced the civil war and anti-government

ideology.

5

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 7 of 31 PageID #: 7
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 236 of 277   Page ID
#:2252

 **John Subleski**
11h · 🌐

Honestly I was happy when the media tried to destroy what we've all been building together because all of us knew they would try anything to make us go away but you can't kill an IDEA and when the media created the FALSE narrative about our Ⓑ iGiGiOO Ⓑ röthers and R E D A C T E D ❓ isters that's when we saw the trash take themselves out. COWARDS! Those who were afraid to be labeled something they already knew they weren't but out of fear of a false label created by the media to disrupt and disburse the Ⓑ iG LuAu some members quickly disassociated themselves.

PLEASE BELIEVE WE KEPT A LIST AND WE'RE CHECKING IT TWICE, GONNA SEE YALL AT THE Ⓑ iG FIESTA ON ICE 🎿 . 🛷 🎿

Y'all realize that Boogaloo boys aren't a left/right thing?
Like they aren't "far left, far right".
Just people from all backgrounds that are tired of the government.
Some are full anarchists, some are Rojava-style socialists, and some just want to be left alone. **The** Ⓑ Ⓑ **Q** *is coming*

👍👎 21                                    2 Comments 5 Shares

12.     Subleski posted the below photo. "Once R.O.E (Rules of Engagement) gets lifted ISSA

BE A WTERFALL of tyrant and patriot (B)lood alike" "WE ARE CODE YELLOW" Subleski

references code yellow and has posted a color-coded threat level.

6

**Exhibit RR - Page 235 of 276**

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 8 of 31 PageID #: 8
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 237 of 277   Page ID
#:2253





Color chart posted October 30 2020 on Subleski's public Facebook account.

13.    The below meme and comment was posted November 1st 2020 publicly by Subleski:

"The (B)igloo (B)ois don't back blue.  Get Wreckt in the Hawaiian BBQ."

7

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 9 of 31 PageID #: 9
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 238 of 277   Page ID
#:2254





14.     Subleski is identified in the photograph above in the left of the photograph with the arrow

identifying him.    The photograph was posted to the Facebook Page of John Subleski, (UID

100054756653625).    The above photo was showed to the Custodian of Records for the Vue at 3rd

8

Case 3:21-cr-00022-BJB  Document 1  Filed 02/09/21  Page 10 of 31 PageID #: 10
Case 2:18-cr-00759-CJC  Document 281-28  Filed 01/15/24  Page 239 of 277  Page ID
#:2255

Street apartments, who affirmed the room was consistent with a studio apartment in the Vue at 3rd. The Custodian confirmed Subleski resides in a studio apartment.

15.    On or about 2 November 2020, Subleski[1] (UID 100054756653625) privately messaged another user: "So one of our members needed a family members house cleared out because there was some guys over staying their welcome. So me, Jacobi, and Adam followed Ryan and Monique and they took us to the house and we raided it and got the 4 occupants out and once they were out we left and came back." He also messaged: "It was wild night but we was in popped the door got everyone on the ground and one by one got them out and immediately left. . .".

16.    An issue of Leo Weekly, a local newspaper available online and in print,[2] dated November 4, 2020, described Subleski as "prepared for military battle," with a "handgun, medical kits, zip ties, smoke grenades, a flare gun, flash bangs, and a drone camera he keeps on hand for "hot" situations." Subleski often takes up a tactical position alone or with UPG where they are in a position of over-watch, in Subleski's words 'to protect their 1st amendment rights with our 2nd amendment rights." The following is a photograph from the Leo Weekly of Subleski.

---

[1] Account names are chosen by users and do not necessarily reflect their true names.

[2] https://www.leoweekly.com/2020/11/protesters-arms-guns-plentiful-protests-reasons-people-carry/

**Exhibit RR - Page 238 of 276**

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 11 of 31 PageID #: 11
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 240 of 277   Page ID
#:2256



10

Case 3:21-cr-00022-BJB  Document 1  Filed 02/09/21  Page 12 of 31 PageID #: 12
Case 2:18-cr-00759-CJC  Document 281-28  Filed 01/15/24  Page 241 of 277  Page ID
#:2257

17.  On 11/13/2020, Subleski, using his @SubleskiJohn Twitter profile tweeted a 14-second video of himself holding what appears to be an anti-tank rocket launcher.



[Comment: The content of this video is transcribed below.

