CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JULIA DEIXLER (Bar No. 301954)
(E-Mail: julia_deixler@fd.org)
ERIN M. MURPHY (Bar No. 285087)
(E-Mail: erin_murphy@fd.org.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ROBERT RUNDO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 18-759-CJC |
| Plaintiff, | **REPLY IN SUPPORT OF DEFENDANT ROBERT RUNDO'S MOTION TO DISMISS FOR SELECTIVE PROSECUTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL; EXHIBITS A THROUGH F** |
| v. | |
| ROBERT RUNDO, | |
| Defendant. | Hearing Date: February 21, 2024<br>Hearing Time: 9:00 am<br>Hearing Place: Courtroom of the Hon.<br>Cormac J. Carney |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ................................................................................................... 2

    A.    Violent far-left actors who attacked right-wing citizens at their own rallies are the correct comparison group, not simply any "left wing" person the government has charged. ............................................................ 2

    B.    Similarly situated far-left actors could have been charged with violating the ARA, no matter how much the government attempts to minimize and ignore their misconduct. ......................................................... 6

        1.    The government could have charged at least three violent, far left wing actors with violating the ARA, and the defense need not show they affirmatively "declined" to do so. ............................. 7

        2.    Mr. Rundo's alleged misconduct is similar in all "relevant" aspects to the minimum of three people the government clearly could have charged with violating the ARA. ................................. 11

    C.    The government's "neutral" reasons for these charges are hollow. .......... 16

        1.    The government's bias against Mr. Rundo's beliefs is evident from what it completely ignores about the left-wing violence documented here. ........................................................................ 16

        2.    Pointing to cases where the government purportedly selectively prosecuted "left wing" people does not diminish its invidious intent here. ......................................................................................... 18

        3.    Charging only one ARA in the recorded history of this district is indicia of discriminatory purpose. .................................................... 20

        4.    No neutral explanation has been offered that is not at odds with the uncharged, far left wing violence here. ..................................... 21

    D.    At a minimum, the defense is entitled to discovery on this claim. ............ 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bordenkircher v. Hayes,*
　　434 U.S. 357 (1978)............................................................................27

*United State v. Thorpe,*
　　471 F.3d 652 (6th Cir. 2006) ............................................................12

*United States v. Adams,*
　　388 F.3d 708 (9th Cir. 2004) ............................................................12

*United States v. Aguilar,*
　　883 F.2d 662 (9th Cir. 1989) ....................................................2, 4, 13

*United States v. Alameh,*
　　341 F.3d 167 (2d Cir. 2003) ..............................................................12

*United States v. Arenas-Ortiz,*
　　339 F.3d 1066 (9th Cir. 2003) ..........................................................12

*United States v. Armstrong,*
　　517 U.S. 456 (1996)................................................................8, 11, 28

*United States v. Bass,*
　　536 U.S. 862 (2002)...........................................................................11

*United States v. Bishop,*
　　959 F.2d 820 (9th Cir. 1992) ............................................................23

*United States v. Bourgeois,*
　　964 F.2d 935 (9th Cir. 1992) ..........................................................6, 7

*United States v. Brantley,*
　　803 F.3d 1265 (11th Cir. 2015) ....................................................16, 17

*United States v. Finn,*
　　2022 WL 1047230 (9th Cir. Apr. 7, 2022)......................................17, 18

*United States v. Jones,*
　　159 F.3d 969 (6th Cir. 1998) ............................................................28

*United States v. Lyles,*
　　2009 WL 3400918 (9th Cir. Oct. 16, 2009) ....................................21

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. McCarty*,
   648 F.3d 820 (9th Cir. 2011) ........................................................................ 9

*United States v. Ruiz*,
   665 F. App'x 607 (9th Cir. 2016) ............................................................... 17

*United States v. Sellers*,
   906 F.3d 848 (9th Cir. 2018) ........................................................................ 8

*United States v. Taylor*,
   716 F.2d 701 (9th Cir. 1983) ...................................................................... 10

*United States v. Thornton*,
   710 F.2d 513 (9th Cir. 1983) ........................................................................ 9

*United States v. Turner*,
   104 F.3d 1180  (9th Cir. 1997) ........................................................... 5, 6, 25

*United States v. Vasquez-Lopez*,
   22 F.3d 900 (9th Cir. 1994) ........................................................................ 23

*United States v. Wilson*,
   639 F.2d 500 (9th Cir. 1981) ...................................................................... 26

*Veloria v. United States*,
   2008 WL 4055819, (D. Haw. Aug. 28, 2008) ........................................... 18

*Wayte v. United States*,
   470 U.S. 598 (1985) .........................................................................24, 26, 27

**Federal Constitutional Provisions**

U.S. Const. amend. I ..................................................................................*passim*

**Other Authorities**

Kurtis Alexander, *Antifa activist ready to rumble at Bay Area right-wing
   gatherings*, SAN FRANSICSO CHRONICLE (Aug. 25, 2017)
   https://www.sfchronicle.com/bayarea/article/Antifa-activist-ready-to-
   rumble-at-Bay-Area-11963127.php ........................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

Michael E. Miller, *Antifa: Guardians against fascism or lawless thrill-seekers?* WASHINGTON POST (Sept. 14, 2017),
https://www.washingtonpost.com/local/antifa-guardians-against-fascism-or-lawless-thrill-seekers/2017/09/14/38db474c-93fe-11e7-89fa-bb822a46da5b_story.html ................................................................20

Paul Payne, *Santa Rosa man among protesters arrested in violent Berkeley clash*, The Press Democrat (Aug. 28, 2017)
https://www.pressdemocrat.com/article/news/santa-rosa-man-among-protesters-arrested-in-violent-berkeley-clash/?ref=related .......................................20

Will Carless, *Antifa unmasked*, Reveal News (Jan. 18, 2018)
https://revealnews.org/article/antifa-unmasked/.................................................15, 20

iv

# I. INTRODUCTION

They coordinated.  They brought weapons.  They attacked people.  They went to rallies to suppress speech.  They bragged about it.  This describes the conduct of the many violent far-left wing actors, including Antifa and BAMN, who went to counter-protest at political events in the year after former President Trump's election.

The government turns its cheek to almost all of this in their Opposition to the defense's Motion to Dismiss for Selective Prosecution.  They ignore their own view of such actors:  that they were the "*principal driver*" of the violence at rallies like these.  They ignore facts:  the Antifa at Huntington Beach who pepper-sprayed a middle-aged woman trying to break up a fight *before* Mr. Rundo fought one of them.

