**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING**

```
UNITED STATES OF AMERICA,      )
                               )
            PLAINTIFF,         )
                               )
        vs.                    ) SACR NO. 18-00759-CJC
                               )
ROBERT PAUL RUNDO, ROBERT BOMAN, )
                               )
            DEFENDANTS.        )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, FEBRUARY 21, 2024

9:01 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                  E. MARTIN ESTRADA
                  UNITED STATES ATTORNEY

                  CAMERON L. SCHROEDER
                  ASSISTANT UNITED STATES ATTORNEY
                  CHIEF, CRIMINAL DIVISION

                  KATHRYNNE N. SEIDEN
                  ASSISTANT UNITED STATES ATTORNEY
                  UNITED STATES DISTRICT COURT
                  312 NORTH SPRING STREET
                  SUITE 1200
                  LOS ANGELES, CALIFORNIA 90012
                  (213) 894-0141
                  kathrynne.seiden@usdoj.gov


                  SOLOMON KIM
                  ASSISTANT UNITED STATES ATTORNEY
                  UNITED STATES DISTRICT COURT
                  312 NORTH SPRING STREET
                  SUITE 1500
                  LOS ANGELES, CALIFORNIA 90012
                  (213) 894-2420
                  solomon.kim@usdoj.gov


                  ANNA BOYLAN
                  ASSISTANT UNITED STATES ATTORNEY
                  UNITED STATES DISTRICT COURT
                  312 NORTH SPRING STREET
                  SUITE 1500
                  LOS ANGELES, CALIFORNIA 90012
                  (213) 894-2170
                  anna.boylan@usdoj.gov

APPEARANCES OF COUNSEL:

    FOR THE DEFENDANT, ROBERT PAUL RUNDO, ROBERT BOMAN:

                CUAUHTEMOC ORTEGA
                FEDERAL PUBLIC DEFENDER

                ERIN MURPHY
                DEPUTY FEDERAL PUBLIC DEFENDER
                321 EAST SECOND STREET
                LOS ANGELES, CALIFORNIA 90012
                (213) 894-7550
                erin_murphy@fd.org

                JULIA DEIXLER
                DEPUTY FEDERAL PUBLIC DEFENDER
                321 EAST SECOND STREET
                LOS ANGELES, CALIFORNIA 90012
                (714) 338-3400
                julia_deixler@fd.org

    FOR THE DEFENDANT, ROBERT BOMAN:

                PETER C. SWARTH
                LAW OFFICES OF PETER C. SWARTH
                6520 PLATT AVENUE
                SUITE 557
                WEST HILLS, CALIFORNIA 91307
                (818) 887-8800
                pswarth@gmail.com

|   | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; WEDNESDAY, FEBRUARY 21, 2024;** |
| 2 | **9:01 A.M.** |
| 3 | -OOO- |
| 4 | THE COURT:  Good morning. |
| 5 | THE CLERK:  Calling Calendar Item No. 1, |
| 6 | CR 18-00759-CJC, United States of America versus Robert Paul |
| 7 | Rundo; United States of America versus Robert Boman. |
| 8 | Counsel, please state your appearances. |
| 9 | MS. SEIDEN:  Good morning. |
| 10 | Kathrynne Seiden, Solomon Kim and Anna Boylan for |
| 11 | the United States. |
| 12 | THE COURT:  Good morning to all of you. |
| 13 | MS. MURPHY:  Good morning, Your Honor. |
| 14 | Erin Murphy and Julia Deixler from the Federal |
| 09:01:58 15 | Public Defender's Office, on behalf of Mr. Rundo, who is |
| 16 | present and in custody. |
| 17 | THE COURT:  Good morning. |
| 18 | MR. SWARTH:  Good morning, Your Honor. |
| 19 | Peter Swarth, on behalf of Robert Boman.  He's |
| 09:02:08 20 | present in the court on bond. |
| 21 | THE COURT:  Hello, Mr. Swarth.  Hello, Mr. Boman. |
| 22 | DEFENDANT BOMAN:  Hello, sir. |
| 23 | THE COURT:  Well, I appreciate the briefing on the |
| 24 | motions from both sides.  It was very thorough and very |
| 09:02:18 25 | helpful.  So what I was hoping we could do is have argument. |

*Deborah D. Parker, U.S. Court Reporter*

09:02:22 1  And since it's the defense motions, Ms. Murphy, are you

2  going to be arguing both motions?

3        MS. MURPHY:  Your Honor, I'll be handling the

4  selective prosecution motion.

09:02:32 5        THE COURT:  Okay.  And Julia Deixler, are you

6  going to handle the due process motion?

7        MS. DEIXLER:  That's correct, Your Honor.

8        THE COURT:  All right.  Why don't I start with

9  you.  I have a few questions for you, but then you could

09:02:42 10 tell me anything else you'd like me to know.

11        MS. DEIXLER:  Absolutely, Your Honor.

12        THE COURT:  Can I have you approach the lectern,

13 please.

14        MS. DEIXLER:  Absolutely.

09:02:54 15       THE COURT:  Thank you.

16     *(Pause.)*

17        MS. DEIXLER:  Yes, Your Honor.

18        THE COURT:  Now, the statute, Anti-Riot Act,

19 requires what I call two acts:  One is what I'm going to

09:03:06 20 call the Commerce Act -- travel or use of a facility of

21 interstate commerce -- and then the overt act which the

22 Ninth Circuit has defined, as I'll call, riotous conduct.

23        In your view, does the Constitution require a

24 temporal connection between the Commerce Act and the Riot

09:03:30 25 Act?

09:03:31   1          MS. DEIXLER:  Yes, Your Honor.

2          THE COURT:  Tell me why.

3          MS. DEIXLER:  Well, Your Honor, our view is that

4    the Ninth Circuit in acknowledging the First Amendment

09:03:40   5    violations in the Anti-Riot Act interpreted it to bring it

6    into compliance with *Brandenburg* which, of course, does

7    require this temporal act element between speech and action.

8    The interstate commerce element really is the speech element

9    of this statute.  And so our view is that the Ninth Circuit

09:04:05   10   and the First Amendment require that the speech, which is as

11   the Government has charged here, text messages and social

12   media postings, which is the crux of the offense here that

13   makes it a federal offense that that conduct in and of

14   itself needs to actually instigate a riot.  So that's -- the

09:04:26   15   temporal connection is -- the *Brandenburg* phrasing of it

16   would be leading to imminent unlawful conduct.  The

17   Ninth Circuit phrases it as speech that actually itself

18   instigates a riot, meaning participates in, carries on or

19   insights a riot.  And I think it's not just the First

09:04:49   20   Amendment that requires that.  I think there's really three

21   reasons.  It's the -- the First Amendment, the reading of

22   the interpretation by the Ninth Circuit, and then also just

23   an understanding in a broader way of what this Act is

24   actually penalizing.

09:05:07   25          So as we noted in the papers, I think the

09:05:11  1  Government's position is that there is absolutely no

2  temporal scope.  I don't see how that comports with the

3  reading of the Ninth Circuit opinion here.  As I said, I

4  think that the First Amendment and *Brandenburg* really

09:05:25  5  require the close connection.

6          THE COURT:  Let me interrupt you on that point.

7  The way I understand the Government's position is, the

8  Ninth Circuit said there wasn't a *Brandenburg* problem

9  because the element of the riotous act, so you have a

09:05:42 10  riotous act.  The fact that another element of the offense

11  doesn't have a temporal limitation is not a problem with

12  *Brandenburg*.  Because the Ninth Circuit interpreted an overt

13  act being a riotous act, there's no *Brandenburg* problem.

14  You have either right then and there a riot or an imminent

09:06:15 15  riot.

