JOHN NEIL McNICHOLAS
STATE BAR #138304
McNicholas Law Office
464 Palos Verdes Blvd.
Redondo Beach, CA 90277
(310) 545-0780
(310) 546-6831 - FAX
Email: john@mcnicholaslawoffice.com
Attorney for Defendant
TYLER LAUBE

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

TYLER LAUBE,

        Defendant.

2:18-cr-00759-CJC-3

**TYLER LAUBE'S SENTENCING MEMORANDUM**

Sentencing Date: 04/04/2024
Sentencing Time: 11:00 a.m.

JOHN NEIL McNICHOLAS
STATE BAR #138304
McNicholas Law Office
464 Palos Verdes Blvd.
Redondo Beach, CA 90277
(310) 545-0780
(310) 546-6831 - FAX
Email: john@mcnicholaslawoffice.com
Attorney for Defendant
TYLER LAUBE

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> TYLER LAUBE, <br><br> Defendant. | 2:18-cr-00759-CJC-3 <br><br> **TYLER LAUBE'S SENTENCING MEMORANDUM** <br><br> Sentencing Date: 04/04/2024 <br> Sentencing Time: 11:00 a.m. |

TYLER LAUBE ("Mr. Laube"), by and through his counsel of record, John Neil McNicholas, hereby submits the following sentencing memorandum, including corrections and objections to the presentence investigation report filed on or about January 29, 2024 [Dkt. 297]. This sentencing memorandum is intended to assist in formulating a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 25 S. Ct. 738 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).

DATED this 21st day of March, 2024.

McNICHOLAS LAW OFFICE

By: /s/
JOHN NEIL McNICHOLAS, ESQ.
Attorney for Defendant,
TYLER LAUBE

# **TABLE OF CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     CORRECTIONS AND OBJECTIONS TO PSR . . . . . . . . . . . . . . . . . . . . 1

III.    18 U.S.C. § 3553 FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      The nature and circumstances of the criminal offense. . . . . . . . . . . . . . 3

        B.      The history and character of the defendant . . . . . . . . . . . . . . . . . . . . . . 7

                1. Childhood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                2. Education and Athletics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                3. Employment History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                4. Health and Psychological issues . . . . . . . . . . . . . . . . . . . . . . . . 11

                5. Substance Abuse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        C.      The kinds of sentences available . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                1. U.S. Probation's application of advisory sentencing guidelines. . . . . . 12

                2.  Mr. Laube's difficult childhood justifies a variance from the
                    guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                3. Post Offense Rehabilitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        D.      Punishing the defendant, protecting the public, educating the defendant,
                providing vocational training, medical care, or other correctional
                treatment, and deterring future criminal conduct. . . . . . . . . . . . . . . . . 16

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DECLARATION OF JOHN NEIL McNICHOLAS . . . . . . . . . . . . . . . . . . . . . . . . 18

i

## EXHIBITS

Exhibit 1:    Redacted Public Safety Report, State of California Parks and Recreation, dated March 25, 2017;

Exhibit 2:    Chronological screen shots from video coverage of events on March 25, 2017 at Bolsa Chica State Beach;

Exhibit 3:    Letters from grandmother, Sharon Hudson, and friend, Matthew Hunter and email from friend, David Cota;

Exhibit 4:    Letter from Tyler Laube.

ii

# TABLE OF AUTHORITIES

## Federal Cases

*Gall v. United States,*
    552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kimbrough v. United States,*
    128 S. Ct. 558 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pepper v. United States,*
    562 U.S. 476 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

*United States v. Booker*,
    125 S.Ct. 738 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Bradstreet,*
    207 F.3d 76 (1ˢᵗ Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. De Shon,*
    183 F.3d 888 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Green,*
    152 F.3d 1202 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States v. Lizarraras-Chacon,*
    14 F.4th 961 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . `14

*United States v. Martin,*
    520 F.2d 87 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. White,*
    506 F.3d, 635, 644 (8ᵗʰ Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## United States District Court Cases

*United States v. Ruiz,*
    2009 WL 636543 (S.D. N.Y., March 11, 2009)) . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Swift,*
    2008 WL 2906884 (N.D.Ind., 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Federal Statutes

