**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) Case No.: CR 18-00759-CJC-3 |
| **Plaintiff,** | ) |
| **v.** | ) SENTENCING MEMORANDUM |
| **TYLER LAUBE,** | ) |
| **Defendant.** | ) |

## I.    INTRODUCTION & BACKGROUND

Defendant Tyler Laube went to a rally supporting then-President Donald Trump at Bolsa Chica State Beach on March 25, 2017.  While he was there, he punched a reporter multiple times in the face, though he caused no bodily injury.  Although the government initially charged Mr. Laube with two serious felonies under the Anti-Riot Act, it agreed that Mr. Laube could plead guilty to a single-count superseding information charging a simple misdemeanor, interference with a federally protected right without bodily injury

in violation of 18 U.S.C. § 245(b)(3).  (Dkts. 262, 265, 268.)  Mr. Laube subsequently pleaded guilty to the single misdemeanor, and he now appears before the Court for sentencing.

Mr. Laube was originally charged in the fall of 2018, when the federal government charged four members of the white supremacist Rise Above Movement ("RAM") under the Anti-Riot Act for using facilities of interstate commerce with the intent to riot at political rallies in Huntington Beach, Berkeley, and San Bernardino.  (*See* Dkt. 1.)  Mr. Laube's codefendants challenged the constitutionality of the Anti-Riot Act, and the Court found that the Anti-Riot Act criminalized a substantial amount of protected speech and assembly and was thus facially overbroad in violation of the First Amendment, requiring dismissal of the indictment against all the defendants.[1]  (*See* Dkt. 145); *United States v. Rundo*, 497 F. Supp. 3d 872 (C.D. Cal. 2019), *rev'd and remanded*, 990 F.3d 709 (9th Cir. 2021).  On appeal, the Ninth Circuit agreed that the Anti-Riot Act "ha[s] some constitutional defects" but determined the "remainder of the Act may be salvaged by severance."  *United States v. Rundo*, 990 F.3d 709, 714, 720 (9th Cir. 2021).  The Ninth Circuit reversed this Court's dismissal of the indictment and remanded.

Mr. Laube again accepted a plea agreement, and on October 23, 2023, he pleaded guilty to the single misdemeanor charge for interference with a federally protected right without bodily injury, and the government agreed to dismiss the Anti-Riot Act charges after sentencing.  (Dkts. 262, 268.)  Approximately three months later, Mr. Laube's codefendants again brought constitutional challenges to their prosecution, arguing the case against them must be dismissed because the Anti-Riot Act is unconstitutionally vague and because they were selectively prosecuted.  (Dkt. 281, 286.)  On February 21, 2024, the Court granted their selective prosecution motion and dismissed the indictment.

---

[1] Mr. Laube pleaded guilty before the Court dismissed the indictment, but the Court allowed him to withdraw his guilty plea.  (Dkt. 151.)

The Court found that the government prosecuted RAM members for their speech and beliefs and did not prosecute similarly situated individuals associated with Antifa and related far-left groups who also organized using facilities of interstate commerce and went to the same political rallies as RAM members with the goal of using violence and intimidation to stifle the speech of supporters of President Trump.[2]  (See Dkt. 333 at 27–35.)  Mr. Laube did not move to set aside his guilty plea, and his counsel and the government have now filed their respective sentencing memoranda.  (Dkts. 376, 377.)

## II.    CALCULATION OF THE GUIDELINE RANGE

"The district courts, while not bound to apply the [United States Sentencing Commission's Sentencing] Guidelines, must consult those Guidelines and take them into account when sentencing."  *United States v. Booker*, 543 U.S. 220, 264 (2005).  Thus, when imposing any sentence, the first step for a district court is to calculate the applicable guideline range.  *See United States v. Mohamed*, 459 F.3d 979, 985 (9th Cir. 2006).

Mr. Laube's base offense level is 10.  He receives a two-level reduction for acceptance of responsibility, for a total offense level of 8.  And he has 6 criminal history points, for a criminal history category of III.  The sentence range applicable to an offense level of 8 and a criminal history category of III is 6–12 months' imprisonment.

