E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
SOLOMON KIM (Cal. Bar No. 311466)
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
ANNA P. BOYLAN (Cal. Bar No. 322791)
Assistant United States Attorneys
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2450/0631/2170
     Facsimile: (213) 894-2979
     E-mail:    solomon.kim@usdoj.gov
                kathrynne.seiden@usdoj.gov
                anna.boylan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-00759(A)-CJC-1 |
|---|---|
| Plaintiff, | OPPOSITION TO DEFENDANT ROBERT RUNDO'S REQUEST FOR RELEASE PENDING APPEAL; DELCARATION OF ANTHONY BEST; DECLARATION OF SOLOMON KIM; EXHIBITS |
| v. | |
| ROBERT RUNDO and ROBERT BOMAN, | |
| Defendants. | Hearing Date: 4/30/2024<br>Hearing Time: 10:00 A.M.<br>Location:    Courtroom of the<br>             Hon. Cormac J.<br>             Carney |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and the undersigned Assistant United States Attorneys, hereby files its Opposition to Defendant's Motion for Release Pending Appeal.

//

1    This Opposition is based upon the attached memorandum of points

2  and authorities, the files and records in this case, the declarations

3  of Anthony Best and Solomon Kim and exhibits attached hereto, and

4  such further evidence and argument as the Court may permit.

5  Dated: April 12, 2024              Respectfully submitted,

6                                     E. MARTIN ESTRADA
                                       United States Attorney
7
                                       CAMERON L. SCHROEDER
8                                      Assistant United States Attorney
                                       Chief, National Security Division
9

10                                     _____/s/_____
                                       SOLOMON KIM
11                                     KATHRYNNE N. SEIDEN
                                       ANNA P. BOYLAN
12                                     Assistant United States Attorneys

13                                     Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.......................................................v

MEMORANDUM OF POINTS AND AUTHORITIES......................................1

I.      INTRODUCTION.....................................................1

II.     FACTUAL BACKGROUND...............................................2

        A.    Defendant Forms Rise Above Movement.......................2

        B.    Defendant and RAM Assault Others at Demonstrations........4

              1.    Huntington Beach Rally.............................4

              2.    Berkeley Rally.....................................7

              3.    San Bernardino Rally...............................8

              4.    Charlottesville Rally..............................9

        C.    Defendant Flees After The FBI Searches His Residence......9

              1.    Defendant Flies to London..........................9

              2.    Defendant Attempts to Fly to Ukraine..............10

              3.    Defendant Travels to Mexico and Cuba..............11

              4.    Defendant Attempts to Fly to Russia...............12

              5.    Defendant Attempts to Fly to Turkey, But is
                    Arrested..........................................13

        D.    Defendant Is Released And Again Leaves The Country.......13

        E.    Defendant Is Reindicted.................................13

        F.    Despite Being Reindicted, Defendant Again Evades
              Arrest..................................................14

        G.    Defendant Is Finally Captured In Romania................15

        H.    Defendant Is Detained...................................16

        I.    Defendant Prepares To Flee To Mexico Again, But Is
              Arrested................................................16

        J.    Defendant's Appearance After Arrest.....................18

        K.    Ninth Circuit Stays Defendant's Release And FSI
              Dismissal...............................................19

III.    ARGUMENT........................................................20

iii

A.   Defendant Must First Request Release With The
     Magistrate Judge........................................20

B.   Defendant Will Flee If Released.........................21

C.   Defendant Poses a Serious Danger........................25

IV.  CONCLUSION..................................................25

# **TABLE OF AUTHORITIES**

**CASES:**

United States v. Cannon,
  711 F. Supp. 2d 602 (E.D. Va. 2010) .................. 17, 18, 19, 20

United States v. Cisneros,
  328 F.3d 610 (10th Cir. 2003) ................................... 17

United States v. McKnight,
  2020 WL 1872412 ............................................... 17

**STATUTES:**

18 U.S.C. § 371 ................................................... 10

18 U.S.C. § 2101 .................................................. 10

18 U.S.C. § 3142 .................................................. 16

18 U.S.C. § 3143 .................................................. 17

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendant Robert Rundo ("defendant") has been an international fugitive who repeatedly avoided arrest.  Defendant has assumed multiple aliases, booked numerous flights, and traveled through three continents and no fewer than seven countries to evade law enforcement.  In fact, defendant has boasted publicly about his expertise and success in escaping arrest and has advised others on how to do the same.  After the first superseding indictment ("FSI") was filed in this case, defendant evaded capture for several months.  When the FBI finally located defendant, they found him living in Romania with falsified identification documents bearing various aliases.  After his extradition to the United States, defendant did not contest detention, and the magistrate judge ordered him detained based on his flight risk and danger.  In February 2024, when he was released again following the dismissal of the FSI, defendant immediately traveled south from Los Angeles to Escondido, California.  According to an FBI source, an associate and defendant were trying to get to the border to cross into Mexico so defendant could flee again.  Hours after the government located defendant and obtained an arrest warrant, defendant exited the building where he had been for over an hour.  But he did not surrender; he began walking down the street.  When the FBI arrested defendant, he claimed that he was eventually going to surrender, but after he "grabbed a beer."  Defendant had a prepaid cell phone and over $300 in cash in his possession.

