1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 18-00759-CJC |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANT ROBERT RUNDO'S MOTION FOR BAIL PENDING APPEAL [Dkt. 389] |
| ROBERT RUNDO AND ROBERT BOMAN, | |
| Defendants. | |

## I.    INTRODUCTION

The presumption of innocence is one of the fundamental principles of our criminal justice system.  This means that no one can be punished simply because he has been accused of a crime.  For this reason, the Eighth Amendment guarantees a person charged

with a crime and awaiting trial the right to be released on bail except in certain and very limited circumstances.

Defendant Robert Rundo is one of several defendants accused in this case of conspiring to cause riots at three political rallies through violence. Though no jury has found him guilty of these charges, he has been detained for nearly 20 months. Now before the Court is Mr. Rundo's motion for bail. (Dkt. 389.) An objective review of the evidence reveals that though Mr. Rundo espouses a hateful ideology, he and his co-defendants were not the true threat to democracy at the rallies. Contrary to the government's accusations, it was Antifa, a far-left extremist group, that posed the insidious threat to democracy. Antifa, not Mr. Rundo and his co-defendants, went to the rallies to shut them down by demeaning, pepper spraying, assaulting, and injuring the people in attendance. Mr. Rundo's and his co-defendants' clear purpose in attending the rallies, on the other hand, was to battle Antifa and prevent Antifa from hurting the people in attendance and denying them their First Amendment right to free assembly and speech. Because there are conditions that can reasonably assure the safety of the community and Mr. Rundo's appearance as required, Mr. Rundo is entitled to bail.

## II.    BACKGROUND

The lead up to and aftermath of the 2016 United States presidential election were marked by growing division between the left and right. During this period, Antifa and other far-left groups attended conservative political rallies and used violence to quash political speech with which they disagreed. (*See* Dkt. 333 at 4–14.) Public officials immediately recognized the threat that Antifa and similar groups posed to the safety of peaceful rally attendees. Shortly after Antifa attacked conservative rally attendees at an event in Berkeley, California, former Speaker of the House of Representatives Nancy Pelosi issued a statement explaining that "[o]ur democracy has no room for inciting

violence or endangering the public, no matter the ideology of those who commit such acts.  The violent actions of people calling themselves Antifa in Berkeley this weekend deserve unequivocal condemnation, and the perpetrators should be arrested and prosecuted."  Brooke Seipel, *Pelosi condemns 'Antifa' after Berkeley clashes*, The Hill, Aug. 29, 2017, available at https://thehill.com/homenews/house/348493-pelosi-condemns-antifa-after-berkeley-clashes/.  Berkeley Mayor Jesse Arreguin shared a similar sentiment, stating "I think we should classify [Antifa] as a gang.  They come dressed in uniforms.  They have weapons, almost like a militia and I think we need to think about that in terms of our law enforcement approach."  (Dkt. 281-3 Ex. S at 103.)  It is this combative and politically divisive environment that sets the stage for the government's allegations in this case.



**Antifa ready to quash rally through violence**

The government alleges that Defendants Robert Rundo, Robert Boman, Tyler Laube, and Aaron Eason (collectively, "Defendants"), as members of a white nationalist organization named the "Rise Above Movement" ("RAM"), conspired to violate the Anti-Riot Act by planning to attend political rallies with the intent to engage in violence

and assault people who held opposing political views.  (Dkt. 209; Dkt. 47.[1])  Specifically, the government alleges that the conspiracy covered three rallies:  (1) the May 25, 2017 rally in Huntington Beach, California; (2) the April 15, 2017 rally in Berkeley, California; and (3) the June 10, 2017 rally in San Bernardino, California.[2]  (Dkt. 209 at 3–10.)

Defendants advance a very different narrative.  Defendants assert that they attended conservative political rallies with the goal of protecting people from Antifa.  (*See, e.g.*, Dkt. 40 at 2; Dkt. 104 at 4–5.)  Mr. Rundo and his co-defendants strongly believe that the government wrongfully charged them.  Antifa, not Mr. Rundo and his co-defendants, were the ones who went to the rallies with the intent to engage in violence and assault people who held opposing political views.

The first rally took place on March 25, 2017, at Bolsa Chica State Beach in Huntington Beach, California.  Supporters of President Trump came together for a "Make America Great Again" rally to march across Bolsa Chica State Beach as a "means to support local police, fire, and first responder agencies."  (Dkt. 333 at 9.)  Prior to the event, law enforcement officers were "warned that protesters may try to stop the event and may use violence or riotous techniques to stop the event."  (*Id.*)  Sadly, this warning proved to be true.  The government claims that "[Mr. Rundo] and his associates . . . actively confronted and pursued counter-protesters along the beach."  (Dkt. 390 at 4–5.)  But the record shows that the government conflates peaceful counter protesters with

---

[1] The government issued the First Superseding Indictment after the Ninth Circuit reversed the Court's first dismissal order and Mr. Eason passed away, (Dkt. 214), but the allegations are largely the same.

