STEPHEN YAGMAN (SBN 69737)
filing@yagmanlaw.net
(for filings only)
YAGMAN + REICHMANN, LLP
333 Washington Boulevard
Venice Beach, California 90292-5152
(310) 452-3200

Attorneys for Robert Paul Rundo

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT PAUL RUNDO,<br><br>Defendants. | 18-cr-00759-CJC<br><br>**DEFENDANT RUNDO'S ADDITIONAL EVIDENCE OF UNITED STATES ATTORNEY ESTEBAN MARTIN ESTRADA'S SELECTIVE NON-PROSECUTION OF PERSONS WHO ARE POLITICALLY WELL-CONNECTED AND WHO ARE POLITICALLY IN FAVOR WITH HIS OFFICE**<br><br>Judge Cormac J. Carney |
|---|---|

Attached hereto is preliminary evidence of United States Attorney Esteban Martin Estrada's selective non-prosecution of persons who are politically well-connected and who are politically in favor with his office.

YAGMAN + REICHMANN, LLP

By: /s/ Stephen Yagman
STEPHEN YAGMAN

1

CALIFORNIA

# Secret FBI files allege former L.A. city attorney lied to feds, likely obstructed justice. He denies it



Then-Los Angeles City Atty. Mike Feuer prepares for a news conference in front of LAPD headquarters in August 2021. (Irfan Khan / Los Angeles Times)

By Dakota Smith and Matt Hamilton

May 16, 2024 Updated 5:47 PM PT

Then-Los Angeles City Atty. Mike Feuer lied to government investigators and probably obstructed justice during a massive federal inquiry into a fraudulent lawsuit orchestrated by his office, according to an affidavit by an FBI agent that was made public this week.

Feuer, who has not been charged with any crimes, maintained his innocence this week.

He has long denied knowing about the fraud behind the lawsuit involving exorbitant Department of Water and Power bills and has similarly denied knowledge of a hush money payment to a Beverly Hills legal assistant who threatened to expose the scheme.

Not only did Feuer know about the legal assistant's threats, but he "impliedly directed" one of his top deputies to handle her demands, FBI Special Agent Andrew Civetti wrote in the Jan. 31, 2020, affidavit in support of a warrant to search Feuer's Apple iCloud account.

As federal agents investigated the city attorney's office and its role in the fraudulent lawsuit, Feuer misled the FBI about the timeline of events and the extent of his office's role in the scheme, Civetti said in the affidavit.

"Multiple sources of evidence provide probable cause to believe that Feuer obstructed justice [and] made materially misleading statements to the FBI" about his knowledge of key events in the scandal, Civetti wrote.

The affidavit and several others by Civetti were part of a sprawling federal criminal investigation that led to charges against three former top city officials and a New York attorney.

Making false statements to the FBI and obstructing justice are federal crimes that can carry up to several years in prison, but prosecutors have not filed charges against Feuer.

During a July 2019 interview, which occurred while federal agents were raiding City Hall and DWP headquarters, Feuer's answers about the origins of the fraudulent lawsuit and his knowledge of it were "material and misleading," Civetti wrote in the affidavit.

Feuer continued to speak by phone or in person to prosecutors, either directly or through his chief of staff, Leela Kapur, according to Civetti's affidavit.

Some of the Civetti affidavits rely on information provided to the FBI by one of Feuer's former top deputies, Thom Peters, who oversaw civil litigation in the city attorney's office. Civetti cited calendar entries, text messages and an audio recording that he said appeared to support Peters' account.

On Tuesday, a trove of documents in the criminal case, including the Civetti affidavits, was released after The Times and Consumer Watchdog moved to unseal them.

Feuer's "narrative of apparent obfuscation, false and misleading statements, and omissions" were part of an effort to protect his political reputation, Civetti wrote in the affidavit.

"On multiple occasions," Feuer told investigators that he wanted to run for mayor in 2022 and "believed he would be among the favorites," Civetti wrote.

Feuer did run for mayor but dropped out before the primary. Last year, he launched an unsuccessful bid for the congressional seat being vacated by Rep. Adam B. Schiff (D-Burbank).

Feuer this week said in a statement that the affidavits relied on "lies" from Peters, who later pleaded guilty in his role in the scheme.

"Any claim that I knew about collusion and tried to conceal it is absurd," Feuer said in a statement.

"I cooperated fully with the U.S. Attorney's staff and am glad they ultimately obtained all the actual facts," he said. "After they did, and assessed each witness's credibility, they prosecuted the wrongdoers and stated there was no ongoing investigation into me."

Reached this week, Peters told The Times: "I am pleased, but not at all surprised, to see that my statements to the FBI about Feuer were corroborated by multiple, independent sources."

A longtime politician, Feuer served on the state Assembly and City Council before voters elected him to be the city's top lawyer in 2013. He grew up in San Bernardino as the son of an educator and survivor of a Nazi prisoner of war camp. Fastidious and ambitious, he earned the nickname "Saint Michael" from City Council members for his focus on ethics. His term as city attorney ended in December 2022.

The Times and Consumer Watchdog had sought the roughly 1,400 pages of documents, which include more than 30 search warrants filed during the government's investigation, to better understand what investigators learned about Feuer.

In a ruling last month, U.S. District Judge Stanley Blumenfeld Jr. said the documents could be unsealed, with personal data and references to grand jury proceedings redacted.

The documents show prosecutors' desire to pore over Feuer's phone records and emails and raise questions about why they never charged Feuer with obstruction of justice or lying to federal authorities.

