E. MARTIN ESTRADA
United States Attorney
DAVID T. RYAN
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
Assistant United States Attorney
Deputy Chief, Terrorism and Export Crimes Section
ANNA P. BOYLAN (Cal. Bar No. 322791)
Assistant United States Attorney
Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0631/2170
     Facsimile: (213) 894-0141
     E-mail:   kathrynne.seiden@usdoj.gov
               anna.boylan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:18-759(A)-JLS-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE INTRODUCTION OF TESTIMONY BY DR. PETE SIMI AND SOCIAL MEDIA EVIDENCE |
| v. | |
| ROBERT BOMAN, | |
| Defendant. | Hearing Date: February 7, 2025<br>Hearing Time: 9:30 a.m.<br>Location:   Courtroom of the<br>             Hon. Josephine L.<br>             Staton |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kathrynne N. Seiden and Anna P. Boylan, hereby files its Opposition to defendant Robert Boman's ("defendant's") motion in limine to preclude introduction of testimony by Dr. Pete Simi and social media evidence.

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 17, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

DAVID T. RYAN
Assistant United States Attorney
Chief, National Security Division

/s/ Kathrynne Seiden
KATHRYNNE N. SEIDEN
ANNA P. BOYLAN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I.    INTRODUCTION...................................................1

II.   BACKGROUND.....................................................2

      A.   Factual Background.......................................2

           1.   Defendant's Participation in the Rise Above
                Movement...........................................2

           2.   Defendant's Social Media Posts and Communications....3

      B.   Defendant's Prior Change-of-Plea Hearing.................3

      C.   The Government's Expert Disclosure.......................4

           1.   Dr. Simi's Proffered Opinions......................4

           2.   The Basis for Dr. Simi's Opinions..................6

           3.   Dr. Simi's Qualifications..........................6

III.  THE SOCIAL MEDIA EVIDENCE AND DR. SIMI'S TESTIMONY ARE
      RELEVANT AND HIGHLY PROBATIVE OF THE CHARGED CONDUCT..........8

IV.   THE SOCIAL MEDIA EVIDENCE IS NOT PROPENSITY EVIDENCE.........12

V.    DR. SIMI'S TESTIMONY IS HELPFUL, RELIABLE, AND BASED ON
      SUFFICIENT FACTS AND DATA...................................15

VI.   THE COURT NEED NOT HOLD A DAUBERT HEARING...................18

VII.  CONCLUSION..................................................20

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

Kumho Tire Co., Ltd. v. Carmichael,
  526 U.S. 137 (1999) .............................................. 15

United States v. Quintero,
  2022 WL 4021744 (C.D. Cal. Aug. 30, 2022) ...................... 19

United States v. Alatorre,
  222 F.3d 1098 (9th Cir. 2000) ................................... 19

United States v. Cervantes,
  2016 WL 491599 (N.D. Cal. Feb. 9, 2016) ...................... 17, 18

United States v. Cutler,
  806 F.2d 933 (9th Cir. 1986) .................................... 10

United States v. DeGeorge,
  380 F.3d 1203 (9th Cir. 2004) ................................... 14

United States v. Finley,
  301 F.3d 1000 (9th Cir. 2002) ............................... 15, 18

United States v. Hunt,
  534 F.Supp.3d 233 (E.D.N.Y. Apr. 15, 2021) ................. 11, 12

United States v. Jawara,
  474 F.3d 565 (9th Cir. 2007) .................................... 18

United States v. Mejia,
  545 F.3d 179 (2d Cir. 2008) ..................................... 17

United States v. Ramirez-Jiminez,
  967 F.2d 1321 (9th Cir. 1992) ............................... 13, 14

United States v. Rundo,
  990 F.3d 709 (9th Cir. 2021) ..................................... 9

United States v. Santiago,
  46 F.3d 885 (9th Cir. 1995) ..................................... 14

United States v. Skillman,
  922 F.2d 1370 (9th Cir. 1990) ................................... 11

United States v. Vera,
  770 F.3d 1232 (9th Cir. 2014) ................................... 18

United States v. Winslow,
  962 F.2d 845 (9th Cir. 1992) ..................................... 10