*"So remember the FBI showed up to my house and they was like, 'Do you own a RPG?' and I was like, 'Hell naw, I [UI] no RPG!' and then...at the time, I wasn't lyin'. I...told them the truth. I didn't own a fuckin' RPG, but uhh..."*]

11

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 13 of 31 PageID #: 13
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 242 of 277   Page ID
#:2258

18.     On 12/13/2020, @SubleskiJohn  tweeted the following:



19.     On 12/16/2020, @SubleskiJohn  retweeted the following post by @realmikedunn:



12

**Exhibit RR - Page 241 of 276**

20. Also on 12/16/2020, @SubleskiJohn posted a photo of himself in a hallway wearing tactical gear and pointing a long gun at the camera:



13

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 15 of 31 PageID #: 15
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 244 of 277   Page ID
#:2260

21.     On 12/18/2020, @SubleskiJohn posted a photo of himself in tactical gear holding a long

gun and tweeted:



1:16 AM · Dec 18, 2020 · Twitter for iPhone

The rifle appears to be same rifle held by SUBLESKI in the photograph of SUBLESKI in the

LEO Weekly publication.  The same optic, magazine, and sticker with the message "whistle

14

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 16 of 31 PageID #: 16
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 245 of 277   Page ID
#:2261

while you lurk" with a photograph of the grim reaper appear in both photographs.  In addition,
SUBLESKI is wearing a helmet with what appears to be night vision goggles in both
photographs. The red B, a symbol of the "Boogaloo" on the helmet is visible in both
photographs.

22.      On 12/20/2020, @SubleskiJohn tweeted the below photo of an LMPD patch on fire.



23.    Below is a timeline of actions published by USA Today, on January 6 2021 and updated on January 15 2021.   Followed by the significant events of the USA Today timeline are Subleski's public posts.   The times of Subleski's public posts were taken from the results a Search Warrant served on Facebook.  (https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/).

## 11 a.m.

Trump's "Save America Rally" begins first with the president's sons Eric and Donald Trump Jr., then his lawyer, Rudy Giuliani. Trump starts speaking shortly before noon at about 11:50 a.m. and says, "And after this, we're going to walk down there, and I'll be there with you, we're going to walk down ... to the Capitol and we are going to cheer

## 12:02 p.m.



John Patrick
4h · 🌐

Those of you afraid to 8 00G because "What if we die?" Well, what if we fucking live? Get out there, Do something!

💙👍 9                                1 Comment  2 Shares

16

**Exhibit RR - Page 245 of 276**

**1:10 p.m.**

Rioters begin grappling with police on the Capitol steps.

**1:26 p.m.**

Capitol police order evacuation of Library of Congress, Madison Building and Cannon House Office Building on Independence Avenue across from the Capitol.

**1:40 p.m.**

D.C. Mayor Muriel Bowser orders citywide curfew starting at 6 p.m. Wednesday and ending at 6 a.m. Thursday. CNN reports District police are asking for more law enforcement.

**2:06 p.m**



John Patrick
January 6 at 2:06 PM · 🌐

They storming the capital in DC and ya'll can't unite enough to storm the gov buildings here....smh I HATE IT

👍😢😍 13                                          1 Share

👍 Like                          ↪ Share

"SMH" Shaking My Head.

**Exhibit RR - Page 246 of 276**

**2:11 p.m.**

Rioters breach police lines on the west side of the Capitol.

**2:33 p.m.**

C-SPAN reports rioters have crossed Statuary Hall, the chamber that separates the House and Senate, heading for the House and Senate.

**2:39 p.m.**

Rioters are photographed breaking Capitol windows.

**2:44 p.m.**

Shots are reported fired in the House chamber.



18

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 20 of 31 PageID #: 20
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 249 of 277   Page ID
#:2265

### 2:47 p.m.

Huffington Post reporter <u>tweets</u> image of rioters at dais. "They're in the chamber."

### 2:55 p.m.

Rep. Tim Burchett, R-Tennessee, texts "shots fired."

### 3:03 p.m.

Rioters are photographed on the Senate floor.



Affiant notes: Subleski appears to be calling people to get into the streets and begin the

"LUAU", a reference to a new civil war and violence towards government figures.

### 3:34 p.m.

CBS reports a woman is in critical condition after being shot in the neck inside the Capitol. Police later report the woman died. She was identified as <u>Ashli Babbitt</u>, 35,



Affiant note:  The emojis following the text represent a hibiscus flower, a symbol often associated with the BB movement, a shaka emoji, often interpreted as a "thumbs up," followed by five "drops of blood," emojis.  In an internal private militia chat Subleski posts "Holy shit woman shot in capital.  Y'all let's storm lmpd"

24.     At or around January 6, 2021 at approximately 4:30 p.m. members of UPG began showing up downtown to meet at Jefferson Square Park.  UPG members known to have come out January 6 2021 are John Subleski, Emma McKinney, Joey Foreman, Jacoby Glenn, Ti'ant Wyatt, Christopher Roderick, and Andrew Peckat.  Affiant believes 30-50 people met at the square        and        began        a        march        at        approximately        5:00p.m.