Instead, the government credits the motives of these left wing violent actors to camouflage what they are:  similarly situated to Mr. Rundo, but never charged.  Where the government cannot plausibly excuse that behavior, they try to paint Mr. Rundo's behavior as worse, highlighting the number of times Mr. Rundo allegedly engaged in riots.  This ignores the fundamental difference of Mr. Rundo's attendance at those rallies:  he was not the counter-protestor.  It was the violent far left actors who came with weapons and plans to disrupt speech, if not worse, at these rallies.  If nothing else betrays the government's bias against the defendants, the government's incomplete and minimizing comparisons of the violent conduct by Antifa and other left-wing counter-protestors certainly do.  If the government is genuine when it says it prioritizes violent actors set on suppressing speech, then singling out only these defendants makes no sense.  The First Superseding Indictment should be dismissed because these groups were similar in all relevant respects, but only the people with alleged white supremacists beliefs were charged.

Because the government cannot meaningfully counter these facts, it tries to raise the standard for discovery on a selective prosecution claim.  It would require any defendant to prove a case with information the government routinely (and even here) says is privileged.  It would require such a parity of facts between the charged and

1

uncharged that it misses the point of the claim altogether--whether people with *similar* but not *identical* conduct were charged for an impermissible reason. Tellingly, the government not once utters the standard for discovery set by the U.S. Supreme Court in cases like this: the defense need only show "some evidence" of discriminatory effect and intent. At a minimum, the defense does that here.

## II. ARGUMENT

**A.      Violent far-left actors who attacked right-wing citizens at their own rallies are the correct comparison group, not simply any "left wing" person the government has charged.**

Because the government charges Mr. Rundo with violating the ARA in connection with these rallies, the far left violent actors identified in the Motion are the correct control group, i.e, the "similarly situated group." As the court explained in *United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989), "[t]he control group and defendant are the same in all *relevant* respects, except that defendant was, for instance, exercising his first amendment rights." *Aguilar*, 883 F.2d at 706 (emphasis added). "The goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination." *Id.* at 706.

Here, the government would frame the control group as all "left wing" people charged under the ARA, but that is deceptively broad. Such a generality ignores that "left wing" politics, like "right wing" politics, are not monolithic. As not all "right wing" people are white supremacist, a "left wing" arsonist in a Black Lives Matter protest is not necessarily the same person who would go to a conservative rally to violently suppress speech. Put differently, the other ARA defendants across the country, and the "left wing" people charged in this district might be "left wing," but they were not arrested for expressing their views with violence against people they believed were white supremacists. Those cases all involved either anti-police or anti-government views. (*See* Mot. to Dismiss for Selective Prosecution ("Mot.") at 28–29, Ex. RR). For example, the defendant in *United States v. Wilson* was charged with

2

arson in connection with George Floyd-related protests.  (*Id.* at 28, n. 133.)  Arson, to begin with, does not inherently implicate speech the same way the government agrees the ARA inevitably does.  (Opp. at 24.)  Also, that case, and the other ARA cases across the country, do not concern two "sides" with competing views engaged in the same conduct.

This difference matters because the defense does not argue the discrimination here was against Mr. Rundo simply for exercising his First Amendment rights.  The claim here is *viewpoint* discrimination.  None of the other ARA cases across the country, or the "left wing" cases the government points to here, implicate the *viewpoints* at issue here.  The government targets the *viewpoint* by looking at two similarly situated groups and only charging the one with the view it finds offensive.  The only comparison group that makes sense is the one drawn here.

*Aguilar*, cited by the government, is instructive, but critically distinguishable here.  (*See* Opp. at 11, 16.)  There, the Arizona defendants were charged with human smuggling through a complex, multi-level conspiracy where Central American refugees were transported through a "modern-day underground railroad."  883 F.2d at 667.  The smugglers argued they were selectively prosecuted for exercising their beliefs, i.e., their humanitarian goals.  *Id.* at 705.  For their comparison group, they did not point to any other "well-organized and structured alien smuggling conspiracies that were smuggling high volumes of aliens."  *Id.* at 707.  Instead, they pointed to uncharged farmers or growers who smuggled humans into Arizona, and argued the only difference between them was the motive of their conduct; the uncharged farmers and growers were exploiting humans for profit, but the defendants were not.  *Id.* at 706.  The court rejected the farmers as a control group.  The court reasoned, "immigration authorities had never uncovered a similar conspiracy by Arizona farmers or growers to transport illegal aliens outside the State of Arizona.  The United States Attorney testified that the office's focus was upon organized smuggling rings," like the defendants.  883 F.2d at 707.  In other words, the better control group was organized smugglers operating for

financial gain: because "*they present a similar threat to immigration policy in terms of the numbers of aliens they smuggle, but they do not engage in the expression that appellants' claim motivated this prosecution.*" *Id.* (emphasis added).  Thus, in *Aguilar*, the claim failed, in part, because the politically neutral smugglers who were equally organized and trafficked a similar volume of people were the better comparison group. They were factually similar (unlike the farmers, who were far less organized), they were not engaged in the same expressive conduct (they were not committing the crime for religious or humanitarian reasons), and their conduct was a similar threat to immigration enforcement (bringing in high volumes of undocumented people).

Here, too, the only appropriate comparison group is the violent, far left wing individuals who went to the same political rallies at issue here, and who engaged in violence against right-wing protestors.  Even if they were also engaged in expressive conduct, it was not the same expression at issue here--i.e., Mr. Rundo's alleged views as a white supremacist.

And like the similarly organized smugglers in *Aguilar*, charging these violent far left individuals would serve the exact same "legitimate interest" the government offers as its reason for charging only Mr. Rundo and his co-defendants:  "targeting violent groups."  (Opp. at 26; *see also* Opp. at 31 ("Defendants were not charged for their speech, but for deliberately and repeatedly engaging in violence in an attempt to silence their opponents").  Far left wing individuals and groups were so notorious that federal law enforcement warned their "use of violence as a means to oppose racism and white supremacist extremists' preparation to counterattack anarchist extremists are the principal drivers of violence at recent white supremacist rallies." (Ex. HH to Mot. at 1.) The government looked into *both* "left wing" and "Trump" side violence at Berkeley and Huntington Beach.  (Mot., Ex. BB.)  The government ignores this, too.