16          MS. DEIXLER:  Well, I think, Your Honor, the

17  problem with that interpretation is, if we only have the

18  riotous act, we don't have a federal offense.  It's a

19  completely different offense.  There are plenty of other

09:06:28 20  statutes that can get to the harm of the underlying riotous

21  conduct through a vandalism charge, a civil disobedience

22  charge, et cetera.  The entire purpose of the Anti-Riot Act

23  really was to get at the agitators of the riot, and that's

24  really the crux of what this statute is about.  And that

09:06:51 25  comes in through the interstate commerce element.

*Deborah D. Parker, U.S. Court Reporter*

| | |
|---|---|
| 09:06:56 | 1 |

THE COURT:  I understand that.  And it's funny
that I'm the one who's making this argument, because I
respectfully disagree with the Ninth Circuit's rewriting of
the Anti-Riot Act, but they are the superior court and I
have to respect that.  But it's a federal offense because
there's travel interstate commerce, or there's a use of an
interstate facility, as I understand it.  So in this day and
age that's going to be a pretty easy element to satisfy, but
it is what it is.  I mean, this statute in many ways, I
think, was almost an attempt statute.  It was going after
the civil rights leaders that were coming to certain places,
firing up the constituents and then leaving.  So it has
really a racist origin that's very troubling.  And it's
ironic that the Ninth Circuit of all circuits is using a
racist statute to go after the defendants in this case, but
for saying it's okay.  But it is what it is.  I made my
decision.  They said I was wrong.  But the way I read their
opinion is they're saying it's not a *Brandenburg* problem,
because you have a riotous act.

And I hear what you're saying.  It's very easy to
then state a federal crime, because you're going to use your
cell phone.  You're going to use e-mail, or you're going to
travel interstate.

MS. DEIXLER:  Well, I agree with Your Honor
that -- first of all, I also agreed with Your Honor's

09:09:00  1   original interpretation of what the Act found.  I do think

2   we've moved off of what Congress' initial intent was with

3   this statute.  But I think we are now, as the Court

4   acknowledges, bound by the Ninth Circuit's interpretation.

09:09:13  5   I think the Ninth Circuit clearly recognized those problems

6   with the statute and they reimagined it, in order to fix

7   those problems.  And I think that the primary way that they

8   reimagined it is to require the overt acts to be completed

9   acts, which is different than how the Fourth Circuit

09:09:33  10  interpreted it.  But I think carefully reading the language

11  that they use and the language in the statute, there is this

12  statutory construction where they refer to any other overt

13  act.  And, I think, the motion cites to the case law that I

14  won't belabor here, but that term "other" means something

09:09:56  15  and there cannot be an "other" overt act without a first

16  overt act.  And so the language there coupled with the

17  Ninth Circuit's real focus on the speech element, which I

18  think really does come from the use of interstate commerce,

19  I think dictates that there are two overt acts and they need

09:10:18  20  to be treated the same way.

21       Now, in the *Miselis* case in the Fourth Circuit,

22  they refer to it as two overt acts.  There's the interstate

23  commerce -- the use of interstate commerce overt act and

24  then there's the "other" overt act in furtherance of the

09:10:35  25  riot.  And they simply interpreted both of those acts to

09:10:37 1   be -- only to require step in furtherance towards the

2   offense.

3         Now, the Ninth Circuit said, *Well, that's a*

4   *First Amendment problem.* And that is probably closer to

09:10:47 5   what Congress really intended. But the Ninth Circuit said,

6   *Well, that's not going to work here. So we need to imbue*

7   *the statute more stringently. Imbue it with an actual*

8   *completed act.* But I think there's no getting around that

9   these two acts need to be treated the same. If the same

09:11:06 10   term is used within the same statute, they should be

11   interpreted the same.

12         THE COURT: Well, of course, the problem with that

13   interpretation is you're -- you're really writing out the

14   word "travel" because very, very rare circumstances is there

09:11:30 15   going to be a riotous act committed in travel, unless you

16   drive your car through the interstate and then ram into

17   people. So that's one problem. And then you also have the

18   problem with the use of the word "thereafter."

19         So to try to summarize, if you -- if you give

09:11:55 20   meaning to "other" to an extent that you're saying it's got

21   to be a riotous act for the commerce act, and then for the

22   overt act, it's got to be a riotous act, then the word

23   "thereafter" has no meaning nor does the word "travel."

24   That's the problem with the statute. And I can't believe

09:12:21 25   the Ninth Circuit meant to have a statute used in such a

09:12:28  1    limited way.

2          MS. DEIXLER:  Well, I think -- I don't think it

3    writes out the word "thereafter."  I still think there is a

4    requirement that there be two acts and that is really what

09:12:41  5    elevates this to a federal offense.  So there needs to be an

6    act that's conferring the jurisdiction.

7          THE COURT:  Correct.

8          MS. DEIXLER:  You know, I disagree with the

9    Government that that can just be any old use of interstate

09:12:51 10    commerce, and I can explain why I think it requires more

11    than that, aside from the arguments we're making now.  But I

12    think that the way that these cases are being prosecuted by

13    the Government -- and they're cited in much more detail in

14    the selective prosecution case, but it is not at all an

09:13:11 15    impossible standard for the Government to meet, and it's not

16    as narrow as it would seem upon first read, because there

17    are so many instances where the defendant that is charged is

18    actually using the Internet to instigate the riot itself.

19    They are saying, *Let's go down to City Hall right now.*

09:13:33 20    *Bring your hammers and bricks.*  And then they go and then

21    they commit a second act thereafter.

22          So I think there are plenty of examples in the

23    case law, even the case law cited by the Government in the

24    *Betts* case and then there's a chart listing several other

09:13:49 25    cases which I can go through.  But it's in the selective

*Deborah D. Parker, U.S. Court Reporter*

09:13:53  1   prosecution motion where this is really how the statute
        2   should be used, because it is not -- it's not just
        3   conferring jurisdiction through any use of commerce, because
        4   it is a speech element, because it is used in ways -- and
09:14:10  5   the Ninth Circuit has recognized this, the Seventh Circuit,
        6   every Court has acknowledged that this statute really is
        7   getting at speech.  The riots that are being charged, they
        8   are occurring in political demonstrations or social
        9   demonstrations.  So there does need to be a heightened
09:14:28 10   standard for what the speech element, which is the
       11   interstate commerce element, requires.  And what this case
       12   is really getting after is people that are not just rioting,
       13   which can be prosecuted in state court or can be prosecuted
       14   as vandalism or assault, but this additional element that
09:14:48 15   they are actually using a phone, or the Internet, or
       16   interstate travel to heighten a riot.  I do think there are
       17   cases --
       18          I acknowledge that it is harder to meet with the
       19   travel element but the way that these cases are being
09:15:05 20   charged now with the use of the Internet, I don't think it
       21   can possibly be read in congruence with what the
       22   Ninth Circuit said about closely tying speech and action and
       23   only prosecuting speech that actually instigates a riot.  I
       24   think the speech here goes to the crux of the offense -- the
09:15:31 25   facility of interstate commerce -- when it's not -- it's not

09:15:33   1   like a *Hobbs Act* case where there just needs to be a

           2   de minimis showing of the impact on federal jurisdiction and

           3   that's what confers federal jurisdiction.

           4              This is really getting at a different crime.  This

09:15:46   5   is getting at agitators who need to extend their conduct

           6   intrastate, in order to come under the umbrella of this

           7   statute.

           8              And so that's why in our briefing we -- we made a

           9   reference in an analogy to the *Duban* case which was

09:16:08  10   interpreting the use of the ID to say that it can't simply

          11   be that the use of an ID for an aggravated identity claim is

          12   simply one step in furtherance of the offense, it has to be

          13   actually what makes the offense fraudulent.