18 U.S.C. § 245(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**United States Sentencing Guidelines**

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

U.S.S.G. § 2H1.1(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S.S.G. §3E1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**California Penal Code**

P.C. 242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

P.C. 4404.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

P.C. 22810(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

# I. PROCEDURAL HISTORY

Tyler Laube was arrested on October 24, 2018 for allegations related to an alleged conspiracy to violate the Anti-Riot Act of 1968, 18 U.S.C. § 2101, et seq. He was released on a $175,000 bond on November 28, 2018 after serving thirty four days in a federal detention facility. The case was dismissed and charges later were reinstated following a reversal and remand from the Ninth Circuit.

The government and the defense agreed to negotiate this matter to a misdemeanor based upon Mr. Laube's extremely limited involvement in anything relevant to the underlying case. On October 23, 2023, Mr. Laube pleaded guilty to a single misdemeanor count in a second superseding information charging 18 U.S.C. § 245(b)(3), Interference with a Federally Protected Right Without Bodily Injury, which was carefully researched by both the government and the defense as one of very few misdemeanors which could possibly be tailored to fit the facts of this case. Mr. Laube is scheduled to be sentenced on April 4, 2024.

# II. CORRECTIONS AND OBJECTIONS TO P.S.R.

Correction: Paragraph 93 of the P.S.R. and Page 6 of disclosed recommendation letter: Mr. Laube never used, tried or experimented with "crack."

Objection: Mr. Laube objects to the factual allegations contained in paragraphs 21-25 of the P.S.R.  The probation officer failed to incorporate the facts contained in Mr. Laube's plea agreement [Dkt. 262] or the Second Superseding Information [Dkt. 265]. Instead U.S. Probation merely copied the prejudicial and outright false accusations contained in the underlying dismissed indictment [Dkt. 47] and the first superseding indictment [Dkt. 209]. If this matter had proceeded to trial on the underlying charges, Mr. Laube would have presented the officer testimony involving Antifa anarchists' attempts to infringe on the free speech rights of the rally and march attendees by arming themselves with weapons like pepper spray, hammers and crowbars. Mr. Laube would have introduced video evidence clearly showing how the fighting erupted, which not only included defendants in this case,

but also included unknown rally attendees who fought together against hysterical black bloc[1] - clad anarchists and agitators determined to destroy the rally and march which was sponsored by leaders of the Orange County Republican party. The actual facts supporting Mr. Laube's conviction are depicted below, and illustrated in Exhibit 2, chronological screen shots from videos of the March 25, 2017 event at Bolsa Chica State Beach. None of the allegations regarding the activities of the so-called "Rise Above Movement (R.A.M.)" are relevant to this sentencing pursuant to U.S.S.G. § 1B1.3, and therefore should be stricken from the P.S.R.

### III. 18 U.S.C. § 3553 SENTENCING FACTORS

18 U.S.C. § 3553 (a)(2) requires that the sentence be "sufficient, but not greater than necessary," to fulfill the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and for the offense; (B) to afford adequate deterrence to criminal conduct; ( C) to protect the public from further crimes of the defendant and (D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

The sentencing guideline range is one of five factors to be considered in determining a defendant's sentence. *United States v. Booker*, 543 U.S. 220,  25 S. Ct. 738, 764-65 (2005). After *Booker*,  Judges were directed to consider the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentence available, the need to avoid unwarranted sentencing disparity, the need to deter and punish, and the need to provide restitution. 18 U.S.C. § 3553(a). Judges "may vary [from guideline ranges] based solely on policy considerations, including disagreements with the guidelines." *Kimbrough*, 128 S. Ct. at 570 (2007). "The statute, as modified by *Booker*, contains an overarching provision

---

[1]https://simple.wikipedia.org/wiki/Black_bloc#:~:text=World%20Trade%20Organization. -,Purpose,and%20protesting%20without%20a%20permit.

2

instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing." *Id.*

**A.     The nature and circumstances of the criminal offense**

> In the most minimal definition of terrorism, it's the unlawful use of violence and intimidation — especially against civilians — in pursuit of political aims. Antifa is a domestic terror group. I strongly believe that the FBI and the Department of Justice should classify them as such.