## III.   DETERMINATION OF APPROPRIATE SENTENCE

Section 3553 of Title 18 of the United States Code sets forth factors for district courts to consider in imposing a sentence.  Courts must consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the

---

[2] The government appealed the Court's order, and the case remains pending before the Ninth Circuit. (Dkt. 334.)

need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the applicable sentencing guidelines range; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

## A.    *Nature and Circumstances of the Offense*

The Court begins by assessing the nature and circumstances of Mr. Laube's offense.  *See* 18 U.S.C. § 3553(a)(1).[3]

The lead up to and the aftermath of the 2016 presidential election led to extreme political division in our country.  The division manifested in the emergence of extremist groups, both on the far right and the far left.  When these groups met, they frequently engaged in violence.  RAM was one of the far-right groups responsible for the rise in violence at political events.  RAM members organized, trained, and used violence to shut down political speech with which they disagreed.

But far-left groups were at least equally culpable in causing much of the violence that erupted at the various political rallies at issue in this case and elsewhere—a fact the government chose to ignore.  Associates of those far-left groups also organized, trained,

---

[3] The Court incorporates herein its Order Regarding Motions to Dismiss.  (Dkt. 333.)  Though Mr. Laube did not join that motion and pleaded guilty to a different offense than what was charged in the dismissed indictment, some background from the Court's dismissal order provides helpful context to the nature and circumstances of the Mr. Laube's offense.

and used violence—including detonating fireworks, carrying improvised explosives, using pepper spray, throwing objects, pouring water on an elderly disabled veteran in a wheelchair when surrounded by a large group of members of Antifa, and more—to shut down political speech with which they disagreed, namely, conservative speech from supporters of President Trump.

**Antifa member pours water on disabled veteran**



**Antifa bloodies rallygoer's nose**

Mr. Laube included in his sentencing memorandum an image of a Facebook invitation calling for Anti-Fascist action at the Bolsa Chica State Beach Trump rally where Mr. Laube committed his offense.[4]  In an example discussed in the Court's selective prosecution order, another far-left group, By Any Means Necessary, put out a flyer to stop a far-right rally, which stated "[t]hese racist, would-be murderers have no right to organize their racist violence in California or anywhere. Their rally must be stopped by any means necessary. . . . Only an organized, mass militant, integrated youth-led movement that is politically independent can mobilize the social forces necessary to defeat the Nazis/KKK, stop the rise of 'Trumpism,' and finally put this nation on the road to progress once more."  One of the lead organizers of that group put it quite bluntly

---

[4] Though the First Amendment protects Antifa members calling for the presence of other Antifa members, it does not protect them when they physically assault those with which they disagree.

when she stated that to them, "there's no free speech for fascists."  And these far-left groups used violence, just as the government has alleged RAM did, to prevent supporters of President Trump from safely exercising their right to free speech.

The high-level context for this case, then, is this:  On the one hand is RAM, which indisputably represents hateful views and beliefs and whose members engaged in violence at political events.  But on the other hand are far-left groups like Antifa, to which the government, at least as to the rallies leading to the charges in this case, has chosen to turn a blind eye even though they were the ones who incited the violence. Against that backdrop, the Court turns to the events at Bolsa Chica State Beach which form the basis for Mr. Laube's crime.  The government and Mr. Laube agree on the bare facts: that Mr. Laube punched a journalist at a Bolsa Chica State Beach political rally organized by supporters of President Trump.  But the parties' views of the significance of Mr. Laube's actions diverge sharply.  The government focuses on Mr. Laube's hateful white-supremacist beliefs and argues that Mr. Laube and his co-defendants affirmatively went after "counter-protestors" and then, apparently unprovoked, attacked a journalist reporting on the rally.  (*See* Dkt. 377 at 1–3.)

Mr. Laube offers a very different story.  As he explains, and as video of the event shows, prior to any physical altercations, a member of Antifa slapped Mr. Laube.[5]

---

[5] Unless otherwise indicated, the following series of images are found attached to Mr. Laube's sentencing memorandum.  (*See* Dkt. 376-2 Ex. 2.)



**Antifa member slaps Mr. Laube for the first time**

Then, the Antifa member slapped him again.



**Antifa member slaps Mr. Laube for the second time**

Next, a cameraman stepped on and broke a rallygoer's American flag.