Defendant is not only a serious flight risk, but is also dangerous and violent.  In 2010, defendant was sentenced to two years

in prison for repeatedly stabbing a victim.  In 2017, after moving to California, defendant co-founded a violent white supremacy extremist organization called the Rise Above Movement ("RAM"), whose purpose was to train for, engage in, and celebrate acts of violence against its perceived political opponents.  RAM's tactic was simple: its "guidelines" instructed members to "[l]ook defensive in beginning of all scuffles or fights," so they could assault others with impunity. Under the banner of RAM, defendant and his co-conspirators engaged in a campaign of violence throughout 2017 during which they traveled to multiple events to assault others in furtherance of their shared extremist ideology.

Defendant's violent extremist ideology underlines the ongoing danger he poses to the community.  While he has a right to his views, those views are nonetheless relevant to understanding his dangerousness because he has shown repeatedly his willingness to use violence in furtherance of those views, and there is a significant risk that he will commit such violence if released.  Because defendant has persistently avoided capture, and because he not only promotes violence, but in fact commits it, he must remain detained.

## II.  FACTUAL BACKGROUND

### A.  Defendant Forms Rise Above Movement

In 2017, defendant formed RAM along with his co-founder Ben Daley.  (Declaration of Anthony Best ("Best Decl.") ¶ 2.)  The group promoted and utilized violence in furtherance of their extremist ideals.  (See Best Decl., Ex. 2.)

RAM's goal was not to defend the speech of others with whom they agreed, but to physically assault and defeat others whom they opposed.  To effectuate that goal, defendant and Daley issued

2

"guidelines" requiring RAM members to engage in hand-to-hand combat training, attend events dressed in coordinated uniforms, "engage with . . . only . . . serious opposition" at the events, and, notably, to "[l]ook defensive in [the] beginning of all scuffles or fights." (Best Decl., Ex. 1 at 1.)

Following these events, defendant and his followers used social media to publish videos and images of themselves assaulting counter-protestors, bragging about their successful use of violence to silence their political opponents.  (Best Decl., Exs. 2-3.)  As Daley admitted when later pleading guilty to conspiring to riot at several of the same events charged in this case, RAM "attended these rallies with the expectation that physical conflict . . . would occur," and "celebrated violence when it happened," including through posts like: "When the squad[']s not out smashing commies," "#rightwingdeathsquad," "goodnightleftside," and "Shortly after this pic antifa was btfo [i.e., blown the f--k out] in Huntington Beach." (Best Decl., Ex. 34 at 2-3 (alterations in original).) As the leader of RAM, defendant embodied its violent extremist ideology.  Defendant publicized his views by, for example, publicly endorsing the "Fourteen Words," a popular white supremacist slogan meaning: "We must secure the existence of our people and a future for white children."  (Unmasking California's New White Supremacists, ProPublica (Oct. 19, 2017), https://www.youtube.com/watch?v=Fpt3ImXIImY (last visited Apr. 12, 2024) at 00:22-00:38.)  While incarcerated in 2010 for repeatedly stabbing a victim, defendant received two prison tattoos -- the number "8" on each shoulder -- which he admitted in a signed

3

statement were "the symbols of white pride."[1]  (Best Decl., Ex., 7.)
At his home, which he shared with a fellow Nazi-sympathizer,
defendant kept Nazi paraphernalia, including drawings of swastikas
and a Nazi eagle ornament in his defendant's bedroom and a framed
portrait of Adolf Hitler in the living room.  (Best Decl., Ex. 4.)

### B.   Defendant and RAM Assault Others at Demonstrations

#### 1.   Huntington Beach Rally

In furtherance of their mission, throughout 2017, defendant and
his followers attended multiple demonstrations where they assaulted
counter-protestors.  One of those demonstrations occurred in
Huntington Beach, California in March 2017.  Several hundred people
attended the rally that day, the vast majority of whom engaged in
peaceful activities.  (See Best Decl., Ex. 33 at 10-14.)  Defendant
and his associates, however, actively confronted and pursued counter-
protestors along the beach, carrying signs that read "DEFEND AMERICA"
and "Da Goyim Know."[2]  (Id. at 11.)  During the march, several people
walking alongside defendant could be heard chanting at counter-

---

[1] "88" is a commonly known and popular neo-Nazi symbol.  The
eighth letter in the alphabet is "H" and the double "88" signifies
"HH" or "Heil Hitler."  (Hate on Display/88, Anti-Defamation League,
https://www.adl.org/resources/hate-symbol/88 (last visited Apr. 12,
2024).)

[2] The phrase "da goyim know" is used by white supremacist
extremists to refer to their purported knowledge of a Jewish
conspiracy to control world affairs.  (See Best Decl., Ex. 33 at 11.)

4

protestors, "You can't run, you can't hide, you get helicopter ride!"[3]  (Dkt. 109 at 5.)[4]

    While pursuing the counter-protestors, several people began pushing two journalists from a local news publication.  (Best Decl., Ex 33 at 11.)  As co-defendant Tyler Laube admitted in his plea agreement, during this altercation, he grabbed one of the journalists and "punch[ed] him several times in the head and body."  (Dkt. 262 at 6; see also Best Decl., Ex 33 at 11.)  Co-defendant Robert Boman repeatedly kicked a counter-protestor in the back as he walked away. (Best Decl., Ex. 33 at 12.)  As the RAM members continued pursuing the counter-protestors, defendant also began assaulting them.  As depicted in the photographs below, defendant suddenly sprinted toward a counter-protestor and punched him in the head.  (Best Decl., Ex. 5 at 1-3.)