[2] The government also includes allegations involving the August 11, 2017, Charlottesville, Virginia rally.  (*See* Dkt. 209 at 10.)  However, Defendants did not attend that rally, nor were they even in Virginia on the date of that rally.  (*See generally* Dkt. 287.)

armed members of Antifa and ignores the fact that Antifa instigated the violence.[3]  (*See* Dkt. 333 at 9–11; Dkt. 385 at 7–12.)

Tensions at the rally were high, and Antifa members aggressively confronted the rally attendees.[4]  One Antifa member brandished a stun gun as she yelled expletives and lunged towards elderly supporters of President Trump.



**Antifa member threatens rally attendees with stun gun**

---

[3] The parties have presented the Court considerable evidence of the Huntington Beach rally, including Defendants' testimony, police reports, news articles, photos, and video screenshots.  The police report detailing Antifa's assault of Mr. Laube includes a link (https://www.youtube.com/watch?v=Sxjbo6rUayY) to the video from which the parties have included screenshots.  (Dkt. 291-1 Ex. D at 12 [report explaining review of and citing to linked YouTube video]; *see, e.g.*, Dkt. 376-2 [screenshots of the linked YouTube video].)  The YouTube video is like those the government previously provided.  (*See* Dkt. 108; Dkt. 109 at 4–6.)

[4] The Court's description of the Huntington Beach rally is based on the government's video exhibits, (Dkt. 108), and the publicly available YouTube video reviewed by local law enforcement and referenced above.

Mr. Laube, along with a group of other rally attendees, chanted and carried a large banner reading "Defend America." (Dkt. 385 at 7–8.) An Antifa member then reached across the banner and slapped Mr. Laube twice directly on his face.



**Antifa member slaps Mr. Laube twice**

After Antifa's assault on Mr. Laube, someone knocked a rally attendee's American flag to the ground.



**Rally attendee recovers American flag from ground**

Mr. Eason, who was not dressed as a RAM member, verbally confronted the person he thought was responsible.  At no point did Mr. Eason get physical.



**Mr. Eason defends rally attendee**

Shortly after, a rally attendee unaffiliated with RAM shoved the person the rally attendee appeared to believe responsible for knocking the American flag to the ground.  A fight broke out, and a journalist wearing all black intervened and grabbed the man who started the shoving.



**Rally attendee fights journalist**

From Mr. Laube's perspective, the journalist was dressed like Antifa and was assisting somebody who had harassed a Trump supporter.  Mr. Laube joined the fray and punched the journalist.



**Mr. Laube punches journalist**

Then, an Antifa member unleashed pepper spray on Mr. Laube and other rally attendees not involved in the fight.





**Mr. Laube and other rally attendees recoil as Antifa pepper sprays them**



**Rally attendee recovers after Antifa pepper sprayed her**

Mr. Laube left the immediate area and entered the ocean to clean the pepper spray from his eyes.  (Dkt. 376 at 7.)  Seconds later, the violence continued as Mr. Rundo and many other rally attendees pursued Antifa.  During the ensuing chaos, Mr. Rundo tackled and

punched a member of Antifa that he believed had pepper sprayed him and other people at the rally.



**Mr. Rundo strikes Antifa member holding pepper spray**

The confrontation was relatively brief, lasting only a few minutes, and there is no indication that Mr. Rundo and his co-defenadnts were involved in further violence.  State law enforcement arrested Antifa members and seized weapons such as pepper spray and knives.  (Dkt. 291-1 Ex. E at 4.)  No such weapons were seized from Mr. Rundo and his co-defendants.



**Antifa weapons seized by law enforcement**

A few weeks after the Huntington Beach rally, supporters of President Trump planned a pro-Trump rally on April 15, 2017 in Berkeley styled as a "free speech" rally. The event was related to a previous "March 4 Trump" rally also in Berkeley, which had ended in violence and arrests. Rally organizers were concerned that the event would turn violent because of Antifa. (Dkt. 104 [Declaration of Brittney Welch] ¶ 12.) One of the rally organizers, who identifies herself as a "slightly conservative" African American/Filipino woman, "invited Aaron Eason to assist [her] and the free speech rally organizers in maintaining order and defending attendees against violence from Antifa members." (*Id.* ¶¶ 2, 13.) She asked Mr. Eason "to invite friends to assist in protecting speakers and innocent bystanders from violent acts of those seeking to prevent free speech." (*Id.* ¶ 13.) At her invitation and with the expectation that he would be reimbursed, Mr. Eason made travel arrangements for himself and RAM members to attend the Berkeley rally. (*Id.* ¶ 14.) According to Mr. Eason, his only "goal was to attend organized events in order to protect speakers and other attendees from violent

outbursts from far left activists wearing masks, who had previously inflicted violence on conservative citizens practicing their First Amendment rights to peacefully assemble and speak." (Dkt. 104 at 5–6.)

As expected, Antifa and related far-left groups decided they needed to "shut this down." (Dkt. 281 at 13.) Organizers on the left "urge[d] all in Northern California and beyond to converge in Berkeley on Saturday April 15th and deny the far-Right an opportunity to grow and expand their movement that is killing, burning, and bombing its way across the U.S." (Dkt. 281-13 Ex. CC at 2.) Members and associates of Antifa heeded the call.