Ciaran McEvoy, a spokesperson for the U.S. attorney's office in Los Angeles, declined to comment on the lack of charges against Feuer. McEvoy said the office has a "strong history" of convicting public officials.

"As we have stated before, where the evidence did not establish every element of a federal crime beyond a reasonable doubt, we have not pursued charges," McEvoy said.

Three people went to prison following the government's criminal investigation, including David F. Alexander, a former DWP cybersecurity chief who was charged with

lying to the FBI about his role in a bribery scheme and is serving a four-year prison sentence. Peters was sentenced to nine months of home confinement.

The corruption scheme originated after the launch of a new billing system by the DWP in 2013, which resulted in thousands of customers receiving erroneous utility bills.

One couple in Van Nuys was sent a bill for nearly $52,000, one of several examples of government ineptitude that stoked public anger and prompted lawsuits against the city.

The city attorney's office quietly sought out a lawyer to file a class-action lawsuit against the city over the billing mess. With a "friendly" attorney on the other side colluding with Feuer's team, all the claims could be settled on terms favorable to the DWP.

Paul Paradis, a New York attorney hired by the city attorney's office who later worked as a government witness, wrote the sham lawsuit and recruited an Ohio-based attorney to file it.

The city's plan was endangered, however, when the Beverly Hills legal assistant threatened to go public about the city's handling of the DWP mess and demanded about $1 million to return sensitive documents that would expose the collusive lawsuit. The legal assistant, Julissa Salgueiro, formerly worked for a Beverly Hills lawyer, Paul Kiesel, who had partnered with the city on the DWP billing litigation.

Peters, the top Feuer deputy, would eventually plead guilty to aiding and abetting extortion for his role in the hush money scheme. Salgueiro, the legal assistant, received $800,000 from Kiesel, according to court records.

Prosecutors, in their charging documents in Peters' case, made clear that other senior officials in the city attorney's office knew about the legal assistant's threats. Those officials went unnamed in criminal court filings and never faced charges.

Feuer has repeatedly told reporters that he didn't find out about the involvement of his attorneys in the collusive lawsuit until April 2019. After incriminating emails were discovered on a computer in the city attorney's office, his staff alerted reporters and the civil court, Feuer has said.

"I worked with our team to disclose that collusion immediately," Feuer told The Times this week. He also has said that he didn't know about the legal assistant's extortion threats until January 2022, when prosecutors announced charges against Peters.

The records unsealed this week tell a different story.

Civetti wrote in the affidavit that "there is probable cause to believe that Feuer was in fact aware of Salgueiro's threats to reveal information about the City Attorney's Office's litigation practices unless she were paid for her silence."

"Feuer was not only aware of Salgueiro's threats and demands, but he impliedly directed Peters to ensure that Kiesel settled those demands by paying a large sum of hush money," Civetti wrote.

In an interview with investigators, Civetti wrote, Peters recounted telling Feuer in fall 2017 about the legal assistant's threats and demands.

Weeks later, Peters attended a Dec. 1 meeting with Feuer and other city staff where they discussed Salguiero's threats, according to the search warrant.

An attorney for Salgueiro has emphasized to The Times that his client has never been charged with a crime.

Peters also told investigators about a January 2019 meeting with Feuer, according to the search warrant materials.

Feuer this week said that he was never told in 2017 about collusion in the lawsuit, and he denied that the January 2019 meeting took place. After The Times published its story, Feuer clarified that a meeting could have occurred but that the discussion described in the affidavit did not happen.

In the affidavit, Civetti said calendars and email records support that the January 2019 meeting occurred, as did a recording of a subsequent phone call.

At that 2019 meeting, Peters told Feuer there was a strong likelihood that documents would become public, revealing the city attorney's office's role in the collusive lawsuit, according to Civetti's affidavit. Among the evidence were records showing that attorneys under Feuer had drafted the complaint filed against the city, according to the affidavit.

Peters recounted to the FBI that Feuer was in a state of extreme shock.

"Feuer's reaction was like nothing Peters had seen before," Civetti wrote in his summary.

"Feuer was highly emotional and visibly upset, covering his face with his hands for a long period. Feuer repeated multiple times that this 'can't be so.'"

Afterward, Peters called Paradis, Kiesel and others, mentioning a plan to be carried out "at Mike's request" — referring to Feuer. Civetti pointed to the phone call, which was surreptitiously recorded, as another piece of evidence showing Feuer's involvement.

## More to Read

L.A. prosecutors say recording of racist City Hall conversation was a crime but refer case to city attorney

May 10, 2024



### High-ranking L.A. prosecutor booked on felony charges, released on $50,000 bond

April 29, 2024



### Top advisor to D.A. Gascón charged with illegal use of deputies' confidential records

April 24, 2024





**Dakota Smith**

Dakota Smith covers City Hall for the Los Angeles Times. She is part of the team that won the 2023 Pulitzer Prize in breaking news for reporting on a leaked audio recording that upended City Hall politics. She joined the newsroom in 2016 and previously covered City Hall for the Los Angeles Daily News. She is a graduate of Lewis & Clark College and lives in Los Angeles.



**Matt Hamilton**

Matt Hamilton is a reporter for the Los Angeles Times. He won the 2019 Pulitzer Prize for investigative reporting with colleagues Harriet Ryan and Paul Pringle and was part of the team of reporters that won a Pulitzer Prize for its coverage of the San Bernardino terrorist attack. A graduate of Boston College and the University of Southern California, he joined The Times in 2013.

Copyright © 2024, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information