**Statutes**

18 U.S.C. § 2101............................................... 9

18 U.S.C. § 371................................................ 2

**Rules**

Fed. R. Evid. 401.............................................. 8

Fed. R. Evid. 403.............................................. 8

Fed. R. Evid. 404........................................ 12, 13, 14

Fed. R. Evid. 702............................................. 15

Fed R. Evid. 402.............................................. 8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant is charged with intentionally rioting and conspiring to riot with fellow members of what the government contends was a violent white supremacist organization.  The parties do not dispute that defendant engaged in physical confrontations at various public protests during the summer of 2017.  Thus, the key issue for the jury to determine will be defendant's intent in doing so.  Apart from defendant's conduct at the riots, the best evidence the jury will have with which to decipher defendant's intent are his own words and beliefs, which the government plans to admit in the form of messages and posts defendant shared on his Facebook account.

Because most of those posts and messages include references, symbols, and imagery whose meaning may not be obvious to a layperson, the government has noticed an expert on the white supremacy movement who can contextualize defendant's statements within that movement. The government's proposed expert will help the jury in determining defendant's intent by explaining that his evident belief system conformed to the violent extremism that characterizes the white supremacy movement.  Because that expert's views are based on decades of fieldwork and academic study and are highly probative of the key issue the jury must decide, the Court should deny defendant's motion to exclude his testimony without a Daubert hearing.  The Court should similarly deny defendant's motion to preclude the key evidence of the major issue in this case: defendant's own social media posts and messages.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Defendant's Participation in the Rise Above Movement

The first superseding indictment ("FSI") charges that beginning in or around March 2017 and continuing until on or about May 2018, defendant conspired with Robert Rundo ("Rundo"), Tyler Laube ("Laube"), and others to riot and did riot, in violation of 18 U.S.C. §§ 371 and 2101.  (Dkt. 209 ¶ 5.)  Using text messages and the internet to coordinate combat training and their attendance at various rallies throughout the country, defendant and his co-conspirators then traveled to those rallies to engage in violence with individuals they identified as holding opposing political views. (Id. ¶ 6.)  At the rallies, defendant and his co-conspirators engaged in violent altercations.  (Id.)  Afterwards, they used the internet to share videos and photographs of themselves and each other committing acts of violence to recruit more people to engage in violence at future events.  (Id.)  The FSI charges that defendant and his co-conspirators did this all as members of RAM, a combat-ready, militant white nationalist and supremacy movement.  (Id. ¶ 2.)

Defendant personally participated in two of those rallies, which occurred in Huntington Beach, California in March 2017 and in Berkeley, California in April 2017.  (Id. ¶ 7.)  His co-conspirators participated in additional rallies during the charged timeframe which defendant did not attend, including rallies in San Bernardino, California in June 2017 and Charlottesville, Virginia in August 2017. (Id.)  At each of the four rallies described in the FSI, defendant and/or his co-conspirators committed violent assaults against

counter-protestors or others who they believed opposed RAM's ideology.

## 2.    Defendant's Social Media Posts and Communications

During the period of the charged conspiracy, defendant used his Facebook account to brag about his violence at the rallies he attended and to promulgate his white supremacist ideology.  Many of those posts and messages facially relate to the charged conduct; for example, in March 2017, just after the Huntington Beach rally, defendant posted a link to an article titled "Trumpenkriegers Physically Remove Antifa Homos in Huntington Beach" along with the comment "we did it fam."  But defendant also made repeated statements reflecting his antisemitic and white supremacist viewpoints: for example, defendant's posts and messages contain repeated references to the "alt-reich," "hail victory," Holocaust denial, "back of the oven," "Dagoyim know," "leftist cucks," "red pilling," and the crusades.  In addition to his explicit statements repeating or discussing the above terms, defendant also shared various memes reflective of his ideology, including illustrated images referencing lynching and antisemitic tropes.  Defendant posted these and other similar images on Facebook between March and August of 2017; in other words, beginning around the time of the Huntington Beach rally and continuing through the approximate time of the Charlottesville rally.