20



25.   UPG member Jacoby Glenn is seen walking away in a separate photo wearing a distinct tie-dye shirt with an eye, carrying a rifle.  To the far right is Braylin Hardin, an associate of UPG.  Red arrows indicate three UPG members near Jefferson Square park with two other persons.  Two of the UPG members follow the BB ideology.

26.   The group began a march from Jefferson Square Park at approximately 5:00 p.m.  At approximately 7:00 p.m., a large group of individuals, to include members of UPG, were blocking the intersection of 2nd Street and Broadway in downtown Louisville, Kentucky. Real Time Crime Center (RTCC) captured video of the incident as it was happening.

21

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 23 of 31 PageID #: 23
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 252 of 277   Page ID
#:2268

27.     7:05 p.m.  Unidentified rioters surround a motorist at 2nd and W Broadway in front of the

McDonald's.  An AR style rifle is pointed at the driver's head and multiple people begin yelling

at him.  An unidentified rioter threw a metal city trashcan behind his vehicle. During this time,

period witness interviews and multiple 911 calls indicate persons associated with the march were

blocking traffic with their vehicles and with their physical persons while some were armed with

rifles and pistols.   Approximately 10 minutes later a public transit bus attempts to move through

the intersection and a crowd swarms around it stopping the progress.   EMS and fire were

directed to avoid the area.



28.     Affiant followed UPG member GLENN as he moved on the video and is able to view the

profile of a rifle being raised towards the driver of the victim vehicle as GLENN moved from the

**Exhibit RR - Page 251 of 276**

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 24 of 31 PageID #: 24
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 253 of 277   Page ID
#:2269

center of the intersection to confront and threaten a car attempting to circumvent the barricade

vehicles by slowly driving on the sidewalk.

29.    After more than 20 minutes of holding, the intersection with vehicle barricades and

armed perimeter guards the group then travelled North on 2nd to make their way to 2nd and Main

Street.    According to witness interviews, persons associated with the group began physically

rocking vehicles trapped in intersections, pointing rifles and pistols at persons in their vehicles

during their movement from Broadway to Main.  Multiple 911 calls were generated during this

time period.

30.    The truck used by Joey Forman & Subleski on 01/06/2021 arrived to Jefferson Square

Park (JSP) at 19:07, while the majority of the group was at 2nd & Broadway.  (While at 2nd and

Broadway rifles are pointed at motorists, and trashcans are thrown and witnesses report a vehicle

being "rocked.)   The vehicle parked at the 6th St side of JSP, and Forman and Subleski exit the

truck.  Forman walks to the north end of JSP, while Subleski goes south on 6th St.  Subleski

returns to the north end of JSP with Forman at 7:11 p.m. Subleski leaves north on 6th St at 7:12

p.m. while Forman stays at the park.  Subleski returns to the park at 7:19 p.m., and the two leave

JSP in the truck at 19:22, travelling south on 6th St arriving to 2nd and Broadway to join the main

group. Subleski can be viewed below on foot, and the truck utilized by Joey Foreman and

Subleski can be seen at Jefferson Square Park.

**Exhibit RR - Page 252 of 276**

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 25 of 31 PageID #: 25
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 254 of 277   Page ID
#:2270





31.     On Wednesday, January 6, 2021 at approximately 7:50 p.m.  Subleski, and a large group

of individuals were at the intersection of West Main and Second Street in Louisville, KY. This

large group of individuals can be seen blocking the road and standing in the intersection not

24

allowing vehicles to pass through the intersection. Multiple persons can be seen with firearms holding the intersection and not allowing vehicles through. While the intersection was blocked, a SUV travels through the barricade on the South side of the intersection and travels around the group's blockade vehicles and pedestrians, through to the North side and continues to travel on the 2nd Street Bridge. After the SUV traverses the intersection, Subleski can be seen firing his rifle at the dark colored SUV.

32.    The photographs below show SUV travels through the barricaded intersection from South to North, at the intersection of Main and 2nd streets, as viewed from left to right:





25

Case 3:21-cr-00022-BJB  Document 1  Filed 02/09/21  Page 27 of 31 PageID #: 27
Case 2:18-cr-00759-CJC  Document 281-28  Filed 01/15/24  Page 256 of 277  Page ID
#:2272

33.     The photograph below shows Subleski firing his rifle toward the SUV, highlighted by the

muzzle flash. Subleski moved from the South part of the intersection at the corner of the street

and to the center of the intersection in order to fire.  Subleski is identified in the photograph with

a red circle.



Based on training and experience, I know that when a rifle is fired it creates a muzzle flash

similar to the one depicted in the photograph.

34.     The photograph below shows Subleski in the left side of the picture with his rifle raised

toward the SUV.  The photo was taken by UPG member Andrew Peckat who was behind

Subleski. Subleski publicly posted the photo on his Twitter account "King Luau" on February 5,

2021.