Noticeably, the government does not deny that charging these far left individuals would have satisfied the same government interest.  They do not deny it because they cannot.  Prosecuting even a single Antifa, BAMN, or other far left wing individual who

committed violence at these conservative rallies would have had the same, if not greater deterrence value, given how many there evidently were.  That is why the government's reliance on cases like *United States v. Turner*, 104 F.3d 1180, 1181-82 (9th Cir. 1997), is faulty.  (Opp. at 17–18.)  *Turner* involved black defendants who argued that black people were disproportionately charged with federal crack offenses where no white people were charged federally, even though the state charged at least a small number of white people with crack offenses.  104 F.3d at 1182.  The defendants did not show, however, whether those white crack sellers were similarly situated to the sellers charged federally, including whether they sold large quantities of crack.  *Id.* at 1185.  Even more, the defendants were targeted as gang members "inclined to violence," which made them more dangerous than the single sale of cocaine.  *Id.*  Thus, the uncharged white people with state offenses were not a good comparison group, and there was a race-neutral reason for charging the defendants.

This case is different from *Turner*.  First, as discussed further below, the defense *has* shown other people who were not charged even though they are similarly situated to Mr. Rundo.  Second, the government interest in *Turner*--deterring violent street gangs--was not satisfied by charging the single crack deals of white suspects.  Here, charging members of the violent far left would serve the exact same purpose.

For similar reasons, the government's reliance on *United States v. Bourgeois,* 964 F.2d 935 (9th Cir. 1992) is also flawed.  (Opp. at 27.)  The government relies on *Bourgeois* to say that such a "narrow [] focus," i.e., focusing on the alleged rallies here to show its discriminatory purpose "is untenable."  (Opp. at 27) (omission in original).  In *Bourgeois*, the black defendants claimed they were charged with firearms offenses because they were black.  964 F.2d at 936.  They argued they were the only race represented in a two-day sweep of gangs notorious for guns and violence, even though other similar gangs of non-blacks commit the same misconduct.  *Id.* at 936.  When the court said that such a "narrow" focus was "untenable," it was this "narrow *time* focus" on only those sweeps.  *Id.* at 940 (emphasis added).  The court zoomed out and looked

5

at firearm charges over a "reasonable period of time," i.e., a few years, which revealed many people were charged with similar gun charges, and the defendant had not alleged that most of them were black.  *Id.* at 940.  The court did not say that focusing on the instant conduct is *per se* too "narrow," as the government suggests.  In cases like *Bourgeois* or *Aguilar,* where there is a history of the charges at issue, it makes sense to expand the timeframe out and take a broader look at other cases because that will give more information about whether "similarly situated" people were charged or not.

That is not the same here.  This is the only ARA charge in this district in decades.  There is no other "reasonable period of time" to zoom out to here.  The government's suggested logic is backwards; the issue is not whether other white supremacists were charged under the ARA, as in *Aguilar* and *Bourgeois*, but that violent far left actors at these conservative rallies were *never* charged.  Even zooming out and looking at a "reasonable period of time," that fact remains true.

The correct comparison group here is the violent far left actors who participated in the same and similar rallies here.  If the government claims Mr. Rundo and his defendants engaged in violence to suppress speech, then the only appropriate comparison group are the other people who arguably did the same thing.  Such conduct implicates the same government interest in targeting violent speech suppression, not simply people imputed with "left wing" beliefs who engaged in a completely different kind of crime for completely different reasons.

**B.      Similarly situated far-left actors could have been charged with violating the ARA, no matter how much the government attempts to minimize and ignore their misconduct.**

Because the defense identifies the correct comparison group, the next question is whether any of those people could have been charged but were not.  In its Motion, the defense points to numerous examples of uncharged far left violence at the rallies charged here, as well as other rallies in California throughout 2017.  The government offers excuses for why it is okay to choose *only* the alleged white supremacists at these

6

1 rallies to charge with federal ARA violations.  The government's position boils down to

2 the following:  the defense does not show the government could have charged any of

3 the violent left wing actors, and Mr. Rundo, RAM, and his co-defendants were more

4 culpable.  Each argument is incorrect.

     1.   **The government could have charged at least three violent, far left**

           **wing actors with violating the ARA, and the defense need not**

           **show they affirmatively "declined" to do so.**

8 The government focuses on the three people at the pro-Trump Huntington Beach

9 rally because the government seems to recognize, as it must, that venue would have

10 been proper here against them: J.A., J.M.A., and J.F., who went to that rally with

11 pepper spray, assaulted people, and admitted to coordinating their efforts.  (Opp at 15;

12 *see* Mot. at pp. 9–11.)  These people were, at a minimum, similar to Mr. Rundo in all

13 "relevant" aspects under the government's view of what an ARA violation must be.

14 While the government argues they are less culpable than Mr. Rundo--which, as set

15 forth below, is not true--the government also asserts the defense has not shown the

16 government could have charged them.  Not so.

17 At the outset, the government seems to argue that the defense must show "the

18 FBI presented [these] individuals to the USAO for prosecution, such that the

19 government can reasonably said to have 'declined' prosecution."  (Opp. at 13.)  Not a

20 single case cited by the government requires proving up the government's internal

21 choice to "decline" prosecution.  Not only does the government fail to cite any

22 authority for this,[1] but it would be unworkable because those materials--FBI charging

23 memos--are routinely defended by the government as privileged and non-discoverable.

24 Even if affirmative knowledge of the other similarly situated group is necessary for a

---

[1] The government cites to *United States v. Armstrong*, 517 U.S. 456, (1996), and
*United States v. Sellers*, 906 F.3d 848, 852-53 (9th Cir. 2018) for this proposition.
(Opp. at 13.)  Neither case says anything about how much actual knowledge the
government needed of the other uncharged, similarly situated people before it charged
the instant defendants, let alone that the defense must show internal, purportedly
privileged government documents to do so.

7

claim of selective prosecution, that is satisfied here.  The government clearly was aware of these three individuals and their misconduct because the government produced their police reports in discovery.  (Mot., Exs. C-E.)

Failing that, then, the government attempts to find other defects in the case against J.A., J.M.A., and J.F.  The government looks to those police reports and says they contain "nothing to suggest that any of J.A., J.M.A. or J.F. traveled interstate or used a facility of interstate commerce with the intent to cite a riot."  (Opp. at 15–16.)  Notwithstanding that the government's charges against Mr. Rundo here would suffer from the exact same deficiency, (*see* Mot. to Dismiss, ECF No. 286), the government is still incorrect here for two reasons.