          14              So here, too, we think that the use of the

09:16:28  15   Internet, or the phone, or the radio, or the mail needs to

          16   be actually what makes the conduct riotous.  It cannot just

          17   be a simple text message at any point in time because that

          18   violates the First Amendment, and we don't think complies

          19   with what the Ninth Circuit is requiring here.

09:16:48  20              And then the separate argument is, it really

          21   renders it unduly vague, because there is absolutely no

          22   telling.  It's one thing to be put on notice that punching a

          23   person, or breaking a window, or setting a car on fire

          24   violates a state law; or if it's on federal property, a

09:17:06  25   federal law.  It's another thing to say all you have to do

09:17:10  1    is send a text message to say, *Hey, you want to meet up*
        2    *later today?*  And suddenly you're under the arm of the
        3    federal government for a federal felony.  It really has to
        4    go to the rioting, and I don't think it's enough to simply
09:17:26  5    have the riotous intent at the time, because in the *Duban*
        6    case, there still is a requirement that you have a
        7    fraudulent intent when you use the ID.

        8        But that case was about, you know, healthcare
        9    fraud where they're using a person's identification in the
09:17:46 10    regular course of the business.  But that's not the crux of
       11    what the fraud was about.  They're not misusing the ID.  So
       12    they are using the ID with the intent that they are going to
       13    defraud Medicare, but the use of the ID doesn't connect to
       14    that.  In this same way, using a text message or posting on
09:18:02 15    social media is not what is fueling imminently the riot.

       16        And so I think it comes from the First Amendment
       17    before the Ninth Circuit's interpretation; but then I think
       18    the Ninth Circuit has recognized all the problems that this
       19    Court saw with the statute and interpreted it in a much more
09:18:22 20    narrow way, in order to save it.  And now that's what we're
       21    stuck with.  And it's a higher burden for the Government to
       22    meet, but they meet it in plenty of other cases where the
       23    use of the Internet actually is what is -- what is getting
       24    other people to participate.  Or is it self-perpetuating the
09:18:42 25    riot, because it's giving people instructions, things of

09:18:45  1    that nature?  And they just haven't alleged that.

2         They didn't change anything in the indictment in

3    response to the Ninth Circuit's opinion, other than, you

4    know, taking out the words "participate," or -- no,

09:18:57  5    "participate" -- excuse me -- "organize" and those struck

6    words.  But otherwise, their indictment remains the same

7    where almost, I think, every -- I think we could agree.  I

8    think the Government would have to concede that every use of

9    the Internet that's alleged in the complaint, every text

09:19:17 10    message and social media post, is protected speech both

11    before the Ninth Circuit opinion and after, because it is at

12    worst organizing, which the Ninth Circuit has deemed as

13    protected.

14         So I find it -- I find it very difficult to have

09:19:37 15    that comport with the Ninth Circuit's mandate that the

16    statute only prohibits speech that itself instigates a riot.

17         THE COURT:  All right.  I think I understand your

18    position.

19         MS. DEIXLER:  Thank you, Your Honor.

09:19:52 20    And I would just add, if there is no temporal

21    scope whatsoever, again, that that doesn't adequately give

22    notice.  It doesn't give guidance to law enforcement.  And

23    it doesn't give notice to individuals of when they're going

24    to be under the hook of this federal statute.  So I think

09:20:11 25    under the Government's interpretation it is void for

09:20:15  1   vagueness.  Under our interpretation, there is a way that

2   the Government could plead its case, and they just haven't

3   done that here.

4          Thank you, Your Honor.

09:20:24  5          THE COURT:  Thank you.  I appreciate the argument.

6          I think for efficiency, I like to deal with both

7   motions together.  Because Ms. Seiden, are you going to be

8   arguing both motions, or --

9          MS. SEIDEN:  No, Your Honor.

09:20:37 10          AUSA Kim is going to be arguing in response to the

11   motion we just heard.

12          THE COURT:  Okay.  Ms. Murphy, why don't I hear

13   from you and then we'll see if Mr. Swarth wants to add

14   anything and then we'll turn it over to the Government.

09:20:57 15          MS. MURPHY:  Good morning, again.

16          THE COURT:  Good morning.

17          On the selective prosecution, tell me why you

18   believe that Mr. Rundo and Mr. Boman were prosecuted because

19   of their white supremacist political views.

09:21:14 20          MS. MURPHY:  Your Honor, I think when we take a

21   look at the big picture here, putting aside the arguments

22   over where is the new proper -- the microscopic comparisons

23   between these defendants and other people that could have

24   been charged and we just take a big picture look at what was

09:21:31 25   going on in this country after the 2016 election through

09:21:37   1   2017, even just in California, example after example after

2   example of conservative speech rallies where there was far

3   left violence coming to these events and causing injury,

4   causing property damage -- I think we laid it out in the

09:21:55   5   opening motion.  There are plenty of examples.  And yet not

6   a single far left violent actor has been charged, not even

7   just under the Anti-Riot Act.  But the Government has

8   pointed to not a single federal charge against any of them.

9   To me that really begs the question.  If we're looking at

09:22:17 10   charging people under this statute that we all agree -- I

11   think after especially Ms. Deixler's argument -- inherently

12   captures speech.

13           We have to be really suspicious about when we see

14   a pattern where we see very similar conduct between two

09:22:35 15   groups that have diametrically opposed views and then we see

16   only one set of charges against them, even though across the

17   country there could have been plenty of instances where a

18   far left violent actor could have been charged.  Under the

19   Government's theory of what the Anti-Riot Act is, they could

09:22:55 20   have been charged as well or any other number of charges

21   that the federal government has at its disposal.

22           So really we have to take a bigger picture look at

23   this and just ask ourselves, *What's the difference here?*

24   *What really is the difference?*

09:23:08 25           We can engage in these, you know, one-to-one

09:23:11  1   comparisons.  But I think that really kind of misses the
          2   forest for the trees.  I think that brings us to a point
          3   where -- I'm concerned that if we take the Government's view
          4   of what selective prosecution is, there's never going to be
09:23:25  5   a selective prosecution claim ever, let alone getting any
          6   evidence of it through discovery, I think that if we're
          7   looking honestly here.
          8            I understand white supremacist views could be very
          9   offensive to many people.  But the fact of the matter is
09:23:42 10   that the First Amendment says that people are allowed to
         11   have offensive views and equal protection says that the
         12   Government does not get to use its authority to punish
         13   people for those views.
         14            And when I look at the explanations that the
09:23:58 15   Government has offered here, there's something about it that
         16   just sort of smacks as an after-the-fact explanation,
         17   especially when we consider, you know, the number of times
         18   Mr. Rundo attended these events.  I don't think that's a
         19   good proxy.  Because if he had gone to three, or -- left
09:24:19 20   wing events, if he went to three, you know, Democratic
         21   rallies or whatever umbrella you wanted to put it under, and
         22   he did that three times, I would understand that argument.
         23   But that's not what this is.  The number of times someone
         24   goes to an event to exercise their own free speech with
09:24:38 25   other like-minded people is not the same as interlopers

09:24:43  1    coming and trying to instigate a riot.  It's not really a

2    sound comparison.

3         THE COURT:  But the Government's position or its

4    understanding on the basis of why it was prosecuting

09:24:58  5    Mr. Rundo was not that he was exercising political speech.

6    He was going to the Trump rallies to mix it up with Antifa

7    or BAMN or any of the other far-left groups.

8         MS. MURPHY:  That may be their argument.  And even

9    accepting if that is true, I want to be very clear.  We're

09:25:18 10    not saying that anyone has a First Amendment right to engage

11    in violence.  That's clearly not the case.  What is

12    troublesome here and I think the bridge where it becomes

13    selective prosecution is looking at two groups of people who

14    are engaging in very similar conduct, even violent conduct

09:25:39 15    and choosing only one to charge when there are so many

16    instances where it would have been appropriate.  If the

17    Government's policy is really what's guiding here -- they

18    want to go after people who are suppressing speech in a

19    violent way -- if that is truly the Government interest,

09:25:58 20    then it does not make sense that not a single other left

21    wing violent person was charged from any of these events.