Former New York City Police Commissioner Bernard Kerik, November 9, 2018.

In the months leading up to the 2016 general election, conservative news programs regularly showed graphic footage of conservative gatherings being stifled by anarchists/left wing groups, referred to collectively as "Antifa." Antifa activists typically wore all black outfits with their faces covered, armed with explosive devices, weapons, and other objects, either frightening the speakers to cease, or inflicting property damage or injury upon the attendees in order to intimidate them in the name of "anti-fascism."[2]



Antifa's loud and often violent deprivation of the speech and association of any group without their political beliefs motivated many young right wing activists

---

[2]https://www.washingtonpost.com/news/morning-mix/wp/2017/02/02/black-bloc-protests-return-for-trump-era-leaving-flames-broken-windows-from-dc-to-berkeley/

3

to get involved in the political process. At age 20, Tyler Laube, while overcoming drug addiction, decided that he would be one of those activists. He affiliated with a group of young men whose purpose was to protect the speech of event organizers and attendees from intended injury inflicted by Antifa.

The Make America Great Again Rally and March at Bolsa Chica State Beach on March 25, 2017 was intended to be a happy event: a celebration of Donald J. Trump's victory hosted by Republican politicians and volunteers which featured speeches by elected officials. The end of the rally featured about fifty doves released from the event stage (below left), and then a one mile march along the beach followed. Many attendees were wearing red, white and blue colors, and Trump campaign attire. Mr. Laube, seen below right in grey, was present for that event.

 

Frank John Tristan ("Mr. Tristan") was the subject whom Mr. Laube struck three times with his fists. For this act, Mr. Laube admitted that he is guilty of a crime.

The following facts are presented for sentencing mitigation purposes and are based upon several months of investigation by counsel and his investigator, review of police reports, interviews of event organizers and State of California Police/ Lifeguards who were present on March 25, 2017 rally and march. Please see Exhibit

4

1, State of California Police report attached hereto and incorporated herein by reference.

Since the event took place on a State Beach, State police who are also lifeguards, had law enforcement jurisdiction and responsibilities. Prior to the event, State police officers were warned that protesters may try to stop the event, and may use violence or riotous techniques to stop the event. Anarchist groups were notified through social media outlets like Facebook, as shown in the post below.



Various anarchist groups came to the event to disrupt as much as possible. Prior to the outbreak of any altercations, an officer counted approximately 28 protesters [Antifa/Anarchists/ left wing activists] on the sand in front of the Sea Legs restaurant, which was the final destination for the march. Approximately seven of the protesters had covered their faces with bandanas and sunglasses. The protesters were playing music and chanting. One of the songs heard by officers was a rap song containing  the lyrics "Fuck Trump." More than one of the protesters had that slogan on their t-shirts. The protesters appeared to want to agitate and annoy the participants of the march. At approximately 12:32 p.m., officers were notified  that a crowbar and hammer had been recovered on the beach the near the

Antifa agitators.

Around 12:35 p.m. police officers observed agitators dressed all in black physically blocking the path of the event at the beginning of the march. This was the location of the confrontations and physical assaults that followed.

Mr. Tristan, like the agitators whom he appeared to be supporting, was wearing a black jacket, a black winter cap, black shirt, and black pants. See, generally, Exhibit 2. Mr. Tristan carried a small back pack on his back, and held what appeared to be a cellular telephone. He did not carry a notepad, a laptop, or anything that would resemble equipment of a news reporter. Mr. Laube never believed that Mr. Tristan was a news reporter or journalist.