**Cameraman breaks rallygoer's American flag**

That led somebody unassociated with RAM or Mr. Laube to start a physical fight.



**Rallygoer starts fight and journalist steps in**

When the journalist Mr. Laube struck, who was wearing a black cap and jacket, stepped in to assist the cameraman, he was attacked by the unknown person who had started the fight.



**Rallygoer fights journalist**

From Mr. Laube's perspective, the journalist was dressed like a member of Antifa and was assisting somebody who had harassed a supporter of President Trump, which, wrongfully, led Mr. Laube to punch the journalist.



**Mr. Laube punches journalist**

As the rally organizer pushed Mr. Laube away from the journalist, the Antifa member who had slapped Mr. Laube twice proceeded to pepper spray Mr. Laube and other Trump supporters in the area.



**Antifa member pepper sprays Mr. Laube and other Trump supporters**

At that point, Mr. Laube ran to the ocean where he attempted to clean his eyes, and he was uninvolved with any of the additional violence at the rally.  The other victims of Antifa were assisted and comforted while they suffered from the painful effects of the Antifa member's pepper spraying.  (*See* Dkt. 333 at 10.)



**Trump supporter recovers after Antifa pepper sprayed her**

State and local police arrested several Antifa members and seized the weapons they used to assault and injure supporters of President Trump.



**Seized Antifa weapons and paraphernalia**

In its sentencing position, the government argues that Mr. Laube's "conduct was less excusable given that he committed it against a journalist documenting the free expression of ideas." But viewing Mr. Laube's actions in context, it does not appear he intended to single out and target a journalist. Violence erupted at the rally. Mr. Laube did not start the violence. Indeed, he was slapped in the face twice before engaging in any violence. Once violence started, Mr. Laube and other RAM members reacted to the Antifa members that were harassing and physically attacking Trump supporters.

None of that excuses Mr. Laube for the misdemeanor conduct to which he pleaded guilty. It was wrong to punch a journalist who was not engaging in violence. Mr. Laube was not acting in self-defense or in defense of others when he punched the journalist. But the scene was chaotic. Associates of far-left groups were known to commit violence against peaceful Trump supporters. Mr. Laube himself had already been struck twice. And Mr. Laube may well have believed that he was acting in defense of others. These circumstances are a significant mitigating factor for Mr. Laube's offense, not an aggravating factor as the government so adamantly asserts.

## B.   *Mr. Laube's History and Characteristics*[6]

Although Mr. Laube's criminal history is an aggravating factor, his personal history is a mitigating factor. Mr. Laube was convicted multiple times as a juvenile for relatively minor offenses. However, most troubling to the Court, at 19 years old, Mr. Laube was convicted of second-degree robbery of a 7-Eleven convenience store and gas station. Specifically, Mr. Laube was the getaway driver for his accomplice, who brandished a gun during the robbery. Later that year, based on separate incidents, Mr. Laube was convicted of possessing a switchblade and resisting arrest. Most recently, in

---

[6] The Court incorporates herein the relevant portions of the Revised Presentence Report. (*See* Dkt. 378 at 9–20.)

2020, Mr. Laube pleaded guilty to driving under the influence. These convictions, particularly Mr. Laube's armed robbery conviction, are serious.

On the other hand, Mr. Laube's personal history is clearly a mitigating factor. Mr. Laube never lived in a stable household with loving parents. When Mr. Laube was four, his father went drinking at a strip club and was involved in a drunk driving accident for which he received a 17-year vehicular manslaughter sentence. Consequently, Mr. Laube rarely saw his father since his parents were never married, and they did not maintain communication. Mr. Laube's mother married his half-sister's father, a gang member from Culver City. Mr. Laube's stepfather physically assaulted Mr. Laube's mother in front of him, and when Mr. Laube attempted to intervene, he was physically assaulted as well. Though Mr. Laube's mother eventually divorced that man, she was consistently involved in relationships with other physically abusive men.