---

    [3] White supremacy extremists and neo-Nazis often refer to "helicopter rides" when discussing how to treat communists and other anti-fascists.  The phrase is a reference to extrajudicial killings known as "death flights" committed by General Augusto Pinochet's forces in Chile in the late 1970s, in which the dictator's forces threw opponents out of helicopters.  (Why Are Trump Supporters Offering People 'Free Helicopter Rides' Online?, Gizmodo, https://gizmodo.com/why-are-trump-supporters-offering-people-free-helicopte-1829705238 (Oct. 12, 2018), (last visited Apr. 12, 2024).)

    [4] Citations to "Dkt." followed by a number refer to the CM/ECF docket number in this case.

Defendant then turned his attention to another nearby counter-protestor whom he body slammed to the ground before repeatedly punching and elbowing the individual.  (Id.)

 

Following their attacks, RAM members publicly celebrated their assaults.  For example, the online site "Daily Stormer" published an article titled "Trumpenkriegers Physically Remove Antifa Homos in



Huntington Beach," which multiple RAM members shared, noting: "We did it fam."  (Best Decl., Ex. 33 at 14, 15.)  As another example, as seen below, the RAM Facebook account posted a picture of defendant punching a counter-protestor in the side of the head from behind, with the words "Physical Removal" superimposed on the image and the hashtag "#riot."  (Best Decl., Ex. 3 at 4-5.)

1          2.   <u>Berkeley Rally</u>

2          Shortly after the Huntington Beach rally, RAM associates began

3  preparing for a "Free Speech" demonstration at a public park in

4  Berkeley, California.  In the weeks leading up to the rally, RAM

5  associates discussed training in hand-to-hand fighting and formation

6  tactics through text messages, with one RAM associate commenting,

7  "Anyone who doesn't come will wish they had."  (Best Decl., Ex. 33 at

8  16.)

9          In April 2017, defendant and his RAM associates arrived in

10 Berkeley prepared to fight, with their hands tapped and faces covered

11 in skull masks.  (Best Decl., Ex. 5 at 5-8.)  Initially, orange

12 fencing set up by law enforcement separated RAM and the protestors

13 from the counter-protestors.  (<u>Id.</u> at 5.)  However, as an officer on

14 the ground noted, "RAM [was] on the frontline of the Right-side

15 instigating the violence against the Left-side."  (Best Decl., Ex. 35

16 at 1.)  For example, at one point, defendant suddenly crossed the

17 fencing and charged at a counter-protestor, punching him several

18 times in the head.  (Best Decl., Ex. 5 at 5-6.)



25         Defendant then came across another counter-protestor and punched

26 him in the head as well.  (<u>Id.</u>)  Sometime thereafter, defendant

27 struck yet another individual in the head.  (<u>Id.</u>)  When a police

28 officer attempted to subdue defendant, defendant resisted and punched

                                    7

the officer twice in the head before officers subdued and arrested him.  (Id.; Best Decl., Ex. 33 at 19.)

Defendant's followers also assaulted counter-protestors at the event.  For example, co-defendant Boman punched a counter-protestor in the face while multiple other RAM members repeatedly kicked and punched a counter-protestor who was crouching in a defensive position.  (Best Decl., Ex. 33 at 17-18.)  At a later point, RAM members pursued counter-protestors out of the park through public streets.  (Id. at 19.)  A second officer on the ground later observed that "[t]hroughout the day, the RAM group would antagonize and then fight with counter-protestors.  On multiple occasions, they would pick a person and then go after the person as a group, pulling the person out, isolat[ing] them, and then attacking them."  (Best Decl., Ex. 35 at 4.)

Following the event, RAM members celebrated their assaults on social media, with one RAM member claiming, "Total Aryan victory." (Best Decl., Ex. 33 at 20.)  Defendant later bragged to a podcaster who planned to interview RAM leaders at Berkeley: "we [RAM] were the first guys to jump over the barrier and engage and . . . that had a huge impact."  (Dkt. 47 at 11-12.)

3.   San Bernardino Rally

Defendant and his co-conspirators soon mobilized for violence again.  On June 1, 2017, Daley sent a Facebook message to an associate stating that he and 30 others were planning to "take over" an upcoming march and sharing photographs of signs that they planned to carry at the march.  (Id. at 8.)  On June 10, 2017, defendant, Daley, and other RAM members attended a political rally in San Bernardino, California, where they engaged in violence against

counter-protestors.  (Best Decl., Ex. 33 at 22.)  Afterwards, Daley messaged an associate, bragging that he, defendant, and the other RAM members had "smashed some antifa as they were leaving."  (Id.)  The associate noted that "[i]f it wasn't for the White Nationalists nothing would ever get done," to which Daley replied: "This is true would've been no victory in Huntington or Berkeley."  (Id.)

### 4.  Charlottesville Rally

On August 12, 2017, several RAM members, including defendant's co-founder, Daley, attended the "Unite the Right" rally in Charlottesville, Virginia.  (Id. at 22.)  In advance of the rally, Daley posted on a group forum: "I'm flying out from CA with a handful regardless [of whether the group had a permit].  Fuck these jews." (Id. at 23.)  Although defendant himself did not attend, defendant's fellow RAM members perpetrated the same violence they had instigated at the previous rallies, committing multiple assaults against multiple victims.  (Id. at 23-24.)  Daley and the RAM members who attended the Charlottesville rally later pleaded guilty in the Western District of Virginia to conspiracy to riot based on their participation in riots on behalf of RAM in Huntington Beach, Berkeley, and Charlottesville.  They received sentences of between 27 and 37 months' imprisonment.  (United States v. Daley et al., No. 3:18-cr-00025-NKM-JCH (W.D. Va. Jul. 19, 2019) Dkts. 149-153, 157-163.)  Defendant's co-conspirators admitted that none of their assaults were in self-defense.  (Daley, Dkts. 59, 99, 108, and 111.)