**Antifa member pours water on a disabled veteran at the Berkeley rally**

They came prepared for violence, bringing weapons including pepper spray, fireworks, knives, and homemade bombs. (Dkt. 281 at 14–15.) And they used those weapons, as well as their bodies, against Trump supporters and law enforcement. (*Id.* at 14–16.)



**Antifa member strikes Trump supporter with skateboard**

One man punched a Trump supporter, threw him onto a park bench to continue the beating, and was in the process of striking him until law enforcement intervened.  (*Id.* at 16 [collecting evidence].)  Another threw eggs across fences to where Trump supporters had congregated.  (*Id.*)  A young woman used pepper spray and hit Trump supporters, explaining that she felt "like fighting a white bitch today."  (*Id.*)  Police detained one Antifa member who had an improvised explosive device and was planning "to do what it took because the police weren't 'doing shit.'"  (*Id.*)  "[H]e wasn't inciting the riot, he was going to end the riot."  (*Id.*)



**Rally attendee injured by Antifa at the Berkeley rally**

Antifa clearly went to the Berkeley rally with "the intent to engage in battle." (Dkt. 109 at 16; *see also id.* at 6 ["'far-left' promoted their intention to engage in a massive violent confrontation, or 'battle,' at the event"].) But it is also true that members of RAM appeared equally interested in engaging in battle with them. Videos provided by the government show Mr. Rundo and other members of RAM squaring off with Antifa, mostly insulting and taunting them. (Dkt. 109 Exs. 10A, 10B, 10C, 10D, 11, 12.) Both sides expressly challenged each other to combat. And other individuals not clearly associated with either side also threw objects. At some point, Mr. Rundo crossed a barrier police set up to keep the sides separate.



**Mr. Rundo strikes individual after crossing barrier**

Mr. Boman testified, however, that shortly before Mr. Rundo crossed the barrier, members of Antifa were getting ready to assault a young Black man wearing a "Defend America" hat. (Dkt. 238 at 26–27.) Mr. Boman and Mr. Rundo were speaking to the young man when Antifa "started jumping this kid." (*Id.* at 27.) Mr. Boman attempted to rescue him while Mr. Rundo "was throwing punches and defending [Mr. Boman] and this kid." (*Id.*) A brawl ensued until law enforcement restored a semblance of order, and both RAM and Antifa returned to their respective sides of the barrier. Shortly after, the warring groups came back together, and chaos erupted. Notably, the continuing violence was in no way limited to a few members of Antifa and RAM. The violence at the rally was widespread and hundreds of people were swept into it.

Nearly three months later, on June 10, 2017, demonstrators held protests across the country against Islamic law, including in San Bernardino, California. Organizers on the left in the San Bernardino area put out the call to "SHUT the anti-muslim march DOWN." (Dkt. 281-17 Ex. GG.) They linked the protest to President Trump and his supporters. (*Id.*)



NAZIS, FASCISTS, BIGOTS NOT WELCOME IN SAN BERNARDINO!
CALLING ALL ANTI-FASCISTS AND ANTI-CAPITALISTS IN SOUTHERN CALIFORNIA!

Saturday, June 10th

**Digital poster calling for Antifa to shut down San Bernardino protest**

The parties have provided considerably less evidence related to the San Bernardino protest as compared to the two earlier rallies.  Mr. Rundo claims that he, other RAM members, "and left-wing counter-protestors attended the rally, which 'sparked violence and acts of vandalism,' per police."  (Dkt. 281 at 17–18.)  The government asserts that RAM members "on several occasions, walk[ed] aggressively toward the counter protestors in an apparent attempt to provoke and intimidate them."  (Dkt. 109 at 12.)

In the fall of 2018, the government charged two groups of RAM members under the Anti-Riot Act.  The government charged one group for interstate travel with the intent to riot related to their attendance at the Unite the Right Rally in Charlottesville, Virginia. And it charged Mr. Rundo and his co-defendants in this case, who did not attend the Unite the Right Rally, for conspiring to use facilities of interstate commerce with the intent to riot at the Huntington Beach, Berkeley, and San Bernardino rallies.  (*See* Dkt. 1

[Complaint]); Miselis Petition, 2021 WL 916349, at *13.  Both groups challenged the constitutionality of the Anti-Riot Act.[5]

In this case, the Court previously found that the Anti-Riot Act criminalized a substantial amount of protected speech and assembly and was thus facially overbroad in violation of the First Amendment.  (*See* Dkt. 145); *United States v. Rundo*, 497 F. Supp. 3d 872 (C.D. Cal. 2019), *rev'd and remanded*, 990 F.3d 709 (9th Cir. 2021).  On appeal, the Ninth Circuit agreed that the Anti-Riot Act "ha[s] some constitutional defects" but determined the "remainder of the Act may be salvaged by severance."  *United States v. Rundo*, 990 F.3d 709, 714, 720 (9th Cir. 2021).  The Ninth Circuit reversed this Court's dismissal of the indictment and remanded.