### B.    Defendant's Prior Change-of-Plea Hearing

In February 2023, defendant signed a plea agreement in which he admitted that he was a member of RAM and that he and his co-conspirators agreed to attend rallies with the intent to commit acts of violence in furtherance of rioting.  (Dkt. 216 ¶ 10.)  But at his change-of-plea hearing, defendant denied that he attended the rallies

with "a mind to fight or [to] have an altercation," asserted that he and his co-conspirators went to the rallies to protest and to act as "security for the speakers," and painted his violence at the rallies alternatively as self-defense and as motivated by his desire to defend an 18-year-old minority being attacked by counter-protestors. (Dkt. 238 at 26-29.) Ultimately, defendant opted not to go through with his guilty plea. His trial is set for February 18, 2025.

### C.    The Government's Expert Disclosure

On December 19, 2024, the parties met and conferred regarding, among other things, the government's anticipated expert testimony. On January 2, 2025, the government provided the written notice attached as Exhibit A to defendant's motion. (Dkt. 465-2.)

#### 1.    Dr. Simi's Proffered Opinions

The government's 20-page notice outlines at length Dr. Pete Simi's anticipated testimony. Notably, the government anticipates that Dr. Simi will give the jury an overview of the white supremacist movement and how violence is inextricably intertwined with that movement, which is premised on the notion that non-whites and "race traitors" like Antifa pose an existential threat to the white race that can only be resolved through violence. (Id. at 8-14.) Dr. Simi will explain how the ideas embedded into the culture of the movement, including the idea that threats are everywhere, prime participants to engage in violence and imbue participants with the sense that violence is justifiable self-defense. (Id. at 11.) He will further opine that public confrontations provide an opportunity for members of the white supremacist movement to trigger their enemies and ignite large-scale conflicts that members of the movement see as inevitable. (Id. at 10.) Dr. Simi will also explain to the jury how participants

in the modern white supremacist movement use "double-speak," "front-stage" and "back-stage" behavior, and social media to outwardly rebrand their violent views as acceptable forms of politics in order to neutralize public stigma, while privately reinforcing norms of violence through exposure to hateful propaganda.  (Id. at 4-7.)

Dr. Simi will then explain to the jury that based on his review of open source materials covering RAM's presence at the charged rallies and RAM's social media accounts, public recruitment videos, and its members' communications, RAM was not simply a fitness-oriented fraternal order, but promoted through its propaganda, attendance at rallies, and on and offline communications a white supremacist agenda filtered through the lens of a warrior motif, reimagining white supremacy as something more fashionable to young adults.  (Id. at 14-16.)  Dr. Simi will explain to the jury the historical references and meanings conveyed by the various messages, symbols, and gestures displayed by RAM members (including defendant) at the charged rallies and will further explain how those references are hallmarks of the white supremacy movement.  (Dkt. 465-2 at 14-16.)  And Dr. Simi will opine that RAM members not only subscribed to a violent ideology, but also used their own violence at these rallies to market themselves to the rest of the white supremacist movement. (Id. at 16.)

Finally, Dr. Simi will explain that defendant's Facebook account and messages with his co-conspirators, other white supremacists, and members of the public reflect his immersion into white supremacist culture and are consistent with him subscribing to a violent white supremacist ideology.  (Id. at 17.)  In particular, Dr. Simi will explain that defendant's various references to Nazi Germany, the

crusades, white genocide, and white supremacist outlets; his displays
of antisemitism and posts celebrating his own violence at the charged
protests; and his references to terms which may seem opaque to a jury
(such as being "red pilled" or "cucked") all make clear that
defendant held a violent extremist ideology which is compatible with
having been immersed in the white supremacist movement and which is
compatible with having committed violence at the public events he
attended in furtherance of that movement.

2.    The Basis for Dr. Simi's Opinions

Dr. Simi's opinions are based on his training and experience,
detailed below, as well as his review and observance of audio, video,
photographic, text, and social media evidence from RAM's own
Instagram and Twitter accounts and training videos, defendant's own
Facebook account, and communications between RAM members.  (Id. at
19-20.)  Dr. Simi has reviewed these materials through open sources,
evidence provided to him in this case, and through his engagement and
consultation on related court proceedings involving RAM, including a
federal civil matter related to the Charlottesville protest, in which
he testified.  (Id.)