26



35.     Subleski can be seen (below) fleeing the scene of the shooting in a truck. Subleski is

identified in the pictures with a red circle around him. The picture to the left is after the shots

were fired and Subleski turns the flashlight on his weapon on and has it pointed toward the

ground. The picture to the right is of Subleski getting in a truck just prior to fleeing the scene.

27



## CONCLUSION

36.     Based on the information contained in this affidavit, your affiant submits that there is probably cause to believe Subleski used an AK style rifle on the evening of January 6 2021 as part of a violent act in furtherance of riot.

37.     Subleski posted five known public messages on an online platform concurrent and relevant to the violence in Washington DC, to include " OUTTA YOUR HOMES AND INTO THE STREETS FUCK THE GOVERNMENT AND THE POLICE!!!!!!!! LETS GET THIS LUAU STARTED,". Doing so Subleski utilized a facility of interstate commerce to incite, promote, participate in, and carry on a riot.

38.     UPG members are known to utilize an encrypted app, which allows real time messaging to multiple persons at one time.  The app is commonly found on smart phones.  During an internal Signal chat on January 6 2021 a UPG member  inquired about going to the park to which Subleski replied " Fuck yeah" "Everyone be armed and armored because shit can go south quick and if it kicks off in one state then like we all ball".  Additionally Subleski communicated internally to UPG via the Signal app "Holy shit woman shot in capital.  Y'all let's storm lmpd".

28

Affiant believes when Subleski, the self identified leader of UPG communicated via an encrypted app he utilized a facility of interstate commerce to incite, promote, participate in, and carry on a riot.

39.    Affiant believes when Subleski fired at least two rounds from his weapon at an automobile on January 6 2021 it was an act of violence in violation of 18 U.S.C. § 2101.

40.    Affiant believes other acts of violence occurred and are evidenced by video and witness statements of a second shooter, and threats to life with raised firearms.

41.    Affiant also believes Subleski used social media to incite a riot, and his violent act was in furtherance of the riot.  Both before and after Subleski's action, he utilized social media to incite individuals to storm the police station and come out to start the "luau" which is a known boogaloo term for civil war and violent action.

42.    Including Subleski, eight persons from the UPG militia and approximately 22-40 other persons were part of a public disturbance, which involved multiple acts of violence, multiple persons who were part of an assemblage.  The actions of violence or threats to persons of constituted a clear and present danger.

43.    Subleski and one other individual committed a violent act by firing a weapon at the SUV after it had travelled through the intersection and was travelling on the 2nd Street Bridge. Additional violent acts and threats occurred when victims were threatened with rifles, verbal threats, and had their vehicles swarmed and rocked.  Multiple UPG members raised their weapons to a position of "fire" after and as the SUV moved through the through the intersection to access the 2nd street bridge.  The shots at the SUV were after the SUV had cleared the group blockading the intersection.  Affiant believes the gunfire was in furtherance of the riot.

44.    Based on the forgoing, I request that the Court issue the proposed arrest warrant.

29

Case 3:21-cr-00022-BJB   Document 1   Filed 02/09/21   Page 31 of 31 PageID #: 31
Case 2:18-cr-00759-CJC   Document 281-28   Filed 01/15/24   Page 260 of 277   Page ID
#:2276

## REQUEST FOR SEALING

45.     I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court. These

documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation. Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation.


                                        Respectfully submitted,


                                        Peter Summers
                                        Special Agent
                                        Federal Bureau of Investigation


Subscribed and sworn to before me by telephone on February 9 ___ , 2021.


REGINA S. EDWARDS
UNITED STATES MAGISTRATE JUDGE

**Exhibit RR - Page 259 of 276**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

-v-

CHRISTOPHER TINDAL,                                    20-MJ-0692

                        Defendant.

_____

State of New York    )
County of Monroe     ) ss:
City of Rochester    )


## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT</u>

**STACEY L. HULL**, being duly sworn, deposes and says:

1.      I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, & Explosives ("ATF"), and I am assigned to the Rochester, New York Field Office. Accordingly, I am the kind of Special Agent delineated in Title 18, United States Code, Section 3051.

2.      I am a graduate of the Criminal Investigator School and the ATF National Academy, both located at the Federal Law Enforcement Training Center in Glynco, Georgia. I have been employed as an ATF Special Agent for approximately four years. As part of my professional experience, I have participated in state and federal investigations involving the illegal possession of firearms, narcotics, and violations of federal laws to include Titles 18 and 26, United States Code and am familiar with various federal arson laws. Previously, I

1

was employed by the Town of Gates Police Department in Rochester, New York for approximately six years. I earned a Master of Arts Degree in Forensic Psychology from the Chicago School of Professional Psychology in 2014. I also received a Bachelor's Degree in both Psychology and Criminal Justice from Roberts Wesleyan College in 2009. I have participated in the service of state search and seizure warrants and have seized or assisted in seizing contraband including firearms, ammunition, documentary evidence, and contraband.