First, the government seems to conflate the standard for selective prosecution-- i.e., *could* the government have charged the similarly-situated group--with the standard for *conviction*.  The government cites no case supporting the proposition that the defense must show the government had sufficient proof against the similarly-situated person on *every element* of the offense.  That is not probable cause, as the government often points out in the suppression motion context.  *See United States v. Thornton*, 710 F.2d 513, 515 (9th Cir. 1983) ("[Officer's] lack of specific evidence that Thornton was not entitled to possession of the gun is irrelevant.  Probable cause does not require specific evidence of every element of an offense."); *United States v. McCarty*, 648 F.3d 820, 838–39 (9th Cir. 2011), *as amended* (Sept. 9, 2011) ("[T]he government need not show that the officers' belief is more likely true than false, . . . and need not demonstrate probable cause for every element of the offense[.]" (cleaned up, citations omitted)).  All that is necessary is "an objectively reasonable belief that [the defendant] committed a crime, based on the totality of the relevant circumstances."  *McCarty*, 648 F.3d at 839 (citations omitted).

This brings us to the second reason the government is incorrect.  The evidence about J.A., J.M.A., and J.F. plainly leads to a reasonable belief that they committed the same crime alleged here, at least taking the government's view of what an ARA

8

violation is.  According to J.F.'s police report, he admitted "he was an activist and had been to numerous protests. [He] said that he came with two of the other three people that had been arrested for pepper spraying the crowd[.]"  (Ex. C to Mot. at 4.)  He admitted "he came to protest fascism, not to fight personally," but "he knew that the confrontation could get violent, that's why he had the mouth guard and pepper spray, for his personal protection." (*Id*.)  The government cannot reasonably argue it does not meet the threshold standard of probable cause, even if it seems to credit J.F.'s explanations.  *See United States v. Taylor*, 716 F.2d 701, 705–06 (9th Cir. 1983) ("[T]he affidavit [of probable cause] need not establish that it was 'more likely than not' that evidence would be found or *preclude other innocent interpretations* for the activities at his house." (emphasis added).)

Finally, J.F. admitted he "contacted them before the event to make sure that they were going."  (Ex. C to Mot. at 4.)  If, as the government seems to claim, *any* communication with the requisite intent made anytime *before* the riotous event is sufficient under the ARA, (*see* Opp. to Mot. to Dismiss, ECF No. 306 at 14–17), then J.F.'s admission certainly leads to an "objectively reasonable belief" that he used some facility of interstate commerce--i.e., a phone, the internet, all the facilities the government alleges Mr. Rundo and/or his alleged co-conspirators used--with the requisite intent to riot.  Does the government truly suggest that when J.F. "contacted [J.A. and J.M.A.] before the event," he did not use a phone or the internet?  That he walked up to their individual doors to tell them in person, or left them a paper note?

Even more, the government cannot fairly complain about any lack of probable cause on the interstate facility element against J.F., J.A, and J.M.A., when it did not even have the evidence of the credit card transactions alleged in Count 2 here until *after* it charged Mr. Rundo.  (*See* Ex. A, under seal at USA_00202374–75 (May 2019 email correspondence between FBI agents and AUSAs about evidence obtained from hotel where an uncharged person reserved a room, and where Mr. Rundo allegedly made a food purchase).)  The Discord chats attributed to Mr. Rundo--seemingly the other

9

"facility of interstate commerce" alleged in Count 2 against him--were not obtained until May 2019, after they were both charged here.  (*See* Ex. B at USA_202295, <u>under seal</u> (FBI report describing when search warrant was issued for Discord chats, and when returns were received).)  If the government believed it did not need to prove every element to charge Mr. Rundo in 2018, it cannot say it needed more to charge J.F., J.A., or J.M.A. then, too.

At bottom, the government clearly could have charged at least these three other people in this district with violating the ARA, under its view of what an ARA violation is.  The existence of uncharged, similarly situated people also sets this case wholly apart from the other cases cited by the government, where the defendants could not identify *anyone* from the comparison group who was not charged.  *See United States v. Armstrong*, 517 U.S. 456, 470 (1996) (finding black defendants charged with crack offenses failed to identify "individuals who were not black and could have been prosecuted");[2] *United States v. Bass*, 536 U.S. 862, 863 (2002) (finding black defendant charged with a capital offense only showed the federal government charges black people with death-eligible offenses more than white people, but nothing about whether such charges could be made against "similarly situated" white people); *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (Middle-eastern person charged with visa fraud did not offer evidence that other, non-Middle-eastern people could have been charged but were not); *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th Cir. 2003) (finding the defendants failed to show that Hispanic undocumented people were selectively targeted for immigration charges over non-Hispanic undocumented people where defendants improperly inferred that more Hispanic undocumented people were

---

[2] The government also relies on *Armstrong* for the proposition that the "anecdotal," "hearsay," and "newspaper" offered in the Motion is insufficient to support a claim of selective prosecution.  (Opp. at 12–13.)  This is not what *Armstrong* says.  After all, those are some of the few ways a defendant can prove up such a claim as they do not have access to the same investigation tools the federal government does.  *Armstrong* merely found that a similar type of evidence was insufficient to support a selective prosecution claim because, in *that* case, it failed to identify non-black people who could have been charged, but were not.  *See Armstrong*, 517 U.S. at 461.

charged with such offenses relative to their overall population); *United State v. Thorpe*, 471 F.3d 652, 656 (6th Cir. 2006) (black man charged with gun crime conceded that he had not shown similarly situated, uncharged black people).

And these facts certainly set this case apart from *United States v. Adams*, 388 F.3d 708 (9th Cir. 2004), which the government cites to say it is not enough to point to other people "who participated in some form of violence at a protest." (Opp at 19.) *Adams* concerned thousands of people at an unpermitted national park. 388 F.3d at 712–13. Despite the many people the government could have ticketed, the government focused its charges on the event organizer, who knew he needed a permit, but declined to get it anyway. *Id.* It is not controversial to say the National Forest Service need not "ticket all persons violating a law or ticket no one" when there are 22,000 people at a gathering, and one person they already know violated the law. *Id.* That is not the same here, where the pool of similarly situated, violent left wing protestors is not nearly as large. Indeed, the burden of charging these identified, violent far left wing actors would impose the same burden on the government as these instant charges have.