22    That's not the problem.  It's not so much that --

23         I accept that that is their view, that that is

24    their stated priority:  We want to go after people who are

09:26:16 25    instigating violence.  The problem with that, though, is

09:26:19  1    that it cuts the other way.  So I think that's -- it becomes

2    almost a neutral point, because it really actually makes the

3    argument that we're making that you can't have it both ways,

4    because it's the same kind of conduct.

09:26:34  5          THE COURT:  So -- don't let me put words in your

6    mouth.  You're saying, *We're not criticizing the Government*

7    *for charging Mr. Rundo and Mr. Boman.  We're criticizing the*

8    *Government for not charging Antifa*?

9          MS. MURPHY:  I think it's one and the same.  I

09:26:58 10    guess what I would say is, when you have so many examples of

11    the same type of conduct and only one group is charged, we

12    have to ask ourselves why.  The only explanation that really

13    sounds truthful to me is, the Government does not like the

14    particular views of these defendants.  That's the only thing

09:27:19 15    that I can see, even in the papers that actually makes

16    sense.  And so it's not so much, *You should have -- you*

17    *should have charged all of these other people, too.*  It's

18    *Why did you only charge these, if we're looking at the body*

19    *of the rest of the conduct at these other events and these*

09:27:39 20    *very events here?*

21          THE COURT:  Understood.

22          MS. MURPHY:  So I think that the Government's

23    approach is both too broad and too narrow at the same time.

24    And what I mean by that it's too broad, because I think they

09:27:55 25    are asking for the comparison group here to be all left wing

09:28:00  1    people.  I don't think that's the correct comparison group.

2    I think the only intellectually honest comparison group has

3    to be the people who were at events like this or these

4    events who were acting in contra-post to these particular

09:28:16  5    defendants, because we're talking about viewpoint

6    discrimination.  And I think that just looking at other

7    instances where violent left wing people did other things,

8    like in arson cases or George Floyd-related protests, it's

9    not the same thing because it risks lumping in a group of

09:28:37  10   speech or viewpoint that is not really the issue here.

11              We're not -- again, we're not talking about

12   whether people on the left have a right to engage in

13   violence versus people on the right.  That's just not First

14   Amendment protected conduct.  We're just talking about why

09:28:50  15   is it okay for the Government to choose to prosecute one

16   group because of its particular beliefs versus another.  And

17   at the same time, I think the Government is too narrow when

18   it's talking about -- when it's comparing who it could have

19   charged here versus in other places.

09:29:09  20              I think that it's interesting when we look at the

21   case law here -- you know, the cases more so tend to say

22   what isn't sufficient in a particular selective prosecution

23   case rather than what is absolutely necessary.  And I think

24   that's an important point when we talk about the comparison

09:29:25  25   group, because there does not seem to be a sort of magic

09:29:29  1   number to determine how many other people could the

2   Government have charged here to show an invidious purpose in

3   charging this person, even in the cases that the Government

4   sites where the courts found that the groups were not

09:29:44  5   similarly situated, like in *Brantley* and *Finn* and *Ruiz.*

6   Those all dealt with cases where the Court was looking at

7   the specific case, and -- except for *Ruiz.*  They were

8   looking at the specific case and then the defendants pointed

9   to either people involved in the same case or people who

09:30:03 10   were -- they argued were similarly situated.  And those

11   groups of people in those three cases were actually very

12   small.  We're talking fewer than three.

13       And so I think that if the courts in those cases

14   want to draw a line and say *You need to show a vast number*

09:30:20 15   *of other people that could have been charged that weren't*

16   *charged,* that's a mistaken reading of those cases.  I think

17   that if the Court wanted to draw a line there, it would have

18   and it didn't.  And that makes good sense, because if we

19   create a rule where -- let's say, we have a case where

09:30:37 20   it's -- there's really, really clear evidence that a

21   particular prosecutor charged an African-American person

22   instead of a white person because the person was

23   African-American, but there's only one other white person

24   who is similarly situated, are we really saying that just

09:30:56 25   because there's one other white person -- there's not two,

09:30:59  1   there's not three, there's not 10 -- that that's not enough

2   to show an invidious purpose?

3          That can't be the case, because that would allow

4   the Government to engage in a single act of selective

09:31:11  5   prosecution.  A single act of selective prosecution is still

6   unconstitutional.  It violates equal protection.  So I think

7   we need to be careful in insisting on some sort of

8   statistical benchmark, in order to meet the standard here.

9          And I really want to touch, also, on the discovery

09:31:29 10   issue.  The Government does not really engage with why we're

11   not entitled to discovery.  I think that what has happened

12   here there's been a conflation of the claim itself, which I

13   believe we satisfied; but even if we didn't, we've

14   absolutely shown some evidence.  Of course, the claim itself

09:31:47 15   is heartening to me.  I think we do that here.  And, of

16   course, discovery on this claim, you know, there's the

17   language about it being a reverse standard.  But it's not

18   impossible.  We don't need to prove the claim itself in

19   order to get discovery on it.  The case law is quite clear

09:32:03 20   on that.  All we need under *Armstrong* is some evidence.

21          And I point the Court again to the *Jones* case

22   where the showing in the *Jones* case was far less substantial

23   than I think we've made here and the court there still

24   found, *Yeah, this is enough.*  They didn't -- in that case

09:32:20 25   didn't even identify exact people who could have been

09:32:22   1   charged but weren't.  And even then the court said, *That's*

2   *enough.  You've done enough to at least entitle yourselves*

3   *to discovery.*

4           We've done more than that here.  We've identified

09:32:33   5   at least three people in Huntington Beach who the Government

6   absolutely could have charged and were similarly situated to

7   Mr. Rundo, and they didn't charge them.

8           THE COURT:  I understand.

9           MS. MURPHY:  Does the Court have any other

09:32:45   10  questions?

11          THE COURT:  No.  Again, briefing was excellent on

12  both sides.

13          MS. MURPHY:  Thank you.

14          THE COURT:  I appreciate it.

09:32:57   15          Mr. Swarth, is there anything you would like to

16  add, sir?

17          MR. SWARTH:  Thank you, Your Honor.

18          As the joinder, we have nothing to add.  We stand

19  with the other arguments.

09:33:03   20          THE COURT:  Mr. Kim, why don't I hear from you

21  next.

22          MR. KIM:  Good morning, Your Honor.

23          I'm happy to answer, of course, any questions by

24  the Court, but I'm more than happy to address some of the

09:33:21   25  arguments that defense counsel have touched upon and

09:33:23  1    Your Honor had questions about, if you would like.

2              THE COURT:  Well, like I said, briefing I thought

3    was excellent on both sides.  It was very helpful.

4              In my questions to Ms. Deixler, I was, I thought,

09:33:37  5    fairly making the arguments you made.  So if I wasn't, or

6    you could have made them better, please do so now.  But I

7    think if we started on the discussion:  Is a temporal

8    connection required under the Constitution between the Riot

9    Act and the Commerce Act?

09:33:58 10    And I said I interpreted the Ninth Circuit's

11   decision saying, *No.  There's none.*  There's not a

12   *Brandenburg* problem because the overt act has to be a

13   Riotous Act.  So you have to have an intent to commit a riot

14   when you use a facility of interstate commerce or you travel

09:34:21 15   in interstate commerce, but it doesn't have to be a

16   Riotous Act.

17             MR. KIM:  That's correct, Your Honor.  And I don't

18   think that I can put it as well as you did, but I will see

19   if I can supplement some of the things that you and

09:34:36 20   Ms. Deixler talked about.