Video reviewed by defense counsel showed Mr. Tristan was standing in front of a banner which read, "Defend America" prior to any physical altercations. From that video evidence, screen shots were taken and are attached in chronological order as Exhibit 2. Laube stood behind the banner along with associates, rally attendees and friends. *Id.* A cameraman, Brian Andrew Feinzimer, was taking photographs near Mr. Tristan. Jessica Aguilar, an Antifa agitator, exchanged verbal taunts with those holding the banner, including Mr. Laube. Ms. Aguilar slapped Mr. Laube in the face twice while he stood behind the banner.[3] *Id.*, pages 1-4. Then Feinzimer knocked a small American flag out of a woman's hand and stepped on it. *Id.*, page 5. An unknown man, with no connection to any defendants or associates then shoved and struck Feinzimer. Mr. Tristan attempted to pull the unknown man away from the cameraman. *Id.*,  page 6. The unknown man then started punching Tristan. Then the Republican party event organizer, Jennifer Sterling, attempted to pull the unknown fighter away from Tristan. *Id.*, page 7. Laube saw the altercation, ran

---

[3]Aguilar was convicted of battery and sentenced to 20 days in jail, 10 days Cal Trans work, and three years probation. Her jail sentence was to be vacated if she completed her Cal Trans sentence. https://orangecountyda.org/press/woman-convicted-of-slapping-man-at-political-rally/

toward Mr. Tristan, and punched Tristan 3 times. *Id.*, page 8. Ms. Sterling was able to push Mr. Laube away from Mr. Tristan. *Id.*, page 9. At that moment, Jessica Aguilar returned to pepper spray Sterling, Laube and other Trump supporters who happened to be in the area. *Id.* Pages 10-11. Several people were struck in the eyes with pepper spray including Laube and Sterling. Laube ran to the ocean in an attempt to use ocean water to stop the burning in his eyes and was never heard from again. Ms. Sterling fell to the sand and cried for help as she was temporarily blinded by Aguilar's spray. *Id.*, pages 12-13.

Mr. Tristan, without hesitation, followed the melee that erupted, with his cell phone out to film. Another black-bloc clad associate just pepper sprayed several innocent people. This precipitated a subsequent fight unrelated to Laube. Mr. Tristan assisted the anarchist after the second fight. *Id.*, page 14. Tristan and the second agitator, later identified as Justin Naoki Fragosa,[4] ran away from the angry crowd. *Id.*, page 15. The total melee lasted less than ten minutes.

Mr. Laube was upset by his behavior that day which was seven years ago. He was embarrassed enough by his own actions that he immediately terminated association with anyone with associated with this event. Mr. Laube strongly regrets his actions.

### B.   The History and Character of the Defendant

#### 1. Childhood

Tyler Laube lived a very poor childhood. Tyler Laube never had a male role model. He was an intelligent boy who won spelling bees in elementary school and excelled in football and baseball. The problem was that the people who were supposed to raise him drastically failed. His tragic childhood was foreseeable considering the amount of dysfunction and abuse that surrounded him since the day

---

[4]Fragosa was arrested for P.C. 22810(g)(1) illegal use of tear gas, or similar device, P.C. 4404.6, Inciting a Riot, and P.C. 242, battery. See Exhibit 1.

he was born.

Tyler Laube was born on April 20, 1996 in Glendale, California. His parents were never married. He hardly knew his father, Jake Baker, who passed away from congestive heart failure at age 51. Laube's mother, Renee Laube, is 47 years old, disabled, and resides in Redondo Beach, California.

When Tyler Laube was four years old, his father drove drunk in his home State of Wisconsin, and killed someone. Mr. Baker was convicted of vehicular manslaughter and sentenced to 17 years in prison. Mr. Laube also recalls that his mother, Renee was unable to care for him at that age. He was sent to live with a great aunt in Yosemite, California to attend kindergarten, and returned to his mother's care after about a year. Mr. Laube did not see Jake Baker again until Mr. Baker was terminal when Mr. Laube moved to Wisconsin to be closer to his father. Shortly after arriving, Mr. Laube learned that his father was using methamphetamine. They clashed, and Mr. Laube returned to the South Bay. Jake Baker died on October 1, 2022.

Renee Laube was a methamphetamine user and seller, who often brought boyfriends into their lives who were physically abusive toward her. It was very difficult as a 6 year old to watch a new boyfriend striking his mother over and over again. Mr. Laube recalls one occasion where two men came into the apartment and pointed a shotgun at his mother's head. The men severely beat her friend who simply happened to be visiting at the time.