Mr. Laube's mother also faced severe challenges with her mental health and struggled to provide for her children. She suffered from bipolar disorder, depression, and attention deficit hyperactivity disorder. She started using and selling methamphetamine when Mr. Laube was around four years old, continuing until he was around 11. Mr. Laube's grandmother once visited the family and found a four-year-old Mr. Laube alone in the streets and his then one-year-old half sister in an alleyway. Their mother was asleep in an apartment coming down from methamphetamine. The family experienced bouts of homelessness and frequently found themselves in shelters. At one point, the family moved into a tool shed provided by a person Mr. Laube's mother had met at a shelter. Because there was no bathroom, the family had to used buckets for defecation, and Mr. Laube does not remember showering. When Mr. Laube's grandmother witnessed their living conditions, she secured the family a two-bedroom apartment in Redondo Beach, California. However, that relief was short lived. They shared the Redondo Beach apartment with a violent female roommate who tried to stab Mr. Laube's

mother with a screwdriver.  The family obtained a restraining order and had to move into a new apartment.

When Mr. Laube was around 10 years old, men broke into their apartment and held a shotgun to his mother's head, presumably related to her drug dealing.  Mr. Laube's mother's drug dealing was eventually reported to police and she was arrested, but not before being shot with a bean bag gun while attempting to evade arrest.  Mr. Laube's grandmother stepped in and raised him, along with his sister, when he was 10 to 14 years old.  This was a stable time for Mr. Laube and his grandparents have consistently been a pillar of support for him.

But once Mr. Laube's mother was released from custody, Mr. Laube and his sister returned to living with her.  Their relationship was strained, and Mr. Laube struggled, which his juvenile criminal history shows.  Notably, whenever he was arrested, Mr. Laube's mother refused to take him back upon release.  Clearly, Mr. Laube lacked any parental guidance and much of his criminal conduct resulted, in part, from his disadvantaged and traumatic upbringing.

Understandably, Mr. Laube himself has struggled with his own mental and emotional health and substance abuse.  He reports being diagnosed with insomnia, depression, anxiety, intermitted explosive disorder, and post-traumatic stress disorder stemming from a near-death experience during which Mr. Laube was shot in the neck in an apparent road rage incident when Mr. Laube was a passenger.  At the age of 14, he was introduced to Xanax and alcohol, which lead to a Xanax addiction so heavy that Mr. Laube's recollection of his life between ages 14 and 20 is unreliable.  At the age of 21, he found his best friend unresponsive due to a Xanax overdose, from which his friend passed away.  During that year, Mr. Laube began using heroin heavily and experimented with methamphetamine and cocaine.  He entered an in-patient drug treatment program

and was able to overcome his drug abuse.  Unfortunately, he then turned to alcohol.  After a detox, he has maintained complete sobriety since September 4, 2021.

More recently, Mr. Laube has taken affirmative steps to address his childhood trauma and start down a better path.  He has worked with therapists and networked with his Alcoholics Anonymous community.  He no longer abuses substances.  He has severed ties with RAM.  (*See* Dkt. 376-4 Ex. 4.)  He has maintained consistent employment, serves as a caretaker for his grandparents, and currently shares a residence with his fiancé, a registered nurse, whom he met in middle school.

## C.   *Remaining Section 3553(a) Factors*

Of the remaining Section 3553(a) factors, the Court believes only two warrant separate discussion:  (1) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant, and (2) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The government argues that a six-month sentence is necessary because of the need for deterrence and to promote respect for the law.  (Dkt. 377 at 4.)  Mr. Laube's prosecution and the 35 days he spent in pretrial custody, however, already have had a significant deterrent effect.  *See United States v. Lawrence*, 254 F. Supp. 3d 441, 447 (E.D.N.Y. 2017) ("The key to both general and specific deterrence is the known risk of detection and punishment, not the length of the sentence.  The fact that defendant was apprehended and has already served a term of incarceration will provide more specific deterrence than would any additional term of incarceration.") (citation omitted).  The

government's recommendation that Mr. Laube be sentenced to an additional five months of incarceration would not create a meaningful difference in deterrent effect.

Nor would imposing a six-month sentence better protect the public from further crimes. Reincarcerating Mr. Laube would threaten the substantial progress he has made. It would again expose him to the gangs and drugs that impacted him as a child and young adult. He may well emerge from prison more dangerous than when he went in. *See id.* at 446 ("Young defendants are eventually released from prison. If they are hardened as criminals during their incarceration, they will pose a greater danger to their community when they get out."). Nothing in the record indicates that keeping Mr. Laube off the streets for five additional months at this time would protect the public. Indeed, there is no indication Mr. Laube is currently engaged in any type of violent or dangerous conduct, and supervised release will mitigate the risk that he might.