### C.  Defendant Flees After The FBI Searches His Residence

### 1.  Defendant Flies to London

Based on defendant's conduct, the FBI executed a search warrant of his residence in Huntington Beach, California on October 2, 2018.

1   (See No. 2:18-MJ-2592 (C.D. Cal.).)  Within two days of the search

2   warrant, defendant booked a flight from Los Angeles to London for the

3   following day, hoping to travel to Ukraine.  (Best Decl., Exs. 6, 9;

4   see also Best Decl., Ex. 8 at 13:33-13:49.)  When defendant flew to

5   London, however, he was denied entry.  (Best Decl., Ex. 8 at 3:44-

6   4:02.)  Upon his return to Los Angeles, on October 7, 2018, FBI

7   agents met defendant at the airport and interviewed him.  When

8   confronted with his attempt to flee the country, defendant told the

9   agents that his plan was to leave the country, and once safe from the

10  FBI, to speak to an attorney because "you guys could come grab me at

11  any time you want . . . you guys arrest me any second you want."

12  (Best Decl., Ex. 8 at 5:09-6:12.)[5]

13              2.    Defendant Attempts to Fly to Ukraine

14       Over the next two weeks, defendant booked an additional **thirteen**

15  one-way flights to avoid being arrested for his conduct.  On October

16  8, 2018, defendant began discussing his plans to flee to Ukraine with

17  an associate ("Associate").  (Best Decl., Ex. 10 at 3-13.)  After

18  confirming that he withdrew a few thousand dollars in cash to avoid

19  law enforcement detection and after receiving reassurances from his

20  Associate that he could easily enter Ukraine, defendant booked a

21  flight from New York to Ukraine departing on October 10, 2018.[6]  (Id.

22  at 4-5; see also Best Decl., Ex. 11.)  In making this booking,

23

24       [5] During the interview, defendant claimed to have had a return
    ticket to Los Angeles.  (Best Decl., Ex. 8 at 5:33-5:40.)  However,
25  defendant failed to mention that he had purchased his return ticket
    to Los Angeles a week before the execution of the search warrant at
26  his home.  (Best Decl., Ex. 9 at 1.)

27       [6] Defendant canceled this flight the next day and booked another
    flight from New York to Ukraine for October 11, 2018, when he
28  realized departing on October 10, 2018, would be too soon.  (Best
    Decl., Ex. 10 at 9-10; see also Best Decl., Ex. 12.)

defendant falsely identified himself as a female.  (Best Decl., Ex. 11 at 7.)  Defendant then purchased a flight from Santa Ana, California, to New York, with a layover in Texas for October 9, 2019.  (Best Decl., Ex. 13.)

Despite already having booked a flight to Ukraine, defendant bought yet another flight to Ukraine the next day, on October 9, 2018.  (Best Decl., Ex. 14.)  In completing this reservation, defendant once again falsely identified himself as a female with a birth year of 1995 (instead of 1990).  (Id. at 7.)  Later that day, defendant was notified that his layover flight from Santa Ana to Dallas was canceled.  (Best Decl., Ex. 10 at 10-11.)  Concerned that the government was monitoring his travel, defendant booked a new flight from Santa Ana to New York departing on October 9, 2018.  (Id.; Best Decl., Ex. 15.)  Shortly thereafter, both defendant's flights from New York to Ukraine departing on October 11, 2018, were canceled.  (Best Decl., Ex. 12 at 5, Ex. 14 at 5.)  After informing his Associate via text message that his flight from Santa Ana to Dallas was canceled, defendant told his Associate, "I'm not allowed to fly.  Fuck.  They banned me from flying. They are probably going to arrest me soon."  (Best Decl., Ex. 10 at 10-11.)

### 3.   Defendant Travels to Mexico and Cuba

When defendant relayed these events to his Associate, the Associate asked whether defendant could travel to Mexico instead. (Id. at 12.)  His Associate advised defendant to "try [his] best not to get caught," to which defendant responded, "Yes will do I think I will ditch my phone."  (Id.)  Defendant told his Associate that defendant had "guys on stand by back home to sell [his] car and a few other things" and that "at the moment [his] whole thing is just to

get away." (Id. at 16.)  Defendant also corresponded with another associate ("Johnny") regarding his travel plans around the same time. Johnny texted defendant, "I really wish you [h]ad a lawyer figure out what was going on [with the search warrant] before you fled" and "[y]ou still don't know what the warrant was for." (Best Decl., Ex. 16 at 1.)  Defendant responded, "[i]t was for harresment [sic] and to terrorize me." (Id.)  When Johnny stated "[t]hats [sic] not a reason to run," defendant responded, "[f]or me it is." (Id.)

The next day, on October 10, 2018, defendant booked flights from Tijuana to Mexico City and from Mexico City to Cuba both for October 11, 2018. (Best Decl., Exs. 17, 18.)  Defendant informed his Associate that his plan was then to fly from Cuba to Russia. (Best Decl., Ex. 10 at 19.)  Defendant ultimately traveled to Mexico and then to Cuba. (Id. at 17, 23.)