As severed and amended by the Ninth Circuit, the Anti-Riot Act now criminalizes:

> Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent–
>
> (1) to incite a riot; or
> (2) to participate in, or carry on a riot; or
> (3) to commit any act of violence in furtherance of a riot; or
> (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;
>
> and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph [1], [2], [3], or [4].

*Id.* at 720–21.  In short, the Anti-Riot Act now criminalizes interstate travel or the use of any facility of interstate commerce (a "Commerce Act") with the intent to commit one of

---

[5] The Fourth Circuit ultimately held portions of the Anti-Riot Act were overbroad but concluded it was constitutional after severance.  *United States v. Miselis*, 972 F.3d 518, 530 (4th Cir. 2020).

the four listed overt acts ("Riotous Acts") whenever somebody either during or after the Commerce Act performs or attempts to perform one of the Riotous Acts (which themselves all require specific intent related to a riot). The Riotous Acts consist of either conduct or "closely connect[] speech and action" such that "*Brandenburg*'s imminence requirement is not violated." *Id.* at 716.

In the intervening period, Mr. Eason passed away,[6] (Dkt. 215), and Mr. Laube entered a plea agreement to a significantly reduced charge of misdemeanor interference with a federally protected right without bodily injury.[7] (Dkt. 262.) On January 15, 2024, Mr. Rundo, later joined by Mr. Boman, brought three motions: a motion to dismiss the case for selective prosecution, a motion to dismiss the case based on the Anti-Riot Act's purported constitutional defects, and a motion to strike allegations relating to the Charlottesville rally that none of Defendants attended. (Dkts. 281, 286, 287.) The Court granted the motion to dismiss the case for selective prosecution, denied the motion to dismiss based on the Anti-Riot Act's constitutional defects, and denied the motion to strike as moot. (Dkts. 333, 338.)

At the hearing in which the Court dismissed the First Superseding Indictment and ordered Mr. Rundo released forthwith, the government requested the Court stay its order pending appeal. The Court denied the government's request because Mr. Rundo and his co-defendants were selectively prosecuted in violation of the Fifth Amendment and "it

---

[6] Prior to his passing, Mr. Eason consistently maintained that he was not a RAM member and did not conspire to cause violence at conservative rallies. (Dkt. 40 at 3–4; Dkt. 104 at 3, 5.) He claimed that "[o]utside of limited meetings and communications with his codefendants, he d[id] not personally know any of them." (Dkt. 104 at 6.)

[7] During his sentencing, Mr. Laube asserted that the agreement came about because of his "extremely limited involvement in anything relevant to the underlying case." (Dkt. 376 at 1.) Like Mr. Eason, Mr. Laube maintained that he never intended to cause violence at conservative rallies. He just wanted to "protect the speech of event organizers and attendees from intended injury inflicted by Antifa." (*Id.* at 4.) On April 4, 2024, the Court sentenced Mr. Laube to time already served in custody (35 days of incarceration), a fine of $2,000, and one year of supervised release. (Dkt. 385 at 18–21.)

would run completely afoul of the Constitution for the court to order that a person sit in jail because at some unknown point in the future an appellate court might reverse the court order that dropped the charges." *United States v. Chavarria*, 2023 WL 5984381, at *3 (D.N.M. Sept. 14, 2023) (citation omitted); (Dkt. 335.)  The Court ordered Mr. Rundo released forthwith and issued a judgment of discharge.  (Dkt. 336.)  The government appealed to the Ninth Circuit minutes after the Court's order.  (Dkt. 334.)

Before the Ninth Circuit, the government filed an emergency request "to stay the Court's release order pending appeal."  (Dkt. 342 at ¶ 4.)  The next day, on February 22, 2024, the Ninth Circuit issued an order that stated in full,

> The district court's February 21, 2024 judgment of discharge authorizing appellee Robert Rundo's immediate release is temporarily stayed pending resolution of appellant's motion to stay release pending appeal.  *See Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019).  The schedule for the motion to stay will be set by separate order.

(*Id.* Ex. 1.)  In *Doe #1 v. Trump*, the Ninth Circuit explained that "[a] temporary stay in this context (sometimes referred to as an administrative stay) is only intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits, and does not constitute in any way a decision as to the merits of the motion for stay pending appeal."  944 F.3d at 1223.

But before the Ninth Circuit issued its order temporarily staying this Court's judgment of discharge, Mr. Rundo *had already been released*.  Since Mr. Rundo was no longer in custody, the Ninth Circuit's administrative stay had no legal force or effect.  It was mooted by Mr. Rundo's release.  Particularly troubling to the Deputy Federal Public Defender, the government never informed the Ninth Circuit that the status quo had

changed, despite knowing that Mr. Rundo had been released, either before or shortly after the Ninth Circuit issued its administrative stay.

Even though Mr. Rundo had already been released, the government applied to the magistrate judge on duty, Magistrate Judge Steve Kim, *ex parte* under seal, for the issuance of an arrest warrant based on the Ninth Circuit's administrative stay of his release (a release which had already taken place). (Dkt. 342.) The government cited no law in support of its application. Instead, it stated that "[i]n light of the Ninth Circuit's stay, the August 2, 2023 detention order of defendant RUNDO is the operative order now in effect." (*Id.* ¶ 6.) The government went on to mischaracterize the Ninth Circuit order as a "stay of the Court's dismissal order." (*Id.* ¶ 7.) Notably, the Ninth Circuit did *not* stay this Court's dismissal of the First Superseding Indictment—it stayed only the judgment of discharge.