3.    Dr. Simi's Qualifications

As explained more fully in the government's disclosure, Dr. Simi
has studied extremist groups and their violence for more than 25
years and has conducted extensive ethnographic fieldwork,[1] including
firsthand interviews with more than 200 current and former members of
domestic extremist groups from 27 states.  (Dkt. 465-2 at 20.)  His

---

[1] Ethnography can be defined as the systematic study of human
groups and human culture; it is a research strategy employed by
social scientists such as anthropologists and sociologists to collect
primary data through intensive interviews and observation.

6

research has been used in the Federal Bureau of Investigation ("FBI")'s National Training Academy to highlight the activity of white supremacist groups and has been relied on by the United States Congress and various federal and state law enforcement agencies for training.  (Id.)

Attached to the government's disclosure was Dr. Simi's 28-page curriculum vitae, which further documents Dr. Simi's extensive experience and expertise in white supremacist groups and their culture.  (Id. at 24-51.)  Dr. Simi has various relevant degrees, including: a B.A. in Social Science; an M.A. in Sociology, for which he wrote his thesis on white supremacy; and a Ph.D. in Sociology, for which he produced a dissertation on skinhead subculture in Los Angeles.  (Id. at 24.)  His decades in academia have included (but are not limited to) tenures as the Director of Radicalization and Violent Groups Research at the University of Nebraska, a visiting professor at the University of Oslo's Center for Research on Extremism, a member of the Executive Committee for National Counterterrorism at the University of Nebraska, Omaha, and a Professor in the Department of Sociology at Chapman University. (Id.)  He has earned multiple certifications from the FBI's Behavioral Science Unit, including as part of a working group on radicalization and street gangs.  (Id.)  His published work is too extensive to relay here, but includes books on extremist white supremacy and the white power movement; nearly 40 peer-reviewed articles on topics relating to violence and white supremacist culture, including "How Threat Mobilizes the Resurgence and Persistence of U.S. White Supremacist Activism," "A Constellation Approach to Understanding Extremist White Supremacy," "More Than a

7

Joke: White Supremacist Humor as a Daily Form of Resistance," "On the Permissibility of Homicidal Violence: Perspectives from Former US White Supremacists," "The Culture of Violent Talk: An Interpretive Approach," and "Understanding the Micro-Situational Dynamics of White Supremacist Violence in the United States"; and more than 50 book chapters and technical publications, including on neo-nazis and other facets of the white supremacist movement, the alt-right, and violent extremism.  (Dkt. 465-2 at 25-31.)  His research on extremism has been funded by more than $5 million in grants, contracts, and fellowships, and he has consulted as a legal expert in dozens of matters, including testifying in a federal civil case arising from the Charlottesville protest charged as part of the instant conspiracy.  (Id. at 34-46.)

## III. THE SOCIAL MEDIA EVIDENCE AND DR. SIMI'S TESTIMONY ARE RELEVANT AND HIGHLY PROBATIVE OF THE CHARGED CONDUCT

The Court should admit defendant's social media posts and Dr. Simi's testimony explaining those posts because that evidence is relevant and highly probative of the primary determination the jury will be asked to make.  "[A]ll relevant evidence is admissible."  Fed R. Evid. 402.  Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  Fed. R. Evid. 401. Relevant evidence should be admitted unless its "probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

Here, the jury will need to decide whether defendant used a facility of interstate commerce with the intent to incite, participate in, or commit an act of violence in furtherance of a

8

1   riot, and whether he committed an overt for the purpose of rioting.

2   See 18 U.S.C. § 2101; see also United States v. Rundo, 990 F.3d 709,

3   720-21 (9th Cir. 2021).  Based on the plain language of the statute,

4   defendant's intent is paramount to that determination.  The jury

5   cannot be expected to discern defendant's intent in a vacuum; rather,

6   his own words during the relevant timeframe provide critical insight

7   into what he was thinking when he attended politically charged

8   rallies and repeatedly engaged in physical altercations with

9   attendees holding opposing viewpoints.