### PURPOSE OF AFFIDAVIT

3.　　This affidavit is submitted in support of a criminal complaint which alleges there is probable cause to believe that on or May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial District of New York, the defendant, CHRISTOPHER TINDAL (hereinafter TINDAL), did violate Title 18, United States Code, Section 844(n) (conspiracy to commit arson) and Title 18, United States Code, Sections 844(i) and 2 (arson).

4.　　The assertions made herein are based upon my personal knowledge and upon information that I have received from this investigation, including but not limited to the review of police reports and discussions with other law enforcement agents and officers, all of which are true and correct to the best of my knowledge and belief. Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I know concerning this investigation. Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that the defendant committed the above-mentioned offenses. In support thereof, I respectfully state the following:

2

**PROBABLE CAUSE**

5.      On May 30, 2020, protests were scheduled at the Public Safety Building (PSB), 185 Exchange Boulevard, City of Rochester, Western Judicial District of New York, in response to the death of George Floyd in Minneapolis, Minnesota.  Officers employed by the Rochester Police Department (RPD) were assigned to assist with crowd control during the protests.  Marked patrol vehicles, including patrol vehicle with plate number 463, VIN#2G1WD5E38C1317282 (hereinafter RPD CAR 463) was parked in the front loop of the PSB.  RPD CAR 463 was readily identifiable as a law enforcement vehicle by markings on all sides of the vehicle and a light bar on top.

6.      During the evening, the protests turned violent resulting in damaged property, looting, and fires.  At approximately 5:05 p.m., RPD CAR 463 was damaged by fire.  Due to the violence and rioting, RPD CAR 463 was towed away from the PSB and secured at 945 Mount Read Boulevard, which is the Equipment Services Facility for the City of Rochester. Once secured, fire investigators conducted an investigation to determine the cause of the fire. The front passenger seat, driver seat, and the entire front inside compartment of the vehicle were damaged by fire.  The vehicle was determined to be a total loss.  After review of video and photographic evidence, the fire investigators concluded the damage to the vehicle was caused by intentional fire.  Fire investigators removed fire debris samples from the burned seat of RPD CAR 463 for lab analysis.

7. Upon review of various video footage, including but not limited to City of Rochester blue light cameras, footage from a law enforcement aerial drone, and Facebook Live videos, the RPD Major Crimes Unit was able to identify TINDAL as one of the individual who intentionally set fire to RPD CAR 463.

8. Before RPD CAR 463 was set on fire, an undercover police officer took the below photographs of TINDAL on top of RPD CAR 463. The photographs show TINDAL wearing a black "I love (heart) excellence" t-shirt, black pants, and white sneakers with a gold tongue. The photograph also depicts a tattoo on TINDAL's forearm.

 

9. At approximately 5:05 p.m., surveillance footage shows a black male with braids wearing a gray RIT hooded sweatshirt and jeans with rips on the quadriceps, later identified as Dyshika McFadden, and TINDAL speaking with each other then move towards RPD CAR 463 and ignite it as seen in the photos below. The video also shows McFadden

2

and TINDAL use an aerosol can and open flame to set fire inside RPD CAR 463. These acts led to a fire inside the vehicle.

10. The photos below are stills from Facebook Live video posted by an individual with the initials D.F. at approximately twenty minutes into the video. The video shows MCFADDEN, in the gray hooded sweatshirt, and TINDAL, now in just the black t-shirt but still wearing the black pants and white sneakers with a gold tongue, light RPD CAR 463 on fire using an aerosol can.

  

11. On or about July 31, 2020, TINDAL was arrested by members of the Rochester Police Department. At approximately 10:20 p.m., RPD Investigator Nicholas Mazzola and Fire Investigator Thomas Dorrer spoke with TINDAL at the PSB. TINDAL was advised of his Miranda warnings and agreed to waive his rights and speak with the investigators. During the recorded interview, TINDAL admitted to being at the riots. He also identified himself in photographs from the scene. Those photographs are included below. One depicts TINDAL

3

standing on RPD CAR 463 wearing the "I love (heart) excellence" t-shirt, and the other depicts TINDAL standing next to MCFADDEN while he sprayed an aerosol can and flame into RPD CAR 463.

 

12.    TINDAL denied setting anything on fire.  When shown a photograph of himself using an aerosol can to light RPD CAR 463, TINDAL stated that the photograph was edited.  The interview concluded when TINDAL stated he did not want to speak with the investigators anymore and wanted to know what he was being charged with.  While speaking with TINDAL, the investigators were able to view TINDAL's arm tattoo and confirmed that it was consistent with the tattoo on the individual depicted in the photographs and video surveillance.