2. **Mr. Rundo's alleged misconduct is similar in all "relevant" aspects to the minimum of three people the government clearly could have charged with violating the ARA.[3]**

Because the government could have charged J.A., J.M.A., and J.F. with violating the ARA, given its theory of what constitutes an ARA charge, the government attempts to distinguish their misconduct from Mr. Rundo's enough to put them outside the realm of "similarly situated." As noted above in *Aguilar*, 883 F.2d 662 (9th Cir. 1989), "[t]he control group and defendant are the same in all relevant respects, except that defendant was, for instance, exercising his first amendment rights." *Aguilar*, 883 F.2d at 706. Of

---

[3] None of the arguments in this section, or in the rest of this motion, are meant to suggest or concede that the government's allegations against Mr. Rundo in the FSI are sufficient as a matter of law.

course, "where the comparison group has less in common with defendant, then factors other than the protected expression may very well play a part in the prosecution." *Id.*

Here, the government stretches "*relevant*" aspects to mean identical in "*every*" aspect, but that is not the law.  These three people were, at a minimum, similar to Mr. Rundo in all "relevant" aspects under the government's view of what an ARA violation must be, and even their theory against Mr. Rundo.  More than ignore this, the government's attempts to differentiate these three violent, far left wing actors reveals the exact bias animating this action.

For starters, the government's description of what happened at Huntington Beach is so narrowly drawn that elides what actually happened.  The government claims the FBI obtained video footage of the March 2017 protest, "which showed all four defendants pursuing and taunting counter-protestors as they walked away from defendants." (Opp. at 4, citing Ex. 1 to Opp. at 0:00-00:33.)  Per the government, "[t]hat footage depicted Boman kicking and shoving counter-protestors in the back, Laube repeatedly punching a journalist in the face, and Rundo attacking a counter-protestor from behind, then punching and elbowing him as he laid on the ground in a defensive position. (*Id.* at 00:31-00:50; Ex. 2 at 9:14-9:45, 7:55-8:45, and 9:40-10:11.) This recitation glosses over what happened on that beach:  these three individuals plainly pepper-sprayed a middle-aged Trump supporter in the face.  (Mot. at 10–11.)

Ignoring this, the government gives these three individuals an incredible amount of deference.  For example, the government points to portions of the police report for J.F. stating he ran away and was "followed by a group from the event."  (Opp. at 19, citing Def. Ex. C at 3.)  The report says he only pepper-sprayed the crowd when his friend was "punched in the face," which the government notes, again ignoring the whole context surrounding any punch.  (Opp. at 19, citing Def. Ex. C at 4.)  The government even seems to credit J.F.'s claims to police--after he was arrested--that he "came to protest," "not to fight personally," and he wore a mouth guard and pepper spray for his "personal protection."  (Opp. at 19, citing Def. Ex. C at 4.)  It may be that

12

J.F. meant these things.  The evidence simply supports something different.  That is what matters in establishing whether they committed the same kind of conduct.[4]  Most tellingly, though, J.F. and the other two violent left wing actors were cited not just for "battery while engaged in a brawl."  (Opp. at 15.)  They were cited for inciting a riot, which the government ignores.  (Mot. Exs. C at 5, D at 5, E at 3.)

The government tries to distinguish these three far left wing actors in other ways that ring hollow.  For example, they focus on the number of protests Mr. Rundo and his co-defendants attended where violence occurred, whereas it claims no other violent left wing actors identified in the Motion went to multiple events.[5]  (Opp. at 18–19.)

This argument, at first glance, has allure.  If someone engages in a crime multiple times, does that not set them apart from someone who only does it once?  If looking at a gun, drug, or other case with only *one* bad actor and *one* set of facts to analyze, yes.

This case is different, though, and context matters.  Simply looking at the number of protests Mr. Rundo attended where violence occurred misses a fundamental fact:  every single protest charged in the FSI was a "right wing" or "conservative" event.  *None* were "left wing" protests where he showed up and incited violence.  *All* of the violent left wing actors were the interlopers.  Is going to three rallies without a weapon as aggravating as bringing pepper-spray and deliberately spraying it into a woman's face as she tries to break up a fight?  The gestalt of the offense is the same; picking it apart into the individual parts, as the government does, misses that point.

---

[4] After all, if the federal government determined whether to charge people upon crediting their defensive comments *after* they were arrested, there would certainly be far fewer federal charges ever filed.

[5] Yvette Felarca attended at least three.  (Mot. at 15, 21).  Other violent far-left wing actors at Berkeley on April 15, 2017 admitted to attending even more.  *See* Ex. C, Michael E. Miller, *Antifa: Guardians against fascism or lawless thrill-seekers?,* Washington Post (Sept. 14, 2017), https://perma.cc/DT2D-NYQV; Ex. D, Paul Payne, *Santa Rosa Man among protesters arrested in violent Berkeley Clash,* Press Democrat (Aug. 28, 2017), https://perma.cc/T2QJ-6GAQ; Ex. E, Will Carless, *Antifa unmasked* (Jan. 8, 2018), https://perma.cc/JD6D-DCAN; Ex. F, Kurtis Alexander, *Antifa activist ready to rumble at Bay Area right-wing gatherings* (Aug. 25, 2017), https://perma.cc/8N3R-9KS6.

The number of events here is not an appropriate proxy of culpability because it flips Mr. Rundo's right to participate at any right-wing rally flatly against him, while affording these violent left wing actors the right to show up and do harm to right wing speech, so long as they only did it once.  In fact, Tyler Laube, charged in Count 1, only allegedly went to one rally.  (FSI, ECF No. 209 at 4–6.)  That puts him in the same category as J.A., J.F., and J.M.A., if number of rallies attended is what matters.  The government ignores this, too.

Also, the government points to no case requiring this level of factual parity with a "similarly situated" group.  Instead, it cites to cases where the facts were so different they either called into question whether the other "similarly situated" group even committed the same crime, or their conduct was so substantially less culpable that they could not be the same.  (Opp. at 17.)  For example, *United States v. Brantley*, 803 F.3d 1265 (11th Cir. 2015), concerned a woman accused of misprision of a felony.  She witnessed her paramour murder two officers with a gun, promised to stay loyal to him (without threat or intimidation), and then took affirmative steps to conceal the crime. 803 F.3d at 1272–73.  Her only comparison was another woman who did not report the murders of two civilians.  *Id.*  Unlike Ms. Brantley, though, she was not present at the time of the murders, she was threatened and beaten into silence about them, and she only saw the shooter with the weapon *after* the murders.  *Id.*  Such substantially mitigating facts understandably distinguished this woman from Ms. Brantley.  *Id.*  And as the court noted, there was a unique value in charging Ms. Brantley; deterring the murder of police officers, which was not present with the other woman, who did not report the murder of civilians.  *Id.* at 1273.