21             I think perhaps it makes sense to Ms. Deixler's

22   comments herself.  In discussing this issue with Your Honor,

23   she had mentioned that the Ninth Circuit essentially, quote,

24   "reimagined the statute and fixed the statute."  I think

09:34:52 25   that's the whole point of this whole *Brandenburg* issue that

09:34:57  1  the defense raises.  The very purpose of that Ninth Circuit

2  decision was to address and fix this *Brandenburg* problem.

3  And, in fact, when you look at the second-to-last sentence

4  of that opinion that's exactly what the Ninth Circuit says,

09:35:12  5  which is that in short a balance must be struck.

6  *Brandenburg* struck that balance and the act after the

7  legions adheres to that result.

8          The problem with the defense argument is that they

9  want to use *Brandenburg* as a sword and a shield.  On one

09:35:29  10  hand, they cite heavily and they rely frequently on

11  *Brandenburg* and they cite to it in their opening brief no

12  less than 20 times.  And they say *Brandenburg* imminence

13  requirement requires this temporal connection between the

14  overt act in one of the four overt acts listed in the

09:35:48  15  statute and this interstate commerce requirement and that

16  those must occur, essentially, at two points in time.

17          On the other hand, they say that despite this

18  being a *Brandenburg* imminence issue, the Court should just

19  disregard the cases that definitely have ruled on that

09:36:08  20  issue, particularly the Ninth Circuit's opinion.  And what

21  the Ninth Circuit opinion did is, as Your Honor alluded to,

22  leaving aside our personal views on what we believe may --

23  the statute may cover or not cover, the Ninth Circuit did

24  squarely address that issue.  And I just want to be very

09:36:27  25  clear about this, because I believe that there was a

*Deborah D. Parker, U.S. Court Reporter*

09:36:29 1    sentence in the Defendant's reply brief addressing why the

2    Ninth Circuit did not address this issue.

3            In short, the assertion was that the Ninth Circuit

4    doesn't address this particular issue that they're raising

09:36:41 5    now, because this issue wasn't raised or at least wasn't

6    raised in the same way.  But if you actually look at the

7    briefing by the Public Defender's Office in this appeal and

8    with respect to this case, they did address this very issue.

9    And that's exactly what the Ninth Circuit responded to.  And

09:37:01 10   in their briefing, they talked about how, for example,

11   there's this built-in, quote, temporal disconnect.  At time

12   "A" the defendant must do something related to interstate

13   commerce; and then at some future time, "B," defendant must

14   attempt or perform any other act with a similar purpose.

09:37:19 15   The time frame for the contemplated riot is entirely

16   unbounded at each step.

17           That is the exact opposite of imminent.  That

18   argument is exactly what the Ninth Circuit was addressing

19   when they fixed the *Brandenburg* problem and that is exactly

09:37:35 20   the same issue that they're attempting to re-litigate and

21   re-raise with this Court.

22           So the Government is in agreement and believes

23   that the Court has interpreted the Ninth Circuit's message

24   clearly that the *Brandenburg* imminence requirement has been

09:37:52 25   satisfied and it is no longer at issue in this particular

09:37:56  1   statute.

2          And I think there is one other point that I wanted

3   to touch on that Ms. Deixler pointed to which is that this

4   statute is, quote, "getting at speech."  And I think the way

09:38:13  5   in which the defense argues that is that they keep -- they

6   continue to rely on this argument that the interstate

7   commerce element is, quote, unquote, "the crux of this

8   statute" which is simply not true.  And the only case that

9   they cite in support of that is *Duban*.  And as the Court

09:38:31 10   recognizes and has read the opinion, *Duban* deals with a

11   completely different statute that was analyzed under a

12   completely different wording of the statute and also a

13   completely different legislative history of the statute to

14   get to that point.

09:38:46 15          And, in fact, to the extent that it's helpful for

16   the Court, there are at least three different decisions --

17   two by the Ninth Circuit in interpreting the Travel Act and

18   one by the Second Circuit in interpreting the Anti-Riot

19   Act -- which discusses the relevance or importance of this

09:39:03 20   interstate commerce element:  One is *United States versus*

21   *Roselli*, 432 F.2d, at 879.  The other one is *Colacurcio*, 499

22   F.2d, 1401.

23          But taking, for example, the *Roselli* case, which

24   talks about the interstate component of the Travel Act, the

09:39:31 25   Ninth Circuit in that case squarely said that the sole

09:39:33  1    reason for conditioning the statute's prohibitions upon use

2    of interstate commerce is to provide a constitutional basis

3    for the exercise of federal power.  What that means is that

4    this interstate commerce requirement is not the crux of the

09:39:47  5    statute.  The crux of the statute is to prohibit this

6    riotous conduct, but the interstate commerce element is

7    essentially a jurisdictional element.

8            Now, the defense position is that, *Well, the*

9    *Travel Act is very different, because it does not encompass*

09:40:03 10    *or does not implicate First Amendment concerns.*  And they

11    cite to several cases which that's what the courts held

12    because the speech that that statute targets is directed to

13    facilitating, quote, unquote, "unlawful activity."  And

14    courts have said *You're not protected under the First*

09:40:22 15    *Amendment for furthering by your speech unlawful activity.*

16            But the point here is that because of the

17    *Brandenburg* analysis and the Ninth Circuit opinion, the

18    Anti-Riot Act is now on the equal footing -- on the same

19    footing as the Travel Act.  Meaning, that the First

09:40:37 20    Amendment implications and concerns that were originally

21    raised in that statute when the Ninth Circuit considered it

22    and Your Honor considered it has now been excised or revised

23    such that those First Amendment implications are no longer

24    present in the statute.

09:40:53 25            And so if you look at the Travel Act and the

*Deborah D. Parker, U.S. Court Reporter*

09:40:56 1   interstate commerce element there, which is a jurisdictional

2   element, and now you look at the revised Anti-Riot Act with

3   its First Amendment problems addressed and its interstate

4   commerce element, the statutes are essentially identical.

09:41:12 5   The only point, again, that Ms. Deixler was referring to was

6   that there's this use of the word "other" and that the claim

7   is that because it refers to any other overt act, that the

8   other overt act -- which is the use of interstate commerce

9   or the use of an interstate facility -- has to mean exactly

09:41:30 10  the same thing.  And the plain language of the statute says

11  that's completely not the case, because the overt act itself

12  is defined in four different ways in the statute.  It's

13  promoting, or -- excuse me, it's participating or carrying

14  on a riot, committing violence, inciting violence, aiding

09:41:48 15  and abetting.  And so there's nothing in the statute that

16  requires somehow that this reference to "overt act" or any

17  other overt act -- that the overt act has to be completed at

18  both stages.  And, again, the argument simply to put it is

19  that -- the defense position is that the statute should read

09:42:05 20  that an overt act must be completed during and after or

21  thereafter the completion of -- or the use of an interstate

22  facility or the travel in interstate commerce, and that's

23  simply not the case.

24          THE COURT:  Let me ask you a question about that,

09:42:21 25  because I do think the defense makes a good point.  The word

09:42:25   1   "other," is that an oversight on the Circuit?  Should they

2   have deleted that word, too?

3            MR. KIM:  I don't think so, Your Honor.

4            Because I think, as the defense points out, this

09:42:35   5   statute was enacted after the Travel Act.  And for Congress

6   and legislators to enact a statute that clarifies or makes

7   clear the verbiage in its statute is not what renders the

8   statute unconstitutional.