Renee Laube met a gang member with whom she married. Renee and her gang-member husband  eventually had a child, Mr. Laube's younger sister, Savannah. Mr. Laube often witnessed his stepfather striking his mother or tearing her clothing.  On one occasion, his stepfather started ripping his mother's dress.  As Mr. Laube attempted to intervene, his stepfather threw him against the wall. He recalled at times, choosing between forms of punishments, such as spankings or

extended periods of confinement in his room that lasted for hours or days. Following their divorce, Renee Laube was consistently involved in relationships with different men, all of whom who would emotionally and physically abuse her.

Eventually, Renee Laube was caught with drugs by police She even tried to run away but was stopped with a bean bag gun and arrested. Renee went to Pacifica House, a drug rehabilitation center, for 18 months. It was eventually learned that Renee suffered from severe bipolar disorder, depression, and attention deficit hyperactivity disorder. Renee Laube became certified drug counselor.

As a family, Renee and her two children often had no home. Mr. Laube recalls being forced to live in his mother's car for an entire year. They often slept in homeless shelters. During one period, they live in a tool shed, with no access to a restroom, bath or shower facilities. Not surprisingly, the family often lacked food, clothing and shelter.

### 2. Education and Athletics

In his early years of education, Mr. Laube recalls winning spelling bees at his various elementary schools and being enrolled in the Gifted and Talented (GATE) program offered in the public schools. Mr. Laube always made the Redondo Beach Little League All Star teams as a pitcher. He also excelled in Pop Warner Football as a cornerback, running back and receiver. Unfortunately, the constant moves and family troubles affected his educational development, and his grades suffered significantly. Predictably, Mr. Laube's youth athletics ended way too soon.

The only stable years in Mr. Laube's life were between ages 10 and 13 when he lived with his maternal grandparents. When he was returned to his mother's custody, she was unable to care for him and unwilling to address her own drug and mental health problems.  Continuous referrals to juvenile camp started when Mr.

Laube was 14 years old and continued until age 18. Mr. Laube recalls playing baseball on the Camp Kilpatrick juvenile offender team when he was 16. Mr. Laube obtained his GED in juvenile camp and his high school diploma at a juvenile youth academy in Woodland Hills, California, in 2017.

### 3. Employment History

Mr. Laube has been gainfully employed at most times since he turned 18 years old. PSR, ¶¶103-109. Most of his employment has involved manual labor, such as tree trimming, construction, and as a door installer, both for in-home doors and garage doors. Mr. Laube worked as a commercial door installer and apprentice at a garage door company for eight months in 2022. He was injured handling a garage door, and subsequently filed a workers compensation claim, which was just settled a few months ago. For several months in 2023, Mr. Laube was employed at an in-house drug addiction rehabilitation facility for firefighters and police officers in Rancho Palos Verdes, California as a behavioral health technician.

Currently Mr. Laube is enrolled in junior college and employed as an electrician apprentice. Mr. Laube also presently serves as a caretaker for his very ill grandfather. He performs home maintenance, grocery shopping, and assists in transporting both grandparents to physician appointments.

Mr. Laube's grandmother, Sharon Hudson, lent him around $4,000 per month for about a year to help pay Mr. Laube's rent in the South Bay area of Los Angeles County. Mr. Laube used funds from his workers compensation settlement to repay Ms. Hudson. He also purchased a new vehicle using his own under insured motorist coverage settlement funds after his parked vehicle was totaled by an uninsured driver in front of his home. All available funds are earmarked to meet Mr. Laube's current rental obligation under a residential lease which expires in about

four months.

### 4. Health and Psychological issues

Mr. Laube presents himself as a healthy man, who is about to turn 28 years old. But he has endured some very painful and stressful events in his life that have taken a toll. His childhood, discussed *supra*, was traumatic, to say the least. He can't count the number of times that he witnessed boyfriends beating his mother. The years living in a car or tool shed was also painful, as was witnessing his mother's drug addiction and downfall.

At age 18, while in the back seat of a friends car traveling from Palos Verdes to Redondo Beach, a road rage incident in Torrance resulted in his being shot through his neck, and the bullet lodging in the head rest in front of him. The bullet missed his spinal chord by 1/8 inch. When Mr. Laube was 21, he found his best friend dying from a xanax overdose. Witnessing his friend's family pull the plug was emotionally painful. He has not yet recovered from that experience. Mr. Laube has been diagnosed with several mental health ailments which have resulted in various prescriptions. He struggles with anxiety, especially relating to this case, as seven years have passed since the ten minute melee on the beach, that will forever haunt him in finding employment and friends.