The government also argues that "a within-Guidelines sentence is further appropriate because it will accomplish the goal [of] avoiding unwarranted sentencing disparities among similarly situated defendants." (Dkt. 377 at 6.) The government claims that "[n]ationwide, defendants with similar criminal histories to defendant's who willfully interfere with or intimidate others during a civil disorder can expect to serve between six to twelve months' imprisonment." (*Id.* at 6.) First, the Court must point out that such a statement ignores the fact that an entire category of similarly situated individuals (individuals associated with Antifa and related far-left groups) that used violence to stifle speech at political rallies remain unprosecuted by the federal government and therefore will spend no time incarcerated. (*See* Dkt. 333 at 27–35.) In other words, the government has itself created a sentencing disparity by prosecuting only RAM members and ignoring individuals associated with Antifa and related far-left

groups.[7]  *See United States v. Stewart*, 590 F.3d 93, 161 (2d Cir. 2009) (Calabresi, J., concurring) (noting there may be "valid reasons to conclude that the failure to charge some potential co-defendants affects, *under the § 3553 factors*, the propriety of a sentence" and explaining "we should not forget that there might be even greater disparities between a defendant and other individuals who were not charged at all"). Sentencing Mr. Laube to additional incarceration would only increase the disparity between his punishment and the lack of punishment (and prosecution) members of far-left groups who committed the same violent conduct received.  Second, the government provides no cases involving purportedly disparate sentences on the charge to which Mr. Laube pleaded guilty.  *See id.* at 143 (describing district court's "review of cases presented by government as comparators" when assessing sentencing disparities); *United States v. Zitlalpopoca-Hernandez*, 805 F. App'x 494, 497 (9th Cir. 2020) (referencing the use of "comparator cases").

### D.  *Sentence Imposed*

Having considered the sentencing factors enumerated in Section 3553(a) including the advisory guideline range of 6 to 12 months, the Court imposes the following sentence:

- Time already served in custody, 35 days of incarceration.

---

[7] This is a unique case.  Typically, a court's selective prosecution finding eliminates any need to assess sentencing disparities in comparison to unprosecuted, similarly situated individuals because sentencing does not proceed at all.  Here, since Mr. Laube chose to stand by his guilty plea, the Court's findings that his co-defendants were selectively prosecuted and similarly situated individuals were not prosecuted are relevant to its sentencing evaluation.  However, even ignoring the Court's selective prosecution finding and the fact that similarly situated individuals did not face prosecution, much less any term of imprisonment, the Court would still conclude that a sentence less than six months is appropriate because the other Section 3553(a) factors weigh in favor of a lesser sentence.

- A total fine of $2,000, consisting of 12 monthly payments of $166.67, the first of which is due immediately.  Mr. Laube shall submit each subsequent payment on the first of each month until he has paid the entirety of this fine.
- A special assessment of $25, which is due immediately.
- A 12-month term of supervised release under the following terms and conditions:
  - Mr. Laube shall comply with the rules and regulations of the United States Probation & Pretrial Services Office and Second Amended General Order 20-04, including the conditions of probation and supervised release set forth in Section III of Second Amended General Order 20-04.
  - During the period of community supervision, Mr. Laube shall pay the special assessment and fine in accordance with the judgment's orders pertaining to such payment.
  - Mr. Laube shall cooperate in the collection of a DNA sample.
  - Mr. Laube shall refrain from any unlawful use of a controlled substance.  He shall submit to one drug test within 15 days of this order and at least two periodic drug tests thereafter, not to exceed eight tests per month, as directed by the Probation Officer.
  - Mr. Laube shall participate in an outpatient substance abuse treatment and counseling program that includes urinalysis, breath or sweat patch testing, as directed by the Probation Officer.  He shall abstain from using alcohol and illicit drugs, and from abusing prescription medications during the period of supervision.
  - During the course of supervision, the Probation Officer, with the agreement of Mr. Laube and defense counsel, may place Mr. Laube in a residential drug treatment program approved by the U.S. Probation and Pretrial Services Office for treatment of narcotic addiction or drug dependency, which may include counseling and testing, to determine if he has reverted to

the use of drugs.  Mr. Laube shall reside in the treatment program until discharged by the Program Director and Probation Officer.