### 4. Defendant Attempts to Fly to Russia

The following day, on October 11, 2018, defendant booked a flight from Cuba to Russia departing on October 17, 2018. (Best Decl., Ex. 19.)  Prior to boarding his flight to Russia, defendant purchased two separate connecting flights from Russia to Dubai departing on October 18, 2018. (Best Decl., Exs. 20, 21.)  When defendant arrived at the airport on October 17, 2018, to fly to Russia, however, he was prohibited from flying. (Best Decl., Ex. 10 at 28-30.)  Defendant then exchanged a series of text messages with his Associate to determine where he could fly to without any issues, including Spain, Ukraine, Brazil, and Ethiopia. (Id. at 28-33.) Defendant lamented to his Associate that he did not "want to stay in these shit country's [sic] to hide out without any contacts." (Id.

1   at 33, 34.)  Defendant ultimately decided to head back to Mexico and

2   "take it from there."  (Id.)

3       5.   Defendant Attempts to Fly to Turkey, But is Arrested

4   Defendant returned to Mexico that same day.  (Id. at 35.)  The

5   following day, on October 18, 2018, defendant booked a flight from

6   Mexico to Guatemala.  (Best Decl., Ex. 22.)  The next day, defendant

7   booked a flight from El Salvador to Turkey departing on October 21,

8   2018.  (Best Decl., Ex. 23.)  On October 20, 2018, the government

9   obtained an arrest warrant for defendant, and he was returned from El

10  Salvador to the United States and arrested.  (Best Decl. ¶ 26; see

11  No. 2:18-MJ-2791 (C.D. Cal.).)

12      **D.   Defendant Is Released And Again Leaves The Country**

13  On October 22, 2018, defendant made his initial appearance in

14  this district.  (Dkt. 13.)  Defendant was ordered detained based on

15  his risk of flight and his danger.  (Dkt. 34.)  A few weeks later, in

16  November 2018, defendant was indicted for conspiracy to riot (18

17  U.S.C. § 371) and rioting (18 U.S.C. § 2101).  (Dkt. 47.)

18  In June 2019, the Court dismissed the indictment in this case

19  and released defendant from custody.  (Dkt. 146.)  According to

20  defendant's financial records, he appeared to have left the country

21  sometime in December 2019.  (Best Decl., Ex. 24 at 2-3.)  According

22  to information received from foreign governments and defendant's

23  financial records, defendant traveled through multiple different

24  countries for the next several years, including, Bulgaria, Bosnia,

25  and Serbia.  (Best Decl. ¶ 28.)

26      **E.   Defendant Is Reindicted**

27  In February 2022, the Ninth Circuit reversed the Court's

28  dismissal order and remanded the case for further proceedings.

13

1   (Dkts. 158-161.)  Defendant did not appear at a status conference in

2   March 2022.  (Dkt. 168.)  Following the hearing, neither defendant's

3   counsel nor the United States Probation and Pretrial Services Office

4   ("USPO") was able to contact or locate defendant.  (Best Decl., Ex.

5   25 at 1.)  As a result, in April 2022, the government obtained an

6   arrest warrant for defendant.  (Best Decl., Ex. 26 at 1-2.)  In

7   November 2022, while in Bulgaria, defendant presented a fraudulent

8   United States passport to a real estate agent while searching for a

9   temporary apartment.  (Best Decl., Ex. 27; Best Decl. ¶ 31.)  The

10  passport bore a photograph of defendant, but listed the alias "Robert

11  Lazar Pavic," a false birthdate of April 28, 1994, and a non-existent

12  passport number.  (Id.)

13      On January 4, 2023, the government obtained the FSI, along with

14  a new arrest warrant, against defendant for conspiracy to riot and

15  rioting.  (Dkt. 209; Best Decl., Ex. 26 at 3-4.)

16      **F.   Despite Being Reindicted, Defendant Again Evades Arrest**

17      Knowing that authorities were attempting to locate and arrest

18  him, defendant continued to evade law enforcement.  He took to social

19  media to boast about his skills in avoiding capture.  Just a few

20  weeks after the FSI was filed, in a public blog post on Telegram,



defendant reposted an April 2021 Newsweek article entitled, "California White Supremacist Robert Rundo Hunted by Police in Europe," and commented, "How's that hunt going ??? 😎" (Best Decl., Ex. 28 at 1.)

A few weeks later, on February 1, 2023, defendant made another public blog post on Telegram lamenting how much of a "headache it is to be on the No Fly List and the amount of money wasted on flight



tickets while figuring out how it works." (Id. at 2.)  Defendant went on to brag that "[b]eing a stubborn and determined individual I made it and might be the only man on the no-fly list to find a way around it and get to travel the world." (Id.)[7]

**G.   Defendant Is Finally Captured In Romania**

Nearly a year after the government obtained its April 2022 arrest warrant, the FBI finally located and arrested defendant in Romania in March 2023.  (Best Decl. ¶ 33.)  When he was arrested,

---

[7] In June 2022, the FBI found a video on Vimeo featuring defendant (created on an unidentified date) in which he discussed tips on how to evade law enforcement, specifically for those on the no-fly list.  (Best Decl., Ex. 29 at 4:35-8:44.)  In the video, defendant advises traveling with a burner phone, traveling to Mexico to fly to one's ultimate destination, and obtaining a second passport from another foreign country.  (Id.)

defendant was in possession of fake identification cards.  (Best

Decl., Ex. 30.)  One, a Croatian identity card, bore defendant's

picture and falsely listed his name as "Marko Rodić," while another,

a gym membership card, falsely listed defendant's name as "Pavic

Roman."  (Id.)