After a Zoom hearing, (*see* Dkt. 346), Magistrate Judge Kim issued a warrant for Mr. Rundo's arrest, (Dkt. 345). Magistrate Judge Kim was skeptical about his authority to issue a warrant based on dismissed charges but did so based on the government's representation that Mr. Rundo would receive some process, such as the ability to challenge his detention via a bail hearing. (Dkt. 366 at 15:9–10 [explaining he issued warrant "without any confidence"]; *id.* at 24:12–13 ["I issued an arrest warrant on the assumption that some other process might still follow from it."]; *id.* at 59:9–12.) At the same time the government sought a warrant from Magistrate Judge Kim, the government submitted papers to the Ninth Circuit arguing that, despite significant authority suggesting otherwise, dismissed charges could support Mr. Rundo's continued detention and that Mr. Rundo did not have a right to seek bail during the pendency of the government's appeal. While the parties were in a hearing before Magistrate Judge Kim, the Ninth Circuit issued an order stating "[n]o lower court may order [Mr. Rundo's] release absent further order of this Court." (Dkt. 364.)

That same day, Mr. Rundo requested a hearing before this Court to provide him the due process that normally accompanies an arrest.  The Court explained that although it was not comfortable proceeding with an arraignment based on dismissed charges, it was comfortable making the finding that Mr. Rundo's arrest was unconstitutional because there was no indictment or complaint pending to support probable cause to arrest him.  (*See generally* Dkt. 363.)  Accordingly, the Court ordered Mr. Rundo released because his arrest was in violation of the Fourth Amendment and Rules 4 and 9 of the Federal Rules of Criminal Procedure, (*see id.* at 8–9) but stayed his release pending direction from the Ninth Circuit.  (*Id.* at 11.)

Ultimately, the Ninth Circuit issued an order staying the Court's dismissal order (meaning there are currently pending charges on which Mr. Rundo can be held) and allowing Mr. Rundo to apply for release.  (Dkt. 375.)  Notably, the Ninth Circuit's order is consistent with the considerable district court authority in this area, *see, e.g., USA v. Arteaga-Centeno*, 360 F. Supp. 3d 1022, 1024 (N.D. Cal. 2019), and impliedly rebuts the government's position that dismissed charges can support a defendant's continued detention.  The Ninth Circuit further ordered that "[i]n the event the district court orders [Mr. Rundo] released, any such order shall automatically be stayed for 96 hours, permitting the government to seek a stay pending review of the order."  (Dkt. 375.)  Pursuant to the Ninth Circuit's order, on April 12, 2024, Mr. Rundo moved for bail pending appeal.  (Dkt. 389.)

## III.   DISCUSSION

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Indeed, the Eighth Amendment expressly provides that "[e]xcessive bail shall not be required," "[t]hus when the Government has admitted that its only interest is in

preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more." *Id.* at 754.  And "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).  For those reasons, pretrial detention— depriving a person of their liberty when he is presumed innocent—is permissible under the Bail Reform Act only because "[t]he statute carefully limit[s] the circumstances under which detention c[an] be sought." *Id.* at 81; *see also Salerno*, 481 U.S. at 755 (explaining Bail Reform Act is constitutional because it is limited to "authoriz[ing] the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community which no condition of release can dispel").

Three general principles guide the Court in applying the Bail Reform Act:
1. Federal law had traditionally provided that a person arrested for a non-capital offense should be granted bail.
2. Only in rare cases should release be denied.
3. Doubts regarding the propriety of release are to be resolved in favor of defendants.

*United States v. Townsend*, 897 F.2d 989, 993–94 (9th Cir. 1990).

### A.   *Statutory Factors*

Pursuant to the Bail Reform Act, the Court may only maintain Mr. Rundo's detention if the Court finds that no conditions can ensure the safety of the community and Mr. Rundo's future appearance at court proceedings.[8]  18 U.S.C. § 3142(b) & (c).  In

---

[8] The government argues that this Court should not consider the "merits" of Mr. Rundo's bail motion because his "request for relief from this Court is premature" and he should first go to a magistrate judge. (Dkt. 390 at 20.)  Similarly, the government suggests that Mr. Rundo may not seek bail at all because he "did not meet his initial burden to reopen his detention hearing."  (*Id.* at 21 n.8.)  The Court disagrees.

assessing whether conditions could reasonably assure the safety of the community and Mr. Rundo's appearance, the Court must evaluate four statutory factors: "(1) the nature and circumstances of the offense charged ...; (2) the weight of the evidence against the person; (3) the history and characteristics of the person ...; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). "To prevent [Mr. Rundo's] release, the government must prove that [he] is a danger to the community by clear and convincing evidence, or it must prove that [he] is a flight risk by a preponderance of the evidence." *United States v. Donagal*, 2014 WL 6601843, at *1 (N.D. Cal. Nov. 18, 2014); *see also United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). Considering the relevant factors, the Court concludes that appropriate release conditions can reasonably assure the safety of the community and Mr. Rundo's appearance.