10       Dr. Simi's testimony further underscores why defendant's posts

11  and messages are relevant because it helps to contextualize

12  references whose connection to the charged conduct may not be obvious

13  to a layperson.  For example, defendant's antisemitism may appear to

14  the average person to bear little relation to his conduct at

15  Huntington Beach or Berkeley, but Dr. Simi will explain that those

16  views are embedded in the white supremacy movement and motivate its

17  members to engage in violence.  Specifically, Dr. Simi will explain

18  that white supremacists believe in a Jewish conspiracy to control

19  world affairs and that to a white supremacist, such a conspiracy

20  poses an existential threat to the white race.  In Dr. Simi's

21  opinion, those beliefs lead white supremacists to view acts of

22  intentional violence against their political opponents as necessary

23  and justifiable.  That testimony is highly relevant to whether

24  defendant intentionally engaged in violence at the protests he

25  attended, or rather, as he has already claimed, attended the rallies

26  without any intention to engage in physical altercations and only did

27  so because he saw a minority being attacked.

28

9

The proffered evidence is also relevant because it helps explain the conspiracy defendant is charged with joining. Specifically, defendant is charged with having agreed to riot with other members of a particular group. Establishing that the group had shared goals based on their unifying ideals and that defendant himself held those ideals is highly probative of whether he entered into an agreement to commit particular acts in furtherance of the group's agenda. See United States v. Winslow, 962 F.2d 845, 850 (9th Cir. 1992) (admitting testimony on Aryan Nation as relevant to bombing of gay bar by group members); United States v. Cutler, 806 F.2d 933, 936 (9th Cir. 1986) (admitting evidence of affiliation with Aryan Nation to show the defendant's motive to hire hit man to kill persons who might testify against the group).

Defendant claims that the social media evidence and Dr. Simi's testimony should be excluded as irrelevant because they concern his motivation to commit the charged offenses, which defendant claims is "irrelevant to the issue of whether the defendant actually committed the alleged offenses." (Def. Mot., Dkt. 465 ("Mot.") at 4.) The proposition that a defendant's motive to commit a crime is irrelevant to whether he did so intentionally flies in the face of common sense and the established law of this Circuit. See Cutler, 806 F.2d at 936. To the extent defendant's posts make clear that he had an actual motive to engage in physical altercations, it makes it significantly more likely that his conduct was intentional. The posts are therefore highly relevant.

Finally, defendant claims that his social media posts should be excluded under Rule 403 because they are prejudicial and risk confusing and misleading the jury. (Mot. at 6.) However, as the

10

Ninth Circuit has made clear, prejudice alone is insufficient to preclude the admission of otherwise relevant evidence; a district court only has discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.  United States v. Skillman, 922 F.2d 1370, 1374 (9th Cir. 1990).  Evidence establishing racial animus is not unfairly prejudicial where that animus is relevant to defendant's motivation for engaging in the charged conduct.  See id. (admitting testimony, over Rule 403 objection, that the defendant asked to attend a "skinhead" picnic as relevant on issue of racial animus in civil rights case).

Defendant relies exclusively on an out-of-district case in which the Eastern District of New York excluded certain evidence as irrelevant and unfairly prejudicial under Rule 403, but that case supports the government's position.  There, the defendant was indicted for threatening to assault and murder members of the U.S. Congress.  United States v. Hunt, 534 F.Supp.3d 233, 239 (E.D.N.Y. Apr. 15, 2021).  The court excluded text exchanges with the defendant's cousin and father reflecting that he was a violent person, but which otherwise had no relationship, temporally or substantively, to the statements or events at issue in the case.  Id. at 252-53.  But the court admitted significant evidence reflecting the defendant's antisemitic and white supremacist beliefs.  Although the court acknowledged that evidence about those beliefs could be unduly prejudicial if it "extend[ed] beyond explaining the references in his alleged threats," id. at 247-48, it nonetheless admitted the majority of the government's proffered evidence reflecting them, including: antisemitic text messages around the time of the election;

references to the writings of Adolf Hitler; portions of a manifesto

making references to "88", "14," and other anti-Semitic symbology;

and the defendant's browser history reflecting visits to a website

used to spread white supremacist and antisemitic propaganda.  Id. at

248-49.  The court found that the evidence about the defendant's

white supremacist and antisemitic beliefs was "probative of his

intent and knowledge" and could "bear on whether [the defendant]

wished to retaliate against public officials."  Id.