13.    Based on information provide to me, RPD CAR 463 is the property of the Rochester police Department and the City of Rochester government.  Both the Rochester Police Department and the City of Rochester government conduct business in interstate commerce, for instance by purchasing vehicles and other equipment and supplies in interstate

4

commerce. The activities of the Rochester Police Department and the City of Rochester government in enacting and enforcing laws of the state of New York affect interstate commerce.

## CONCLUSION

14.     Based upon the above information, I submit that there is probable cause to believe that on May 30, 2020, in the City of Rochester, County of Monroe, Western Judicial District of New York, the defendant, CHRISTOPHER TINDAL, did commit violations of Title 18, United States Code, Section 844(n) (conspiracy to commit arson) Title 18, United States Code, Sections 844(i), and 2 (arson).

STACEY L. HULL, Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Affidavit and Criminal Complaint submitted
electronically by email in .pdf format.  Oath
administered, and contents and signature,
attested to me as true and accurate telephonically
pursuant to Fed.R.Crim.P. 4.1 and 4(d) on this
_6th_ day of August, 2020.

HON. MARK W. PEDERSEN
United States District Court

5

**Exhibit RR - Page 266 of 276**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

CHRISTOPHER TINDAL,

               Defendant.

21-CR-6038 CJS

## PLEA AGREEMENT

The defendant, CHRISTOPHER TINDAL, and the United States Attorney for the Western District of New York (hereinafter "the government") hereby enter into a plea agreement with the terms and conditions as set out below.

## I. THE PLEA AND POSSIBLE SENTENCE

1.    The defendant agrees to waive indictment and plead guilty to a one-count Information which charges a violation of Title 18, United States Code, Section 2101(a) (Riot), for which the maximum possible sentence is a term of imprisonment of 5 years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of 3 years. The defendant understands that the penalties set forth in this paragraph are the maximum penalties that can be imposed by the Court at sentencing.

2.    The defendant understands that, if it is determined that he has violated any of the terms and conditions of his term of supervised release, he may be required to serve in prison all or part of the term of supervised release, up to 2 years, without credit for time previously served on supervised release. As a consequence, in the event the defendant is sentenced to the maximum term of incarceration, a prison term imposed for a violation of

**Exhibit RR - Page 267 of 276**

supervised release may result in the defendant serving a sentence of imprisonment longer than the statutory maximum set forth in ¶ 1 of this agreement.

## II. ELEMENTS AND FACTUAL BASIS

3.      The defendant understands the nature of the offense set forth in ¶ 1 of this agreement and understands that if this case proceeded to trial, the government would be required to prove beyond a reasonable doubt the following elements of the crime:

First, that the defendant used any facility of interstate or foreign commerce with the intent to commit any act of violence in furtherance of a riot, or to organize, participate in, or carry on a riot.

Second, that the defendant, during the course of such use, or thereafter, performed, or attempted to perform, any other overt act for the purpose of committing any act of violence in furtherance of a riot, or organizing, participating in, or carrying on a riot.

A "riot" means a public disturbance involving an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person.

### FACTUAL BASIS

4.      The defendant and the government agree to the following facts which form the basis for the defendant's guilty plea including relevant conduct:

a.      On or about May 30, 2020, in the City of Rochester, in the Western District of New York, the defendant, **CHRISTOPHER TINDAL**, participated with numerous other individuals (exceeding three persons) in a public protest near the Public Safety Building located at 185 Exchange Street, Rochester, New York. At various times during the public protest, the gathering turned violent, resulting in significant property damage and looting.

2

b.  During the course of the riot, the defendant and others used an aerosol can and an open flame to set fire to a marked Rochester Police Department patrol vehicle with license plate number 463, Vehicle Identification Number (VIN) 2G1WD5E38C1317282 (hereinafter referred to as "RPD CAR 463") parked in front of the Public Safety Building. RPD CAR 463 was the property of the Rochester Police Department and the City of Rochester. Both government organizations conduct business in interstate commerce, for instance by purchasing vehicles and other equipment and supplies from outside the state of New York. The activities of the Rochester Police Department and the City of Rochester government in enacting and enforcing laws of the State of New York also affect interstate commerce.

c.  The burning of RPD CAR 463 was broadcast and recorded on Facebook Live, which streamed the burning of RPD CAR 463 online in real time. RPD CAR 463 was completely destroyed by the fire. The defendant does not contest that the fire was an incendiary, intentionally set fire, set by his own hands with the assistance of others.

d.  After RPD CAR 463 was destroyed by fire, the defendant and others left the area around the Public Safety Building and participated in looting stores and pharmacies throughout the City of Rochester. The defendant utilized a cellular telephone to obtain transportation to other areas of the city and to coordinate with others involved in the rioting.

e.  The defendant further admits and agrees that he utilized Facebook Live and his cellular telephone, both facilities of interstate or foreign commerce, to communicate with or broadcast to any person or group of persons with the intent to commit any act of violence in furtherance of a riot, and to organize, participate in, and carry on a riot.