Unlike *Brantley*, the differences are not nearly as stark between Mr. Rundo's alleged misconduct and these three left wing violent actors, as described above.  Also unlike *Brantley*, the same deterrent value *is* present in charging left wing violence at right wing events.

14

Other cases cited by the government also involved groups so dissimilar they could not reasonably be compared to the defendants, unlike here.  In *United States v. Ruiz*, the Hispanic tax fraud defendants argued they were similarly situated to two non-Hispanic people who faced only civil penalties for the same conduct. 665 F. App'x at 610.  But the conduct in the two civil actions was not the same at all because of a laundry list of reasons:  "the extent of the fraud, the degree of sophistication required, the number of persons involved, the amount of actual or intended loss and the prior histories or related conduct of certain members of the scheme." *Id.*

In *United States v. Finn*, 2022 WL 1047230 (9th Cir. Apr. 7, 2022), the defendant had engaged in a fraudulent scheme that took millions from 16 investors, and $830k for himself.  2022 WL 1047230, at *1.  The uncharged women, however, were materially different because their role in the scheme was far less involved and culpable: one took $300,000 and cooperated; one participated in only one transaction with one victim; and one had a materially different role—processing escrow transactions.  *Id*.  Far from similarly situated to him, they were evidently lower-level actors in his broader, more culpable scheme to defraud.  Naturally, in any conspiracy, there could be less culpable, lower level actors who the government would decline to charge as responsible for the *whole* conspiracy or offense.[6]

That cannot be said of J.F., J.A., or J.M.A. These three violent left wing actors were not lesser involved members of the conspiracy charged here.  They were distinctly engaged in the exact conduct Mr. Rundo is charged with here.  They simply had different views, and were not charged.

---

[6] This is the same reason why the uncharged men were distinguishable from the woman charged in *Veloria v. United States*, Crim. No. 00–00145 SOM, Civ. No. 08–00019 SOM/BMK, 2008 WL 4055819, at *16 (D. Haw. Aug. 28, 2008), also cited by the government.  (Opp. at 15.)  Ms. Veloria was charged with possession with intent to distribute crack cocaine based on search of home where she lived; her residence in the home where the drugs were found distinguished her from other men who merely had ties to the house, or who had no connection to the drugs at all.  2008 WL 4055819, at *15–*16.

1

**C.     The government's "neutral" reasons for these charges are hollow.**

2

The government offers reasons why it charged Mr. Rundo which are unrelated to

3

his views.  (*See* Opp. at 22–31.)  None add up to a credible, neutral reason to charge

4

Mr. Rundo, but not a single violent left wing actor from these conservative rallies.

5

1.     **The government's bias against Mr. Rundo's beliefs is evident from**

6

**what it completely ignores about the left-wing violence**

7

**documented here.**

8

The Motion pointed to example after example of other uncharged left wing

9

violence at these and other rallies.  (Mot. at 8-11, 16-17.)  In response, the government

10

claims they were less culpable because Mr. Rundo and/or RAM did worse things, but

11

utterly ignores *all* the evidence that these far left violent actors did the same, if not

12

worse conduct in California alone:

13

Used the internet to recruit new members.  Antifa, BAMN, and other far left-

14

wing groups did that, too.  (*See* Mot. at 4,13-14).

15

Trained together to engage in "combat" fighting.  Far left-wing actors not only

16

discussed doing that, but suggested bringing guns, gave instructions on how to make

17

Molotov cocktails, and actually brought weapons like pepper-spray, homemade bombs,

18

and full soda cans to launch at the "right wing" side. (*See* Mot. at 4, 10–11, 14, 16–17. )

19

Traveled throughout the state and country to assault people who didn't share

20

their viewpoints.  Yvette Fellarca, who was arrested at least twice in connection with

21

her counter-protesting, admitted on camera that people traveled from *outside* California

22

to "stop" neo-Nazis from exercising their First Amendment rights, arguing they do not

23

have such rights at all.  (*See* Mot. Ex. W-1 at 1–2.).

24

Bragged about the violence at the rallies.  Here are just a few examples of violent

25

far left wing actors "bragging" about their violence in 2017:

26

S.H. was arrested at the August 27, 2017 protest where more than 100 antifa

27

activists leapt over barricades and stormed Martin Luther King Jr. Civic Center Park,

28

attacking a handful of Trump supporters and right-wing activists.  (*See* Mot. at 19–20.)

16

He said "his only regret was that he was arrested before things got interesting."[7]  He boasted to the Washington Post, "Most people I know love me now," and "I'm not trying to brag, but I've become pretty popular."  After the tragedy in Charlottesville, he posted on Facebook:  "Every time we bleed we grow stronger[.]"[8]

A man going by the name "Dominic" admitted that "[w]henever [Nazis] come to Berkeley, I have no problem physically encountering them."  Bloody-knuckled, he boasted about chasing away a right-wing activist who was on the "list" of "Nazis" to target, and confirmed "[t]he people on our list are targets, so they got injured."[9]

Yvette Felarca, after one of at least three violent rallies where she and other BAMN members counter-protested, said unapologetically on camera:

> The goal today was to shut down the Nazi's recruitment rally.  *And I want to congratulate everyone who came out today because we succeeded in doing that.*  We defeated them in their efforts.  *They had to run hiding, running from hiding behind the police and then just running away altogether. . . ..*

(Mot., Ex. W-1 at 1) (emphasis added.)

The government says nothing about this.  It insists these "Defendants were not charged for their speech, but for deliberately and repeatedly engaging in violence in an attempt to silence their opponents."[10]  (Opp. at 31.)  These same words describe exactly what these far left wing, violent actors did.  Even if they may not have committed an

---

[7]Ex. C.

[8]Ex. D.

[9]Ex. E.

[10] Again, and to be clear, the defense is not arguing that Mr. Rundo had a First Amendment right to engage in violence.  That distinguishes Mr. Rundo's case from *United States v. Lyles*, 2009 WL 3400918, at *2 (9th Cir. Oct. 16, 2009), which the government cites to suggest that white supremacist beliefs cannot immunize someone from engaging in violence.  (Opp. at 31.)  The Hells Angel member in *Lyles* did not show a nexus between any of his expressive conduct, or the expressive conduct of the hells angels, and his charge for violating drug laws.  Expressive activity is the core of the conduct here, as the government recognizes.  (Opp. at 24.)