9            And I think if the Court, for example, looks at

09:42:59  10   the case of *Corona* -- and it addresses this sort of issue in

11   terms of clarifying the statute -- it specifically stated,

12   quote:

13            "It should not be surprising that

14            statutes are not necessarily written so

09:43:15  15            that one and only one statute can apply

16            at a time.  To the contrary, statutes

17            often contain overlapping provisions.

18            The term belts and suspenders is

19            sometimes used to describe the common

09:43:29  20            tendency of lawyers to use redundant

21            terms to make sure that every

22            possibility is covered."

23            And that's 66 F.3d 360, at pin cite 369.  So the

24   reason why I quote that is because the use of the word

09:43:42  25   "other" is simply classification that there are two distinct

*Deborah D. Parker, U.S. Court Reporter*

09:43:46   1   acts that the statute requires.  Our position isn't that the

2   interstate commerce requirement doesn't have to be met.  It

3   certainly has to be met.  But the overt act involves the

4   four that are listed in the statute, and the other act, as

09:44:00   5   Your Honor described, is the use of interstate facility or

6   the travel in interstate commerce.  And I think that is the

7   most consistent way and logical way to read the statute.

8   That is also consistent with the Ninth Circuit's opinion in

9   this case.

09:44:15   10           THE COURT:  I agree with that.  But the problem

11   is.  We're doing a lot of interpretation.  It doesn't

12   explicitly say that.

13           MR. KIM:  That's certainly correct, Your Honor.  I

14   think the point that I would make with that is that what the

09:44:30   15   Court is thinking about vagueness issue, there's certainly

16   going to be cases where there are close calls.  And I think

17   the defense cited to several hypotheticals where if someone

18   is cheering or someone is using violence as an act of

19   self-defense, does that constitute rioting behavior?  And

09:44:52   20   there's no question.  There is a spectrum of activity that

21   may be stronger to prove up at a trial beyond a reasonable

22   doubt than others.  But I think -- which the Government

23   cited in its brief -- this point, I think, is very well

24   addressed by the Court's decision in *Williams*, which is

09:45:11   25   that:

09:45:12  1              "What renders a statute vague is not the

          2              possibility that it will sometimes be

          3              difficult to determine whether the

          4              incriminating fact it establishes has

09:45:20  5              been proved, but rather the

          6              indeterminacy of precisely what the fact

          7              is."

          8         And so we're not disputing that there are

          9  determinations or factual disputes and subjective

09:45:31 10  determinations, just like the *Brandenburg* imminence

         11  requirement itself that have to be made.  That is, as one

         12  court put it, sort of the curse of using words that are not

         13  going to have mathematical precision.  But I think the point

         14  is that that issue is addressed by jury instructions and the

09:45:50 15  standard of proof that the Government must meet and the

         16  standard of proof that the jury must follow in deciding the

         17  facts of this case, rather than a point that somehow then

         18  invalidates the entirety of the statute for vagueness

         19  grounds.

09:46:04 20              THE COURT:  I appreciate your arguments.

         21              MR. KIM:  Thank you, Your Honor.

         22              THE COURT:  Thank you.

         23              Ms. Seiden.

         24              MS. SEIDEN:  Thank you, Your Honor.

09:46:16 25              Does the Court have any questions in particular or

09:46:19  1   should I address --

2   THE COURT:  I have one question but it's probably

3   a pretty obvious one.

4   MS. SEIDEN:  Yes, Your Honor.

09:46:25  5   THE COURT:  Why didn't the Government charge any

6   member of Antifa, or BAMN, or any other far-left group that

7   was at the three rallies that the defendants were charged

8   with?

9   MS. SEIDEN:  I'm glad you asked, Your Honor.

09:46:39 10   The defense has the burden in making this motion

11   and part of why the -- part of what the Supreme Court has

12   made very clear is that the defendants are required to

13   identify specific individuals who the Government could have

14   charged and defense has still not done that, Your Honor.

09:46:57 15   We can't put aside the details, as Ms. Murphy

16   said.  We can't just focus on the big question.  That's the

17   thrust of the Supreme Court's decision in *Armstrong* is that

18   the defendants are required to present credible evidence

19   that the Government could have prosecuted a similarly

09:47:14 20   situated person and that it chose not to.

21   So what defendants initially ignored and are now

22   apparently denying is that to be similarly situated, a

23   person needs to be the same as the defendants in all

24   material aspects.  And what the Ninth Circuit has said is

09:47:30 25   that that means that all aspects of their criminal conduct

09:47:33 1   need to be the same, Your Honor.  They need to have
2   committed the same crime in the same way.  And now
3   defendants are insisting that the cases don't have to be
4   identical, but the Supreme Court and the Ninth Circuit have
09:47:45 5   both said, as have every other circuit that's analyzed the
6   issue, that it needs to be extremely close.  It needs to be
7   an apples-to-apples comparison.  Because what a selective
8   prosecution claim is doing is asking the Court to step in
9   and find that the prosecutors violated defendants' equal
09:48:02 10  protection rights just by virtue of serving the function
11  that prosecutors are supposed to serve, which is charging
12  people with criminal conduct.  It's not a defense on the
13  merits.  It's a claim that even though a defendant may have
14  actually committed this crime, his equal protection rights
09:48:17 15  are being violated, Your Honor.  So it's supposed to be
16  extremely narrow and only reserved for claims where
17  everything besides the specific viewpoint of the individuals
18  is the same.  Because only in those instances is it fair to
19  assume or to draw the inference that the differential
09:48:35 20  treatment was because of the viewpoint as opposed to some
21  other -- some other factor.
22          And so that's what the Ninth Circuit said in
23  Aguilar, which I know was quoted and discussed in the reply
24  brief, which is interesting because that case does not help
09:48:50 25  the defendants, Your Honor.  There, the Court said that the

09:48:52   1   defendant's definition of similarly situated failed, because

2   it, quote, "Did not ensure that all distinctions extraneous

3   to the First Amendment expression are removed."

4          And that's exactly the case here.  Defendants have

09:49:06   5   pointed to three people -- three people, Your Honor, who are

6   at Huntington Beach who even had -- those are the only

7   people who have been identified who had any contact

8   whatsoever with this District, such that the U.S. Attorney's

9   Office could have even charged them.  And with all three of

09:49:21  10   those people, we're not even in the ballpark of being able

11   to remove all distinctions extraneous to the First

12   Amendment.

13          There are very obvious distinctions between the

14   defendants who were charged here and those three

09:49:34  15   individuals -- who there are police reports for -- at

16   Huntington Beach.  One of those individuals doesn't even

17   live in this District.  One of them doesn't appear to have

18   been involved in a physical altercation at all and actually

19   seems to have run away from the physical altercation.  There

09:49:49  20   is no indication for any of these three individuals that

21   they were training for violent encounters; that they were

22   creating propaganda to recruit people to engage in these

23   violent encounters; that they were publicly bragging about

24   their criminal intent; that they were acting in concert at

09:50:05  25   the events themselves and, as the officers described,

*Deborah D. Parker, U.S. Court Reporter*

09:50:09   1   selecting people and pulling them out; that they were --

2   that they -- or that they engaged in violence or even went

3   to more than one of these protests, Your Honor.  That's not

4   alleged for any of these three individuals.  There is no

09:50:24   5   indication of that whatsoever.

6           So defense has some counters to those arguments in

7   their reply brief.  For example, they say that the

8   Government's willing to credit one of those people -- I

9   think was J.F. -- when he said that he didn't come there to

09:50:39  10   engage in violence and that he knew these things could get

11   violent.  He brought pepper spray, but that wasn't his

12   purpose being there.  And in the reply brief, defense

13   complains that the Government is crediting that statement.