### 5. Substance Abuse

Tyler Laube does not recall a time during his childhood where drugs and alcohol were not present. His mother and her friends were constantly consuming. Her inability to maintain a reasonable home for the family was a direct result of her addiction. Mr. Laube was only 14 years old when he first used Xanax as a recreational drug. He was already drinking alcohol at that time.  Mr. Laube's teenage years were very foggy, as he was too intoxicated to recall basic events during those

years. His drug addiction led to his involvement in a robbery as the getaway driver.

Rather than using his experience of seeing his best friend die as a reason to stop drug usage, Mr. Laube dug deeper into his life of addiction, as he became a daily heroin user. After living as a heroin addict for about a year, he enrolled in and completed an in-patient program which enabled him to discontinue his heroin usage. He struggled with alcohol for a few more years, including at the time that he was involved in the instant case.

Thanks to regular attendance at Narcotics Anonymous and Alcoholics Anonymous meetings, Mr. Laube's last sip of alcohol was in September, 2021. His ongoing support group has been a powerful influence in his life of sobriety.

**C. The Kinds of Sentences Available**

The single misdemeanor count as stated in the second superseding information for violating 18 U.S.C. § 245(b)(3), Interference with a Federally Protected Right Without Bodily Injury, carries a maximum sentence of not more than 1 year imprisonment and a $100,000 fine (Class A Misdemeanor).

**1.    U.S. Probation's application of advisory sentencing guidelines**

Mr. Laube agrees with the calculation by U.S. Probation regarding the Total Offense Level. His Base Offense Level is 10. U.S.S.G. § 2H1.1(a)(3). He is entitled to a 2-level decrease for acceptance of responsibility. U.S.S.G. § 3E1.1(a). Based upon those calculations, he has a Total Offense Level of 8. Mr. Laube agrees that he is justifiably placed in Criminal History Category III. The advisory guideline range would be 6-12 months if the analysis ended there. We are, however, asking that the Court grant a variance from the guidelines, and sentence Mr. Laube to a term of imprisonment of time served with no supervised release to follow, and all fines be waived.

### 2.  Mr. Laube's difficult childhood justifies a variance from the guidelines.

In fashioning a "sentence sufficient, but not greater than necessary," under 18 U.S.C. § 3553(a), "district courts are not only permitted, but required, to consider 'the history and characteristics of the defendant.' "  *United States v. White*, 506 F.3d, 635, 644 (2007) (*quoting* 18 U.S.C. § 3553(a)(1)).  The Court may consider a defendant's lack of guidance as a youth and circumstances indicating a disadvantaged upbringing as part of the analysis under §3553(a). *See United States v. Ruiz*, 2009 WL 636543 (S.D. N.Y., March 11, 2009) (judge imposed 96 months rather than guideline range of 140-175 months for crack offenses in part due to defendant's difficult childhood with abusive mother and largely absent father who was incarcerated and a heroin addict, and the absence of any prior substance abuse assistance); *See also United States v. Swift*, 2008 WL 2906884 (N.D.Ind., 2008) (court departed 10 months from the guideline range and imposed mandatory minimum, finding that defendant's lack of youthful guidance, and acceptance of responsibility indicate that the additional 10 months would serve no deterrent or retributive purpose to defendant or to general public).

Mr. Laube's childhood was extraordinarily difficult. He had no father figure. His mother was a drug dealer and user. The family was often homeless. Despite his personal potential, his mother lacked the ability to care for him. So Mr. Laube bounced from relatives in Northern California, to his grandparents, to his mother and her abusive husband and boyfriends, to juvenile hall. He had no hope of excelling in anything because nobody was there to support him. Addiction was foreseeable, as were his criminal acts that followed. We are asking for a 1-2 level variance which takes Mr. Laube's very unfortunate childhood into consideration.