o As directed by the Probation Officer, Mr. Laube shall pay all or part of the costs of the Court-ordered treatment to the aftercare contractors during the period of community supervision.  He shall provide payment and proof of payment as directed by the Probation Officer.  If Mr. Laube has no ability to pay, no payment shall be required.

o Mr. Laube shall submit his person, property, house, residence, vehicle, papers, computers, cell phones, other electronic communications or data storage devices or media, email accounts, social media accounts, cloud storage accounts, or other areas under Mr. Laube's control, to a search conducted by a United States Probation Officer or law enforcement officer. Failure to submit to a search may be grounds for revocation. Mr. Laube shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that Mr. Laube has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

o Mr. Laube shall participate in mental health treatment, which may include evaluation and counseling, until discharged from the program by the treatment provider, with the approval of the Probation Officer.

o As directed by the Probation Officer, Mr. Laube shall pay all or part of the costs of the Court-ordered treatment to the aftercare contractors during the period of community supervision.  Mr. Laube shall provide payment and proof of payment as directed by the Probation Officer.  If Mr. Laube has no ability to pay, no payment shall be required.

- o Mr. Laube shall not associate with anyone known to Mr. Laube to be a member of the RAM organization and others known to Mr. Laube to be participants in the RAM organization's criminal activities.
- o Mr. Laube shall not associate with any member of any white nationalist organization.
- o As directed by the Probation Officer, Mr. Laube shall not be present in any area known to Mr. Laube to be a location where members of the RAM organization meet or assemble.

This sentence appropriately takes into consideration the nature and circumstances of Mr. Laube's offense and Mr. Laube's history and characteristics. It fulfills the requirements of the remaining Section 3553(a) factors. Mr. Laube was prosecuted in federal court and publicly identified as a white supremacist. He was incarcerated for his physical act of violence—punching a journalist without inflicting bodily injury. The Court's custodial sentence and the payment of a $2,000 fine reflects the seriousness of Mr. Laube's offense, promotes respect for the law, provides just punishment, and adequately deters criminal conduct. Most importantly, the Court's sentence adequately protects the public from further crimes. Mr. Laube's adult crimes are linked to substance abuse and white supremacist groups, and he states that he no longer abuses substances or affiliates with white supremacist groups. The Court imposes a term of supervised release that ensures Mr. Laube will abide by those statements, minimizing the risk of future criminal conduct.[8]

---

[8] Mr. Laube represents that "[h]e hopes to relocate to another state after sentencing where he can seek a fresh start, as well as more affordable housing and services." (Dkt. 376 at 17.) The Court will not deny Mr. Laube an opportunity to make and live a law-abiding and productive life, so Mr. Laube will be allowed to move out of state.

## IV.    CONCLUSION

Despite initially charging Mr. Laube with two serious felonies, the government decided that a simple misdemeanor was a more appropriate charge for his punching a journalist who he believed was associated with Antifa.  35 days of incarceration, a $2,000 fine, and stringent conditions of supervised release is an appropriate sentence for a simple misdemeanor that resulted in no bodily injury.  This sentence also addresses all the important factors and objectives of sentencing under Section 3553(a).  No doubt, the government and others will object to the Court's sentence, focusing entirely on Mr. Laube's past white-supremacist beliefs and ignoring the violent conduct of Antifa and similar groups.  But the Court cannot cast aside the Constitution and ignore the mitigating factors and sentencing objectives under Section 3353(a).  The Constitution and the laws of the United States apply to everyone.  We must never forget that if the political winds change in this country, and the new government decides to turn on those not sharing the new government's views, it will be the rights and liberties guaranteed by the Constitution and the laws of the United States that will protect us.[9]

DATED:     April 4, 2024

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[9] *See, e.g.*, Robert Bolt, *A Man for All Seasons* 66 (1962) ("Yes, I'd give the Devil benefit of law, for my own safety's sake.").