**H.   Defendant Is Detained**

Defendant made his initial appearance on the FSI on August 2,

2023.  (Dkt. 251.)  Defendant did not contest his detention and was

ordered detained by the Honorable Jean P. Rosenbluth, United States

Magistrate Judge.  (Id.)  The Court detained defendant as both a

serious flight risk and danger, citing his prior travel history and

prior conviction involving violence.  (Dkt. 253 at 3.)  Defendant's

prior conviction was for attempted gang assault, to which he pleaded

guilty and for which he was sentenced in 2010 to two years'

imprisonment.  (Best Decl., Ex. 31 at 4, 6, 12.)  In 2009, defendant,

along with four associates, approached a victim in a store in Queens,

New York.  (Best Decl., Ex. 31 at 1.)  Defendant asked the victim why

he was wearing blue.  (Id.)  When the victim attempted to flee the

store, defendant, along with several associates, chased the victim

until the victim tripped and fell.  (Id.)  While the victim was on

the ground, defendant used a knife to stab the victim all over his

body, including his hand, elbow, arm, back of his neck, and chest.

(Id.)

**I.   Defendant Prepares To Flee To Mexico Again, But Is Arrested**

On February 21, 2024, the Court again dismissed the FSI and

ordered defendant's release from custody forthwith.  (Dkt. 338.)

After the Court denied the government's request to stay the dismissal

and release, the government immediately filed a notice of appeal as

to the dismissal order, which is currently pending with the Ninth Circuit, and an emergency motion with the Circuit requesting a stay of defendant's release and his continued detention ("Stay Motion"). (<u>See</u> Dkt. 334.)  Defendant was subsequently released while the Stay Motion was pending.  (Dkt. 363 at 2.)

Early the next morning, on February 22, 2024, the Ninth Circuit issued an order staying defendant's immediate release.  (<u>United States v. Rundo et al.</u>, No. 24-932 (9th Cir. 2024), Dkt. 5.)  The government applied for an arrest warrant for defendant with the duty magistrate judge, the Honorable Steve Kim.  Judge Kim held a hearing on the government's application with both parties present.  (Dkt. 346.)  Several hours later, at 2:34 p.m., Judge Kim granted the government's request for an arrest warrant.  (Dkt. 345; Declaration of Solomon Kim ("Kim Decl."), Ex. A.)  By the time the government obtained the arrest warrant, defendant was already in Ramona, California, 100 miles south of Los Angeles and approximately an hour from the United States-Mexico border, as verified through physical surveillance.  (Best Decl., Ex. 32.)

While in the area, defendant and an associate, R.W., visited several stores, including MetroPCS, Walmart, and an auto detailing studio.  (<u>Id.</u> at 2.)  After Judge Kim granted the government's application for an arrest warrant, carbon copying defense counsel with a copy of the warrant at approximately 2:42 p.m. (Kim Decl., Ex. A), defendant entered an auto detailing store in Ramona, California (Best Decl., Ex. 32 at 6).  Defendant then remained in the auto detailing store (except to briefly visit a store next door) for approximately the next hour and a half.  (<u>Id.</u> at 6-8.)  While

17

1  defendant was in the store, another associate of defendant, G.M.,
2  arrived and met defendant.  (Id.)

3      Defense counsel for defendant waited two hours, then called the
4  government at approximately 4:45 p.m., expressing a desire to arrange
5  for his self-surrender.  (Kim Decl. ¶¶ 2-3, Ex. A; Dkt. 373 at 7.)
6  The parties discussed defendant's surrender.  (Dkt. 373 at 7.)  While
7  these discussions were occurring, defendant and G.M. left the store
8  at around 5:03 p.m.  (Best Decl., Ex. 32 at 8.)  After exiting,
9  defendant and G.M. walked approximately a block south of the store
10  and turned west onto another street, at which point authorities, who
11  had been surveilling defendant, arrested defendant.  (Id.)  Upon his
12  arrest, defendant told law enforcement that he was going to turn
13  himself in but after he "grabbed a beer first."  (Best Decl. ¶ 37.)
14  At the time of his arrest, defendant was found in possession of a
15  prepaid Samsung cellular phone and approximately $329 in cash.  (Best
16  Decl., Ex. 32 at 14-20.)

17      An FBI source subsequently provided insight into defendant's
18  motivations for traveling toward the southern border.  On February
19  23, 2024, the source spoke with an individual, B.H..  (Best Decl.,
20  Ex. 36 at 3.)  According to B.H., defendant and G.M., who was with
21  defendant at the time of his arrest, were trying to make it to the
22  border to cross into Mexico so defendant could flee the country
23  again.  (Id.)

24  **J.  Defendant's Appearance After Arrest**

25      The next morning, on February 23, 2024, defendant was taken to
26  the First Street United States Courthouse in Los Angeles to be booked
27  into U.S. Marshals' custody to make his initial appearance.  (Best
28  Decl., Ex. 32 at 13.)  While defendant was in transport, Judge Kim

scheduled a Zoom hearing for 11:00 a.m.  (Dkt. 355.)  During the Zoom hearing, the Ninth Circuit issued an order mandating that defendant remain in custody pending the resolution of the government's motion to stay and that no lower court release defendant absent further order from the Ninth Circuit.  (Dkt. 364.)  Shortly after the hearing concluded, defense counsel requested a hearing on defendant's initial appearance with this Court.  (Dkt. 363 at 5.)