---

First, the government's positions are inconsistent with the Ninth Circuit's order, which held that Mr. Rundo "may apply for release as permitted under the Bail Reform Act" and that "[t]he clerk's office shall forward any motion relating to the *district court*'s resolution of Defendant's bail application to t[he] panel." (Dkt. 375 at 1–2 [emphases added].) Second, it is the policy and practice of district judges in the Central District to rule on any matters after the magistrate judge's initial detention order unless the district judge refers the matter back to a magistrate judge. This Court is significantly more familiar with the record than any magistrate judge and would, in any event, review a magistrate judge's bail order de novo. Indeed, a "district court ha[s] the jurisdiction to reopen the bail issue on its own motion." *United States v. Gebro*, 948 F.2d 1118, 1120 (9th Cir. 1991). This is because of "the importance of the [district] judge having original jurisdiction over the offense. [The Ninth Circuit] do[es] not believe that this substantial responsibility, placed in the hands of an Article III judge, can be diminished by the earlier action of a magistrate. In vesting decision-making authority in magistrates under the Federal Magistrate's Act, 28 U.S.C. § 636, Congress was sensitive to Article III values. It emphasized that the magistrate acts subsidiary to and only in aid of the district court, and that the entire process takes place under the district court's total control and jurisdiction." *Id.* (internal quotation marks and citation omitted). Third, even if the bail procedure the Ninth Circuit ordered varies from typical procedures, such variance is explained by the government's extraordinary step of acquiring a warrant based on then-dismissed charges and using that warrant to arrest Mr. Rundo while arguing to the Ninth Circuit that he was due none of the process that accompanies an arrest.

1

### 1.    Nature and Circumstances of the Offense Charged

As Mr. Rundo correctly points out, the charges against him are not any of the crimes the Bail Reform Act identifies as creating a rebuttable presumption of detention.[9] (Dkt. 389 at 4.)  In the scheme of federal offenses, the charges against Mr. Rundo are relatively minor.  The thrust of the charges is that Mr. Rundo conspired with other members of RAM to attend political rallies with the intention of causing violence against peaceful, law-abiding counter protestors and that he carried out this conspiracy.  Notably, much of RAM's alleged conduct is clearly protected by the First Amendment.  *See Rundo*, 990 F.3d at 717 (holding that urging, organizing, encouraging, and promoting a riot are all protected under the First Amendment).  The remaining allegations involving violent conduct are restricted in scope to rallies where groups like Antifa showed up to harass, intimidate, and assault the people in attendance.  Because the allegations of Mr. Rundo's violence are limited to a particular context, release conditions, such as prohibiting Mr. Rundo from attending any political rally or associating with any member of any white nationalist organization, are well-suited to addressing any potential danger to the community.  Additionally, the government does not allege that Mr. Rundo or any of his co-defendants injured anybody.  Indeed, the government agreed to a favorable plea agreement for Mr. Rundo's co-defendant, Mr. Laube, and reduced the charges against him to a simple misdemeanor and recommended he receive only six months of incarceration.  (*See* Dkt. 377 at 4.)

"Consideration of the nature of the offenses charged [also] involves consideration of the penalties." *Townsend*, 897 F.2d at 995.  Mr. Rundo faces a statutory maximum sentence of five years.  With an offense level of 14 pursuant to § 2A2.2 of the United States Sentencing Guidelines (assuming no adjustments for additional offense

---

[9] The government fails to meaningfully address this statutory factor.

characteristics or aggravating role) and a criminal history category II, Mr. Rundo's guideline range is 18 to 24 months in custody.[10]  *See* U.S.S.G. § 2A2.2(a).  But Mr. Rundo has already spent approximately 20 months in custody.  Particularly concerning to the Court is the fact that even if the Ninth Circuit reverses this Court's dismissal order and Mr. Rundo is found guilty at trial, he will be in custody for months longer than is necessary to achieve a fair and just sentence.  The fact that Mr. Rundo has already served most, if not all, of any potential sentence reduces his risk of flight and weighs strongly against continued detention.

## 2.    Weight of the Evidence

"[T]he weight of the evidence is the least important of the various factors." *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008).  The Bail Reform Act "neither requires nor permits a pretrial determination that the person is guilty." *Motamedi*, 767 F.2d at 1408.  "Nevertheless, the Bail Reform Act requires that courts consider the evidence in terms of the likelihood that [Mr. Rundo] will pose a danger." *Hir*, 517 F.3d at 1090 (simplified).  Undoubtedly, the evidence shows Mr. Rundo engaged in violence at the rallies at issue in this case.  But context is key.  Contrary to the government's allegations, the evidence does not show that Mr. Rundo conspired to assault peaceful counter protesters.  Instead, the evidence shows that Mr. Rundo's focus was on Antifa. (*See* Dkt. 391 Ex. 8 [explaining danger of Antifa's violence at rallies].)  He followed the instructions RAM gave him not to engage with the general public, but rather only with "antifa or serious opposition." (Dkt. 392-2 at 1.)  Notably, the government has provided no evidence that Mr. Rundo used a weapon of any kind or caused any injury to anyone.