Here, like in Hunt, the evidence the government seeks to admit

is highly probative of his intent and of whether he had a motivation

to riot against those he viewed as his political enemies.  None of

the evidence the government seeks to admit is unnecessarily gruesome,

graphic, or otherwise "unfairly" prejudicial; rather, the evidence

consists of cursory phrases, symbols, or illustrated internet memes

which are highly probative of defendant's state of mind during the

charged conspiracy.  The Court should not exclude evidence that can

give the jury an accurate sense of defendant's ideology, and thus his

intent in attending highly charged political rallies.  To do so would

be to mislead the jury.

**IV.  THE SOCIAL MEDIA EVIDENCE IS NOT PROPENSITY EVIDENCE**

Defendant further claims that the evidence should be excluded as

impermissible character evidence under Rule 404(a) (Dkt. 465 at 4),

which provides that evidence of a person's "character or character

trait is not admissible to prove that on a particular occasion the

person acted in accordance with the character or trait."  Fed. R.

Evid. 404(a)(1).  Defendant's argument would hold weight if, for

example, the government wanted to call a witness to testify that

defendant has a reputation as a violent person, and such evidence

were only relevant to prove that he acted violently during the charged rallies.  That is not the case here.  Defendant's own words and postings during the charged conspiracy are not being offered as evidence of defendant's character trait, but as evidence of his motive and intent to riot.  Moreover, some of the posts are also admissible because they are themselves instances of defendant using a facility of interstate commerce with the intent to incite a riot.  In other words, defendant's posts and messages immediately preceding the Berkeley rally are not only relevant because they shed light on his mental state once he was physically present at the Berkeley rally, but also because they are direct examples of defendant committing the crime with which he is charged.

Defendant also points to Rule 404(b) as precluding admission of his social media posts, but that rule does not help him, either.  Under Rule 404(b), evidence of any _other_ crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion, the person acted in accordance with that character.  Fed. R. Evid. 404(b)(1).  But "evidence should not be treated as other crime evidence when the evidence concerning the act and the evidence concerning the crime charged are inextricably intertwined."  United States v. Ramirez-Jiminez, 967 F.2d 1321, 1327 (9th Cir. 1992).  "In such cases, the policies supporting the exclusion of evidence under Rule 404(b) are inapplicable, since the evidence is not being presented to 'prove the character of a person in order to show action in conformity therewith.'"  Id.  "Instead, the evidence is 'direct evidence,' used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the [evidence] in

its proper context." Id. Here, defendant's social media posts,
which he made during the period of the charged conspiracy, are not
evidence of some other crime, wrong, or act; rather, they are
admissions about his motivation to engage in the charged conduct, and
are thus exempt from a Rule 404(b) analysis. See id. (finding false
statements made during the course of the defendant's arrest were not
subject to Rule 404(b) analysis); see also United States v. DeGeorge,
380 F.3d 1203, 1220 (9th Cir. 2004) (holding evidence of prior acts
are not subject to a Rule 404(b) analysis where the evidence
"constitutes a part of the transaction that serves as the basis for
the criminal charge"); United States v. Santiago, 46 F.3d 885, 889
(9th Cir. 1995) (finding that evidence of gang links to the planning
of the crime was not "other crimes" evidence subject to Rule 404(b)
where it related directly to the crime for which the defendant was
invited and the record "reveal[ed] no evidence of any specific,
wrongful acts by either the Mexican Mafia or [the defendant] that are
unrelated to the [charged] murder").

Even if defendant's social media posts were subject to a 404(b)
analysis, they would be admissible under Rule 404(b)(2), which allows
the admission of other act evidence which is used to prove motive,
opportunity, intent, preparation, plan, knowledge, identity, absence
of mistake, or lack of accident. Fed. R. Evid. 404(b)(2). As stated
above, the government seeks to admit defendant's posts and messages -
- which either directly comment on the charged conduct or else
reflect defendant's immersion into and commitment to the white
supremacist movement and its violent extremist ideology -- to prove
defendant's intention to and motive for rioting and to prove that the
physical altercations he engaged in were part of his and RAM's plan.