## III.  SENTENCING GUIDELINES

5.  The defendant understands that the Court must consider but is not bound by the Sentencing Guidelines (Sentencing Reform Act of 1984).

## BASE OFFENSE LEVEL

6.  The government and the defendant agree that Guidelines § 2K1.4(a)(2)(A) applies to the offense of conviction and provides for a base offense level of 20.

3

## ACCEPTANCE OF RESPONSIBILITY

7.     At sentencing, the government agrees not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines § 3E1.1(a) (acceptance of responsibility), and further agrees to move the Court to apply the additional one (1) level downward adjustment of Guidelines § 3E1.1(b), which would result in a total offense level of 17.

## CRIMINAL HISTORY CATEGORY

8.     It is the understanding of the government and the defendant that the defendant's criminal history category is V. The defendant understands that if the defendant is sentenced for, or convicted of, any other charges prior to sentencing in this action the defendant's criminal history category may increase. The defendant understands that the defendant has no right to withdraw the plea of guilty based on the Court's determination of the defendant's criminal history category.

## GUIDELINES' APPLICATION, CALCULATIONS AND IMPACT

9.     It is the understanding of the government and the defendant that with a total offense level of 17 and criminal history category of V, the defendant's sentencing range would be a term of imprisonment of **46 to 57 months, a fine of $10,000 to $95,000, and a period of supervised release of 1 to 3 years**. Notwithstanding this, the defendant understands that at sentencing the defendant is subject to the maximum penalties set forth in ¶ 1 of this agreement.

10.     The government and the defendant agree to the Sentencing Guidelines calculations set forth in this agreement and neither party will advocate or recommend the application of any other Guideline, or move for any Guidelines departure, or move for or recommend a sentence outside the Guidelines, except as specifically set forth in this

4

agreement. A breach of this paragraph by one party will relieve the other party of any agreements made in this plea agreement with respect to sentencing motions and recommendations. A breach of this paragraph by the defendant shall also relieve the government from any agreements to dismiss or not pursue additional charges.

11.     The defendant understands that the Court is not bound to accept any Sentencing Guidelines calculations and the defendant will not be entitled to withdraw the plea of guilty based on the sentence imposed by the Court.

## IV. <u>STATUTE OF LIMITATIONS</u>

12.     In the event the defendant's plea of guilty is withdrawn, or conviction vacated, either pre- or post-sentence, by way of appeal, motion, post-conviction proceeding, collateral attack or otherwise, the defendant agrees that any charges dismissed pursuant to this agreement shall be automatically reinstated upon motion of the government and further agrees not to assert the statute of limitations as a defense to any federal criminal offense which is not time barred as of the date of this agreement. This waiver shall be effective for a period of six months following the date upon which the withdrawal of the guilty plea or the vacating of the conviction becomes final.

## V. <u>REMOVAL</u>

13.     The defendant represents that he is a citizen of the United States. However, if the defendant is not a citizen of the United States, the defendant understands that, if convicted, the defendant may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

5

## VI. <u>GOVERNMENT RIGHTS AND RESERVATIONS</u>

14.    The defendant understands that the government has reserved the right to:

a.    provide to the Probation Office and the Court all the information and evidence in its possession that the government deems relevant concerning the defendant's background, character and involvement in the offense charged, the circumstances surrounding the charge and the defendant's criminal history;

b.    respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government;

c.    advocate for a specific sentence consistent with the terms of this agreement including the amount of restitution and/or a fine and the method of payment; and

d.    modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines including criminal history category, in the event that subsequent to this agreement the government receives previously unknown information, including conduct and statements by the defendant subsequent to this agreement, regarding the recommendation or factor.

15.    At sentencing, the government will move to dismiss the complaint currently pending against the defendant under Magistrate No. 20-MJ-0692.

## VII. <u>RESTITUTION AND FINANCIAL PENALTY PROVISIONS</u>

16.    The defendant understands, and the parties agree, that the Court must require restitution to be paid to the victim(s) of the offense as part of the sentence pursuant to Sentencing Guidelines § 5E1.1 and Title 18, United States Code, Section 3663A. The restitution amount will be determined by the Court at the time of sentencing. The defendant understands that defendant will not be entitled to withdraw the plea of guilty based upon any restitution amount ordered by the Court.