17

ARA violation in *this* district, the government's attempt to draw Mr. Rundo as more worthy of prosecution without even acknowledging these parallels is telling of two things:  (1) the government's apparent bias against these defendants, and/or (2) the government's unstated recognition that Mr. Rundo and his co-defendants were prosecuted for alleged misconduct that paled in comparison to what some left-wing actors were doing throughout California at the same time.[11]  *Cf. Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the [employment discrimination] defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

>    2.    **Pointing to cases where the government purportedly selectively prosecuted "left wing" people does not diminish its invidious intent here.**

To fill this vacuum, the government argues it cannot have a bias against Mr. Rundo's beliefs because, after all, it charged "left wing" people in other cases.  (Opp. at 26–27.)  It points to cases "premised on purportedly 'left-wing' protestors' illegal conduct during riots in the wake of George Floyd protests[.]"  (Opp. at 26, n. 9.)  The government's logic appears to be this:  because it charged left wing people in other cases, it must mean it does not have a bias against these alleged white supremacists.  This logic fails for two reasons.

First, and as noted above, these "left wing" people who engaged in arson or other acts amid the George Floyd protests were not charged under the ARA, and they are not

---

[11] The government assures us that it did not prosecute, or even investigate Mr. Rundo with an eye toward his beliefs.  In support, it points to a cautionary statement in an FBI investigation form that requested a full investigation into RAM in January 2018. (Opp., under seal Ex. 6 at USA_00003017.)  That disclaimer purports that the inclusion of the investigated individuals "is not intended to associate the [First Amendment] protected activity with criminality or a threat to national security, or to infer that such protected activity itself violates federal law."  (*Id.*)  Most notably, that disclaimer is for a report that focuses almost entirely on Ben Daley, who is not charged here. Regardless, simply saying the government is not targeting people for their beliefs does not mean they are not.

the correct comparison group. The government points to no evidence that those "left wing" defendants were committing their crimes during conservative rallies, or against conservative or right-wing speech. They were engaged in anti-*government* behavior. They are simply not the same cohort as the violent, far left wing people who came to these rallies, but whom the government never charged.

Second, pointing to cases where the government purportedly engaged in selective prosecution of a *different* viewpoint cannot possibly support the government here. This is akin to saying one cannot be biased against a certain religion in favor of another, because one is actually biased against that other religion, too.

The government applies a similar kind of flawed logic to people who allegedly share Mr. Rundo's beliefs, but who the government did not charge, to prove it was not discriminating against Mr. Rundo. (Opp. at 25, Ex. 6 at USA_00003018, 3021, 3023.) Absent from the government's argument is any proffer that it *could have* charged any of these other people. Indeed, one of the young men it seems to identify as a potential defendant here sadly died before the government charged anyone, and a majority of the others were charged in either the Charlottesville case, or here. (*Id.* at USA_0000318.)

Even if there were other alleged white supremacists the government could have charged, the government's argument forgets a key concept in the realm of equal protection. That is, even a single government act animated with a discriminatory purpose is too much. In *United States v. Bishop*, 959 F.2d 820, 827 (9th Cir. 1992), *overruled on other grounds by United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010), a prosecutor struck a black juror without a race-neutral reason, and there were still black people on the jury. The court said the presence of remaining black jurors was relevant to non-discriminatory motive, but it did not offset the constitutional violation itself. Holding otherwise would "collide[] with the fundamental principle that under *Batson*, the striking of one black juror for a racial reason violates the Equal Protection Clause." *Bishop*, 959 F.2d at 827 (cleaned up, quotation omitted); *see also United States v.*

19

1   *Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) ("We have held that the Constitution

2   forbids striking even a single prospective juror for a discriminatory purpose.").

3          As here, leaving "some" members with the same viewpoint uncharged does not

4   mean the government did not act with an invidious purpose towards *these* defendants.

5          3.      **Charging only one ARA in the recorded history of this district is**

6                  **indicia of discriminatory purpose.**

7          The government attempts to use the singular nature of this case as proof that it

8   did not engage in a "policy" or "pattern" of prosecuting alleged white supremacists.

9   (Opp. at 28–29.)  Put differently, the sample size of charged ARA cases in this district--

10  this one--is too small to demonstrate the USAO engaged in a systemic denial of equal

11  protection.  (*Id.*)  This logic is not only wrong, it is dangerous.

12         Just because the government only charges a statute once in a matter of decades

13  does not mean the government could not have done so with a discriminatory purpose.

14  Imagine the consequences of such a policy.  The government could immunize itself

15  from a selective prosecution claim by finding the most obscure charge against a group

16  it does not like, then claim there is no good comparison group because it is the first

17  time it charged someone with that offense.  Per the government, that defendant could

18  not challenge such an abuse of power.  Incredibly, under that logic, *Yick Wo v. Hopkins*

19  would not be decided the same way today.  "If the Court then had focused only on the

20  prosecutions themselves, as [the government] does now, it would have found no

21  discrimination in the choice, among violators of the ordinance, of the individuals to be

22  prosecuted.  Indeed, all but one of these violators were of Chinese origin.  Instead, the

23  Court properly focused on the official action that led to those prosecutions."  *Wayte v.*

24  *United States*, 470 U.S. 598, 630–31 (1985) (Marshall, J., Brennan, J., dissenting).

25         None of the cases cited by the government support this idea.  The government

26  cites *Armstrong*, stating "courts analyzing selective prosecution claims have required

27  defendants to point to a 'federal prosecutorial policy,' or at least a pattern of

28  enforcement," that indicates discrimination.  (Opp. at 28.)  From this, the government

20

seems to suggest the defense must show the government selectively prosecuted other alleged white supremacists in other cases to show a "pattern." (*Id.*)  That is not what *Armstrong* says.  The nefarious pattern of enforcement is not just the prosecution of a *single* case, it is the *non*-prosecution of *other* cases.

4. **No neutral explanation has been offered that is not at odds with the uncharged, far left wing violence here.**

At its core, the government's defense in charging this case is at odds with why it would not also charge *any* of the violent, far left actors.  The other rationale it offers-- that these defendants "effectively selected themselves" because of their public comments about the rallies--dismisses too much of everything else demonstrating an invidious purpose.  (Opp. at 24.)  In support, the government points to cases where the court faced a very unique set of facts that do not exist here.