14   And I think it's very important to be clear.  It's not that

09:50:56  15   the Government is crediting that statement or in any way

16   condoning what any member of Antifa did at any of these

17   rallies.  I think there was clearly abhorrent conduct on

18   both sides.  But the inquiry is:  Is the case the same in

19   all relevant respects?

09:51:11  20           And as the Court knows and as defense knows, a

21   defendant's own statements about what he did certainly go a

22   long way in strengthening or weakening the case.  And so

23   here we have defendants who were posting online photos of

24   themselves physically beating people at these rallies and

09:51:29  25   writing things like "physical removal" and "hashtag riot."

09:51:33  1   And we don't have any similar indication that there was any

          2   similar conduct from any of these other people.

          3              Now, I know in the reply brief, there is a section

          4   where defense says, *Well, Antifa on a whole was engaged in*

09:51:48  5   *the same conduct.  They did brag and they did say that they*

          6   *wanted to go and remove people from these protests.*

          7              And there's sort of an amorphous hand weaving of

          8   lumping those three people from Huntington Beach with what

          9   Antifa as this general group was doing, but the

09:52:04 10   Supreme Court has been very clear that that is not

         11   sufficient, because the defense needs to point to specific

         12   individuals who engaged in the conduct that the Government

         13   could have prosecuted and chose not to, Your Honor.

         14              Your Honor, I also want to just address, if I

09:52:35 15   might, the notion in defendant's brief that the Government

         16   doesn't need to have been given the choice to prosecute

         17   someone; that we can retroactively sit here and effectively

         18   play Monday morning quarterback and find people on the

         19   Internet and point to them and say, *Why didn't the*

09:52:52 20   *Government choose that person?*

         21              But, again, Your Honor, a selective prosecution

         22   claim, first of all, it suggests that there's some actual

         23   selection going on which implies a deliberate and conscious

         24   choice.  But in addition to that, Your Honor, it's not

09:53:08 25   enough, because a selective prosecution claim is asking the

09:53:12  1  Court to step in and find that a prosecutor did not

2  faithfully discharge his duties.  It's a big deal.  And so

3  there's a reason that the standard is so high and that it

4  requires an actual showing, not only that the prosecutor was

09:53:25  5  aware of these other people who it could have charged, but

6  that it actually could have charged them and that there are

7  no alternative explanations for why they were not charged in

8  addition to the defendants.

9          And I also would like to talk about the *Jones* case

09:53:39  10  that defendants just cited to as a further proposition that

11  they are entitled to discovery.  Again, Your Honor,

12  *Armstrong* sets out the standard for discovery and it

13  requires defendants to produce credible evidence -- some

14  credible evidence but credible evidence as to both prongs.

09:53:58  15          Now, in the *Jones* case, the reply brief quoted the

16  Westlaw headnote but not the actual substance of the case

17  itself.  And in that case, the defendants pointed to eight

18  non-African Americans who were arrested and locally charged

19  but not federally charged for distributing crack cocaine.

09:54:17  20  And so they did make a showing of some evidence under the

21  discriminatory effect prong.  And in that case, the

22  defendants made a very strong showing under the

23  discriminatory motive prong, because they were able to show

24  that members of the prosecution team committed overtly

09:54:32  25  racist acts.  It mailed racist postcards to the defendants

09:54:37   1   while they were in custody.  There's nothing of that sort

           2   here, Your Honor.  There's been absolutely no showing on the

           3   discriminatory purpose prong, and the Supreme Court has

           4   said, *You need both.  Even for discovery, you need some*

09:54:47   5   *showing of credible evidence under both prongs.  Not*

           6   *hand-waving.  Not general assertions.  Evidence that there*

           7   *was a discriminatory motive at play here.*

           8            And the only thing we have -- the only thing

           9   defendants offer in support of the discriminatory purpose

09:55:03  10   prong is that fact that this was the only prosecution.

          11   That's it.  And the Supreme Court has been very clear that

          12   we are not to rely on statistics, except in extreme

          13   circumstances, like *Yick Wo*, where you had dozens and dozens

          14   of instances of a governing body making decisions that were

09:55:21  15   clearly based on race and the only people who were being

          16   denied these permits were all of Chinese descent.  There's

          17   nothing like the sort here, Your Honor.

          18            There's one case.  It's simply not a sufficient

          19   statistic from which the Court can reasonably infer that

09:55:36  20   there was a discriminatory motive at play.  And if the Court

          21   were to find that, Your Honor, then effectively what the

          22   Court would be saying is in any case where the Government

          23   charges one group or one person who has a viewpoint or who

          24   belongs to a protected class or trait, the Government needs

09:55:54  25   to also go out and find someone with a different trait or a

09:55:58  1  different viewpoint to prosecute, lest it be opening itself

2  up to a selective prosecution claim.  And that would be a

3  real problem because that would be selective prosecution.

4  That would be requiring the Government to go out and even

09:56:08  5  the score.  And that's something that courts have been very,

6  very hesitant to do and we would respectfully submit that

7  the Court should not do here, Your Honor?

8  THE COURT:  I appreciate your argument.

9  Thank you.

09:56:25  10  Ms. Murphy, is there anything you would like to

11  respond to?

12  Ms. Deixler, I don't -- I think I've heard enough

13  on the due process, and the briefing was very thorough.

14  MS. MURPHY:  Thank you, Your Honor.

09:56:37  15  I want to address first what *Armstrong* says.

16  *Armstrong* says there needs to be some evidence of a

17  discriminatory effect and a discriminatory intent.  And the

18  important thing that we have to distinguish about *Armstrong*

19  the facts of that case are different here, because there in

09:56:54  20  the comparator cohort, the Federal Defender's Office -- I

21  think the same office I work now -- had argued that there

22  were a group of white -- the defendants were black crack

23  cocaine defendants.  They were charged with possessing crack

24  cocaine.  And the argument was that there were these other

09:57:15  25  people -- just based on some statistics and some anecdotal

09:57:20  1   evidence from someone who worked at a rehab facility -- that

2   there were some other people of different races who dealt in

3   crack cocaine.  The court there found that that was not

4   enough to identify a similarly situated person who could

09:57:35  5   have been charged.  That's different from here.

6         We have identified at least three people who could

7   have been charged.  These are three people who came to this

8   event, who according to the police report, said that they

9   coordinated coming to the event.  They brought weapons with

09:57:50 10   them.  Their whole purpose in going there was to engage in a

11   riot.  They were charged with instigating a riot.  We have

12   identified those three people.

13         I think that this -- what the Government is doing

14   by taking the language from *Aguilar* and the other cases

09:58:04 15   where we're talking about how close to these comparator

16   groups needs to be is reading too much into what those cases

17   are actually saying.  None of the cases, at least in the

18   Ninth Circuit -- certainly not *Aguilar* -- say that they need

19   to be identical in every respect.  They need to be same in

09:58:24 20   relevant respects.  And the Court there does agree that

21   where the comparison group has less in common, then, of

22   course, factors other than the protected expression may come

23   in to explain the prosecution.  That is not the same as

24   saying that they need to be identical in every single way.

09:58:42 25   If that is the measure, then there literally could never be

09:58:45   1   another selective prosecution claim, ever.  Because in any

2   case, there will always be some detail for why we can look

3   backwards and say this is different or that is different.

4          So I think that what the Government is requiring

09:59:00   5   on the claim, certainly on the level of what we need to show

6   for discovery, is far too high.  And they have to make it

7   that high here, because the claim is actually quite strong.

8   That's why the Government is trying to make it so specific,

9   and the law does not necessarily require it to be that

09:59:19   10  specific.