*///*

13

### 3. Post Offense Rehabilitation

In *Pepper v. United States,* 562 U.S. 476 (2011), the Supreme Court emphasized that "highly relevant - if not essential - to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* at 480. Underlying this concern is "the principle that the punishment should fit the offender and not merely the crime." *Id.* at 487-488. "In a § 3553(a) factor analysis, such information should include, where applicable, post-sentencing and post-offense rehabilitation." *United States v. Lizarraras-Chacon,* 14 F.4th 961, 967 (9th Cir. 2021), citing *Pepper,* 562 U.S. at 480, 488 *(Pepper* holding that the court of appeals' ruling prohibiting the district court from considering evidence of a defendant's rehabilitation since the initial sentencing "conflict[ ed] with longstanding principles of federal sentencing law and Congress' express directives in [18 U.S.C.] § § 3601 and 3553(a)"); see also *United States vs. Green,* 152 F.3d 1202, 1207-1208 (9th Cir. 1998) (post-sentencing rehabilitation may be basis for downward departure). Much like post-sentencing rehabilitation, post-offense rehabilitation "sheds light on the likelihood that [the defendant] will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence." *Pepper,* 562 U.S. at 492; see *Gall v. United States,* 552 U/S/ 38, 59 (2007) ([Defendant's] self-motivated rehabilitation . . . lends strong support to the conclusion that imprisonment was not necessary to deter [ the defendant] from engaging in future criminal conduct or to protect the public from his future criminal acts"); *Pepper* (Defendant's steady employment, completion of drug program in prison and drug-free condition "suggest a diminished need for 'educational or vocational training . . . or other correctional treatment.' § 3553( a)(2)(D)"). The Supreme Court further explained in *Pepper* that the defendant's "exemplary post sentencing conduct may be taken as the most accurate indicator of his present

purposes and tendencies and significantly to suggest the period  of restraint and the kind of discipline that ought to be imposed upon him." *Id.* at 492-493. District courts have granted downward departures based primarily on a defendant's post-offense or post-sentencing rehabilitation. See, e.g. *United States v. Green, supra,* 152 F.3d 1202 (post-sentencing rehabilitative efforts, e.g., exemplary conduct in prison, justified down departure of 11 levels and re-sentencing to 30 days in case charging distribution of 4,000 marijuana plants); *United States v. Martin,* 520 F .2d 87 (1st Cir. 2008) (imposing 144 months instead of career offender range of 262-327 months for crack cocaine distribution conspiracy, stressing, among other factors, defendant's impression as changed man who renounced his former ways and renewed his commitment to religion and family); *United States v. Bradstreet,* 207 F.3d 76 (1ˢᵗ Cir. 2000) ( departing from 51 months to 31 months at re-sentencing in security fraud case based on post-offense rehabilitation: defendant tutored inmates in prison,  completed prison's Boot Camp Program, served as prison chaplain's assistant and prison parenting program assistant and lectured at local colleges on ethics in business; district court noted that defendant's rehabilitative efforts "have been directed [ not only to self-improvement, but] in large degree, to others as well." *Id.* at 83; *United States v. De Shon,* 183 F.3d 888 (8th Cir. 1999) (In tax evasion case district court departed downward from 30-37 months to 5 months community confinement based on post-offense rehabilitation involving defendant's renewed life in the church and efforts to turn life around.)

As the defendant in *Pepper* reflected:

> [M]y life was basically headed to . . . I guess where I ended up,
> in prison, or death. Now I have some optimism about . . . what
> I can do with my life. I'm glad that I got this chance to try
> again . . . at a decent life . . . My life was going nowhere before,

and I think it's going somewhere now."

*Pepper,* 562 U.S. at 482.  On March 25, 2017, Mr. Laube was suffering from depression as he only recently stopped using heroin. He was still drinking, and clearly had difficulty controlling his anger and impulse. Following his arrest, Mr. Laube was determined to beat his drug and alcohol addiction. His belief in Alcoholics/ Narcotics Anonymous and dedication to staying sober have significantly changed his life. Mr. Laube has not had a sip of alcohol in 2 ½ years. He has been an AA sponsor and meets with his own sponsor on a daily basis. A friend who stopped using alcohol last month credits his sobriety to the example set by Mr. Laube. Another friend called him just a few weeks ago at 2:00 a.m. (while Mr. Laube was working graveyard shift at his current job), and asked if he could accompany Mr. Laube to the next meeting.   Mr. Laube also realized that he needed to control his impulses, and acting out violently like he did in this case.