The Court declined to hold an initial appearance, but instead held a status conference, finding that defendant's arrest was unconstitutional because the Court previously dismissed all pending charges against defendant.  (Id. at 6; see also Dkt. 356.)  During the hearing, the Court stated that defendant "was not trying to escape to South America or Ukraine; he was actually in San Diego, I assume, with family or friends, and he was willing to surrender."  (Dkt. 373 at 20.)  Defense counsel agreed with that assessment but provided no evidence to support it.  (Id.)

Thereafter, the Court issued a written order releasing defendant.  (Dkt. 363.)  The order did not discuss the 18 U.S.C. § 3142 factors or assess defendant's flight risk and dangerousness. The Court did, however, recite defense counsel's conclusory representation: "According to the Deputy Federal Public Defender, Mr. Rundo was [not preparing to flee by way of the southern boarder but] was instead simply staying in that area where he had lived prior to the prosecution in this case."  (Id. at 4 n.2.)

**K.    Ninth Circuit Stays Defendant's Release And FSI Dismissal**

Several weeks later, on March 13, 2024, the Ninth Circuit stayed the Court's dismissal order and ruled that defendant "may apply for

1  release as permitted under the Bail Reform Act, 18 U.S.C. § 3143."

2  (Dkt. 375 at 1.)

3  **III. ARGUMENT**

4      **A.   Defendant Must First Request Release With The Magistrate
           Judge**

5

6      At the outset, defendant's request for relief from this Court is

7  premature.  Pursuant to 18 U.S.C. § 3143(c), in a case where an

8  appeal has been taken by the government, a defendant's bail

9  determination must be determined in accordance with § 3142.  Section

10  3142(f) provides that a detention hearing "may be reopened . . .

11  after a determination by the judicial officer . . . if the judicial

12  officer finds that information exists that was not known to the

13  movant at the time of the hearing" and that such information has a

14  "material bearing" on the issue of defendant's flight and/or danger.

15      By its terms, therefore, the Bail Reform Act requires the same

16  judicial officer who conducted the initial detention hearing in this

17  case, United States Magistrate Judge Jean Rosenbluth, to consider any

18  motion to reopen a detention hearing.  See United States v. Cisneros,

19  328 F.3d 610, 614 (10th Cir. 2003); United States v. McKnight, 2020

20  WL 1872412, No. CR18-16 TSZ, at *1 (W.D. Wash. Apr. 15, 2020); United

21  States v. Cannon, 711 F. Supp. 2d 602, 606 (E.D. Va. Mar. 19, 2010).

22  While either party could, of course, seek this Court's de novo review

23  of any further detention or release order, defendant's request should

24  be considered by Judge Rosenbluth, not this Court, in the first

25  instance.

26

27

28

### B.   Defendant Will Flee If Released

If the Court reaches the merits and concludes that defendant can meet his initial burden to reopen his detention hearing,[8] defendant should nonetheless remain detained.  Defendant has taken every opportunity over the course of this case to evade arrest and avoid prosecution.  His actions speak for themselves.  Every time he believed he might be arrested, he chose to flee.  He has fled through three continents and no fewer than seven countries to avoid arrest. Most notably, just two days after the FBI first executed a search warrant of his residence in October 2018, defendant fled to London. (Best Decl., Ex. 6.)  When defendant was denied entry into the United Kingdom and returned to the United States, defendant admitted to the FBI that he fled because he was concerned about getting arrested. (Best Decl., Ex. 8 at 5:09-6:12.)

Realizing that the FBI was now monitoring his travel patterns, defendant schemed with an associate to determine how best to avoid capture.  (See supra II.C.2-4.)  Over the next two weeks, defendant booked **thirteen** one-way tickets to multiple destinations.  (Id.) Defendant first attempted to flee to Ukraine by booking three different flights.  (Best Decl., Exs. 11, 12, 14.)  In purchasing the flights, defendant attempted to conceal his true identity.  For all three flights, defendant falsely listed himself as a female instead of a male, and, for one of the flights, defendant falsely listed his birth year as 1995 (instead of 1990).  (Best Decl., Ex. 11 at 7; Ex. 12 at 7; Ex. 14 at 7.).

---

[8] This Court ordered the parties to file simultaneous briefing; accordingly, the government preserves any argument that defendant did not meet his initial burden to reopen his detention hearing.

1    Defendant then changed his plans and fled to Mexico.  (Best

2    Decl., Ex. 10 at 17.)   From Mexico, defendant traveled further to

3    Cuba with the goal of flying to Russia.  (Best Decl., Ex. 10 at 20-

4    25.)  When defendant was denied from boarding his flight in Cuba to

5    Russia, he changed course and traveled to El Salvador, hoping to go

6    to Turkey, but was ultimately arrested in El Salvador before he could

7    leave.  (Best Decl., Ex. 23; Best Decl. ¶ 26.)

8         Defendant's own admissions make it clear that he was traveling

9    to hide from law enforcement.  During the course of his travel,

10   defendant admitted to one of his associates via text that he was

11   going to "ditch [his] phone," that he had "guys on stand by back

12   home" to sell his possessions as needed, and that his whole plan was

13   "just to get away."  (Best Decl., Ex. 10 at 12, 16.)  When another

14   associate pointed out to defendant that the execution of a search

15   warrant was not a reason to flee, defendant responded via text,

16   "[f]or me it is."  (Best Decl., Ex. 16 at 1.)