---

[10] The government has not provided evidence that any victim sustained bodily injury.  *See* U.S.S.G. § 2A2.2(b)(3).  Nor has the government provided any evidence that Mr. Rundo supervised, managed, or directed the activities of his co-defendants at the three rallies such that the aggravating role adjustment would apply.  *See* U.S.S.G. § 3B1.1.

(*See* Dkt. 390 at 25.)  Indeed, the FBI agent who interviewed Mr. Rundo prior to his arrest told him that "[y]ou have nothing to fear as long as you're not committing federal crimes.  **You have not, so far, at least it doesn't look like you have**."  (Dkt. 391 Ex. 8.)

Antifa and its associates, on the other hand, went to conservative rallies with the stated intent of shutting the rallies down through violence.  They even went so far as humiliating an elderly, disabled veteran who could not defend himself.  What was the point of such cruel intimidation?  Antifa wanted to quash First Amendment political speech.  The veteran was thereafter faced with two choices.  He could either continue to attend pro-Trump rallies and risk further humiliation or worse at the hands of Antifa, or he could give up his First Amendment rights.  Nor did Antifa limit itself to humiliation and verbal abuse—Antifa used weapons such as pepper spray, stun guns, and improvised explosives in furtherance of its goals.  Clearly Antifa was the true threat to democracy at these rallies, not Mr. Rundo and his co-defendants.  Antifa's conduct was shameful, cowardly, and repugnant to free speech and assembly under the First Amendment.  But instead of prosecuting members of Antifa for their conduct, the government gave Antifa a free pass to demean, assault, and injure rally attendees.  The weight of the evidence factor weighs heavily in favor of releasing Mr. Rundo, especially because Mr. Rundo's ability to engage in future violence at conservative rallies can be eliminated by stringent release conditions.

### 3.    Mr. Rundo's History and Characteristics

Mr. Rundo is a United States citizen with strong ties to Southern California.  However, as the government explains in detail, Mr. Rundo has a history of attempting (often successfully) to leave the country when he expects to be arrested because of his involvement in this case.  (Dkt. 390 at 9–15.)  In fairness to Mr. Rundo, during many of these periods he was technically free to travel.  (*See* Dkt. 389 at 4.)  Still, Mr. Rundo's

use of fake documents and other deceptive tactics while attempting to travel internationally demonstrate that, in practical terms, he was trying to evade prosecution and is willing to leave the country to maintain his freedom.  (Dkt. 389 at 4 ["Mr. Rundo left Southern California and eventually sought to build a new life for himself in Europe."].)

To support its argument that Mr. Rundo is a flight risk, the government cites Mr. Rundo's recent actions after the Court dismissed the First Superseding Indictment.  The parties agree that the day after the Court ordered Mr. Rundo's release, Mr. Rundo learned that an arrest warrant had been issued against him.  The parties also agree that Mr. Rundo was arrested without incident.  Mr. Rundo and his counsel maintain that Mr. Rundo was in the process of self-surrendering when he was arrested and was not planning to flee.  The government, on the other hand, believes that Mr. Rundo was preparing to flee to Mexico.  While the government's evidence in support of this belief is concerning, it is certainly not conclusive.  The government first cites Mr. Rundo's location at the time of his arrest in Ramona, California, approximately one hour away from the border.  (Dkt. 390 at 23.)  But this is not particularly persuasive evidence of flight given that Mr. Rundo is from Southern California and has friends in the area.  Similarly, while the government's citation to the length of time between when Mr. Rundo learned of his warrant and his eventual arrest shows a lack of eagerness to return to custody, it does not necessarily mean that he was planning to flee.  If Mr. Rundo was intent on fleeing, why, having been free since the previous night, had he not actually fled?  Finally, the government's confidential FBI source who stated that Mr. Rundo and an associate were trying to cross the border into Mexico is not reliable evidence that the Court feels comfortable using to deny Mr. Rundo's constitutional right to bail.  (*See id.* at 23–34.)  The relevant report is heavily redacted and provides no context or background information.  It involves multiple levels of hearsay.  And even accepting it all as true, Mr. Rundo may well have been discussing the possibility of flight with an associate before

deciding against it.  In any event, there are several release conditions that the Court can impose to mitigate the risk that Mr. Rundo will fail to appear as required at future court proceedings, including travel and residency restrictions as well as electronic location monitoring.

The Court must also consider Mr. Rundo's history and characteristics as to his dangerousness.  Over 10 years ago, Mr. Rundo stabbed a victim multiple times and pleaded guilty to attempted gang assault for which he was sentenced to two years' imprisonment.  (*Id.* at 25.)  However, the Court cannot find that Mr. Rundo will endanger the safety of the community "based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).  The Court has seen no evidence that Mr. Rundo has used any weapon since that assault, nor is the Court aware of Mr. Rundo causing any injury to anyone since that assault.  And although Mr. Rundo did engage in violence at the three political rallies, the violence was limited to a specific context, battling Antifa.  To the extent Mr. Rundo poses any danger to the community, the Court believes it can impose stringent release conditions to mitigate that danger.