14

**V.    DR. SIMI'S TESTIMONY IS HELPFUL, RELIABLE, AND BASED ON
        SUFFICIENT FACTS AND DATA**

Dr. Simi's testimony is appropriate expert testimony under Rule
702, which allows a witness "who is qualified as an expert by
knowledge, skill, experience, training, or education" to testify as
an expert.  Fed. R. Evid. 702.  The expert's knowledge can be
"scientific, technical, or other[wise] specialized," and as the
Supreme Court has explained, there are "many different kinds of
expertise."  Fed. R. Evid. 702(a); <u>Kumho Tire Co., Ltd. v.
Carmichael</u>, 526 U.S. 137, 150 (1999).

Defendant argues that Dr. Simi's testimony should be excluded on
three bases.  First, defendant claims Dr. Simi's testimony should be
excluded because it will not help the jury to understand the evidence
or determine a fact at issue.  (Mot. at 7.)  But as explained above,
Dr. Simi's testimony will help the jury to understand the broader
white supremacist movement, how white supremacists use violent,
public confrontations to advance the agenda of that movement, and
whether RAM was or was not a white supremacist group.  Those issues
are relevant to whether or not RAM's members conspired to riot; that
is, to engage in deliberate violence in public settings.  Dr. Simi's
testimony will also help the jury to interpret defendant's use of
language, symbols, and historical references, which shed light on
defendant's state of mind and, specifically, whether or not he held
beliefs that motivated him to engage in intentional acts of violence.
Put simply, defendant's intent is the ultimate issue in this case,
and Dr. Simi's testimony will help the jury understand and
contextualize his intent.  <u>See e.g.</u> <u>United States v. Finley</u>, 301 F.3d
1000, 1013 (9th Cir. 2002) (finding that an expert who would have

helped the jury "interpret and assess" their own observations about a defendant's demeanor would have assisted the trier of fact and noting "[o]ur case law recognizes the importance of expert testimony when an issue appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their knowledge.")

Second, defendant claims that Dr. Simi's testimony should be excluded because it is not based on sufficient facts and data. Specifically, defendant complains that Dr. Simi has not interviewed defendant or "gathered personalized information." (Mot. at 7.) But the Court should not exclude Dr. Simi's testimony simply because he has not interviewed defendant; Dr. Simi is not, for example, a psychologist attempting to render a diagnosis of a defendant whom he has never treated. Rather, Dr. Simi is an academic researcher who has conducted extensive ethnographic fieldwork and can recognize hallmarks of the white supremacy movement, including phrases, ideas, and symbols that permeate its culture, which he has encountered again and again through his work. It is further immaterial whether Dr. Simi has "gathered personalized information" about defendant (Mot. at 7); even if Dr. Simi's testimony were cabined to general information about the white supremacy movement, Dr. Simi's ethnographic fieldwork would be sufficient to support generalized opinions about the white supremacy movement. But it is also inaccurate to say that Dr. Simi has not "gathered personalized information"; to the contrary, as his expert notice reflects, Dr. Simi has reviewed not only extensive materials specific to RAM, but has also reviewed defendant's own messages and posts, which are "personalized information" reflective of defendant's state of mind and beliefs. Accordingly, Dr. Simi's conclusions about defendant are based on sufficient facts and data.

To the extent defendant feels that Dr. Simi's lack of personal interaction with defendant limits the value of his testimony, defendant is free to probe that in his cross-examination and argue it to the jury.

Third, defendant claims that Dr. Simi's testimony is speculative and unreliable because his opinions are premised on the behavior and characteristics of a "larger group of people" who "lack uniform or clear characteristics." (Mot. at 7.) That claim misconstrues Dr. Simi's proffered opinion, which is that notwithstanding the decentralization of the white supremacy movement, there are core beliefs that unify and permeate its culture. (Dkt. 465-2 at 3-4 (noting Dr. Simi's opinion that "there is considerable overlap among the branches of the [white supremacist movement ("WSM")], so distinctions are often blurred"; "[a]ny single group may use symbols or rituals from across different branches"; "spreading across the WSM are its core racist beliefs," and "[e]ven where members belong to different groups or networks, the common culture of the WSM binds leader and members together in an understanding that all sectors will fight together in . . . a coming race war").)