6

17.    The defendant agrees to disclose fully and completely all assets in which the defendant either has any property interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. The defendant agrees to make complete financial disclosure to the United States by truthfully executing a sworn financial statement by the deadline set by the United States, or if no deadline is set, no later than two weeks prior to the date of sentencing. The defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms for the United States to obtain tax information, bank account records, credit history, and social security information. The defendant agrees to discuss or answer any questions by the United States relating to the defendant's complete financial disclosure. The defendant will submit to an examination under oath and/or a polygraph examination conducted by an examiner selected by the U.S. Attorney's Office on the issue of the defendant's financial disclosures and assets, if deemed necessary by the U.S. Attorney's Office. The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by the agreement and/or that may be imposed upon the defendant by the Court. In addition, the defendant promises that the defendant will make no such transfers in the future.

18.    The defendant agrees that any financial records and information provided by the defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

19.    The defendant understands and agrees that the Court, at the time of sentencing, will order that all monetary penalties imposed at that time (including any fine, restitution, or

7

**Exhibit RR - Page 273 of 276**

special assessment imposed in accordance with the terms and conditions of this plea agreement) are to be due and payable in full immediately and will be (i) subject to immediate enforcement as provide for in Title 18, United States Code, Section 3613, and (ii) submitted to the Treasury Offset Program ("TOP") so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts but will not affect any periodic payment schedule set by the Court.

20.     The defendant understands and acknowledges that any schedule of payments imposed by the Court at the time of sentencing is merely a minimum schedule of payments and does not, in any way, limit those methods available to the United States to enforce the judgment.

21.     The defendant agrees that any funds and assets in which the defendant has an interest, which have been seized or restrained by the government or law enforcement as part of the investigation underlying this plea agreement, and not subject to forfeiture, will be used to offset any judgment of restitution and fine imposed pursuant to this plea agreement, or to satisfy any debts owed by the defendant to the United States and/or agencies thereof.

22.     To the extent that the defendant has an interest, the defendant authorizes the District Court Clerk to release any funds posted as security for the defendant's appearance bond in this case, which funds shall be applied to satisfy the financial obligation(s) of the defendant pursuant to the judgment of the Court.

23.     The defendant is aware that voluntary payment of restitution prior to adjudication of guilt is a factor in considering whether the defendant has accepted responsibility under the United States Sentencing Guidelines § 3El.1.

8

## VIII. <u>APPEAL RIGHTS</u>

24.    The defendant understands that Title 18, United States Code, Section 3742 affords a defendant a limited right to appeal the sentence imposed. The defendant, however, knowingly waives the right to appeal and collaterally attack any component of a sentence imposed by the Court which falls within or is less than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 9 above, notwithstanding the manner in which the Court determines the sentence. In the event of an appeal of the defendant's sentence by the government, the defendant reserves the right to argue the correctness of the defendant's sentence.

25.    The defendant understands that by agreeing to not collaterally attack the sentence, the defendant is waiving the right to challenge the sentence in the event that in the future the defendant becomes aware of previously unknown facts or a change in the law which the defendant believes would justify a decrease in the defendant's sentence.

26.    The defendant understands that, pursuant to this plea agreement, the government has agreed not to charge the defendant with a violation of Title 18, United States Code, Section 844(i) (arson), which, if convicted on such charge, would subject the defendant to a mandatory minimum term of imprisonment of 5 years up to a maximum term of 20 years.

27.    The government waives its right to appeal any component of a sentence imposed by the Court which falls within or is greater than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 9 above, notwithstanding the manner in which the Court determines the sentence. However, in the event of an appeal from the defendant's sentence by the defendant, the government reserves its right to argue the correctness of the defendant's sentence.

9

## IX. TOTAL AGREEMENT AND AFFIRMATIONS

28.    This plea agreement represents the total agreement between the defendant, CHRISTOPHER TINDAL, and the government. There are no promises made by anyone other than those contained in this agreement. This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

JAMES P. KENNEDY, JR.
United States Attorney
Western District of New York

By: _____
CASSIE M. KOCHER
Assistant U.S. Attorney

Dated: April 27, 2021

I have read this agreement, which consists of pages 1 through 10. I have had a full opportunity to discuss this agreement with my attorney, Avik K. Ganguly, Esq. I agree that it represents the total agreement reached between me and the government. No promises or representations have been made to me other than what is contained in this agreement. I understand all of the consequences of my plea of guilty. I fully agree with the contents of this agreement. I am signing this agreement voluntarily and of my own free will.

_____          _____
CHRISTOPHER TINDAL                   AVIK K. GANGULY, ESQ.
Defendant                            Attorney for the Defendant

Dated: April 27, 2021                Dated: April 27, 2021

10

**Exhibit RR - Page 276 of 276**