In *Wayte v. United States*, 470 U.S. 598 (1985), the government had a "beg" policy for charging people who failed to register for the draft.  Given the vast number of non-registrants, the government created a system identifying people who affirmatively told the government it would not be registering (i.e., "vocal non-registrants") and people who were reported by others as non-registrants.  *Wayte*, 470 U.S. at 612.  Then, the government *tried multiple times* to get the non-registrants to register and avoid the consequence of prosecution.  *Id.* at 601–03.  Only after that failed did the government charge any of them.  *Id.*

*Wayte* is distinguishable for two critical differences.  First, it is much harder to impute an intent to discriminate against vocal non-registrants when the government made affirmative efforts to *try* to avoid prosecution.  *Wayte*, 470 U.S. at 609–610.  A prosecutor truly intent on punishing beliefs would not likely offer that option.  Certainly, that did not happen here.  Second, the government in *Wayte* created a system to promote prosecutorial efficiency where there were "thousands" of non-registrants

21

who could be failing to register for any number of innocent reasons.[12]  *Id.* at 612–13.
Thus, the government could present a coherent, neutral explanation for how they went
about selecting individuals for prosecution.  Here, the government does not say it
focused on Mr. Rundo and his co-defendants because there were simply too many
others to charge and it needed to weed out the most compelling case.  The government
offers no evidence of any such "system" of efficiency at all.

This kind of backwards looking explanation is risky because it permits pretextual
explanations for unconstitutional conduct.  Even a "mixed" intent--invidious
discrimination paired with a reasonable-sounding explanation for charging someone--
would still raise the specter of a selective prosecution.  That the government might now
point to reasons to prioritize Mr. Rundo over others does not fully diminish the
otherwise strong indicia of invidious intent here.  Crediting such excuses out-of-hand is
precisely what Justices Thurgood Marshall and William J. Brennan, Jr. warned of in
their prescient dissent in *Wayte*:  "If the Government intentionally discriminated in
defining the pool of potential prosecutees, it cannot immunize itself from liability
merely by showing that it used permissible methods in choosing whom to prosecute
from this previously tainted pool."  *Id.* at 630 (Marshall, J., Brennan, J., dissenting).

Underlying this rationale still is a darker premise.  The comments the
government points to as a reason to target Mr. Rundo are speech.  (Opp. at 6–7.)  While
the government may argue these comments could suggest intent to riot, that argument
reveals the unique susceptibility of the ARA to selective prosecution.  Not only would

---

[12] A similar efficiency policy was also key to the court's finding in *United States
v. Wilson*, 639 F.2d 500, 504–05 (9th Cir. 1981), also cited by the government to
support its purported neutral intent here.  (Opp. at 23.)  There was, as in *Wayte* but
unlike here, a demonstrated need for such efficiency.  The *Wilson* defendants argued
they were targeted for tax crimes because they were tax protestors.  They showed only
that all tax protestors were charged, but did not show that all charged were tax
protestors.  *See id.*  That is not the case here, as set forth above: all of the ARA
defendants in this district are alleged white supremacists.  Even more, though, the court
pointed to the institutional limitations specific to tax cases, where willfulness is an
element of the offense and investigating and prosecuting millions of returns justifies
"some degree of selectivity" in prosecution.  *Id.* at 504–05.  No such institutional
limitations are implicated here.

1    the government use someone's speech as a target, but the government can then use that

2    speech as an arrow to a selective prosecution claim.

3    **D.   At a minimum, the defense is entitled to discovery on this claim.**

4          In its Opposition, the government does not once utter the correct standard for

5    discovery in a selective prosecution case. (Opp. at 20–21.) The government repeats

6    language from *Armstrong* which confirms the defense must make a "threshold

7    showing" of the claim to obtain discovery on it. (*Id.* at 20); *see Armstrong*, 517 U.S. at

8    458. Noticeably absent, however, is the standard itself: "some evidence" of

9    discriminatory intent and effect. *Armstrong*, 517 U.S. at 468. That's it. Nothing more.

10         The government stresses how this is an "intentionally 'rigorous'" standard, but

11   does not meaningfully argue why the defense has not met it. (*See* Opp. at 20–21.)

12   Rather, the government appears to merge the standard for discovery with the standard

13   on the claim itself. (*Id.* at 20 (concluding the defense has not pointed to any similarly

14   situated individuals the government declined to prosecute, so they fail to meet their

15   threshold burden).) That is incorrect.

16         *United States v. Jones,* 159 F.3d 969 (6th Cir. 1998) is instructive. There, the

17   black defendant showed that non-black people had been charged for crack cocaine

18   offenses locally, but were not referred for federal prosecution. 159 F.3d at 975–76.

19   However, "he did not establish that law enforcement failed to refer similarly situated

20   non-black people for federal prosecution." *Id.* at 977. Even so, the court found this

21   was "some evidence" of discriminatory effect to justify discovery. *Id.* "Obviously, a

22   defendant need not prove his case in order to justify discovery on an issue." *Id.* at 978.

23   In other words, it is unnecessary to make micro-comparisons between the charged and

24   uncharged groups to find the defendant is at least entitled to discovery on the claim.

25         Here, the defense has put forth an even stronger prima facie case than in *Jones*.

26   The defense identified similarly situated people from the correct control group whom

27   the government could have charged, but did not. The defendant in *Jones* did not do

28

23

that, and the court *still* found he was entitled to discovery.  If this Court finds it premature to grant this motion on the merits, it should order discovery on this claim.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  February 12, 2024          By   */s/ Erin M. Murphy*

ERIN M. MURPHY
JULIA DEIXLER
Deputy Federal Public Defenders
Attorneys for ROBERT RUNDO

24

# DECLARATION OF ERIN M. MURPHY

I, Erin M. Murphy, declare:

1.      I am an attorney at the Office of the Federal Public Defender in the Central District of California appointed to represent defendant Robert Rundo in *United States v. Robert Rundo, et al.*, 18-CR-759-CJC.

2.      Attached to this motion are true and correct copies of the following exhibits:

        a.  Ex. A, <u>under seal</u> -- Discovery produced in this case by the government.

        b.  Ex. B, <u>under seal</u> -- Discovery produced in this case by the government.

        c.  Ex. C -- an article from The Washington Post website.

        d.  Ex. D -- an article from The Press Democrat website.

        e.  Ex. E -- an article from The RevealNews.org website.

        f.  Ex. F -- an article from The San Francisco Chronicle website.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on February 12, 2024, at Los Angeles, California.


*/s/ Erin M. Murphy*
ERIN MURPHY
Deputy Federal Public Defender