11         I don't see *Aguilar* as requiring that.  And I

12  think it's interesting.  Two parties can read *Aguilar* and

13  feel like it helps either side.  I read *Aguilar* as actually

14  quite helpful for the defense.  Because the problem in

09:59:32   15  *Aguilar* was that the comparison group that the defense was

16  pointing to was just absolutely not the right comparison

17  group.  That was a case where you had -- I guess you call

18  it -- a humanitarian group who were trying to bring in

19  refugees from the southern border.  And they argued that

09:59:52   20  they were being charged, even though agricultural farmers

21  who did the same thing, they weren't being charged.  But the

22  Ninth Circuit appropriately made the distinction there that

23  those are not the right comparison groups, because the

24  humanitarian group were doing it on such a massive scale

10:00:12   25  that really the better comparison group is another group

10:00:15    1    doing it on a similar scale.  That's not controversial.

            2    That's drawing an appropriate logical line.  That's the same

            3    logical line we're drawing here.  The only inference I can

            4    see for why the Government would charge one side versus the

10:00:28    5    other is the difference of beliefs.

            6            And I would like to also just touch on this point,

            7    briefly, about how much do we need to show that the

            8    Government considered the other side or considered charging

            9    them or not?  What my point was in my reply is saying that

10:00:48   10    we literally don't have access to internal FBI charging

           11    memos to prosecutors where they present charges to the

           12    prosecutors and say, *We think you should charge these*

           13    *people.*  And we don't have access to the prosecutor's

           14    internal memo saying "yes" or "no."  The only reason we

10:01:07   15    could ever get that is years later through a Public Records

           16    Act request.

           17            That's why we're requesting discovery here.  But

           18    we also can show, through all of the materials that we

           19    presented to Your Honor and the opening motion, that the

10:01:20   20    Government was absolutely aware of all of the far left-wing

           21    violence across the country, especially in California.  So

           22    the Government can't actually say that they weren't aware of

           23    these other people.  They certainly can't say that they

           24    weren't aware of the three individuals that we've identified

10:01:38   25    here, because they produced the police reports to us.

*Deborah D. Parker, U.S. Court Reporter*

10:01:43  1            THE COURT:  Understood.  Thank you.

          2            MS. MURPHY:  Thank you.

          3            THE COURT:  Ms. Seiden, do you want to respond?

          4            MS. SEIDEN:  Yes, Your Honor, briefly.

10:01:53  5            Just two points, Your Honor.  First of all, I'm

          6   glad Ms. Murphy just brought up these people who defense

          7   claims and insists the Government could have charged.

          8            There's no indication of that, Your Honor.

          9   Setting aside what I said previously, which is that they're

10:02:10 10   not similarly situated because their conduct is not

         11   materially the same to these defendants, there's also no

         12   indication that the Government even could have charged these

         13   people.  There's no indication that they used any facility

         14   of interstate commerce, let alone that they did it with the

10:02:24 15   specific intent to riot.

         16            And what Ms. Deixler just said in arguing the

         17   other motion is that there needs to be a jurisdictional hook

         18   to elevate this to a federal offense and that that is a

         19   critical component of the rioting act.  And so the fact that

10:02:39 20   these defendants were locally arrested for rioting has no

         21   bearing, whatsoever -- maybe some bearing in that it helps

         22   with one element, but it does not mean that there is

         23   sufficient evidence there for a federal charge, Your Honor.

         24            The facts alleged about those three people who

10:02:54 25   were in Huntington is that they coordinated with friends.

10:02:57   1   They went to a couple of protests together and that they

2   deployed pepper spray at one of them.  And I can tell you,

3   Your Honor, that if I went to a magistrate judge in this

4   District and said that is enough to charge someone with

10:03:09   5   federal rioting charges, I would not do that, Your Honor.  I

6   don't know anyone who would do that.  That's simply not

7   enough.  And the Ninth Circuit has said that even the fact

8   that there may be an indication, certainly one could argue

9   the Government could have looked into those people more and

10:03:26  10   found some of that evidence.  Maybe; maybe not.  But the

11   Ninth Circuit in *Wilson* said that that is not enough for a

12   defendant to make a showing on a selective prosecution

13   claim.  It needs to be evident that the Government could

14   have charged them at the time and chose not to.

10:03:42  15        And the second point I wanted to make, Your Honor,

16   is:  It's true that often the evidence that a defendant

17   would need to make a selective prosecution claim is in the

18   possession of the Government to the extent that it exists at

19   all.  But that is what the Supreme Court has said over and

10:04:00  20   over again.  And the Ninth Circuit has said that just

21   because a defendant can't meet their burden without

22   discovery doesn't mean that they get to bypass the burden

23   that they are required to meet in making their claim.  They

24   don't get to leap over that, just because they can't get

10:04:16  25   that to that standard without some discovery.  That's the

10:04:19  1    point is that these claims are supposed to be rare and

2    that's why there is very little case law to no case law

3    cited where courts have found that defendants have met their

4    burden because it is supposed to be the very rare instance,

10:04:31  5    and that has just not been met here, Your Honor.

6         THE COURT:  I appreciate the arguments.  Give me

7    15 minutes.  I want to finalize my decision and then I'll

8    issue it.

9         THE CLERK:  All rise.

10:05:35 10    *(Pause.)*

11        THE CLERK:  Please come to order.  This Court is

12    again in session.

13        THE COURT:  All right.  Well, I issued the order,

14    and I know both sides disagree and the Government disagrees

10:41:31 15    with the decision, but the decision is what it is.

16        Now that I've dismissed the charges, Mr. Rundo,

17    you are to be released forthwith and Mr. Boman, your bond is

18    exonerated.

19        DEFENDANT BOMAN:  Thanks a lot.

10:41:50 20        THE COURT:  Is there anything further anybody

21    wants to say?

22        MS. BOYLAN:  Yes, Your Honor.

23        The Government would request that the defendant

24    remains detained, pending the Government's potential appeal.

10:42:00 25    The Government intends to file a protective notice of appeal

```
10:42:04   1    with the Ninth Circuit following this hearing.
           2           THE COURT:  I understand.  That's respectfully
           3    denied.  I obviously have felt that the prosecution was
           4    selective, and I don't believe it's warranted that Mr. Rundo
10:42:21   5    spend one minute more in custody, so I'm going to release
           6    him forthwith.
           7           MS. BOYLAN:  The Government would request a stay
           8    of Your Honor's order of dismissal for -- as well as
           9    Your Honor -- a stay of Your Honor's dismissal order, as
10:42:40  10    well as the release order to allow the Government an
          11    opportunity to file an appeal with the Ninth Circuit.
          12           THE COURT:  I appreciate your position, and I
          13    respectfully deny that as well.
          14           I feel very comfortable in the decision I made.  I
10:42:56  15    think it's the right call.  Maybe the Circuit will disagree,
          16    but I feel it's the right call.
          17           Anything further from the defense?
          18           MS. DEIXLER:  No.  Thank you, Your Honor.
          19           THE COURT:  Mr. Swarth, anything further, sir?
10:43:13  20           MR. SWARTH:  No, Your Honor.
          21           THE COURT:  Thank you.
          22        (At 10:43 a.m., proceedings were adjourned.)
          23                         -oOo-
          24
          25
```

```
 1                           CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3   Title 28, United States Code, the foregoing is a true and

 4   correct transcript of the stenographically reported

 5   proceedings held in the above-entitled matter and that the

 6   transcript page format is in conformance with the

 7   regulations of the Judicial Conference of the United States.

 8

 9   Date:  February 24, 2024

10

11

12                      _____/s/DEBORAH D. PARKER_____
                        DEBORAH D. PARKER, OFFICIAL REPORTER
13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Deborah D. Parker, U.S. Court Reporter*