Mr. Laube has worked continuously, except for the period after losing his job at a drug rehabilitation facility. During that period he focused, instead, on settling his workers compensation case, and moving to a different line of employment.  The letters from his grandmother, Sharon Hudson, and friend, Matthew Hunter and email from friend David Cota,  are a testament to Mr. Laube's post offense rehabilitation. See Exhibit 3, character letters and email. We ask that the Court grant an additional one-level variance from the sentencing guideline calculation, and/or as an additional 18 U.S.C. § 3553(a) factor.

> **D.**      **Punishing the defendant, protecting the public, educating the defendant, providing vocational training, medical care, or other correctional treatment, and deterring future criminal conduct**

It has been seven years since the incident on the beach and since Mr. Laube abandoned the associations that led to his being charged in this case. He takes full

16

responsibility for his actions related to striking Mr. Tristan. Unfortunately, Mr. Laube has many bad memories from his childhood, and as an adult, including from the ramifications of this case, which include the doxxing[5] by left wing media publications and labeling him as a "white supremacist" which have continued since his indictment in 2018. He was also terminated from a job because of the press surrounding this case. He hopes to relocate to another state after sentencing where he can seek a fresh start, as well as more affordable housing and services.

Mr. Laube is sober. He is working. He has no interest in engaging in the type of conduct that led to his arrest and conviction. He has been subjected to supervision for several years. He humbly asks the Court for a sentence of time served with no period of supervised release to follow. We ask that the Court consider Mr. Laube's financial status in waiving any fine.

## IV. CONCLUSION

Based upon the foregoing, defendant, Tyler Laube respectfully requests that this Honorable Court sentence him to a term of imprisonment of time served with no supervised release to follow.

Dated: March 21, 2024                    McNICHOLAS LAW OFFICE


                                         /s/
                                         JOHN NEIL McNICHOLAS
                                         Attorney for Defendant

                                         TYLER LAUBE

---

[5] Doxxing is publicly identifying or publishing private information about (someone) especially as a form of punishment or revenge. https://www.merriam-webster.com/dictionary/dox.

## DECLARATION OF JOHN NEIL McNICHOLAS

I, John Neil McNicholas, do hereby declare under penalties of perjury that the following is true.

1. I am an attorney, duly licensed in the State of California and admitted to practice in the United States District Court in the Central District of California.

2. I represent Tyler Laube in the above-captioned matter.

3. Together with my investigator, Joel Wyenn, we spent several months investigating the facts and allegations of this case, which included interviewing event organizers in Huntington Beach, and the California State Department of Recreation and Parks police officers/ lifeguards who were on duty on March 25, 2017. We reviewed officer reports, and several videos and photographs of the incident. Based upon those investigative techniques, I am extremely familiar with the events that transpired on March 25, 2017.

4. A true and correct redacted copy of a State of California Department of Parks and Recreation public safety report depicting some of the facts and events which occurred on March 25, 2017 is attached hereto as Exhibit 1 and incorporated herein by reference.

5. I personally reviewed numerous separate video recordings from March 25, 2017, and captured screen shots in chronological order which are featured in Exhibit 2. Exhibit 2 reflects true and correct screen shots of the events leading up to, during, and subsequent to the relevant incident related to Mr. Laube.

6. True and correct copies of letters from Mr. Laube's  grandmother, Sharon Hudson, and friend, Matthew Hunter, and an email from friend, David Cota, are attached hereto as Exhibit 3 and incorporated into this declaration and sentencing

memorandum.

7. A true and correct copy of a letter from Mr. Laube and addressed to the Court is attached hereto as Exhibit 4 and incorporated into this declaration and sentencing memorandum.

DATED this 21st day of March, 2024 in Redondo Beach, California.

*/s/ John Neil McNicholas*
JOHN NEIL McNICHOLAS

19