17        Defendant's flight continued in 2022.  Defendant fled after the

18   Ninth Circuit reinstated the original indictment in February 2022,

19   after it was dismissed.  Defendant failed to appear for a status

20   conference in March 2022, and neither the USPO nor his counsel could

21   contact or locate defendant to secure his appearance.  (Dkt. 168;

22   Best Decl., Ex. 25 at 1.)  As a result, the government was forced to

23   obtain an arrest warrant for defendant in April 2022.  (Best Decl.,

24   Ex. 26 at 1-2.)  The government obtained another arrest warrant when

25   it filed the FSI.  (Dkt. 209; Best Decl., Ex. 26 at 3-4.)

26        Despite knowing that law enforcement was looking for him,

27   defendant continued to evade capture.  He flew to different foreign

28   countries and possessed fake identification documents to facilitate

                                    22

his flight, including a falsified United States passport and fake

Croatian identification card.  (Best Decl., Exs. 27, 30.)  In fact,

defendant boasted publicly on his own social media regarding his

successes in circumventing law enforcement.  In January and February

2023, through blog posts, defendant taunted law enforcement about its

failure to capture him and bragged openly that he "might be the only

man on the no-fly list to find a way around it and get to travel the

world."  (Best Decl., Ex. 28 at 2.)  It took law enforcement nearly a

year to locate and finally arrest defendant in Romania after

obtaining a warrant for his arrest.  (Best Decl. ¶ 33.)  Defendant

has demonstrated capability, means, and support from his associates

to flee.

That support became evident again less than two months ago,

after the Court dismissed the FSI on February 21, 2024, and ordered

defendant released the same day.  (Dkt. 338.)  By the time the

government was able to obtain an arrest warrant for defendant the

next day, he was already in Ramona approximately an hour from the

border.  (Best Decl., Ex. 32 at 6.)  That morning, defendant,

accompanied by an associate, traveled to nearby MetroPCS and Walmart

stores.  (Id.)  In the afternoon, defendant spent several hours

entering and exiting an auto detailing store in Ramona, California,

for no apparent reason other than to establish a meeting place with

his associate, G.M., who eventually met defendant at the store.

(Id.)  Despite knowing that there was a pending warrant for his

arrest, as evidenced by defendant's own post-arrest statements,

defendant remained in the auto detailing store for over an hour.

When defendant finally decided to exit the store, defendant and G.M.

walked approximately a block south of the store and turned west onto

another street, at which point law enforcement arrested him.  Upon his arrest, defendant claimed that he was going to surrender, but only after he "grabbed a beer."  When defendant was arrested, he was in possession of a prepaid cell phone and over $300 in cash.  (Id.)  Finally, on the day of defendant's arrest, G.M. told an FBI source that he and defendant were indeed trying to get to Mexico so defendant could flee again.  (Best Decl., Ex. 36.)

These facts, which are consistent with defendant's attempts to flee through Mexico in the past, flatly contradict defense counsel's assertion that defendant was simply in Escondido to visit friends and family, and that he was in the process of self-surrendering prior to his arrest.[9]  (See No. 24-932, Dkt. 363 at 4 n.2.)  Nothing about defendant's conduct post-release suggests that he was trying to self-surrender, which would have been starkly inconsistent with his prior conduct.  On the contrary, defendant's actions, and G.M.'s admission, demonstrate that defendant was attempting to do again what he had done several times before: flee the country to avoid arrest in this case.

In short, releasing defendant now, after his multiple efforts to avoid capture and prior failure to appear in court, would only further embolden defendant and seriously jeopardize his continued appearance in this matter.

---

[9] While defense counsel contacted the government and proposed a self-surrender, counsel's stated interest in discussing options for self-surrender does not demonstrate that defendant intended to do so. Furthermore, by the time defense counsel called the government, several hours after the court issued the arrest warrant, to arrange for defendant's surrender, the government had made clear that it knew defendant's whereabouts and had a warrant for his arrest, and so defendant would have known that any attempt to flee would likely have been futile.

1          C.    **Defendant Poses a Serious Danger**

2          Defendant also poses a serious danger to the community if

3    released.  Defendant has demonstrated for many years his sustained

4    commitment to promoting and engaging in violence in furtherance of

5    his ideology.

6          Defendant's history of violence dates back to at least 2009.  In

7    2009, Defendant chased an individual out of a store and down the

8    street.  (Best Decl., Ex. 31.)  When defendant caught up to his

9    victim, he proceeded to repeatedly stab the victim all over his body,

10   including his hand, elbow, arm, neck, and chest.  (Id.)  Defendant

11   pleaded guilty to attempted gang assault and was sentenced to two

12   years' imprisonment.  (Id.)  However, his sentence did not deter him.

13         Several years later, in 2017, defendant formed RAM, a militant

14   white supremacist group dedicated to waging physical violence against

15   its purported adversaries under the guise of self-defense.  (See Best

16   Decl., Exs. 1-3, 33-35.)  Defendant and his followers attended

17   multiple protests where they assaulted other individuals, including

18   counter-protestors and a police officer.  (Best Decl., Exs. 5, 33-

19   35.)  At those protests, defendant personally instigated numerous

20   violent assaults, punching multiple counter-protestors in the head.

21   (Best Decl., Ex. 5.)  Defendant's repeated acts of violence

22   demonstrate that he will pose a danger to the community if release.

23   **IV.  CONCLUSION**

24         For the foregoing reasons, defendant's request to release

25   defendant pending appeal should be denied.

26

27

28