### 4.     Nature and Seriousness of the Danger to the Community

"Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope [and] requires that the Court . . . engage in an open-ended assessment of the 'seriousness' of the risk to public safety." *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018).  It has been over 10 years since Mr. Rundo engaged in violence that ended in significant injury.  Without minimizing the potential dangerousness of unarmed combat, this would be a very different case if there were evidence that Mr. Rundo carried dangerous weapons to the rallies as Antifa did.  The fact

that he did not reduces the seriousness of any danger Mr. Rundo may pose to the community.[11]

It is again also important to note that Mr. Rundo's recent violence was limited to conservative political rallies.  There is no evidence that Mr. Rundo attended liberal rallies with the intent of suppressing liberal speech.  His focus was battling Antifa at conservative rallies where Antifa was determined to assault and injure those in attendance.  Notably, it was Antifa that, through violence and any means necessary, set about quashing conservative speech.  It was Antifa that was the true threat to the First Amendment and democracy, not Mr. Rundo.

### B.    *Stringent Release Conditions*

A defendant may be detained pending trial only where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  *United States v. Dagesian*, 2023 WL 2061934, at *1 (C.D. Cal. Feb. 15, 2023) (quoting 18 U.S.C. § 3142(e)(1)).  The Court finds that Mr. Rundo's proposed combination of release conditions, as supplemented by the Court, will reasonably assure Mr. Rundo's future appearance (to the extent it is required) and the safety of any other person and the community.  These conditions will severely curtail his ability to even approach the border and, most importantly, will keep him far removed from the only context in which he has committed violence in the last 10 years.  Those conditions are:

---

[11] Indeed, the member of Antifa who Mr. Rundo tackled and punched at the Huntington Beach rally was himself carrying pepper spray.  After a brief physical altercation with Mr. Rundo, the Antifa member stood up, seemingly without injury, while Mr. Rundo was struggling to recover from being pepper sprayed.

- Mr. Rundo shall provide an unsecured appearance bond with affidavits of surety of third parties.
- Mr. Rundo shall submit to Pretrial Services supervision as directed.
- Mr. Rundo shall surrender all passports and travel documents to Pretrial Services immediately, sign a Declaration re Passport and Other Travel Documents (Form CR-37), and not apply for a passport or other travel document during the pendency of this case.
- Mr. Rundo's travel is restricted to the Central District of California unless prior permission is granted by Pretrial Services to travel to a specific other location.  Court permission is required for international travel as well as for any other domestic travel.
- Mr. Rundo is restricted from entering any airport, seaport, railroad, or bus terminal which permits exit from the Central District of California without Court permission.
- Mr. Rundo shall participate in and reside at the Salvation Army Anaheim facility and abide by all the residential program's rules and regulations. Mr. Rundo shall not relocate without prior permission from Pretrial Services.
- Mr. Rundo shall maintain or actively seek employment unless excused by Pretrial Services for schooling, training, or other reasons approved by Pretrial Services, and provide verification to Pretrial Services.
- Mr. Rundo shall not possess any firearms, ammunition, destructive devices, or other dangerous weapons.  In order to determine compliance, Mr. Rundo agrees to submit to a search of his person and property by Pretrial Services.
- Mr. Rundo shall not use or possess any identification, mail matter, access device, or any identification-related material other than in Mr. Rundo's own legal or true name without prior permission from Pretrial Services.  In order

to determine compliance, Mr. Rundo agrees to submit to a search of your person and property by Pretrial Services.

- Mr. Rundo shall participate in a Location Monitoring program and abide by all the requirements of the program and any indicated restrictions, under the direction of Pretrial Services.

- Mr. Rundo shall not associate with anyone known to him to be a member of the RAM organization and others known to Mr. Rundo to be participants in the RAM organization's activities.

- Mr. Rundo shall not associate with any member of any white nationalist organization.

- Mr. Rundo shall not be present in any area known to him to be a location where members of the RAM organization or any other white nationalist organization meet or assemble.

- Mr. Rundo shall not attend political events, rallies, or marches, regardless of what group has planned to attend or participate.

## IV.   CONCLUSION

The government's conduct in this case has been quite troubling. The government selectively prosecuted Mr. Rundo for his political speech, ideology, and associations in violation of the First and Fifth Amendments. The government then rearrested Mr. Rundo without any pending charges supported by probable cause in violation of the Fourth Amendment. And now the government seeks to deny Mr. Rundo bail in violation of the Eighth Amendment. The government just does not seem to care about the Constitution. Well I do. Because there are conditions of release that can reasonably assure the safety of the community and Mr. Rundo's future appearance as required, the Court **GRANTS** Mr. Rundo's motion for bail and **ORDERS** that he be released on stringent conditions.

Mr. Rundo's release is **STAYED** 96 hours in compliance with the Ninth Circuit's order. (Dkt. 375.)

DATED:     April 30, 2024

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

**cc: PSA, USPO, USM, BOP**