Defendant complains that Dr. Simi's opinion is unreliable for the additional reason that it is premised on the behavior of a group that "communicates in an opaque manner." (Mot. at 7.) But as another court in this Circuit has recognized, "[j]ust as an anthropologist might be equipped by education and fieldwork to testify to the cultural mores of a particular social group, [witnesses] may be equipped by experience and training to speak to the operation, symbols, jargon, and internal structure of criminal organizations." United States v. Cervantes, 2016 WL 491599, at *4

(N.D. Cal. Feb. 9, 2016) (quoting <u>United States v. Mejia</u>, 545 F.3d 179, 190 (2d Cir. 2008)).  Similarly, in the context of drug prosecutions, "officers may testify about their interpretations of 'commonly used drug jargon' based solely on their training and experience."  <u>United States v. Vera</u>, 770 F.3d 1232, 1241 (9th Cir. 2014).

Here, Dr. Simi can rely on his training and experience, including his decades of research and ethnographic fieldwork, to illuminate for the jury the meaning of the symbols, references, and terminology defendant describes as "opaque."  See <u>Cervantes</u>, 2016 WL 491599, at *4 (admitting "[o]pinions about the meaning of different symbols associated with gang membership and the general means of communication among gang members" where those opinions "appear to stem from a synthesis of information from [the] officer's training and investigation experience").  Moreover, the coded nature of communications among white supremacists does not render unreliable Dr. Simi's testimony, but rather, underscores the necessity of his testimony in unraveling the meaning behind those opaque communications.  See <u>Finley</u>, 301 F.3d at 1013 ("It is precisely because juries are unlikely to know that social scientists and psychologists have identified such a personality disorder . . . that the testimony would have assisted the jury in making its decision.") (internal alterations, quotations, and citation omitted).

VI.  **THE COURT NEED NOT HOLD A DAUBERT HEARING**

Although the district court has a general "gatekeeping" duty to ensure proffered expert testimony "rests on a reliable foundation and is relevant to the task at hand," that obligation does not "require the court to hold a separate Daubert hearing."  <u>United States v.</u>

18

Jawara, 474 F.3d 565, 582-83 (9th Cir. 2007).  The Court does not need to hold a pretrial hearing to determine whether Dr. Simi is qualified or his testimony is reliable.  A court need not hold a hearing where a proposed expert's experience makes plain that he or she is qualified to testify on the subject matter for which he or she is noticed.  See e.g., United States v. Alatorre, 222 F.3d 1098, 1105 (9th Cir. 2000) (concluding pretrial hearing was not necessary before admission of agent's testimony on the value of marijuana where the agent had twelve years of experience and specialized training and the defendant would have the opportunity to "explore the relevance and reliability of the proposed testimony" at trial); United States v. Quintero, 2022 WL 4021744, at *20-21 (C.D. Cal. Aug. 30, 2022) (finding Daubert hearing was not necessary because the government's proposed expert witness had extensive experience investigating narcotics activity and had testified on substantially similar topics in the past).

     Here, Dr. Simi has multiple advanced degrees relevant to his proffered testimony, 25 years of experience in academia focused on the subject of white supremacy and extremism, and significant ethnographic fieldwork.  He has also testified on substantially similar topics in the past, most notably in Sines v. Kessler, the civil suit arising from the Charlottesville rally charged as part of this case, in which he testified, among other things, about the "double-speak" or "just joking strategies" developed and used by white supremacists to conceal their racist or violent messages.  See Sines v. Kessler, No. 3:17-cv-00072 (W.D. Va. Apr. 15, 2021).  The Court can and should find that Dr. Simi's testimony is admissible without a Daubert hearing.

**VII. CONCLUSION**

     For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to exclude evidence from defendant's social media account during the charged conspiracy and deny defendant's motion to exclude Dr. Simi's testimony without holding a <u>Daubert</u> hearing.